## ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

### In The

# United States Court of Appeals

### For The District of Columbia Circuit

# CHICAGO INSURANCE COMPANY,

*Plaintiff – Appellee,*

### v.

# PAULSON & NACE, PLLC; BARRY JOHN NACE,

*Defendants– Appellants,*

# GABRIEL ASSAAD; SARAH GILBERT,

*Defendants– Appellees,*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————

## JOINT APPENDIX
## VOLUME I OF II
## (Pages 1 – 453)

—————

Stephen A. Horvath
BANCROFT, MCGAVIN,
HORVATH & JUDKINS, P.C.
3920 University Drive
Fairfax, Virginia 22030
(703) 385-1000

*Counsel for Appellants*

David D. Hudgins
HUDGINS LAW FIRM, P.C.
515 King Street, Suite 400
Alexandria, Virginia 22314
(703) 739-3300

*Counsel for Appellee
Chicago Insurance Company*

Paulette S. Sarp
HINSHAW & CULBERTSON, LLP
333 South 7th Street, Suite 2000
Minneapolis, Minnesota 55402
(612) 333-3434

*Counsel for Appellee
Chicago Insurance Company*

*(Counsel continued on inside cover)*

**THE LEX GROUP**DC ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C. 20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

Gabriel Amin Assaad
ATTORNEY AT LAW
1425 K Street, NW, Suite 350
Washington, DC  20005
(202) 741-9348

*Counsel for Appellee*
 *Gabriel Amin Assaad*

Carla D. Brown
CHARLSON BREDEHOFT & COHEN
11260 Roger Bacon Drive, Suite 201
Reston, Virginia  20190
(703) 318-6800

*Counsel for Appellee*
 *Sarah Gilbert*

Herman Aubrey Ford, III
CANTOR STONEBURNER
 FORD GRANA& BUCKNER
7130 Glen Forest Drive, Suite 201
Richmond, Virginia  23226

*Counsel for Appellee*
 *Sarah Gilbert*

# TABLE OF CONTENTS
## VOLUME I OF II

**Appendix Page**

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Complaint for Declaratory Judgment**
     filed December 27, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Defendants' Answer and Grounds of Defense**
     filed January 16, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Defendants' Motion for Summary Judgment,**
**With Memorandum of Points and Authorities in Support,**
     filed August 8, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Plaintiff's Motion for Summary Judgment,**
**With Memorandum of Points and Authorities in Support,**
**Statement of Material Facts in Support, and Exhibits,**
     filed September 19, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    Exhibits:

    A.    **Complaint**
            dated March 13, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    B.    **Complaint**
            undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

    D.    **Complaint**
            dated October 25, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

    E.    **Transcript of Hearing before**
        **The Honorable Melvin R. Hughes**
            on January 4, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

    F.    **Order of**
        **The Honorable Melvin R. Hughes**
        **Re: Dismissing Plaintiffs' Claims**
            dated February 26, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . 142

Plaintiff's Motion for Summary Judgment,
With Memorandum of Points and Authorities in Support,
Statement of Material Facts in Support, and Exhibits,
    filed September 19, 2013, continued:

<u>Exhibits</u>, continued:

G.    Transcript of Hearing before
      The Honorable Melvin R. Hughes
          on June 18, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

H.    Order of
      The Honorable Melvin R. Hughes
      Re: Granting Defendants' Motion to Dismiss Complaint
          dated August 3, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

J.    Lawyers Professional Liability Insurance Application
          received June 17, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

K.    Declarations
      Professional Liability Insurance Policy
          received August 10, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . 210

L.    Declarations
      Professional Liability Insurance Policy
          various dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

M.    Supplemental Claim Incident Information
          dated July 23, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

N.    Application for Lawyers Professional Liability Insurance
          dated July 20, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

O.    Letter to
      Barry Nace from
      Cari K. Ellenberger
      Re: Confirming Telephone Conference,
      With Attached Email Correspondence,
          dated May 17, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258

Plaintiff's Motion for Summary Judgment,
With Memorandum of Points and Authorities in Support,
Statement of Material Facts in Support, and Exhibits,
    filed September 19, 2013, continued:

<u>Exhibits</u>, continued:

P.    Letter to
      Duana J. Grage from
      Karen W. Stephens
      Re:  Enclosed CD
           dated November 21, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

Q.    Letter to
      Barry J. Nace from
      Jennifer Green
      Re:  Review of Notice,
      With Attachments,
           dated January 13, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

R.    Letter to
      Barry J. Nace from
      H. Aubrey Ford
      Re:  Enclosed Copy of Complaint
           dated March 19, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

S.    Claim History Report
           dated January 30, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . 284

T.    Letter to
      Barry J. Nace from
      Jennifer L. Green
      Re:  Reviewing Lawsuit,
      With Attachments,
           dated April 21, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

V.    Defendants' Memorandum in Support of
      Motion to Dismiss Pursuant to
      Fed. R. Civ. P. 12(b)(1), 12(b)(2) and 12(b)(3)
           dated October 12, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . 303

**Defendant Sarah Gilbert's Response to Defendants'
Memorandum of Points and Authorities in Support of
Their Motion for Summary Judgment,
With Exhibits,**
filed November 21, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314

Exhibits:

A. **Final Order of
Re: Granting Defendants' Motion for Remitittur**
dated November 1, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

B. **Affidavit of H. Aubrey Ford**
sworn August 5, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

**Plaintiff's Memorandum of Points and Authorities in Support of
Response in Opposition to the Defendants' Motion for Summary Judgment,
With Statement of Material Facts Not in Dispute and
Plaintiff's Additional Statement of Undisputed Material Facts in
Support of Plaintiff's Opposition,
With Exhibits,**
filed December 12, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

Exhibits:

Y. **Copy of CIC's Claim Notes Relating to
Mr. Gilbert's Potential Claim** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 392

Z. **Excerpts of Transcript of Deposition of Barry J. Nace**
taken November 22, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 394

AA. **Letter to
Barry J. Nace from
H. Aubrey Ford
Re: New Representation**
dated January 28, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 427

BB. **FileNet Claims Documentation Index Request**
dated April 24, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 430

Plaintiff's Memorandum of Points and Authorities in Support of
Response in Opposition to the Defendants' Motion for Summary Judgment,
With Statement of Material Facts Not in Dispute and
Plaintiff's Additional Statement of Undisputed Material Facts in
Support of Plaintiff's Opposition,
With Exhibits,
    filed December 12, 2013, continued:

<u>Exhibits</u>, continued:

CC.    Excerpts of Transcript of Deposition of Frank J. Lindner
            taken November 22, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 433

# TABLE OF CONTENTS
## VOLUME I OF II

**Appendix Page**

Defendants' Opposition to Plaintiff's
Motion for Summary Judgment,
With Statement of Genuine Issues of
Material Fact Necessary to be Litigated and Exhibits,
    filed December 12, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 454

Exhibits:

2.    Excerpts of Transcript of Deposition of Barry J. Nace
           taken November 22, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . 491

4.    Pleadings in Underlying Medical Malpractice Lawsuits
           various dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 500

5.    Affidavit of Barry J. Nace
           sworn November 13, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . 514

6.    Affidavit of H. Aubrey Ford
           sworn August 5, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 517

7.    Declarations
    Professional Liability Insurance Policy
           issued July 24, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 520

8.    Letter to
    Julie M. Lindenmann from
    Barry J. Nace
    Re: Declined to Accept Appeal,
    With Attachments,
           dated March 2, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 544

Plaintiff's Reply Memorandum in Support of
Motion for Summary Judgment
    filed January 9, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 675

**Defendants' Reply to Plaintiff's**
**Opposition to Motion for Summary Judgment,**
**With Response to Statement of Additional Material Facts and Exhibits,**
    filed January 9, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 702

    <u>Exhibits:</u>

    11.    **Letter to**
           **Jennifer L. Green from**
           **Barry J. Nace**
           **Re:  Response to April 21, 2012 Letter**
               **dated May 30, 2012** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 742

    12.    **Transcript of Deposition of Frank J. Lindner**
               **taken November 22, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . 744

**Plaintiff's Sur-Reply in Support of Opposition to**
**Defendants' Motion for Summary Judgment,**
**With Exhibit,**
    filed January 22, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 755

    <u>Exhibit:</u>

    DD.   **Commercial Lines Policy**
               **undated** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 761

**Exhibit to**
**Defendants' Notice of Exhibit Correction**
    filed January 27, 2014:

    2.    **Excerpts of Transcript of Deposition of Barry J. Nace**
               **taken November 22, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . 795

**Exhibit to**
**Defendants' Notice of Exhibit Correction**
    filed January 27, 2014:

    2.    **Excerpts of Transcript of Deposition of Barry J. Nace**
               **taken November 22, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . 817

**Order of**
**The Honorable Amy Berman Jackson**
**Re:  Granting Plaintiff's Motion for Summary Judgment**
         filed April 10, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 839

**Memorandum Opinion of**
**The Honorable Amy Berman Jackson**
**Re:  Granting Plaintiff's Motion for Summary Judgment**
         filed April 10, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 840

APPEAL,CLOSED,JURY,TYPE-M

## U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:12-cv-02068-ABJ

| | |
|---|---|
| CHICAGO INSURANCE COMPANY v. PAULSON & NACE, PLLC, ET AL | Date Filed: 12/27/2012 |
| Assigned to: Judge Amy Berman Jackson | Date Terminated: 04/11/2014 |
| Case in other court: 12-02068 | Jury Demand: Defendant |
| Cause: 28:1332 Diversity-Declaratory Judgement | Nature of Suit: 110 Insurance |
| | Jurisdiction: Diversity |

**Plaintiff**

**CHICAGO INSURANCE COMPANY**                    represented by **David Drake Hudgins**
HUDGINS LAW FIRM, P.C.
515 King Street
Suite 400
Alexandria, VA 22314
(703) 739-3300
Fax: (703) 739-3700
Email: e-mailbox@hudginslawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paulette S. Sarp**
HINSHAW & CULBERTSON, LLP
333 South Seventh Street
Suite 2000
Minneapolis, MN 55402
(612) 334-2626
Fax: (612) 334-8888
Email: psarp@hinshawlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**PAULSON & NACE, PLLC**                    represented by **Stephen Anthony Horvath**
BANCROFT, MCGAVIN, HORVATH & JUDKINS,
P.C.
3920 Unversity Drive
Fairfax, VA 22030
(703) 385-1000
Fax: (703) 385-1555
Email: shorvath@tbmhjlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BARRY J. NACE**                    represented by **Stephen Anthony Horvath**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**GABRIEL ASSAAD**                    represented by **Gabriel Amin Assaad**
ASSAAD LAW, PLLC
1425 K Street, NW

1

Suite 350
Washington, DC 20005
(202) 741-9348
Fax: (202) 741-9347
Email: gassaad@assaadlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SARAH GILBERT**      represented by **Carla Denette Brown**
CHARLSON BREDEHOFT COHEN BROWN &
SAKATA, P.C.
11260 Roger Bacon Drive
Suite 201
Reston, VA 20190
(703) 318-6800
Fax: (703) 318-6808
Email: cbrown@cbc-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Herman Aubrey Ford , III**
CANTOR STONEBURNER FORD GRANA &
BUCKNER
7130 Glen Forest Drive
Suite 400
Richmond, VA 23226
(804) 664-1400
Fax: (804) 644-9205
Email: aford@virginiatrialfirm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/27/2012 | 1 | COMPLAINT *for Declaratory Judgment* against All Defendants ( Filing fee $ 350 receipt number 0090-3173362) filed by CHICAGO INSURANCE COMPANY. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Waiver of Service, # 7 Waiver of Service, # 8 Waiver of Service, # 9 Wawiver of Service)(Hudgins, David) (Entered: 12/27/2012) |
| 12/27/2012 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CHICAGO INSURANCE COMPANY (Hudgins, David) (Entered: 12/27/2012) |
| 12/27/2012 | | Case Assigned to Judge Amy Berman Jackson. (mmh) (Entered: 12/28/2012) |
| 01/02/2013 | 3 | WAIVER OF SERVICE by CHICAGO INSURANCE COMPANY. Gabriel Assaad waiver sent on 12/28/2012, answer due 2/26/2013. (Hudgins, David) (Entered: 01/02/2013) |
| 01/10/2013 | 4 | WAIVER OF SERVICE by CHICAGO INSURANCE COMPANY. SARAH GILBERT waiver sent on 12/28/2012, answer due 2/26/2013. (Hudgins, David) Modified on 1/11/2013 to correct date (jf, ). (Entered: 01/10/2013) |
| 01/16/2013 | 5 | ANSWER to Complaint by BARRY J. NACE, PAULSON & NACE, PLLC.(Horvath, Stephen) (Entered: 01/16/2013) |
| 01/16/2013 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Paulette S. Sarp, :Firm- Hinshaw & Culbertson, :Address- 333 South Seventh St., Suite 2000, Minneapolis, MN 55402. Phone No. - 612-334-2626. by CHICAGO INSURANCE COMPANY (Attachments: # 1 Exhibit)(Hudgins, David) (Entered: 01/16/2013) |
| 01/17/2013 | | MINUTE ORDER granting 6 Motion for Leave of Paulette S. Sarp to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. Signed by Judge Amy Berman Jackson on 1/17/13. (DMK) (Entered: 01/17/2013) |

| 02/21/2013 | 7 | ANSWER to Complaint with Jury Demand by SARAH GILBERT.(Brown, Carla) (Entered: 02/21/2013) |
|---|---|---|
| 02/24/2013 | 8 | *Defendant Assaad's* ANSWER to Complaint with Jury Demand by GABRIEL ASSAAD.(Assaad, Gabriel) (Entered: 02/24/2013) |
| 02/25/2013 | | MINUTE ORDER. Meet and Confer Initial Scheduling Conference set for 3/22/2013 at 10:00 AM in Courtroom 3 before Judge Amy Berman Jackson. The parties shall meet, confer, and file a Joint Report pursuant to Local Rule 16.3 by 3/12/2013. Any dates contained in the Report should be expressed as specific dates (month/day /year) rather than as time frames (e.g., "60 days after the entry of the scheduling order"). Counsel are directed to contact the Court's Deputy Clerk in the first instance to request the rescheduling of court appearances. The party seeking the change in schedule must first confer with counsel for all other parties and be prepared to provide the Deputy Clerk with proposed mutually agreeable dates. Signed by Judge Amy Berman Jackson on 02/25/2013. (jth) (Entered: 02/25/2013) |
| 03/04/2013 | 9 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Herman Aubrey Ford, III, :Firm- Cantor Stoneburner Ford Grana & Buckner, :Address- 7130 Glen Forest Drive, #400, Richmond, VA 23226. Phone No. - (804) 644-1400. Fax No. - (804) 644-9205 by SARAH GILBERT (Attachments: # 1 Exhibit Exhibit A)(Brown, Carla) (Entered: 03/04/2013) |
| 03/05/2013 | 10 | NOTICE of Proposed Order by SARAH GILBERT re 9 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Herman Aubrey Ford, III, :Firm- Cantor Stoneburner Ford Grana & Buckner, :Address- 7130 Glen Forest Drive, #400, Richmond, VA 23226. Phone No. - (804) 644-1400. Fax No. - (804) 644-9 (Attachments: # 1 Text of Proposed Order)(Brown, Carla) (Entered: 03/05/2013) |
| 03/05/2013 | | MINUTE ORDER granting 9 Motion for Leave of Herman Aubrey Ford, III, to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. Signed by Judge Amy Berman Jackson on 3/5/13. (DMK) (Entered: 03/05/2013) |
| 03/11/2013 | 11 | MEET AND CONFER STATEMENT. (Attachments: # 1 Text of Proposed Order)(Sarp, Paulette) (Entered: 03/11/2013) |
| 03/13/2013 | | Set/Reset Hearings: The Initial Scheduling Conference presently set for 3/22/2013 at 10:00 AM is rescheduled for 3/22/2013 at 11:00 AM in Courtroom 3 before Judge Amy Berman Jackson. (jth) (Entered: 03/13/2013) |
| 03/13/2013 | 12 | MOTION Excuse from Initial Conference re Order, Set Deadlines/Hearings,,,,,, Set/Reset Hearings by GABRIEL ASSAAD (Assaad, Gabriel) (Entered: 03/13/2013) |
| 03/14/2013 | | ORDER granting 12 Defendant Assaad's Motion to be excused from the Initial Scheduling Conference set for 3/22/2013 at 11:00 AM. Defendant Assaad is advised that he will be bound by any scheduling order that issues as a result of the scheduling conference. Signed by Judge Amy Berman Jackson on 3/14/2013.(jth) (Entered: 03/14/2013) |
| 03/22/2013 | | Minute Entry for proceedings held before Judge Amy Berman Jackson: Meet and Confer Hearing held on 3/22/2013. Scheduling Order to be Issued. (Court Reporter Scott Wallace) (jth) (Entered: 03/22/2013) |
| 03/22/2013 | 13 | SCHEDULING ORDER: Discovery shall be completed no later than September 30, 2013. Any dispositive motions will be due by October 30, 2013, with oppositions due on December 2, 2013, and any replies due on December 23, 2013. A further status conference is set for September 20, 2013 at 10:00 AM in Courtroom 3. See order for details. Signed by Judge Amy Berman Jackson on 3/22/2013. (lcabj2) (Entered: 03/22/2013) |
| 08/08/2013 | 14 | MOTION for Summary Judgment by BARRY J. NACE, PAULSON & NACE, PLLC (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9)(Horvath, Stephen) (Entered: 08/08/2013) |
| 08/12/2013 | 15 | Consent MOTION for Extension of Time to File Response/Reply as to 14 MOTION for Summary Judgment by CHICAGO INSURANCE COMPANY (Attachments: # 1 Text of Proposed Order)(Sarp, Paulette) (Entered: 08/12/2013) |
| 08/12/2013 | | MINUTE ORDER granting 15 Motion for Extension of Time to File Response/Reply. Plaintiff's response to defendants' motion for summary judgment is due by September 5, 2013. Signed by Judge Amy Berman Jackson on 8/12/2013. (lcabj2) (Entered: 08/12/2013) |
| 08/15/2013 | 16 | NOTICE *of Exhibit Correction* by BARRY J. NACE, PAULSON & NACE, PLLC re 14 MOTION for Summary Judgment (Attachments: # 1 Affidavit)(Horvath, Stephen) (Entered: 08/15/2013) |

| | | |
|---|---|---|
| 08/30/2013 | 17 | Consent MOTION for Extension of Time to File Response/Reply as to 14 MOTION for Summary Judgment by CHICAGO INSURANCE COMPANY (Attachments: # 1 Text of Proposed Order)(Sarp, Paulette) (Entered: 08/30/2013) |
| 09/03/2013 | | MINUTE ORDER granting 17 Motion for Extension of Time to File Response/Reply. It is ORDERED that plaintiff's response to defendants' motion for summary judgment [Dkt. # 14] is due by October 11, 2013. Signed by Judge Amy Berman Jackson on 9/3/2013. (lcabj2) (Entered: 09/03/2013) |
| 09/18/2013 | | MINUTE ORDER that in light of the pending Motion for Summary Judgment filed by Defendant's PAULSON & NACE, PLLC, and BARRY J. NACE [Dkt.#14] that the Status Conference scheduled for Friday, September 20, 2013 at 10:00 AM be vacated. Signed by Judge Amy Berman Jackson on 9/18/2013. (jth) (Entered: 09/18/2013) |
| 09/19/2013 | 18 | MOTION for Summary Judgment by CHICAGO INSURANCE COMPANY (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X)(Sarp, Paulette) (Entered: 09/19/2013) |
| 09/25/2013 | 19 | Consent MOTION for Extension of Time to *Complete Discovery and to File Responses to Motions for Summary Judgment* by CHICAGO INSURANCE COMPANY (Attachments: # 1 Text of Proposed Order)(Sarp, Paulette) (Entered: 09/25/2013) |
| 09/26/2013 | | MINUTE ORDER granting 19 Motion for Extension of Time. It is ORDERED that the deadline for completing discovery is extended through October 30, 2013, and the deadline for the parties to file their responses to the pending motions for summary judgment is extended through November 15, 2013. Signed by Judge Amy Berman Jackson on 9/26/2013. (lcabj2) (Entered: 09/26/2013) |
| 09/26/2013 | | Set/Reset Deadlines: Discovery is to be completed by 10/30/2013, and the Deadline for the parties to file their responses to the pending motions for summary judgment is extended through 11/15/2013. (jth) (Entered: 09/26/2013) |
| 10/25/2013 | 20 | Consent MOTION for Extension of Time to Complete Discovery , Consent MOTION for Extension of Time to File Response/Reply as to 14 MOTION for Summary Judgment , 18 MOTION for Summary Judgment by BARRY J. NACE, PAULSON & NACE, PLLC (Attachments: # 1 Text of Proposed Order)(Horvath, Stephen) (Entered: 10/25/2013) |
| 10/28/2013 | | MINUTE ORDER. The parties' 20 Consent Motion to Extend Deadline to Conduct Discovery and Respond to Summary Judgment Motions is GRANTED. It is ORDERED that the deadline for completing discovery is extended through November 25, 2013. It is FURTHER ORDERED that the deadline for the parties to file responses to the pending motions for summary judgment is extended through December 2, 2013. Signed by Judge Amy Berman Jackson on 10/28/2013. (lcabj3) (Entered: 10/28/2013) |
| 10/28/2013 | | Set/Reset Deadlines: The Discovery completion deadline is extended until 11/25/2013. The deadline for the parties to file responses to the pending Motions for Summary Judgment is extended through 12/2/2013. (jth) (Entered: 10/28/2013) |
| 11/21/2013 | 21 | RESPONSE re 14 MOTION for Summary Judgment filed by SARAH GILBERT. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Ford, Herman) (Entered: 11/21/2013) |
| 11/25/2013 | 22 | Consent MOTION for Extension of Time to File Response/Reply as to 14 MOTION for Summary Judgment , 18 MOTION for Summary Judgment by CHICAGO INSURANCE COMPANY (Attachments: # 1 Text of Proposed Order)(Sarp, Paulette) (Entered: 11/25/2013) |
| 11/26/2013 | | MINUTE ORDER granting 22 Consent Motion to Extend Deadline for Filing Responses and Replies to Motions for Summary Judgment. It is ORDERED that the parties' responses shall be due on or before December 12, 2013. It is FURTHER ordered that the parties' replies shall be due on or before January 2, 2014. Signed by Judge Amy Berman Jackson on 11/26/2013. (lcabj3) (Entered: 11/26/2013) |
| 11/27/2013 | | Set/Reset Deadlines: Response to Motion for Summary Judgment due by 12/12/2013. Reply to Motion for Summary Judgment due by 1/2/2014. (tb, ) (Entered: 11/27/2013) |
| 12/12/2013 | 23 | Memorandum in opposition to re 14 MOTION for Summary Judgment filed by CHICAGO INSURANCE COMPANY. (Attachments: # 1 Exhibit Y, # 2 Exhibit Z, # 3 Exhibit AA, # 4 Exhibit BB, # 5 Exhibit CC)(Sarp, Paulette) (Entered: 12/12/2013) |
| 12/12/2013 | 24 | RESPONSE re 18 MOTION for Summary Judgment filed by BARRY J. NACE, PAULSON & NACE, PLLC. (Attachments: # 1 Statement of Facts, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 |

| | | Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9)(Horvath, Stephen) (Entered: 12/12/2013) |
|---|---|---|
| 12/12/2013 | 25 | NOTICE of Exhibit Correction by BARRY J. NACE, PAULSON & NACE, PLLC re 24 Response to motion, (Attachments: # 1 Exhibit 1)(Horvath, Stephen) (Entered: 12/12/2013) |
| 12/23/2013 | 26 | Consent MOTION for Extension of Time to File Response/Reply as to 14 MOTION for Summary Judgment , 18 MOTION for Summary Judgment by BARRY J. NACE, PAULSON & NACE, PLLC (Attachments: # 1 Proposed Order)(Horvath, Stephen) (Entered: 12/23/2013) |
| 12/23/2013 | | MINUTE ORDER granting 26 Consent Motion to Extend Deadline for Filing Replies to Oppositions to Motions for Summary Judgment. It is ORDERED that the deadline for the parties to file replies to the oppositions to motions for summary judgment is extended through and including January 9, 2014. Signed by Judge Amy Berman Jackson on 12/23/2013. (lcabj3) (Entered: 12/23/2013) |
| 12/26/2013 | | Set/Reset Deadlines: The Parties Replies in support of their Motions for Summary Judgment are now due by 1/9/2014. (jth) (Entered: 12/26/2013) |
| 01/08/2014 | 27 | REPLY to opposition to motion re 14 MOTION for Summary Judgment of Defendants filed by SARAH GILBERT. (Ford, Herman) (Entered: 01/08/2014) |
| 01/09/2014 | 28 | REPLY to opposition to motion re 18 MOTION for Summary Judgment filed by CHICAGO INSURANCE COMPANY. (Sarp, Paulette) (Entered: 01/09/2014) |
| 01/09/2014 | 29 | REPLY to opposition to motion re 14 MOTION for Summary Judgment filed by BARRY J. NACE, PAULSON & NACE, PLLC. (Attachments: # 1 Statement of Facts, # 2 Exhibit 10, # 3 Exhibit 11, # 4 Exhibit 12, # 5 Exhibit 13)(Horvath, Stephen) (Entered: 01/09/2014) |
| 01/13/2014 | 30 | NOTICE of Filing Exhibit Y by CHICAGO INSURANCE COMPANY re 23 Memorandum in Opposition (Attachments: # 1 Exhibit Y)(Sarp, Paulette) (Entered: 01/13/2014) |
| 01/15/2014 | 31 | MOTION to Strike 29 Reply to opposition to Motion, by CHICAGO INSURANCE COMPANY (Sarp, Paulette) (Entered: 01/15/2014) |
| 01/15/2014 | | MINUTE ORDER that plaintiff shall have until January 24, 2014, to file a very brief sur-reply that addresses only the issue of any alleged prejudice arising out of the timing of CIC's reservation of rights letter. It is FURTHER ORDERED that plaintiff's 31 Motion to Strike is denied as moot. Signed by Judge Amy Berman Jackson on 1/15/2014. (lcabj3) (Entered: 01/15/2014) |
| 01/15/2014 | | Set/Reset Deadlines: Plaintiff's sur-reply is due by 1/24/2014. (jth) (Entered: 01/15/2014) |
| 01/22/2014 | 32 | SURREPLY to re 18 MOTION for Summary Judgment filed by CHICAGO INSURANCE COMPANY. (Attachments: # 1 Exhibit DD)(Sarp, Paulette) Modified on 1/22/2014 (jf, ). (Entered: 01/22/2014) |
| 01/23/2014 | 33 | Consent MOTION to Stay Proceedings by CHICAGO INSURANCE COMPANY (Sarp, Paulette) (Entered: 01/23/2014) |
| 01/23/2014 | | MINUTE ORDER granting 33 Consent Motion to Stay Proceedings. It is ORDERED that this matter is stayed until February 7, 2014. It is FURTHER ORDERED that the parties shall submit a joint status report to the Court no later than February 7, 2014. Signed by Judge Amy Berman Jackson on 1/23/2014. (lcabj3) (Entered: 01/23/2014) |
| 01/24/2014 | | Set/Reset Deadlines: Joint Status Report is due by 2/7/2014. (jth) (Entered: 01/24/2014) |
| 01/27/2014 | 34 | NOTICE of Exhibit Correction by BARRY J. NACE, PAULSON & NACE, PLLC re 24 Response to motion, (Attachments: # 1 Exhibit 2)(Horvath, Stephen) (Entered: 01/27/2014) |
| 01/27/2014 | 35 | NOTICE of Exhibit Correction by BARRY J. NACE, PAULSON & NACE, PLLC re 24 Response to motion, (Attachments: # 1 Exhibit 2)(Horvath, Stephen) (Entered: 01/27/2014) |
| 02/07/2014 | 36 | STATUS REPORT by CHICAGO INSURANCE COMPANY. (Sarp, Paulette) (Entered: 02/07/2014) |
| 02/10/2014 | | MINUTE ORDER that in light of the parties' 36 joint status report, the stay in this case will be extended through February 21, 2014, and the parties shall submit a joint status report on that date. Signed by Judge Amy Berman Jackson on 2/10/2014. (lcabj3) (Entered: 02/10/2014) |
| 02/10/2014 | | Set/Reset Deadlines: Joint Status Report due by 2/21/2014. (jth) (Entered: 02/10/2014) |
| 02/24/2014 | 37 | STATUS REPORT by CHICAGO INSURANCE COMPANY. (Sarp, Paulette) (Entered: 02/24/2014) |

| 02/25/2014 | | MINUTE ORDER that the stay in this case is now lifted. The Court notes that it will schedule oral argument if and when it finds it necessary to do so. Signed by Judge Amy Berman Jackson on 2/25/2014. (lcabj3) (Entered: 02/25/2014) |
|---|---|---|
| 03/18/2014 | | MINUTE ORDER. Upon review of the record, it appears that neither defendant Gabriel Assaad nor defendant Sarah Gilbert has filed a memorandum in opposition to [18](#) plaintiff's motion for summary judgment within the time period mandated by LCvR 7(b). It is therefore ORDERED that by April 8, 2014, defendants Gilbert and Assaad must either inform the Court that they intend to join the [24](#) memorandum in opposition filed by defendants Paulson & Nace, PLLC and Barry J. Nace, or move for an extension of time to oppose plaintiffs' motion with good cause shown. Otherwise, the Court will treat plaintiff's motion for summary judgment as conceded as to defendants Assaad and Gilbert. Signed by Judge Amy Berman Jackson on 3/18/2014. (lcabj3) (Entered: 03/18/2014) |
| 03/18/2014 | [38](#) | RESPONSE re [18](#) MOTION for Summary Judgment filed by GABRIEL ASSAAD. (Assaad, Gabriel) (Entered: 03/18/2014) |
| 03/26/2014 | [39](#) | RESPONSE re [18](#) MOTION for Summary Judgment filed by SARAH GILBERT. (Ford, Herman) (Entered: 03/26/2014) |
| 04/10/2014 | [40](#) | ORDER denying [14](#) defendants' Motion for Summary Judgment; granting [18](#) plaintiff's Motion for Summary Judgment. Signed by Judge Amy Berman Jackson on 4/10/2014. (lcabj3) (Entered: 04/10/2014) |
| 04/10/2014 | [41](#) | MEMORANDUM OPINION. Signed by Judge Amy Berman Jackson on 4/10/2014. (lcabj3) (Entered: 04/10/2014) |
| 04/22/2014 | [42](#) | BILL OF COSTS by CHICAGO INSURANCE COMPANY. (Sarp, Paulette) (Entered: 04/22/2014) |
| 05/01/2014 | [43](#) | NOTICE OF APPEAL TO DC CIRCUIT COURT as to [40](#) Order on Motion for Summary Judgment, by BARRY J. NACE, PAULSON & NACE, PLLC. Filing fee $ 505, receipt number 0090-3702849. Fee Status: Fee Paid. Parties have been notified. (Horvath, Stephen) (Entered: 05/01/2014) |
| 05/02/2014 | [44](#) | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re [43](#) Notice of Appeal to DC Circuit Court,. (jf, ) (Entered: 05/02/2014) |
| 06/30/2014 | | USCA Case Number 12-2068 for [43](#) Notice of Appeal to DC Circuit Court, filed by BARRY J. NACE, PAULSON & NACE, PLLC. (erd) (Entered: 06/30/2014) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 11/03/2014 13:46:34 | | |
| PACER Login: | tl0027:2646207:0 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:12-cv-02068-ABJ |
| Billable Pages: | 6 | Cost: | 0.60 |

**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHICAGO INSURANCE COMPANY, <br> An Illinois Corporation <br> 33 West Monroe Street, Suite 1200 <br> Chicago, Illinois 60603 <br><br> Plaintiff, <br><br> v. <br><br> PAULSON & NACE, PLLC, <br><br> **SERVE:** Paulson & Nace, PLLC <br> c/o Barry J. Nace, Esquire <br> 1615 New Hampshire Avenue, N.W. <br> Washington, D.C. 20009 <br><br> BARRY J. NACE, an individual; <br><br> **SERVE:**  Barry J. Nace, Esquire <br> Paulson & Nace, PLLC <br> 1615 New Hampshire Avenue, N.W. <br> Washington, D.C. 20009 <br><br> GABRIEL ASSAAD, an individual; <br> **SERVE:**  Gabriel Assaad <br> Assaad Law, PLLC <br> 1425 K Street, N.W., Suite 350 <br> Washington, D.C. 20005 <br><br> and <br><br> SARAH E. GILBERT, an individual. <br> **SERVE:**  Sarah E. Gilbert <br> 2611 Turner Road <br> Goochland, Virginia 23063-2606 <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )  Civil Action No. _____ <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

_____

**COMPLAINT FOR DECLARATORY JUDGMENT**
_____

     Plaintiff Chicago Insurance Company ("CIC") for its Complaint for Declaratory

Judgment against defendants Paulson & Nace, PLLC, a professional limited liability company;

Barry J. Nace, an individual; Gabriel Assaad, an individual; and Sarah E. Gilbert, an individual, states and alleges as follows:

## THE PARTIES

1.      CIC is a corporation organized under the laws of the state of Illinois with its principal place of business in Illinois and a citizen of the state of Illinois.

2.      Paulson & Nace, PLLC ("Paulson & Nace") is a professional limited liability company organized under the laws of Washington, D.C., engaged in the practice of law in Washington, D.C., with its principal place of business in Washington, D.C., and a citizen of Washington, D.C.

3.      Paulson & Nace has only one member, specifically, Barry J. Nace ("Mr. Nace").

4.      Mr. Nace is an attorney who engages in the practice of law in Washington, D.C. and who is a citizen and resident of Washington, D.C.

5.      Gabriel Assaad ("Mr. Assaad") is an attorney who worked at Paulson & Nace in 2006.  Mr. Assaad regularly practices law in Washington, D.C. and maintains a law office in Washington, D.C. known as "Assaad Law, PLLC".

6.      Mr. Assaad is a citizen and resident of Washington, D.C.

7.      Paulson & Nace, Mr. Nace, and Mr. Assaad will be referred to collectively in this complaint as the "Attorney Defendants".

8.      Upon information and belief, Sarah E. Gilbert presently attends college in Virginia and is a citizen and resident of the state of Virginia.  Ms. Gilbert will be referred to in this complaint as "Claimant Gilbert".

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332(a).  CIC and the defendants are citizens of different states and the amount in

2

controversy exceeds $75,000 exclusive of interest and costs.  The Attorney Defendants seek coverage under a policy of insurance issued by CIC which has a limit of liability of $2 million for "each claim."

10.     The Court has personal jurisdiction over the Attorney Defendants and Claimant Gilbert.

11.     Venue is appropriate in this District by virtue of the provisions of 28 U.S.C. §1391.

## JURY DEMAND

12.     CIC demands a jury trial of any factual issues pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND

13.     Paulson & Nace, Mr. Nace and Mr. Assaad have been named as defendants in a lawsuit filed by Sarah E. Gilbert in the Circuit Court of the City of Richmond, Virginia  ("The Gilbert Lawsuit").  The Gilbert Lawsuit seeks damages for breach of contract and professional negligence relating to the Attorney Defendants' legal representation of Sarah E. Gilbert.

14.     The complaint in The Gilbert Lawsuit alleges that the Attorney Defendants filed the first medical malpractice lawsuit on Ms. Gilbert's behalf in a Virginia court on July 24, 2006.

15.     The statute of limitations on Sarah E. Gilbert's medical malpractice claim expired on July 28, 2006.

16.     The complaint in The Gilbert Lawsuit alleges that the first complaint filed on Ms. Gilbert's behalf, who was a minor at the time, was styled "Richard Gilbert and Rosie Lee Gilbert, Individually and on behalf of their daughter, Sarah Gilbert, a minor."  The defendants in that lawsuit immediately filed motions to dismiss on the grounds that the Attorney Defendants had filed the case in the name of the wrong party.

17.     The Attorney Defendants filed a separate, second complaint on October 25, 2006 which was styled "Sarah Gilbert, by her parents and next friends, Richard and Rosie Lee Gilbert and Richard and Rosie Lee Gilbert, Individually."

18.     On February 26, 2007, the Virginia court dismissed with prejudice all of the claims of Ms. Gilbert filed in the first case on the grounds that the Defendants had filed it in the name of the wrong party.

19.     Ultimately, Ms. Gilbert's medical malpractice claim was dismissed for failure to file her lawsuit before the statute of limitations expired.

## **COVERAGE**

20.     On July 18, 2007 Mr. Nace sent an application to CIC to obtain a professional liability policy requesting an effective date of July 24, 2007.   In the application, Mr. Nace answered the following question:

(b)     Having inquired of all partners, officers, owners and employed lawyers, are there any circumstances which may result in a claim being made against the firm, its predecessors or any current or past partner, officer, owner or employed lawyer of the firm?     ☐ Yes ☒ No

* * *

THE APPLICANT REPRESENTS THAT THE ABOVE STATEMENTS AND FACTS ARE TRUE AND THAT NO MATERIAL FACTS HAVE BEEN SUPPRESSED OR MISSTATED.

Barry J. Nace                                              7/18/07
Print or Type Name and Title          Date (Mo-Day-Yr.)

21.     CIC first issued a Lawyers Professional Liability Policy to "Barry J. Nace dba Paulson & Nace" effective on July, 24, 2007 through July 24, 2008 under Master Policy Number

LWC-8001101; Certificate Number LWB-2400909 ("the First Policy").  That policy was written on a claims made and reported basis.

22.     Only claims made against the insureds and reported to CIC during the policy term are potentially covered under the First Policy.

23.     CIC was not advised of a potential claim or a claim by Miss Gilbert while the First Policy was in effect.

24.     CIC issued a subsequent professional liability policy to "Barry J. Nace dba Paulson & Nace" for the policy period July 24, 2008 through July 24, 2009 ("the 2009 Policy").

25.     In May of 2009, Mr. Nace submitted a "Supplemental Claim/Incident Information" form to CIC identifying Sarah Gilbert as a "claimant".  On that form, Mr. Nace advised that the date of the "alleged error" in the handling of Mr. Gilbert's claim was 2008.  The "alleged error" occurred in 2006.

26.     The insuring agreement to the 2009 Policy provided:

**INSURING AGREEMENTS**

**I.      COVERAGE**

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the **Policy Period** or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. Provided always that such **Professional Services** or **Personal Injury** happen:

A.      during the **Policy Period**; or

B.      prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business,** and continuously renewed and maintained in effect to the inception of this policy period:

1.     the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury**;

2.     the **Named Insured**, any partner, shareholder, employee, or where appropriate the **Named Insured's** management committee or any member thereof, had no reasonable basis to believe that the **Insured** had breached a professional duty or to **Reasonably Foresee** that a **Claim** would be made against the **Insured**; and

3.     there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such **Claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any **Claim**, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

(Emphasis supplied).

27.     The professional services rendered by the Attorney Defendants which give rise to The Gilbert Lawsuit happened prior to the effective date of the 2009 Policy. The First Policy issued by CIC to the Attorney Defendants was effective on July 24, 2007. The Gilbert Lawsuit could only be covered by the 2009 Policy if prior to July 24, 2007, the insured had no reasonable basis to believe that the insured had breached a professional duty or to reasonably foresee that a claim would be made against the insured.

28.     The Policy defines "reasonably foresee" as:

**Reasonably Foresee(n)** means:

1.     **Claims** or incidents reported to any prior insurer;

2.     unreported **Claims** or suits of which any **Insured** had received notice prior to the effective date of the first policy with the Company;

3.     incidents or circumstances that involve a particular person or entity which an **Insured** knew might result in a **Claim** or suit prior to the effective date of the first policy issued by the Company to the **Named Insured**, and which was not disclosed to the Company.

29.     Ms. Gilbert's first complaint for medical malpractice was dismissed in February, 2007.  Prior to July 24, 2007, the date the First Policy incepted, the insureds had a reasonable basis to believe that a professional duty had been breached or that a claim might be made against the insureds.  There is no coverage for The Gilbert Lawsuit under the 2009 Policy issued by CIC.

## COUNT I

### FOR DECLARATORY RELIEF

30.     CIC incorporates the allegations made in paragraphs 1 to 29 above as if provided here in full.

31.     A real and justiciable controversy exists concerning whether the Attorney Defendants are entitled to coverage under the 2009 Policy for the Gilbert Lawsuit.

32.     CIC seeks, and is entitled to, a declaration that it has no obligation to defend the Attorney Defendants for The Gilbert Lawsuit.

33.     CIC seeks, and is entitled to, a declaration that it has no obligation to indemnify the Attorney Defendants for any damages awarded, or costs or fees incurred in connection with The Gilbert Lawsuit.

WHEREFORE, CIC requests that the Court grant the following relief against the Attorney Defendants and Claimant Gilbert:

1.     The declaratory relief requested under Count One;

2.     Such other and further relief as the Court deems just and appropriate.

Dated:  December 27, 2012             **CHICAGO INSURANCE COMPANY**


By:_____/s/_____
     David D. Hudgins, Virginia Bar No. 20602
     Hudgins Law Firm, P.C.
     515 King Street, Suite 400
     Alexandria, VA  22314
     Tel:  703-739-3300; 703-739-3700 facsimile
     dhudgins@hudginslawfirm.com


**ATTORNEY FOR PLAINTIFF CHICAGO
INSURANCE COMPANY**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHICAGO INSURANCE COMPANY, :
an Illinois Corporation            :
                                   :
        Plaintiff,                 :
                                   :
v.                                 :          Civil No. 1:12-CV-2068
                                   :
PAULSON & NACE, PLLC, et al.,      :
                                   :
        Defendants.                :
_____/

## ANSWER AND GROUNDS OF DEFENSE

COME NOW the defendants, Paulson & Nace, PLLC and Barry J. Nace, by

counsel, and for their Answer and Grounds of Defense to the Complaint for

Declaratory Judgment state the following:

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

In response to the specific allegations contained in the Complaint, these

defendants assert the following:

1.      Defendants are without knowledge as to the truth or falsity of the

allegations contained in paragraph number 1.

2.      The allegations contained in paragraph number 2 are admitted.

3.      The allegations contained in paragraph number 3 are denied.

4.      The allegations contained in paragraph number 4 are admitted.

**BANCROFT, MCGAVIN, HORVATH & JUDKINS, P.C.**
3920 UNIVERSITY DRIVE  •  FAIRFAX, VIRGINIA 22030  •  (703) 385-1000  •  FAX (703) 385-1555

15

5.      The allegations contained in paragraph number 5 that Gabriel
Assaad at one time worked for Paulson & Nace are admitted.  The remaining
allegations contained in paragraph number 5 are denied.

6.      The allegations contained in paragraph number 6 are denied.
Mr. Assaad is a resident and citizen of the state of Texas.

7.      Objection is being made to lumping all of the defendants together as
a single entity known as "Attorney Defendants".  Plaintiff is required to separately
state the claims against each of the defendants.

8.      The allegations contained in paragraph number 8 are admitted.

9.      Defendants are without knowledge as to the truth or falsity of the
allegations contained in paragraph number 9 as they do not know the principle
place of business for the insurance company plaintiff.

10.     As to the defendants, Paulson & Nace, PLLC and Barry J. Nace, the
allegations contained in paragraph number 10 are admitted.  These defendants
are without knowledge as to the truth or falsity of the remaining allegations in
paragraph number 10.

11.     The allegations contained in paragraph number 11 are admitted.

12.     The allegations contained in paragraph number 12 are nothing more
than a jury demand, and as such no response is required.  These defendants
likewise demand a trial by jury.

13.     The allegations contained in paragraph number 13 that Paulson &
Nace, Barry Nace and Mr. Assaad have all been named as defendants in a

BANCROFT, MCGAVIN, HORVATH & JUDKINS, P.C.
3920 UNIVERSITY DRIVE  •  FAIRFAX, VIRGINIA 22030  •  (703) 385-1000  •  FAX (703) 385-1555

16

lawsuit pending in the Circuit Court for the City of Richmond are admitted.  It is denied that these defendants have engaged in any negligent conduct or breach of contract.

14.     The allegations contained in paragraph number 14 that a medical malpractice suit was filed on July 24, 2006 are admitted.

15.     The allegations contained in paragraph number 15 state a conclusion of law and as such no response is required.

16.     In response to the allegations contained in paragraph number 16, it is admitted that a lawsuit was filed as styled, but deny that this constitutes negligence or a breach of the standard of care.

17.     The allegations contained in paragraph number 17 are denied.

18.     The allegations contained in paragraph number 18 are denied.

19.     The allegations contained in paragraph number 19 state a conclusion of law and as such no response is required.

20.     In response to the allegations contained in paragraph number 20, it is admitted that an application was sent to the plaintiff.  The entire application has not been set out, and only a portion of the application and the statements contained in the application have been set out.

21.     The allegations contained in paragraph number 21 concerning the issuance of the policy of insurance was issued are admitted.  The full terms and conditions of the policy have not been set out in paragraph 21.

**BANCROFT, MCGAVIN, HORVATH & JUDKINS, P.C.**
3920 UNIVERSITY DRIVE   •   FAIRFAX, VIRGINIA 22030   •   (703) 385-1000   •   FAX (703) 385-1555

17

22.    The allegations contained in paragraph number 22 are denied.  The terms and conditions of the policy of insurance have not been fully set forth in paragraph 22.

23.    In response to the allegations in paragraph number 23, no claim existed against the defendants during the time of the first policy, and no claim was made against these defendants that could have been reported.

24.    The allegations contained in paragraph number 24 are admitted.

25.    The allegations contained in paragraph number 25 that a claim was submitted are admitted. Notice was given prior to formally submitting the claim. It is denied that there was any known error in 2006.

26.    In response to the allegations contained in paragraph number 26, it is admitted that a portion of the policy has been set forth.

27.    The allegations in paragraph number 27 are denied.

28.    In response to the allegations contained in paragraph number 28, it is admitted that a portion of the policy has been quoted.

29.    The allegations contained in paragraph 29 are denied.

### Count I

30.    In response to the allegations contained in paragraph number 30, defendants incorporate their responses to the allegations contained in paragraph numbers 1 through 29.

31.    The allegations contained in paragraph number 31 are denied.

**BANCROFT, MCGAVIN, HORVATH & JUDKINS, P.C.**
3920 UNIVERSITY DRIVE   •   FAIRFAX, VIRGINIA 22030   •   (703) 385-1000   •   FAX (703) 385-1555

18

32.   The allegations contained in paragraph number 32 state a claim for relief, and as such no response is required.  To the extent a response is required, it is denied that the plaintiff insurance company is entitled to a declaration that it has no duty to indemnify or defend these defendants.

33.   The allegations contained in paragraph number 33 state a claim for relief, and as such no response is required.  To the extent a response is required, it is denied that the plaintiff insurance company is entitled to a declaration that it has no duty to indemnify or defend these defendants.

## THIRD DEFENSE

The plaintiff has failed to comply with the applicable statutes and regulations necessary to preserve any defenses to coverage, plaintiff has waived any defense that it might have under the contract of insurance.

## FOURTH DEFENSE

Plaintiff has continued to accept and hold the premiums under this policy of insurance, and as a result, has waived any right to deny coverage, and is estopped to deny coverage.

## FIFTH DEFENSE

The plaintiff's claims are barred by the equitable doctrines of unclean hands, that he who seeks equity must do equity, and equity aids the vigilant.

## SIXTH DEFENSE

The plaintiff's claims are barred by the doctrine of latches.

## SEVENTH DEFENSE

**BANCROFT, MCGAVIN, HORVATH & JUDKINS, P.C.**
3920 UNIVERSITY DRIVE   •   FAIRFAX, VIRGINIA 22030   •   (703) 385-1000   •   FAX (703) 385-1555

19

Plaintiff'S denial of coverage was not in good faith, and as a result, defendants are entitled to recover costs and attorney's fees.

WHEREFORE, the defendants, Paulson & Nace, PLLC and Barry J. Nace, Esquire pray that this Court declare that there has been full compliance with the terms and conditions of the policy of insurance, that the policy of insurance applies to any claims made by Sarah E. Gilbert, that Chicago Insurance Company has a duty to defend, indemnify and hold harmless Paulson & Nace, PLLC and Barry Nace, Esquire, and that these defendants be awarded costs, attorney's fees, and the Court enter such other relief as is appropriate.

PAULSON & NACE, PLLC and
BARRY J. NACE, Esquire
By Counsel

_____ /s/
Stephen A. Horvath
Virginia Bar No. 19133
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 University Drive
Fairfax, Virginia 22030
(703) 385-1000
(703) 385-1555 - Facsimile
shorvath@bmhjlaw.com
Counsel for Defendants, Paulson & Nace, PLLC and
Barry J. Nace, Esq.

BANCROFT, MCGAVIN, HORVATH & JUDKINS, P.C.
3920 UNIVERSITY DRIVE • FAIRFAX, VIRGINIA 22030 • (703) 385-1000 • FAX (703) 385-1555

20

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _____ day of January, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

David D. Hudgins, Esquire
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, Virginia 22314
dhudgins@hudginslawfirm.com
Counsel for Plaintiff

Gabriel Assaad, Esquire
Assaad Law, PLLC
1425 K Street, N.W., Suite 350
Washington, D.C. 20005
gassaad@assaadlaw.com
Defendant

/s/
Stephen A. Horvath
Virginia Bar No. 19133
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 University Drive
Fairfax, Virginia  22030
(703) 385-1000
(703) 385-1555 - Facsimile
shorvath@bmhjlaw.com
Counsel for Defendants, Paulson & Nace, PLLC and
Barry J. Nace, Esq

BANCROFT, MCGAVIN, HORVATH & JUDKINS, P.C.
3920 UNIVERSITY DRIVE   •   FAIRFAX, VIRGINIA 22030   •   (703) 385-1000   •   FAX (703) 385-1555

21

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHICAGO INSURANCE COMPANY,           :
an Illinois Corporation              :
                                     :
        Plaintiff,                   :
                                     :
v.                                   :         Civil No. 1:12-CV-2068
                                     :
PAULSON & NACE, PLLC, et al.,        :
                                     :
        Defendants.                  :
_____     /

## DEFENDANTS PAULSON & NACE, PLLC'S AND BARRY J. NACE, ESQUIRE'S MOTION FOR SUMMARY JUDGMENT

COME NOW, Defendants Paulson & Nace, PLLC, and Barry J. Nace, Esq., by

counsel, and hereby move this Honorable Court to enter Summary Judgment in their

favor pursuant to Rule 56 of the Federal Rules of Civil Procedure, and in support thereof

relies upon its Statement of Material Facts Not in Dispute and Memorandum of Points

and Authorities.

**PAULSON & NACE, PLLC and**
**BARRY J. NACE, Esquire**
By Counsel

_____/s/_____
Stephen A. Horvath
Virginia Bar No. 19133
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 University Drive
Fairfax, Virginia 22030
(703) 385-1000
(703) 385-1555 - Facsimile
shorvath@bmhjlaw.com
Counsel for Defendants, Paulson & Nace, PLLC and
Barry J. Nace, Esq.

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 8th day of August, 2013, I emailed the foregoing to the following:

David D. Hudgins, Esq.
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, VA 22314
dhudgins@hudginslawfirm.com
Counsel for Plaintiff

Herman Aubrey Ford, III, Esquire
Cantor Stoneburner Ford Grana & Buckner
7130 Glen Forest Drive, Ste 400
Richmond, VA 23226
aford@virginiatrialfirm.com
Co-Counsel for Defendant Sarah Gilbert

Paulette S. Sarp, Esquire
Hinshaw & Culbertson, LLP
333 South Seventh Street
Suite 2000
Minneapolis, MN 55402
psarp@hinshawlaw.com
Counsel for Plaintiff

Gabriel Assaad, Esquire
Assaad Law, PLLC
1425 K Street, NW, Suite 350
Washington, DC 20005
gassaad@assaadlaw.com
Defendant

_____/s_____
Stephen A. Horvath
Virginia Bar No. 19133
BANCROFT, McGAVIN, HORVATH &
JUDKINS, P.C.
3920 University Drive
Fairfax, VA 22030
(703) 385-1000
(703) 385-1555 - Facsimile
shorvath@bmhjlaw.com
Counsel for Defendants, Paulson & Nace,
PLLC and Barry J. Nace, Esquire

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHICAGO INSURANCE COMPANY,   :
an Illinois Corporation           :
                                 :
       Plaintiff,             :
                                 :
v.                            :     Civil No. 1:12-CV-2068
                                 :
PAULSON & NACE, PLLC, et al.,    :
                                 :
       Defendants.         :
_____ /

## DEFENDANTS PAULSON AND NACE, PLLC'S, AND BARRY J. NACE'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

COME NOW, Defendants Paulson and Nace, PLLC ("Paulson & Nace") and

Barry J. Nace, Esq. (collectively, the "Nace Defendants"), by counsel pursuant to Fed.

R. Civ. P. 56, hereby move this Court for summary judgment declaring that Chicago

Insurance Company ("CIC") failed to give timely notice of a reservation of rights letter,

and as a result, waived any defense to coverage.  As a result, the legal malpractice

claim by Sarah Gilbert is covered by CIC's policy of insurance.

### I.  INTRODUCTION

Plaintiff is seeking to declare that Barry Nace and his firm are not covered under

a legal malpractice insurance policy issued by CIC by reason of the alleged failure to

comply with a condition precedent to coverage:  giving timely notice of a potential claim.

CIC investigated the matter for over two and a half years without raising this defense,

and when CIC did send out a reservation of rights, no notice was given to the tort

claimant of the reservation of rights.  Since the tort allegedly occurred in Virginia,

1

Virginia law controls the issue of a reservation of rights, and under Va. Code § 38.2-2206, notice of the reservation of rights should have been issued within 45 days of the discovery of the alleged breach.   Under the common law and by statute, the defenses raised by CIC have been waived.   Further, once the reservation of rights was issued, notice should have been given to the tort claimant within 45 days after the reservation letter being sent.   Va. Code § 38.2-2206.   The undertaking to investigate the matter, without a reservation of rights creates coverage even if no coverage existed.

Based upon the interrogatory answers[1], and documents produced[2] by Plaintiff, it is abundantly clear that there are no facts that show that Plaintiff, Chicago Insurance Company ("CIC"), put Paulson & Nace, Mr. Nace, or Defendant Sarah Gilbert (claimant in the underlying legal malpractice claim against the Nace Defendants), on timely notice that it would defend the Nace Defendants in the Gilbert lawsuit under a reservation of rights.   To the contrary, CIC's interrogatory answers and communications to the Nace Defendants undisputedly show that CIC put the Nace Defendants on notice of its reservation of rights over two years after the required time for such notice expired, and never put Ms. Gilbert on notice, a breach of Va. Code Ann. § 38.2-2226.   The failure to give timely notice operates as a barrier to any contractual defenses, including the defense of failure to give timely notice.   As a result, CIC cannot claim that a breach of

---

[1] Plaintiff's Supplemental Answers to Interrogatories dated May 13, 2013, are attached as Exhibit 1.

[2] Plaintiff's Supplemental Responses to Requests for Production of Documents dated May 13, 2013, without attachments, are attached as Exhibit 2.   Relevant documents from Plaintiff's production are specifically referenced herein and attached as individual exhibits.

2

contract or lack of fulfillment of a condition precedent to coverage by the Nace Defendants relieves its duty to provide coverage in the underlying Gilbert lawsuit.

## I. BACKGROUND

This case arises from a coverage dispute between CIC, which provided a professional liability policy to the Nace Defendants for the period July 24, 2007, through July 24, 2008, and which was renewed annually thereafter (the "Policy").  Compl. ¶ 21, 24.  The coverage dispute arises from a legal malpractice claim filed by Defendant Sarah Gilbert, whose parents retained the Nace Defendants to pursue a medical malpractice claim against a doctor who performed spinal surgery on Ms. Gilbert in 2004, which resulted in her partial paralysis.  Compl. ¶ 14.

<u>The Underlying Gilbert Medical Malpractice Cases</u>

On July 24, 2006, Paulson & Nace filed a complaint for medical malpractice against the doctor who performed the spinal surgery on Ms. Gilbert, which led to her injuries, and the hospital in which the surgery occurred, in Richmond City Circuit Court on behalf of Ms. Gilbert and her parents (the "First Case").  Compl. ¶ 14.  The complaint was styled "Richard Gilbert and Rosie Lee Gilbert, Individually and on behalf of their daughter, Sarah Gilbert, a minor," and therefore, the defendants filed motions to dismiss.  Compl. ¶ 16.  The medical provider defendants in the malpractice claim alleged that n July 28, 2006, the statute of limitations for Ms. Gilbert's medical malpractice claim expired.  Compl. ¶ 15.  These defendants further allege that the action should have been styled "minor by next friend" and not "next friend individually and on behalf of minor."  On October 25, 2006, Paulson & Nace filed a second complaint for medical malpractice styled "Sarah Gilbert, a minor, by her next friends and

3

parents, Richard Gilbert and Rosie Lee Gilbert" against the same doctor defendants

(the "Second Case").  Compl. ¶ 17.  On February 26, 2007, the trial court dismissed the

First Case due to the order in which the parties were named in the Complaint.  Compl. ¶

18.  On March 6, 2007, Mr. Assad filed an amended complaint in the First Case in Ms.

Gilbert's parents' names only for their own economic and non-economic damages.  Pl.

Supp. Resp. Req. Prod. Doc. No. 1, "Pleadings In Underlying Medical Malpractice

Lawsuits" (hereinafter, "Pleadings Index" attached hereto as Exhibit 3), p. 3.  The

medical provider Defendants brought a special plea of statute of limitations, motions to

dismiss, and demurrers to the parents' claims in the amended Second Case.  Pleadings

Index, p. 12.  On August 3, 2007, the trial court sustained the Defendants' special plea

of the statute of limitations, dismissed the Second Case with prejudice, sustained the

demurrers to the parents' claims for non-economic damages in the First Case, and

consolidated the remaining claims.  Compl. ¶ 19; Pleadings Index, p. 5.

On August 29, 2007, Defendant Gabriel Assaad, an associate at Paulson & Nace

at the time, filed notices of appeal in both the First and Second Case.  Pleadings Index,

p. 5.  After briefing by both parties, the Supreme Court of Virginia dismissed the appeals

as premature to a final order from the trial court because the parents' case was still

pending.  Pleadings Index, p. 5.  As a result, on April 13, 2009, Mr. Nace and Kathleen

Burke, local Virginia counsel, filed a Motion to Reconsider the August 3, 2007, Order in

the trial court, which was later denied.  Pleadings Index, p. 10.  On May 19, 2009, Mr.

Nace and Ms. Burke nonsuited the remaining defendants and claims.  Pleadings Index,

p. 10.  Mr. Nace and local Virginia counsel W. Brian McCann proceeded to appeal the

4

now final orders and those appeals were dismissed by the Supreme Court of Virginia on December 15, 2009.  Pleadings Index, p. 11.

### The Coverage Dispute and Legal Malpractice Claim

On May 20, 2009, one day after the nonsuit of both cases, Mr. Nace completed and faxed a Supplemental Claim/Incident Form (the "Claim Report") to Kevin Bradley, at Alliant Insurance Services, reporting the potential claim that may arise due to the alleged procedural faults in the pursuit of the Gilbert lawsuits.  Compl. ¶ 25; See Affidavit of Barry Nace (hereinafter "Nace Aff.," attached as Exhibit 4), ¶ 4.  The Claim Report stated that the "alleged error" in the handling of Ms. Gilbert's claim occurred in 2008.  Compl. ¶ 25.  Pursuant to the Complaint, CIC received the Claim Report in May 2009.  Compl. ¶ 25.

From December 2009 through January 2012, communication continued between CIC, Mr. Nace, and Mr. Nace's attorney, Deborah Whelihan, regarding the status of any claim by the Gilberts.  Nace Aff. ¶ 5; Pl. Supp. Resp. Req. Prod. Doc. No. 1, Bates CIC 000017-55, CIC000227; CIC000444-448; CIC000491-497[3].  On January 28, 2011, H. Aubrey Ford, Esq., sent a letter to Mr. Nace advising that the Gilberts asked to transfer their representation in the medical malpractice claim to his firm.   Pl. Supp. Resp. Req. Prod. Doc. No. 1, Bates CIC000467-69[4].   Importantly, during this two year period, CIC was actively on notice of a potential claim, and no reservation of rights was communicated to the Nace Defendants or Ms. Gilbert.  Nace Aff. ¶ 6; see also Affidavit of H. Aubrey Ford, III (hereinafter "Ford Aff.," attached hereto as Exhibit 7), ¶ 5, 6.

---

[3] Copies attached hereto as Exhibit 5.
[4] Letter attached hereto as Exhibit 6.

It was not until January 13, 2012, that, by CIC's own admission, it forwarded letters to Mr. Nace, Paulson & Nace, and Mr. Assad, asserting that their defense of a potential legal malpractice claim by the Gilberts would proceed under a reservation of rights.  Pl. Supp. Resp. Req. Prod. Doc. No. 1, Bates CIC 000017-30, See Ex. 5;  Nace Aff. ¶ 6.  Mr. Ford filed a legal malpractice claim on behalf of the Gilberts against the Nace Defendants and Mr. Assad on March 13, 2012.  Compl. ¶ 13.  CIC filed a complaint for declaratory relief in the Eastern District Court of Virginia, Alexandria Division, on September 25, 2012, which was dismissed for lack of in personam and subject matter jurisdiction on December 3, 2012.[5]  The present complaint for declaratory relief was filed on December 27, 2012.  At no point up to the present has CIC ever sent notice to the Gilberts or their counsel of the reservation of rights, with the exception of serving Sarah Gilbert through her attorney with the first declaratory judgment complaint on or about October 12, 2012.  Ford Aff. ¶ 6.

## II.  LAW AND ANALYSIS

### A.  Summary Judgment Standard

Summary judgment must be awarded where "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Sup.Ct.Civ.R. 56(c); O'Malley, III v. Chevy Chase Bank, 766 A.2d 964, 967 (D.C. 2001).  The existence of some factual dispute will not defeat a motion for summary judgment, rather there must be a "genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  Summary

---

[5] See Order dated December 3, 2012, attached as Exhibit 8.

judgment is properly granted where the record would not permit an impartial jury, acting

reasonably, to return a verdict in the nonmoving party's favor.  Id., 477 U.S. at 252.

In this case, the pleadings and affidavits clearly show that CIC did not comply

with Va. Code Ann. § 38.2-2226, as it failed to put the Nace Defendants or Ms. Gilbert

on timely notice of any reservation of rights.  As a result, CIC waived its defense to

coverage based upon the alleged breach by Mr. Nace in the 2007 policy renewal

application.  See Va. Code Ann. § 38.2-2226.  Further, under the common law there

was a waiver of the defenses and by undertaking to investigate the matter for two and a

half years coverage is created by estoppel.

B.   Virginia Law Applies To The Analysis Of This Declaratory Judgment
Action.

Where, as in this case, jurisdiction is based on diversity of citizenship, the court

should "apply the choice of law rules for the jurisdiction in which it sits."  Stromberg v.

Marriott Int'l, Inc., 474 F. Supp. 2d 57, 61 (D.D.C. 2007) (quoting Meng v. Schwartz, 305

F. Supp. 2d 49, 58 (D.D.C. 2004)).

Virginia has adopted a strong policy of protecting its injured plaintiffs from

proceeding forward without know if of the existence of a reservation of rights.  Pursuant

to Va. Code Ann. § 38.2-2226, an insurer must provide notice of its intention to rely

upon a reservation of rights to the insured after learning of facts that would show a

failure to comply with a condition precedent to coverage.  Id.  If an insurer fails to provide

timely notice of a reservation of rights to the insured, its defense to coverage is waived

by operation of law.  Id.  Further, once a reservation of rights is issued, notice of that

7

reservation must be sent to the tort plaintiff or the tort plaintiff's attorney.  Va. Code Ann. § 38.2-2226.

Under D.C. law, there can also be a waiver, but D.C. does not have the specific deadlines set forth in Va. Code Ann. § 38.2-2226.  Rather, the court would undergo a fact-specific inquiry as to the timeliness of CIC's notice of reservation of rights to the insured and claimant.  Diamond Serv. Co., Inc. v. Utica Mut. Ins. Co., 476 A.2d 648, 656 (D.C. 1984).  D.C. courts have held that a "reservation of rights is sufficient so long as the insurer conducts an investigation and analysis with 'reasonable diligence and promptly notifies the insured' once the process is complete.  Capitol Speciality Ins. Corp. v. Sanford Wittels & Heisler, LLP, 793 F.Supp.2d 399 (D.D.C. 2011) (quoting Central Armature Works, Inc., 520 F. Supp. 283, 288 n. 4 (D.D.C. 1980)); see also Lee v. Travelers Ins. Co., 184 A.2d 636, 639 (D.C. 1962)).  Under the D.C. standard, applied in Diamond, the court found a nine month period between notification of a claim and the insurer disclaiming coverage reasonable.  476 A.2d at 654-56.

   i. *Under the 'more substantial interest' analysis, the Court should apply Virginia law in this case.*

Under the modified "governmental interests analysis" employed by D.C. courts, the court

> Evaluate[s] the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review . . . As part of this analysis, we also consider the four factors enumerated in Restatement (Second) of Conflict of Laws § 145:
>
> a) the place where the injury occurred;
>
> b) the place where the conduct causing the injury occurred;

    c)      the domicile, residence, nationality, place of incorporation and place of business of the parties; and

    d)      the place where the relationship is centered.

Washkoviak v. Student Loan Mktng Ass'n, 900 A.2d 168, 180 (D.C. 2006) (quoting District of Columbia v. Coleman, 667 A.2d 811, 816 (D.C. 1995)).

The policy underlying Va. Code Ann. § 38.2-2226 is "to require a liability insurer which intends to rely on a breach of the terms and conditions of the policy contract, in defense of any claim under the policy, to furnish prompt notice of such intention to the claimant or his attorney, so that steps may be taken by the claimant, a stranger to the insurance contract, to protect his rights." Liberty Mut. Ins. Co. v. Safeco Ins. Co., 223 Va. 317, 325 (1982). Through the enactment of § 38.2-2226, "[t]he insurer can prevent, without difficulty, a claimant's wasting of finances and time pursuing a judgment that later proves to be uncollectible. Virginia, through this statute, has manifested a legitimate interest in safeguarding the rights of persons injured within her boundaries." Fed. Ins. Co. v. Nationwide Mut. Ins. Co., 448 F. Supp. 723, 726 (W.D. Va. 1978).

The D.C. analysis of timeliness and reasonable investigation effect the policy of requiring good faith performance by all parties to a contract. See e.g. Diamond, 476 A.2d at 656 ("[t]he relationship of insured and insurer presumes good faith on both sides"). The D.C. rule is also based on fundamental fairness – balancing an insurer's interest in having a reasonable amount of time to investigate a claim and potential coverage against an insured's interest in knowing the scope of its potential personal exposure for a claim and mounting a prompt defense. Central Armature Works, 520 F. Supp. at 288.

9

Virginia's policy would be more advanced by the application of its law to the facts in this case because § 38.2-2226 conveys a stronger interest in Virginia's policy of protecting those injured within its borders than D.C.'s variable balancing test.

The Court may also still consider the Second Restatement factors.  In this case, the injury occurred in Virginia.  The alleged legal malpractice was the style of the first complaint filed in the Gilbert's medical malpractice claim, which occurred in the Circuit Court of the City of Richmond, Virginia.  The conduct causing the alleged injury occurred in Virginia – the Gilberts' medical malpractice claims - were all filed, dismissed, and appealed in Richmond.  These pleadings, along with correspondence between the Nace Defendants, CIC and Virginia counsel for the Gilberts and the Nace Defendants occurred in Virginia.

While the parties are from several different states, two of the parties have significant ties to Virginia.  CIC is an Illinois corporation with its principal place of business and citizenship in Illinois.  CIC is, however, licensed to sell insurance in Virginia and is present in Virginia.  Paulson & Nace is a professional limited liability company organized under the laws of Washington, D.C. with its principal place of business and citizenship in D.C.  Barry Nace is a resident and domicile of Washington, D.C.  Gabriel Assaad is a citizen and resident of Texas.  Sarah Gilbert is a citizen and resident of the Commonwealth of Virginia.

Finally and compellingly, the place where the relationship is centered is Virginia.  The alleged medical malpractice that injured Ms. Gilbert took place in Virginia; the suit for that malpractice was filed in Virginia; Barry Nace associated with local Virginia counsel to represent Ms. Gilbert in that case; and the alleged legal malpractice forming

10

the basis for the underlying case, coverage for which is at dispute in this declaratory

judgment action, took place in Virginia.

The only connection Washington D.C. has to this matter is that the policy was

issued to the Nace Defendants in D.C. and the Nace Defendants are citizens and

residents of D.C.   The entire basis of the claim involves actions taken in lawsuits in

Richmond, Virginia.  Therefore, the Court should apply Virginia law.

C.     Va. Code Ann. § 38.2-2226 Applies Because CIC Claims Breach Of A
Contractual Condition In The Policy.

The Complaint for declaratory relief effectively alleges a breach of contract by Mr.

Nace when applying for a renewal of the Policy in July 2007.  Therefore, Va. Code Ann.

§ 38.2-2226 applies.  This section provides:

> Whenever any insurer on a policy of liability insurance discovers a breach
> of the terms or conditions of the insurance contract by the insured, the
> insurer shall notify the claimant or the claimant's counsel of the breach.
> Notification shall be given within forty-five days after discovery by the
> insurer of the breach or of the claim, whichever is later. . .[f]ailure to give
> the notice within forty-five days will result in a waiver of the defense based
> on such breach to the extent of the claim by operation of law.

§ 38.2-2226 does not apply, however, when an insurer alleges a right to render a policy

void or seeks to rescind a policy.  See The Continental Ins. Co. v. Matney, 2004 U.S.

Dist. LEXIS 6885, *15 (W.D.Va. 2004); Erie Ins. Exch. v. Outlaw, 83 Va. Cir. 363, 365

(Henrico 2011).

In this case, CIC specifically states that it does not seek to render the Policy void

or rescind it[6].  The Complaint alleges the breach of a notice provision – a condition

precedent - that Mr. Nace had a duty to report existing or reasonably foreseeable claims

---

[6] See Ex. 1, p. 10.

11

34

both on the renewal application and during the Policy period.  See Compl. ¶¶ 22., 29; Pl.

Ans. Int. 4, 5, 6, 7.  CIC further articulates its breach of contract basis in Supplemental

Answers to Interrogatories dated May 13, 2013.  For example, CIC states in answer to

Interrogatory 8:

> [i]t is CIC's position that the facts available at this time support the
> conclusion that Paulson & Nace and/or Barry Nace made a material
> misrepresentation or omission of material fact in their application for
> insurance to CIC.  However, CIC is not making a claim for rescission in
> this matter.  ***Whether or not the condition precedents to coverage***
> included in the policy's insuring agreement have been satisfied is a distinct
> legal issue from the issue of rescission.  CIC does not have to prove that
> the policy is void or that the policy should be rescinded in order to prevail
> on ***its claim that the conditions precedent to coverage have not been
> satisfied here***.[7] (emphasis added).

The allegation that the Nace Defendants failed to satisfy a condition precedent to

coverage is no different than the requirement that an insured must give timely notice of

a claim as a condition precedent to coverage.  The Supreme Court of Virginia has held

multiple times that notice provisions are considered conditions precedents to coverage

under a policy of insurance and that a failure to fulfill a condition precedent constitutes a

breach of that provision.  See Liberty Mut. Ins. Co. v. Safeco Ins. Co., 223 Va. 317, 324,

288 S.E.2d 469, 473 (1982); Lord v. State Farm Mut. Auto. Ins. Co., 224 Va. 283, 284,

295 S.E.2d 796, 797 (1982); State Farm Mut. Auto. Ins. Co. v. Porter, 221 Va. 592, 597,

272 S.E.2d 196, 199 (1980).

"In construing notice provisions in the context of liability coverages . . .

performance of such provisions is a condition precedent to coverage under the

insurance contract, 'requiring substantial compliance by the insured.'"  Lord, 224 Va. at

---

[7] See Ex. 1, p. 10.

12

284, 295 S.E.2d at 797.  In <u>Lord</u>, the Supreme Court of Virginia held that an insured's failure to give timely notice of an automobile accident "constitute[d] a breach of the notice conditions of the policy in question. . ." <u>Id.</u> at 288, 295 S.E.2d at 800.  However, "even if proper notice [of an accident] was not given 'as soon as practicable' [an insurer is still] under a duty to notify the claimant . . . within twenty days of its intention to rely on the defense of lack of notice." <u>Federal Ins. Co. v. Nationwide Mut. Ins. Co.</u>, 448 F. Supp. 723, 725 (W.D.Va. 1978) (decided under an earlier version of Va. Code Ann. § 38.2-2226, Va. Code Ann. § 38.1-389.1 (1950)).

The notice provisions in an insurance policy such as the policy at issue in this case, are conditions precedent to coverage and require an insured to provide the insurer timely notice of a potential claim so the insurer has the opportunity to conduct a prompt investigation.  However, *regardless* of whether an insured provides timely notice or not, an insurer is statutorily required to issue a prompt reservation of rights to the claimant and insured so that in particular, the claimant can protect her rights. Regardless of how CIC describes its position, by relying on a lack of timely notice by Paulson & Nace, it is asserting that Paulson & Nace breached the Policy and therefore, § 38.2-2226 applies.

D.   <u>CIC's Failure To Comply With § 38.2-2226 Notice Provisions Bars This Action To Disclaim Coverage For The Gilbert's Legal Malpractice Lawsuit.</u>

CIC admits that it first provided notice of a reservation of rights to Paulson & Nace, Barry Nace, and Mr. Assad, on or about January 13, 2012.  CIC never provided notice within 45 days of learning of facts which put it on notice of the breach and CIC never provided notice to the Gilberts or their counsel of any reservation of rights until it

13

filed the first declaratory judgment claim in September 2012.  <u>See</u> Ford Aff. ¶ 5, 6.  The purpose of § 38.2-2226

> is to require a liability insurer that intends to rely on a breach of the terms and conditions of the policy contract, in defense of any claim under the policy, to furnish prompt notice of such intention to the claimant or his attorney so that steps may be taken by the claimant, a stranger to the insurance contract, to protect his rights.

To fulfill this purpose, § 38.2-2226 requires that "notification [by the insurer] shall be given within forty-five days *after discovery by the insurer of the breach or of the claim, whichever is later.*" (emphasis added).  "[D]iscovery" of a breach entails "first, awareness by the insurer of facts tending to show there has been a violation of the policy provisions and, second, evaluation of those known facts culminating in a decision that a breach apparently has occurred." <u>Liberty Mut.</u>, 223 Va. at 474.

> i.   *CIC's reservation of rights notice to Defendants was untimely as CIC was aware of the Gilberts' claim and Defendants' alleged breach no later than May 2009.*

By its own admission, CIC was aware of the Gilberts' potential claim and Defendants' alleged breach of the Policy in May 2009, and received all relevant pleadings by March 2, 2010.  Compl. ¶ 25, Pl. Supp. Resp. Req. Prod. Doc. No. 1, Bates CIC 000229-357.[8]  Therefore, its January 2012, notice of reservation of rights was untimely, and its defense to providing coverage in the legal malpractice claim is barred by § 38.2-2226.

In <u>Liberty Mutual</u>, the insured was at fault in an automobile collision that occurred on January 27, 1977, injuring the plaintiffs.  <u>Id.</u> at 320, 288 S.E.2d at 471.  On March 17, 1977, plaintiffs' counsel sent a letter to the insurer advising it of the accident, plaintiffs'

---

[8] <u>See</u> Letter from Barry Nace with enclosures, attached as Exhibit 9.

injuries, and the claim. Id. at 321, 288 S.E.2d at 472. The insured never contacted the insurer to report the accident. Id. By May 18, 1977, the insurer, through the state accident report, had enough information to open an internal file to handle the claim. Id. at 322, 288 S.E.2d at 472. That same day, the insurer called plaintiffs' counsel and told him it would likely have to rely on a breach of policy defense. Id. The Court held that the notice period in § 38.2-2226 began to run on May 18, 1977, when the insurer "for the first time, [had] the bare details necessary for it to make an informed decision whether an apparent breach of the policy condition had occurred," and therefore, it issued a timely reservation of rights notice. Id. at 326, 288 S.E.2d at 474.

Notice of a claim does not necessarily require that claimants have filed and served a lawsuit. For example, in Morrel v. Nationwide Mut. Fire Ins. Co., 188 F.3d 218 (4th Cir. 1999), the Fourth Circuit Court of Appeals held that the insurer had notice of a claim prior to any court filings. In Morrel, the claimants hired a contractor, the insured, to renovate their home on April 10, 1995. Id. at 219. The contractor damaged the claimant's house and they submitted a claim to his insurer, Nationwide, on August 12, 1995. Id. Nationwide opened a file for the claim and inspected the property several times. Id. In July 1996, because they had not yet been compensated for the damage, the Morrels commenced an arbitration proceeding pursuant to their contract with the insured. Id. at 220. After the trial court entered judgment for the Morrels, they forwarded all pleadings to Nationwide, seeking to enforce the judgment. Id. at 221. Nationwide refused to pay and sent a letter to the Morrels in August 1997, explaining the contractor breached the insurance policy and therefore, it would not cover the claim. Id.

15

The Fourth Circuit affirmed the district court's holding that Nationwide's defense of breach of the policy was barred by § 38.2-2226.  Id. at 228.  The court held that, at the point when Nationwide sent inspectors to the Morrels house, prior to any arbitration or court filing, it "[u]nquestionably, then, . . . knew of the Morrels' claim no later than this date."  Id. at 227.  The Court further held that Nationwide knew of the insured's breach of the policy at the latest when it received a copy of the arbitration award from the Morrels' counsel, which indicated the insured contractor did not even participate in the arbitration proceeding.  Id.  Therefore, Nationwide's notice to the Morrels in August 1997 was untimely pursuant to § 38.2-2226, and its defense based on breach of contract by the insured was barred by operation of law.

CIC admits that it received notice from Barry Nace of a potential claim involving Sarah Gilbert in May 2009, and its discovery responses reveal that it received all relevant pleadings by March 2, 2010.  Compl. ¶ 25, See Ex. 9.  Despite its active involvement in tracking the Gilberts' potential claim and communicating with Mr. Nace regarding its status for almost 3 years, CIC waited until January 2012, to notify the insureds of its reservation of rights.  CIC knew or should have known of the breach it alleges in the Complaint in May 2009.  The Complaint claims the error (or potential legal malpractice) occurred in 2006, when Mr. Assad filed the First Case.  Compl. ¶ 25.  The breach of Policy CIC alleges in its Complaint occurred when Mr. Nace completed the policy application in 2007 and failed to disclose the potential Gilbert claim.  Compl. ¶ 29.  Therefore, by CIC's own admission, if it received notice of the Gilbert's potential claim in May 2009, including sufficient "bare details to make an informed decision whether an apparent breach of the policy condition had occurred," and the 45-day notice period

16

began to run.  Consequently, CIC had until forty-five days after May 20, 2009, to provide

notice to the insureds and Ms. Gilbert of its reservation of rights.

Pursuant to § 38.2-2226, CIC's January 13, 2012, reservation of rights notice to

Paulson & Nace, Barry Nace, and Gabriel Assad was not timely.

> ii.   *Even if the Court determines CIC was not aware of the Gilbert's Claim and*
> *Defendants' alleged breach until filing of the Legal Malpractice claim, its*
> *defense is still barred by § 38.2-2226 because it did not provide timely*
> *notice to the Gilberts.*

Alternatively, even if the Court determined that the 45-day time period did not

begin to run until the Gilberts served Paulson & Nace and Barry Nace with the legal

malpractice claim, CIC's defense is still time-barred.  Service of the legal malpractice

claim occurred on June 4, 2012[9].  Therefore, despite being on notice of a potential claim

since May 2009, and knowing the alleged breach occurred in 2007, the *latest* CIC could

have timely provide notice of its reservation of rights to the Gilberts would have been

July 19, 2012.  CIC never issued notice to Sarah Gilbert, other than naming her as a

defendant in the first declaratory judgment action concerning coverage in September

2012.

In State Auto Property and Cas. Ins. Co. v. Gorsuch, 323 F. Supp. 2d 746

(W.D.Va. 2004), the district court of the Western District of Virginia held the insurer's

notice to the claimant untimely because the claimant did not receive notice until the

insurer filed its declaratory judgment action, well over forty-five days after learning of the

claim and breach.  Id. at 757.  On July 8, 2001, a heavy storm flooded culverts installed

by Stevenson, owner of the property and president and sole shareholder of BH&P, a

---

[9] See Nace Aff. ¶ 9.

mining company which used the property. Id. at 748.  The flooding on Stevenson's

property caused flooding on his neighbor's property, causing damage. Id. at 749.

Stevenson, notified BH&P's insurance agent that the claimants believed his culverts

caused their property damage within a week of the flood. Id.  Stevenson testified he

spoke with his insurance agent multiple times regarding the flooding and potential

lawsuits for the next two years. Id.  The claimants did not file suit until April 2003. Id. at

750.  Upon receipt of the lawsuit, the insurer sent a reservation of rights letter to the

Stevenson and his attorney, claiming that Stevenson was not an insured under the

policy, that the policy's pollution exclusion precluded coverage, and that Stevenson and

BH&P violated the policy condition by failing to timely notify the insurer of the incident.

Id.  The insurer filed a declaratory judgment action seeking to disclaim coverage on

October 1, 2003.  Id.

The claimants did not receive notice of the insurer's intent to rely upon a breach

of the policy provisions to deny coverage for their claims until filing of the declaratory

judgment action and the insurer did not forward a copy of the 2003 reservation of rights

letter to claimants until April 2004. Id.  The Court determined that the insurer's notice

was untimely pursuant to § 38.2-2226 because the insurer at the latest, was required to

notify the claimants of its reservation of rights within forty-five days of the letter to the

Stevenson.  Id. at 757.

Similarly in the present case, CIC issued its reservation of rights letters to

Defendants in January 2012, however it did not forward any notice to the Gilberts.  In

fact, the Gilberts were unaware of CIC's intention to rely upon the defense of breach of

policy to disclaim coverage for their claim until CIC filed its first declaratory judgment

18

action on September 25, 2012.  Pursuant to <u>Gorsuch</u>, and all the cases cited herein, this notice was simply too late.  Therefore, CIC waived its defense by operation of law pursuant to § 38.2-2226.

       E.    <u>Under the Common Law, CIC Waived Or Is Estopped From Disclaiming Coverage.</u>

Waiver and estoppel are frequently discussed together.  "Waiver is voluntary action or inaction with intent to surrender a right *in esse* with knowledge of the facts and circumstances which gave birth to the right."  <u>Empl. Commercial Union Ins. Co. v. Great American Ins. Co.</u>, 214 Va. 410, 413, 200 S.E.2d 560, 562 (1973).  Estoppel, a doctrine in equity, "is the consequence worked by operation of law which enjoins one whose action or inaction has induced reliance by another from benefitting from a change in his position at the expense of another."  <u>Id.</u>  In this case, CIC both waived its right to rely upon a breach of contract defense to coverage and is estopped from asserting that defense due to its action in investigating the Gilbert Lawsuit and providing a defense to the Nace Defendants, and its inaction in issuing notice of its intent to rely upon a breach of contract defense.

       i.    *CIC waived its right to rely upon a breach of contract defense to coverage when it undertook to investigate the Gilbert Lawsuit and waited 2 ½ years to issue a reservation of rights.*

For a waiver to exist, "knowledge of the facts basic to the exercise of the right and the intent to relinquish that right are essential elements."  <u>Empl. Commercial Union Ins. Co. v. Great American Ins. Co.</u>, 214 Va. 410, 413, 200 S.E.2d 560, 562 (1973) (citing <u>May v. Martin</u>, 205 Va. 397, 137 S.E.2d 860 (1964)).  There is no genuine issue of material fact that CIC had notice of the Gilberts' potential claim and fully investigated

19

the matter, including obtaining all relevant pleadings almost two years before it issued a reservation of rights.  Compl. ¶ 25, Pl. Supp. Resp. Req. Prod. Doc. No. 1, Bates CIC 000229-357.  Therefore, CIC had knowledge of all of the facts basic to its exercise of a breach of contract defense and by its actions and inactions, intended to waive its right to rely on such a defense.

> ii.    *CIC is estopped from denying coverage because it represented coverage existed by undertaking to investigate the Gilbert Lawsuit for 2 ½ years.*

The elements necessary to establish equitable estoppel, absent a showing of fraud or deception, are 1) a representation; 2) reliance; 3) a change of position; and 4) detriment.  Waynesboro Village, L.L.C. v. BMC Properties, 255 Va. 75, 79, 496 S.E.2d 64, 67 (1998); T v. T, 216 Va. 867, 872, 224 S.E.2d 148, 152 (1976).  CIC represented that it would not rely upon a breach of contract defense to coverage by undertaking to investigate the matter, retaining counsel for the Nace Defendants, and communicating with that counsel and the Nace Defendants for three years.  Nace Aff. ¶ 5; Pl. Supp. Resp. Req. Prod. Doc. No. 1, Ex. 5.  The Nace Defendants relied on that representation and determined not to retain their own counsel to protect their individual interests as a result of CIC providing coverage and a defense.  Furthermore, the Gilberts proceeded to pursue their claim without the benefit of knowing that CIC would potentially deny coverage.  All the parties except for CIC relied upon CIC's investigation and defense of the Gilbert Lawsuits and all of the parties changed their position to their detriment as a result.

20

43

## III. CONCLUSION

For the foregoing reasons, Defendants Paulson & Nace, PLLC, and Barry J.

Nace, Esquire, respectfully request this Court grant their Motion for Summary Judgment

and Dismiss the Complaint with prejudice.

**PAULSON & NACE, PLLC and**
**BARRY J. NACE, Esquire**
By Counsel

_____/s/_____
Stephen A. Horvath
Virginia Bar No. 19133
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 University Drive
Fairfax, Virginia 22030
(703) 385-1000
(703) 385-1555 - Facsimile
shorvath@bmhjlaw.com
Counsel for Defendants, Paulson & Nace, PLLC and
Barry J. Nace, Esq.

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 8th day of August, 2013, I emailed the foregoing to the following:

David D. Hudgins, Esq.
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, VA 22314
dhudgins@hudginslawfirm.com
Counsel for Plaintiff

Herman Aubrey Ford, III, Esquire
Cantor Stoneburner Ford Grana & Buckner
7130 Glen Forest Drive, Ste 400
Richmond, VA 23226
aford@virginiatrialfirm.com
Co-Counsel for Defendant Sarah Gilbert

Paulette S. Sarp, Esquire
Hinshaw & Culbertson, LLP
333 South Seventh Street
Suite 2000
Minneapolis, MN 55402
psarp@hinshawlaw.com
Counsel for Plaintiff

Gabriel Assaad, Esquire
Assaad Law, PLLC
1425 K Street, NW, Suite 350
Washington, DC 20005
gassaad@assaadlaw.com
Defendant

_____ /s _____
Stephen A. Horvath
Virginia Bar No. 19133
BANCROFT, McGAVIN, HORVATH &
JUDKINS, P.C.
3920 University Drive
Fairfax, VA 22030
(703) 385-1000
(703) 385-1555 - Facsimile
shorvath@bmhjlaw.com
Counsel for Defendants, Paulson & Nace,
PLLC and Barry J. Nace, Esquire

22

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHICAGO INSURANCE COMPANY,<br>An Illinois corporation, | : <br> : <br> : | |
| Plaintiff, | : <br> : | Civil Action No. 1:12-CV-02068-ABJ |
| v. | : <br> : <br> : | |
| PAULSON & NACE, PLLC, a professional<br>limited liability company; BARRY J. NACE,<br>an individual; GABRIEL ASSAAD, an<br>individual; and SARAH E. GILBERT, an<br>individual. | : <br> : <br> : <br> : <br> : | |
| Defendants. | : <br> : | |

## PLAINTIFF CHICAGO INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Chicago Insurance Company ("CIC"), by counsel and pursuant to Fed. R. Civ. Pro. R. 56(a), moves this Honorable Court for Summary Judgment against defendants Paulson & Nace, PLLC, Barry J. Nace, Gabriel Assaad, and Sarah E. Gilbert ("Defendants") on the grounds that there are no genuine issues with regard to any material fact, and that it is entitled as a matter of law to judgment in its favor on its claims for declaratory judgment against Defendants.

In support of its Motion, CIC respectfully directs the Court's attention to its Statement of Materials Facts As To Which There Is No Genuine Issue, and Memorandum of Points and Authorities in Support, attached hereto and incorporated herein by reference.

Pursuant to LCvR 7(f), CIC requests an oral hearing on its Motion for Summary Judgment against Defendants.

WHEREFORE, CIC's Motion for Summary Judgment against Defendants should be granted.

121583127 0939915

46

**CHICAGO INSURANCE COMPANY**

Dated:    September 19, 2013    By:   */s/ Paulette S. Sarp*
                                  Paulette S. Sarp, admitted pro hac vice
                                  HINSHAW & CULBERTSON LLP
                                  333 South Seventh Street, Suite 2000
                                  Minneapolis, MN  55402
                                  O:  (612) 333-3434
                                  F:  (612) 334-8888
                                  psarp@hinshawlaw.com

                          *-and-*

                                  David D. Hudgins, Esq., D.C. Bar No. 362451
                                  HUDGINS LAW FIRM
                                  515 King Street, Suite 400
                                  Alexandria, VA  22314
                                  O:  (703) 739-3300
                                  F:  (703) 739-3700
                                  e-mailbox@hudginslawfirm.com

                                  Counsel for Plaintiff

2

121583127 0939915

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHICAGO INSURANCE COMPANY, <br> An Illinois corporation, | : <br> : | |
| | : | Civil Action No. 1:12-CV-02068-ABJ |
| Plaintiff, | : <br> : | |
| v. | : <br> : | |
| PAULSON & NACE, PLLC, a professional <br> limited liability company; BARRY J. NACE, <br> an individual; GABRIEL ASSAAD, an <br> individual; and SARAH E. GILBERT, an <br> individual. | : <br> : <br> : <br> : <br> : | |
| Defendants. | : | |

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**CIC'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Chicago Insurance Company ("CIC") submits the following Memorandum of Law in support of its Motion for Summary Judgment.

**<u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>**

CIC seeks a declaratory judgment that it is not obligated to continue defending Paulson & Nace, PLLC, Barry Nace and Gabriel Assaad (the "Attorney Defendants") in an underlying legal malpractice action filed against them by Sarah Gilbert or to pay any settlement or judgment entered in that lawsuit. The basis for CIC's position is that one of the requirements for coverage in the insuring agreement of the professional liability policy it issued to the Attorney Defendants has not been satisfied as a matter of law. The insuring agreement requires that prior to the first policy being issued, the insured must have had "no reasonable basis to believe that the Insured had breached a professional duty <u>or</u> to Reasonably Foresee that a Claim would be made against the Insured." (Emphasis added). This requirement is not an exclusion from coverage, but rather, a requirement for coverage included in the insuring agreement. Unless this requirement for coverage is met, CIC has no obligation to defend or indemnify under the policy.

121581291 0939915

CIC issued its first claims made and reported professional liability policy to the Attorney Defendants on July 24, 2007.  Shortly before this policy was issued, two separate medical malpractice lawsuits filed by the Attorney Defendants on behalf of their client Sarah Gilbert had been dismissed with prejudice.  Ms. Gilbert had retained the Attorney Defendants after she underwent spinal fusion surgery to correct her scoliosis on July 28, 2004 and was rendered a paraplegic as a result of the surgery.  The Attorney Defendants filed the first medical malpractice lawsuit on July 24, 2006, just four days before the statute of limitations on Miss Gilbert's claim expired.  The complaint incorrectly named Ms. Gilbert's parents "on behalf of their daughter" instead of "as next friends" as required under Virginia law.  The defendants in the first medical malpractice lawsuit immediately filed motions to dismiss on the grounds that the Attorney Defendants had filed the case in the name of the wrong party.  Accordingly, in recognition that the first lawsuit had been improperly pleaded, on October 25, 2006 – three months *after* the statute of limitations on Ms. Gilbert's claim had expired – Paulson & Nace filed a separate, second complaint identifying her parents as "next friends."  The defendants filed a motion to dismiss the second lawsuit based on the statute of limitations.

In a hearing on the record before the judge in the first medical malpractice lawsuit on January 4, 2007, attorney Gabriel Assaad (an associate at the Paulson & Nace firm at that time), stated: "I agree we haven't filed the claim appropriately with regard to the claim at issue at this point in time..."  On February 26, 2007, the first medical malpractice lawsuit was dismissed with prejudice because the suit had been filed in the name of the wrong party in violation of Va. Code § 8.01-8 (2007).

2

121581291 0939915

On June 18, 2007, the court heard oral arguments on the defendants' motion to dismiss and ruled from the bench dismissing the second medical malpractice lawsuit with prejudice on the grounds that the statute of limitations barred the action.

On July 18, 2007 – approximately five months after the first medical malpractice lawsuit was dismissed with prejudice and only one month after the second medical malpractice lawsuit was dismissed with prejudice – Mr. Nace sent an application to CIC to obtain professional liability coverage requesting an effective date of July 24, 2007.  Mr. Nace did not disclose that these two medical malpractice lawsuits had been dismissed or the potential for a claim in his application.  On July 24, 2007, CIC issued its first professional liability policy to Paulson & Nace for the period July 24, 2007 to July 24, 2008 ("the 2007-2008 policy").  CIC renewed the policy for the July 24, 2008 to July 24, 2009 policy period ("the 2008-2009 policy").  The coverage was provided on a claims made and reported basis.

The Attorney Defendants first reported to CIC a potential claim by Ms. Gilbert in approximately May of 2009, during the 2008-2009 policy period.  When Ms. Gilbert finally filed her legal malpractice lawsuit in March of 2012, CIC agreed to provide the Attorney Defendants with a defense to that lawsuit subject to a reservation of rights to deny coverage on the grounds that the "no prior knowledge" requirement for coverage in the policy's insuring agreement had not been satisfied.

CIC now requests summary judgment in its favor.  The undisputed facts establish that the insureds had a reasonable basis to believe before the first CIC policy was issued on July 24, 2007 that a professional duty had been breached <u>or</u> to reasonably foresee that a claim would be made against them.  The pertinent case law confirms that the test is an objective one.  Whether or not the Attorney Defendants may have believed that they ultimately could convince an appellate

3

court to reverse the dismissal of the two medical malpractice lawsuits or that Ms. Gilbert would not actually bring a claim against them is irrelevant.  Any *reasonable attorney* who, after receiving a motion to dismiss a lawsuit for failure to properly plead and then files another complaint outside the statue of limitations would conclude that a professional duty had been breached, particularly when both lawsuits were dismissed with prejudice.   Under these circumstances, any reasonable attorney also would know that a legal malpractice claim might be brought against him.

Because the requirements for coverage set forth in the insuring agreement are not satisfied, CIC has no obligation to provide defense or indemnity to the Attorney Defendants for Ms. Gilbert's legal malpractice lawsuit.  CIC is entitled to summary judgment as a matter of law.

## FACTUAL BACKGROUND

### The underlying legal malpractice lawsuit and the professional error upon which it is based.

On March 19, 2012, Sarah Gilbert filed a legal malpractice lawsuit captioned: <u>Sarah E. Gilbert v. Paulson & Nace, PLLC, Barry J. Nace, and Gabriel Assaad</u>, in the Circuit Court of the City of Richmond (the "Gilbert Lawsuit"). (<u>See</u> Plaintiff's Statement of Material Facts ("PSOF"), ¶ 1).  The Gilbert Lawsuit alleges professional negligence and breach of contract against the Attorney Defendants arising out of their legal representation of Sarah Gilbert in two medical malpractice lawsuits filed on her behalf.  (PSOF, ¶ 2).

The Gilbert Lawsuit alleges that on July 28, 2004, Ms. Gilbert underwent spinal fusion surgery to correct her scoliosis.  The surgery rendered Miss Gilbert a paraplegic.  (PSOF, ¶ 3). In December of 2004, Ms. Gilbert's parents, Richard and Rosie Gilbert, retained Barry Nace and his law firm, Paulson & Nace, on behalf of their minor daughter to pursue a claim of medical malpractice and negligence in Virginia.  (PSOF, ¶ 4).

4

121581291 0939915

On July 24, 2006, just four days before the statute of limitations expired on Ms. Gilbert's claim, Paulson & Nace filed a medical malpractice lawsuit in Virginia (the "first medical malpractice lawsuit"). (PSOF, ¶¶ 5, 6). The complaint, filed on Ms. Gilbert's behalf, named her parents "*on behalf of their daughter*." (Id.) (Emphasis added).

The defendants in the first medical malpractice lawsuit immediately filed motions to dismiss on the grounds that the Attorney Defendants had filed the case in the name of the wrong party and that, under Virginia law, a parent cannot sue on behalf of a child; rather, the child must bring the suit and the parents named in the suit as "next friends." (PSOF, ¶ 7).

On October 25, 2006 – three months after the statute of limitations on Ms. Gilbert's claim had expired – Paulson & Nace filed a separate, second complaint identifying her parents as "next friends" (the "second medical malpractice lawsuit"). (PSOF, ¶ 8).

At a hearing on the defendants' motion to dismiss the first medical malpractice lawsuit on January 4, 2007, one of the Attorney Defendants, Gabriel Assaad, who was an associate at the Paulson & Nace firm involved in filing the medical malpractice lawsuits, represented to the Virginia court as follows:

> I do agree the action took place – or the negligence took place on July 28[th], 2004, and, therefore, the statute of limitations would be on that date, would be July 28[th], 2006. However, Your Honor, there are certain issues that may toll the statute, based on continuing treatment, based on we might move the Court to declare this person incapacitated during a certain period of time during that period, and I have yet to receive the medical records from the defendants to be able to make those arguments to determine whether or not we're going to proceed with that action. That's why I feel at this point, to dismiss the child's claim with prejudice would be inappropriate. <u>I agree we haven't filed the claim appropriately with regard to the claim at issue at this point in time and therefore</u> –

(Emphasis added). (PSOF, ¶ 9). On February 26, 2007, the court dismissed the first medical malpractice lawsuit with prejudice because it had been filed in the name of the wrong party. (PSOF, ¶ 10).

121581291 0939915

The defendants also filed motions to dismiss in the second medical malpractice lawsuit, this time based on the fact that the statute of limitations expired before this lawsuit was filed. (PSOF, ¶ 11).  On June 18, 2007, at the oral argument held by the Virginia court on these motions, the court ruled from the bench and dismissed the second medical malpractice lawsuit with prejudice on the basis that Ms. Gilbert's claims were barred by the statute of limitations. (Id.)

**Issuance of the first CIC policy to Paulson & Nace**.

On July 18, 2007 – just one month after Ms. Gilbert's second medical malpractice lawsuit had been dismissed – Mr. Nace submitted an application to CIC to obtain a professional liability policy requesting an effective date of July 24, 2007.  (PSOF, ¶ 14).  In the application, Mr. Nace answered the following question:

> (b)   Having inquired of all partners, officers, owners and employed lawyers, are there any circumstances which may result in a claim being made against the firm, its predecessors or any current or past partner, officer, owner or employed lawyer of the firm?        ☐ Yes  ☒ No
>
> * * *
>
> THE APPLICANT REPRESENTS THAT THE ABOVE STATEMENTS AND FACTS ARE TRUE AND THAT NO MATERIAL FACTS HAVE BEEN SUPPRESSED OR MISSTATED.
>
> Barry J. Nace                                    7/18/07
> Print or Type Name and Title         Date (Mo-Day-Yr.)

(PSOF, ¶ 15).  The application did not advise CIC of a potential claim by Ms. Gilbert.  (PSOF, ¶ ¶ 14-15).

CIC issued a claims made and reported Lawyers Professional Liability Policy to "Barry J. Nace dba Paulson & Nace" for the policy period July 24, 2007 to July 24, 2008 ("the 2007-2008 policy").  (PSOF, ¶ 16).  The coverage was renewed for the policy period July 24, 2008 to July 24, 2009  ("the 2008-2009 policy"). (PSOF, ¶ 17).  The relevant terms and provisions in these

121581291 0939915

two policies are the same for purposes of the coverage issues in this lawsuit.  (PSOF, ¶ ¶ 16-17).

The insuring agreement for both policies provides as follows

### INSURING AGREEMENTS

**I.     COVERAGE**

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the **Policy Period** or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. Provided always that such **Professional Services** or **Personal Injury** happen:

A.     during the **Policy Period**; or

B.     prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business,** and continuously renewed and maintained in effect to the inception of this policy period:

1.     the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury**;

2.     the **Named Insured**, any partner, shareholder, employee, or where appropriate the **Named Insured's** management committee or any member thereof, had no reasonable basis to believe that the **Insured** had breached a professional duty or to **Reasonably Foresee** that a **Claim** would be made against the **Insured;** and

3.     there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such **Claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any **Claim**, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

(PSOF, ¶ 24).  Pursuant to Paragraph II.B.2 of the policy's insuring agreement, there can only be

coverage for claims arising out of professional services rendered before the policy was issued, as

121581291 0939915

is the case here, if, before CIC issued its first policy, the insured had no reasonable basis to believe that a professional duty had been breached or to reasonably foresee that a claim would be made against it.  If the professional services and error took place during the policy period, then the "no prior knowledge" requirement for coverage in Paragraph II.B.2 does not apply.  The policy defines the terms "claim" and "reasonably foresee" as follows:

> "**Claim**" means a demand for money or services, or the filing of suit or institution of arbitration proceedings or **Alternative Dispute Resolution** naming an **Insured** and alleging a negligent act, error, omission or **Personal Injury** resulting from the rendering of or failure to render **Professional Services**.  **Claim** does not include proceedings seeking injunctive or other non-pecuniary relief.

> \* \* \*

> **Reasonably Foresee(n)** means:

> 1.     **Claims** or incidents reported to any prior insurer;

> 2.     unreported **Claims** or suits of which any **Insured** had received notice prior to the effective date of the first policy with the Company;

> 3.     incidents or circumstances that involve a particular person or entity which an **Insured** knew might result in a **Claim** or suit prior to the effective date of the first policy issued by the Company to the **Named Insured**, and which was not disclosed to the Company.

(PSOF, ¶ ¶ 25, 26).

### Notice of Ms. Gilbert's potential claim to CIC.

In May of 2009, during the 2008-2009 policy period, Mr. Nace submitted a "Supplemental Claim/Incident Information" form to CIC identifying Sarah Gilbert as a potential claimant.  (PSOF, ¶ 18).  Mr. Nace stated in this written notification that "no claim or suit has been filed" and that the date of the "alleged error" in the handling of Mr. Gilbert's claim was 2008.  (Id.)  However, as CIC later discovered during its investigation and monitoring of Ms. Gilbert's potential claim, the date of the "alleged error" was not 2008, but rather, 2006, which was before CIC issued its first policy.  Even Mr. Nace later acknowledged in an application for

121581291 0939915

professional liability insurance he submitted to Lloyds of London in 2011 that the correct "date of alleged error" relating to Ms. Gilbert's claim was "7/24/06 – Date of Original Complaint" filed by Paulson & Nace.  (PSOF, ¶ 19).

In July of 2009, shortly after the potential claim of Ms. Gilbert was reported to CIC, CIC issued a letter to the Attorney Defendants requesting the underlying file and advising that it would investigate and monitor the potential claim under a reservation of rights pending the outcome of the appeals that had been filed.  (PSOF, ¶ ¶ 20, 21).   On January 13, 2012, CIC sent a supplemental reservation of rights letter to the Attorney Defendants.  (PSOF, ¶ 23).

**Ms. Gilbert's claim and lawsuit against the Attorney Defendants**.

On March 19, 2012, attorney Aubrey Ford filed the Gilbert Lawsuit on behalf of Sarah Gilbert.  Mr. Ford sent a letter to Barry Nace on that date enclosing a copy of the complaint that had been filed.  (PSOF, ¶ 28).  On April 12, 2012, CIC received notice of the Gilbert Lawsuit from the insurance broker for the Attorney Defendants.  (PSOF, ¶ 29).  On April 21, 2012, CIC issued reservation of rights letters to the Attorney Defendants advising that CIC would provide them with a defense to the Gilbert Lawsuit subject to a reservation of rights to deny coverage, to withdraw from the defense, and to bring a declaratory judgment action seeking a declaration of no coverage for the Gilbert Lawsuit based upon the "no prior knowledge" requirement in the insuring agreement not being satisfied. (PSOF, ¶ 30).

## ARGUMENT

**1.**   **Legal standard.**

Summary judgment is properly entered under Federal Rule of Civil Procedure 56 if the evidence before the Court establishes that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  See also Marcin v.

121581291 0939915

Reliance Standard Life Ins. Co., 895 F.Supp.2d 105, 112 (D.D.C. 2012) ("Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'").  A genuine issue exists only if a "fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Only disputes that may affect the outcome of the case are considered material.  Id. at 248.   "[A]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." Marcin, 895 F.Supp.2d at 112 (citation omitted).

In cases involving interpretation of contracts, summary judgment is appropriate when the material facts are undisputed and the only issue is one of one of interpreting unambiguous contract language.  See Stevens v. United General Title Ins. Co., 801 A.2d 61, 66 (D.C. 2002) ("'[W]here [insurance] contract language is not ambiguous, summary judgment is appropriate because a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence.'"); Byrd v. Allstate Ins. Co., 622 A.2d 691, 693 (D.C. 1993) (same); Essex Ins. Co. v. Cafe Dupont, LLC, 674 F.Supp.2d 166, 169 70 (D.D.C. 2009) (same); MDB Communications, Inc. v. Hartford Cas. Ins. Co., 479 F.Supp.2d 136, 141 (D.D.C. 2007); Nationwide Mut. Ins. Co. v. National REO Management, Inc., 205 F.R.D. 1, 9 (D.D.C. 2000) (granting insurer's motion for summary judgment on issue of whether policy required defense or indemnity of insured).

"An insurance policy is a contract between the insured and the insurer, and in construing it [a court] must first look to the language of the contract." Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP, 793 F.Supp.2d 399, 409 (D.D.C. 2011) (citation omitted). Under District of Columbia law, when the language of insurance contracts is "clear and

121581291 0939915

unambiguous," courts must enforce the contract as written, so long as it does not "violate a statute or public policy." Id. (citation omitted). See also I.J.G., Inc. v. Penn-America Ins. Co., 803 A.2d 430, 436 (D.C. 2002) ("'a court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity.'").

**2.      The law of the District of Columbia applies to this coverage action.**

If it is determined that a conflict exists between the laws of different states that could apply to determine coverage in this action, this court must apply District of Columbia choice of law rules to determine which jurisdiction has the "more substantial interest" in the resolution of the issues." See, e.g., Eli Lilly and Co. v. Home Ins. Co., 653 F.Supp. 1, 7 (D.D.C. 1984).  It is CIC's position that it is entitled to summary judgment based on the "nor prior knowledge" requirement in the insuring agreement under the law of the District of Columbia and the law of Virginia.  See Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP, 793 F. Supp. 2d 399 (D.D.C. 2011) (applying D.C. law and holding that insurer was not obligated to provide coverage as a matter of law when the "no prior knowledge" requirement for coverage was not satisfied); Bryan Brothers Inc. v. Continental Cas. Co., 2011 WL 1058851 (4th Cir. 2011) (applying Virginia law and awarding summary judgment in insurer's favor on the grounds that the policy's "no prior knowledge" requirement was not satisfied).  However, to the extent it is determined that a conflict does exist, D.C. law should be applied to determine coverage in this declaratory judgment action.

The "more substantial interest" test is "not a mechanical standard and courts must ascertain the quality of the contacts which invoke a state's interest in a particular case." Eli Lilly and Co. v. Home Ins. Co., 653 F.Supp. 1, 7 (D.D.C. 1984).  In insurance cases, "a court will look at the following factors to determine which law will apply: 1) the residence of the insured, 2) the

11

121581291 0939915

place where the application was completed, 3) the places where the policy was negotiated, consummated, and delivered, and 4) the situs of the insured risk." Id.

For example, in Potomac Elec. Power Co. v. California Union Ins. Co., 777 F.Supp. 968, 972-74 (D.D.C. 1991), the court applied the "more substantial interest" test to determine which state's law applied to resolve coverage in action filed by an insured against its insurer seeking indemnity coverage for payments the insured made to resolve environmental damage claims asserted against it.  The insured, a large electric utility company primarily serving D.C. and Maryland argued that D.C. law should apply because D.C. was its headquarters and principal place of business.  The insurer argued that Maryland law should apply because that is where the pollution damage occurred giving rise to the claims against the insured and because Maryland was the largest source of revenue of the three jurisdictions in which the insured operated.  The court held that the fact that the damage occurred in Maryland did not weigh in favor of Maryland law applying because it was equally possible that environmental damage could have occurred in the other states where the insured operated.  777 F. Supp. at 972.

The court refused to apply the rule that the place where damage occurred should control the issue of insurance coverage.  Instead, the court held that "the most reasonable course" in an insurance coverage dispute was to choose the insured's headquarters "as the location with the most substantial interest in the controversy."  777 F. Supp. at 973.  The court noted that this was particularly true where the headquarters is also the center of the insured's operations.  Id. According to the court, "[a]nother reason for choosing the headquarters of the insured as the source of law is that this is the location which appears to be most likely contemplated by the parties":

12

121581291 0939915

> [C]ommon sense suggests that, knowing of the potential for claims in any number of states … the parties would consider the insured's principal headquarters as the one jurisdiction which ties all potential parties together.  [citation omitted]
>
> This view is consistent with that of the Restatement (Second) of Conflict of Laws which states that for a liability insurance contract the local law of state which the parties understood to be the principal location of the insured risk during the term of the policy [will be the source of law for the policy] unless with respect to the particulate issue, some other state has a more significant relationship.

Id.

More recently, the D.C. Court of Appeals applied similar factors to hold that the law of the state where the insured was headquartered applied to determine whether the insurer was obligated to defend and indemnify the insured in a series of ongoing lawsuits against the insured, one of which was filed in D.C.[1]  See Adolph Coors Co. v. Truck Ins. Exch., 960 A.2d 617 (D.C. Ct. App. 2008).   The insured (Adolph Coors Brewing Companies) was headquartered in Colorado and its principal place of business also was in Colorado.   Adolph Coors was sued in several putative class action lawsuits filed in D.C., Colorado, North Carolina and Ohio for unfair business practices, unjust enrichment, and corrupt activity in marketing to minors in these states. 960 A.2d at 619-621.   The court held that Colorado had the most significant interest in the issue of coverage because that was where the policy was negotiated and the insured had its principal place of business and headquarters.   Id. at 621.   The court noted that the only apparent connection to D.C. was that one of the plaintiffs was a D.C. resident and filed his lawsuit against Adolph Coors in D.C.   The court concluded that this fact alone was insufficient to override the interests of Colorado under these circumstances.   Id.

---

[1] The court considered (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; (5) the residence and place of business of the parties; and (6) the principal location of the insured risk.  Adolph Coors, 960 A.2d at 620.

13

121581291 0939915

The two relevant states' law here are Virginia and the District of Columbia.  The only interest Virginia has in this insurance coverage dispute, if any, is that the claimant, Ms. Gilbert, is a resident of the state.  The District of Columbia, on the other hand, is where the insured, Paulson & Nace, is headquartered and has its principal place of business.  D.C. is where the policy was negotiated and delivered.  D.C. also is the principal location of the insured risk. Barry Nace is not even licensed to practice law in Virginia.  The principal location of the insured risk for a firm of lawyers primarily practicing in the District of Columbia is the District of Columbia.  Accordingly, to the extent there is any conflict between the law of Virginia and the District of Columbia, District of Columbia law should apply.

Until recently, the Attorney Defendants also have adamantly maintained that D.C. law – and not Virginia law – should be applied to determine coverage.  For example, when CIC filed its original coverage action in Virginia to ensure personal jurisdiction over Ms. Gilbert (the claimant), the Attorney Defendants immediately moved to dismiss on the grounds that Virginia did not have personal jurisdiction over them.  One of the Attorney Defendants' primary arguments in support of their motion was that D.C. law would apply to determine coverage under the CIC policy.  The Attorney Defendants argued that the Virginia court had no jurisdiction over the "Washington D.C. Policy" at issue in this coverage dispute because the policy was negotiated and delivered in Washington, D.C. and "is subject to Washington, D.C. law interpretation." (PSOF, ¶ 35).  According to the Attorney Defendants, "the issue in this case implicates Washington, D.C.'s significant interest in determining and applying its own insurance contract interpretation law." (Id.)  The record is replete with the Attorney Defendants' arguments to the Virginia court that D.C. law applies:

☐      "The only issue before the Court in the present action is the insurance contract, no
        the underlying tort claim.  There are simply no connections to Virginia as between

14

121581291 0939915

CIC, Paulson & Nace, Barry Nace and interpretation or enforcement of the insurance contract."

☐ "[T]he two counts in the present case arise out of the interpretation and enforcement of a Washington, D.C. insurance policy.  The only parties to the contract are CIC and Paulson & Nace.  CIC is an Illinois corporation and Paulson & Nace is a Washington, D.C. limited liability company.  Barry Nace resides and works in Washington, D.C.  Further, the negotiation for and execution of the Policy occurred in Washington, D.C.  Consequently, there is no basis for venue in the Alexandria Division of the Eastern District under § 1391(b)(2) because none of the acts or omissions surrounding the Policy occurred there."

☐ "[T]he issue in this case implicates Washington, D.C.'s significant interest in determining and applying its own insurance contract interpretation law."

☐ "[T]he Court does not have *in personam* jurisdiction arising out of a contract entered into in the District of Columbia, when the Defendants, Paulson & Nace and Barry Nace, are neither citizens nor residents of Virginia, do not have substantial contacts with Virginia, and are not subject to the Court's jurisdiction in Virginia."

☐ "This case arises out of an insurance policy or contract, executed by an Illinois insurance company and a Washington, D.C. law firm."

☐ "Neither Paulson & Nace nor Barry J. Nace is registered or licensed to do business in Virginia."

☐ "[I]t is inapposite to this case whether or not the Richmond City Circuit Court has personal jurisdiction over the Nace Defendants in the legal malpractice case due to their representation of Ms. Gilbert in the underlying medical malpractice case because the present case does not arise out of any of the Nace Defendants' contacts with Virginia."

☐ "[N]either Paulson & Nace, PLLC, nor Barry J. Nace, had any regular court of conduct or business transaction in the Commonwealth of Virginia."

☐ "Despite the fact that the Gilbert Lawsuit is pending in Richmond City Circuit Court, CIC brought this declaratory judgment action related to its obligations under the Washington D.C. Policy towards the Attorney Defendants in the Gilbert Lawsuit in this Court, where none of the parties reside, nor any of the events occurred."

(PSOF, ¶ 35).  Having succeeded in avoiding having to litigate coverage in a Virginia court in

large part by arguing that D.C. law should apply to this coverage action, the Attorney Defendants

should not be allowed to take the exact opposite position in this Court and argue that Virginia

121581291 0939915

law applies.[2]   On the contrary, consistent with the choice of law factors utilized by D.C. courts,

it is the District of Columbia that has the most significant interest in determining whether

coverage exists under a policy where the principal location of the insured risk was D.C.

**3.**     **The Attorney Defendants had a reasonable basis to believe that they had breached a professional duty or reasonably foresee that a claim might be made against them before CIC's first policy was issued.**

As a preliminary matter, it is important to note that the Attorney Defendants have the

burden of proof in establishing coverage.  It is well established under D.C. law that an insured

seeking benefits under an insurance policy has the burden of establishing that the claim falls

within the policy's coverage.  Evans v. Medical Inter-Ins. Exchange, 856 A.2d 609, 613 (D.C.

2004); Young Women's Christian Ass'n of Nat. Capital Area, Inc. v. All State Ins. Co. of

Canada, 158 F.R.D. 6, 8 (D.D.C. 1994) (citing Wright & Miller, *Federal Practice and*

*Procedure,* § 1243, p. 297).   See also Council For Responsible Nutrition v. Hartford Cas. Ins.

Co., 2007 WL 2020093 at *4 (D.D.C. 2007) ("insured bears the burden of showing that the

underlying complaint comes within the policy's grant of coverage").   Here, the Attorney

Defendants have the burden of proof in establishing that all of the requirements for coverage

included in the insuring agreement, including the "no prior knowledge" requirement, have been

satisfied in order to obtain coverage.  Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler,

LLP, 793 F. Supp. 2d 399 (D.D.C. 2011).  This situation is analogous to an "occurrence-based"

---

[2] CIC notes that the Attorney Defendants have in fact argued in their Motion for Summary Judgment (Doc. 14-1) that Virginia substantive law should apply.  The sole basis for the Attorney Defendants' new argument that Virginia law should apply is their misguided attempt to apply as an affirmative defense in this coverage action a Virginia statute that requires insurers to provide notice of coverage disclaimers to claimants in certain circumstances.  D.C. has no such statute.  As CIC will demonstrate in its opposition to the Attorney Defendants' motion, even if Virginia law were to apply here, this statute is of limited application and does not apply for several reasons, one of which is that it only applies when the insurer denies coverage based upon the insured's breach of the policy and only if the claimant has been prejudiced.  CIC has never alleged that the insureds breached the policy.  CIC's position is that there is no coverage because the terms and provisions of the policy's insuring agreement have not been met.  In addition, Ms. Gilbert has made no showing of prejudice.  This Court should reject the Attorney Defendants' disingenuous attempt to take contrary positions on the same facts simply because they perceive that it suits their purposes to do so.

121581291 0939915

liability policy that provides coverage only for "bodily injury" or "property damage" caused by an "occurrence" that takes place during the policy period.  Under both types of policies it is the insured's burden to establish that the facts and circumstances of the claim for which the insured seeks coverage fall within the scope of the insuring agreement.

The Attorney Defendants fail to meet this burden as matter of law.  The United States District Court's opinion in Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP, 793 F. Supp. 2d 399 (D.D.C. 2011) is on point and requires summary judgment in CIC's favor.  In Capital Specialty, the court analyzed a similar insuring agreement and concluded that there was no coverage for a legal malpractice action against an insured law firm because it could not establish that the "no prior knowledge" requirement had been satisfied.  In 2004, Sanford Wittels & Heisler, LLP (the insured) agreed to represent three individuals in a racial discrimination suit against the United States Department of Commerce ("DOC").  Id. at 402.  On October 5, 2005, the firm filed a suit on behalf of the clients individually and as representatives of a putative class of similarly-situated African American employees.  According to local rules of the United States District Court, the law firm had 90 days from the date of filing the complaint to file for class certification.  On March 17, 2006, DOC moved to strike the class claims on the ground that the clients had missed the filing deadline for class certification.

On June 23, 2006, the clients filed an amended complaint and a motion to extend the class certification deadline.  The DOC renewed its motion to strike the class claims in July 2006. The underlying court granted the DOC's motion and refused to reconsider the order, "noting that defendants did not rely on their reading of the local rule 'until after they realized they had already missed the filing deadline by more than two and a half months' and that instead, they 'hoped, through the filing of an amended complaint, to resurrect their ability to file a motion that *they*

17

121581291 0939915

**64**

*already knew was already several months out of time.*'" <u>Id.</u> at 403.  The underlying court also observed that defendants' "post hoc rationalizations" for missing the certification deadline did little to conceal the fact that defendants "ha[d] no excuse beyond attorney mistake for their failure to file a timely motion for class certification." <u>Id.</u>  Following this ruling, the clients retained new counsel and pursued their individual claims against the DOC.

The law firm did not hear anything further from the clients until March 20, 2008 when they received a letter from an attorney, Fred Goldberg on behalf of the clients.  <u>Id.</u> at 404. The letter advised the law firm that as a result of their failure "to meet the Local Rule requirement with regard to class certification, [the clients] and the class have been economically harmed." <u>Id.</u>  The law firm provided a copy of this letter to Capitol Specialty, their malpractice insurer, on April 4, 2008.

On January 21, 2010, the clients filed a legal malpractice action against the law firm.  On February 19, 2010, the law firm notified Capitol Specialty of the lawsuit.

Capitol Specialty first issued a liability insurance policy to the law firm for the policy period December 10, 2004 to December 10, 2005.  This policy was not renewed and, for the next two years, the law firm was insured by a different company.  Beginning on December 10, 2007, Capitol Specialty again became the law firm's legal malpractice insurer.  The policy was continuously renewed thereafter.

Prior to the policy's issuance, the law firm signed a Renewal Application for Lawyers Professional Liability Insurance and Warranty Statement.  In its Application, signed November 1, 2007, the firm denied being aware of "any circumstances, allegations, tolling agreements or contentions as to any incident which may result in a claim being made against the Applicant or

121581291 0939915

any of its past or present Owners, Partners, Shareholders, Corporate Officers, Associates, Employed Lawyers, Contract Lawyers or Employees or predecessors in business." Id. at 404.

The professional liability policy issued to the firm set forth the following requirement to coverage:

> (b) *prior to the inception date of the first policy* issued by the Company *if* continuously renewed, no Insured had any basis (1) to believe that any Insured had breached a professional duty; or (2) to foresee that any such act or omission or Related Act or Omission might reasonably be expected to be the basis of a Claim against any Insured; and

Id. at 408.

Capitol contended that the claim was not covered because the firm had notice of a potential claim in March of 2006 when the DOC first moved to strike the class claims on the grounds that the claimants had missed a filing deadline. According to Capitol, that knowledge was reinforced in February, 2007 when the class claim was dismissed and again in September, 2007 when the underlying court rejected the reconsideration efforts. Id.

The court agreed, holding that "[w]here the policy expressly makes compliance with its terms a condition precedent to liability on the part of the insurer, failure to comply with the notice provision will release the insurer of liability on the policy." Id. (citing Lee v. Travelers Ins. Co., 184 A.2d 636, 638 (D.C. 1962)). The court reasoned that missing a filing deadline resulting in the dismissal of the class action claim could "easily qualify as a breach of a professional duty." Id. (citing See In re Belmar, 319 B.R. 748, 755 (Bankr. D.D.C. 2004) ("[T]here is no genuine issue that the defendants breached that standard of care by failing to timely file an opposition or seek an extension of time in which to file such an opposition.")

The law firm argued that the clients' malpractice action was not reasonably foreseeable. The law firm emphasized that the clients "expressed their understanding that the Court's dismissal of the class claims could be appealed at a later time, and the clients further stated their

121581291 0939915

intent to proceed with the individual claims and appeal the Court's decision to strike the class claims at the end of litigation." Id.

The court rejected this argument and observed that the correct standard was an "objective, reasonable attorney" standard – not "whether the lawyer in fact had a subjective belief that a malpractice action was probable." Id. at 411. "[T]he question whether the insured has acted reasonably becomes a question of law only when reasonable persons can draw but one inference...." Id. (citation omitted). According to the court, "the dismissal of a lawsuit because of attorney error would clearly put a lawyer on notice of the possibility of a malpractice claim." Id. See also Ross v. Continental Cas. Co., 420 B.R. 43 (D.D.C. 2009) (a law firm's failure to file a timely answer resulting in a default judgment could reasonably be expected to form the basis for a malpractice claim; the insured concedes that the firm knew the facts surrounding the entry of default against RESD. Goldschmidt knew he did not file an answer on behalf of RESD, unsuccessfully sought to have Superior Court vacate the entry of default, and knew that the Superior Court entered a default judgment against RESD before the liability policy went into effect); Cameron v. Washington Metro. Area Transit Auth., 649 A.2d 291, 294 (D.C. 1994) (finding an attorney "has a duty to pay attention to filing deadlines...."); O'Neil v. Bergan, 452 A.2d 337, 341–43 (D.C. 1982) (holding that "allowing the statute of limitations to run on the client's claim" is an example of obvious malpractice that does not require expert testimony to establish a standard of care).

The court therefore concluded that the acts or omissions underlying the malpractice lawsuit established "as a matter of law" that the insureds had a basis to "believe that any Insured had breached a professional duty," or to "foresee that any such act or omission ... might reasonably be expected to be the basis of a Claim against the Insured." Id. Because the insured

121581291 0939915

could not satisfy the requirement to coverage, the malpractice action was not covered under the policy.

In <u>Bryan Bros. Inc. v. Continental Cas. Co.</u>, 660 F.3d 827, 830-31 (4th Cir. 2011) (applying Virginia law), the court similarly concluded that the insured's prior knowledge of an act or omission that could reasonably be expected to be the basis of a claim precluded coverage under the policy. The insured was a professional accounting firm that was sued for claims relating to embezzlement by an insured employee. In the insuring agreement, Continental Casualty agreed to cover Bryan Brothers' "liability on claims made during the policy period '*provided that* ... prior to the effective date of this policy, none of you had a basis to believe that any such act or omission, or interrelated act or omission, might reasonably be expected to be the basis of a claim.'" <u>Id.</u> (emphasis in original). The court noted that "Bryan Brothers's lack of prior knowledge [of a potential claim] is a condition of Continental Casualty Company's agreement to cover Bryan Brothers's liability from acts predating the policy." <u>Id.</u> The court concluded that because this requirement for coverage in the insuring agreement was not satisfied there was no coverage under the policy. <u>Id.</u> Specifically, the court held that because the insured knew of at least some of the thefts prior to issuance of the professional liability policy, as a matter of law, the insured had a reasonable basis to believe that these acts could result in a claim by the clients.

The <u>Bryan Bros.</u> court observed that "[t]his interpretation melds with the concept of fortuity, a fundamental premise of insurance law." <u>Id.</u> "Insurers do not usually contract to cover preexisting risks and liabilities known by the insured." <u>Id.</u> "[T]he prior knowledge provision essentially makes fortuity a condition of coverage" and "indicates in clear and unambiguous

21

121581291 0939915

language Continental Casualty Company's unwillingness to cover liability arising from prior acts or omissions that any insured might reasonably expect to result in a claim." Id.

In Worth v. Tamarack American, a Div. of Great American Ins. Co., 47 F.Supp.2d 1087, 1095 (S.D. Ind. 1999), aff'd 2000 WL 101227 (7th Cir. Jan. 26, 2000), the court applied a "prior knowledge" limitation in the insuring agreement and concluded that the insurer properly refused to defend or indemnify its insured attorney in a malpractice action.  In 1992, Worth filed a Chapter 7 petition on behalf of his client, Clock, months after the service of process deadline expired and after the government had filed a motion to dismiss for failure to perfect service.  Id. at 1098.  The court dismissed the complaint filed by Worth on behalf of his client.  Id.  Clock subsequently filed a malpractice action against Worth and Worth sought defense and indemnity coverage from his professional liability insurer.  Id. at 1093.

The insuring agreement to the professional liability policy issued to Worth added "an important caveat, denying coverage for acts, errors or omissions that occurred prior to the policy period unless Worth [the insured] had 'no reasonable basis to believe that [he] had breached a professional duty or to foresee that a claim would be made against [him].'"  Id. at 1095.  The court applied an objective standard to determine whether a reasonable attorney in the insured's position would have believed he had breached a professional duty to his client before the effective date of the policy coverage.  Id. at 1096.

According to the court, "[t]he insurance provision excepting coverage for acts and omissions that occurred prior to policy coverage exists for a reason—it encourages would-be insureds to disclose any reasonable basis to believe that a prior act or omission resulted in a breach of professional duty."  Id. at 1099.  "By inducing would-be insureds to disclose potential or actual breaches of professional duty, the insurer is better able to assess the risk of extending

22

121581291 0939915

insurance, thereby adjusting premium levels, altering the type of insurance extended, or denying coverage altogether if the insurer believes that such a breach might ripen into a valid malpractice action during the coverage period." Id.

The Worth court concluded that even if the insured did not believe that his client would succeed in proving causation or damages in a malpractice action, "he had a reasonable basis to believe that he previously had breached a professional duty when he obtained policy coverage in 1995." Id. at 1099-1100.  Nonetheless, he chose not to report the dismissal of his client's claim when purchasing the "'claims made' insurance policy containing clear and unambiguous language that excluded coverage for known omissions and errors occurring prior to policy coverage." Id.   The court therefore held that based upon the undisputed facts, the insurer properly refused to defend and indemnify Worth in the underlying malpractice action against him, which was clearly and obviously excluded from coverage.  Id.

Courts across the country applying this objective standard consistently hold that an insured's subjective belief that he may have temporarily "fixed" his professional error or that the error might be remedied on appeal does not satisfy the "no prior knowledge" requirement for coverage in a claims-made policy.  See Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co., 712 F.3d 336 (7th Cir. 2013) (holding as a matter of law that a reasonable attorney knew or should have known that his inadvertent misfiling of an executed sales contract might give rise to a claim, regardless of whether the insure believed a court would eventually rule in favor of his client); Wittner, Poger, Rosenblum & Spewak, P.C. v. Bar Plan Mut. Ins. Co., 969 S.W.2d 749, 754 (Mo. 1998) (insured's subjective belief that default judgment eventually would be vacated and client would not file a claim did not preclude finding that insured had a reasonable basis to believe he had committed an error); Lewis v. St. Paul Fire and Marine Ins. Co., 452 N.W.2d 386,

389 (Iowa 1990) (rejecting argument that attorney could not reasonably believe a claim might be pursued against him based upon dismissal of client's workers compensation claim until commissioner rendered final ruling that claim could not be reinstated); General Ins. Co. of America v. Boyd, 2002 U.S. Dist. LEXIS 13276 at *19-20 (S.D. Ind. 2002) (insured's good faith subjective belief that default judgment against his client was in error and would be reversed on appeal did not preclude finding that a malpractice claim was reasonably foreseeable); Ross v. Continental Cas. Co., 420 B.R. 43, 55 (D.D.C. 2009)(no malpractice coverage available to an attorney for a suit stemming from the attorney's failure to file an answer which resulted in a default being entered; the court stated, "[i]n establishing prior knowledge, there is no requirement that the client complain ahead of time or indicate that it will file a claim against the insured"); Mt. Airy Ins. Co. v. Thomas, 954 F. Supp. 1073, 1080 (W.D. Pa. 1997) (dispute over whether attorney believed that client would actually pursue a claim is not relevant).[3]

This legal authority mandates a finding that, as a matter of law, the Attorney Defendants had a reasonable basis to know before CIC issued its first policy on July 24, 2007 that a professional error had been committed *or* that a claim might be brought against them by Ms. Gilbert as a result of this error.  On February 26, 2007 – five months before the first CIC policy was issued to Paulson & Nace – the court dismissed Miss Gilbert's first medical malpractice lawsuit with prejudice because it had been filed in the name of the wrong party.   On June 18, 2007, just one month before the first CIC policy was issued, the court dismissed the second malpractice lawsuit that the Attorney Defendants had filed in order to correct the pleading error

---

[3] CIC does not have to establish that it has sustained any prejudice before it is entitled to deny coverage on the grounds that the "no prior knowledge" requirement in the insuring agreement has not been satisfied.  See, e.g., Continental Cas. Co. v. Cuda, 306 Ill. App. 3d 340, 350 (1st Dist. 1999); Abood v. Gulf Group Lloyds, 2008 U.S. Dist. LEXIS 51406 at * 27 (W.D.Pa. July 1, 2008); Wittner, Poger, Rosenblum & Spewak, P.C. v. Bar Plan Mut. Ins. Co., 969 S.W.2d 749, 754 (Mo. 1998) (distinguishing between a "late notice" defense sometimes asserted under an occurrence-based policy with the "no prior knowledge" requirement for coverage in a claims-made policy and confirming that an insurer is entitled to enforce a "no prior knowledge" condition without proving prejudice).

121581291 0939915

in the first malpractice lawsuit.  The second lawsuit was dismissed with prejudice because it was filed after the statute of limitations had expired.

Based on these undisputed facts, the "no prior knowledge" requirement for coverage has not been satisfied as a matter of law.  No reasonable attorney could fail to understand under the circumstances that existed prior to CIC's first policy being issued that a professional error had been committed or that a legal malpractice claim might be asserted against them as a result of these errors.  Whether or not these errors ultimately could be "fixed" (which they were not) an whether or not the Attorney Defendants subjectively believed that Ms. Gilbert would not assert a claim does not change this fact.  Because the requirements for coverage in the policy's insuring agreement are not satisfied as a matter of law, CIC has no obligation to continue defending the Attorney Defendants in the Gilbert Lawsuit and no obligation to pay for any settlement or judgment that may be entered against the Attorney Defendants.

## CONCLUSION

The requirements for coverage included in the insuring agreement of the CIC policy have not been satisfied as a matter of law.  CIC respectfully requests that the Court enter summary judgment in its favor.

## REQUEST FOR ORAL HEARING

CIC requests an oral argument on this Motion.

121581291 0939915

**CHICAGO INSURANCE COMPANY**

Dated:      September 19, 2013      By:     */s/ Paulette S. Sarp*
                                                 _____
                                                 Paulette S. Sarp, admitted pro hac vice
                                                 HINSHAW & CULBERTSON LLP
                                                 333 South Seventh Street, Suite 2000
                                                 Minneapolis, MN  55402
                                                 O:  (612) 333-3434
                                                 F:  (612) 334-8888
                                                 psarp@hinshawlaw.com

                                   *-and-*
                                                 David D. Hudgins, Esq., D.C. Bar No. 362451
                                                 HUDGINS LAW FIRM
                                                 515 King Street, Suite 400
                                                 Alexandria, VA  22314
                                                 O:  (703) 739-3300
                                                 F:  (703) 739-3700
                                                 e-mailbox@hudginslawfirm.com

                                                 Counsel for Plaintiff

121581291 0939915

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHICAGO INSURANCE COMPANY, <br> An Illinois corporation, | : <br> : | |
| | : | |
| Plaintiff, | : <br> : | Civil Action No. 1:12-CV-02068-ABJ |
| | : | |
| v. | : <br> : | |
| | : | |
| PAULSON & NACE, PLLC, a professional <br> limited liability company; BARRY J. NACE, <br> an individual; GABRIEL ASSAAD, an <br> individual; and SARAH E. GILBERT, an <br> individual. | : <br> : <br> : <br> : <br> : | |
| | : | |
| Defendants. | : | |

---

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF CHICAGO INSURANCE
COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to LCvR 7(a), Plaintiff Chicago Insurance Company ("CIC") submits the following statement of material facts as to which there is no genuine issue in support of its Motion for Summary Judgment against the Defendants.

**The underlying legal malpractice lawsuit and the professional error upon which it is based.**

1.      On March 19, 2012, Sarah Gilbert filed a legal malpractice lawsuit captioned: Sarah E. Gilbert v. Paulson & Nace, PLLC, Barry J. Nace, and Gabriel Assaad, in the Circuit Court of the City of Richmond (the "Gilbert Lawsuit").   (A true and correct copy of the complaint filed in the Gilbert Lawsuit is attached as **Exhibit A**).

2.      The Gilbert Lawsuit alleges professional negligence and breach of contract against Paulson & Nace, PLLC, Barry J. Nace, and Gabriel Assaad (collectively "the Attorney Defendants") arising out of their legal representation of Sarah Gilbert in two medical malpractice lawsuits filed on her behalf.  (Exhibit A).

3.      The Gilbert Lawsuit alleges that on July 28, 2004, Ms. Gilbert underwent spinal fusion surgery to correct her scoliosis.  The surgery rendered Ms. Gilbert a paraplegic.  (Exhibit A, ¶ ¶ 18-26).

4.      In December of 2004, Ms. Gilbert's parents, Richard and Rosie Gilbert, retained Barry Nace and his law firm, Paulson & Nace, on behalf of their minor daughter to pursue a claim of medical malpractice and negligence in Virginia.  (Exhibit A).

5.      The Attorney Defendants filed the first medical malpractice lawsuit on Ms. Gilbert's behalf in a Virginia court on July 24, 2006.  The complaint, filed on Miss Gilbert's behalf, named her parents "*on behalf of their daughter*."  (Emphasis added).  (A true and correct copy of the first medical malpractice lawsuit filed by Paulson & Nace on behalf of Ms. Gilbert is attached as **Exhibit B**).

6.      The statute of limitations on Ms. Gilbert's medical malpractice claim expired on July 28, 2006.  The first medical malpractice lawsuit was filed four days before the statute of limitations expired on Miss Gilbert's claim.  (Exhibit A, ¶ 38).

7.      The defendants in the first medical malpractice lawsuit immediately filed motions to dismiss on the grounds that the Attorney Defendants had filed the case in the name of the wrong party and that, under Virginia law, a minor must sue in his or her own name by his or her next friend(s).  Va. Code § 8.01-8 (2007).  (A true and correct copy of the defendants' motion to dismiss the first medical malpractice lawsuit is attached as **Exhibit C**).

8.      On October 25, 2006 – three months after the statute of limitations on Ms. Gilbert's claim had expired – the Attorney Defendants filed a separate, second complaint identifying Ms. Gilbert's parents as "next friends."  (A true and correct copy of the second

2

121580786 0939915

medical malpractice lawsuit filed by Paulson & Nace on behalf of Ms. Gilbert is attached as

**Exhibit D**).

9.      In a hearing on the defendants' motion to dismiss in the first malpractice lawsuit

conducted on January 4, 2007, one of the Attorney Defendants, Gabriel Assaad, stated as

follows:

> I do agree the action took place – or the negligence took place on July 28[th], 2004,
> and, therefore, the statute of limitations would be on that date, would be July 28[th],
> 2006.  However, Your Honor, there are certain issues that may toll the statute,
> based on continuing treatment, based on we might move the Court to declare this
> person incapacitated during a certain period of time during that period, and I have
> yet to receive the medical records from the defendants to be able to make those
> arguments to determine whether or not we're going to proceed with that action.
> That's why I feel at this point, to dismiss the child's claim with prejudice would be
> inappropriate.  <u>I agree we haven't filed the claim appropriately with regard to the
> claim at issue at this point in time and therefore</u> – (Emphasis added).

(A true and correct copy of the transcript for the January 4, 2007 hearing is attached as **Exhibit**

**E**, at pp. G13-G14 ).

10.     On February 26, 2007, the court dismissed Miss Gilbert's first medical

malpractice lawsuit with prejudice because it had been filed in the name of the wrong party.  (A

true and correct copy of the February 26, 2007 dismissal is attached as **Exhibit F;** Exhibit A at ¶

42).

11.     The defendants also filed a motion to dismiss in the second medical malpractice

lawsuit.  On June 18, 2007, the court heard oral argument on the defendants' motion to dismiss.

(A true and correct copy of the hearing is attached as **Exhibit G**).  At the June 18, 2007 hearing

on the defendants' motion, the judge ruled from the bench and dismissed the second malpractice

lawsuit with prejudice.  (Exhibit G, at pp. 31-32, 44).

121580786 0939915

12.     The Virginia court's ruling at oral argument that the second medical malpractice lawsuit was dismissed with prejudice was also confirmed in a written order dated August 3, 2007.  (A true and correct copy of the order is attached as **Exhibit H**).

13.     A chart that illustrates the timeline of the events set forth in the preceding paragraphs is attached as **Exhibit I**.

**Issuance of the first CIC policy to Paulson & Nace.**

14.     On July 18, 2007 Mr. Nace sent an application to CIC to obtain a professional liability policy requesting an effective date of July 24, 2007.  (A true and correct copy of the July 18, 2007 application is attached as **Exhibit J**).

15.     In the application, Mr. Nace answered the following question:

*   *   *

(b)     Having inquired of all partners, officers, owners and employed lawyers, are there any circumstances which may result in a claim being made against the firm, its predecessors or any current or past partner, officer, owner or employed lawyer of the firm?        ☐ Yes ☒ No

* * *

THE APPLICANT REPRESENTS THAT THE ABOVE STATEMENTS AND FACTS ARE TRUE AND THAT NO MATERIAL FACTS HAVE BEEN SUPPRESSED OR MISSTATED.

| Barry J. Nace | 7/18/07 |
|---|---|
| Print or Type Name and Title | Date (Mo-Day-Yr.) |

(Exhibit J, at CIC-UW-000046).

16.     CIC first issued a claims made and reported Lawyers Professional Liability Policy to "Barry J. Nace dba Paulson & Nace" for the policy period July 24, 2007 to July 24, 2008 (the "2007-2008 policy").  (A true and correct copy of CIC's July 24, 2007 to July 24, 2008 policy is attached as **Exhibit K**).

4

121580786 0939915

17.   The coverage was renewed for the policy period July 24, 2008 to July 24, 2009 (the "2008-2009 policy"). (A true and correct copy of CIC's July 24, 2008 to July 24, 2009 policy is attached as **Exhibit L**).

**Notice of Ms. Gilbert's potential claim to CIC**.

18.   In May of 2009, during the 2008-2009 policy period, Mr. Nace submitted a "Supplemental Claim/Incident Information" form to CIC identifying Sarah Gilbert as a potential claimant. On that form, Mr. Nace advised that "no claim or suit has been filed" and that the date of the "alleged error" in the handling of Mr. Gilbert's claim was 2008. (A true and correct copy of the May 2009 "Supplemental Claim/Incident Information" form is attached as **Exhibit M**).

19.   However, as Mr. Nace later stated in an application for professional liability insurance he submitted to Lloyds of London in 2011, the *correct* "date of alleged error" relating to Ms. Gilbert's claim was "7/24/06 – Date of Original Complaint" filed by Paulson & Nace. (A true and correct copy of the Lloyds' application is attached as **Exhibit N**).

20.   In July of 2009, shortly after Mr. Nace had reported to CIC Ms. Gilbert's potential claim involving a 2008 date of alleged error, CIC issued a general reservation of rights letter to its insureds and continued to monitor and investigate the potential claim. (A copy of the 2009 acknowledgment of potential claim reservation of rights letter from Cari Ellenberger to Barry Nace (Chicago 0011-12); email string dated July 24, 2009 from broker for Paulson & Nace confirming receipt of letter (Chicago 002-4); and Ms. Ellenberger's claim log notes dated July 2, 2009 concerning sending of acknowledgment letter are attached as **Exhibit O**.)

21.   CIC's reservation of rights acknowledged notice of the "potential attorney malpractice claim by Sarah Gilbert and her family". CIC advised that it would investigate the potential claim under a reservation of rights:

121580786 0939915

Nothing contained herein constitutes a waiver of any of our potential rights and defenses. CIC reserves all of its rights under the policy and, in particular, reserves the right to assert coverage or policy defenses, if any, at such time when pertinent facts and circumstances or their significance are disclosed or otherwise become known to CIC. Nothing in this letter or in any prior or subsequent investigation should be construed to extend the terms or conditions of coverage in your policy. Nothing in this letter or in any prior or subsequent investigation should be construed as a restriction of any exclusion of coverage. CIC does not waive any such terms, conditions, or exclusions.

(See Exhibit O).

22.     On November 21, 2011, CIC received copies of all of the pleadings and hearing transcripts from the underlying malpractice lawsuits. (A true and correct copy of the November 21, 2011 letter from attorney Deborah Whelihan to CIC's counsel is attached as **Exhibit P**).[1]

23.     Upon discovery that the date of the alleged error giving rise to Ms. Gilbert's potential claim was actually prior issuance of CIC's first policy, CIC issued supplemental reservation of rights letter to the insureds. Specifically, on January 13, 2012, CIC advised in writing that there may be no coverage for Ms. Gilbert's potential claim on the grounds that the requirement for coverage in policy's insuring agreement that the insureds have no reasonable basis to believe that a professional duty had been breached or that a claim might be made prior to inception of the first policy by CIC had not been satisfied. CIC advised that it would "continue to monitor and investigate this potential claim under a strict reservation of rights". (True and correct copies of the January 13, 2012 reservation of rights letters are attached as **Exhibit Q**).

24.     The insuring agreement to the 2008-2009 policy provides:

**INSURING AGREEMENTS**

**I.     COVERAGE**

---

[1] Mr. Nace had utilized Ms. Whelihan as counsel in other matters and considered her to be "his attorney". (See Affidavit of Barry J. Nace, ¶ 3, Doc. 14-6).

121580786 0939915

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the **Policy Period** or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. Provided always that such **Professional Services** or **Personal Injury** happen:

A.  during the **Policy Period**; or

B.  prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business,** and continuously renewed and maintained in effect to the inception of this policy period:

> 1.  the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury**;
>
> 2.  the **Named Insured**, any partner, shareholder, employee, or where appropriate the **Named Insured's** management committee or any member thereof, had no reasonable basis to believe that the **Insured** had breached a professional duty or to **Reasonably Foresee** that a **Claim** would be made against the **Insured**; and
>
> 3.  there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such **Claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any **Claim**, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

(Exhibit L, at CIC-UW-000160) (emphasis added)).

25.  The term "claim" is defined as follows:

"**Claim**" means a demand for money or services, or the filing of suit or institution of arbitration proceedings or **Alternative Dispute Resolution** naming an **Insured** and alleging a negligent act, error, omission or **Personal Injury** resulting from the rendering of or failure to render **Professional Services**.  **Claim** does not include proceedings seeking injunctive or other non-pecuniary relief.

(Exhibit L, at CIC-UW-000163).

121580786 0939915

26.     The 2008-2009 policy defines the term "reasonably foresee" as follows:

**Reasonably Foresee(n)** means:

1.      **Claims** or incidents reported to any prior insurer;

2.      unreported **Claims** or suits of which any **Insured** had received notice prior to the effective date of the first policy with the Company;

3.      incidents or circumstances that involve a particular person or entity which an **Insured** knew might result in a **Claim** or suit prior to the effective date of the first policy issued by the Company to the **Named Insured**, and which was not disclosed to the Company.

(Exhibit L, at CIC-UW-000164).

27.     The defense provision in the 2008-2009 policy provides:

The Company shall have the right and duty to defend any suit against the **Insured** seeking **Damages** to which this insurance applies even if any of the allegations of the suit are groundless, false or fraudulent.  The Company, at its option, shall select and assign defense counsel; however, the Insured may engage additional counsel, solely at their own expense, to associate in their defense of any **Claim** covered hereunder….Furthermore, the **Insured** shall not assume any obligations, incur any costs, charges, or expenses or enter into any settlement without the Company's consent.

(Exhibit L, at CIC-UW-000160).

**<u>Ms. Gilbert's claim and lawsuit against the Attorney Defendants</u>**.

28.     On March 19, 2012, attorney Aubrey Ford filed the Gilbert Lawsuit on behalf of Sarah Gilbert.  Mr. Ford sent a letter to Barry Nace on that date enclosing a copy of the complaint that had been filed.  (A true and correct copy of the March 19, 2012 letter from H. Aubrey Ford, III to Barry J. Nace is attached as **Exhibit R**).

29.     On April 12, 2012, CIC received notice of the Gilbert Lawsuit from the insurance broker for the Attorney Defendants.  (<u>See</u> 4/12/2012 entry from CIC claim log, CIC 000491, a true and correct copy of which is attached as **Exhibit S**).

8

121580786 0939915

30.     On April 21, 2012, CIC issued reservation of rights letters to the Attorney Defendants advising that CIC would provide them with a defense to the Gilbert Lawsuit subject to a reservation of rights to deny coverage, to withdraw from the defense, and to bring a declaratory judgment action seeking a declaration of no coverage for the Gilbert Lawsuit.  (True and correct copies of CIC's April 21, 2012 reservation of rights letters are attached as **Exhibit T**).

**The Coverage Action.**

31.     On September 25, 2012, CIC filed a Complaint for Declaratory Relief against Paulson & Nace, PLLC; Barry J. Nace; Gabriel Assaad; and Sarah Gilbert in the United States District Court, Eastern District of Virginia, file number 12-cv-1082 (the "Virginia Coverage Action").  (A true and correct copy of the Virginia DJ Complaint is attached as **Exhibit U**).  The Virginia Coverage Action involved the same parties and CIC sought the same relief in the Virginia Coverage Action as it does here.  (Id.).

32.     On October 12, 2012, Paulson & Nace and Barry Nace filed a Motion to Dismiss the Virginia Coverage Action on the grounds that the Virginia court did not have personal jurisdiction over the Nace Defendants.  (A true and correct copy of the Nace Defendants' Motion to Dismiss is attached as **Exhibit V**).

33.     On November 15, 2012, the Nace Defendants filed a Reply brief in support of their Motion and an Affidavit of Barry J. Nace and Declaration of Gabriel Assaad.  (True and correct copies of the Nace Defendants' Reply, Nace Affidavit and Assaad Declaration are attached as **Exhibit W**).

34.     Mr. Assaad joined in the Nace Defendants' Motion to Dismiss.  (A true and correct copy of Mr. Assaad's joinder is attached as **Exhibit X**).

35.     In their briefing in support of their Motion to Dismiss, the Attorney Defendants made the following representations to the court:

☐      "[T]he Court does not have *in personam* jurisdiction arising out of a contract entered into in the District of Columbia, when the Defendants, Paulson & Nace and Barry Nace, are neither citizens nor residents of Virginia, do not have substantial contacts with Virginia, and are not subject to the Court's jurisdiction in Virginia. (Motion, Exh. V, pp.2-3).

☐      "This case arises out of an insurance policy or contract, executed by an Illinois insurance company and a Washington, D.C. law firm." (Motion, Exh. V, p. 4).

☐      "This case centers on a contract entered into by an Illinois insurance corporation and a Washington, D.C. limited liability company.  Negotiations took place in Washington, D.C., the contract, which was delivered in Washington, D.C., is subject to Washington, D.C. law interpretation, and any performance or misrepresentation alleged in the Complaint occurred in Washington, D.C." (Motion, Exh. V, p. 5).

☐      "The only issue before the Court in the present action is the insurance contract, no the underlying tort claim.  There are simply no connections to Virginia as between CIC, Paulson & Nace, Barry Nace and interpretation or enforcement of the insurance contract." (Motion, Exh. V, p. 5).

☐      "[T]he two counts in the present case arise out of the interpretation and enforcement of a Washington, D.C. insurance policy.  The only parties to the contract are CIC and Paulson & Nace.  CIC is an Illinois corporation and Paulson & Nace is a Washington, D.C. limited liability company.  Barry Nace resides and works in Washington, D.C.  Further, the negotiation for and execution of the Policy occurred in Washington, D.C.  Consequently, there is no basis for venue in the Alexandria Division of the Eastern District under § 1391(b)(2) because none of the acts or omissions surrounding the Policy occurred there." (Motion, Exh. V, p. 6).

☐      "[T]he issue in this case implicates Washington, D.C.'s significant interest in determining and applying its own insurance contract interpretation law." (Motion, Exh. V, p. 8).

☐      "Neither Paulson & Nace nor Barry J. Nace is registered or licensed to do business in Virginia." (Reply, Exh. W, p. 4).

☐      "[I]t is inapposite to this case whether or not the Richmond City Circuit Court has personal jurisdiction over the Nace Defendants in the legal malpractice case due to their representation of Ms. Gilbert in the underlying medical malpractice case because the present case does not arise out of any of the Nace Defendants' contacts with Virginia." (Reply, Exh. W, p. 8).

☐      "[N]either Paulson & Nace, PLLC, nor Barry J. Nace, had any regular court of conduct or business transaction in the Commonwealth of Virginia." (Nace Aff., Exh. W, ¶ 11).

121580786 0939915

☐ "Despite the fact that the Gilbert Lawsuit is pending in Richmond City Circuit Court, CIC brought this declaratory judgment action related to its obligations under the Washington D.C. Policy towards the Attorney Defendants in the Gilbert Lawsuit in this Court, where none of the parties reside, nor any of the events occurred."  (Motion, Exh. V, p. 2).

36.     According to Mr. Nace's affidavit submitted in the Virginia Coverage Action, he is not licensed to practice law in Virginia.  (Nace Aff., Exh. W, ¶ 4).

37.     Paulson & Nace, PLLC is a professional limited liability company organized under the laws of Washington, D.C., engaged in the practice of law in Washington, D.C., with its principal place of business in Washington, D.C. (Nace Aff., Exh. W, ¶ 3).

38.     On December 3, 2012, the Virginia court dismissed the Virginia Coverage Action without prejudice for lack of jurisdiction.

39.     CIC then filed a Complaint for Declaratory Judgment action in the United States District Court for the District of Columbia.  (Doc. 1).

**CHICAGO INSURANCE COMPANY**

Dated:      September 19, 2013          By:     /s/ Paulette S. Sarp
                                                Paulette S. Sarp, admitted pro hac vice
                                                HINSHAW & CULBERTSON LLP
                                                333 South Seventh Street, Suite 2000
                                                Minneapolis, MN  55402
                                                O:  (612) 333-3434
                                                F:  (612) 334-8888
                                                psarp@hinshawlaw.com

                                        and     David D. Hudgins, Esq., D.C. Bar No. 362451
                                                HUDGINS LAW FIRM
                                                515 King Street, Suite 400
                                                Alexandria, VA  22314
                                                O:  (703) 739-3300
                                                F:  (703) 739-3700
                                                e-mailbox@hudginslawfirm.com

                                                Counsel for Plaintiff

121580786 0939915

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of September, 2013, a copy of the foregoing pleading was served via ECF on:

Stephen A. Horvath, Esq.
Bancroft, McGavin, Horvath & Judkins, P.C.
3920 University Drive
Fairfax, Virginia 22030
shorvath@tbmhjlaw.com

H. Aubrey Ford, III, Esq.
Cantor, Stoneburner, Ford, Grana & Buckner
7130 Glen Forest Drive, Suite 400
Richmond, Virginia 23226
aford@virginiatrialfirm.com

Gabriel A. Assaad, Esq.
Assaad Law, PLLC
1425 K Street, NW, Suite 350
Washington, DC 20005
gassaad@assaadlaw.com

 

/s/ Paulette S. Sarp
Paulette S. Sarp, Esq., admitted pro hac vice
Hinshaw & Culbertson, LLP
333 South Seventh Street
Suite 2000
Minneapolis, MN 55402
(612) 333-3434
(612) 334-8888 - facsimile
psarp@hinshawlaw.com

and

David D. Hudgins, Esq., D.C. Bar No. 362451
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, Virginia 22314
dhudgins@hudginslawfirm.com

ATTORNEYS FOR PLAINTIFF

121583375v1 0939915

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT A



**VIRGINIA:**

IN THE CIRCUIT COURT OF THE CITY OF RICHMOND

| | |
|---|---|
| SARAH E. GILBERT,          ) | |
|     Plaintiff,             ) | |
|                   ) | |
| v.                   ) | Case No. _____ |
|                   ) | |
| PAULSON & NACE, PLLC,    ) | |
|                   ) | |
| and                 ) | |
|                   ) | |
| BARRY J. NACE,         ) | |
|                   ) | |
| and                 ) | |
|                   ) | |
| GABRIEL ASSAAD,       ) | |
|     Defendants.         ) | |

## COMPLAINT

The Plaintiff, Sarah E. Gilbert, by counsel, files her Complaint against the

Defendants, jointly and severally, and states as follows:

### NATURE OF THE CASE

1.    This action involves claims of breach of contract and professional

negligence against the Defendants relating to their legal representation of the Plaintiff,

Sarah E. Gilbert.

2.    Defendants' negligent acts and omissions, referred to below, constitute

breaches of their contract for legal representation with the Plaintiff.

CONFIDENTIAL

CIC 000007

## PARTIES

3.      The Plaintiff, Sarah E. Gilbert ("Miss Gilbert"), is a resident of Goochland County, Virginia who is currently attending college at Virginia Tech. Miss Gilbert was born on October 28, 1990 and was a minor at the time of the surgical procedure and injury described below.

4.      Defendant Paulson & Nace, PLLC ("Paulson & Nace") is a professional limited liability company engaged in the practice of law. The main office of Paulson & Nace is located at 1615 New Hampshire Avenue, NW, Washington, D.C.

5.      Defendant Barry J. Nace ("Mr. Nace") is an attorney who has been practicing law for over forty years and is a founding partner and principal of Paulson & Nace. He continues to practice law with Paulson & Nace.

6.      Defendant Gabriel Assaad ("Mr. Assaad") is an individual who has been practicing law since 2001. In 2004, Mr. Assaad joined the law firm of Paulson & Nace as an attorney.

7.      Following his employment with Paulson & Nace, Mr. Assaad opened his own law firm entitled Assaad Law, PLLC and currently practices law with that entity.

8.      At all times pertinent to this matter, Mr. Nace and Mr. Assaad were attorneys employed by and practicing law with Paulson & Nace. All of their acts described below were undertaken in the course and scope of their employment for Paulson & Nace.

## JURISDICTION AND VENUE

9.      Paulson & Nace regularly represents plaintiffs in medical malpractice and personal injury litigation in Virginia as well as Washington, D.C., Maryland and West



CIC 000008

Virginia. Paulson & Nace advertises its capacity to engage in the practice of law in Virginia and to represent Virginia citizens.

10.    One of the senior attorneys employed with Paulson & Nace, Caitlin S. Palacios, Esq., resides in Virginia.

11.    Mr. Assaad has been a member of the Virginia State Bar since 2001 and has regularly engaged in the practice of law in Virginia since then.

12.    Mr. Assaad lists two addresses for his current law firm Assaad Law, PLLC: (a) 1425 K Street in Washington, D.C. and (b) his designated "Virginia address" as 8300 Greensboro Drive in McLean, Virginia.

13.    All Defendants transacted business in Virginia from 2004 to the present by engaging in the practice of law in Virginia.

14.    The Defendants filed the pertinent lawsuits described below in the Circuit Court of the City of Richmond and also pursued appeals in the Supreme Court of Virginia in Richmond relating directly to the damages sustained by the Plaintiff.

15.    There is a direct connection between the damages alleged by the Plaintiff and the specific activities of the Defendants described below occurring in the Commonwealth of Virginia.

16.    This Court has jurisdiction over this matter pursuant to the Virginia long arm statute (Virginia Code § 8.01-328.1).

17.    This cause of action, or parts thereof, arose in Richmond pursuant to Virginia Code § 8.01-262(4).

## MISS GILBERT'S SURGERY AND INJURY

18.    On or about July 28, 2004, Susan E. Atkins, M.D., an orthopedic surgeon licensed to practice medicine in the Commonwealth of Virginia, ("Dr. Atkins") performed

3



CIC 000009

spinal fusion surgery upon Miss Gilbert to correct Miss Gilbert's scoliosis (the "Surgery").

19.    Dr. Atkins was a partner, member, agent, servant and employee of Children's Orthopedic Center.

20.    On or about July 28, 2004, during the Surgery, Dr. Atkins placed a left upper thoracic hook at T-4.

21.    On or about July 28, 2004, during the Surgery, Miss Gilbert had abrupt loss of SSEP readings to her lower extremities.

22.    On or about July 28, 2004, during the Surgery, Miss Gilbert had an abrupt loss of her electromagnetic graft (EMG) readings.

23.    On or about July 28, 2004, during the Surgery, no motion could be detected to Miss Gilbert's lower extremities on a wake-up test.

24.    On or about July 28, 2004, Dr. Atkins removed all the hardware and discontinued the Surgery.

25.    On or about July 28, 2004, following the Surgery, Miss Gilbert was transferred to the VCU Medical Center.

26.    On or about July 28, 2004, Miss Gilbert was diagnosed as a paraplegic.

27.    Miss Gilbert suffered catastrophic and permanent injuries including paralysis.

## THE LEGAL REPRESENTATION

28.    Miss Gilbert and her parents, Richard Gilbert and Rosie Lee Gilbert, communicated with Defendant Nace in December of 2004 for Paulson & Nace to represent them in potential medical malpractice actions arising out of the Surgery against Dr. Atkins, Children's Orthopedic Center, and CJW Medical Center.

4



CONFIDENTIAL

CIC 000010

29.    Defendants agreed to accept the case.  A written legal representation agreement was in effect between the Defendants, Miss Gilbert and her parents.

30.    The Defendants, who held themselves out to the public as very experienced in the field of medical malpractice law, fully investigated the claims of medical negligence against Dr. Atkins, Children's Orthopedic Center and CJW Medical Center, and determined that they would be able to successfully prove the allegations of medical negligence arising out of the Surgery.

31.    Mr. Assaad and Mr. Nace served as counsel on the case being handled by Paulson & Nace.

32.    At all times material to this action, the Defendants had an attorney-client relationship with Miss Gilbert and with Miss Gilbert's parents.

33.    The Defendants undertook to represent Miss Gilbert in her claims for medical malpractice and negligence arising out of the Surgery that left her a paraplegic.

34.    The Defendants took many depositions and designated a medical expert witness in support of their allegations of medical malpractice.

35.    The attorney-client relationship between the Defendants and Miss Gilbert gave rise to a duty on the part of the Defendants to exercise reasonable care, skill, and diligence in their performance of professional services on behalf of Miss Gilbert.

36.    As a result of the attorney-client relationship between the Defendants and Miss Gilbert, the Defendant attorneys owed a fiduciary duty to Miss Gilbert to represent her interests in her claims arising out of the Surgery with reasonable care, skill and diligence.

CONFIDENTIAL

CIC 000011

## THE MEDICAL MALPRACTICE LAWSUITS

37.   Miss Gilbert's Surgery occurred on July 28, 2004.

38.   Under Virginia law, the statute of limitations for Miss Gilbert's medical malpractice claim would expire on July 28, 2006.

39.   On July 24, 2006, four days before the statute of limitations was to expire, the Defendants filed a medical malpractice Complaint in the Circuit Court of the City of Richmond against Dr. Atkins and the medical defendants in the style "Richard Gilbert and Rosie Lee Gilbert, Individually and on behalf of their daughter, Sarah Gilbert, a minor" (the "Original Case").

40.   The medical defendants in the medical malpractice action filed motions to dismiss the Complaint on the grounds that Defendants had filed the Original Case in the name of the wrong party.

41.   Realizing that they may have erred in the Original Case, Defendants filed a separate Complaint in the Circuit Court of the City of Richmond on October 25, 2006 styled: "Sarah Gilbert, by her parents and next friends, Richard and Rosie Lee Gilbert, and Richard and Rosie Lee Gilbert, individually" (the "Second Case").

42.   On February 26, 2007, the Judge in the Original Case dismissed with prejudice all of the claims of Miss Gilbert on the grounds that the Defendants had filed the Original Case in the name of the wrong party.

43.   The Judge in the Second Case ultimately dismissed all of Miss Gilbert's claims because the Second Case was filed after the statute of limitations had expired.

44.   In response to further motions by the parties in the Original Case and the Second Case, the Judge in the Richmond Circuit Court on August 3, 2007 ruled that all of Miss Gilbert's claims for medical malpractice were dismissed with prejudice.

6

CONFIDENTIAL

CIC 000012

45.     After subsequent motions and a premature appeal to the Supreme Court of Virginia, the Defendants filed a motion to reconsider the prior rulings.  On April 28, 2009, a separate Judge in the Richmond Circuit Court heard the motion to reconsider and denied it, again affirming that the Defendants had filed the medical malpractice action improperly and that the statute of limitations had expired.

46.     The Defendants appealed the prior rulings of the Richmond Circuit Court to the Supreme Court of Virginia.

47.     In their appellate brief to the Supreme Court of Virginia dated August 14, 2009, the Defendants essentially acknowledged their error in filing the Original Case incorrectly.  (Petition for Appeal at pp. 12-16).

48.     On December 15, 2009, the Supreme Court of Virginia denied the appeal filed by the Defendants.

49.     The Defendants filed a third lawsuit attempting to assert the medical claims of Miss Gilbert.  On November 23, 2010, the Richmond Circuit Court again dismissed all of Miss Gilbert's claims arising out of the Surgery.

50.     As a result of the Defendants' actions and the rulings of the various courts, Miss Gilbert has no viable claim or remedy for the catastrophic and permanent personal injuries she suffered as a result of the Surgery.

51.     In communications from Defendants to Miss Gilbert and her parents on May 18, 2009, the Defendants admitted their responsibility for the error in the Original Case and the ultimate dismissal of Miss Gilbert's claims.

## BREACH OF CONTRACT AND PROFESSIONAL NEGLIGENCE

52.     Plaintiff fully incorporates by reference all of the preceding paragraphs as though fully set forth herein.



CIC 000013

53.    The existing law in the Commonwealth of Virginia at the time the
Defendants filed the Original Case on July 24, 2006 was well settled that a legal action
filed on behalf of a minor in the manner selected by Defendants was improper and
would not be viable.

54.    Defendants negligently provided professional services to Miss Gilbert,
including but not limited to the following acts or omissions:

a.    Filing the original medical malpractice action in a style and in a manner
      that was improper and would be dismissed under Virginia law;
b.    Failing to properly draft the pleadings on behalf of Miss Gilbert for her
      medical malpractice action;
c.    Filing the pleadings on behalf of Miss Gilbert in a manner and at a time
      that exposed Miss Gilbert's action to a serious risk of dismissal;
d.    Delaying the filing of the original medical malpractice action so as to
      enhance the risk of potential dismissal under the statute of limitations;
e.    Failing to adequately protect Miss Gilbert's interests in the medical
      malpractice action;
f.    Failing to take any and all reasonable actions to protect the interests of
      Miss Gilbert in her medical malpractice action; and
g.    Failing to retain the services of counsel experienced in the Commonwealth
      of Virginia in handling medical malpractice actions on behalf of minors.

55.    As a direct and proximate result of the Defendants' failure to exercise that
degree of skill, care and knowledge required of a reasonably prudent attorney in the
Commonwealth of Virginia which constitutes breaches of their contract with Miss
Gilbert, Miss Gilbert has suffered damages in an amount to be proven at trial.

56.    As a result of the Defendant attorneys' negligence in this regard, Miss
Gilbert has forever lost her right to proceed against the medical providers for the
catastrophic injuries she suffered in the Surgery.

57.    By the acts and omissions above, the Defendants breached their duties to
meet the standard of care in their representation of Miss Gilbert.

58.    If the Defendants had met the standard of care in their representation of
Miss Gilbert, Defendants would have successfully proven the allegations of medical

8

CONFIDENTIAL

CIC 000014

negligence that they asserted in Paragraph 23 of the medical malpractice Complaint they filed in the Original Case:

> At all times relevant hereto, Defendants failed to perform the aforesaid duty and were negligent in the following respects:
>
> a) Failure to properly perform Sarah Gilbert's Operation to correct her scoliosis;
> b) In the placement of the thoracic hook during the Operation;
> c) In the use of the thoracic hook during the Operation;
> d) In the treatment of paralysis following the Operation;
> e) Plaintiffs also assert the doctrine of res ipsa loquitur and respondeat superior; and
> f) Being otherwise negligent.

59.     If the Defendants had met the standard of care in their representation of Miss Gilbert, Miss Gilbert would have obtained a substantial recovery or judgment against the medical providers in the medical malpractice action.

60.     As a direct and proximate result of the Defendants' breaches of their duties, Miss Gilbert has sustained significant damages.

61.     Miss Gilbert suffered damages in an amount to be proven at trial, including the following:

a.     Bodily injuries she sustained and their permanent effect upon her health and welfare;

b.     Physical pain and mental anguish she suffered in the past and will continue to suffer in the future;

c.     Disfigurement and deformity and the associated humiliation and embarrassment;

d.     Inconvenience caused in the past and that will be caused in the future;

e.     Loss of earnings and lessening of earning capacity; and

f.     Emotional distress and mental anguish.

9



CONFIDENTIAL

CIC 000015

WHEREFORE, for the reasons stated, Plaintiff Sarah E. Gilbert respectfully requests this Court to enter judgment in her favor against the Defendants, jointly and severally, in the sum of FIVE MILLION AND NO/100 DOLLARS ($5,000,000) in compensatory damages, together with prejudgment interest, and such other relief as the Court shall deem appropriate.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

**SARAH E. GILBERT**

By: _____
       Of Counsel

H. Aubrey Ford, III (VSB No. 18691)
Irvin V. Cantor (VSB No. 17870)
Stephanie E. Grana (VSB No. 35736)
CANTOR STONEBURNER FORD
   GRANA & BUCKNER
7130 Glen Forest Drive, Suite 400
Richmond, Virginia  23226
Telephone:   (804) 644-1400
Facsimile:   (804) 644-9205
E-mail:   aford@virginiatrialfirm.com
E-mail:   icantor@virginiatrialfirm.com
E-mail:   sgrana@virginiatrialfirm.com
Counsel for Plaintiff

10

CONFIDENTIAL

CIC 000016

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT B

VIRGINIA:

## IN THE CIRCUIT COURT
## FOR THE CITY OF RICHMOND

RICHARD GILBERT and   :
ROSIE LEE GILBERT, Individually and :
on behalf of their daughter,   :
SARAH GILBERT, a minor:   :
2611 Turner Road     :
Goochland, VA 23063    :
         :
    Plaintiffs,   :
   v.     :  At Law No.: _____
         :
SUSAN EDWIN ATKINS, M.D.  :
1011 Hioaks Road, Suite D   :
Richmond, VA 23225-4040   :
         :
*-and-*        :
         :
CHILDREN'S ORTHOPEDIC CENTER :
1101 Hioaks Road     :
Richmond, VA 23225    :
         :
*-and-*        :
         :
CHIPPENHAM & JOHNSTON-WILLIS :
HOSPITAL, INC.,     :
d/b/a CJW MEDICAL CENTER  :
7101 Jahnke Road     :
Richmond, VA 23225    :
         :
  <u>Serve:</u>  CT Corporation System :
     4701 Cox Road, Suite 301 :
     Glen Allen, VA 23060 :
         :
    Defendants.  :

## COMPLAINT

  COMES NOW, Plaintiffs Richard Gilbert and Rosie Lee Gilbert, individually and on

behalf of their daughter, Sarah Gilbert, by and through the undersigned counsel, and make this

Complaint against Defendants.  In support thereof, Plaintiffs state as follows:

**A3**

**PARTIES**

1.      Plaintiff Richard Gilbert is an adult resident of the Commonwealth of Virginia.

2.      Plaintiff Rosie Gilbert is an adult resident of the Commonwealth of Virginia.

3.      Plaintiffs Richard Gilbert and Rosie Gilbert are the parents of their daughter, Sarah Gilbert, a minor.

4.      At all times relevant hereto, Defendant Susan E. Atkins, M.D. was a health care provider licensed to practice medicine in the Commonwealth of Virginia.

5.      At all times relevant hereto, Defendant Chippenham & Johnston-Willis Hospital, Inc. (hereinafter "CJW Medical Center") was a business providing healthcare in the Commonwealth of Virginia

6.      At all times relevant hereto, Defendant Children's Orthopedic Center (hereinafter "COC") was a business providing healthcare in the Commonwealth of Virginia.

7.      At all times relevant hereto, Defendant Atkins was a partner, member, agent, servant and/or an employee of Defendant COC.

**JURISDICTION**

8.      This Court has subject matter jurisdiction over this action pursuant to § 17.1-513 of the Code of Virginia in that this is a case at law greater than $15,000.00 and that the matters alleged herein occurred in the Commonwealth of Virginia.

9.      This Court has personal jurisdiction over Defendant pursuant to § 8.01-328.1 of the Code of Virginia in that Defendant committed a tortuous injury in this Commonwealth.

10.     This Court is the proper venue for this matter pursuant to § 8.01-262 of the Code of Virginia in that this cause of action arose in Richmond, Virginia.

**A4**

## FACTUAL BACKGROUND

11.     On or about July 28, 2004, Defendant Atkins, an orthopedic surgeon, performed a spinal fusion surgery to correct Sarah Gilbert's scoliosis (hereinafter "Operation").

12.     On or about July 28, 2004, during the Operation, Defendant Atkins placed a left upper thoracic hook at T4.

13.     On or about July 28, 2004, during the Operation, Sarah Gilbert had abrupt loss of SSEP readings to her lower extremities.

14.     On or about July 28, 2004, during the Operation, Sarah Gilbert had an abrupt loss of her electromagnetic graph (EMG) readings.

15.     On or about July 28, 2004, during the Operation, no motion could be detected to Sarah Gilbert's lower extremities on a wake-up test.

16.     On or about July 28, 2004, Defendant Atkins removed all the hardware and discontinued the Operation.

17.     On or about July 28, 2004, following the Operation, Sarah Gilbert was transferred to the Virginia Commonwealth University Health System.  Specifically, the Medical College of Virginia Hospital and Physicians in Richmond, Virginia.

18.     On or about July 28, 2004, Sarah Gilbert was diagnosed as a paraplegic.

19.     Sarah Gilbert suffers significant and permanent injuries including paralysis.

### Count I
(Medical Malpractice)

20.     Plaintiffs incorporate paragraphs 1 through 19 herein by reference.

21.     At all times relevant hereto, Defendants had a duty to provide care consistent with the accepted standard of care of health care providers existing under the same or similar circumstances.

3

**A5**

22.     Plaintiffs relied upon Defendants to exercise such degree of skill and care to properly, accurately, and timely diagnose and treat Sarah Gilbert's condition, as would other reasonable health care providers if presented with the same or similar circumstances.

23.     At all times relevant hereto, Defendants failed to perform the aforesaid duty and were negligent in the following respects:

    a)  Failure to properly perform Sarah Gilbert's Operation to correct her scoliosis;
    b)  In the placement of the thoracic hook during the Operation;
    c)  In the use of the thoracic hook during the Operation;
    d)  In the treatment of paralysis following the Operation;
    e)  Plaintiffs also assert the doctrine of *res ipsa loquitur* and *respondeat superior*; and
    f)  Being otherwise negligent.

24.     Sarah Gilbert has otherwise been injured without any negligence on her part contributing thereto and relied upon the expertise of Defendants.

25.     As a direct and proximate result of the negligence of the Defendants Dr. Susan Atkins, COC and CJW Medical Center, and each of them, Plaintiffs have been injured and have suffered and will continue to suffer economic and non-economic losses, including but not limited to mental anguish, paralysis, pain and suffering, humiliation, embarrassment, and the loss of enjoyment of life, all of which are permanent and will continue into the future.

**WHEREFORE**, Plaintiffs request judgment against Defendants in the amount of $5,000,000.00, plus interest costs of suit, and such other and further relief as this Court deems just and proper.

4

**A6**

Respectfully submitted,

PAULSON & NACE

Barry J. Nace
Gabriel A. Assaad, #46621
PAULSON & NACE
1615 New Hampshire Avenue, NW
Washington, DC  20009
(202) 463-1999
*Attorneys for Plaintiffs*

## Jury Demand

Plaintiffs, by and through the undersigned counsel, hereby demands trial by jury of all

issues in this matter.

Respectfully submitted,

Barry J. Nace
Gabriel A. Assaad, #46621
PAULSON & NACE
1615 New Hampshire Avenue, NW
Washington, DC  20009
(202) 463-1999
*Attorneys for Plaintiffs*

5

**A7**

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT D

**VIRGINIA:**

**IN THE CIRCUIT COURT**
**FOR THE CITY OF RICHMOND**

SARAH GILBERT, by her parents and next : 
friends RICHARD GILBERT and ROSIE LEE : 
GILBERT; and RICHARD GILBERT and : 
ROSIE LEE GILBERT, individually : 
2611 Turner Road : 
Goochland, VA 23063 : 
       : 
            **Plaintiffs,** : 
       **v.** :       At Law No.: *CL06-6787-3*
       : 
SUSAN EDWIN ATKINS, M.D. : 
1011 Hioaks Road, Suite D : 
Richmond, VA 23225-4040 : 
       : 
*-and-* : 
       : 
CHILDREN'S ORTHOPEDIC CENTER : 
1101 Hioaks Road : 
Richmond, VA 23225 : 
       : 
*-and-* : 
       : 
CHIPPENHAM & JOHNSTON-WILLIS : 
HOSPITAL, INC., : 
d/b/a CJW MEDICAL CENTER : 
7101 Jahnke Road : 
Richmond, VA 23225 : 
       : 
      Serve:     CT Corporation System : 
                4701 Cox Road, Suite 301 : 
                Glen Allen, VA 23060 : 
       : 
            **Defendants.** : 

RECEIVED & FILED
CIRCUIT COURT
OCT 2 5 2006
BEVILL M. DEAN, CLERK
By...................................D.C.

**COMPLAINT**

      COMES NOW, Plaintiffs Sarah Gilbert, by her parents and next friends Richard Gilbert

and Rosie Lee Gilbert; and Richard Gilbert and Rosie Lee Gilbert, individually, by and through

**B1**

104

the undersigned counsel, and make this Complaint against Defendants.  In support thereof,

Plaintiffs state as follows:

## PARTIES

1.      Plaintiff Sarah Gilbert is a minor resident of the Commonwealth of Virginia.

2.      Plaintiff Richard Gilbert is an adult resident of the Commonwealth of Virginia.

3.      Plaintiff Rosie Gilbert is an adult resident of the Commonwealth of Virginia.

4.      Plaintiffs Richard Gilbert and Rosie Gilbert are the parents of their daughter,

Sarah Gilbert, a minor.

5.      At all times relevant hereto, Defendant Susan E. Atkins, M.D. was a health care

provider licensed to practice medicine in the Commonwealth of Virginia.

6.      At all times relevant hereto, Defendant Chippenham & Johnston-Willis Hospital,

Inc. (hereinafter "CJW Medical Center") was a business providing healthcare in the

Commonwealth of Virginia

7.      At all times relevant hereto, Defendant Children's Orthopedic Center (hereinafter

"COC") was a business providing healthcare in the Commonwealth of Virginia.

8.      At all times relevant hereto, Defendant Atkins was a partner, member, agent,

servant and/or an employee of Defendant COC.

## JURISDICTION

9.      This Court has subject matter jurisdiction over this action pursuant to § 17.1-513

of the Code of Virginia in that this is a case at law greater than $15,000.00 and that the matters

alleged herein occurred in the Commonwealth of Virginia.

10.     This Court has personal jurisdiction over Defendant pursuant to § 8.01-328.1 of

the Code of Virginia in that Defendant committed a tortuous injury in this Commonwealth.

**B2**

11.     This Court is the proper venue for this matter pursuant to § 8.01-262 of the Code of Virginia in that this cause of action arose in Richmond, Virginia.

## FACTUAL BACKGROUND

12.     On or about July 28, 2004, Defendant Atkins, an orthopedic surgeon, performed a spinal fusion surgery to correct Sarah Gilbert's scoliosis (hereinafter "Operation").

13.     On or about July 28, 2004, during the Operation, Defendant Atkins placed a left upper thoracic hook at T4.

14.     On or about July 28, 2004, during the Operation, Sarah Gilbert had abrupt loss of SSEP readings to her lower extremities.

15.     On or about July 28, 2004, during the Operation, Sarah Gilbert had an abrupt loss of her electromagnetic graph (EMG) readings.

16.     On or about July 28, 2004, during the Operation, no motion could be detected to Sarah Gilbert's lower extremities on a wake-up test.

17.     On or about July 28, 2004, Defendant Atkins removed all the hardware and discontinued the Operation.

18.     On or about July 28, 2004, following the Operation, Sarah Gilbert was transferred to the Virginia Commonwealth University Health System.  Specifically, the Medical College of Virginia Hospital and Physicians in Richmond, Virginia.

19.     On or about July 28, 2004, Sarah Gilbert was diagnosed as a paraplegic.

20.     Sarah Gilbert suffers significant and permanent injuries including paralysis.

21.     Plaintiffs Richard and Rosie Gilbert suffered injury to property and loss of services of their daughter.

**B3**

22.     Sarah Gilbert suffers suffered injury to property.

## Count I
### (Medical Malpractice)

20.     Plaintiffs incorporate paragraphs 1 through 22 herein by reference.

21.     At all times relevant hereto, Defendants had a duty to provide care consistent with the accepted standard of care of health care providers existing under the same or similar circumstances.

22.     Plaintiffs relied upon Defendants to exercise such degree of skill and care to properly, accurately, and timely diagnose and treat Sarah Gilbert's condition, as would other reasonable health care providers if presented with the same or similar circumstances.

23.     At all times relevant hereto, Defendants failed to perform the aforesaid duty and were negligent in the following respects:

    a) Failure to properly perform Sarah Gilbert's Operation to correct her scoliosis;
    b) In the placement of the thoracic hook during the Operation;
    c) In the use of the thoracic hook during the Operation;
    d) In the treatment of paralysis following the Operation;
    e) Plaintiffs also assert the doctrine of *res ipsa loquitur* and *respondeat superior*; and
    f) Being otherwise negligent.

24.     Sarah Gilbert has otherwise been injured without any negligence on her part contributing thereto and relied upon the expertise of Defendants.

25.     As a direct and proximate result of the negligence of the Defendants Dr. Susan Atkins, COC and CJW Medical Center, and each of them, Plaintiffs Sarah Gilbert, Richard Gilbert, and Rosie Lee Gilbert have been injured and have suffered and will continue to suffer economic and non-economic losses, including but not limited to mental anguish, paralysis, pain and suffering, humiliation, embarrassment, and the loss of enjoyment of life, all of which are permanent and will continue into the future.

**B4**

26.     As a direct and proximate result of the negligence of the Defendants Dr. Susan Atkins, COC and CJW Medical Center, and each of them, Plaintiffs Sarah Gilbert, Richard Gilbert, and Rosie Lee Gilbert have been injured to their property which is permanent and will continue in the future.

26.     As a direct and proximate result of the negligence of the Defendants Dr. Susan Atkins, COC and CJW Medical Center, and each of them, Plaintiffs Richard Gilbert and Rosie Lee Gilbert have been injured to their property and loss of services of Sarah Gilbert which is permanent and which will continue in the future.

**WHEREFORE**, Plaintiffs request judgment against Defendants in the amount of $5,000,000.00, plus interest costs of suit, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

PAULSON & NACE

Gabriel A. Assaad, #46621
PAULSON & NACE
1615 New Hampshire Avenue, NW
Washington, DC 20009
(202) 463-1999
*Attorneys for Plaintiffs*

5

**B5**

## Jury Demand

Plaintiffs, by and through the undersigned counsel, hereby demands trial by jury of all issues in this matter.

Respectfully submitted,

Gabriel A. Assaad, #46621
PAULSON & NACE
1615 New Hampshire Avenue, NW
Washington, DC  20009
(202) 463-1999
*Attorneys for Plaintiffs*

6

**B6**

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT E

1    VIRGINIA:

2        IN THE CIRCUIT COURT OF THE CITY OF RICHMOND

3    ------------------------------------------------------------
     RICHARD GILBERT and ROSIE LEE
4    GILBERT, Individually and on
     Behalf of Their Daughter,
5    SARAH GILBERT, a minor,

6                        Plaintiff,
     v.                                  Case No.   CL06-4760
7
     SUSAN EDWIN ATKINS, M.D., et al.,
8
                        Defendants.
9    ------------------------------------------------------------

10

11

12

13                       HEARING PROCEEDINGS

14        BEFORE:   THE HONORABLE MELVIN R. HUGHES, JUDGE

15

16

17
                         January 4, 2007
18
                       Richmond, Virginia
19

20

21

22

23                   HALASZ REPORTING & VIDEO
                         P. O. Box 1644
24                   Richmond, VA 23218-1644
                         (804) 741-5215
25              Reported by:  Mary L. Rosser, RPR

COPY

G2
2

1

2    APPEARANCES:

3        PAULSON & NACE
         BY:  GABRIEL A. ASSAAD, ESQ.
4        attorney, of counsel for the plaintiff

5        GOODMAN, ALLEN & FILETTI
         BY:  KATHLEEN M. McCAULEY, ESQ.
6        attorney, of counsel for Chippenham &
            Johnston-Willis Hospital, Inc., etc.
7
         LECLAIR, RYAN
8        BY:  DONNA L. FOSTER, ESQ.
         attorney, of counsel for Dr. Atkins, et al.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HALASZ REPORTING & VIDEO

1          THE COURT:   Good morning.

2          MR. ASSAAD:   Good morning, Your Honor.

3          MS. McCAULEY:   Good morning.

4          MS. FOSTER:   Good morning, Your Honor.

5          THE COURT:   Yes, ma'am.

6          MS. FOSTER:   We are here today on defendant's

7   special plea and motion to dismiss.   My name is Donna

8   Foster, and I'm here on behalf of Dr. Susan Edwin Atkins,

9   M.D. and Children's Orthopedic Center.

10          Is it all right, Your Honor, if I stand here?

11          THE COURT:   Yes.

12          MS. FOSTER:   And joining in my special plea and

13   motion to dismiss is Chippenham & Johnston-Willis

14   Hospitals.

15          Your Honor, the basis of our special plea is

16   that the plaintiff filed their complaint -- styled the

17   case and filed the case in the name of Richard Gilbert

18   and Rosie Gilbert, Individually, and on behalf of their

19   daughter, Sarah Gilbert, a minor.

20          And just by way of background, this is a

21   medical malpractice action wherein the plaintiffs allege

22   the defendants were negligent in their care and treatment

23   of the minor plaintiff during a spinal fusion surgery,

24   performed at Chippenham & Johnston-Willis Hospitals to

25   correct the plaintiff's scoliosis on July 28th, 2004.

1   And the plaintiffs further allege that due to the

2   defendants' negligence, the minor plaintiff suffers from

3   significant permanent injuries, including paralysis.

4           Virginia Code Section 8.01-8 states that any

5   minor entitled to sue may do so by his next friend.

6   Either or both parents may sue on behalf of the minor as

7   his next friend.  The common law in Virginia, parents

8   cannot bring an action in their own name on behalf of

9   their child.  This is stated in Kirby versus Gilliam, 182

10  Va. 111, and that was stated in 1943.

11          That was, again, stated recently in the case of

12  Herndon versus St. Mary's Hospital, 266 Va. 472, 2003,

13  where the court determined that Virginia Code Section

14  8.01-8 does not modify the common law rule and that a

15  minor child must bring an action by his or her next

16  friend.

17          I'm sure the Court is aware of the Herndon

18  case, where, in that case, the parents of a minor child

19  brought a medical malpractice action against a hospital

20  and other health-care providers.  And the plaintiffs in

21  that case were Debbie Thompson Herndon, as mother and

22  next friend, of Matthew McNeil Herndon, and Larry McNeil

23  Herndon, as father and next friend of Matthew McNeil

24  Herndon, and the hospital there moved to dismiss the

25  action on the basis the action was not brought by the

1    minor child in conformity with Virginia Code 8.01-8.   The

2    trial court did sustain the hospital's motion to dismiss,

3    and the parents appealed.

4            On appeal, the Court did affirm the trial

5    court's judgment, holding the statute does not modify the

6    common law rule and merely clarifies that either or both

7    parents may serve as a minor child's next friend.

8            In the present action, the parents here did not

9    sue by her next friend, as required under the Code.

10   Here, they sued on behalf of their daughter, which is not

11   permitted.   And here the complaint suffers the same

12   defect as it did in Herndon and, also, as set forth in

13   Kirby.   Because this complaint does not comply with the

14   requirements of the Code, it must be dismissed.

15           Now, what the plaintiff is now contending --

16   the defense filed their special plea, a motion to dismiss

17   on October 18, 2006.   I noticed this motion for hearing

18   on November 3rd, 2006.   On December 27, 2006, plaintiff's

19   counsel mailed out their opposition to defendants'

20   special plea in bar and motion to dismiss, which

21   counsel -- I guess I received maybe two days ago.

22           In there, plaintiff contends that the

23   defendants are only seeking to dismiss the minor's claim

24   and not the parents' claim, and that dismissal at this

25   time would be inappropriate.   While plaintiff is correct

1   that a parent can bring a claim individually, the

2   defendants are seeking to dismiss this claim in its

3   entirety because plaintiff's counsel has only attempted

4   to bring a claim in the name of the child, which they

5   can't do in this case because they haven't done it

6   properly, as I've already stated.

7          In their opposition, curiously, they do contend

8   that they actually weren't bringing a cause of action on

9   behalf of the child, but they were merely only bringing a

10  cause of action for the parents, individually.  And,

11  respectfully, I submit, Your Honor, that they haven't

12  done that here.  If you carefully look at the complaint,

13  there are no --

14         THE COURT:  Did the Herndon case say, rather

15  than suing on behalf of the child, that the plaintiffs

16  only asserted a claim for themselves?

17         MS. FOSTER:   No, Your Honor.  In that case, in

18  the Herndon case -- I'm sorry if I didn't explain it more

19  specifically.

20         THE COURT:  No, that's all right.

21         MS. FOSTER:  But in that case, the two parents

22  brought suit against a health-care provider on behalf of

23  their minor child, styled, Debbie Thompson Herndon, as

24  mother and next friend of Matthew McNeil versus

25  St. Mary's, and the trial court dismissed the case

1  without prejudice because it was not filed in Matthew's

2  own name by his next friend.  So that sort of --

3          THE COURT:  But the court didn't say that the

4  only thing asserted there was a claim by the parents, did

5  they?

6          MS. FOSTER:  No, because the parents did not

7  assert --

8          THE COURT:  They didn't seek to assert their

9  own claim there?

10          MS. FOSTER:  No.

11          THE COURT:  All right.

12          MS. FOSTER:  And what plaintiff is now saying

13  in their opposition is that we're not making a claim for

14  the child.

15          THE COURT:  In this case, they say --

16          MS. FOSTER:  In this case.

17          THE COURT:  -- they're bringing their own

18  claim.

19          MS. FOSTER:  They're saying the parents are

20  bringing their own claim.  And we submit that that's not

21  what they've done here.

22          If you look at the four corners of the

23  complaint here, this is clearly a complaint that was

24  attempting to bring a cause of action for the child.

25  They didn't do that properly.  So the complaint here is,

1     indeed, a legal nullity, as I explained is set forth in

2     Herndon, Kirby, and under Code 8.01-8.

3          In their opposition, they're attempting to cure

4     that by saying, What we were really asking for was to

5     make a cause of action on behalf of the parents,

6     individually, and I submit, Your Honor, that they haven't

7     done that here.

8          If you look at the complaint, there is no count

9     here alleging injury to property or loss of services to

10    the daughter in the complaint, and there is no allegation

11    that they have incurred medical expenses or loss of

12    services, as required under the Code.  They merely just

13    have one generalized statement that the plaintiff has

14    been injured and has suffered and will continue to suffer

15    economic and non-economic losses, including, but not

16    limited to, mental anguish, paralysis, pain and

17    suffering, humiliation, embarrassment, loss of enjoyment

18    of life, all of which are permanent and will continue

19    into the future.

20         And as Your Honor is well-aware, parents are

21    not entitled to non-economic losses, including, but not

22    limited to, things like mental anguish and things of that

23    nature.  They are entitled to medical expenses they have

24    incurred in an attempt to cure their minor child's

25    injuries caused by the health-care provider's alleged

1   negligence.  That is not pled here.  They have not pled

2   that they have suffered injury to property and loss of

3   services of their daughter.  They haven't done that here.

4         So what they have now tried to do in their

5   opposition is come back and say, We weren't trying to

6   attempt to allege an action on behalf of the daughter,

7   but for the parents.  That's not pled here.

8         And, you know, I think that basically the

9   essential fact -- you know, when you look at the

10   complaint, it's essential that they inform the defendants

11   of the true nature of the claim, and it's clear from

12   looking at this that this was to bring an action for the

13   daughter, which clearly doesn't comply with the Code or

14   with the law of this Commonwealth, and it becomes a legal

15   nullity.  And at this point, it's time-barred as to the

16   daughter.  She was 14 at the time the alleged negligence

17   occurred, which was July 28th, 2004, which means she had

18   two years to file the lawsuit.  So, obviously, it's

19   time-barred.

20         So we submit that the lawsuit be dismissed with

21   prejudice.  In the alternative, Your Honor, if the Court

22   does feel that the case can proceed as to the parents,

23   that it can only proceed, we submit, and the parents can

24   only be entitled to the medical expenses.  As Your Honor

25   is well-aware, they are not entitled to non-economic

HALASZ REPORTING & VIDEO

1   damages of any type.  They are only entitled to medical

2   expenses they have incurred in an attempt to cure the

3   minor child's injuries caused by the health-care

4   provider's alleged negligence, and there cannot be a

5   cause of action at this point moving forward as to Sarah

6   Gilbert, the infant.

7          And I'd like to give Ms. McCauley an

8   opportunity, if she wishes.

9          MS. McCAULEY:  Happy New Year, Your Honor.

10          THE COURT:  Happy New Year.

11          MS. McCAULEY:  I'm here on behalf of CJW and

12   Johnston-Willis Hospitals.  I have nothing to add to what

13   Ms. Foster has already said, Your Honor, but to say that

14   I do have another motion that may be rendered moot, but I

15   do join in Dr. Atkins' and her group's arguments with

16   respect to the demurrer and motion to dismiss, as well as

17   the plea in bar.

18          MS. FOSTER:  Your Honor, I would like to

19   reserve an opportunity to just respond to anything that

20   plaintiff's counsel does have to say, and, also, we do

21   have a demurrer, if it's relevant after.

22          THE COURT:  All right.

23          MR. ASSAAD:  Good morning, Your Honor.  I'm

24   Gabriel Assaad, on behalf of the plaintiffs.

25          THE COURT:  Did you sign these pleadings?

1          MR. ASSAAD:  Yes.

2          THE COURT:  I see you're the only member of

3    your firm that is a member of the Virginia Bar.

4          MR. ASSAAD:  That is correct, Your Honor.

5          First of all, Your Honor, looking at the

6    caption of the case, the parents are named individually

7    in the caption.  They do have a claim.

8          I'd just like to point out to the Court Rule

9    3:18 of the Virginia Practice and Procedures, and it

10   states, An allegation of negligence or contributory

11   negligence is sufficient without specifying the

12   particulars of the negligence.  We pled non-economic and

13   economic damages, and we pled it with plural,

14   plaintiffs.

15         THE COURT:  Is it your intent to file a claim

16   only for the parents?

17         MR. ASSAAD:  I'm addressing the parents' claim

18   right now, and I'll address the child's claim in a

19   minute.

20         THE COURT:  All right.

21         MR. ASSAAD:  Therefore, Your Honor, the parents

22   have a claim.  We don't have to specify loss of services

23   and medical expenses.  We specified negligence and

24   economic damages.  Loss of services and medical expenses

25   are economic damages.  We pled that in paragraph 23 of

```
 1    our complaint, Your Honor.

 2              Second of all, Your Honor, I'm not aware of any

 3    case that holds that parents are not entitled to

 4    non-economic damages.  The defendant states this Court is

 5    well-aware.  I'm not aware of any case that states that.

 6    I researched the issue.  There's nothing on point.  If

 7    they find a case later on, I think I'd like to address

 8    that issue at that time.  I think it would be

 9    inappropriate to grant any type of demurrer or dismissal

10    on non-economic damages on behalf of the parents without

11    any cite or case law to support her position, Your Honor.

12              So I think the parents' claim is established in

13    this case, as parties to this complaint and with regards

14    to the loss of services, at least the loss of services

15    and medical expenses.  And the issue of non-economic

16    damages, I think that it's not ripe at this point to

17    argue that point, that issue, based on I have nothing to

18    argue based on their lack of support of case law or

19    statutory law with respect to their position.

20              With regard to the child's claim, according to

21    the case of 2003, they are technically correct.  At this

22    time, I have filed another complaint in this Court, on

23    October 25th, 2006, and I have yet to file it based on

24    the issues I mentioned in my opposition.  First, I have

25    yet to receive all the records from --
```

```
 1              THE COURT:  Let me be clear.  You filed it and
 2    you have yet to file it.  Which one?
 3              MR. ASSAAD:  I have yet to serve it.  I
 4    apologize.
 5              THE COURT:  Yet to serve it.
 6              MR. ASSAAD:  I apologize.  I misspoke, Your
 7    Honor.  I have yet to serve it.  I have a year to serve
 8    it, according to case law, and I have yet to serve it
 9    based on I have yet to receive any of the medical
10    records.  This patient is a 13-year-old child.
11              THE COURT:  You filed another action that's
12    pending, but not served.  How is that styled?
13              MR. ASSAAD:  It is styled correctly with
14    relation to the child.
15              THE COURT:  All right.
16              MR. ASSAAD:  I do agree the action took
17    place -- or the negligence took place on July 28th, 2004,
18    and, therefore, the statute of limitations would be on
19    that date, would be July 28th, 2006.  However, Your
20    Honor, there are certain issues that may toll the
21    statute, based on continuing treatment, based on we might
22    move the Court to declare this person incapacitated
23    during a certain period of time during that period, and I
24    have yet to receive the medical records from the
25    defendants to be able to make those arguments to
```

1    determine whether or not we're going to proceed with that

2    action.  That's why I feel at this point, to dismiss the

3    child's claim with prejudice would be inappropriate.  I

4    agree we haven't filed the claim appropriately with

5    regard to the claim at issue at this point in time and,

6    therefore --

7              THE COURT:  Well, you've said that twice.  I

8    tend to agree with the defendants.

9              MR. ASSAAD:  I can't argue that point.

10   However, Your Honor, I will argue that the statute, as

11   written, a parent cannot bring -- the two-year statute of

12   limitations for med. mal. for minors, as written, if a

13   parent cannot bring a claim on behalf of a child, which

14   is 8.01-243.1, as written, the child may bring a claim on

15   her own because the statute of limitations would not

16   apply to her because she's bringing it on her own --

17   she's bringing it by her own action and not on behalf --

18   and not a parent bringing it on behalf of her.

19             And if you look at the statute of 8.01-243.1,

20   it states, Any cause of action accruing on or after July

21   1st, 1987, on behalf of a person who was a minor at the

22   time of the cause of action.  Their argument is that we

23   brought this case on -- the parents' brought the case on

24   behalf of a minor.  If we're not allowed to bring a case

25   on behalf of a minor, then this statute does not apply

1   because then the minor has to bring the case on her own

2   behalf, and not a parent on behalf of someone else.  And

3   that has not been raised in the Supreme Court, and it's

4   basically an issue of first impression.

5           THE COURT:  Now, you may have to repeat that

6   for me.

7           MR. ASSAAD:  Okay.  Their argument, Your Honor,

8   is that a parent is not allowed to bring a claim on

9   behalf of a child after two years of the date of the

10  negligence based on 8.01-243.1, the statute of

11  limitations.  Well, if the parent can't bring the claim

12  on behalf of the child, then 8.01-243.1 does not apply to

13  the child herself bringing the claim on her own and,

14  therefore, two things could happen.  One, we rule the

15  statute void, as improperly written or, two, I wait until

16  the child is 18 to bring a claim on her behalf.

17          THE COURT:  Well, you have some special

18  provisions in the medical malpractice statute, don't you,

19  under 581?  Is it 581?

20          MR. ASSAAD:  Not with regard to statute of

21  limitations.

22          THE COURT:  No?  Sorry.

23          MR. ASSAAD:  I could be incorrect, Your Honor,

24  but --

25          THE COURT:  All right.  So you think that

1   this -- while you concede that this claim that's being

2   asserted on behalf of the child is not properly asserted,

3   the case should remain on the docket because the parents

4   are suing?

5        MR. ASSAAD:  The parents should stay.  As of

6   now, I have another case that has been filed with the

7   child's claim.  And if this Court rules that I haven't

8   pled or haven't properly captioned the child's claim,

9   which would be very hard for me to argue against, I

10  request this Court just to dismiss the child's claim,

11  which technically doesn't really exist at this point in

12  time, without prejudice, and address the issue of the

13  child's claim that I haven't served, the next complaint,

14  upon receiving all the information, and, depending on the

15  information that I discover, continuing treatment,

16  whether this patient was incapacitated for a certain

17  period of time before the statute of limitations, deal

18  with those issues at a later point in time.

19        And to give you background of this child, the

20  child had a back surgery, and during the back surgery the

21  patient became a paraplegic at the age of 13, was unable

22  to take care of herself, was in operations and health

23  facilities for months.  And depending on what I discover,

24  that few months she could be ruled as incapacitated and,

25  therefore, toll the limitations for that period of time

1    and, therefore, the October 25th filing of the complaint

2    will be acceptable and it would toll the statute of

3    limitations.

4              THE COURT:  All right.

5              MS. FOSTER:  Thank you, Your Honor.  Just to

6    address a couple of points.  First and foremost, the

7    plaintiff raised the issue of the parents' claim and

8    stated that he claimed that the complaint states that the

9    parents have filed a -- the complaint does state a cause

10   of action for the parents.  There is no indication in

11   here that there is a cause of action on behalf of the

12   parents.

13             Making a general statement of economic damages

14   is not enough.  Clearly, under the Code, it says medical

15   expenses and loss of services.  The statute -- let me get

16   to it, Your Honor -- does say --

17             THE COURT:  Which statute is that?

18             MS. FOSTER:  8.01 -- for loss of property,

19   parents are given five years.  A claim by a parent for

20   medical expenses incurred in an attempt to cure the

21   injuries of a child as a result of personal injury to the

22   child must be brought within five years of the date the

23   cause of action accrued.  Virginia Code 8.01-243(B).

24             That is what they're entitled to.  They are not

25   entitled to anything other than that.  They are not

1   entitled to non-economic damages.  Anything other than

2   that, they're subject to the -- the child is the only

3   person that is entitled to non-economic damages, and

4   they're subject to the two-year statute of limitations.

5   This child was over the age of 10 at the time of the

6   alleged negligence.

7        THE COURT:  Yeah.  Don't the statutes make a

8   distinction regarding the statute of limitations in

9   medical mal. cases --

10        MS. FOSTER:  Absolutely, Your Honor.

11        THE COURT:  -- as to the age of the child?  I

12   misspoke.  It's not 581.

13        MS. FOSTER:  Well, it's 229.

14        THE COURT:  229?

15        MS. FOSTER:  Yes.  And, Your Honor, it clearly

16   states that if the child is over 10 years old at the time

17   of the alleged malpractice, they're subject to the

18   two-year statute of limitations.  It's when the child is

19   below the age of 8, then they get -- I believe they get

20   an additional two years once they turn -- I have to look.

21        THE COURT:  What about that window from 8 to

22   10?  Suppose you're 9?

23        MS. FOSTER:  When you turn 10 years old, you

24   have two years.

25        THE COURT:  Turn 10, I see.

1           MS. FOSTER:  Yes.  This child was 14, and she

2    is subject to the two-year statute of limitations.  I

3    know this very well.

4           I mean, the fact is, if you read the complaint,

5    this was a cause of action that was brought for Sarah

6    Gilbert.  This complaint is a legal nullity.  They did

7    not comply with 8.01-8, which the case law -- the Supreme

8    Court spoke about in great detail in Herndon and spoke

9    loud and clear to me, Your Honor, with all due respect,

10   when I got the complaint, and you cannot have a catchall

11   paragraph that says economic and non-economic damages,

12   and now come back and say, We're actually making a claim

13   for the parents.  The statute is very clear, medical

14   expenses and loss of services.  And they do get five

15   years for that, but that's not what they were doing here.

16          Secondly, the complaint that was filed by the

17   by the plaintiff on October 25th, 2006, that they're now

18   saying was done correctly, is not before the Court today.

19   That's not before the Court.

20          But I will say that for the plaintiff to come

21   here today and say, We didn't do something because we

22   didn't have medical records, is very misleading because

23   Your Honor is well-aware under the expert certification

24   statute, before you can even serve a lawsuit, you have to

25   have this case reviewed by an expert -- filed, and so I

1    have some misgivings on why this case was even served and

2    filed on the defendants in the first place.  And if they

3    didn't even have the records of my defendant, I'm a

4    little concerned because that tells me that perhaps an

5    expert hasn't even looked at this case.

6         Secondly, the plaintiff's counsel has all but

7    conceded that he knows that there's not a cause of action

8    against -- first, on behalf of Sarah Gilbert, which tells

9    me their pleading wasn't filed in good faith, which is

10   concerning under 8.01-271.1, so I have lots of concerns

11   here.

12        But getting back to the motion at issue, this

13   lawsuit is a legal nullity.  It should be dismissed.  And

14   any subsequent lawsuit that's filed does not toll the

15   statute of -- it does not relay back because when a

16   lawsuit is a legal nullity, it does not toll the statute

17   of limitations.

18        So we respectfully submit, Your Honor, that the

19   defendant's special plea and motion to dismiss should be

20   granted.  Thank you, Your Honor.

21        THE COURT:  All right.

22        MR. ASSAAD:  If I could address a few issues

23   based on those accusations by counsel against me on my

24   good faith.  We have the medical records of the

25   operation.  We have the medical records post-op.  What we

1   don't have, which haven't been produced, but requested,

2   are the office visit medical records of the defendant,

3   Dr. Atkins.  But I do have the certificate of expert, and

4   any allegations to this Court that I haven't or I haven't

5   in good faith is a false accusation, a baseless

6   accusation, and they're just basically talking, like

7   these other accusations, without any case law to support

8   it.

9           3:18 states, Any allegation of negligence or

10  contributory negligence is sufficient without specifying

11  the particulars of the negligence.  We pled negligence

12  against the defendants.  The parents are parties to the

13  claim as individuals, and whether or not it's fully pled,

14  they could file a bill of particulars for a more definite

15  statement, and we do that.  But to dismiss the parents'

16  claim at this time based on the -- I can't recall the --

17  I'm trying to use the exact word she used, but based on

18  that there's no claim pled, that's totally incorrect.

19          Second of all, 8.01-229 is not the med. mal.

20  statute of limitations.  It actually says, The two-year

21  statute of limitations for tort cases and for infants or

22  for people under the age of majority, it's tolled to the

23  age of 18.  That's the common law, and that's the way

24  it's been until it was amended by the legislature by

25  8.01-243.1, which changed the statute of limitations for

1    minors in a med. mal. case to two years.  And my argument

2    is that that doesn't apply for a minor that's -- or for a

3    person that's bringing an action by herself or hisself.

4    But at this time, it's not ripe because I haven't served

5    the other complaint.  But the parents' claim should stay

6    at this point in time, Your Honor.

7              THE COURT:  Ms. McCauley, you had a demurrer?

8              MS. McCAULEY:  Ms. Foster had a demurrer.  I

9    had a motion for a bill of plaintiffs, Your Honor.

10             But before we step away from the issue of the

11   parents' claim, Mr. Assaad asserts that the parents are

12   entitled to non-economic damages.  And as the Court

13   knows, a parents' claim in an action for malpractice for

14   the care and treatment given to a minor is a derivative

15   action, and it's a derivative action out of the alleged

16   negligence asserted on the minor child.  By virtue of the

17   fact that it is a derivative action, it is for economic

18   damages only.  It is not for any personal injury to

19   themselves as a parent because the action --

20             THE COURT:  Isn't there a little distinction

21   about this?  Do you remember the Motorbar (ph.) case; I

22   think a mother who claims injury to her child in utero?

23             MS. McCAULEY:  A mother who is claiming

24   injuries to herself during the delivery of a child, yes,

25   Your Honor, there is a distinction there.

```
 1            THE COURT:  But that's about the only one I can
 2    think of.
 3            MS. McCAULEY:  Yes, Your Honor.  And this is a
 4    case for an injury to a 14-year-old minor child.  There
 5    is no non-economic damage or cause of action that the
 6    parents can assert, other than that derivative action
 7    that necessarily requires the personal injury action of
 8    the minor child.  The statute of limitations is longer
 9    for those actions because they're derivative in nature
10    and because the medical expenses might not be full at the
11    time the statute of limitation runs for the personal
12    injury action underneath, but it is a derivative action,
13    and, for that reason, and by statute, it's for medical
14    expenses and loss of services of the injured person.
15            The non-economic damages that are permissible
16    in Virginia in a personal injury action are for those of
17    the actual injured person, like pain and suffering, like
18    embarrassment, like scarring and disfigurement, like loss
19    of enjoyment of life.  Those are unique to, in this case,
20    Sarah Gilbert.  The parents can't claim those general or
21    non-economic damages.  They're only entitled to recover
22    their medical expenses, as well as loss of services, and
23    that was not pled in the original complaint.  Thank you,
24    Judge.
25            THE COURT:  Well, if the plaintiff is allowed
```

1   to recast this and assert a loss of services claim and a

2   claim for medical expenses, would you argue their claim

3   would be time-barred at this point?

4          MS. McCAULEY:  The parents' claim?  The parents

5   claim would not be time-barred.  The underlying action

6   would be time-barred.

7          MR. ASSAAD:  I just want to address that issue.

8   There is no case law that states parents can't have

9   mental anguish or non-economic damages.

10          THE COURT:  Well, the only situation I can

11   think of now is the case I just alluded to, the situation

12   I just alluded to.

13          MR. ASSAAD:  And the action does exist, Your

14   Honor, because under the wrongful death claim, a

15   beneficiary can claim solace, loss of companionship and

16   all the above, even though it's by statute, according to

17   law, wrongful death.

18          THE COURT:  Well, there's always been some

19   dispute about whether a beneficiary is actually a party,

20   The actual party is a personal representative,

21   beneficiary of the decedent, and that claim is brought on

22   behalf --

23          MR. ASSAAD:  Well, those actions are allowed

24   under the wrongful death statute.

25          THE COURT:  Well, they are, and that's

1    statutory.

2            MR. ASSAAD:  That's statutory.  But there's no

3    case law in Richmond that says that the same type of

4    damages does not allow a personal injury by a parent.

5    And maybe it needs to be briefed a little further, but at

6    this point in time --

7            THE COURT:  I'm just not aware of any case that

8    stands for the proposition you just suggested.

9            MR. ASSAAD:  Well, there's no case that stands

10   for the opposite either, Your Honor.

11           THE COURT:  What else do you have?  Do you have

12   a demurrer?

13           MS. McCAULEY:  Your Honor, I have a motion for

14   a bill of particulars.

15           THE COURT:  Well, did you say you had a

16   demurrer?  What's the demurrer about?

17           MS. FOSTER:  The demurrer, Your Honor, the

18   basis of the demurrer, first, in Count --

19           THE COURT:  This goes to the merits of the

20   child's claim?

21           MS. FOSTER:  The demurrer, Your Honor, is that

22   the -- the first basis is that in Count I, paragraph 23,

23   subsection (e) of the complaint, the plaintiff attempts

24   to set forth a claim of res ipsa loquitur.

25           THE COURT:  Subsection (e)?

1          MS. FOSTER:  Yes.  In the complaint, paragraph

2     23, there are --

3          THE COURT:  Oh, I see.  Right, you're right.

4          MS. FOSTER:  The plaintiffs assert the doctrine

5     of res ipsa loquitur, which is not a compensable cause of

6     action in Virginia.

7          THE COURT:  Well, I think -- what other motions

8     do you have?  You have a bill of particulars and

9     demurrer?

10          MS. FOSTER:  That's it.

11          THE COURT:  That's it?  I think this motion has

12     merit, the motion to dismiss, and I will dismiss it.  The

13     question is -- now, your motion goes to dismiss the

14     child's claim; is that right?

15          MS. FOSTER:  Your Honor, we contend that the

16     entire claim should be, but, in the alternative, I

17     believe that if you're going to allow anything, it would

18     only be with regard to the parents, only as to medical

19     expenses and loss of services.

20          THE COURT:  That's the position I'm going to

21     take, and I'll grant the motion to dismiss.

22          Now, what are we going to do about this other

23     case that's hanging?

24          MR. ASSAAD:  Your Honor, I just want to clarify

25     the Court's ruling.  The motion to dismiss is --

```
 1              THE COURT:  The child's claim.

 2              MR. ASSAAD:  The child's claim, not the

 3    parents' claim?

 4              THE COURT:  Well, I'm going to give you leave

 5    to amend the parents' claim, and I think you can assert a

 6    claim for medical expenses and loss of services, but I

 7    don't think -- unless you are confident in your position

 8    about asserting a claim for non-economic damages in this

 9    context, but I'm just not aware that a parent can assert

10    such a claim under these circumstances.  So I'll give you

11    leave to amend, at any rate, to recast the parents'

12    claim.

13              MR. ASSAAD:  But if I file a motion in support

14    of my claim for non-economic damages for the parents'

15    claim --

16              THE COURT:  File a motion?

17              MR. ASSAAD:  I mean, if I add non-economic

18    damages, they're going to file a demurrer and --

19              THE COURT:  Just make sure you have some basis

20    for it.  You know, we're talking about sanctions and so

21    forth.

22              MR. ASSAAD:  Thank you, Your Honor.

23              THE COURT:  Now, the order, though, with regard

24    to dismissing the child's claim, in light of the fact

25    that you filed this other case and you say you have some
```

1   basis to pursue that claim now, it's properly styled, but

2   brought in October, which is, what, about three months

3   since the statute may have run, the two years, but if you

4   have some theory about how that claim survives the

5   running of the statute, I think we'll do -- well, in this

6   case, I'll dismiss the child's claim.  Maybe the order

7   just says that the case is dismissed.  I wouldn't want to

8   say dismissed with prejudice because the other case that

9   has been mentioned is not before me, and I don't know

10   what you're going to, for lack of a better term and I

11   don't mean this derogatory, what you're going to come up

12   with in the other case.

13          MR. ASSAAD:  The technicality, Your Honor, with

14   just granting a dismissal automatically assumes that the

15   child is properly a party in the case, and they're

16   arguing the child is not a party to the case because of

17   the way it was captioned.  So I would think the more

18   appropriate action, maybe grant the demurrer against any

19   claim for pain and suffering --

20          THE COURT:  But they haven't filed a demurrer.

21          MR. ASSAAD:  Well, dismissal would be an

22   inappropriate term because the child is not a party to

23   the case, so how can you dismiss something that's not a

24   party?

25          MS. McCAULEY:  Your Honor, if you dismiss the

```
 1    case that is --
 2              THE COURT:  This case?
 3              MS. McCAULEY:  Yes, sir.  If you dismiss it by
 4    action number, at law number, it dismisses the complaint
 5    that is currently before the Court, the complaint that
 6    has been filed and served and is the subject matter.
 7              MR. ASSAAD:  Well, Your Honor, I disagree with
 8    that because the two-year statute of limitations, which
 9    this one was filed within, for any tort for the parents
10    would not apply to the following October 25th, 2006
11    complaint.  So to dismiss --
12              THE COURT:  Well, I think Ms. McCauley is
13    right.  We can dismiss this case, this case, and then
14    we'll see what happens.
15              MR. ASSAAD:  Well, I don't want to lose the
16    two-year statute of limitations on the parents.
17              THE COURT:  Well, you may not.  You may not.
18    I'm not saying you have.
19              MR. ASSAAD:  Well, if they dismiss this case,
20    you're dismissing the parents' claim as well, Your Honor.
21              THE COURT:  Well, I give you leave to amend the
22    parents' claim.
23              MR. ASSAAD:  Okay.  So we're not dismissing
24    this; we're granting leave to --
25              THE COURT:  I'm dismissing the child's claim.
```

```
 1    To the extent this asserts the child's claim --
 2              MR. ASSAAD:  Fair enough.
 3              THE COURT:  -- that will be dismissed.  With
 4    respect to the parents' claim, you can amend, and you'll
 5    have 21 days to do that -- well, 15 days, 15 days to
 6    amend, and 10 days to respond to any amended claim for
 7    the parents.  And we'll look at the other case in due
 8    course.
 9              All right.  Thank you.
10              MS. McCAULEY:  Thank you, Your Honor.
11
12                   (Hearing adjourned.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

HALASZ REPORTING & VIDEO

1

2

3

4

5

6                    CERTIFICATE OF REPORTER

7

8

9           I, Mary L. Rosser, shorthand reporter, do

10    certify that the foregoing 30 pages is a full, true and

11    correct transcript of my stenographic notes taken on

12    January 4, 2007, in the Circuit Court of the City of

13    Richmond, in the matter captioned Richard Gilbert and

14    Rosie Lee Bilbert, etc. versus Susan Edwin Atkins, M.D.,

15    et al.

16           Given under my hand this 22nd day of January,

17    2007.

18

19                              _____

20                                   Mary L. Rosser
                                   Shorthand Reporter

21

22

23

24

25

HALASZ REPORTING & VIDEO

141

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT F

VIRGINIA:
### IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND
### John Marshall Courts Building

**RICHARD GILBERT and**
**ROSIE LEE GILBERT, Individually and**
**on behalf of their daughter,**
**SARAH GILBERT, a minor**

       **Plaintiffs,**

                         **AT LAW NO.: CL06004760-00**

**SUSAN EDWIN ATKINS, M.D., et al**

       **Defendants.**

### ORDER

On January 4, 2007, came the parties, by counsel, on Defendants', Susan Edwin Atkins, M.D. and Children's Orthopedic Center (hereinafter "Defendants"), Special Plea in Bar and Motion to Dismiss, which was subsequently joined by Defendant Chippenham and Johnston-Willis Hospital, Inc., d/b/a CJW Medical Center.

UPON CONSIDERATION of the motions and arguments of counsel and for good cause shown, Defendants' Special Plea in Bar is SUSTAINED and their Motion to Dismiss is GRANTED.

It is therefore ORDERED that Sarah Gilbert's, a minor, claims are DISMISSED ~~WITH PREJUDICE~~.

It is further ORDERED that all claims made by Richard Gilbert and Rosie Lee Gilbert, individually, are DISMISSED WITHOUT PREJUDICE WITH LEAVE TO AMEND pursuant to Rule 1:8 of the Rules of the Supreme Court of Virginia. Plaintiffs, Richard Gilbert and Rosie Gilbert, Individually, shall have fifteen (15) days

**A187**

from the entry of this Order to file and serve on counsel for the Defendants an

amended Complaint. Defendants shall have ten (10) days thereafter to file responsive

pleadings.

The Clerk is hereby directed to send a certified copy of this order to all

counsel of record.

ENTER: *2/26/07*

SEEN E OBJECTED TO FOR REASONS
~~WE ASK FOR THIS:~~ STATED AT HEARING!       Judge

Rodney K. Adams, Esquire
Donna L. Foster, Esquire
LeClair Ryan, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street, 8th Floor
Richmond, Virginia 23219
*Counsel for Defendants Susan Edwin Atkins, M.D.*
*and Children's Orthopedic Center*

A Copy,
Teste:  BEVILL M. DEAN, CLERK

BY: _____ D.C.

Kathleen M. McCauley, Esquire
Goodman, Allen & Filetti, PLLC
4501 Highwoods Parkway, Suite 210
Glen Allen, Virginia 23060
*Counsel for Defendant Chippenham & Johnston-Willis Hospital, Inc.*

SEEN AND OBJECTED TO:

Barry J. Nance, Esquire
Gabriel A. Assaad, Esquire.
Paulson & Nance
1615 New Hampshire Avenue, NW
Washington, DC  20009
*Counsel for Plaintiff*

2

**A188**

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT G

G32

Page 1

VIRGINIA:

  IN THE CIRCUIT COURT OF THE CITY OF RICHMOND

SARAH GILBERT,  minor,

          PLAINTIFF,

      v.                          Case No: CL06-4760

SUSAN EDWIN ATKINS, MD, et al.,

          DEFENDANTS.



Before:  THE HONORABLE MELVIN R. HUGHES, JR, JUDGE

              HEARING

June 18, 2007

Richmond, Virginia

HALASZ REPORTING & VIDEO
Post Office Box 1644
Richmond, Virginia 23218-1644
(804) 708-0025

Reported by:  Sally Valentine, RPR, CCR
Certification No:  0313029
Notary Registration Number:  223953

1

2

3    APPEARANCES:

4

5         PAULSON & NACE
          By:  GABRIEL A. ASSAAD, ESQUIRE
6

7         On behalf of the PLAINTIFF

8

9         LECLAIR RYAN
          By:  DONNA L. FOSTER, ESQUIRE
10

11        On behalf of the DEFENDANTS
          Dr. Atkins and Childrens' Orthopaedic Center
12

13        GOODMAN, ALLEN & FILETTI
          By:  KATHLEEN M. MCCAULEY, ESQUIRE
14

15        On behalf of the DEFENDANT
          Chippenham/Johnston-Willis Hospital
16

17

18

19

20

21

22

23

24

25

G34

Page 3

1            (Court reporter sworn.)

2            (Proceedings began at 3:35 p.m.)

3        THE COURT:  Good afternoon.

4        MR. ASSAAD:  Good afternoon.

5        MS. FOSTER:  Good afternoon, Your Honor.

6        MS. MCCAULEY:  Good afternoon, sir.

7        THE COURT:  Counsel, I don't have a file

8    in this case.  I don't know why you're here.

9        MS. FOSTER:  We are here, Your Honor,

10   on --

11       THE COURT:  I haven't been able to review

12   a file.  I can't find it.  You're here for

13   what?

14       MS. FOSTER:  There are two case numbers in

15   this particular case, and so we're here on a

16   special plea of the statute of limitations and

17   a demurrer with respect to case number 6006787

18   and a demurrer with respect to case number

19   6004760.

20       THE COURT:  All right.

21       MS. MCCAULEY:  Your Honor, did you want to

22   take a peek at -- these are the pleadings that

23   we are arguing today.

24       THE COURT:  All right.

25       MS. MCCAULEY:  That might orient you as to

1    the case.

2        THE COURT:  So there's a demurrer and a

3    plea of the statute of limitations in one case

4    and a demurrer in the other case?

5        MS. MCCAULEY:  Your Honor, actually, in

6    truth, there is -- with respect to 4760, there

7    is not only a motion for bill of particulars

8    and a demurrer, there are actually four

9    demurrers.  Then with respect to 6787 there's a

10   plea, statute, motion to dismiss --

11       THE COURT:  Uh-huh.

12       MS. MCCAULEY:  -- four demurrers and a

13   plea --

14       THE COURT:  And those four demurrers go to

15   the various counts?

16       MS. MCCAULEY:  Yes, they do.

17       THE COURT:  I think it's sufficient if I

18   just listen to it.

19       MS. MCCAULEY:  That's fine, I didn't know

20   if you wanted to take a peek -- if I may take

21   those back; listening might be more effective.

22   Thank you.

23       MS. FOSTER:  Thank you, Your Honor.  May

24   it please the Court, this is a

25   medical-malpractice action.  The named

1    defendant is a Dr. Atkins and her orthopedic

2    group and Chippenham/Johnston-Willis Hospital.

3    And the plaintiffs are alleging that defendants

4    were negligent in their care and treatment of

5    the minor plaintiff during spinal fusion

6    surgery performed at Chippenham and

7    Johnston-Willis Hospital to correct the

8    plaintiff's scoliosis on July 28th, 2004.

9         The plaintiffs are further alleging that

10   due to the defendants' negligence, the minor

11   plaintiff suffers from significant and

12   permanent injuries including paralysis.

13        In the first case, which I will refer to

14   as 4760, it was filed in the name of Richard

15   Gilbert and Rosie Gilbert individually and on

16   behalf of their daughter, Sarah Gilbert, a

17   minor.  As Your Honor may recall, the real

18   party of interest in the case, the minor, Sarah

19   Gilbert, did not sue by her next friend as

20   required by Virginia Code Section 8.01-8.

21   Instead, the plaintiffs named in the caption of

22   the complaint were Richard Gilbert and Rosie

23   Lee Gilbert individually and on behalf of their

24   daughter, Sarah Gilbert, a minor.  Consequently

25   the Court held Sarah Gilbert could not maintain

1    a cause of action and dismissed the case --

2         THE COURT:  What Court, this Court?

3         MS. FOSTER:  Yes.

4         THE COURT:  I did?

5         MS. FOSTER:  Yes, and dismissed the case

6    brought by Sarah Gilbert.

7         THE COURT:  Well, there was a case on

8    that, as you know.

9         MS. FOSTER:  Yes, the Herndon case.  And

10   the Court held that the parents could only

11   maintain their individual claims --

12        THE COURT:  Are you talking about this

13   Court or the Supreme Court?

14        MS. FOSTER:  This Court.

15        THE COURT:  So that action was taken when?

16        MS. FOSTER:  That was taken several months

17   ago.

18        THE COURT:  And this is a refiled case?

19        MS. FOSTER:  This -- the special plea is

20   going to deal with another case that was filed

21   under a different case number, and I just want

22   to give Your Honor some background so that when

23   Ms. McCauley deals with the demurrer, we sort

24   of have the story.

25        THE COURT:  Uh-huh, so was that case

1    dismissed?

2         MS. FOSTER:  It was dismissed -- as to the

3    child, the infant, it was dismissed without

4    prejudice, the child's claim, and then Your

5    Honor held that the parents could maintain the

6    individual claims for loss of property and loss

7    of services if plaintiff's counsel properly

8    amended the complaint.  And --

9         THE COURT:  Why was that case dismissed

10   without prejudice?

11        MS. FOSTER:  Well, Your Honor, I don't

12   know.  That was a good question.  I obviously

13   contended that it should be dismissed with

14   prejudice.

15        THE COURT:  Had the statute run by that

16   time?

17        MS. FOSTER:  The statute had run, and I

18   think Your Honor's concern was that you wanted

19   to at least be able to make the ruling on the

20   special plea of the statute of limitations.  I

21   contended that because you granted the special

22   plea and motion to dismiss because it was not

23   brought properly in the first place, that it

24   was, as a matter of law, dismissed.

25        THE COURT:  Wasn't there some question

Page 8

1      about some other case that was pending?

2          MS. FOSTER:  That's why we're here today.

3          THE COURT:  Well, then maybe that's why I

4      did it without prejudice, because there was

5      another case pending.

6          MS. FOSTER:  Exactly, that's why I said I

7      think Your Honor was concerned you might not be

8      able to make that ruling because there was a

9      case pending.

10         THE COURT:  All right.

11         MS. FOSTER:  Your Honor also stated that

12     the parents could not maintain a claim for

13     non-economic damages at that time.  He could

14     amend the complaint -- for the parents'

15     individual complaint, but could not bring a

16     claim for non-economic damages.  So we contend

17     the defendants -- this is the law of the case.

18         A second complaint styled case number 6787

19     was filed by Sarah Gilbert by her parents and

20     next friends, Richard Gilbert and Rosie Lee

21     Gilbert and Richard and Rosie Lee Gilbert

22     individually, was filed on October 25th, 2006.

23     As Your Honor knows, Virginia Code Section

24     8.01-243.1 states, in part, and I quote, "Any

25     cause of action ... on behalf of a person who

1    was a minor at the time the cause of action

2    accrued for personal injury ... shall be

3    commenced within two years of the date of the

4    last act or omission giving rise to the cause

5    of action except that if the minor was less

6    than eight years of age at the time of the

7    occurrence of the malpractice, he shall have

8    until his tenth birthday to commence an

9    action".

10        In the instant case, Sarah Gilbert was

11   14-years-old at the time of the alleged

12   malpractice, July 28th, 2004.  Consequently she

13   had two years to file this personal injury

14   action.  Here Sarah Gilbert's complaint was not

15   filed until October 25th, 2006, approximately

16   three months after the statute of limitations

17   had expired.  And the defendants did not treat

18   Miss Gilbert after July 28th, 2004.

19   Consequently, Sarah Gilbert's claims are barred

20   by the statute of limitations, and any claims

21   by Sarah Gilbert must be dismissed with

22   prejudice.

23        Plaintiff has filed an opposition to our

24   special plea of the statute of limitations and

25   attempts to argue -- albeit in a very creative

1   fashion -- that 8.01-243.1 does not apply in

2   this case.  It appears that he's contending

3   that the statute only applies to the minor's

4   age, but not to whether the infant is -- but

5   not when an infant is incapacitated.  And first

6   and foremost, by definition, minors are

7   considered incapacitated.  That's why the

8   General Assembly has carved out statutes to

9   deal with infants and that's why cases are

10  brought by next friend.  And that's also why

11  the General Assembly has carved out a special

12  exception to the statute of limitations,

13  8.01-243.1.

14      THE COURT:  Was that what you just spoke

15  to in the malpractice --

16      MS. FOSTER:  Yes, Your Honor.

17      THE COURT:  -- area?

18      MS. FOSTER:  But nevertheless, plaintiff's

19  counsel has cited two Virginia code sections to

20  attempt to say that because Miss Gilbert was

21  incapacitated after the alleged malpractice,

22  somehow 8.01-243.1 should not apply in this

23  case.  We respectfully submit that that is

24  certainly not true and that this case is

25  definitely barred by the statute of

Page 11

1       limitations, and --

2            THE COURT:  Is that a suggestion of

3       incapacity meaning something other than age?

4            MS. FOSTER:  Well, I mean, I think the

5       General Assembly has spoken on this, that the

6       lawsuit needs to be filed by next friend, and

7       that if the child is over the age of eight at

8       the time the lawsuit -- alleged malpractice,

9       they, like anyone else, have two years to file

10      this.

11           The code sections that plaintiff cites,

12      Virginia Code Annotated 37.2-1000, that deals

13      with incapacitated adults, specifically says

14      that that applies when only an adult can -- it

15      says specifically, only an adult person can be

16      considered incapacitated under that code

17      section.  And it's based on the language of

18      that statute.  And an incapacitated person

19      means an adult who has been found by a Court to

20      be incapable of receiving and evaluating

21      information effectively.  Nowhere in this

22      complaint has that been pled anywhere.  The

23      words "infant" or "minor" are not mentioned in

24      the language of that statute.  And an adult

25      person is considered incapacitated only after a

G43

1    finding by a court of law, which there has been

2    no particular finding in this case, so we would

3    submit that this statute does not toll the

4    statute of limitations in this case.

5         Plaintiff goes on to mention Virginia Code

6    Section 8.01-26(e).  Clearly the legislature

7    was not referring to an infant there.  They --

8    you know, it's -- that statute is dealing where

9    an adult is incapable of taking proper care of

10   themselves.  For example, they're incapable of

11   handling their property, managing their estate,

12   something that happens later on in that

13   person's life and because of age or temporary

14   or permanent impairment, whether physical or

15   mental.  That is not the case of an infant.

16   That was not the purpose of that, why the

17   General Assembly put that statute in place.

18   And again, that statute does not toll the

19   statute of limitations in this case.

20        It's -- the plaintiff is overreaching here

21   in an attempt to circumvent what the General

22   Assembly has already spoken to here.  They have

23   carved out an exception to the general statute

24   of limitations on personal-injury actions to

25   deal with this very issue.  And for better or

Page 13

1    for worse, the Court has spoken on this and

2    this, the -- any cause of action with respect

3    to Sarah Gilbert should be dismissed with

4    prejudice.

5        Thank you, Your Honor.

6        THE COURT:  Thank you.

7        MS. MCCAULEY:  Your Honor, may I briefly

8    just add, we filed also a plea of statute of

9    limitations and a motion to dismiss on behalf

10   of the hospital, and I endorse and incorporate

11   by reference all of Ms. Foster's arguments,

12   although I do want to point out one thing to

13   the Court prior to counsel taking the podium,

14   if the Court doesn't mind.

15       MR. ASSAAD:  I'm sorry.

16       THE COURT:  All right.  Go ahead.

17       MS. MCCAULEY:  Thank you, Judge.  In

18   support of plaintiff's opposition to our pleas

19   of the statute of limitations and motion to

20   dismiss, Mr. Assaad, in support of his

21   contention that Sarah Gilbert was, at the time

22   of the filing of this action, incapacitated, he

23   attaches an affidavit of a Robert A. Rovner,

24   MD.  And Dr. Rovner is an orthopedic surgeon,

25   board certified spine surgeon in California.

Page 14

1    And he indicates that based on his review of

2    the medical records, this child was under the

3    care and treatment of various and sundry

4    health-care professionals from July 28th, 2004

5    until October 23, 2005.  And in his learned

6    opinion, this child lacked the capacity to meet

7    the essential requirements for health care and

8    therapeutic needs, and therefore he believes

9    retrospectively she requires the assistance of

10   a guardian.  And that's all fine and good

11   except that she had two parents who were not

12   deemed to be unfit to provide for her care and

13   safekeeping.  And at no time prior to the

14   filing of this opposition brief was there ever

15   even a hint or a whisper or suggestion that

16   Sarah Gilbert needed the assistance of the

17   Court and the appointment of a guardian or a

18   review by a guardian ad litem, even.  So in an

19   effort to cure what has been a missed statute

20   of limitations, Mr. Assaad is now asserting

21   that this child, for some reason, because she

22   needed care and treatment, should be

23   retroactively deemed to be incapacitated, which

24   if we follow that through to its logical

25   conclusion, would mean that any person who is

Page 15

1    receiving care and treatment by a physician or

2    in a hospital should be therefore deemed to be

3    incapacitated.  And it would have the effect of

4    tolling the statute of limitations really for

5    who knows how long in any medical-malpractice

6    case, if somebody was requiring ongoing care

7    and treatment ad infinitum.  So to suggest that

8    because she received care and treatment during

9    this time period that she was therefore

10   incapacitated is truly misplaced.  There's no

11   reason to suggest that this case is anything

12   other than one that should have the 8.01-243.1

13   apply, that being the minor statute of

14   limitations.

15        THE COURT:  Right, the case that is

16   dismissed, is that case before me today?

17        MS. MCCAULEY:  It is.  In some form or

18   fashion it is, Your Honor.  There's an amended

19   complaint of that one that was dismissed, and

20   it seems to assert certain allegations against

21   the defendants in the hopes of having certain

22   damages be attributed to those or that of the

23   parents as opposed to the minor child, whose

24   claim you have already dismissed, and that

25   really is the subject matter of the demurrers.

1      THE COURT:  Okay.  When did the -- when is

2   it said that the cause of action arose?

3      MS. MCCAULEY:  July 28th, 2004 is when the

4   statute really started, because the child left

5   our care and treatment on that day, and that's

6   the date of the alleged injury.  There's no

7   continuing treatment.  July 24th, 2006 --

8   July 28th, 2006, rather, is when the statute

9   ran, the amended --

10      THE COURT:  July 28th, 2006?

11      MS. MCCAULEY:  Yes, sir.  The first

12   complaint was filed July 24, 2006.  You

13   dismissed that claim.

14      THE COURT:  I'm sorry, that first

15   complaint was filed when again?

16      MS. MCCAULEY:  July 24, 2006.

17      THE COURT:  All right.

18      MS. MCCAULEY:  And then when plaintiff was

19   alerted to the fact that that was styled

20   incorrectly, a second complaint was filed on

21   October 25th -- and that date is correct,

22   October 25th, 2006.  And that is truly the

23   subject of the defendants' plea of the statute

24   of limitations and motion to dismiss here

25   today, with respect to that actual complaint.

Page 17

1      THE COURT:  All right.  I'm sorry, again,

2  the first -- what happened on July 24th, 2006?

3      MS. MCCAULEY:  That was the date the

4  original complaint was filed, and that was the

5  one that was styled inappropriately, and that

6  was the one Your Honor dismissed with respect

7  to the minor child.

8      THE COURT:  All right.

9      MS. MCCAULEY:  You permitted counsel an

10  opportunity to amend the complaint in an effort

11  to salvage the parents' definitive claim, which

12  had a five-year statute, and that obviously had

13  not run yet.

14      THE COURT:  So what happened on

15  October 25th, '06 again?

16      MS. MCCAULEY:  A separate and distinct

17  motion for judgment, I guess the complaint, was

18  filed in the Richmond Circuit Court on behalf

19  of the child, and it was styled appropriately

20  in conjunction with the ruling in Herndon

21  versus St. Mary's Hospital, and that's the one

22  that is not timely.

23      THE COURT:  Okay.

24      MS. MCCAULEY:  Thank you, Judge.

25      THE COURT:  Thank you.

Page 18

1        MR. ASSAAD:  Good afternoon, Your Honor.

2        THE COURT:  Good afternoon.

3        MR. ASSAAD:  My name is Gabriel Assaad.  I

4    represent the plaintiff in this case.  First of

5    all, I've heard no issue regarding whether or

6    not Sarah Gilbert, the minor, is incapacitated.

7    On July the 28th, 2004, the defendant,

8    Dr. Atkins, performed a surgery which we allege

9    she was negligent in committing malpractice

10   which caused the minor 14-year-old, Sarah

11   Gilbert, to become a paraplegic.  She was

12   transferred to another institution, received

13   care, transferred to UVA to do a revision

14   surgery.  And not only that, not only did --

15   Dr. Atkins was negligent in her care, but she

16   concealed the fact that she caused a contusion

17   on the spinal cord.  And that didn't come --

18   that wasn't discovered until the second surgery

19   was performed by Dr. Able down at UVA.

20       From July 28th to October 23rd, Sarah

21   Gilbert was in the hospital for rehab, for

22   treatment, for preparation of the surgery, for

23   depression, and she was unable to take care of

24   herself.  Now, whether or not she was

25   incapacitated is for the judge to decide or if

1       there's an issue, for the jury to decide.   It

2       can become an issue of fact.   And if this Court

3       believes that it is an issue of fact, then it

4       should go to the jury, and therefore the

5       statute of limitations may be tolled with

6       regard to Sarah Gilbert.

7               Defense counsel has stood here and said

8       the General Assembly this, the General Assembly

9       that, is their intent, and has not said

10      anything in the General Assembly worth

11      8.01-243.1 does not incorporate the

12      incapacitation tolling of Section 8.01-229.

13      And, in fact, it refers -- if you look clearly,

14      and I suggest that this Court go look at the

15      statutes before it rules and look clearly at

16      the statute and what it says.   243.1, regarding

17      the statute of limitations will refer to

18      minors, actually references, it says,

19      "Notwithstanding the provisions of 8.01-229 A

20      and except as provided in Subsection C of

21      8.01-243".   Section C of 8.01-243 states where

22      the tolling of limitations may be extended, and

23      that's with foreign objects or concealment or

24      fraud or intentional misrepresentation.

25      However, in C it also allows that, "The

1    provisions of this subsection shall not apply

2    to extend the limitations period beyond ten

3    years from the date the cause of action

4    accrues, except that the provisions of 8.01-229

5    A 2 shall apply to toll the statute of

6    limitations in actions brought by or on behalf

7    of a person under a disability".  I have

8    referenced -- you have the minor statute of two

9    years referencing the medical-malpractice

10   statute of limitations, which that references

11   that it could be extended by incapacitation,

12   which is 8.01-229.

13       I know it's a little bit confusing, Your

14   Honor, but it basically -- what I'm trying to

15   assert is that the medical-malpractice statute

16   for minors references the incapacity or

17   incapacitation of the tolling of statutes which

18   allows for tolling of the statute of

19   limitations.

20       Now, there's no dispute that she's a

21   paraplegic.  There's no dispute whether or not

22   she was an adult or a minor, that even if she

23   was an adult, becoming paraplegic has a time

24   when you're incapacitated, and that's common

25   sense.  She's in a wheelchair all of a sudden.

1    Her whole life is changed around.  She's

2    depressed.  And incapacitation does not go to

3    just mental incompetency, Your Honor.

4    According to Section 37.2-1000, an,

5    "Incapacitated person means an adult who has

6    been found by a Court to be incapable of

7    receiving and evaluating information

8    effectively or responding to people, events or

9    environments to such an extent that the

10    individual lacks the capacity to meet the

11    essential requirements for his health, care,

12    safety or therapeutic needs without the

13    assistance or protection of a guardian".

14        Whether or not Sarah Gilbert was an adult

15    or child, her paraplegia caused her to be

16    incapacitated for a period of time, and we're

17    asking this Court, we suggest that -- and it's

18    at least six months, if not a year, but at

19    least the three months, which tolls the statute

20    of limitations with regard to -- with regard to

21    this case here, which would bring the filing

22    date of October 25th, 2008, which would toll

23    the statute of limitations to that date.

24        We have an affidavit from a physician who

25    has reviewed the records, which will testify to

1   a reasonable degree of medical probability that

2   the statute -- of -- that Sarah Gilbert was

3   incapacitated for at least six months.

4        Second of all, and there's also our

5   contention that the evidence will show in this

6   case --

7        THE COURT:  Well, you say six months,

8   presumably after that six months she was

9   restored to capacity?

10       MR. ASSAAD:  Yes, but according to

11  8.01-229 A, the time period that the person is

12  incapacitated does not count towards the two

13  years.

14       THE COURT:  Does that apply because she's

15  an infant or because she had medical problems?

16       MR. ASSAAD:  The affidavit or the statute?

17       THE COURT:  The incapacity.

18       MR. ASSAAD:  The incapacity is because she

19  was paraplegic and she was unable as a person,

20  whether or not an adult or child, to take care

21  of her health, her care, her safety, her

22  therapeutic needs.  This girl was in a

23  wheelchair all of a sudden.  Any one of us --

24       THE COURT:  But when would a child ever be

25  deemed to be able to do all of those things,

Page 23

1      even if they didn't have this experience?  I'm

2      having trouble with this idea of -- as counsel

3      mentioned, of incapacity as it relates to a

4      child for the purpose of the statute of

5      limitations.

6           MR. ASSAAD:  Well, the 243.1, which

7      relates to minors, Your Honor, basically put

8      the child in the same position as an adult, and

9      if she wants to be deemed as an adult -- and I

10     suggest to the Court, look at her as an adult.

11     I think it's unheard of to say that an adult

12     will have more rights than a child in that

13     case?  I mean, the adult could argue that he or

14     she was incapacitated for -- because of the

15     paraplegia and a child can't?

16          THE COURT:  Well, a child wouldn't be able

17     to do anything anyway, even if they were --

18     even if they didn't have this problem or --

19     this medical problem that's been described

20     here.  I mean, they couldn't institute a

21     lawsuit --

22          MR. ASSAAD:  I understand --

23          THE COURT:  -- alone.

24          MR. ASSAAD:  -- but the General Assembly

25     has put the child in the same position as an

1    adult, child can't force someone to file a

2    lawsuit, but the General Assembly has made it

3    two years for a person such as Sarah Gilbert.

4    If they make it two years for Sarah Gilbert,

5    similar to an adult, this Court should allow

6    Sarah Gilbert the same tolling provisions that

7    an adult would have.  And it's not precluded

8    anywhere in the statute that the tolling

9    provisions of incapacitation should -- or do

10   not apply to minors.  If it applies to an

11   adult, it should apply to minors.

12        And in fact, under our other theory of why

13   this Court should not grant the special plea of

14   statute of limitations, there will be evidence

15   based on the fact that Dr. Atkins concealed

16   what happened during the surgery, and it wasn't

17   discovered until the second operation.  She

18   placed a hook in the thoracic spine, and she

19   informed my clients -- the parents -- that she

20   did not know what happened.  It was later found

21   out that there was a contusion, which only

22   could have been caused by somebody directly

23   hitting the spine.  Under that theory, she

24   concealed the injury.  And looking under

25   8.01-243, which is an exception to the minor

1    statute of limitations, which is two years,

2    says, "In cases in which fraud, concealment or

3    intentional misrepresentation prevented

4    discovery of the injury within the two-year

5    period, for one year from the date the injury

6    is discovered or, by the exercise of due

7    diligence, reasonably should have been

8    discovered.  However, the provisions of this

9    subsection shall not apply to extend the

10   limitations period beyond ten years from the

11   date the cause of action accrues, except that

12   the provisions of 8.01-229 A 2", which is

13   dealing with incapacitation, "shall apply to

14   toll the statute of limitations in actions

15   brought by or on behalf of a person under a

16   disability".

17       So therefore, under this theory, Your

18   Honor, if I prove concealment, then I have one

19   year from the date of discovery, which would be

20   the second surgery, and then if I can show to

21   the Court that Sarah Gilbert was incapacitated

22   for -- my math is not that that good, for a

23   period of time, even this statute allows me to

24   use the incapacitation statute for minors.  It

25   is clear.  So under either theory I should be

Page 26

1      allowed to try to prove my case, to prove that

2      there was concealment, which pushes in the

3      discovery rule and therefore the statute of

4      limitations is tolled by incapacitation or that

5      she was incapacitated and she should be treated

6      as an adult, Your Honor.

7          And I would suggest that before the Court

8      rules that -- I know it's kind of confusing and

9      complicated, what the statute says, and -- but

10     I've laid it out in my brief as much as I could

11     within five pages, Your Honor.  So unless

12     there's any other questions regarding this

13     issue --

14         THE COURT:  All right.  I don't have any

15     other questions.  Thank you.

16         MS. FOSTER:  Your Honor, if I could just

17     point out one thing.  I mean, it's the legal

18     incapacity.  I mean, it's not a finding of

19     fact.  I mean, it's a law.  And the other thing

20     is, under 8.01-229, which is what Mr. Assaad

21     has spoken to, it says specifically under

22     Subsection A, which deals with disabilities

23     which toll the statute of limitations, it says

24     specifically, "Except as otherwise specifically

25     provided in 8.01-243.1", which is the statute

1    of limitations that deals with infants.

2       Furthermore, plaintiff's theory is that

3    Sarah Gilbert was incapable of filing a lawsuit

4    in a timely fashion.  Well, clearly that's not

5    the case, because they did file a lawsuit in a

6    timely fashion, they just didn't do it

7    correctly.  So that is not -- that argument

8    really is not well-founded, because they did

9    file a lawsuit within a timely fashion.  That

10    lawsuit's been dismissed, in part.  So again,

11    the arguments that were just raised are not

12    well-founded in the law in this Commonwealth.

13       Thank you, Your Honor.

14       THE COURT:  All right.

15       MR. ASSAAD:  I just want to add one more

16    thing to the statement about the statute.

17    Statute 229 A 2, which talks about

18    incapacitation, says "A person shall be deemed

19    incapacitated if he is so adjudged by a Court

20    of competent jurisdiction or if it shall

21    otherwise appear to the Court or jury

22    determining the issue that such a person is or

23    was incapacitated within the prescribed

24    limitation period", so it is -- it can be a

25    jury issue, Your Honor, finding of fact.

Page 28

1          With regard to the first part, that is

2     irrelevant of whether or not the statute of

3     limitations should be tolled.  Tolling has

4     nothing to do with what happened previously.

5     And the question is, was she incapacitated, if

6     so, for how long, and how long a toll for the

7     statute of limitations.  Whether or not she

8     filed a claim before, it was improper, is

9     irrelevant with regard to whether or not the

10    statute of limitations is tolled in the second

11    case.

12          THE COURT:  All right.  Ms. McCauley?

13          MS. MCCAULEY:  Your Honor, I just have one

14    final comment on this whole incapacity issue.

15    I can't help myself, I'm afraid.  The

16    defendants concede that Sarah Gilbert was

17    incapacitated.  She was under the legal

18    incapacity of being a minor.  That's why 243.1

19    applies in this case.  Incapacity, as Your

20    Honor knows, with respect to tollings of the

21    statutes of limitations, has nothing to do with

22    whether you're a paraplegic or whether you're

23    in a wheelchair or anything other than that.

24    It contemplates things such as people who are

25    unconscious, people who are mentally retarded,

1       people who are on life support.  It deals with

2       wrongful death, for example, you have to name

3       an executor and administrator of an estate.

4       These are the things that legal incapacity

5       refers to, not somebody's on crutches or

6       somebody can't get out of the house because

7       they're in a wheelchair, sitting in the

8       hospital.  If that were the case, every statute

9       of limitations and every medical-malpractice

10      case that required ongoing treatment would be

11      tolled into the future for some date until we

12      decide that that person doesn't need crutches

13      anymore or doesn't need to be in a wheelchair

14      anymore.  So for purposes of this lawsuit,

15      243.1 is the applicable statute of limitations,

16      and that has been missed in this case.  And for

17      all of the reasons stated by both Ms. Foster

18      and me, I respectfully request that the pleas

19      be sustained and the motions granted.

20           Your Honor, we are only here until 4:00.

21      We do have the demurrers with respect to both

22      lawsuits.  I will defer to Your Honor.  I don't

23      want to keep anybody waiting.

24           THE COURT:  Well, I think there's merit in

25      the special pleas, and the Court will sustain

1    for the reasons advanced by the defendants.   I

2    don't think that capacity comes into play with

3    a minor under these circumstances.   I'll just

4    ask you to submit those orders for me, if you

5    will.

6        MS. MCCAULEY:   Your Honor, with respect to

7    the amended complaint then, as the Court has

8    just sustained the pleas and granted the

9    motions to dismiss to the second filing, which

10   is 6787, that extinguishes the second lawsuit

11   with respect to Sarah Gilbert.   However, there

12   are -- there is an amended complaint, 4760,

13   which is still outstanding with respect to

14   Mr. and Mrs. Gilbert.   It is a derivative

15   action.   And there are multiple demurrers that

16   apply to that.

17       THE COURT:   All right.

18       MS. MCCAULEY:   There are -- it did take

19   kind of a bit of time to get this hearing with

20   Your Honor.   Would you --

21       THE COURT:   Well, could we check and see

22   if the 4:00 o'clock is out there?   Check to

23   see -- took time to get the hearing, you say?

24       MS. MCCAULEY:   It has just taken some

25   time.   I know Mr. Assaad's schedule has been

1    such that he has not been able to come to

2    Richmond on multiple occasions, despite the

3    fact that this has been noticed multiple times.

4         THE COURT:  Ms. Foster, you were here

5    once -- oh, yeah, this was the case where

6    counsel couldn't -- they were in Washington or

7    something?

8         MS. FOSTER:  That's correct.

9         THE COURT:  All right.

10         MS. MCCAULEY:  Your Honor, before we move

11    on to the demurrers, can I get the Court's

12    clarification?  The dismissal of Sarah

13    Gilbert's claims, both the original complaint

14    which was styled incorrectly and the second

15    complaint which was untimely, are with

16    prejudice?

17         THE COURT:  Well, the second is

18    substantively the same as the first, isn't it?

19         MS. MCCAULEY:  It is exactly the same.

20         THE COURT:  I think I dismissed the first

21    one without prejudice because the second case

22    was pending, and that case, as I recall, was

23    not up for bat, if you will.

24         MS. MCCAULEY:  That's right.

25         THE COURT:  I think the record ought to

```
 1     reflect the first case was dismissed without
 2     prejudice and this case is dismissed with
 3     prejudice, but inasmuch as it's the same
 4     claim --
 5           MR. ASSAAD:  Your Honor, I understand your
 6     ruling.  Note my exception to it.
 7           THE COURT:  All right.
 8           MR. ASSAAD:  This case is going to be
 9     tried regardless.  I mean, I will appeal this
10     issue with the Virginia Supreme Court.  And I
11     guess what I'm trying to say is since -- is
12     there any way that this Court, even though it's
13     not going to grant it, will allow it to go to
14     the jury just so we don't have to retry the
15     case again?
16           THE COURT:  Well, I think it's clear in my
17     mind that this incapacity does not apply to an
18     infant at all.
19           MR. ASSAAD:  Well, I still have the
20     concealment, Your Honor.  And if I prove
21     concealment and incapacity, that is in the
22     statute, Your Honor, that it does apply.
23           THE COURT:  Well, concealment applies, I
24     suppose, but you have got the overriding issue
25     of capacity or lack thereof.
```

Page 33

1          MR. ASSAAD:   Under the statute if I show

2      concealment, if you look at it carefully, then

3      I can get the incapacity, which deals with

4      how --

5          MS. MCCAULEY:   Your Honor, there is no

6      pleading before this Court that says word one

7      about concealment.   There is not an allegation

8      about concealment in any pleadings filed with

9      the Court.   This is something that has just

10     come up today.   It is not in opposition brief.

11     This is an attempt to draw out the statute of

12     limitations because it was missed.   And it is

13     not fair to these defendants that Mr. Assaad be

14     permitted to throw things at the wall to see

15     what will stick.   This has been pled as a

16     standard medical-malpractice case.   There is no

17     allegation of fraud.   As Your Honor knows, if

18     there's some fraud or concealment alleged, that

19     has to be alleged with specificity.   And if

20     Your Honor has looked at these, I filed a

21     motion for bill of particulars.   There's not

22     much specificity in these complaints.   So to

23     permit plaintiff opportunity after opportunity

24     to just come up with new theories in an effort

25     to draw out that statute of limitations would

Page 34

1   not be appropriate in this case.  This case has

2   been pending now since last July, and we have

3   been doing this over and over and over again.

4   And I understand Mr. Assaad's position, but

5   it's prejudicial to these defendants that we go

6   forward in that way.

7       MR. ASSAAD:  I should have the right to

8   prove concealment.

9       THE COURT:  I understand it wasn't raised

10  in the pleadings.

11      MR. ASSAAD:  I mean, I don't have to plead

12  negligence.  I should be allowed to, if I

13  discover information -- no depositions have

14  been taken.  Every time I take a deposition --

15      THE COURT:  I think you said you noted an

16  appeal.  I think if you note an appeal, the

17  Court might give you some direction about how

18  to proceed, if your case has merit.

19      What's next?

20      MS. MCCAULEY:  Your Honor, we have the

21  demurrer secondly filed on behalf of all

22  defendants to the amended complaint, which is

23  case number 4760.  And as has been discussed

24  going forward today, Your Honor permitted

25  counsel for the plaintiff opportunity to amend

1    the original complaint to properly plead the

2    derivative action on behalf of the parents.

3    And what we talked about was the derivative

4    action with respect to medical expenses

5    associated with the care and treatment at

6    Chippenham and under the care of Dr. Atkins.

7            THE COURT:  I think there was also a claim

8    for loss of services?

9            MS. MCCAULEY:  That's right.

10           THE COURT:  And that's still a viable

11   claim, isn't it?

12           MS. MCCAULEY:  It is, Your Honor.  And

13   those certainly are not the allegations that

14   are at issue in the defendants' demurrers.

15   What has also been pled in these various

16   amended complaint allegations include an

17   allegation that these defendants were negligent

18   in the care and treatment they provided to the

19   minor child after July 28th, 2004.  The

20   interesting thing about that allegation is that

21   the pleading also alleges that as of July 28th,

22   2004, Sarah Gilbert's care was transferred to

23   the folks at Virginia Commonwealth University

24   Health System.  So there was no care provided

25   to Sarah Gilbert after July 28th, 2004 by any

1    of the named defendants.  And for that reason

2    we demur to that allegation.  There's failure

3    to state a claim upon which relief may be

4    granted in this instance.

5        Second, there's an allegation against

6    these defendants on behalf of Mr. and

7    Mrs. Gilbert that we are guilty of res ipsa

8    loquitur, that this is not just a simple

9    negligence case, it stands for itself, that

10   there, for some reason, perhaps Mr. Assaad

11   believes he doesn't need expert testimony in

12   this case -- which is interesting since he's

13   already appended an affidavit from an

14   orthopedic surgeon who espouses certain

15   opinions in this case.  So to the degree that

16   Mr. Assaad thinks this is a case of res ipsa

17   loquitur, we demur to that allegation.  This is

18   a simple negligence case where expert testimony

19   is required both by case law and by statute in

20   Virginia.

21       There's an allegation, Your Honor, that

22   these defendants were, "otherwise negligent".

23   Neither Ms. Foster nor I have been able to

24   determine what that means, so we demur to that

25   allegation as well.

1          And finally and most importantly there's

2     an allegation in the amended complaint where

3     the plaintiffs, Mr. and Mrs. Gilbert, are

4     seeking non-economic damages for the

5     allegations of negligent care and treatment for

6     their minor child, and those allegations

7     include that they are entitled to the general

8     damages of mental anguish, pain and suffering,

9     humiliation, embarrassment and the loss of

10    enjoyment of life.  And as Your Honor is well

11    aware, those are the general damages afforded

12    individuals in personal-injury actions.  Those

13    would be the damages of Sarah Gilbert, not of

14    Mr. and Mrs. Gilbert.  Mr. and Mrs. Gilbert are

15    entitled to only those derivative damages which

16    include medical expenses, loss of services and

17    loss of property and/or injury to property.

18         Mr. Assaad -- I will speak to his

19    opposition brief in this regard.  Mr. Assaad

20    has alleged that the injury to property that

21    they have sustained in this case is an injury

22    to their minor child, who is property.  And I

23    don't know of any case law in Virginia that

24    says children are chattel, but Ms. Foster and I

25    are perplexed as to why an injury to

Page 38

1      Miss Gilbert would amount to an injury to the

2      property of the parents.  The allegations that

3      they're entitled to economic damages associated

4      with medical expenses, we agree that you're

5      entitled to get that as a parent of a minor who

6      is in a medical-malpractice action, and loss of

7      services, but you can't have those other

8      things, the embarrassment, the mental anguish,

9      the things like that.

10          With respect to the property issue as

11     well, Mr. Assaad cites to the Naccash versus

12     Burger case and the Hughes versus Moore case, I

13     believe.  And as Your Honor notices, those two

14     cases speak to the infliction of emotional

15     distress on witnesses which does not apply in

16     this case.  The allegation of negligence --

17          THE COURT:  The plaintiffs turned out to

18     be witnesses and in the Hughes case the

19     plaintiff witnessed a car coming on to a porch?

20          MS. MCCAULEY:  Yes, Your Honor, but these

21     parents were not in the operating room when

22     this intraoperative misadventure occurred,

23     which they would have to be in that zone, as

24     both cases state, for them to claim negligent

25     inflection of emotional distress.  What's very

Page 39

```
 1      interesting, though, is although Mr. Assaad

 2      cites to those cases, there is no allegation in

 3      the amended complaint seeking redress for

 4      negligent infliction of emotional distress.

 5      All he pleads is the general damages that you

 6      would plead in an ordinary personal-injury

 7      action, embarrassment, loss of enjoyment of

 8      life, injury to person, that type of thing.

 9      They're not entitled to those.

10          So for reasons I have already stated, we

11      respectfully request that the demurrer be

12      sustained with respect to negligent care and

13      treatment after July 28th, 2004, the doctrine

14      of res ipsa loquitur, allegations of being

15      otherwise negligent and any non-economic

16      damages to which the parents are not entitled

17      in an action such as this.

18          Thank you, Judge.

19          MR. ASSAAD:  With regard to negligence

20      after July 28th, I think -- of 2004, I think we

21      talked about this before.  I will concede

22      anything after the patient was discharged out

23      of CJW, but there was a period of time after

24      the surgery where they were offering treatment

25      and medication, and we may allege negligence
```

1    during Dr. Atkins' treatment during that time.

2         THE COURT:  Is that the --

3         MR. ASSAAD:  The day of the surgery.

4         THE COURT:  Is that the parents' claim,

5    though?

6         MR. ASSAAD:  Yes -- well, in the parents'

7    claim, we still have to show medical

8    malpractice.  So I mean, it's all going through

9    the whole -- we still have the same burden of

10   showing deviation of standard of care with

11   regard to the treatment of the minor, Sarah

12   Gilbert.

13        With regard to res ipsa loquitur, this is

14   a case that should apply.  And just because

15   you're filing, you're going under the theory of

16   res ipsa loquitur, I never stated we don't need

17   expert testimony.  We have expert testimony

18   that a contusion, which occurred to Sarah

19   Gilbert's spinal cord, does not occur without

20   negligence.  That is the definition of res ipsa

21   loquitur.  And since she was under the

22   exclusive control of the defendant in this

23   case, and it doesn't happen without

24   negligence -- we don't know whether it was

25   caused by the thoracic hook or a retractor or

Page 41

1    whatever.  And that's the purpose of res ipsa

2    loquitur.  We were not there.  We were not

3    eye-witnesses.  We know that Sarah Gilbert

4    walked in and she walked -- or after the

5    surgery, she had a contusion.  We don't know

6    exactly what happened in there, but we do know

7    that that does not occur without negligence,

8    and res ipsa should apply.  And res ipsa is not

9    lost in Virginia case law.  It still does exist

10   for a condition such as this.  And I think we

11   have met the requirements for res ipsa at this

12   point in time.

13        With regard to the parents' claim, mental

14   anguish, loss of enjoyment of life,

15   humiliation, to be honest with the Court, it is

16   probably a stretch, but it is foreseeable.

17   She's a minor.  She is property, because the

18   statute allows the parents to collect for loss

19   of services, and therefore under Virginia

20   law -- I mean, if you collect for loss of

21   services, you own something for those loss of

22   services, so, they were there right after the

23   operation.  They were told right away that

24   there was a -- something went wrong and she was

25   paralyzed.  And it's a foreseeable risk, Your

1    Honor, that a parent could suffer mental

2    anguish, emotional distress and whatever -- and

3    non-economic damage as a result of injury to

4    their child.  I mean, they were at the

5    operating room.

6        And I don't -- pleading "otherwise

7    negligent", according to Rule 1:4, Rules of the

8    Supreme Court, that's all we need to plead, is

9    negligence and being otherwise negligent.  To

10   limit what comes out during trial is more

11   motion in limine, but at this time we should be

12   allowed to go on any theory of negligence in

13   this case that might arise during discovery.

14       THE COURT:  All right.

15       MS. MCCAULEY:  Your Honor, I only have one

16   comment with respect to what Mr. Assaad said,

17   and that is we do not dispute that res ipsa

18   loquitur is alive in Virginia.  It certainly is

19   alive in malpractice cases, but it applies in

20   very, very limited circumstances, such as

21   leaving a sponge behind, an instrument behind.

22   As for surgical technique, there is no case

23   that says res ipsa loquitur applies in those

24   cases.  In fact, there are cases to the

25   contrary that say those must be proved by

```
 1        competent expert testimony, and that's

 2        8.01-581.20 as well.  And for all the reasons

 3        we stated, we stand by our briefs as well as

 4        oral argument today.  We respectfully request

 5        that those demurrers be sustained.

 6              Thank you, Judge.

 7              MS. FOSTER:  Your Honor, we have filed

 8        similar demurrers on behalf of Dr. Atkins and

 9        her orthopedic group, and we join in the oral

10        arguments brought by Ms. McCauley today.

11              MR. ASSAAD:  Your Honor, and the same

12        demurrers apply to both cases?

13              THE COURT:  Uh-huh.  Well, I think the

14        demurrers have merit, too, and I will sustain

15        them both, you know, for the reasons that have

16        been mentioned.  You know, Naccash sort of

17        stands on its own bottom.  Hughes is another

18        case, as I mentioned, with the plaintiff

19        witnessing -- but you know, the Court was very

20        careful to say that in that kind of case, with

21        negligent inflection of emotional distress

22        under Hughes, there has to be some indication

23        of physical injury.  I don't know what the

24        physical injury here is for these parents but,

25        you know, the case -- the Court cited that, I
```

Page 44

1     think plaintiff's complaint alleged some

2     menstrual upset because of witnessing the car

3     coming at her --

4          MS. MCCAULEY:  That's right, there was an

5     actual physical injury to the witness in that

6     case.

7          THE COURT:  And that, among a lot of

8     reasons here that have been mentioned, suggests

9     to me that these claims don't have any -- are

10    not legally sufficient.

11         MS. MCCAULEY:  Your Honor, has the

12    demurrer on all four counts been sustained?

13         THE COURT:  Yes.

14         MS. MCCAULEY:  Thank you, Judge.

15         THE COURT:  All right.  Thank you very

16    much.  Send me an order if you would.

17         MS. FOSTER:  Your Honor, we -- at docket

18    call today, because we needed to set this case

19    into 2008, we needed to have a hearing before

20    Your Honor, and since we were here today, the

21    three of us, we thought perhaps today would be

22    a good day.

23         THE COURT:  What's left after these

24    rulings?

25         MS. MCCAULEY:  We just have the economic

1       damages, the medical expenses to which the

2       parents are entitled.

3            THE COURT:  All right.  That's true.

4            MS. FOSTER:  And so I guess the question

5       is how can we go about doing that?

6            THE COURT:  Well, if you rush down real

7       quick, you can go down --

8            MS. FOSTER:  So we have Your Honor's

9       permission to do that?

10           THE COURT:  Yes.  Why do we need to delay

11      it so far, because of scheduling?

12           MS. FOSTER:  Yeah.  I mean LeClair -- Rod

13      and I are boxed in, you know, to January.

14      That's -- I mean, that's the unfortunate thing.

15           MS. MCCAULEY:  I think we talked that we

16      had January and February dates.

17           THE COURT:  All right.

18           MR. ASSAAD:  Your Honor, before we start

19      writing orders, there are two parts to Sarah

20      Gilbert's claim with regard to the second

21      lawsuit, one was for personal injury, the other

22      one was the property statute, which gives her

23      five years after she turns 18.  You know, her

24      medical expenses, which is part of her

25      property, is going to accrue, and she should be

Page 46

1    able to collect on those, and that's a

2    five-year statute of limitations which we filed

3    within the five years.

4         MS. MCCAULEY:  Your Honor, forgive me, but

5    we have been through this.  The medical

6    expenses are the claim at present of the

7    parents because Miss Gilbert is a minor, who is

8    incapacitated.  So you can't have double

9    dipping, either the parents get to claim it or

10   Miss Gilbert gets to claim it.  Currently Miss

11   Gilbert has no cause of action for medical

12   expenses because she's a minor.  That's why

13   this case had to be brought on behalf of her by

14   next friend.  So to suggest that some magical

15   claim is going to come to fruition when she

16   becomes 18 for these medical expenses when they

17   have already been claimed by the parents, I

18   just don't understand how that has any merit or

19   that she has any standing to bring that claim.

20        MR. ASSAAD:  Well, Your Honor, there's

21   nothing in the statute or case law that says

22   medical expenses after she comes to the age of

23   majority are not collectable, and if not

24   property it is a loss to the estate when she

25   turns 18, whether or not the parents would

1    collect future reasonable medical expenses that

2    will incur because of her paraplegia or

3    whether --

4         THE COURT:  Well, there's no recovery and

5    adjudication regarding recovery for medical

6    expenses.  I guess when she reaches 18 she

7    could recover, but I'm told the parents are now

8    pursuing that claim.

9         MR. ASSAAD:  Well, if the Court is

10   allowing the parties to claim beyond the age of

11   18, that's fine, of all the --

12        THE COURT:  I guess if this is a question

13   of whatever medical expenses they may expect to

14   incur in the future, that will be based on the

15   evidence.

16        MS. MCCAULEY:  That's right.  The statute

17   permits the parents to do that.

18        THE COURT:  Right.  There might be that

19   evidence because of the child's condition,

20   which they -- which we would reduce to a

21   present value, I suppose.

22        MR. ASSAAD:  Well, if that's the ruling of

23   the Court, that's fine, as long as either the

24   parents or the child could collect for future

25   medical expenses, but I don't want it to be

Page 48

1      argued later on that --

2         THE COURT:  Well, if the parents bring the

3      claim now and the claim looks to the future,

4      that will be resolved based on whatever

5      evidence there is on her future medical needs.

6      All right.  Thank you.

7

8         (Proceedings concluded at 4:15 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G80

Page 49

1                   CERTIFICATE OF COURT REPORTER

2

3          I, SALLY VALENTINE, hereby certify that I,

4    having been duly sworn, was the court reporter in

5    the Circuit Court of the City of Richmond, Virginia,

6    on June 18, 2007, at the time of the hearing herein;

7    further, that the foregoing is a true and accurate

8    record of the testimony and other incidents of the

9    hearing herein.

10         Given under my hand this 11th day of July,

11   2007.

12

13

14

15                        _____

16                        Sally Valentine, RPR, CCR
                          Certification No:  0313029
                          Notary Public, Commonwealth
17                        of Virginia, At Large

18                        Notary Number: 223953

19

20

21

22

23

24

25

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT H

VIRGINIA:

## IN THE CIRCUIT COURT OF THE CITY OF RICHMOND

RICHARD GILBERT and ROSIE LEE GILBERT, individually

      Plaintiffs

v.

                                       Case No. CL06004760-01

SUSAN EDWIN ATKINS, M.D.,
CHILDREN'S ORTHOPEDIC CENTER, and
CHIPPENHAM & JOHNSTON-WILLIS HOSPITAL, INC.,
d/b/a CJW MEDICAL CENTER

      Defendants

and

SARAH GILBERT, by her parents and next friends,
RICHARD GILBERT and ROSIE LEE GILBERT and
RICHARD GILBERT and ROSIE LEE GILBERT, Individually

      Plaintiffs

v.

                                         Case No. CL06-6787-01

SUSAN EDWIN ATKINS, M.D.,
CHILDREN'S ORTHOPEDIC CENTER, and
CHIPPENHAM & JOHNSTON-WILLIS HOSPITAL, INC.,
d/b/a CJW MEDICAL CENTER

      Defendants

## <u>ORDER</u>

On June 18, 2007, came the parties by counsel and after hearing argument on Defendants' Demurrers to Plaintiffs' Amended Complaint, Case No. CL06004760-01, and Defendants' Special Pleas of the Statute of Limitations, Demurrer, and Motions to Dismiss Plaintiffs' Complaint, Case No. CL06-6787-00, it is hereby ORDERED, ADJUGED AND DECREED that Defendants' Special Pleas of the Statute of

**B93**

196

Limitations are SUSTAINED and their Motions to Dismiss plaintiffs' Complaint, Case No. CL06-6787-00, with prejudice are GRANTED.

It is further ORDERED that Defendants' Motions to Dismiss any and all claims for personal injury filed by or on behalf of Sarah Gilbert, Case No. CL06004760-00 are GRANTED and these allegations are DISMISSED with prejudice.  However, Richard Gilbert's and Rosie Lee Gilbert's claim for economic damages and loss of services will be permitted to proceed as pled in the Amended Complaint, Case No. CL06004760-00.

It is further ORDERED that Defendants' Demurrer to Sarah Gilbert's property damage claim is SUSTAINED and any allegation of damage to property is DISMISSED with prejudice.

It is further ORDERED that Defendants' Demurrers to Amended Complaint, Case No. CL06004760-01, are SUSTAINED and Paragraph 25(d), Paragraph 25(e), Paragraph 25(f) are DISMISSED with prejudice.

It is further ORDERED that Defendants' Demurrer to any claim by Richard Gilbert and Rosie Lee Gilbert for non-economic damages, including but not limited to mental anguish, pain and suffering, humiliation, embarrassment, and the loss of enjoyment of life, is SUSTAINED and these allegations are DISMISSED with prejudice.   This Order shall in no way be construed to alter or dismiss the derivative action of Richard and Rosie Lee Gilbert with respect to their claims for economic damages and loss of services as pled in Amended Complaint, Case No. CL06004760-01 and Complaint, Case No. CL06-6787-00.  By agreement of counsel Richard and Rosie Lee Gilbert's Complaints shall be consolidated under Case No.

CL06004760-0.   Finally, by agreement of counsel, the defendants shall have 14 days from the date of entry of this Order to file an Answer.

ENTER: 8 / 3 / 07

_____
Melvin R. Hughes, Jr., Judge

We ask for this:

_____
Kathleen M. McCauley, VSB #39028
Goodman, Allen & Filetti, PLLC
4501 Highwoods Parkway, Suite 210
Glen Allen, VA  23060
804/346-0600
804/346-5954-fax
        Counsel for Chippenham & Johnston-Willis Hospital,
        d/b/a CJW Medical Center


Donna L. Foster, VSB #42220
LeClair Ryan
P. O. Box 2499
Richmond, VA  23218-2499
783-7532
916-7285-fax
        Counsel for Susan Atkins, M.D. and
        Children's Orthopedic Center

Seen and objected to:

_____
Gabriel A. Assaad, VSB #46621
Paulson & Nace
1615 New Hampshire Avenue, NW
Washington, DC  20009
202-463-1999
202-223-6824 – fax
        Counsel for the Plaintiff

A Copy,
Teste:  BEVILL M. DEAN, CLERK

BY: _____ D.C.

3
B95

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT J

Jul 16 2007 1:43PM   Paulson & Nace        (202) 223-5824        P.2

Please Type or Print in Ink and Return With a Sample of Letterhead

**CHICAGO INSURANCE COMPANY**

**LAWYERS PROFESSIONAL LIABILITY INSURANCE APPLICATION**
**THIS IS A CLAIMS-MADE APPLICATION**

Administered by:
ProQuest Insurance Agency ▪ 101 Southfield Road ▪ Birmingham, MI 48009
Phone: (248) 540-5377 ▪ Fax (248) 540-3223

| Firm Name: Barry J. Nace dba | E-mail: bjn@ | Business Phone (include Area Code) |
|---|---|---|
| PAULSON & NACE | paulsonandnace.c... | (202) 463-1555 |
| | | Fax Number |
| | | (202) 223-6824 |

Principal Business Address (INCLUDING COUNTY) – Street Address Only – No P.O. Box

1615 New Hampshire Ave NW

Washington    DC    20009
City       State       Zip       County

| Form of Business: | |
|---|---|
| Individual | Partnership |
| Professional Assn. | Corporation |
| Limited Liability | |
| Partnership/Corporation | |

Effective Date Requested:
7/25/07

Month/Year Firm Established
1976

(Please list any secondary or foreign locations on a separate sheet)

**COVERAGE SELECTIONS**

Limits Desired:

☐ $ 100,000/$300,000
☐ $ 200,000/$600,000
☐ $ 500,000/$1,000,000
☐ $ 1,000,000/$2,000,000
☐ $ 1,000,000/$3,000,000

☒ $ 2,000,000/$2,000,000
☐ $ 2,000,000/$4,000,000
☐ $ 3,000,000/$3,000,000
☐ $ 4,000,000/$4,000,000
☐ $ 5,000,000/$5,000,000

Higher limits are available to qualifying firms.

101 southfield road
birmingham, mi 48009

248.540.5377
fax 248.540.3223
toll free 877.540.5377

Per Claim Deductible Desired:

☐ $1,000
☐ $2,500

☐ $ 5,000
☒ $10,000
☐ $

Aggregate Deductible Desired:

☐ Per Claim    ☐ Aggregate
Available to qualifying firms.

Higher deductibles are available to qualifying firms.

**FIRM CHANGES**

1.  (a)  Has applicant's firm name changed in the past five (5) years?    ☐ Yes ☒ No

If "yes", please provide the following information in chronological order:

| Predecessor Firm | Date Established/ Date Dissolved | # of partners, officers owners of predecessor at date of dissolution | # of partners, officers, owners of predecessor who joined applicant | % of billings & assets assigned to assignee |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

(b)  Over the past 5 years has there been a change in the firm's operations such as a merger, the opening or closing of a branch office or the addition or deletion of 25% or more of the lawyers in the firm?  If "yes", explain by attachment.    ☐ Yes ☒ No

Is a merger, name change, or organizational change in progress?  If "yes", explain by attachment.    ☐ Yes ☒ No

RECEIVED
JUN 17 2008
PROACCESS, L.L.C.

ACKNOWLEDGED.

CIC-UW-000042

CONFIDENTIAL

Jul 18 2007 1:43PM   Paulson & Nace          (202) 223-8824          p.3

**CHICAGO INSURANCE COMPANY**
Lawyers Professional Liability Insurance
Insured Supplement

Any lawyer listed on the Insured Supplement, who leaves the insured Insured, no
longer qualifies as an insured under Section II., Persons Insured, letter D. of the
policy form.  Coverage will now fall under Section II., Persons Insured, letter C.
for those individuals.

2.   List all lawyers to be insured.  (Include yourself as you are a sole proprietor.)

| Lawyer's Name | Social Security # | Designation Code # | Month/Year Admitted to Bar | Years in Private Practice | Date of Hire mm/dd/yyyy | Bar Association (s) |
|---|---|---|---|---|---|---|
| Barry J. Nace | ###-##-#### | S 740 | MD/1970 | over 30 | Founder of firm | MD |
|  |  | D | PA /1971 |  |  | PA |
|  |  |  | DC/1972 |  |  | DC |
|  |  |  | WV/1997 |  |  | WV |
|  |  |  |  |  |  |  |
| Christopher Nace | ###-##-#### | E 740 | VA /2001 | 6 | 4/15/04 | VA |
|  |  |  | DC/2002 |  |  | DC |
|  |  |  |  |  |  |  |
| Christopher Nace | ###-##-#### | E 740 | GA/2003 | 4 | 2/1/2007 | GA |
|  |  |  | MD/2004 |  |  | MD |
|  |  |  | DC /2006 |  |  |  |
|  |  |  |  | G |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

Designation Codes: (Indicate all that apply)
D = Officers, Directors or Shareholders of the corporation who are
   licensed lawyers
E = Employed lawyers (must be employee of applicant)
PT = Part-Time lawyer (works less than 1,000 hours per year)

P = Partners of a partnership
OC&IC= Of Counsel/ Independent
   Contractor
*=hrs per week working for firm
S = Sole Proprietor

CONFIDENTIAL

CIC-UW-000043

**STAFFING**

3.  (a)  Please complete the Instant Supplement for Lawyers Professional Liability Insurance, and attach a sample of your letterhead.

Total Number of Lawyers:  | 3 |

(b)  Does any lawyer named in Question (a) above have any other law partner, associate, of counsel, employed lawyer or office sharing arrangement other than those named in Question 1? If your Response is yes, and the other law partner, etc. appears on your letterhead but not in Question 1, complete the following:   ☒ Yes  ☐ No

BARRY J. NACE of Counsel to BURKE SCHULTZ; HARNAN & JENKA

| Type of Practice | Insurance Company | Policy Number | Nature of Association with your firm |
|---|---|---|---|
| Personal Injury | Accordia | LPA196320-016 | Mr. Nace is of Counsel to said firm |

(c)  Provide the number of employees and/or support staff utilized.  (There is no additional charge for non-legal staff.)

| Law Clerks | Investigators | Abstractors | Accountants | Paralegal Personnel | Clerical Steno/Secretary | Nurse |
|---|---|---|---|---|---|---|
| 1 (Alyce) | | | | 1 (Darleen) | 3 | |

(d)  If you are a sole practitioner, please provide the name of the attorney who would be responsible for your affairs if you were absent for an extended period of time (i.e. vacation, illness, etc.)

Name: Gabriel Assad / Christopher Nace

Address (City, State, Zip): Washington, DC 20009

Telephone Number: 202-965-7999

**AREA OF PRACTICE**

4.  (a)  Indicate the percentage of gross billable dollars for the last fiscal year, from activities devoted to the following areas of practice.
If this is a newly established firm, please provide estimates.

| | Prior % | New % | | Prior % | New % |
|---|---|---|---|---|---|
| Administrative Law | | | Juvenile/Juvenile At Law | | |
| Admiralty/Maritime | | | Labor Relations | | |
| Antitrust/Price Fixing | | | Landlord/Tenant | | |
| Banking/Financial Institutions | | | Litigation: | | |
| | | | General Commercial – Defense | | |
| Bankruptcy | | | General Commercial – Plaintiff | | |
| | | | Bodily Injury/Personal Injury – Defense | | |
| Bonds: Federal, State or Municipal | | | Bodily Injury/Personal Injury – Plaintiff | 95 | 95 |
| | | | Insurance Defense | | |
| Business/Contracts | | | Workers Compensation – Defense | | |
| Collections | | | Workers Compensation – Plaintiff | | |
| | | | Maritime Law – Do not include bond work | | |
| Corporate Formation/Securities/Mergers | | | Oil & Gas | | |
| Criminal | | | | | |
| | | | Product Liability | 5 | 5 |
| Domestic/Family Law | | | Public Utilities | | |
| Educational | | | Real Estate – Commercial | | |
| Environmental | | | Securities Law | | |
| ERISA/Employee Benefits | | | Corporate Bonds, etc. | | |
| | | | | | |
| Immigration | | | Social Security | | |
| International Law | | | Taxation | | |
| Investment Counseling/Money Management | | | Tax Options | | |
| | | | Other | 2 | 2 |
| | | | **TOTAL MUST EQUAL 100%** | 100 | 100 |

CIC-UW-000044

CONFIDENTIAL

Jul 18 2007 1:44PM   Paulson & Nace          (202) 223-6824          p.5

(b) Does Any member of the firm provide professional services as an accountant? If yes, complete the following:   ☐ Yes ☒ No

| Type of Practice | Percent of Practice | Insurance Carrier | Expiration (Mo-Day-Yr) |
|---|---|---|---|
|  | % |  |  |
|  | % |  |  |

(c) In the past 6 years has any member of the firm practiced law in the capacity of prosecuting attorney, public defender, municipal counsel, state counsel, or in-house counsel? If yes, complete the following:   ☐ Yes ☒ No

| Name of Attorney | Entity | Services Provided | Firm's Percent of Practice | Insurance Carrier | Expiration (Mo-Day-Yr) |
|---|---|---|---|---|---|
|  |  |  | % |  |  |

5.  How many suits for collection of your legal fees were filed during the past year?  # ☐ 0

**RISK MANAGEMENT**

6.  (a)  Does your firm's calendar control system include the following:  (Please check all applicable categories)
Single Calendar  ☐ Yes ☐ No     Dual Calendar  ☐ Yes ☐ No     Tickler Cards  ☐ Yes ☐ No
Computer  ☒ Yes ☐ No     Master Listing  ☒ Yes ☐ No     Other (describe)  *Pocket Diary*

(b)  Are at least 2 individuals involved in maintaining the calendar control system?   ☒ Yes ☐ No

(c)  Please indicate how frequently time deadlines are cross-checked:
☒ Daily     ☐ Weekly     ☐ Monthly     ☐ Other (describe)

(d)  Does the ultimate responsibility for the Calendar Control of a matter rest with the lawyer handling the matter?   ☒ Yes ☐ No

7.  (a)  Does your firm require the use of engagement letters including fee agreements on all new matters undertaken by the firm?   ☒ Yes ☐ No

(b)  Are declination or non-engagement letters issued on all matters declined by your firm?   ☒ Yes ☐ No

8.  (a)  How does the firm maintain its conflict of interest avoidance system?  (Please check all of applicable categories)
☒ Computer     ☐ Index File     ☐ Conflict Committee     ☒ Other (describe by attachment)  *Oral Memory*

(b)  How often is the conflict of interest system updated?
☐ Daily     ☐ Weekly     ☐ Monthly     ☒ Other (Monthly)  *When case is received as possible case*

(c)  Does the firm's conflict of interest avoidance system disclose attorney-client relationships established by newly hired lawyers, partners, predecessor, merged, or acquired firms?   ☒ Yes ☐ No

(d)  Are business ventures permitted with clients of the firm? IF YES, PLEASE PROVIDE DETAILS   ☐ Yes ☒ No

(e)  If any lawyer of the firm becomes aware of a conflict of interest, do they disclose it in writing to all parties involved and all partners? If no, explain by attachment.   ☒ Yes ☐ No

(f)  In the past 5 years, has any current or past lawyer of the firm served or is currently serving as a director, officer, partner or employee of any past or present CLIENT? IF YES, COMPLETE OUTSIDE INTEREST SUPPLEMENTAL APPLICATION.   ☐ Yes ☒ No

(g)  Has any current or past lawyer of the firm had, or currently have, any equity interest in any past or present CLIENT? IF YES, COMPLETE OUTSIDE INTEREST SUPPLEMENTAL APPLICATION.   ☐ Yes ☒ No

9.  Has any current or past lawyer of the firm provided any professional services to, acted as a director, or serve on an internal committee of a financial institution (defined as a savings and loan, bank, credit union, savings association, building and loan association) or any other banking institution, holding company or affiliate thereof) within the past 5 years?   ☐ Yes ☒ No

If "yes," please complete the attached *Financial Institutions Supplement.*

10.  Has any current or past lawyer of the firm performed any legal services in connection with the offer and sale of securities within the past 5 years?   ☐ Yes ☒ No

If "yes," please complete the attached *SEC Supplement.*

CONFIDENTIAL
CIC-UW-000045

Jul 18 2007 1:45PM   Paulson & Nace          (202) 223-6824          P.6

11. (a) Has any current or past lawyer of the firm performed any federal, state or municipal bond engagements within the past five years?                                                   ☐ Yes ☒ No

    (b) In the past 5 years, has any member of the firm provided any legal services in connection with the offer and sale of bonds issued by the United States or any State Municipality, political subdivision or politic instrumentality of the U.S., state, or any municipality?                              ☐ Yes ☒ No

       If "yes" to b. above, please complete the attached _Bond Supplement_.

12. (a) Does the firm delegate, sub-contract and/or hack and split fee arrangements?                      ☒ Yes ☐ No

    (b) If "yes", what percentage of your total revenue is derived from these arrangements?        SMALL %

    (c) Are the firms associated with these arrangements insured?                                        ☒ Yes ☐ No

13. Does the firm receive more than 25% of its gross billings from a single client?                        ☐ Yes ☒ No

    If "yes", please provide the name of the client, including, percentage or gross billings and services provided on a separate sheet.

CLAIMS AND DISCIPLINARY ACTION

14. Has any current or past lawyer of the firm listed on the Insured Supplement:

    (a) Had his/her legal license or authority to practice law revoked?                                    ☐ Yes ☒ No

    (b) Been subject to disciplinary action by any state or local bar or ABA?                             ☐ Yes ☒ No

    (c) Been subject to any fine, reprimand or criminal penalty related to performance of professional services?   ☐ Yes ☒ No

    (d) Has applicant firm, predecessor in business or lawyer had their lawyers professional liability insurance denied, cancelled or non-renewed (other than due to loss of market)?   ☐ Yes ☒ No

       If "yes" to any of the above, please explain below, including the date and officers.

15. (a) Have any claims or suits been brought against any lawyer listed on the Insured Supplement, a predecessor of the firm or any current or past partner, officer, owner or employed lawyer thereof during the past 5 years?   ☐ Yes ☒ No

    (b) Having inquired of all partners, officers, owners and employed lawyers, are there any circumstances which may result in a claim being made against the firm, its predecessors or any current or past partner, officer, owner or employed lawyer of the firm?   ☐ Yes ☒ No

       If "yes" to 15.a or b, please complete the attached _Supplemental Claim Form_ for each claim or circumstances which could give rise to a claim.

PRIOR INSURANCE

16. (a) Was lawyers professional liability insurance carried by you, your firm or previous firms during the past FIVE (5) years? If "yes", list by year.

| Inception (Mo.Day/Yr.) | Expiration (Mo.Day/Yr.) | Insurance Company | Premium | Limits | Deductible | For Claim Or Aggregate Deductible |
|---|---|---|---|---|---|---|
| 7/24/06 | 7/24/07 | Philadelphia | 10,469. | 2M/2M | 10,000. | purchased |
| 7/24/05 | 7/24/06 | Indemnity | 10,289. | " | " | " |
| 7/24/04 | 7/24/05 | " | 10,289. | " | " | " |
| 7/24/03 | 7/24/04 | " | 10,871. | " | " | " |
| 7/24/02 | 7/24/03 | Chicago Ins Co. | 7,558. | 1M/1M | " | " |

    (b) Has the firm or any lawyer listed on the Insured Supplement purchased an endorsement to extend the claims reporting period? (i.e., tail, extended reporting endorsement, ERP, etc.)   ☐ Yes ☒ No
       If "yes", complete the following:

       Lawyer/Firm who purchased: _____

       Effective Date of endorsement: _____   Length of reporting period: _____ months

CIC-UW-000046

CONFIDENTIAL

(f)  Does your current policy, or any individual lawyer in the firm, have a prior acts exclusion?          ☐Yes ☒No
     (Please provide a copy to ensure proper rating.)

     Firm/Lawyer _____          Mr./Dep/Yr. _____

     Attach a separate sheet, if necessary.                                Effective Date of Retroacty

(g)  Does your current policy, or any individual lawyer in the firm have any restrictive endorsements?          ☐Yes ☒No
     If "yes," please provide a copy of any restrictive endorsements.

17.  **CONTINUING LEGAL EDUCATION**                                          [ 60 ]
     What's the total number of hours of continuing legal education within the past 12 months for all lawyers
     listed on the Insured Supplement?

     **Notice to Applicant — Please Read Carefully**

     **THE APPLICANT REPRESENTS THAT THE ABOVE STATEMENTS AND FACTS ARE TRUE AND THAT NO MATERIAL
     FACTS HAVE BEEN SUPPRESSED OR MISSTATED.**

     Applicant acknowledges a continuing obligation to report to the Company as soon as practicable any material changes in the
     facts and statements above, and in such supplemental application, of which applicant becomes aware after signing the
     application.

     NOTE:  In applying for coverage, applicant agrees that covered losses must be defended by a Company lawyer and that the
     deductible applies to damages and claim expenses, investigation costs and legal fees.  If applicant elects to handle a claim
     without involving the Company, then the policy may not afford coverage for such claim.

     COMPLETION OF THIS FORM DOES NOT BIND COVERAGE.  APPLICANT'S ACCEPTANCE OF COMPANY'S
     QUOTATION IS REQUIRED PRIOR TO BINDING COVERAGE AND POLICY ISSUANCE.  IT IS AGREED THAT THIS FORM
     SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED, AND IT WILL BE ATTACHED TO THE
     POLICY.

     Applicant hereby authorizes the release of claim information from any prior insurer to the Company indicated above.

     Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance
     containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto,
     commits a fraudulent insurance act.

     Signing this form and tendering premium does not bind the applicant or the          **NOTICE:**
     Company to complete the insurance.  Application must be signed and dated
     to be considered an operation.                                          Failure to report:

                                                                            1.  any claim made against you during your
                                                                                current policy term, or

     _____  7/18/07  _____          2.  any facts, circumstances or events which may
     Applicant Signature (must be signed and dated in ink by an Owner, Partner or Officer)      give rise to a claim to your current insurance
                                                                                company BEFORE policy expiration may
     BARRY J. NACE            7/18/07                            create a lack of coverage.
     Print or Type Name and Title    Date (Mo./Day/Yr.)
     Owner
     Senior Partner

                                          RECEIVED
                                          JUN 17 2009
                                          PROACCESS, L.L.C.

CIC-UW-000047

CONFIDENTIAL

Jul 18 2007 1:46PM   Paulson & Nace          (202) 223-8524          p.8

INTERSTATE
INSURANCE
GROUP

## PLAINTIFF LITIGATION SUPPLEMENT

**PLEASE COMPLETE THE FOLLOWING:**

**IF FIRM IS NEWLY ESTABLISHED, PLEASE PROVIDE YOUR BEST ESTIMATE.**

1. Describe the types of cases handled (e.g. admiralty, aviation, asbestos, bodily injury, breast implant, commercial, discrimination, general liability/medical malpractice/personal injury/product liability/mass tort, sexual harassment, tobacco, worker's compensation, unfair competition, wrongful death, etc.).

2. What is the percentage of time devoted to representation of plaintiffs in the following areas of practice:

Average dollar size of judgments awards and settlements

Bodily Injury/Personal Injury _____ 0 _____  $_____ #1
Product Liability _____ 5 _____  $_____ #2
Medical Malpractice _____ 70 _____  $_____ #3
Other _25_ % (please specify) _misc_  $_____

Does any member of the firm handle class action/multiple plaintiff cases? ☐ Yes ☒ No
If "Yes", please provide details.

3. What is your firm's average litigation case load per year? ................ 100-125

4. What percentage of the firm's litigation cases are: settled before trial? ..... 96%
                                                                 tried to a verdict? ..... 1%
                                                         handled on a contingency fee basis? ... 100%

5. What is the estimated average dollar size of judgments, awards and settlements
   in the litigation cases handled by the firm? ........................... $250,500.₂

6. What is the largest judgment, award or settlement in a litigation case obtained
   by the firm in the past five years? ................................... $50,000,000.₂

7. Does the firm take litigation case referrals from other law firms? ......... ☒ Yes ☐ No
   If "Yes", please indicate the approximate number of cases and the types involved. _80% of cases we receive are medical malpractice_

8. Does the firm refer cases to other law firms? ......................... ☒ Yes ☐ No
   If "Yes", please indicate the approximate number of cases and the types involved. _really - automobile accidents_

9. Has the firm or attorney been involved in any class action plaintiff cases within the past five years? .... ☐ Yes ☒ No
   If "Yes", please indicate the approximate number of cases and the types involved.

10. Does the firm or accept cases with less than 6 months to statute of limitations? ..... ☒ Yes ☐ No
    If so, how many? _half a dozen per year (DC has < 1 year wrongful death statute)_

## NOTICE

Applicant understands the information submitted herein becomes a part of the Applicant's Lawyer Professional Liability Insurance Application or Renewal Application and is subject to the same representations and conditions.

Must be signed and dated by an Owner, Partner or Principal who is duly authorized on behalf of the Applicant.

_____          Owner          7/18/07
Signature of Owner, Partner or Principal      Title          Date

POA-52-2201 (02-03)                                    Page 1 of 1

CONFIDENTIAL

CIC-UW-000048

206

## Outside Interest Supplemental Application

INTERSTATE
INSURANCE
GROUP

Name of Firm: Barry J Nace & B Paulson & Nace

Instructions: Complete only if, in the past 5 years, any member of the firm served as a director, officer, partner or employee of any Client or firm which required additional Limit. If any item is not applicable, type or print N/A.

| Name of Insured | Name of Client | Nature of Business (profession) or Non-Profit | Legal Services Professional | Position Held Including Committee | Equity Interest Highest Annual Amount ($) | Equity Interest Highest Annual % of Interest | Highest Annual % of Applicant's Gross Billing | Does the Client, have the Applicant Insurance? | |
|---|---|---|---|---|---|---|---|---|---|
| Barry J Nace | Greater Nat'l Bank | Non-Profit | President | | $ | % | % | ☐ Yes | ☐ No |
| | Trial Lawyers | Member | Attorney Professional | | $ | % | % | ☐ Yes | ☐ No |
| | Corporate for Justice | | Attorney Professional | | $ | % | % | ☐ Yes | ☐ No |
| | Nat'l Trial Lawyers, Board | | | | $ | % | % | ☐ Yes | ☐ No |
| | | | | | $ | % | % | ☐ Yes | ☐ No |
| | | | | | $ | % | % | ☐ Yes | ☐ No |

I understand if the information submitted herein becomes a part of any Professional Liability Insurance Application and is subject to the same warranty and representation. I further permit (who knowingly) and (with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent Insurance act.

SIGNATURE OF OWNER, PARTNER OR OFFICER

TITLE: Owner

DATE: 7/18/07

PCA-2040 (12/01)                                    Page 1 of 2

CONFIDENTIAL

# Outside Interest Supplemental Application

Name of Firm: Barry J. Kee dba Brokers of Noce

INTERSTATE
INSURANCE
GROUP

Instructions: Complete only if, to the best of your knowledge, any member of the firm served as a director, officer, partner or employee of any Client or if any firm member owned [directly or indirectly] any ownership interest in any Client or if any firm member owned [directly or indirectly] any ownership interest in any Client. If your firm has already completed the financial application, questions on the Financial Institution Supplemental Application, the information provided on this item need not be duplicated below. If any item is not applicable, type or print N/A.

| Name of Owner | Name of Client | Nature of Client [Individual or Non-Profit] | Legal Services Rendered | Position Held Including Committee | Equity Interest Highest Annual Amount ($) | Highest Annual % of Interest | Highest Annual % of Applicable Gross Billing | Does the Client have D&O Insurance? |
|---|---|---|---|---|---|---|---|---|
| Barry J Kee | Grace Ann Barry | Non-Profit | Guardian | | $ | % | % | ☐ Yes ☐ No |
| | Theresa Hawkins | | | | $ | % | % | ☐ Yes ☐ No |
| | Miller | Non-Profit | Guardian | | $ | % | % | ☐ Yes ☐ No |
| | Appointed by | | Both | | $ | % | % | ☐ Yes ☐ No |
| Barry J Kee | Estate of | | Guardian | | $ | % | % | ☐ Yes ☐ No |
| | Ronald Grant | | | | $ | % | % | ☐ Yes ☐ No |
| | | | | | $ | % | % | ☐ Yes ☐ No |
| | | | | | $ | % | % | ☐ Yes ☐ No |

I understand this information submitted herein becomes a part of my Professional Liability Insurance Application and is subject to the same warranty and condition.

Any person, who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act.

SIGNATURE OF OWNER, PARTNER OR OFFICER

TITLE: Owner

DATE: 7/18/07

FIN-0040 (3/92)

Page 1 of 2

CONFIDENTIAL

CIC-UW-000041

208

## SUPPLEMENTAL CLAIM/INCIDENT INFORMATION

This form should be completed for each claim, suit or incident applicant firm is aware of after inquiry of all partners, officers, owners and employees.

Make sure all questions are answered completely.      *None*

1:   Full name of Applicant or Insured: _____

2.   Full name of Firm which reported claim: _____

3.   Full name of claimant: _____

4.   Indicate whether:  ☐ Claim/suit   ☐ Incident

5.   Date of alleged error: ___/___/___

6.   Date you became aware of alleged error: ___/___/___

7.   Date it was reported to your insurance carrier: ___/___/___

     Name of your insurance carrier _____

8.   Additional defendants: _____

9.   a.  IF CLOSED indicated date closed. ___/___/___   Total amount paid $ _____

     b.  Of the total amount paid, how much was paid for legal expenses? $ _____

10.  IF PENDING, PLEASE SEND SUIT PAPERS AND ANSWER ALL QUESTIONS BELOW:

     a.  Claimant's settlement demand: $ _____

     b.  Defendant's offer for settlement: $ _____

     c.  Insurer's loss reserve: $ _____
         (Available by calling your insurance company and/or defense counsel)

     d.  Is claim in suit?   ☐ Yes   ☐ No

         If yes, amount sued in summons: $ _____

     e.  Limits of Liability _____   Deductible _____

11.  Name of your insurance carrier responding to this claim or incident: _____

12.  Was an engagement letter used?  ☐ Yes   ☐ No

13.  Provide a brief description of the claim, indicating the alleged error, type of engagement and alleged injury.

_____          7/18/07
Signature of Owner, Officer or Partner            Date (month-day-year)

PMA 90731 (12/01)

CONFIDENTIAL

CIC-UW-000050

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT K

# Declarations
## Professional Liability Insurance Policy
## Lawyers

**This is a claims-made Policy.  Please review your Policy carefully.**
The Policy is limited to liability for only those claims that are first made against the Insured during the policy period.

**Insured by the Stock Company below and hereinafter called the company.**

Chicago Insurance Company
*Executive Offices: 33 W. Monroe Street*
*Chicago, Illinois 60603*

Fireman's Fund®

**MASTER POLICY NUMBER: LWC - 8001101**
**CERTIFICATE NUMBER: LWB -** 2400909

| Item 1. Named Insured and Address (number, Street, Town or City, County, State, Zip Code) | Producer Name |
|---|---|

**ProAccess, L.L.C.**  000 4/92

| | Item 2. Policy Period | | |
|---|---|---|---|
| | From (Mo.-Day-Yr.) | To (Mo.-Day-Yr.) | 12:01 A.M. Standard Time at the address of the Named Insured as stated herein. |

Barry J. Nace dba Paulson & Nace
1615 New Hampshire Avenue, NW
Washington, DC 20009

Policy Period: ✓ From 07-24-07  To 07-24-08

**Item 3. Form of Named Insured's Business**
Insured is ☐ Individual  ☐ Partnership  ☐ Corporation
☒ Other

**Item 4. Limit of Liability**

$  2,000,000   Each Claim
$  2,000,000   Aggregate

☒ a. Are included within the limits of liability.
☐ b. Claim expenses are payable in addition to the limits of liability.

**Item 5. Deductible**
$  10,000  Per Claim
☐ a. The deductible amount specified above applies only to damages.
☒ b. The deductible amount specified above applies to both damages and claim expenses.

**Item 6. Premium**
$  9,886.00  Amount  81400  Class  3  No. of Lawyers

Total Premium $  9,886.00

**Item 7. Forms Attached at issue**
POP-2122,  POJ-2028(10/99)(Ed.09/06),PON-2003,POE-2232.

M. Malloy  AUG 10 2007

By acceptance of this policy the Insured agrees that the statements in the Declarations and the Application and any attachments hereto are the Insured's agreements and representations and that this policy embodies all agreements existing between the Insured and the Company or any of its representatives relating to this insurance.

| Do Not Write In This Box | Remark | Countersigned at | Issue Date |
|---|---|---|---|
| | | | 7/27/07 |
| | | Authorized Representative | Countersign Date |

POP-2122 (01/03) (Ed. 04/06)

CONFIDENTIAL

CIC 000498

# CONSUMER INFORMATION NOTIFICATION

## IMPORTANT INFORMATION TO PURCHASING GROUP MEMBERS
### KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS.

**PLEASE NOTE**
**PLEASE READ YOUR COVERAGE TERMS CAREFULLY.**
THE POLICY MAY CONTAIN ONE OR MORE OF THE FOLLOWING EXCLUSIONS:
*ASBESTOS, DISCRIMINATION, SEXUAL ASSAULT, TRANSMISSION OF DISEASE*

AS ACCEPTED AND APPROVED BY YOUR RISK PURCHASING GROUP ASSOCIATION, THIS POLICY DOES NOT INSURE PUNITIVE OR EXEMPLARY DAMAGES THAT MAY BE SOUGHT AGAINST YOU. YOUR PREMIUM FOR THIS POLICY IS LOWER AS A RESULT OF THIS EXCLUSION.

THIS POLICY DOES NOT PROVIDE A REINSTATEMENT OF THE AGGREGATE LIMIT OF LIABILITY UNDER ANY OPTIONAL EXTENDED REPORTING PERIOD UNLESS SPECIFIC STATE LAW REQUIRES SUCH REINSTATEMENT.

WARNING: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

*In the event you need to contact someone about this policy for any reason please contact your agent. If you have additional questions, you may contact the Insurance company issuing this policy at the following address and telephone number:*

**CHICAGO INSURANCE COMPANY**
**Professional Liability Department**
**33 W. Monroe St., Chicago, IL 60603**
**Phone: (312) 346-6400**

*If you have been unable to contact or obtain satisfaction from the company or the agent, you may contact your State Insurance Department.*

*Written correspondence is preferable so that a record of your inquiry is maintained. When contacting your agent, company, or the State Insurance Department, have your certificate number available.*

**INTERSTATE
INSURANCE
GROUP**

PON-2003 (08/02)

CONFIDENTIAL

CIC 000500

*IN ALASKA:* All return premiums will be computed pro-rata.
Pursuant to the Alaska Division of Insurance, we must provide *to you and comply with the following notice:*
Your policy contains a provision relating to "Other Insurance". If any other valid insurance is primary, and permits contributions by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid is applicable limits of insurance or none of the loss remains, which ever comes first.

| *IN ARKANSAS,* contact: | Consumer Services Division<br>1123 South University<br>400 University Tower Building<br>Little Rock, Arkansas 72204 | Phone: (501) 686-2945 |

*IN INDIANA:*
Should you have a valid claim and feel you are not being treated fairly, you may contact the Indiana Department of Insurance at the address and phone number below with your complaint and seek assistance from the governmental agency that regulates insurance.

| Public Information/Market Conduct<br>Indiana Department of Insurance<br>311 West Washington Street, Suite 300<br>Indianapolis, IN 46204-2787 | Phone: Consumer Hotline:<br>In Indianapolis area: | 1-800-662-4461<br>1-317-232-2395 |

*IN NORTH CAROLINA:*
Within 45 days after receipt of a written request from the Named Insured the Company shall mail or deliver loss information on open and closed claims covering a three-year period. In the event of policy cancellation or non-renewal, the Insured may elect to purchase coverage for the extending reporting period. The Insured may choose a limit of liability in the policy aggregate for the extended reporting period which is one hundred percent (100%) of the expiring policy aggregate that was in effect at the inception of the policy.

*IN TEXAS:* COMPLAINT NOTICE:
Should any dispute arise about your premium or about a claim that you have filed, contact the agent or write to the company that issued the policy or certificate. If the problem is not resolved, you may also write the State Board of Insurance, P.O. Box 149091, (333 Guadalupe), Austin, Texas 78714-9091, Fax# (512) 322-3550. This notice of complaint procedure is for information only and does not become a part or condition of this policy or certificate. Please be advised that the insurance company issuing your policy may not be subject to all insurance laws and regulations of the State of Texas.

**FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL: 1-800-628-8574**

| *IN VIRGINIA,* contact:<br>State of Virginia Bureau of Insurance<br>Property & Casualty Division<br>P.O. Box 1157<br>Richmond, Virginia 23209 | Phone: (In-state toll free):<br>(Out-of-state calls): | 1-800-552-7945<br>1-804-786-3741 |

| *IN WEST VIRGINIA,* contact:<br>Consumer Service Division<br>West Virginia Insurance Department<br>P.O. Box 50540<br>Charleston, W. Virginia 25305-0540 | Phone: (In-state toll free):<br>(Otherwise) | 1-800-642-9004<br>1-304-558-3386 |

*IN WISCONSIN:*
PROBLEMS WITH YOUR INSURANCE? - If you are having problems with your insurance company or agent, do not hesitate to contact the insurance company or agent to resolve your problem. You can also contact the OFFICE OF THE COMMISSIONER OF INSURANCE, a state agency which enforces Wisconsin's insurance laws, and file a complaint. You can contact the OFFICE OF THE COMMISSIONER OF INSURANCE by writing to:

**OFFICE OF THE COMMISSIONER OF INSURANCE**
Complaints Department
P.O. Box 7873
Madison, WI 53707-7873

or you can call 1-800-236-8517 outside of Madison or 266-0103 in Madison and request a complaint form.

CIC 000501

**CONFIDENTIAL**

PLEASE PROMPTLY SIGN THE ENDORSEMENT BELOW AND RETURN ONE COPY OF
THIS NOTICE/ENDORSEMENT TO YOUR AGENT FOR DELIVERY TO THE COMPANY.

## INDIVIDUAL PRIOR ACTS EXCLUSION ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

In consideration of the premium charged, this policy specifically excludes loss resulting from **Claims**
made against any **Insured** arising from any negligent   act, error, omission, or **Personal Injury**
occurring or alleged to have occurred prior to

2/20/07

This exclusion applies solely to      Christopher T. Nace

**ACKNOWLEDGED AND ACCEPTED**

I understand and agree to the above terms and conditions.

_____        _____        _____
  Signature of Partner, Officer, or Sole Proprietor                    Title                          Date

Barry J. Nace dba Paulson & Nace
LWB2400909 Effective Date:  7/24/08

## ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

POE-2232 (10/95) (Ed. 01/00)

CONFIDENTIAL                         CIC 000502

214

PLEASE PROMPTLY SIGN THE ENDORSEMENT BELOW AND RETURN ONE COPY OF THIS NOTICE/ENDORSEMENT TO YOUR AGENT FOR DELIVERY TO THE COMPANY.

## INDIVIDUAL PRIOR ACTS EXCLUSION ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

In consideration of the premium charged, this policy specifically excludes loss resulting from **Claims** made against any **Insured** arising from any negligent  act, error, omission, or **Personal Injury** occurring or alleged to have occurred prior to

12/12/07

This exclusion applies solely to        Jonathan B. Nace

**ACKNOWLEDGED AND ACCEPTED**

I understand and agree to the above terms and conditions.

_____        _____        _____
Signature of Partner, Officer, or Sole Proprietor        Title        Date

Barry J. Nace dba Paulson & Nace
LWB2400909 Effective Date:  7/24/08

## ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

POE-2232 (10/95) (Ed. 01/00)

CONFIDENTIAL

CIC 000503

215



Page 2 of 21

**Declarations**
**Professional Liability Insurance Policy**
**Lawyers**

This is a claims-made Policy. Please review your Policy carefully.
The Policy is limited to liability for only those claims that are first made against the Insured during the policy period.

Insured by the Stock Company below and hereinafter called the company.

Chicago Insurance Company
Executive Offices: 55 W. Monroe Street
Chicago, Illinois 60603

MASTER POLICY NUMBER: LWG-8004192
CERTIFICATE NUMBER: LWS - 2400909

Producer Name
ProAccess, L.L.C.   8004192

Item 2. Policy Period
| From (Mo./Day/Yr.) | To (Mo./Day/Yr.) |
| 07-24-07 | 07-24-08 |

Item 1. Named Insured and Address (Number, Street, Town or City, County, State, Zip Code)

Barry J. Nace dba Paulson & Nace
1615 New Hampshire Avenue, NW
Washington, DC 20009

Item 3. Form of Named Insured's Business
☑ Individual  ☐ Partnership  ☐ Corporation
☐ Other

Item 4. Limit of Liability
$   2,000,000   Each Claim
$   2,000,000   Aggregate

☑ a. Are included within the limits of liability.
☐ b. Claim expenses are payable in addition to the limits of liability.

Item 5. Deductible
$   10,000   Per Claim
☐ a. The deductible amount specified above applies only to damages.
☑ b. The deductible amount specified above applies to both damages and claim expenses.

Item 6. Premium
$   9,866.00   Amount   81400   Class

3   No. of Lawyers

Total Premium $   9,866.00

Item 7. Forms Attached at Issue
POP-2122, POP-2026 (10/99) (Ed. 09/06), POF-2003, POE-2232.

VA Monroy  AUG 10 2007

By acceptance of this policy the Insured agrees that the statements in the Declarations and the Application and any attachments hereto are the Insured's agreements and representations and that this policy embodies all agreements existing between the Insured and the Company or any of its representatives relating to this Insurance.

| Do Not Write In This Box | Remark |
| | Countersigned at |
| | Authorized Representative |

Issue Date
7/27/07

Countersign Date

POP-2122 (01/03) (Ed. 04/05)

CIC 000504

CONFIDENTIAL

216

## NOTICE
### THIS IS A CLAIMS-MADE POLICY. PLEASE REVIEW THE POLICY CAREFULLY.

**THE POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD UNLESS AND TO THE EXTENT THAT AN EXTENDED REPORTING PERIOD OPTION APPLIES.**

## CHICAGO INSURANCE COMPANY
(a stock insurance company, herein called the Company)

agrees with all **Insureds**, in consideration of the payment of the premium, and in reliance upon the statements in the Declarations and subject to the limit of liability, exclusions, conditions and other terms of this policy, as follows:

## INSURING AGREEMENTS

**I. COVERAGE**

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the **Policy Period** or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. Provided always that such **Professional Services** or **Personal Injury** happen:

   A. during the **Policy Period**; or

   B. prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business**, and continuously renewed and maintained in effect to the inception of this policy period:

      1. the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury**;

      2. the **Named Insured**, any partner, shareholder, employee, or where appropriate the **Named Insured's** management committee or any member thereof, had no reasonable basis to believe that the **Insured** had breached a professional duty or to **Reasonably Foresee** that a **Claim** would be made against the **Insured**; and

      3. there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such **Claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any **Claim**, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

The Company shall have the right and duty to defend any suit against the **Insured** seeking **Damages** to which this insurance applies even if any of the allegations of the suit are groundless, false or fraudulent. The Company, at its option, shall select and assign defense counsel; however, the **Insured** may engage additional counsel, solely at their expense, to associate in their defense of any **Claim** covered hereunder. The Company shall also have the right to investigate any **Claim** and/or negotiate the settlement thereof, as it deems expedient, but the Company shall not commit the **Insured** to any settlement without their consent. If the **Insured** refuses to consent to any settlement recommended by the Company and elects to contest the **Claim** or continue any legal proceedings in connection with such **Claim**, then the Company shall be relieved of any further duty to defend the **Claim**, and the liability of the Company for **Damages** and **Claim Expenses** shall not exceed the amount for which the **Claim** could have been settled, as well as the **Claim Expenses** incurred by the Company, or with the Company's consent, up to the date of such refusal. Furthermore, the **Insured** shall not assume any obligations, incur any costs, charges, or expenses or enter into any settlement without the Company's consent.

In the event:

   A. Item 4.a. of the Declarations is applicable to this policy, **Claim Expenses** shall be part of, and not in addition to, the Limits of Liability specified in Item 4 of the Declarations;

   B. Item 4.b. of the Company for this policy, **Claim Expenses** shall be in addition to the Limits of Liability specified in Item 4 of the Declarations.

In no event shall the Company be obligated to pay **Damages** or **Claim Expenses** or to defend, or continue to defend, any suit after the applicable limit of the Company's liability has been exhausted by payments of judgments, settlements, **Damages** or **Claim Expenses**, as applicable.

POJ-2028 (10/99)

Page 1 of 10



CONFIDENTIAL

CIC 000505

**II.  PERSONS INSURED**

Each of the following is an Insured under this policy to the extent set forth below:

A.  The entity or person named in Item 1 of the Declarations as the Named Insured;

B.  Any Predecessor in Business or Successor in Business;

C.  Any past partner, officers, directors, stockholders or employees of any person or entity specified in Item A. or B. above (except as provided in I. below), but only while acting within the scope of their duties on behalf of such person or entity;

D.  Any current partner, director, stockholder or employed lawyer of any person or entity specified in Item A. or B. above;

E.  Any current non-lawyer employee of any person or entity specified in Item A. or B. above, but only while acting within the scope of their duties on behalf of any such person or entity;

F.  Any non-affiliated legal firm, including their partners, officers, directors, or employees, but solely for Professional Services performed within the scope of their contract with, and on behalf of, the Named Insured, Predecessor in Business or Successor in Business;

G.  Any legal representative, if the Insured becomes incompetent, insolvent, bankrupt or dies;

H.  Any lawyer acting as "of Counsel" or on a contracted basis but only while performing Professional Services on behalf of any person or entity specified in sections A., B., C. or D. above.

I.  Any past partner, director, officer or employed lawyer of any person or entity specified in Item A. or B. above who retires from the private practice of law while insured under a Lawyers Professional Liability insurance policy issued by the Company.

**III.  LIMIT OF LIABILITY**

Regardless of the number of Insureds under the Insurance or the number of Claims made, the Company's liability is limited as follows:

A.  In the event Claim Expenses are included within the limit of liability as specified in Item 4.a. of the Declarations, the limit of liability stated in the Declarations as applicable to "each Claim" is the limit of the Company's liability for all Damages and Claim Expenses because of each Claim covered hereby. All Claims arising from the same or related negligent act, error or omission or Personal Injury shall be considered a single Claim for the purpose of this Insurance and shall be subject to the same limit of liability.

The limit of liability stated in the Declarations as "aggregate" is, subject to the above provision respecting "each Claim", the total limit of the Company's liability under this policy for all Damages and Claim Expenses.

B.  In the event Claim Expenses are in addition to the limit of liability as specified in Item 4.b. of the Declarations, the limit of liability stated in the Declarations as applicable to "each Claim" is the limit of the Company's liability for Damages resulting from each Claim covered hereby. There shall be a separate and equal limit of liability applicable to Claim Expenses for any such Claim. All Claims arising from the same or related negligent act, error or omission or Personal Injury shall be considered a single Claim for the purpose of this Insurance and shall be subject to the same limit of liability.

The limit of liability stated in the Declarations as "aggregate" is, subject to the above provision respecting "each Claim", the total limit of the Company's liability under this policy for all Damages. A separate "aggregate" limit of liability shall apply to all Claims Expenses incurred in the defense of Claims covered by this Policy, subject to the above provision respecting the Company's liability for Claim Expenses for "each Claim".

C.  The Company's liability for Damages and/or Claim Expenses, as applicable, resulting from "each Claim" is in excess of the deductible amount stated in the Declarations.  The deductible amount stated in the Declarations shall apply upon written demand by the Company, be paid by the Named Insured within 30 days of demand.

D.  The application of any Extended Reporting Period option shall not increase the limit of liability stated in the Declarations.

E.  In the event the Insured participated in an Alternative Dispute Resolution to settle a Claim brought by a client of the firm, the Company will waive 50% of the Insured's deductible obligation. The maximum amount of this waiver shall not exceed $25,000 per Claim. If the Alternative Dispute Resolution fails to resolve the Claim, and the Claim proceeds to litigation, the deductible will apply to any Damages and/or Claim Expenses paid by the Company after the litigation has commenced.

Page 2 of 10

POJ-2028 (1069)

CIC 000506



CONFIDENTIAL

218



**IV. POLICY TERRITORY**

The Insurance afforded by this policy applies to any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services taking place anywhere in the world. The Insurance afforded by this policy applies to Claims which are first made and reported to the Company during the Policy Period or Extended Reporting Period, if applicable, provided Claim is made or suit, if any, is brought within the United States of America, its territories or possession, or Canada.

**V. WHEN A CLAIM IS DEEMED AS FIRST MADE**

A Claim shall be deemed as being first made at the earlier of the following times:

A. When the Company first receives written notice from the Insured or its representative that a Claim has been made; or

B. When the Company first receives written notice from the Insured or its representative of specific circumstances or a Potential Claim involving a particular person or entity which may result in a Claim.

All Claims arising out of the same or related negligent act, error, omission or Personal Injury shall be considered as having been made at the time the first such Claim is made, and shall be subject to the same limit of liability and deductible.

**VI. SUPPLEMENTARY PAYMENTS**

The Company will pay, in addition to the applicable limit of liability:

A. Up to $500 for loss of earnings to each Insured for each day or part of a day of such Insured's attendance, at the Company's request, at a trial, deposition, hearing or arbitration proceeding involving a civil suit against such Insured for covered Damages, but the amount so payable for any one or series of trials, depositions, hearings or arbitration proceedings arising out of the same or related negligent act, error, omission or Personal Injury shall in no event exceed $10,000; and

B. Premiums on appeal bonds, but not to include bonds in excess of the Company's limit of liability. The Company shall be under no obligation to apply for or furnish any such bonds. The Company will pay reasonable attorney fees and other costs, expenses or fees resulting from the investigation or defense of a proceeding before a state licensing board, peer review committee or governmental regulatory body incurred as the result of a notice of a proceeding first received by the Insured and reported to the Company during the Policy Period, arising out of any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services by an Insured covered under this policy.

**VII. EXCLUSIONS**

This Insurance does not apply to Claims:

A. Based on or arising out of the Insured's services and/or capacity as an employee, owner, partner, stockholder, director, officer or trustee of any sole proprietorship, partnership or corporation or other business enterprise which is not defined as Named Insured, Predecessor In Business or Successor In Business unless such Claim arises out of a lawyer-client relationship;

B. Arising out of any dishonest, fraudulent, criminal or malicious act or omission, or collaborate misrepresentation (including but not limited to, actual or alleged violations of state or federal antitrust, price-fixing, restraint of trade, copyright or deceptive trade practice laws, rules or regulations) committed by, at the direction of, or with the knowledge of any Insured; however, we will provide a defense of such actions until such time as the act is finally adjudicated by trial verdict, court ruling, regulatory ruling or legal admission as dishonest, fraudulent, criminal or malicious.

C. Based on or arising out of any obligations for which any Insured or any carrier acting as the Insurer may be liable under any workers' compensation, disability or corporation or other business benefits law, or similar law, including but not limited to, the Employee Retirement Income Security Act of 1974 and any amendments thereto; this exclusion does not apply to the usual and customary legal services performed in connection with such capacities or laws on behalf of any person or entity not defined as an Insured;

D. Arising out of the Insured's services and/or capacity as:

1. an officer, director, partner, trustee, or employee of:
   a. a charitable organization;
   b. a pension, welfare, profit sharing or mutual fund;
   c. an investment trust or investment trust;
2. a public official, or an employee of a governmental body, subdivision, or agency; or
3. a fiduciary under the Employee Retirement Income Security Act of 1974 and is the amendments or any regulation or order issued pursuant thereto, except if an Insured is deemed to be a fiduciary solely by reason of legal advice rendered with respect to an employee benefit plan;

4. a trustee, administrator, conservator, executor, guardian, receiver or similar fiduciary capacity when any Insured is a beneficiary or distributee of any trust or estate serviced and the fee accruing from such work inures to the benefit of any Insured.

Page 3 of 10

POI-2026 (10/98)

CIC 000507



E.   For bodily injury, sickness, disease or death of any person, or injury to or destruction of any tangible property or loss of use resulting therefrom;

F.   Arising out of notarized certification or acknowledgment of a signature without the physical appearance before such notary public of the person who is or claims to be the person signing said instrument;

G.   Arising out of any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services performed for any organization, corporation, company, partnership, or operation (other than the Named Insured, Predecessor in Business or Successor in Business) while any Insured or their spouse has more than 10% equity position in such entity;

H.   Made by an Insured under this policy against any other Insured under this policy, unless such Claim arises solely out of Professional Services performed for that party in a lawyer-client capacity;

I.   Solely as respects Personal Injury:

   1.   the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the Insured;

   2.   libel or slander or the publication or utterance of defamatory or disparaging material concerning any person or organization or goods, products or services, or in violation of an individual's right of privacy, made by or at the direction of the Insured with the Insured's knowledge of the falsity thereof;

   3.   failure of performance of contract, but this exclusion does not apply to the unauthorized appropriation of ideas based upon alleged breach of implied contract;

   4.   infringement of trademark, service mark or trade name, other than titles or slogans, by use thereof on or in connection with goods, products or services sold, offered for sale or advertised; or

   5.   knowingly incorrect description or mistake in advertised price of goods, products or services sold, offered for sale or advertised.

VIII.   DEFINITIONS

When used in this policy (including endorsements forming a part hereto):

"Alternative Dispute Resolution" means the use of arbitration or mediation.

"Claim" means a demand for money or services, or the filing of suit or institution of arbitration proceedings or Alternative Dispute Resolution naming an Insured and alleging a negligent act, error, omission or Personal Injury resulting from the rendering of or failure to render Professional Services. Claim does not include proceedings seeking injunctive or other non-pecuniary relief.

"Claim Expenses" means:

(a)   Fees charged by an attorney(s), arbitrator(s) or mediator(s) designated by the Company and all other expenses resulting from the investigation, adjustment, defense and appeal of a Claim, suit or proceeding arising in connection therewith, if incurred by the Company, or by the Insured with written consent of the Company, but does not include salary charges or expenses of regular employees or officials of the Company, or fees and expenses of independent adjusters;

(b)   All costs taxed against the Insured in suits or proceedings and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the Company has paid or tendered or deposited, whether in court or otherwise, but only as respects that part of the judgment which does not exceed the limit of the Company's liability thereof. Prejudgment Interest (where payable under this policy will be in addition to the Limit of Liability stated in the Declarations); and

(c)   Premiums on appeal bonds and premiums on bonds to release attachments in such suits, but not for bond amounts in excess of the applicable limit of liability of the policy. The Company shall have no obligation to pay for or furnish any bond.

"Damages" means compensatory judgments, settlements or awards but does not include punitive or exemplary damages, sanctions, fines or penalties assessed directly against any Insured, the return of fees or other consideration paid to the Insured, or that portion of any award or judgment caused by the trebling or multiplication of actual damages under federal or state law.

"Insured" means any person or organization qualifying as an Insured in the "Persons Insured" provision of this policy. The insurance afforded applies separately to each Insured against whom Claim is made or suit is brought, except with respect to the Company's limits of liability.

"Named Insured" means the person or organization named in Item I of the Declarations of this policy.

PDJ-2028 (10/98)

CONFIDENTIAL

CIC 000508

220

"**Personal Injury**" means: (a) false arrest, detention or imprisonment, wrongful entry or eviction, other invasion of private occupancy, or malicious prosecution; (b) the publication or utterance of libel, slander or other defamatory or disparaging material, or a publication or an utterance in violation of an individual's right of privacy; or (c) injury arising out of an offense occurring in the course of the Named Insured's advertising activities, including but not limited to infringement of copyright, title slogan, patent trademark, trade dress, trade names, service mark or service number.

"**Policy Period**" means, whenever used in this policy, the period from the inception date of this policy to the policy expiration date as set forth in the Declarations or its earlier termination date, if any;

"**Potential Claim**" means knowledge of any circumstances involving an individual person or entity that could result in a Claim.

"**Predecessor In Business**" means any legal firm which has undergone dissolution and either: (a) some or all of such firm's principals, owners, officers or partners have joined the Named Insured, provided that such persons were responsible for producing in excess of 50% of the prior firm's annual gross billings and such billings have been assigned or transferred to the Named Insured; or (b) at least 50% of the principals, owners, partners or officers of the prior firm have joined the Named Insured; or (c) at least 50% of the prior firm's financial assets/liabilities have been assumed by the Named Insured.

"**Professional Services**" means:

(a)   services performed or advice given by the Insured in the Named Insured's practice as a law firm or legal professional;

(b)   services as a notary public, title agent, title insurance agent, arbitrator or mediator;

(c)   services as a trustee, administrator, conservator, executor, guardian, receiver or similar fiduciary capacity;

(d)   activities of the Insured as a member of a formal accreditation, ethics, peer review, licensing board, standards review or similar professional board or committee;

(e)   the publication or presentation of research papers or similar materials, but only if direct pecuniary compensation for publication or presentation is less than $3,000;

(f)   services performed by the Insured in a lawyer-client relationship on behalf of one or more clients shall be deemed for the purpose of this section to be the performance of Professional Services for others in the Insured's capacity as a lawyer, although such services could be performed wholly or in part by non-lawyers.

"**Reasonably Foreseeable(n)**" means:

1.   Claims or incidents reported to any prior insurer;

2.   unreported Claims or suits of which any Insured had received notice prior to the effective date of the first policy with the Company;

3.   incidents or circumstances that involve a particular person or entity which an Insured knew might result in a Claim or suit prior to the effective date of the first policy issued by the Company to the Named Insured, and which was not disclosed to the Company.

"**Specific Excess**" as used in this policy and in accordance with said policy's terms and limits shall cover liability and defense if and only if all other applicable insurance has been exhausted. Specific Excess shall also apply in the event that any term or provision included in this policy offers broader coverage than any other form of insurance simultaneously held by policyholder.  The interpretation shall apply to, but not be limited to, issues concerning any Extended Reporting Period, Optional Reporting Period, Automatic Extended Reporting Period, or similar periods in any prior policy or policies.

"**Successor In Business**" means, after dissolution of the Named Insured, any law firm in which either: (a) some or all of the principals, owners, officers and/or partners of the Named Insured have joined an existing firm, or formed a new, law firm provided such persons were responsible for producing in excess of 50% of the Named Insured's annual gross billings at the time of dissolution and such billings have been assigned or transferred to the successor law firm; or (b) at least 50% of the principals, owners, partners or officers of the Named Insured have joined the successor law firm; or (c) at least 50% of the Named Insured's financial assets/liabilities have been assumed by the successor law firm; provided this policy does not apply to Professional Services performed or Personal Injury if the Successor In Business is also an Insured under any similar liability or indemnity policy, or would be an Insured under any such policy but for exhaustion of its limits of liability. This coverage shall terminate at the earlier of policy termination or 90 days from the date of dissolution of the Named Insured unless written notice is given to the Company, together with such information as the Company may request, and the Successor In Business shall pay any additional premium required in the event the Company agrees to continue the policy.

POI-0028 (10/99)

Page 6 of 10

CONFIDENTIAL

CIC 000509

221

## IX. CONDITIONS

**A. Premium:** All premiums for this policy shall be computed in accordance with the Company's rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein. The **Named Insured** shall maintain records of the information necessary for premium computation and shall send copies of such records to the Company at such times as the Company may direct.

**B. Assistance and Cooperation of Insured in the Event of Claim or Suit:** Upon the **Insured** becoming aware of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** which could reasonably be expected to be the basis of a **Claim** covered hereby, written notice shall be given by the **Insured**, or its representative to the Company together with the fullest information obtainable as soon as practicable. If **Claim** is made or suit is brought against the **Insured**, the **Insured** or its representative shall immediately forward to the Company every demand, notice, summons or other process received by the **Insured** or the **Insured's** representative. The **Insured** shall cooperate with the Company and, upon the Company's request, assist in making statements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **Insured** because of **Damages** with respect to which this insurance applies. The **Insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **Insured** shall not, except at the **Insured's** own cost, voluntarily make any payments, admit liability, assume any obligation or incur any expense. The **Insured** may provide for **Alternate Dispute Resolution** with a client under an engagement letter or any other written contract, as long as such agreement is executed in writing prior to any **Claim** being made.

**C. Waiver of Exclusion and Breach of Conditions:**
Whenever coverage under any provision of this policy would be excluded, suspended or lost:
1. because of EXCLUSION B. relating to any judgment or final adjudication based upon or arising out of any dishonest, deliberately fraudulent, criminal, malicious or deliberately wrongful acts or omissions by any **Insured**; or
2. because of noncompliance with Section B, **CONDITIONS** relating to the giving of notice to the Company with respect to which any other **Insured** shall be in default solely because of the default or concealment of such default by one or more partners or employees responsible for the loss or damage otherwise insured hereunder,

the Company agrees that such insurance as would otherwise be afforded under this policy shall apply with respect to each and every **Insured** who did not personally commit or personally participate in committing one or more of the acts, errors, or omissions described in any such exclusion or condition; provided that if the condition be one with which such **Insured** can comply, after receiving knowledge thereof, the **Insured** entitled to the benefit of the Waiver of Exclusions and Breach of Conditions shall comply with such conditions promptly after obtaining knowledge of the failure of any other **Insured** or employee to comply therewith.

With respect to provision C. 1. above, the Company's obligation to pay in the event of such waiver shall be in excess of the deductible and in the excess of the full extent of any assets in the firm of any **Insured** who is not a beneficiary to the waiver.

**D. Assignment:** The interest of the Named Insured is not assignable. If any **Insured** shall die or be adjudged incompetent, this insurance shall thereupon terminate for such person but shall cover the **Insured's** legal representative as the **Insured** with respect to liability previously incurred and covered by this insurance. Pro rata return premium will be computed from the date of termination.

**E. Legal Action Against the Company:** A person or organization may bring a suit against the Company including, but not limited to, a suit to recover on an agreed settlement or on a final judgment against an **Insured**; but the Company will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by the Company, the **Insured** and the claimant or the claimant's legal representative.

However, no action by an **Insured** shall lie against the Company unless there has been full compliance with all of the terms of this policy.

**F. Conformity to Statute:** Notwithstanding anything contained herein to the contrary, in the event that any terms or conditions of this contract conflict with any law applicable to the coverage afforded hereunder, the terms of this contract shall by this statement be amended to conform to such law or laws.

POJ-2028 (10/99)

Page 6 of 10

CONFIDENTIAL

CIC 000510

G. **Other Insurance:** If there is other valid insurance (whether primary, excess, contingent or self-insurance), against a Claim covered by this policy the Insurance provided hereunder shall be deemed excess insurance over and above the applicable limit of all other insurance or self-insurance. This policy is written as specific excess of coverage available under any Extended Reporting Period, Optional Extended Reporting Period and Automatic Extended Reporting Period or similar period in any prior policy or policies.

When this insurance is excess, the Company shall have no duty under this policy to defend any Claim or suit that any other insurer or self-insurer has a duty to defend. If such other insurer or self-insurer refuses to defend such Claim or suit, the Company shall be entitled to the Insured's rights against all such other insurers or self-insurers for any Claim Expenses incurred by the Company.

When both this insurance and other insurance or self-insurance apply to the Claim on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater proportion of the Damages or Claim Expenses than the applicable limit of liability under this policy for such Claim bears to the total limit of all valid and collectible insurance against such Claim. Subject to the foregoing, if a loss occurs involving two or more policies, each of which provides that its insurance shall be excess, each will contribute pro rata.

H. **Subrogation:** In the event of any payment under this policy, the Company shall be subrogated to all the Insured's rights of recovery therefore against any person, organization or entity and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after any loss to prejudice such rights.

I. **Changes:** The terms of this policy shall not be waived or changed except by endorsement issued to form a part of this policy.

J. **Bankruptcy or Insolvency of Insured:** Bankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder.

K. **Cancellation:** This insurance may be cancelled by the Named Insured at any time by written notice or by surrender of this insurance to the Company or its authorized representative and the Company shall refund the unearned premium less the earned portion thereof within thirty (30) days of the latter of the effective date of the cancellation or the date of delivery of the Insured's notice of intent to cancel subject to the retention by the Company of any minimum premium stipulated herein (or proportion thereof previously agreed upon). The earned portion of the premium shall be computed on the customary short-rate basis unless any state law or regulation of the state shown in the mailing address of the Named Insured on the Declarations Page requires that return premium be computed on a pro-rata basis, even in the event of cancellation by the Named Insured. This insurance may also be cancelled, with or without the return of the unearned premium, by the Company, or by its authorized representative on behalf of the Company, by sending to all Named Insureds, by first class, registered or certified mail, at the Named Insured(s) address last known to the Company or its authorized agent, not less than ninety (90) days written notice stating the specific reason for such cancellation and when the cancellation shall be effective. In such case the Company shall refund the paid premium less the earned portion thereof within ten (10) business days after the effective date of cancellation, subject to the retention by the Company of any minimum premium stipulated herein (or proportion thereof previously agreed upon). In the event of cancellation by the Company, minimum premium shall not apply to the return of unearned premium. In case of non-payment of premium only thirty (30) days written notice of cancellation must be given by the Company. Proof of mailing will be sufficient proof of notice.

Cancellation by the Company shall only be effective if based on one or more of the following reasons:

1. Nonpayment of premium;
2. The policy was obtained through a material misrepresentation that was relied on by the Company, and such policy would not have been issued by the Company under the same terms and conditions if correct information had been disclosed;
3. Material failure to comply with policy terms, conditions or contractual duties;
4. The risk originally accepted has measurably increased;
5. Loss by the Company of reinsurance which provided coverage for all or a substantial part of the risk Insured.

L. **Nonrenewal:** The Company will renew this policy unless written notice of the Company's intent not to renew, stating the specific reasons for nonrenewal, is mailed to the Named Insured not less than ninety (90) days before the policy expires.

Any notice of nonrenewal will be mailed by first class registered or certified mail to the Named Insured at the last mailing address known to the Company. Proof of mailing will be sufficient proof of notice.

Page 7 of 10

PGU-8026 (10/99)

CIC 000511

CONFIDENTIAL

223

**M. Renewal Rate Increase or Change in Policy Terms:** If the Company increases the rate, changes the deductible, reduces the limit or substantially reduces coverage at renewal, the Company will mail to the **Named Insured,** at least sixty (60) days prior to the effective date of that increase or change:

1. Written notice of any change in coverage terms;
2. The amount of our rate increase.

A rate increase is defined as any increase in premium except increase due to change in exposure (including claims-made step factors) and/or rating plans based solely on the insured's developed experience.

Any notice of renewal rate increase or change in policy terms will be mailed by first class registered or certified mail to all **Named Insureds** at the last mailing address known to the Company. Proof of mailing will be sufficient proof of notice.

**N. Declarations and Applications:** By acceptance of this policy, the **Insured** agrees that the statements in the Declarations and application are his agreements and representations, and that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the Company or any of its agents relating to this insurance.

**O. Extended Reporting Period Option:**
1. **Cancellation/Nonrenewal:** In the case of:
   (a) cancellation or nonrenewal of this policy by the **Named Insured** or the Company for any reason other than flat cancellation at policy inception for non-payment of premium; or
   (b) advancing a retroactive or prior acts date from or previously applied by the Company

the **Named Insured** shall have the right, subject to the other terms and conditions of this policy, or an endorsement attached thereto, to have an endorsement issued extending the time during which **Claims** can be reported for an additional premium of:
   (i) 100% of the full annual premium for this policy, to a period of twelve (12) months;
   (ii) 150% of the full annual premium for this policy, to a period of twenty-four (24) months;
   (iii) 185% of the full annual premium for this policy, to a period of thirty-six (36) months; or
   (iv) 285% of the full annual premium for this policy, for an unlimited period.

following the effective date of such cancellation or nonrenewal in which to give written notice to the Company of **Claims** first made against the **Insured** during this Extended Reporting Period for any act, error, omission or **Personal Injury** arising from the rendering of or failure to render **Professional Services** occurring prior to the termination of the final **Policy Period,** subject to its terms, limitations, exclusions and conditions. This right shall terminate sixty (60) days after the effective date of such action as is indicated in subparagraphs (a) or (b) above unless written notice of such election, together with the additional premium, is received by the Company or its authorized agent from the **Named Insured** within that sixty (60) day period.

Subject to the foregoing, in the event that the **Named Insured** is a partnership or a corporation, and the policy is terminated, the premium calculation stated in i. through iv. above shall not include a charge for any individual legal professional who qualifies for a free Extended Reporting Period under section 2., 3. or 4. following, provided always that the notice is given to the Company as required and the other provisions of these sections are fully satisfied.

2. **Retiree Provision:** Notwithstanding **CONDITION O. 1.** above, in the event that the **Named Insured** is an individual, the **Named Insured** shall also have the right to have an endorsement issued extending the reporting period for this policy to an unlimited period following the effective date of such cancellation or non-renewal upon his or her retirement from the private practice of law and the payment of additional premium for this option will be waived if:

   (a) the **Named Insured** is an individual and has been continuously insured by the Company under a claims-made Lawyers Professional Liability Insurance policy for at least:
      (i) seven consecutive years prior to such cancellation or nonrenewal, and is at least 55 years of age at the time of retirement; or
      (ii) six consecutive years prior to such cancellation or nonrenewal and is at least 56 years of age at the time of retirement; or
      (iii) five consecutive years prior to such cancellation or nonrenewal and is at least 57 years of age at the time of retirement.

CONFIDENTIAL

CIC 000512

(b) written notice of this election is given to the Company within sixty (60) days after termination of this policy; and

(c) all premiums and deductibles due the Company have been paid in full.

3. **Death or Disability of Insured:** Notwithstanding CONDITION O. 1. of this policy, if the Named Insured designated in the Declaration is an individual and shall cancel or nonrenew this policy, the Named Insured shall have the right, at no cost, to have an endorsement issued extending the reporting period for this policy to an unlimited period following the effective date of such cancellation or nonrenewal provided that:

(a) such cancellation or nonrenewal results from the death or disability of the Named Insured during the Policy Period;

(b) in the event of disability, the Named Insured is totally and continuously disabled from the practice of law a minimum of six (6) months prior to the election of this option;

(c) satisfactory written evidence of death or disability is provided to the Company within one (1) year of such death or disability; and

(d) all premiums and deductibles due the Company have been paid in full.

This right shall terminate, however, unless written notice of election is received by the Company or its authorized agent from the Named Insured or legal representative of Named Insured within sixty (60) days after the effective date of such cancellation or nonrenewal.

4. Notwithstanding CONDITION O. 1. above, in the event that a licensed lawyer:

(a) is an insured under sections A. and D. of Persons Insured as defined by this policy; and

(b) Either:

  (i) Retires from the active practice of law and:
    (1) Has been continuously insured by the Company under a claims-made policy for at least:
      (a) seven consecutive years prior to such cancellation or nonrenewal, and is at least 65 years of age at the time of retirement; or
      (b) six consecutive years prior to such cancellation or nonrenewal, and is at least 66 years of age at the time of retirement; or
      (c) five consecutive years prior to such cancellation or nonrenewal and is at least 57 years of age at the time of retirement.
    (2) Written notice of retirement is given to the Company within sixty (60) days after retirement; and
    (3) All premiums and deductibles due the Company have been paid in full;

or

  (ii) Dies or becomes permanently disabled during the Policy Period and:
    (1) In the event of disability, the Named Insured must be totally and continuously disabled from the practice of law for a minimum of six (6) months prior to the election of this option;
    (2) Satisfactory written evidence of death or disability is provided to the Company within one (1) year of such death or disability; and
    (3) All premiums and deductibles due the Company have been paid in full

then the period during which Claims must be first made against each qualifying lawyer will be extended as follows:

During the Policy Period, or any renewal thereof, each individual will be afforded coverage as a former partner, owner, employee, officer or trustee of the Named Insured, subject to the terms, conditions and limitations of such policy or renewal policy; and/or

If this policy terminates and an Extended Reporting Period option is elected by the Named Insured, each individual will be afforded coverage subject to the terms, conditions and limitations of the policy and the extended reporting endorsement elected; and/or

If this policy terminates and an Extended Reporting Period option is not elected by the Named Insured, each individual who qualifies under (a) and (b) above will be entitled to an unlimited Extended Reporting Period endorsement at no additional premium. This Extended Reporting Period shall be part of this policy or the last policy issued by the Company to which this is a renewal. The limit of liability available for the Extended Reporting Period shall be part of, and not in addition to, the limits available under such policy.

In the event notice is given by the individual as provided in (a) and (b) above, a memorandum of coverage will be issued upon written request to the Company.

PCU-2026 (10/96)

Page 9 of 10

CIC 000513

CONFIDENTIAL

225

5. At the commencement of any Extended Reporting Period option, the entire premium therefore shall be deemed earned and the Company shall not be liable to return to the Named Insured any portion of the premium for the Extended Reporting Period. The cost of any Extended Reporting Period option is based on the rates and rules in effect at the time the policy was issued or last renewed.

The fact that the period during which a Claim must be first made against the Named Insured under this policy is extended by virtue of any Extended Reporting Period option shall not in any way increase the limit of this policy. The limit of liability under any Extended Reporting Period option shall be part of, and not in addition to, the limit of liability available under the last policy or renewal certificate issued to the Named Insured.

6. An automatic sixty (60) day Extended Reporting Period Option, effective at the termination of the policy period, will be provided by the Company at no additional cost unless this insurance is replaced with the same or similar insurance issued by the Company, whether or not the limits or deductibles are identical to those provided under this policy. This extended reporting period option shall only apply to claims made during the policy period and reported to the Company within sixty (60) days of the policy termination. The limits available under this extension shall be part of, and not in addition to, the limits available under the expiring policy period. Coverage provided by this automatic extended reporting period shall be specific excess over any replacement policy providing the same or similar coverage. This Extended Reporting Period option shall not be available if the policy is cancelled for non-payment of premium effective at policy inception.

Any provision in the policy which conflicts with this extension is amended accordingly.

P. Reimbursement: While the Company has no duty to do so, if the Company pays Damages or Claims Expenses:
1. Within the amount of the applicable deductible; or
2. In excess of the applicable limit of liability

all Insureds shall be jointly and severally liable to the Company for such amounts. Upon written demand, the Insured shall repay such amounts to the Company with thirty (30) days thereof. Failure to pay any amount indicated may lead to policy cancellation.

Q. Liberalization Clause:
If the Company adopts any revision that would broaden the coverage under the policy without additional premium at any time during the Policy Period, the broadened coverage will immediately apply to the policy.

In Witness whereof, the Company has caused this policy to be signed by its president and secretary.

_Secretary_

_President_

Page 10 of 10

POLI-2026 (10/96)

CIC 000514

CONFIDENTIAL

# CONSUMER INFORMATION NOTIFICATION

## IMPORTANT INFORMATION TO PURCHASING GROUP MEMBERS
### KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS.

PLEASE NOTE
PLEASE READ YOUR COVERAGE TERMS CAREFULLY.
THE POLICY MAY CONTAIN ONE OR MORE OF THE FOLLOWING EXCLUSIONS:
*ASBESTOS, DISCRIMINATION, SEXUAL ASSAULT, TRANSMISSION OF DISEASE*

AS ACCEPTED AND APPROVED BY YOUR RISK PURCHASING GROUP ASSOCIATION, THIS POLICY DOES NOT INSURE PUNITIVE OR EXEMPLARY DAMAGES THAT MAY BE SOUGHT AGAINST YOU. YOUR PREMIUM FOR THIS POLICY IS LOWER AS A RESULT OF THIS EXCLUSION.

THIS POLICY DOES NOT PROVIDE A REINSTATEMENT OF THE AGGREGATE LIMIT OF LIABILITY UNDER ANY OPTIONAL EXTENDED REPORTING PERIOD UNLESS SPECIFIC STATE LAW REQUIRES SUCH REINSTATEMENT.

WARNING: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

In the event you need to contact someone about this policy for any reason please contact your agent. If you have additional questions, you may contact the insurance company issuing this policy at the following address and telephone number:

**CHICAGO INSURANCE COMPANY**
Professional Liability Department
33 W. Monroe St., Chicago, IL 60603
Phone: (312) 346-6400

If you have been unable to contact or obtain satisfaction from the company or the agent, you may contact your State Insurance Department:

Written correspondence is preferable so that a record of your inquiry is maintained. When contacting your agent, company, or the State Insurance Department, have your certificate number available.

**INTERSTATE INSURANCE GROUP**

PON-2003 (08/02)

Page 1 of 2

CONFIDENTIAL

CIC 000515

227

(Page 4 of 23)

**IN ALASKA:** All return premiums will be computed pro-rata.
Pursuant to the Alaska Division of Insurance, we must provide to you and comply with the following notice: Your policy contains a provision relating to "Other Insurance". If any other valid insurance is primary, and permits contributions by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limits of insurance or none of the loss remains, which ever comes first.

**IN ARKANSAS, contact:**

Consumer Service Division
1123 South University
400 University Tower Building
Little Rock, Arkansas 72204

Phone:   (501) 686-2945

**IN INDIANA:**
Should you have a valid claim and find you are not being treated fairly, you may contact the Indiana Department of Insurance at the address and phone number below with your complaint and seek assistance from the governmental agency that regulates insurance.

Public Information/Market Conduct
Indiana Department of Insurance
311 West Washington Street, Suite 300
Indianapolis, IN 46204-2787

Phone: Consumer Hotline:    1-800-622-4461
In Indianapolis area:    1-317-232-2395

**IN NORTH CAROLINA:**
Within 45 days after receipt of a written request from the Named Insured the Company shall mail or deliver less information on any closed claims covering a three-year period. In the event of policy cancellation or non-renewal, the insured may elect to purchase coverage for the extending reporting period. The insured may choose a limit of liability in the policy aggregate for the extended reporting period which is one hundred percent (100%) of the expiring policy aggregate that was in effect at the inception of the policy.

**IN TEXAS: COMPLAINT NOTICE:**
Should any dispute arise about your premium or about a claim that you have filed, contact the agent or write to the company that issued the policy or certificate. If the problem is not resolved, you may also write to the State Board of Insurance, P.O. Box 149091, (333 Guadalupe), Austin, Texas 78714-9091, Fax# (512) 322-3550. This notice of complaint procedure is for information only and does not become a part or condition of the policy or certificate. Please be advised that the insurance company issuing your policy may not be subject to all insurance laws and regulations of the State of Texas.

**FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL: 1-800-628-8574**

**IN VIRGINIA, contact:**
State of Virginia Bureau of Insurance
Property & Casualty Division
P.O. Box 1157
Richmond, Virginia 23209

Phone: (in-state toll free):    1-800-552-7945
(Out-of-state calls):    1-804-786-3741

**IN WEST VIRGINIA, contact:**
Consumer Service Division
West Virginia Insurance Department
P.O. Box 60540
Charleston, W. Virginia 25306-0540

Phone: (in-state toll free):    1-800-642-9004
(Otherwise)    1-304-558-3386

**IN WISCONSIN:**
PROBLEMS WITH YOUR INSURANCE? - If you are having problems with your insurance company or agent, do not hesitate to contact the insurance company or agent to resolve your problem. You can also contact the OFFICE OF THE COMMISSIONER OF INSURANCE, a state agency which enforces Wisconsin's insurance laws, and file a complaint. You can contact the OFFICE OF THE COMMISSIONER OF INSURANCE by writing to:

**OFFICE OF THE COMMISSIONER OF INSURANCE**
Complaints Department
P.O. Box 7873
Madison, WI 53707-7873

or you can call 1-800-236-8517 outside of Madison or 266-0103 in Madison and request a complaint form.

POH-2003 (09/02)

Page 2 of 2

CONFIDENTIAL

CIC 000516

228

(Page 1 of 21)

PLEASE PROMPTLY SIGN THE ENDORSEMENT BELOW AND RETURN ONE COPY OF THIS NOTICE/ENDORSEMENT TO YOUR AGENT FOR DELIVERY TO THE COMPANY.

## INDIVIDUAL PRIOR ACTS EXCLUSION ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

In consideration of the premium charged, this policy specifically excludes loss resulting from Claims made against any Insured arising from any negligent act, error, omission, or Personal Injury occurring or alleged to have occurred prior to  6/07/2004

This exclusion applies solely to    Gabriel A. Assaad

ACKNOWLEDGED AND ACCEPTED

I understand and agree to the above terms and conditions.

Signature of Partner, Officer, or Sole Proprietor        Title        Date

Barry J. Nace dba Paulson & Nace
LWB2400909
7/24/07-08

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

POE-2232 (10/95) (Ed. 01/00)

CIC 000517

CONFIDENTIAL

229

PLEASE PROMPTLY SIGN THE ENDORSEMENT BELOW AND RETURN ONE COPY OF
THIS NOTICE/ENDORSEMENT TO YOUR AGENT FOR DELIVERY TO THE COMPANY.

## INDIVIDUAL PRIOR ACTS EXCLUSION ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

In consideration of the premium charged, this policy specifically excludes loss resulting from **Claims**
made against any **Insured** arising from any negligent   act, error, omission, or **Personal Injury**
occurring or alleged to have occurred prior to          **2/20/2007**

This exclusion applies solely to     Christopher T. Nace

ACKNOWLEDGED AND ACCEPTED

I understand and agree to the above terms and conditions.

_____          _____          _____
Signature of Partner, Officer, or Sole Proprietor          Title          Date

Barry J. Nace dba Paulson & Nace
LWB2400909
7/24/07-08

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

POE-2232 (10/95) (Ed. 01/00)

CONFIDENTIAL                                         CIC 000518

230

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT L

## Declarations
**Professional Liability Insurance Policy**

**Lawyers**

**This is a claims-made Policy.  Please review your Policy carefully.**
The Policy is limited to liability for only those claims that are first made against the Insured during the policy period.

**Insured by the Stock Company below and hereinafter called the company.**

**Chicago Insurance Company**
Executive Offices: 33 W. Monroe Street
Chicago, Illinois 60603

Fireman's Fund®

**MASTER POLICY NUMBER: LWC - 8001101**
**CERTIFICATE NUMBER: LWB - 2400909**

| Item 1. Named Insured and Address (number, Street, Town or City, County, State, Zip Code) | Producer Name |
|---|---|
| | ProAccess, L.L.C.    4192 |

**Barry J. Nace dba Paulson & Nace**
**1615 New Hampshire Avenue, NW**
**Washington, DC 20009**

| Item 2. Policy Period | | |
|---|---|---|
| From (Mo.-Day-Yr.) | To (Mo.-Day-Yr.) | 12:01 A.M. Standard Time at the address of the Named Insured as stated herein. |
| 07-24-08 | 07-24-09 | |

Item 3. Form of Named Insured's Business
Insured is   ☐ Individual   ☐ Partnership   ☐ Corporation
☒ Other

**Item 4.  Limit of Liability**

$ **2,000,000**     Each Claim

$ **2,000,000**     Aggregate

☒ a. Are included within the limits of liability.
☐ b. Claim expenses are payable in addition to the limits of liability.

**Item 5.  Deductible**

$ **10,000**     Per Claim

☐ a. The deductible amount specified above applies only to damages.
☒ b. The deductible amount specified above applies to both damages and claim expenses.

**Item 6.  Premium**

$ **9,733.00**   Amount     **81400**   Class     **3**   No. of Lawyers

Total Premium $     **9,733.00**

Item 7. Forms Attached at Issue
**POP-2122, POJ-2028(10/99)(Ed.09/06),PON-2003,POE-2232.**     M. Mulloy AUG 1 4 2008

By acceptance of this policy the Insured agrees that the statements in the Declarations and the Application and any attachments hereto are the Insured's agreements and representations and that this policy embodies all agreements existing between the Insured and the Company or any of its representatives relating to this insurance.

| Do Not Write In This Box | Remark | Countersigned at | Issue Date  7/25/08 |
|---|---|---|---|
| | | Authorized Representative | Countersign Date |

POP-2122 (01/03) (Ed. 04/06)

CONFIDENTIAL

CIC-UW-000191

# CONSUMER INFORMATION NOTIFICATION

## IMPORTANT INFORMATION TO PURCHASING GROUP MEMBERS
### KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS.

**PLEASE NOTE**
**PLEASE READ YOUR COVERAGE TERMS CAREFULLY.**
**THE POLICY MAY CONTAIN ONE OR MORE OF THE FOLLOWING EXCLUSIONS:**
*ASBESTOS, DISCRIMINATION, SEXUAL ASSAULT, TRANSMISSION OF DISEASE*

---

AS ACCEPTED AND APPROVED BY YOUR RISK PURCHASING GROUP ASSOCIATION, THIS POLICY DOES NOT INSURE PUNITIVE OR EXEMPLARY DAMAGES THAT MAY BE SOUGHT AGAINST YOU.  YOUR PREMIUM FOR THIS POLICY IS LOWER AS A RESULT OF THIS EXCLUSION.

---

THIS POLICY DOES NOT PROVIDE A REINSTATEMENT OF THE AGGREGATE LIMIT OF LIABILITY UNDER ANY OPTIONAL EXTENDED REPORTING PERIOD UNLESS SPECIFIC STATE LAW REQUIRES SUCH REINSTATEMENT.

---

WARNING:  ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

---

*In the event you need to contact someone about this policy for any reason please contact your agent.  If you have additional questions, you may contact the insurance company issuing this policy at the following address and telephone number:*

**CHICAGO INSURANCE COMPANY**
**Professional Liability Department**
**33 W. Monroe St., Chicago, IL  60603**
**Phone: (312) 346-6400**

*If you have been unable to contact or obtain satisfaction from the company or the agent, you may contact your State Insurance Department:*

*Written correspondence is preferable so that a record of your inquiry is maintained. When contacting your agent, company, or the State Insurance Department, have your certificate number available.*

**INTERSTATE**
**INSURANCE**
**GROUP**

CONFIDENTIAL

CIC-UW-000192

**IN ALASKA:** All return premiums will be computed pro-rata.
Pursuant to the Alaska Division of Insurance, we must provide to you and comply with the following notice:
Your policy contains a provision relating to "Other Insurance". If any other valid insurance is primary, and permits contributions by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid is applicable limits of insurance or none of the loss remains, which ever comes first.

| | | |
|---|---|---|
| **IN ARKANSAS,** contact: | Consumer Services Division<br>1123 South University<br>400 University Tower Building<br>Little Rock, Arkansas 72204 | Phone:   (501) 686-2945 |

**IN INDIANA:**
Should you have a valid claim and feel you are not being treated fairly, you may contact the Indiana Department of Insurance at the address and phone number below with your complaint and seek assistance from the governmental agency that regulates insurance.

| | | |
|---|---|---|
| Public Information/Market Conduct<br>Indiana Department of Insurance<br>311 West Washington Street, Suite 300<br>Indianapolis, IN  46204-2787 | Phone: Consumer Hotline:<br>In Indianapolis area: | 1-800-662-4461<br>1-317-232-2395 |

**IN NORTH CAROLINA:**
Within 45 days after receipt of a written request from the Named Insured the Company shall mail or deliver loss information on open and closed claims covering a three-year period. In the event of policy cancellation or non-renewal, the insured may elect to purchase coverage for the extending reporting period. The insured may choose a limit of liability in the policy aggregate for the extended reporting period which is one hundred percent (100%) of the expiring policy aggregate that was in effect at the inception of the policy.

**IN TEXAS: COMPLAINT NOTICE:**
Should any dispute arise about your premium or about a claim that you have filed, contact the agent or write to the company that issued the policy or certificate. If the problem is not resolved, you may also write the State Board of Insurance, P.O. Box 149091, (333 Guadalupe), Austin, Texas 78714-9091, Fax# (512) 322-3550. This notice of complaint procedure is for information only and does not become a part or condition of this policy or certificate. Please be advised that the insurance company issuing your policy may not be subject to all insurance laws and regulations of the State of Texas.

**FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL: 1-800-628-8574**

| | | |
|---|---|---|
| **IN VIRGINIA,** contact:<br>State of Virginia Bureau of Insurance<br>Property & Casualty Division<br>P.O. Box 1157<br>Richmond, Virginia 23209 | Phone: (In-state toll free):<br>(Out-of-state calls): | 1-800-552-7945<br>1-804-786-3741 |

| | | |
|---|---|---|
| **IN WEST VIRGINIA,** contact:<br>Consumer Service Division<br>West Virginia Insurance Department<br>P.O. Box 50540<br>Charleston, W. Virginia 25305-0540 | Phone: (In-state toll free):<br>(Otherwise) | 1-800-642-9004<br>1-304-558-3386 |

**IN WISCONSIN:**
**PROBLEMS WITH YOUR INSURANCE?** - If you are having problems with your insurance company or agent, do not hesitate to contact the insurance company or agent to resolve your problem. You can also contact the OFFICE OF THE COMMISSIONER OF INSURANCE, a state agency which enforces Wisconsin's insurance laws, and file a complaint. You can contact the OFFICE OF THE COMMISSIONER OF INSURANCE by writing to:

**OFFICE OF THE COMMISSIONER OF INSURANCE**
Complaints Department
P.O. Box 7873
Madison, WI 53707-7873

or you can call 1-800-236-8517 outside of Madison or 266-0103 in Madison and request a complaint form.

CONFIDENTIAL

CIC-UW-000193

234

**PLEASE PROMPTLY SIGN THE ENDORSEMENT BELOW AND RETURN ONE COPY OF THIS NOTICE/ENDORSEMENT TO YOUR AGENT FOR DELIVERY TO THE COMPANY.**

## INDIVIDUAL PRIOR ACTS EXCLUSION ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

In consideration of the premium charged, this policy specifically excludes loss resulting from **Claims** made against any **Insured** arising from any negligent   act, error, omission, or **Personal Injury** occurring or alleged to have occurred prior to

2/20/07

This exclusion applies solely to   Christopher T. Nace

**ACKNOWLEDGED AND ACCEPTED**

I understand and agree to the above terms and conditions.

| Signature of Partner, Officer, or Sole Proprietor | Title | Date |

Barry J. Nace dba Paulson & Nace

LWB2400909 Effective Date:  7/24/08

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

POE-2232 (10/95) (Ed. 01/00)

CONFIDENTIAL

CIC-UW-000194

235

**PLEASE PROMPTLY SIGN THE ENDORSEMENT BELOW AND RETURN ONE COPY OF THIS NOTICE/ENDORSEMENT TO YOUR AGENT FOR DELIVERY TO THE COMPANY.**

## INDIVIDUAL PRIOR ACTS EXCLUSION ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

In consideration of the premium charged, this policy specifically excludes loss resulting from **Claims** made against any **Insured** arising from any negligent   act, error, omission, or **Personal Injury** occurring or alleged to have occurred prior to

<u>12/12/07</u>

This exclusion applies solely to    <u>Jonathan B. Nace</u>

**ACKNOWLEDGED AND ACCEPTED**

I understand and agree to the above terms and conditions.

---

| Signature of Partner, Officer, or Sole Proprietor | Title | Date |
|---|---|---|

Barry J. Nace dba Paulson & Nace

LWB2400909 Effective Date:  7/24/08

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

POE-2232 (10/95) (Ed. 01/00)

CONFIDENTIAL

CIC-UW-000195

236

# LAWYER'S PROFESSIONAL

# LIABILITY CLAIMS-MADE

# INSURANCE POLICY

Offered through the
*ADVOCACY PROTECTION PLUS PURCHASING GROUP*
Located and domiciled in the State of Illinois

## INTERSTATE
## INSURANCE
## GROUP

**CHICAGO INSURANCE COMPANY**
*Executive Offices:*
55 E. Monroe Street
Chicago, Illinois 60603

In the event of any notice of claim or potential claim stemming
from negligent acts, errors, omissions or Personal Injury,
you should immediately contact your agent or broker
or contact this company directly.

Refer all inquiries to your agent or broker or contact the company
at Chicago, Illinois

PCJ-2028 (10/99)

CONFIDENTIAL

CIC-UW-000159

## NOTICE
### THIS IS A CLAIMS-MADE POLICY. PLEASE REVIEW THE POLICY CAREFULLY.

**THE POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD UNLESS AND TO THE EXTENT THAT AN EXTENDED REPORTING PERIOD OPTION APPLIES.**

### CHICAGO INSURANCE COMPANY
(a stock insurance company, herein called the Company)

agrees with all Insureds, in consideration of the payment of the premium, and in reliance upon the statements in the Declarations and subject to the limit of liability, exclusions, conditions and other terms of this policy, as follows:

### INSURING AGREEMENTS

**I.  COVERAGE**

The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages for Claims first made against the Insured and reported to the Company during the Policy Period or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services for others by an Insured covered under this policy. Provided always that such Professional Services or Personal Injury happen:

   A.  during the Policy Period; or

   B.  prior to the Policy Period provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the Named Insured or Predecessor in Business, and continuously renewed and maintained in effect to the inception of this policy period:

     1.  the Insured did not give notice to any prior insurer of any such act, error, omission or Personal Injury;

     2.  the Named Insured, any partner, shareholder, employee, or where appropriate the Named Insured's management committee or any member thereof, had no reasonable basis to believe that the Insured had breached a professional duty or to Reasonably Foresee that a Claim would be made against the Insured; and

     3.  there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such Claim, unless the available limits of liability of such prior policy or policies are insufficient to pay any Claim, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

The Company shall have the right and duty to defend any suit against the Insured seeking Damages to which this insurance applies even if any of the allegations of the suit are groundless, false or fraudulent. The Company, at its option, shall select and assign defense counsel; however, the Insured may engage additional counsel, solely at their expense, to associate in their defense of any Claim covered hereunder. The Company shall also have the right to investigate any Claim and/or negotiate the settlement thereof, as it deems expedient, but the Company shall not commit the Insured to any settlement without their consent. If the Insured refuses to consent to any settlement recommended by the Company and elects to contest the Claim or continue any legal proceedings in connection with such Claim, then the Company shall be relieved of any further duty to defend the Claim, and the liability of the Company for Damages and Claim Expenses shall not exceed the amount for which the Claim could have been settled, as well as the Claim Expenses incurred by the Company, or with the Company's consent, up to the date of such refusal. Furthermore, the Insured shall not assume any obligations, incur any costs, charges, or expenses or enter into any settlement without the Company's consent.

In the event:

   A.  Item 4.a. of the Declarations is applicable to this policy, Claim Expenses shall be part of, and not in addition to, the Limits of Liability specified in Item 4 of the Declarations;

   B.  Item 4.b. of the Declarations is applicable to this policy, Claim Expenses shall be in addition to the Limits of Liability specified in Item 4 of the Declarations.

In no event shall the Company be obligated to pay Damages or Claim Expenses or to defend, or continue to defend, any suit after the applicable limit of the Company's liability has been exhausted by payments of judgments, settlements, Damages or Claim Expenses, as applicable.

CIC-UW-000160



CONFIDENTIAL

238

## II. PERSONS INSURED

Each of the following is an insured under this policy to the extent set forth below:

A. The entity or person named in item 1 of the Declarations as the Named Insured;

B. Any Predecessor in Business or Successor in Business;

C. Any past partners, officers, directors, stockholders or employees of any person or entity specified in item A. or B. above (except as provided in I. below), but only while acting within the scope of their duties on behalf of such person or entity;

D. Any current partner, director, stockholder or employed lawyer of any person or entity specified in item A. or B. above;

E. Any current non-lawyer employee of any person or entity specified in item A. or B. above, but only while acting within the scope of their duties on behalf of any such person or entity;

F. Any non-affiliated legal firm, including their partners, officers, directors, or employees, but solely for Professional Services performed within the scope of their contract with, and on behalf of, the Named Insured, Predecessor in Business or Successor in Business;

G. Any legal representative, if the Insured becomes incompetent, insolvent, bankrupt or dies;

H. Any lawyer acting as "of Counsel" or on a contracted basis but only while performing Professional Services on behalf of any person or entity specified in sections A., B., C. or D. above.

I. Any past partner, director, officer or employed lawyer of any person or entity specified in item A. or B. above who retires from the private practice of law while insured under a Lawyers Professional Liability Insurance policy issued by the Company.

## III. LIMIT OF LIABILITY

Regardless of the number of Insureds under this insurance or the number of Claims made, the Company's liability is limited as follows:

A. In the event Claim Expenses are included within the limit of liability as specified in item 4.a. of the Declarations, the limit of liability stated in the Declarations as applicable to "each Claim" is the limit of the company's liability for all Damages and Claims Expenses because of each Claim covered hereby. All Claims arising from the same or related negligent act, error or omission or Personal Injury shall be considered a single Claim for the purpose of this insurance and shall be subject to the same limit of liability.

The limit of liability stated in the Declarations as "aggregate" is, subject to the above provision respecting "each Claim", the total limit of the Company's liability under this policy for all Damages and Claims Expenses.

B. In the event Claim Expenses are in addition to the limit of liability as specified in item 4.b. of the Declarations, the limit of liability stated in the Declarations as applicable to "each Claim" is the limit of the Company's liability for Damages resulting from each Claim covered hereby. There shall be a separate and equal limit of liability applicable to Claim Expenses for any such Claim. All Claims arising from the same or related negligent act, error or omission or Personal Injury shall be considered a single Claim for the purpose of this insurance and shall be subject to the same limit of liability.

The limit of liability stated in the Declarations as "aggregate" is, subject to the above provision respecting "each Claim", the total limit of the Company's liability under this policy for all Damages. A separate "aggregate" limit of liability shall apply to all Claims Expenses incurred in the defense of Claims covered by this Policy, subject to the above provision respecting the Company's liability for Claim Expenses for "each Claim".

C. The Company's liability for Damages and/or Claim Expenses, as applicable, resulting from "each Claim" is in excess of the deductible amount stated in the Declarations. The deductible amount stated in the Declarations shall upon written demand by the Company, be paid by the Named Insured within 30 days of demand.

D. The application of any Extended Reporting Period option shall not increase the limit of liability stated in the Declarations.

E. In the event the Insured participated in an Alternative Dispute Resolution to settle a Claim brought by a client of the firm, the Company will waive 50% of the Insured's deductible obligation. The maximum amount of this waiver shall not exceed $25,000 per Claim. If the Alternative Dispute Resolution fails to resolve the Claim, and the Claim proceeds to litigation, the deductible will apply to any Damages and/or Claim Expenses paid by the Company after the litigation has commenced.

CONFIDENTIAL

CIC-UW-000161

239

## IV. POLICY TERRITORY

The insurance afforded by this policy applies to any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services taking place anywhere in the world. The insurance afforded by this policy applies to Claims which are first made and reported to the Company during the Policy Period or Extended Reporting Period, if applicable, provided Claim is made or suit, if any, is brought within the United States of America, its territories or possessions, or Canada.

## V. WHEN A CLAIM IS DEEMED AS FIRST MADE

A Claim shall be deemed as being first made at the earlier of the following times:

A. When the Company first receives written notice from the Insured or its representative that a Claim has been made; or

B. When the Company first receives written notice from the Insured or its representative of specific circumstances or a Potential Claim involving a particular person or entity which may result in a Claim.

All Claims arising out of the same or related negligent act, error, omission or Personal Injury shall be considered as having been made at the time the first such Claim is made, and shall be subject to the same limit of liability and deductible.

## VI. SUPPLEMENTARY PAYMENTS

The Company will pay, in addition to the applicable limit of liability:

A. Up to $500 for loss of earnings to each Insured for each day or part of a day of such Insured's attendance, at the Company's request, at a trial, deposition, hearing or arbitration proceeding involving a civil suit against such Insured for covered Damages, but the amount so payable for any one or series of trials, depositions, hearings or arbitration proceedings arising out of the same or related negligent act, error, omission or Personal Injury shall in no event exceed $10,000; and

B. Up to $5,000 per Policy Period for each lawyer included within sub-sections A., B., C., D. and I. of Persons Insured for attorney fees and other costs, expenses or fees resulting from the investigation or defense of a proceeding before a state licensing board, peer review committee or governmental regulatory body incurred as the result of a notice of a proceeding first received by the Insured and reported to the Company during the Policy Period, arising out of any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services by an Insured covered under this policy.

## VII. EXCLUSIONS

This insurance does not apply to Claims:

A. Based on or arising out of the Insured's services and/or capacity as an employee, owner, partner, stockholder, director, officer or trustee of any sole proprietorship, partnership or corporation or other business enterprise which is not defined as Named Insured, Predecessor in Business or Successor in Business unless such Claim arises out of a lawyer-client relationship;

B. Arising out of any dishonest, fraudulent, criminal or malicious act or omission, or deliberate misrepresentation (including but not limited to, actual or alleged violations of state or federal antitrust, price-fixing, restraint of trade, copyright or deceptive trade practice laws, rules or regulations) committed by, at the direction of, or with the knowledge of any Insured; however, we will provide a defense of such actions until such time as the act is ruled either by trial verdict, court ruling, regulatory ruling or legal admission as dishonest, fraudulent, criminal or malicious.

C. Based on or arising out of any obligations for which any Insured or any carrier acting as the insurer may be liable under any workers' compensation, unemployment compensation, disability or pension benefits law, or any similar laws, including but not limited to, the Employee Retirement Income Security Act of 1974 and any amendments thereof; this exclusion does not apply to the usual and customary legal services performed in connection with such capacities or laws on behalf of any person or entity not defined as an Insured;

D. Arising out of the Insured's services and/or capacity as:
1. an officer, director, partner, trustee, or employee of:
   a. a charitable organization;
   b. a pension, welfare, profit sharing or mutual fund;
   c. an investment fund or investment trust;
2. a public official, or an employee of a governmental body, subdivision, or agency; or
3. a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto, except if an Insured is deemed to be a fiduciary solely by reason of legal advice rendered with respect to an employee benefit plan;
4. a trustee, administrator, conservator, executor, guardian, receiver or similar fiduciary capacity when any Insured is a beneficiary or distributee of any trust or estate serviced and the fee accruing from such work inures to the benefit of any Insured.

CIC-UW-000162

CONFIDENTIAL

240

E. For bodily injury, sickness, disease or death of any person, or injury to or destruction of any tangible property or loss of use resulting therefrom;

F. Arising out of notarized certification or acknowledgment of a signature without the physical appearance before such notary public of the person who is or claims to be the person signing said instrument;

G. Arising out of any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services performed for any organization, corporation, company, partnership, or operation (other than the Named Insured, Predecessor in Business or Successor in Business) while any insured or their spouse has more than 10% equity position in such entity;

H. Made by an insured under this policy against any other insured under this policy, unless such Claim arises solely out of Professional Services performed for that party in a lawyer-client capacity;

I. Solely as respects Personal Injury:

   1. the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the insured;

   2. libel or slander or the publication or utterance of defamatory or disparaging material concerning any person or organization or goods, products or services, or in violation of an individual's right of privacy, made by or at the direction of the insured with the insured's knowledge of the falsity thereof;

   3. failure of performance of contract, but this exclusion does not apply to the unauthorized appropriation of ideas based upon alleged breach of implied contract;

   4. infringement of trademark, service mark or trade name, other than titles or slogans, by use thereof on or in connection with goods, products or services sold, offered for sale or advertised; or

   5. knowingly incorrect description or mistake in advertised price of goods, products or services sold, offered for sale or advertised.

## VIII. DEFINITIONS

When used in this policy (including endorsements forming a part hereto):

"Alternative Dispute Resolution" means the use of arbitration or mediation.

"Claim" means a demand for money or services, or the filing of suit or institution of arbitration proceedings or Alternative Dispute Resolution naming an insured and alleging a negligent act, error, omission or Personal Injury resulting from the rendering of or failure to render Professional Services. Claim does not include proceedings seeking injunctive or other non-pecuniary relief.

"Claim Expenses" means:

(a) Fees charged by an attorney(s), arbitrator(s) or mediator(s) designated by the Company and all other fees, costs, and expenses resulting from the investigation, adjustment, defense and appeal of a Claim, suit or proceeding arising in connection therewith, if incurred by the Company, or by the insured with written consent of the Company, but does not include salary charges or expenses of regular employees or officials of the Company, or fees and expenses of independent adjusters;

(b) All costs taxed against the insured in suits or proceedings and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the Company has paid or tendered or deposited, whether in court or otherwise, but only as respects that part of the judgment which does not exceed the limit of the Company's liability thereof; Prejudgment interest if/where payable under this policy will be in addition to the Limits of Liability stated in the Declarations.

(c) Premiums on appeal bonds and premiums on bonds to release attachments in such suits, but not for bond amounts in excess of the applicable limit of liability of this policy. The Company shall have no obligation to pay for or furnish any bond.

"Damages" means compensatory judgments, settlements or awards but does not include punitive or exemplary damages, sanctions, fines or penalties assessed directly against any insured, the return of fees or other consideration paid to the insured, or that portion of any award or judgment caused by the trebling or multiplication of actual damages under federal or state law.

"Insured" means any person or organization qualifying as an insured in the "Persons Insured" provision of this policy. The insurance afforded applies separately to each insured against whom Claim is made or suit is brought, except with respect to the Company's limits of liability.

"Named Insured" means the person or organization named in Item I of the Declarations of this policy.

CIC-UW-000163

CONFIDENTIAL

"**Personal Injury**" means: (a) false arrest, detention or imprisonment, wrongful entry or eviction, other invasion of private occupancy, or malicious prosecution; (b) the publication of utterance of libel, slander or other defamatory or disparaging material, or a publication or an utterance in violation of an individual's right of privacy; or (c) injury arising out of an offense occurring in the course of the Named Insured's advertising activities, including but not limited to infringement of copyright, title slogan, patent trademark, trade dress, trade names, service mark or service number.

"**Policy Period**" means, whenever used in this policy, the period from the inception date of this policy to the policy expiration date as set forth in the Declarations or its earlier termination date, if any.

"**Potential Claim**" means knowledge of any circumstances involving an individual person or entity that could result in a Claim.

"**Predecessor in Business**" means any legal firm which has undergone dissolution and either: (a) some or all of such firm's principals, owners, officers or partners have joined the Named Insured, provided such persons were responsible for producing in excess of 50% of the prior firm's annual gross billings and such billings have been assigned or transferred to the Named Insured; or (b) at least 50% of the principals, owners, partners or officers of the prior firm have joined the Named Insured; or (c) at least 50% of the prior firm's financial assets/liabilities have been assumed by the Named Insured.

"**Professional Services**" means:
- (a)     services performed or advice given by the Insured in the Named Insured's practice as a law firm or legal professional;
- (b)     services as a notary public, title agent, title insurance agent, arbitrator or mediator;
- (c)     services as a trustee, administrator, conservator, executor, guardian, receiver or similar fiduciary capacity;
- (d)     activities of the Insured as a member of a formal accreditation, ethics, peer review, licensing board, standards review or similar professional board or committee;
- (e)     the publication or presentation of research papers or similar materials, but only if direct pecuniary compensation per publication or presentation is less than $3,000;
- (f)     services performed by the Insured in a lawyer-client relationship on behalf of one or more clients shall be deemed for the purpose of this section to be the performance of Professional Services for others in the Insured's capacity as a lawyer, although such services could be performed wholly or in part by non-lawyers.

**Reasonably Foresee(n)** means:
1.     Claims or incidents reported to any prior insurer;
2.     unreported Claims or suits of which any insured had received notice prior to the effective date of the first policy with the Company;
3.     incidents or circumstances that involve a particular person or entity which an insured knew might result in a Claim or suit prior to the effective date of the first policy issued by the Company to the Named Insured; and which was not disclosed to the Company.

"**Specific Excess**" as used in this policy and in accordance with said policy's terms and limits shall cover liability and defense if and only if all other applicable insurance has been exhausted. Specific Excess shall also apply in the event that any term or provision included in this policy offers broader coverage than any other form of insurance simultaneously held by policyholder. This interpretation shall apply to, but not be limited to, issues concerning any Extended Reporting Period, Optional Reporting Period, Automatic Extended Reporting Period, or similar periods in any prior policy or policies.

"**Successor in Business**" means, after dissolution of the Named Insured, any law firm in which either: (a) some or all of the principals, owners, officers and/or partners of the Named Insured have joined an existing, or formed a new, law firm provided such persons were responsible for producing in excess of 50% of the Named Insured's annual gross billings at the time of dissolution and such billings have been assigned or transferred to the successor law firm; or (b) at least 50% of the principals, owners, partners or officers of the Named Insured have joined an existing, or formed a new law firm; or (c) at least 50% of the Named Insured's financial assets/liabilities have been assumed by the successor law firm; provided this policy does not apply to Professional Services or Personal Injury if the Successor in Business is also an Insured under any similar liability or indemnity policy, or would be an Insured under any such policy but for exhaustion of its limits of liability. This coverage shall terminate at the earlier of policy termination or 90 days from the date of dissolution of the Named Insured unless written notice is given to the Company, together with such information as the Company may request, and the Successor in Business shall pay any additional premium required in the event the Company agrees to continue the policy.

CIC-UW-000164

CONFIDENTIAL

242

**IX. CONDITIONS**

**A. Premium:** All premiums for this policy shall be computed in accordance with the Company's rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein. The Named Insured shall maintain records of the information necessary for premium computation and shall send copies of such records to the Company at such times as the Company may direct.

**B. Assistance and Cooperation of Insured in the Event of Claim or Suit:** Upon the Insured becoming aware of any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services which could reasonably be expected to be the basis of a Claim covered hereby, written notice shall be given by the Insured, or its representative to the Company together with the fullest information obtainable as soon as practicable. If Claim is made or suit is brought against the Insured, the Insured or its representative shall immediately forward to the Company every demand, notice, summons or other process received by the Insured or the Insured's representative. The Insured shall cooperate with the Company and, upon the Company's request, assist in making statements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of Damages with respect to which this insurance applies. The Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at the Insured's own cost, voluntarily make any payments, admit liability, assume any obligation or incur any expense. The Insured may provide for Alternate Dispute Resolution with a client under an engagement letter or any other written contract, as long as such agreement is executed in writing prior to any Claim being made.

**C. Waiver of Exclusion and Breach of Conditions:**
Whenever coverage under any provision of this policy would be excluded, suspended or lost:

1. because of EXCLUSION B, relating to any judgment or final adjudication based upon or arising out of any dishonest, deliberately fraudulent, criminal, malicious or deliberately wrongful acts or omissions by any Insured; or

2. because of noncompliance with Section B, CONDITIONS relating to the giving of notice to the Company with respect to which any other Insured shall be in default solely because of the default or concealment of such default by one or more partners or employees responsible for the loss or damage otherwise insured hereunder,

the Company agrees that such insurance as would otherwise be afforded under this policy shall apply with respect to each and every Insured who did not personally commit or personally participate in committing one or more of the acts, errors, or omissions described in any such exclusion or condition; provided that if the condition be one with which such Insured can comply, after receiving knowledge thereof, the Insured entitled to the benefit of the Waiver of Exclusions and Breach of Conditions shall comply with such conditions promptly after obtaining knowledge of the failure of any other Insured or employee to comply therewith.

With respect to provision C. 1. above, the Company's obligation to pay in the event of such waiver shall be in excess of the deductible and in the excess of the full extent of any assets in the firm of any Insured who is not a beneficiary to the waiver.

**D. Assignment:** The interest of the Named Insured is not assignable. If any Insured shall die or be adjudged incompetent, this insurance shall thereupon terminate for such person but shall cover the Insured's legal representative as the Insured with respect to liability previously incurred and covered by this insurance. Pro rata return premium will be computed from the date of termination.

**E. Legal Action Against the Company:** A person or organization may bring a suit against the Company including, but not limited to, a suit to recover on an agreed settlement or on a final judgment against an Insured; but the Company will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by the Company, the Insured and the claimant or the claimant's legal representative.

However, no action by an Insured shall lie against the Company unless there has been full compliance with all of the terms of this policy.

**F. Conformity to Statute:** Notwithstanding anything contained herein to the contrary, in the event that any terms or conditions of this contract conflict with any law applicable to the coverage afforded hereunder, the terms of this contract shall by this statement be amended to conform to such law or laws.

CIC-UW-000165

CONFIDENTIAL

243

**G.  Other Insurance:** If there is other valid insurance (whether primary, excess, contingent or self-insurance), against a Claim covered by this policy the insurance provided hereunder shall be deemed excess insurance over and above the applicable limit of all other insurance or self-insurance. This policy is written as specific excess of coverage available under any Extended Reporting Period, Optional Extended Reporting Period and Automatic Extended Reporting Period or similar period in any prior policy or policies.

When this insurance is excess, the Company shall have no duty under this policy to defend any Claim or suit that any other insurer or self-insurer has a duty to defend. If such other insurer or self-insurer refuses to defend such Claim or suit, the Company shall be entitled to the Insured's rights against all such other insurers or self-insurers for any Claim Expenses incurred by the Company.

When both this insurance and other insurance or self-insurance apply to the Claim on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater proportion of the Damages or Claim Expenses than the applicable limit of liability under this policy for such Claim bears to the total applicable limit of liability of all valid and collectible insurance against such Claim. Subject to the foregoing, if a loss occurs involving two or more policies, each of which provides that its insurance shall be excess, each will contribute pro rata.

**H.  Subrogation:** In the event of any payment under this policy, the Company shall be subrogated to all the Insured's rights of recovery therefore against any person, organization or entity and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after any loss to prejudice such rights.

**I.  Changes:** The terms of this policy shall not be waived or changed except by endorsement issued to form a part of this policy.

**J.  Bankruptcy or Insolvency of Insured:** Bankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder.

**K.  Cancellation:** This insurance may be canceled by the Named Insured at any time by written notice or by surrender of this insurance to the Company or its authorized representative and the Company shall refund the paid premium less the earned portion thereof within thirty (30) days of the latter of the effective date of the cancellation or the date of delivery of the Insured's notice of intent to cancel subject to the retention by the Company of any minimum premium stipulated herein (or proportion thereof previously agreed upon). The earned portion of the premium shall be computed on the customary short-rate basis unless any state law or regulation of the state shown in the mailing address of the Named Insured on the Declarations Page requires that return premium be computed on a pro-rata basis, even in the event of cancellation by the Named Insured. This insurance may also be canceled, with or without the return or tender of the unearned premium, by the Company, or by its authorized representative on its behalf, by sending to all Named Insureds, by first class, registered or certified mail, at the Named Insured(s) address last known to the Company or its authorized agent, not less than ninety (90) days written notice stating the specific reason for such cancellation and when the cancellation shall be effective. In such case the Company shall refund the paid premium less the earned portion thereof within ten (10) business days after the effective date of cancellation, subject to the retention by the Company of any minimum premium stipulated herein (or proportion thereof previously agreed upon). In the event of cancellation by the Company, minimum premium shall not apply to the return of unearned premium. In case of non-payment of premium only thirty (30) days written notice of cancellation must be given by the Company. Proof of mailing will be sufficient proof of notice.

Cancellation by the Company shall only be effective if based on one or more of the following reasons:
1.  Nonpayment of premium;
2.  The policy was obtained through a material misrepresentation that was relied on by the Company, and such policy would not have been issued by the Company under the same terms and conditions if correct information had been disclosed;
3.  Material failure to comply with policy terms, conditions or contractual duties;
4.  The risk originally accepted has measurably increased;
5.  Loss by the Company of reinsurance which provided coverage for all or a substantial part of the risk insured.

**L.  Nonrenewal:** The Company will renew this policy unless written notice of the Company's intent not to renew, stating the specific reasons for nonrenewal, is mailed to the Named Insured not less than ninety (90) days before the policy expires.

Any notice of nonrenewal will be mailed by first class registered or certified mail to the Named Insured at the last mailing address known to the Company. Proof of mailing will be sufficient proof of notice.

M. **Renewal Rate Increase or Change in Policy Terms:** If the Company increases the rate, changes the deductible, reduces the limit or substantially reduces coverage at renewal, the Company will mail to the Named Insured, at least sixty (60) days prior to the effective date of that increase or change:

1. Written notice of any change in coverage terms;
2. The amount of our rate increase.

A rate increase is defined as any increase in premium except increase due to change in exposure (including claims-made step factors) and/or rating plans based solely on the insured's developed experience.

Any notice of renewal rate increase or change in policy terms will be mailed by first class registered or certified mail to all Named Insureds at the last mailing address known to the Company. Proof of mailing will be sufficient proof of notice.

N. **Declarations and Applications:** By acceptance of this policy, the Insured agrees that the statements in the Declarations and application are his agreements and representations, and that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the Company or any of its agents relating to this insurance.

O. **Extended Reporting Period Option:**
1. **Cancellation/Nonrenewal:** In the case of:
   (a) cancellation or nonrenewal of this policy by the Named Insured or the Company for any reason other than flat cancellation at policy inception for non-payment of premium; or
   (b) advancing a retroactive or prior acts date from or previously applied by the Company

the Named Insured shall have the right, subject to the other terms and conditions of this policy, or an endorsement attached thereto, to have an endorsement issued extending the time during which Claims can be reported for an additional premium of:
   (i) 100% of the full annual premium for this policy, to a period of twelve (12) months;
   (ii) 150% of the full annual premium for this policy, to a period of twenty-four (24) months;
   (iii) 185% of the full annual premium for this policy, to a period of thirty-six (36) months; or
   (iv) 285% of the full annual premium for this policy, for an unlimited period.

following the effective date of such cancellation or nonrenewal in which to give written notice to the Company of Claims first made against the Insured during this Extended Reporting Period for any act, error, omission or Personal Injury arising from the rendering of or failure to render Professional Services occurring prior to the termination of the final Policy Period, subject to its terms, limitations, exclusions and conditions. This right shall terminate sixty (60) days after the effective date of such action as is indicated in subparagraphs (a) or (b) above unless written notice of such election, together with the additional premium, is received by the Company or its authorized agent from the Named Insured within that sixty (60) day period.

Subject to the foregoing, in the event that the Named Insured is a partnership or a corporation, and the policy is terminated, the premium calculation stated in I. through IV. above shall not include a charge for any individual legal professional who qualifies for a free Extended Reporting Period under section 2., 3. or 4. following, provided always that the notice is given to the Company as required and the other provisions of these sections are fully satisfied.

2. **Retiree Provision:** Notwithstanding CONDITION O. 1. above, in the event that the Named Insured is an individual, the Named Insured shall also have the right to have an endorsement issued extending the reporting period for this policy to an unlimited period following the effective date of such cancellation or non-renewal upon his or her retirement from the private practice of law and the payment of additional premium for this option will be waived if:

   (a) the Named Insured is an individual and has been continuously insured by the Company under a claims-made Lawyers Professional Liability insurance policy for at least:
   (i) seven consecutive years prior to such cancellation or nonrenewal, and is at least 55 years of age at the time of retirement; or
   (ii) six consecutive years prior to such cancellation or nonrenewal and is at least 56 years of age at the time of retirement; or
   (iii) five consecutive years prior to such cancellation or nonrenewal and is at least 57 years of age at the time of retirement.

CONFIDENTIAL

CIC-UW-000167

(b) written notice of this election is given to the Company within sixty (60) days after termination of this policy; and

(c) all premiums and deductibles due the Company have been paid in full.

3.  **Death or Disability of Insured:** Notwithstanding CONDITION O. 1. of this policy, if the Named Insured designated in the Declaration is an individual and shall cancel or nonrenew this policy, the Named Insured shall have the right, at no cost, to have an endorsement issued extending the reporting period for this policy to an unlimited period following the effective date of such cancellation or nonrenewal provided that:

(a) such cancellation or nonrenewal results from the death or disability of the Named Insured during the Policy Period;

(b) in the event of disability, the Named Insured is totally and continuously disabled from the practice of law a minimum of six (6) months prior to the election of this option;

(c) satisfactory written evidence of death or disability is provided to the Company within one (1) year of such death or disability; and

(d) all premiums and deductibles due the Company have been paid in full.

This right shall terminate, however, unless written notice of election is received by the Company or its authorized agent from the Named Insured or legal representative of Named Insured within sixty (60) days after the effective date of such cancellation or nonrenewal.

4.  Notwithstanding CONDITION O. 1. above, in the event that a licensed lawyer:

(a) is an Insured under sections A. and D. of Persons Insured as defined by this policy; and

(b) Either:

   (i) Retires from the active practice of law and:

     (1) Has been continuously insured by the Company under a claims-made policy for at least:

       (a) seven consecutive years prior to such cancellation or nonrenewal, and is at least 55 years of age at the time of retirement; or

       (b) six consecutive years prior to such cancellation or nonrenewal, and is at least 56 years of age at the time of retirement; or

       (c) five consecutive years prior to such cancellation or nonrenewal and is at least 57 years of age at the time of retirement.

     (2) Written notice of retirement is given to the Company within sixty (60) days after retirement; and

     (3) All premiums and deductibles due the Company have been paid in full;

   or

   (ii) Dies or becomes permanently disabled during the Policy Period and:

     (1) In the event of disability, the Named Insured must be totally and continuously disabled from the practice of law for a minimum of six (6) months prior to the election of this option;

     (2) Satisfactory written evidence of death or disability is provided to the Company within one (1) year of such death or disability; and

     (3) All premiums and deductibles due the Company have been paid in full

then the period during which Claims must be first made against each qualifying lawyer will be extended as follows:

During the Policy Period, or any renewal thereof, each individual will be afforded coverage as a former partner, owner, employee, officer or trustee of the Named Insured, subject to the terms, conditions and limitations of such policy or renewal policy; and/or

If this policy terminates and an Extended Reporting Period option is elected by the Named Insured, each individual will be afforded coverage subject to the terms, conditions and limitations of the policy and the extended reporting endorsement elected; and/or

If this policy terminates and an Extended Reporting Period option is not elected by the Named Insured, each individual who qualifies under (a) and (b) above will be entitled to an unlimited Extended Reporting Period endorsement at no additional premium. This Extended Reporting Period shall be part of this policy or the last policy issued by the Company to which this is a renewal. The limit of liability available for the Extended Reporting Period shall be part of, and not in addition to, the limits available under such policy.

In the event notice is given by the individual as provided in (a) and (b) above, a memorandum of coverage will be issued upon written request to the Company.

CIC-UW-000168



CONFIDENTIAL

246

5.   At the commencement of any Extended Reporting Period option, the entire premium therefore shall be deemed earned and the Company shall not be liable to return to the Named Insured any portion of the premium for the Extended Reporting Period.  The cost of any Extended Reporting Period option is based on the rates and rules in effect at the time the policy was issued or last renewed.

   The fact that the period during which a Claim must be first made against the Named Insured under this policy is extended by virtue of any Extended Reporting Period option shall not in any way increase the limit of this policy.  The limit of liability under any Extended Reporting Period option shall be part of, and not in addition to, the limit of liability available under the last policy or renewal certificate issued to the Named Insured.

6.   An automatic sixty (60) day Extended Reporting Period Option, effective at the termination of the policy period, will be provided by the Company at no additional cost unless this insurance is replaced with the same or similar insurance issued by the Company, whether or not the limits or deductibles are identical to those provided under this policy.  This extended reporting period option shall only apply to claims made during the policy period and reported to the Company within sixty (60) days of the policy termination.  The limits available under this extension shall be part of, and not in addition to, the limits available under the expiring policy period.  Coverage provided by this automatic extended reporting period shall be specific excess over any replacement policy providing the same or similar coverage.  This Extended Reporting Period option shall not be available if the policy is cancelled for non-payment of premium effective at policy inception.

   Any provision in the policy which conflicts with this extension is amended accordingly.

P.   Reimbursement: While the Company has no duty to do so, if the Company pays Damages or Claims Expenses:
   1.   Within the amount of the applicable deductible; or
   2.   In excess of the applicable limit of liability

   all insureds shall be jointly and severally liable to the Company for such amounts.  Upon written demand, the Insured shall repay such amounts to the Company with thirty (30) days thereof.  Failure to pay any amount indicated may lead to policy cancellation.

Q.   Liberalization Clause:
   If the Company adopts any revision that would broaden the coverage under the policy without additional premium at any time during the Policy Period, the broadened coverage will immediately apply to this policy.


In Witness whereof, the Company has caused this policy to be signed by its president and secretary.


*Secretary*

*President*

CIC-UW-000169

CONFIDENTIAL

247

# Declarations
## Professional Liability Insurance Policy
## Lawyers

**This is a claims-made Policy.  Please review your Policy carefully.**
The Policy is limited to liability for only those claims that are first made against the Insured during the policy period.

Insured by the Stock Company below and hereinafter called the company.

Chicago Insurance Company
*Executive Offices: 33 W. Monroe Street*
*Chicago, Illinois 60603*

**MASTER POLICY NUMBER:  LWC - 8001101**
**CERTIFICATE NUMBER:  LWB -** 2400909

| Item 1. Named Insured and Address (number, Street, Town or City, County, State, Zip Code) | Producer Name |
|---|---|
| | ProAccess, L.L.C.   0004192 |

**Item 2. Policy Period**

| From (Mo.-Day-Yr.) | To (Mo.-Day-Yr.) | 12:01 A.M. Standard Time at the address of the Named Insured as stated herein. |
|---|---|---|
| 07-24-07 | 07-24-08 | |

Barry J. Nace dba Paulson & Nace
1615 New Hampshire Avenue, NW
Washington, DC 20009

**Item 3. Form of Named Insured's Business**
Insured is  ☐ Individual   ☐ Partnership   ☐ Corporation
☒ Other

**Item 4.  Limit of Liability**

$    2,000,000    Each Claim
$    2,000,000    Aggregate

☒ a. Are included within the limits of liability.
☐ b. Claim expenses are payable in addition to the limits of liability.

**Item 5. Deductible**
$    10,000    Per Claim
☐ a. The deductible amount specified above applies only to damages.
☒ b. The deductible amount specified above applies to both damages and claim expenses.

**Item 6. Premium**
$    9,886.00    Amount    81400    Class    3    No. of Lawyers

Total Premium $    9,886.00

**Item 7. Forms Attached at Issue**
POP-2122, POJ-2028(10/99)(Ed.09/06), PON-2003, POE-2232.

M. Molloy  AUG 10 2007

By acceptance of this policy the Insured agrees that the statements in the Declarations and the Application and any attachments hereto are the Insured's agreements and representations and that this Policy embodies all agreements existing between the Insured and the Company or any of its representatives relating to this insurance.

| Do Not Write In This Box | Remark | Countersigned at | Issue Date 7/27/07 |
|---|---|---|---|
| | | Authorized Representative | Countersign Date |

POP-2122 (01/03) (Ed. 04/06)

CONFIDENTIAL

CIC-UW-000171

# CONSUMER INFORMATION NOTIFICATION

## IMPORTANT INFORMATION TO PURCHASING GROUP MEMBERS
### KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS.

**PLEASE NOTE**
**PLEASE READ YOUR COVERAGE TERMS CAREFULLY.**
THE POLICY MAY CONTAIN ONE OR MORE OF THE FOLLOWING EXCLUSIONS:
*ASBESTOS, DISCRIMINATION, SEXUAL ASSAULT, TRANSMISSION OF DISEASE*

---

AS ACCEPTED AND APPROVED BY YOUR RISK PURCHASING GROUP ASSOCIATION, THIS POLICY DOES NOT INSURE PUNITIVE OR EXEMPLARY DAMAGES THAT MAY BE SOUGHT AGAINST YOU.  YOUR PREMIUM FOR THIS POLICY IS LOWER AS A RESULT OF THIS EXCLUSION.

---

THIS POLICY DOES NOT PROVIDE A REINSTATEMENT OF THE AGGREGATE LIMIT OF LIABILITY UNDER ANY OPTIONAL EXTENDED REPORTING PERIOD UNLESS SPECIFIC STATE LAW REQUIRES SUCH REINSTATEMENT.

---

WARNING:  ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

---

*In the event you need to contact someone about this policy for any reason please contact your agent.  If you have additional questions, you may contact the insurance company issuing this policy at the following address and telephone number:*

**CHICAGO INSURANCE COMPANY**
**Professional Liability Department**
**33 W. Monroe St., Chicago, IL  60603**
**Phone: (312) 346-6400**

*If you have been unable to contact or obtain satisfaction from the company or the agent,*
*you may contact your State Insurance Department:*

*Written correspondence is preferable so that a record of your inquiry is maintained. When contacting your agent, company, or the State Insurance Department, have your certificate number available.*

**INTERSTATE**
**INSURANCE**
**GROUP**

PON-2003 (08/02)                                                           Page 1 of 2



CONFIDENTIAL

CIC-UW-000172

**IN ALASKA:** All return premiums will be computed pro-rata.
Pursuant to the Alaska Division of Insurance, we must provide to you and comply with the following notice:
Your policy contains a provision relating to "Other Insurance". If any other valid insurance is primary, and permits contributions by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limits of insurance or none of the loss remains, which ever comes first.

| | | |
|---|---|---|
| **IN ARKANSAS**, contact: | Consumer Services Division<br>1123 South University<br>400 University Tower Building<br>Little Rock, Arkansas 72204 | Phone:   (501) 686-2945 |

**IN INDIANA:**
Should you have a valid claim and feel you are not being treated fairly, you may contact the Indiana Department of Insurance at the address and phone number below with your complaint and seek assistance from the governmental agency that regulates insurance.

Public Information/Market Conduct
Indiana Department of Insurance                  Phone: Consumer Hotline:        1-800-662-4461
311 West Washington Street, Suite 300                In Indianapolis area:          1-317-232-2395
Indianapolis, IN 46204-2787

**IN NORTH CAROLINA:**
Within 45 days after receipt of a written request from the Named Insured the Company shall mail or deliver loss information on open and closed claims covering a three-year period. In the event of policy cancellation or non-renewal, the insured may elect to purchase coverage for the extending reporting period. The insured may choose a limit of liability in the policy aggregate for the extended reporting period which is one hundred percent (100%) of the expiring policy aggregate that was in effect at the inception of the policy.

**IN TEXAS:** COMPLAINT NOTICE:
Should any dispute arise about your premium or about a claim that you have filed, contact the agent or write to the company that issued the policy or certificate. If the problem is not resolved, you may also write the State Board of Insurance, P.O. Box 149091, (333 Guadalupe), Austin, Texas 78714-9091, Fax# (512) 322-3550. This notice of complaint procedure is for information only and does not become a part or condition of this policy or certificate. Please be advised that the insurance company issuing your policy may not be subject to all insurance laws and regulations of the State of Texas.

**FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL: 1-800-628-8574**

| | | |
|---|---|---|
| **IN VIRGINIA**, contact:<br>State of Virginia Bureau of Insurance<br>Property & Casualty Division<br>P.O. Box 1157<br>Richmond, Virginia 23209 | Phone: (In-state toll free):<br>(Out-of-state calls): | 1-800-552-7945<br>1-804-786-3741 |

| | | |
|---|---|---|
| **IN WEST VIRGINIA**, contact:<br>Consumer Service Division<br>West Virginia Insurance Department<br>P.O. Box 50540<br>Charleston, W. Virginia 25305-0540 | Phone: (In-state toll free):<br>(Otherwise): | 1-800-642-9004<br>1-304-558-3386 |

**IN WISCONSIN:**
**PROBLEMS WITH YOUR INSURANCE?** - If you are having problems with your insurance company or agent, do not hesitate to contact the insurance company or agent to resolve your problem. You can also contact the OFFICE OF THE COMMISSIONER OF INSURANCE, a state agency which enforces Wisconsin's insurance laws, and file a complaint. You can contact the OFFICE OF THE COMMISSIONER OF INSURANCE by writing to:

**OFFICE OF THE COMMISSIONER OF INSURANCE**
Complaints Department
P.O. Box 7873
Madison, WI 53707-7873

or you can call 1-800-236-8517 outside of Madison or 266-0103 in Madison and request a complaint form.

CONFIDENTIAL

CIC-UW-000173

**PLEASE PROMPTLY SIGN THE ENDORSEMENT BELOW AND RETURN ONE COPY OF
THIS NOTICE/ENDORSEMENT TO YOUR AGENT FOR DELIVERY TO THE COMPANY.**

## INDIVIDUAL PRIOR ACTS EXCLUSION ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

In consideration of the premium charged, this policy specifically excludes loss resulting from **Claims** made against any **Insured** arising from any negligent   act, error, omission, or **Personal Injury** occurring or alleged to have occurred prior to

6/07/2004

This exclusion applies solely to   **Gabriel A. Assaad**

**ACKNOWLEDGED AND ACCEPTED**

I understand and agree to the above terms and conditions.

| Signature of Partner, Officer, or Sole Proprietor | Title | Date |
|---|---|---|

Barry J. Nace dba Paulson & Nace
LWB2400909
7/24/07-08

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

POE-2232 (10/95) (Ed. 01/00)


CONFIDENTIAL

CIC-UW-000174

PLEASE PROMPTLY SIGN THE ENDORSEMENT BELOW AND RETURN ONE COPY OF
THIS NOTICE/ENDORSEMENT TO YOUR AGENT FOR DELIVERY TO THE COMPANY.

# INDIVIDUAL PRIOR ACTS EXCLUSION ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

In consideration of the premium charged, this policy specifically excludes loss resulting from **Claims**
made against any **Insured** arising from any negligent   act, error, omission, or **Personal Injury**
occurring or alleged to have occurred prior to

**2/20/2007**
_____

This exclusion applies solely to    **Christopher T. Nace**
_____

**ACKNOWLEDGED AND ACCEPTED**

I understand and agree to the above terms and conditions.

_____     _____     _____
Signature of Partner, Officer, or Sole Proprietor           Title                        Date

Barry J. Nace dba Paulson & Nace
LWB2400909
7/24/07-08

### ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

POE-2232 (10/95) (Ed. 01/00)

CONFIDENTIAL

CIC-UW-000175

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT M

## SUPPLEMENTAL CLAIM/INCIDENT INFORMATION

This form should be completed for each claim, suit or incident applicant firm is aware of after inquiry of all partners, officers, owners and employees.

Make sure all questions are answered completely.

1. Full name of Applicant or Insured: *Barry J. Nace dba Paulson & Nace*

2. Full name of Firm which reported claim: *N/A*

3. Full name of claimant: *Sarah Gilbert*

4. Indicate whether: ☐ Claim/suit   ☒ Incident

5. Date of alleged error: *2008*

6. Date you became aware of alleged error: *2008*

7. Date it was reported to your insurance carrier: *not yet reported*

   Name of your insurance carrier: *Fireman's Fund – Chicago Insurance Co.*

8. Additional defendants: *N/A Incident Only*

9. a. IF CLOSED indicated date closed _____   Total amount paid $ _____

   b.                     Of the total amount paid, how much was paid for legal expenses? $ _____

10.         IF PENDING, PLEASE SEND SUIT PAPERS AND ANSWER ALL QUESTIONS BELOW:

    a.              Claimant's settlement demand: $ _____

    b.              Defendant's offer for settlement: $ _____

    c.              Insurer's loss reserve: $ _____   *- Fund –*
                 (Available by calling your insurance company and/or defense counsel)

    d. Is claim in suit?   ☐ Yes   ☒ No   *No claim or suit has been filed*

       If yes, amount asked in summons: $

    e. Limits of Liability _____   Deductible _____

11. Name of your insurance carrier responding to this claim or incident: _____ *N/A* _____

12. Was an engagement letter used?   ☐ Yes   ☒ No

13. Provide a brief description of the claim, indicating the alleged error, type of engagement and alleged injury.

    *An associate mis-named a plaintiff in a complaint filed in [...] upon the phone [...]*
    *[...] court [...] the plaintiff alone. A motion to [...]*
    *[...] was filed and denied in May of 2009. The case will [...]*
    *be appealed.*

    Signature of Owner, Officer or Partner   *Owner*   Date (month-day-year)   *5/20/09*
                                                                              *7/23/09*

POA-2024 (12/95)

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT N

*Sarah Gilbert*



SUPPLEMENT **6**

LLOYD'S OF LONDON

APPLICATION FOR
**LAWYERS PROFESSIONAL LIABILITY INSURANCE**
"WITH CERTAIN UNDERWRITERS AT LLOYD'S"
**CLAIM FORM**

**APPLICANT'S INSTRUCTIONS**

A. THIS FORM IS TO BE COMPLETED IF THE APPLICANT OR ANY LAWYER NAMED IN SUPPLEMENT 1 IS CURRENTLY OR HAS BEEN INVOLVED IN ANY CLAIM OR SUIT DURING THE LAST TEN YEARS AS INDICATED BY A "YES" ANSWER TO QUESTIONS 10B OR 10C.
PLEASE COMPLETE ONE FORM FOR EACH CLAIM.

B. IF SPACE IS INSUFFICIENT TO ANSWER ANY QUESTION FULLY, PLEASE USE SEPARATE ADDENDUM. DO NOT ATTACH COPIES OF SUMMONS AND COMPLAINT.

C. PLEASE NOTE THIS SUPPLEMENT IS FOR UNDERWRITING INFORMATION AND DOES NOT CONSTITUTE NOTICE OF CLAIM.  IF YOU WISH TO NOTIFY A CLAIM ON YOUR CURRENT OR EXPIRING POLICY PLEASE CHECK THE CLAIMS PROVISIONS OF YOUR POLICY AND/OR SEEK ADVICE FROM YOUR BROKER.

D. PLEASE LEAVE NO BLANKS.

1. Full Name of individual(s) and name of firm involved in the claim:
   A. *PAULSON & NACE*
   B. *Gabriel Assaad – no Tongue with Applicant*
   C. _____

2. Additional Defendants:
   A. _____
   B. _____
   C. _____
   D. _____

3. Full Name of claimant: *Richard Gilbert, Rosie Gilbert & Sarah Gilbert*
4. Date of alleged error: *7/24/06 - Date of original complaint*
5. To what Insurance Company did you report this claim: *Fireman's Fund*
6. Date reported to Insurance Company: *2/25/10*
7. From which Area of Law as described in Question 2C Activities, did the claim or circumstance arise?
   *Personal Injury Litigation – Medical Malpractice*

Chicago 0068

256

8.   Please indicate: Present status of claim: (Tick One) and fill in the spaces below as appropriate.

**OPEN CLAIM**                                    **CLOSED CLAIM**

Circumstance/ ☒        In Suit ☐        Closed without ☐        Closed with ☐
Claim                                    payment                 payment

*Amounts Outstanding*                    *Amounts Paid*

Amount asked in summons:  $_____      Defense costs Paid by Applicant: $_____

Claimant's settlement demand: $_____  Defense costs Paid by Insurer:  $_____

Defendant's offer for settlement: $_____   Damages/Settlement Paid by Applicant: $_____

Defense costs to date:  $_____        Damages/Settlement Paid by Insurer:  $_____

Insurers Current Loss reserve:  $_____   Date of Settlement: _____

9.   (Please provide enough information to allow an evaluation - DO NOT ATTACH SUMMONS AND COMPLAINT.

A.  Please describe the Services rendered and how they relate to the Parties in this matter:
*Virginia Counsel, Gabriel Assaad, improperly named the child in the caption of a medical malpractice complaint. Therefore, the complaint was dismissed. MR. ASSAAD IS NO*

B.  Describe plaintiff's allegation/Applicant's response and evaluation: *LONGER WITH APPLICANT.*
*The claim of the parents is still viable and being pursued by another attorney in VA. If he loses the case there is probably is no liability. If he wins the case, the maximum*

C.  Value of the case or transaction to your Client: $_____      Trial Date: _____
*value would be the difference between about two million ($The "cap") and what the jury returns for the parents.*

D.  Applicant's evaluation of value of this claim:  Est Loss     $_____

Est Defense Costs     $_____

Current Case Status:  *Plaintiff has retained other counsel to pursue the underlying claim which is still pending.*

E.  Please explain what has been done to avoid a recurrence of this type of claim:

*The Virginia Counsel Gabriel Assaad, is no longer with Applicant. Applicant is no longer taking cases in VA. All VA cases are being referred out.*

I UNDERSTAND THE INFORMATION SUBMITTED HEREIN BECOMES PART OF THE APPLICANT'S
PROFESSIONAL LIABILITY APPLICATION AND IS SUBJECT TO THE SAME REPRESENTATIONS AND
CONDITIONS AND THAT THERE WILL BE NO COVERAGE AFFORDED UNDER THE PROPOSED
INSURANCE FOR ANY MATTER(S) LISTED IN RESPONSE TO THIS SUPPLEMENT

_____                    _____
AUTHORIZED SIGNATURE OF APPLICANT           TITLE

7-20-11

Chicago 0069

257

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT O



**Fireman's Fund™**
Insurance Company

A company of **Allianz** (⑪)

May 17, 2013

Barry Nace
Paulson & Nace
1615 New Hampshire Avenue NW
Washington, DC 20009

*Sent via electronic mail*

      **Re:**    **Insured: Barry J. Nace dba Paulson & Nace**
              **Potential claimant: Sarah Gilbert**
              **Issuing Company:  Chicago Insurance Company**
              **Claim No.:    00509630577**

Dear Mr. Nace:

This will confirm our telephone conferences of June 29 and July 2, 2009, at which time we discussed the potential attorney malpractice claim by Sarah Gilbert and her family. This case involves your representation of the Gilberts in a medical malpractice action.

Let me remind you that Chicago Insurance Company ("CIC") previously issued a Lawyers Professional Liability Insurance Policy No. LWB 2400909 to the firm on a claims made basis. The policy has effective dates of July 24, 2008 to July 24, 2009. The limits of liability are $2,000,000 per claim and $2,000,000 in the aggregate for each policy period. There is a $10,000 deductible per claim. The deductible applies to both loss and expense.  Claims expenses will reduce the portion of the limit of liability that remains available to pay claims.

You have advised me that the wrong caption was put on the Complaint resulting in a dismissal of the minors claim.  You plan to appeal this dismissal and in the mean time have dismissed the parent's claims with the intent to re-file within a six month period.

Nothing contained herein constitutes a waiver of any of our potential rights and defenses. CIC reserves all of its rights under the policy and, in particular, reserves the right to assert coverage or policy defenses, if any, at such time when pertinent facts and circumstances

or their significance are disclosed or otherwise become known to CIC. Nothing in this letter or in any prior or subsequent investigation should be construed as an admission of coverage or of the obligation to defend, and this letter should not be construed to extend the terms or conditions of coverage in your policy. Nothing in this letter or in any prior or subsequent investigation should be construed as a restriction of any exclusion of coverage. CIC does not waive any such terms, conditions, or exclusions.

As discussed, we will keep this file open pending the outcome of the appeal of the minors dismissal from the lawsuit. In the mean time, please send me a copy of the underlying file including the original pleadings and dismissal.

If you have any questions, please feel free to contact me at (720) 733-9210.

Very truly yours,

Cari K. Ellenberger
Claims Specialist
Chicago Insurance Company
A Fireman's Fund Company
4601 DTC Blvd.
Denver, CO 80237
Direct 720-733-9210
Fax 888-324-2397

Cc      Lillian Mattos - ProAccess

Chicago 0012

**Sarah Kelsick**

| | |
|---|---|
| **From:** | Lillian Mattos [lmattos@proaccess1.com] |
| **Sent:** | Friday, July 24, 2009 8:49 AM |
| **To:** | Michelle L. Gietzen |
| **Subject:** | RE: Paulson & Nace - LWB2400909 - Effective 7/24/2009 |

Hello Michelle,

As per our quote dated 6/18/2009, please accept this as confirmation that the above captioned account is now bound. Invoice and binder to follow.

Thank you,
Lillian


Lillian Mattos
Account Executive
lmattos@proaccess1.com
ProAccess, LLC
100 Executive Drive
West Orange, NJ 07052
Phone: 973-669-2339
Fax: 973-669-2399


Ask me about our markets for Home Healthcare / Staffing Startups / Hospice / Imaging Centers / MediSpas / Surgery Centers / Sleep Centers / Ambulance (air & ground) / "Hard to place Doctors" etc.

IMPORTANT REMINDER TO PROACCESS CLIENTS: No insurance may be bound by e-mail, and no changes in existing insurance coverages may be effectuated by e-mail, until such time as your request is explicitly acknowledged by your licensed ProAccess representative.

**CONFIDENTIALITY NOTICE:** The contents of this transmittal and any attachments are intended for the exclusive use of the addressee(s), and may contain confidential and / or legally privileged information. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmittal in error, please notify us immediately by return e-mail, and then delete this message and all attachments.


**From:** Michelle L. Gietzen [mailto:MGietzen@alliantinsurance.com]
**Sent:** Friday, July 24, 2009 9:45 AM
**To:** Lillian Mattos
**Cc:** Kathy Carie
**Subject:** RE: Paulson & Nace - LWB2400909 - Effective 7/24/2009

Lillian:

Please bind coverage as follows:

1

Limit - $2,000,000/ $2,000,000 – Each Claim / Aggregate
Deductible - $10,000
Annual Premium - $12,676

Please verify that coverage is bound.

Thank you,


Michelle L. Gietzen
Vice President
Key Client Group
Alliant | ProQuest a division of Alliant
101 Southfield Road
Birmingham, MI  48009
Direct Dial:  248.205.2907
Mobile:  248.890.1016
Facsimile:  248.203.7514
mgietzen@alliantinsurance.com<mail to:mgietzen@alliantinsurance.com>

---

**From:** Lillian Mattos [mailto:lmattos@proaccess1.com]
**Sent:** Friday, July 24, 2009 9:28 AM
**To:** Michelle L. Gietzen
**Subject:** RE: Paulson & Nace - LWB2400909 - Effective 7/24/2009

Hello Michelle,

I reported the claim upon receipt of the renewal application.  Attached is FFIC's acknowledgement.  Thank you for the additional information requested.  All items required have been met and we are ready to bind coverage upon your request.

Thank you,
Lillian

---

Lillian Mattos
Account Executive
lmattos@proaccess1.com
ProAccess, LLC
100 Executive Drive
West Orange, NJ 07052
Phone: 973-669-2339
Fax: 973-669-2399


Ask me about our markets for Home Healthcare / Staffing Startups / Hospice / Imaging Centers / MediSpas / Surgery Centers / Sleep Centers / Ambulance (air & ground) / "Hard to place Doctors" etc.

IMPORTANT REMINDER TO PROACCESS CLIENTS: No insurance may be bound by e-mail, and no changes in existing insurance coverages may be effectuated by e-mail, until such time as your request is explicitly acknowledged by your licensed ProAccess representative

CONFIDENTIALITY NOTICE: The contents of this transmittal and any attachments are intended for the exclusive use of the addressee(s), and may contain confidential and / or legally privileged information. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmittal in error, please notify us immediately by return e-mail, and then delete this message and all attachments.

2

Chicago 0003

**From:** Michelle L. Gietzen [mailto:MGietzen@alliantinsurance.com]
**Sent:** Friday, July 24, 2009 8:42 AM
**To:** Lillian Mattos
**Subject:** Paulson & Nace - LWB2400909 - Effective 7/24/2009
**Importance:** High

Lillian:

Attached please find all of the missing information that you needed to bind coverage, including a re-signed and dated claim supplement.  Please advise if this matter has been reported to Chicago Insurance Company/Fireman's Fund or if I need to report.

Best Regards,


Michelle L. Gietzen
Vice President
Key Client Group
Alliant | ProQuest a division of Alliant
101 Southfield Road
Birmingham, MI  48009
Direct Dial:  248.205.2907
Mobile:  248.890.1016
Facsimile:  248.203.7514
mgietzen@alliantinsurance.com<mail to:mgietzen@alliantinsurance.com>

This e-mail and all attachments to it are for the sole use of the intended recipients and may contain proprietary information and trade secrets of Alliant Insurance Services, Inc. and its subsidiaries. This e-mail may also contain information which is confidential or which is protected from disclosure by privilege. Any unauthorized use, disclosure or distribution of this e-mail and its attachments is prohibited. If you are not the intended recipient, let us know by reply e-mail and then erase and destroy all electronic or other copies of this message.

This e-mail and all attachments to it are for the sole use of the intended recipients and may contain proprietary information and trade secrets of Alliant Insurance Services, Inc. and its subsidiaries. This e-mail may also contain information which is confidential or which is protected from disclosure by privilege. Any unauthorized use, disclosure or distribution of this e-mail and its attachments is prohibited. If you are not the intended recipient, let us know by reply e-mail and then erase and destroy all electronic or other copies of this message.

3

Chicago 0004

This is a potential claim that we know very little about. The insured has yet to provide me any documentation requested. We know that it is a medical malpractice case against a doctor who performed surgery on a little girl that went wrong resulting in her to be wheelchair bound. We do not have information in the liability of the doctor or damages.

| 10/13/2009-1:01 PM | | File Note - Sent email to insured to get statu | Status: Final |
|---|---|---|---|
| Performer: Carl K. Ellenberger | Category: Investigation | Participant: | |

Sent email to insured to get status of appeal and file docs.

| 9/8/2009-10:59 AM | | File Note - Insured pushed back on providir | Status: Final |
|---|---|---|---|
| Performer: Carl K. Ellenberger | Category: Investigation | Participant: | |

Insured pushed back on providing entire file (very large and only potential claim). TL and I expected same. Requested original complaint, pleadings related to dismissal and appeal.

| 8/13/2009-1:07 PM | | File Note - I have not received a copy of the | Status: Final |
|---|---|---|---|
| Performer: Carl K. Ellenberger | Category: Investigation | Participant: | |

I have not received a copy of the insureds file yet. Sent insured email following up on same.

| 8/3/2009-6:22 AM | | File Note - Reviewed potential nhp and will a | Status: Final |
|---|---|---|---|
| Performer: Nadine R. Eissler | Category: Supervision | Participant: | |

| 7/27/2009-11:13 AM | | File Note - TL review NHP and Forward to C | Status: Final |
|---|---|---|---|
| Performer: Michael G. Ostler | Category: Supervision | Participant: | |

TL review. NHP notice forwarded to CT Eissler. Will follow on present task diary for review prior to mid October UR deadline. We should have the Insured's file by that time.

| 7/2/2009-2:27 PM | | File Note - Sent notice of NHP to tl for review | Status: Final |
|---|---|---|---|
| Performer: Carl K. Ellenberger | Category: Evaluation | Participant: | |

Sent notice of NHP to tl for review and to send to claims technical.

| 7/2/2009-2:26 PM | | File Note - Ack letter attached | Status: Final |
|---|---|---|---|
| Performer: Carl K. Ellenberger | Category: Coverage | Participant: | |

Ack letter attached

| 7/2/2009-2:10 PM | | File Note - Spoke with tl and we agreed that | Status: Final |
|---|---|---|---|
| Performer: Carl K. Ellenberger | Category: Evaluation | Participant: | |

Called and advised insured I would send ack letter and be keeping file open. Also need his file.

| 6/30/2009-8:02 AM | | File Note - TL initial review | Status: Final |
|---|---|---|---|
| Performer: Michael G. Ostler | Category: Supervision | Participant: | |

TL review new loss. This is a potential lawyers claim out of Virginia.

We need to obtain a copy of the insured's file and prepare for UR by 10/19. NHP

CONFIDENTIAL

CIC 000495

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT P

10509 JUDICIAL DRIVE
SUITE 200
FAIRFAX, VIRGINIA 22030
(703) 246-0900
FAX (703) 591-3673

111 S. CALVERT STREET
SUITE 2700
BALTIMORE, MARYLAND 21202
(410) 625-5080

**LAW OFFICES**
**JORDAN COYNE & SAVITS, L.L.P.**
**1100 CONNECTICUT AVENUE, N.W.**
**SUITE 600**
**WASHINGTON, D.C. 20036**

(202) 296-4747
Fax: (202) 496-2800
www.jocs-law.com

161 FORT EVANS ROAD, NE
SUITE 345
LEESBURG, VIRGINIA 20176
(703) 443-2550

33 WOOD LANE
ROCKVILLE, MARYLAND 20850
(301) 424-4161

8387 APPALACHIAN HWY.
DAVIS, WEST VIRGINIA 26260
(304) 636-9037

DEBORAH MURRELL WHELIHAN
DC & MD BARS
DIRECT DIAL: (202)496-2810
E-MAIL: d.whelihan@jocs-law.com

November 21, 2011

<u>VIA FEDERAL EXPRESS</u>

Duana J. Grage, Esquire
Hinshaw & Culbertson, LLP
333 South Seventh Street, Suite 2000
Minneapolis, MN 55402

> Re:   Gilbert/Paulson & Nace
>       <u>Our File No.: 4383.2008002</u>

Dear Ms. Grage:

Please find enclosed a CD of all of the pleadings, correspondence, medical records, medical bills, deposition transcripts, hearing transcripts, memos and research that the insured provided in the above-mentioned case. You will also find enclosed an index to the files on the CD.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Karen W. Stephens
Assistant to Deborah Murrell Whelihan

DMW:kws
Enclosures
cc: Jennifer L. Green, Esquire (w/o enclosures)

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT  Q



**Fireman's Fund** [SM]
Insurance Company

A company of **Allianz** (ⅱ)

January 13, 2012

<u>**VIA U.S. MAIL – RETURN RECEIPT REQUESTED**</u>

Barry J. Nace, Esq.
1615 New Hampshire Avenue, NW
Washington, DC  20009

Re:   Insured:                 Barry J. Nace dba Paulson & Nace
          Potential Claimants:   The Gilberts
          Claim No.:             00509630577
          Issuing Company:       Chicago Insurance Company

Dear Mr. Nace:

I am the claims professional assigned by Chicago Insurance Company ("CIC") to review the notice you provided of the potential claim that may be asserted against your firm Paulson & Nace relative to your firm's legal representation of Richard and Rosie Lee Gilbert and their daughter Sarah Gilbert ("the Gilberts").

CIC understands that your firm represented the Gilberts in a medical malpractice lawsuit against Susan Edwin Atkins, M.D., et al. arising out of a surgery to Sarah Gilbert on July 28, 2004.  CIC understands that your firm subsequently filed a medical malpractice action on behalf of the Gilberts in 2006, but the lawsuit was ultimately dismissed because it did not comply with Virginia Statutes.  Your firm then filed another medical malpractice lawsuit on behalf of the Gilberts, but this lawsuit was also dismissed because it was filed after the statute of limitations had expired.

In 2009, you first provided notice to CIC that there was a potential that a claim may be brought by the Gilberts against your firm.  CIC issued a Lawyers Professional Liability Policy to "Barry J. Nace dba Paulson & Nace" which was in effect from July 24, 2007 to July 24, 2008.  The CIC policy was renewed for the subsequent July 24, 2008 to July 24, 2009 policy period.

The purpose of this letter is to advise you that, for the reasons discussed below, CIC will continue to monitor and investigate this potential claim under a strict reservation of rights including, but not limited to, the right to bring a declaratory judgment action seeking a declaration of no coverage or a rescission action in the event the Gilberts bring a claim against your firm and/or any of your firm's involved attorneys including Gabriel Assaad.  This is, however, subject to the understanding that no action taken by CIC in the monitoring or

Fireman's Fund
Insurance Companies
33 West Monroe St.
Chicago, IL  60603
www.firemansfund.com

Phone (800) 628-8574 ext. 452300
Direct: (312) 629-2300
Fax: (888) 264-1579

Email: Jennifer.green@ffic.com

CIC 000017



Barry J. Nace, Esq.
Page 2
1/13/2012

investigation of this matter constitutes an admission of any matter or fact, waiver, or estoppel, express or implied, in any coverage litigation or in any other proceeding to support any argument or assertion relating to the insurance coverage, if any, afforded by CIC relative to any claim brought by the Gilberts. To this end, CIC requests that you please review and execute the enclosed non-waiver agreement.

## BACKGROUND

The below is a summary of the information contained the documents obtained from your firm. CIC understands that you may dispute some of the allegations in the documents as well as the various decisions by the courts, but includes this information in this letter to explain CIC's coverage position.

Paulson & Nace pursued a medical malpractice claim on behalf of the Gilberts in the Circuit Court for the City of Richmond, Virginia. Various complaints addressing the alleged malpractice were filed by you and associate Gabriel Assaad for Richard Gilbert and Rosie Lee Gilbert and daughter, Sarah Gilbert, a minor, against Susan Edwin Atkins, M.D. and Children's Orthopedic Center and Chippenham & Johnston-Willis Hospital, Inc., d/b/a CJW Medical Center. The lawsuits generally alleged that on or about July 28, 2004, Defendant Atkins, an orthopedic surgeon, performed a spinal fusion surgery to correct Sarah Gilbert's scoliosis. The lawsuits also alleged that as a result of that operation, Sarah Gilbert was diagnosed as a paraplegic and suffered significant and permanent injuries including paralysis.

Paulson & Nace filed the first complaint on behalf of the Gilberts on July 24, 2006. This first case was filed in the name of "Richard Gilbert and Rosie Gilbert individually and on behalf of their daughter, Sarah Gilbert, a minor." This first complaint sought economic and non-economic damages for Miss Gilbert as well as for her parents, the Gilberts, individually.

The defendants in that case bought a motion to dismiss the first complaint alleging that the complaint failed to comply with a Virginia statute which requires that a minor sue in his or her own name by his or her next friend(s). The defendants contended that the parents could not sue "on behalf" of Sarah Gilbert under the statute and that Sarah Gilbert was required to be the plaintiff in the lawsuit and her parents must be named as "next friends."

Paulson & Nace filed a second complaint on October 25, 2006. This complaint was brought by "Sarah Gilbert, by her parents and next of friends, Richard Gilbert and Rosie Lee Gilbert." This second complaint again sought economic and non-economic damages for Miss Gilbert as well as for her parents, individually.

In a hearing on the record before the Judge on January 4, 2007, the attorney for the Paulson & Nace law firm, Gabriel Assaad, stated as follows:

> I do agree the action took place -- or the negligence took place on July 28[th], 2004, and, therefore, the statute of limitations would be on that date, would be July 28[th], 2006. However, Your Honor, there are certain issues that may toll the statute, based on continuing treatment, based on we might move the Court to declare this



Barry J. Nace, Esq.
Page 3
1/13/2012

> person incapacitated during a certain period of time during that period, and I have
> yet to receive the medical records from the defendants to be able to make those
> arguments to determine whether or not we're going to proceed with that action.
> That's why I feel at this point, to dismiss the child's claim with prejudice would be
> inappropriate. <u>I agree we haven't filed the claim appropriately with regard to the
> claim at issue at this point in time and therefore</u> –

(Emphasis supplied).

On February 26, 2007, the trial court dismissed Sarah Gilbert's claims contained in the first
complaint. The trial court also sustained the defendants' motions to dismiss the Gilberts'
individual claims for economic and non-economic damages. The trial court indicated that the
Gilberts' individual claims for non-economic damages were derivative of Miss Gilbert's claims,
and could not be brought given the dismissal of her claims.

Five months later, on July 18, 2007, you sent an application to CIC to obtain a professional
liability policy for Barry Nace dba Paulson & Nace which requested an effective date of July 24,
2007. You answered the following question:

> (b)   Having inquired of all partners, officers, owners and employed lawyers,
>       are there any circumstances which may result in a claim being made
>       against the firm, its predecessors or any current or past partner, officer,
>       owner or employed lawyer of the firm?   ☐ Yes ☒ No

* * *

> THE APPLICANT REPRESENTS THAT THE ABOVE STATEMENTS AND
> FACTS ARE TRUE AND THAT NO MATERIAL FACTS HAVE BEEN
> SUPPRESSED OR MISSTATED.
>
> <u>Barry J. Nace</u>                    <u>7/18/07</u>
> Print or Type Name and Title      Date (Mo-Day-Yr.)

The CIC application includes the following notice:

> NOTICE:
>
> Failure to report:
>
> 1.   any claim made against you during your current policy term, or
>
> 2.   any facts, circumstances or events which may give rise to a claim to your
>      current insurance company BEFORE policy expiration may create a lack
>      of coverage.

You noted on the application that Paulson & Nace's immediately preceding professional liability
insurer was Philadelphia. The Philadelphia policy incepted on July 24, 2006 and ended on July
24, 2007. Please advise if Philadelphia has been made aware of the potential claim by the

CONFIDENTIAL

CIC 000019

Barry J. Nace, Esq.
Page 4
1/13/2012

Gilberts and, if so, advise CIC as to the coverage position they have taken and the date the notice was provided to Philadelphia. If Philadelphia has not been placed on notice, please do so immediately.

Ultimately, all arguments made by Paulson & Nace that the statute of limitations should have been tolled were rejected by the court. An order dismissing the second lawsuit for failure to comply with the statute of limitations was entered on August 3, 2007.

On August 29, 2007, the plaintiffs filed Notices of Appeal for both cases which were dismissed on procedural grounds. On April 8, 2009, the plaintiffs filed a Motion for Reconsideration of the court's orders dismissing Sarah Gilbert's cause of action and her parents' claim for non-economic damages. The court denied plaintiffs' Motions on May 28, 2009. On May 19, 2009, one week before the trial on the parents' individual claims for economic damages was scheduled to begin, the parents non-suited their individual claims filed in the first complaint, and plaintiffs appealed to the Supreme Court of Virginia claiming the trial court erred when it sustained defendants' Special Plea of the Statute of Limitations to the second case and limited the parents' individual claims to economic losses for medical expenses and loss of services. On December 15, 2009, the Supreme Court of Appeals of Virginia denied plaintiffs' Petition for Appeal.

Meanwhile, on November 16, 2009, plaintiffs filed another lawsuit against the defendants, alleging the same allegations set forth in their previous complaints. The defendants moved to dismiss this new lawsuit on the same grounds.

In 2009 you gave notice to CIC that the Gilberts may make a claim against Paulson & Nace relative to the firm's representation of them. In early 2011, the plaintiffs transferred the handling of their file to a new law firm.

In your claim form you advised CIC that the error, if any, was committed in 2008. CIC relied on this representation when it agreed to treat this as a potential claim at that time. Based on recent documents made available to CIC it is clear that the error, if any, was committed in 2006.

## THE COVERAGE

Chicago Insurance Company issued a Lawyers Professional Liability Policy to "Barry J. Nace dba Paulson & Nace" effective July 24, 2007 to July 24, 2008 under Master Policy Number LWC-8001101, Certificate Number LWB-2400909. CIC also issued a subsequent professional liability policy to "Barry J. Nace dba Paulson & Nace" effective July 24, 2008 to July 24, 2009.

The policies contain the following provisions:

### INSURING AGREEMENTS

I.   **COVERAGE**

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the

CONFIDENTIAL

CIC 000020

Barry J. Nace, Esq.
Page 5
1/13/2012

Policy Period or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. Provided always that such **Professional Services** or **Personal Injury** happen:

A.   during the **Policy Period**; or

B.   prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business,** and continuously renewed and maintained in effect to the inception of this policy period:

    1.   the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury;**

    2.   <u>the **Named Insured**, any partner, shareholder, employee, or where appropriate the **Named Insured's** management committee or any member thereof, had no reasonable basis to believe that the **Insured** had breached a professional duty or to **Reasonably Foresee** that a **Claim** would be made against the **Insured**;</u> and

    3.   there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such **Claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any **Claim**, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

(Emphasis supplied). If an insured had a reasonable basis to believe that a professional duty had been breached or to "reasonably foresee" that a "claim" would be made against the insured before July 24, 2007, the day the first CIC policy incepted, a claim resulting from the breach is not covered under the policies. The CIC policies define "reasonably foresee" as follows:

**Reasonably Foresee(n) means:**

1.   **Claims** or incidents reported to any prior insurer;

2.   unreported **Claims** or suits of which any **Insured** had received notice prior to the effective date of the first policy with the Company;

3.   incidents or circumstances that involve a particular person or entity which an **Insured** knew might result in a **Claim** or suit prior to the effective date of the first policy issued by the Company to the **Named Insured**, and which was not disclosed to the Company.

CONFIDENTIAL

CIC 000021

Barry J. Nace, Esq.
Page 6
1/13/2012

CIC reserves its rights to deny coverage to the extent an insured had a reasonable basis to believe that a professional duty had been breached or to "reasonably foresee" that a "claim" would be made against the insured before the CIC policy incepted on July 24, 2007.

Please be advised that CIC also reserves its rights to bring a rescission action based on the July 2007 application submitted by Paulson & Nace wherein it denied knowing any circumstances which may result in a claim being made against the firm or any current or past partner, officer, owner or employed lawyer of the firm. In addition, CIC reserves its right to bring a rescission action based on your representation that the error, if any, was committed in 2008 when the information recently made available to CIC indicates that the error, if any, was committed in 2006.

Nothing contained in this letter should be deemed a waiver of the terms or conditions of the policies. CIC expressly reserves the right to rely upon any term or condition of the policies or any other ground which may be found to limit or preclude coverage. CIC reserves the right to modify this coverage position if warranted by further investigation. CIC also reserves the right to seek contribution from other insurance carriers.

If you have any questions regarding any aspect of this matter including the enclosed non-waiver agreement, please do not hesitate to contact me at the e-mail address or phone numbers shown.

Sincerely,

Ms. Jennifer Green
Chicago Insurance Company, a Fireman's Fund Insurance Company
Fireman's Fund Insurance Company, a Company of Allianz

Enclosure



CONFIDENTIAL

CIC 000022

## NON-WAIVER AGREEMENT

This Non-Waiver Agreement ("Agreement") is between Barry J. Nace dba Paulson & Nace (the "Insured") and Chicago Insurance Company ("CIC").

CIC has been advised of a potential claim arising from the Insured's representation of Richard and Rosie Gilbert and their daughter Sarah Gilbert ("the Gilberts"). A dispute has arisen between CIC and the Insured concerning the obligation, if any, of CIC to provide insurance coverage to the Insured in the event a claim for damages is eventually brought by the Gilberts against the Insured.

For good and valuable consideration, the receipt of which is acknowledged, the Insured expressly agrees that any action or non-action taken by CIC including, but not limited to, its deferral from commencing a declaratory judgment action and/or rescission action shall not constitute a waiver or estoppel, either express or implied, of any provision of the insurance policies between CIC and the Insured or the applicable law. It is also specifically agreed that the Insured will not assert any equitable defense including, but not limited to, estoppel and waiver to any action instituted by CIC for declaratory relief and/or to rescind the insurance policy based on CIC's action or non-action concerning the potential claim arising from the Insured's representation of the Gilberts. The Insured further acknowledges and agrees that no provision of this Agreement constitutes an admission of liability by CIC or gives rise to waiver or estoppel, either express or implied.

By:

_____
Barry J. Nace dba Paulson & Nace



CONFIDENTIAL

CIC 000023




**Fireman's Fund**™
Insurance Company

A company of **Allianz** (Ⅱ)

January 13, 2012

<u>**VIA U.S. MAIL – RETURN RECEIPT REQUESTED**</u>

Gabriel Assaad, Esq.
Assaad Law, PLLC
1425 K Street, NW
Suite 350
Washington, DC  20005

Re:    Insured:                  Barry J. Nace dba Paulson & Nace
         Potential Claimants:   The Gilberts
         Claim No.:              00509630577
         Issuing Company:       Chicago Insurance Company

Dear Mr. Assaad:

I am the claims professional assigned by Chicago Insurance Company ("CIC") to review the notice your former firm Paulson & Nace provided of a potential claim that may be asserted against Paulson & Nace relative to the firm's legal representation of Richard and Rosie Lee Gilbert and their daughter Sarah Gilbert ("the Gilberts"). CIC understands that while you were an associate attorney at Paulson & Nace, you participated in the representation of the Gilberts.

It is CIC's understanding that Paulson & Nace represented the Gilberts in a medical malpractice lawsuit against Susan Edwin Atkins, M.D., et al. arising out of a surgery to Sarah Gilbert on July 28, 2004. CIC understands that the firm subsequently filed a medical malpractice action on behalf of the Gilberts in 2006, but the lawsuit was ultimately dismissed because it did not comply with Virginia Statutes. The firm then filed another medical malpractice lawsuit on behalf of the Gilberts, but this lawsuit was also dismissed because it was filed after the statute of limitations had expired.

In 2009, Paulson & Nace first provided notice to CIC that there was a potential that a claim may be brought by the Gilberts against the firm and its involved attorneys. CIC issued a Lawyers Professional Liability Policy to "Barry J. Nace dba Paulson & Nace" which was in effect from July 24, 2007 to July 24, 2008. The CIC policy was renewed for the subsequent July 24, 2008 to July 24, 2009 policy period.

The purpose of this letter is to advise you that, for the reasons discussed below, CIC will monitor and investigate this potential claim under a strict reservation of rights including, but not limited to, the right to bring a declaratory judgment action seeking a declaration of no coverage or a

Fireman's Fund
Insurance Companies
33 West Monroe St.
Chicago, IL  60603
www.firemansfund.com

Phone (800) 628-8574 ext. 452300
Direct: (312) 629-2300
Fax: (888) 264-1579

Email: Jennifer.green@ffic.com



CIC 000024

Gabriel Assaad, Esq.
January 13, 2012
Page 2

rescission action in the event the Gilberts bring a claim against the firm and/or any of the firm's involved attorneys, including you. This is, however, subject to the understanding that no action taken by CIC in the monitoring or investigation of this matter constitutes an admission of any matter or fact, waiver, or estoppel, express or implied, in any coverage litigation or in any other proceeding to support any argument or assertion relating to the insurance coverage, if any, afforded by CIC relative to any claim brought by the Gilberts. To this end, CIC requests that you please review and execute the enclosed non-waiver agreement.

## BACKGROUND

The below is a summary of the information contained the documents obtained from Paulson & Nace. CIC understands that you may dispute some of the allegations in the documents as well as the various decisions by the courts, but includes this information in this letter to explain CIC's coverage position.

Paulson & Nace pursued a medical malpractice claim on behalf of the Gilberts in the Circuit Court for the City of Richmond, Virginia. Various complaints addressing the alleged malpractice were filed by the firm and you for Richard Gilbert and Rosie Lee Gilbert and daughter, Sarah Gilbert, a minor, against Susan Edwin Atkins, M.D. and Children's Orthopedic Center and Chippenham & Johnston-Willis Hospital, Inc., d/b/a CJW Medical Center. The lawsuits generally alleged that on or about July 28, 2004, Defendant Atkins, an orthopedic surgeon, performed a spinal fusion surgery to correct Sarah Gilbert's scoliosis. The lawsuits also alleged that as a result of that operation, Sarah Gilbert was diagnosed as a paraplegic and suffered significant and permanent injuries including paralysis.

Paulson & Nace filed the first complaint on behalf of the Gilberts on July 24, 2006. This first case was filed in the name of "Richard Gilbert and Rosie Gilbert individually and on behalf of their daughter, Sarah Gilbert, a minor." This first complaint sought economic and non-economic damages for Miss Gilbert as well as for her parents, the Gilberts, individually.

The defendants in that case bought a motion to dismiss the first complaint alleging that the complaint failed to comply with a Virginia statute which requires that a minor sue in his or her own name by his or her next friend(s). The defendants contended that the parents could not sue "on behalf" of Sarah Gilbert under the statute and that Sarah Gilbert was required to be the plaintiff in the lawsuit and her parents must be named as "next friends."

Paulson & Nace filed a second complaint on October 25, 2006. This complaint was brought by "Sarah Gilbert, by her parents and next of friends, Richard Gilbert and Rosie Lee Gilbert." This second complaint again sought economic and non-economic damages for Miss Gilbert as well as for her parents, individually.

In a hearing on the record before the Judge on January 4, 2007, you stated as follows:

> I do agree the action took place – or the negligence took place on July 28[th], 2004, and, therefore, the statute of limitations would be on that date, would be July 28[th], 2006. However, Your Honor, there are certain issues that may toll the statute,

CONFIDENTIAL

CIC 000025

276

Gabriel Assaad, Esq.
January 13, 2012
Page 3

based on continuing treatment, based on we might move the Court to declare this person incapacitated during a certain period of time during that period, and I have yet to receive the medical records from the defendants to be able to make those arguments to determine whether or not we're going to proceed with that action. That's why I feel at this point, to dismiss the child's claim with prejudice would be inappropriate. <u>I agree we haven't filed the claim appropriately with regard to the claim at issue at this point in time and therefore</u> –

(Emphasis supplied).

On February 26, 2007, the trial court dismissed Sarah Gilbert's claims contained in the first complaint. The trial court also sustained the defendants' motions to dismiss the Gilberts' individual claims for economic and non-economic damages. The trial court indicated that the Gilberts' individual claims for non-economic damages were derivative of Miss Gilbert's claims, and could not be brought given the dismissal of her claims.

Five months later, on July 18, 2007, Paulson & Nace sent an application to CIC to obtain a professional liability policy for Barry Nace dba Paulson & Nace which requested an effective date of July 24, 2007. Barry Nace answered the following question:

> (b)   Having inquired of all partners, officers, owners and employed lawyers, are there any circumstances which may result in a claim being made against the firm, its predecessors or any current or past partner, officer, owner or employed lawyer of the firm?   ☐ Yes ☒ No

* * *

THE APPLICANT REPRESENTS THAT THE ABOVE STATEMENTS AND FACTS ARE TRUE AND THAT NO MATERIAL FACTS HAVE BEEN SUPPRESSED OR MISSTATED.

| <u>Barry J. Nace</u> | <u>7/18/07</u> |
|---|---|
| Print or Type Name and Title | Date (Mo-Day-Yr.) |

The CIC application includes the following notice:

NOTICE:

Failure to report:

1.   any claim made against you during your current policy term, or

2.   any facts, circumstances or events which may give rise to a claim to your current insurance company BEFORE policy expiration may create a lack of coverage.

Barry Nace also noted on the application that Paulson & Nace's immediately preceding professional liability insurer was Philadelphia. The Philadelphia policy incepted on July 24,

CONFIDENTIAL

CIC 000026

277

Gabriel Assaad, Esq.
January 13, 2012
Page 4

2006 and ended on July 24, 2007.  Please advise if Philadelphia has been made aware of the potential claim by the Gilberts and, if so, advise CIC as to the coverage position they have taken and the date the notice was provided to Philadelphia.  If Philadelphia has not been placed on notice, please do so immediately.

Ultimately, all arguments made by Paulson & Nace that the statute of limitations should have been tolled were rejected by the court.  An order dismissing the second lawsuit for failure to comply with the statute of limitations was entered on August 3, 2007.

On August 29, 2007, the plaintiffs filed Notices of Appeal for both cases which were dismissed on procedural grounds.  On April 8, 2009, the plaintiffs filed a Motion for Reconsideration of the court's orders dismissing Sarah Gilbert's cause of action and her parents' claim for non-economic damages.  The court denied plaintiffs' Motions on May 28, 2009.  On May 19, 2009, one week before the trial on the parents' individual claims for economic damages was scheduled to begin, the parents non-suited their individual claims filed in the first complaint, and plaintiffs appealed to the Supreme Court of Virginia claiming the trial court erred when it sustained defendants' Special Plea of the Statute of Limitations to the second case and limited the parents' individual claims to economic losses for medical expenses and loss of services.  On December 15, 2009, the Supreme Court of Appeals of Virginia denied plaintiffs' Petition for Appeal.

Meanwhile, on November 16, 2009, plaintiffs filed another lawsuit against the defendants, alleging the same allegations set forth in their previous complaints.  The defendants moved to dismiss this new lawsuit on the same grounds.

In 2009 Paulson & Nace gave notice to CIC that the Gilberts may make a claim against Paulson & Nace and its involved attorneys relative to the firm's representation of them.  In early 2011, the plaintiffs transferred the handling of their file to a new law firm.

In Paulson & Nace's claim form it advised CIC that the error, if any, was committed in 2008.  CIC relied on this representation when it agreed to treat this as a potential claim at that time.  Based on recent documents made available to CIC, it is clear that the error, if any, was committed in 2006.

### THE COVERAGE

Chicago Insurance Company issued a Lawyers Professional Liability Policy to "Barry J. Nace dba Paulson & Nace" effective July 24, 2007 to July 24, 2008 under Master Policy Number LWC-8001101, Certificate Number LWB-2400909.  CIC also issued a subsequent professional liability policy to "Barry J. Nace dba Paulson & Nace" effective July 24, 2008 to July 24, 2009.

The policies contain the following provisions:

**INSURING AGREEMENTS**

I.     **COVERAGE**

**CONFIDENTIAL**

CIC 000027

278

Gabriel Assaad, Esq.
January 13, 2012
Page 5

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the **Policy Period** or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. Provided always that such **Professional Services** or **Personal Injury** happen:

A.   during the **Policy Period**; or

B.   prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business,** and continuously renewed and maintained in effect to the inception of this policy period:

   1.   the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury;**

   2.   the **Named Insured**, any partner, shareholder, employee, or where appropriate the **Named Insured's** management committee or any member thereof, had no reasonable basis to believe that the **Insured** had breached a professional duty or to **Reasonably Foresee** that a **Claim** would be made against the **Insured;** and

   3.   there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such **Claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any **Claim,** in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

(Emphasis supplied).   If an insured had a reasonable basis to believe that a professional duty had been breached or to "reasonably foresee" that a "claim" would be made against the insured before July 24, 2007, the day the first CIC policy incepted, a claim resulting from the breach is not covered under the policies.   The CIC policies define "reasonably foresee" as follows:

**Reasonably Foresee(n)** means:

   1.   **Claims** or incidents reported to any prior insurer;

   2.   unreported **Claims** or suits of which any **Insured** had received notice prior to the effective date of the first policy with the Company;



CONFIDENTIAL

CIC 000028

279

Gabriel Assaad, Esq.
January 13, 2012
Page 6

3.   incidents or circumstances that involve a particular person or entity which
     an **Insured** knew might result in a **Claim** or suit prior to the effective date
     of the first policy issued by the Company to the **Named Insured**, and
     which was not disclosed to the Company.

CIC reserves its rights to deny coverage to the extent an insured had a reasonable basis to believe
that a professional duty had been breached or to "reasonably foresee" that a "claim" would be
made against the insured before the CIC policy incepted on July 24, 2007.

Please be advised that CIC also reserves its rights to bring a rescission action based on the July
2007 application submitted by Paulson & Nace wherein it denied knowing any circumstances
which may result in a claim being made against the firm or any current or past partner, officer,
owner or employed lawyer of the firm.  In addition, CIC reserves its right to bring a rescission
action based on Paulson & Nace's representation that the error, if any, was committed in 2008
when the information recently made available to CIC indicates that the error, if any, was
committed in 2006.

Nothing contained in this letter should be deemed a waiver of the terms or conditions of the
policies.  CIC expressly reserves the right to rely upon any term or condition of the policies or
any other ground which may be found to limit or preclude coverage.  CIC reserves the right to
modify this coverage position if warranted by further investigation.  CIC also reserves the right
to seek contribution from other insurance carriers.

If you have any questions regarding any aspect of this matter including the enclosed non-waiver
agreement, please do not hesitate to contact me at the e-mail address or phone numbers shown.

Sincerely,

Ms. Jennifer Green
Chicago Insurance Company, a Fireman's Fund Insurance Company
Fireman's Fund Insurance Company, a Company of Allianz

Enclosure

CONFIDENTIAL

CIC 000029

## NON-WAIVER AGREEMENT

This Non-Waiver Agreement ("Agreement") is between Gabriel Assaad and Chicago Insurance Company ("CIC").

CIC has been advised of a potential claim arising from the Gabriel Assaad's representation of Richard and Rosie Gilbert and their daughter Sarah Gilbert ("the Gilberts"). A dispute has arisen between CIC and Gabriel Assaad concerning the obligation, if any, of CIC to provide insurance coverage to Gabriel Assaad in the event a claim for damages is eventually brought by the Gilberts against Gabriel Assaad.

For good and valuable consideration, the receipt of which is acknowledged, Gabriel Assaad expressly agrees that any action or non-action by CIC including, but not limited to, its deferral from commencing a declaratory judgment action and/or rescission action shall not constitute a waiver or estoppel, either express or implied, of any provision of the insurance contract between CIC and Gabriel Assaad or the applicable law. It is also specifically agreed that Gabriel Assaad will not assert any equitable defense including, but not limited to, estoppel and waiver to any action instituted by CIC for declaratory relief and/or to rescind the insurance policy based on CIC's action or non-action concerning the potential claim arising from his representation of the Gilberts. Gabriel Assaad further acknowledges and agrees that no provision of this Agreement constitutes an admission of liability by CIC or gives rise to waiver or estoppel, either express or implied.


By:


_____

Gabriel Assaad



CONFIDENTIAL

CIC 000030

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT  R



**CANTOR STONEBURNER FORD**
**GRANA BUCKNER**

COPY

H. Aubrey Ford, III
Direct Dial: (804) 343-4360
E-mail: aford@virginiatrialfirm.com

March 19, 2012

**BY FEDERAL EXPRESS**
Barry J. Nace, Esquire
Paulson & Nace
1615 New Hampshire Avenue, N.W.
Washington, D.C.  20009

Re:   Sarah E. Gilbert v. Paulson & Nace, PLLC, Barry J. Nace and Gabriel Assaad

Dear Mr. Nace:

I enclose a copy of the Complaint we have filed on behalf of Sarah Gilbert relating to your firm's representation arising out of her 2004 surgery. We filed the case in the Richmond Circuit Court but specifically instructed the Clerk not to serve process upon any of the Defendants at this time. We wanted to provide you and your firm's legal malpractice insurance carrier an opportunity to discuss the case and the possible resolution of the case before it becomes public and actively litigated.

Rosie and Rick Gilbert have decided that they will not pursue their pending case for recovery of Sarah's medical bills. Considering the enormity of Sarah's injury, they believe that any recovery should be for her benefit. Thus, if we are unable to negotiate a resolution of the legal malpractice action, we will proceed to serve process and move forward with it. We do have positive medical expert support and certifications under Virginia medical malpractice law from two highly qualified board certified physicians.

I know this is not a welcome communication. After you have had an opportunity to share this with your firm's insurance carrier, I would be pleased to discuss the matter with their representative or with you. I would request a response of some nature by April 2.

Sincerely,

H. Aubrey Ford, III

HAF/mes
Enclosure

CONFIDENTIAL

Main: 804-644-1400 • Fax: 804-644-9205
Street Address: 7130 Glen Forest Drive • Suite 400 • Richmond, VA 23226
Mailing Address: P.O. Box 561 • Richmond, VA 23218-0561
www.VirginiaTrialFirm.com

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT  S

**Claim History Caption Report**                                         <u>Print</u> <u>Help</u>

**Found: 44 Displaying: 1-44**

**Search Results**

| 1/30/2013-7:40 AM | File Note - Supervisor note | Status: Final |
| Performer: Amy A. Schwemer | Category: Supervision | Participant: |

Suffix: PI - Personal Injury / Pr(Sarah Gilbert)

███████████████████████████████████████████████████

| 12/18/2012-2:50 PM | File Note - DJ refile | Status: Final |
| Performer: Jennifer Green | Category: Investigation | Participant: |

███████████████████████████████████████████████████

| 10/2/2012-11:24 AM | File Note - t/c from insd. | Status: Final |
| Performer: Jennifer Green | Category: Customer Service | Participant: |

███████████████████████████████████████████████████

| 10/2/2012-10:33 AM | File Note - t/c to insd. | Status: Final |
| Performer: Jennifer Green | Category: Investigation | Participant: |

███████████████████████████████████████████████████

| 9/14/2012-9:43 AM | File Note - Supervisor noter | Status: Final |
| Performer: Amy A. Schwemer | Category: Supervision | Participant: |

Participated in conference and poa per TD's note. Diaried to monitor.

| 9/14/2012-8:47 AM | 𝒞  File Note - Conference call with CH, coverag | Status: Final |
| Performer: Nadine R. Eissler | Category: Supervision | Participant: |

Conference call with CH, coverage counsel, TL and CD.

███████████████████████████████████████████████████

| 9/6/2012-2:12 PM | 𝒞  File Note - Discussed with TL re: status. TL1 | Status: Final |
| Performer: Nadine R. Eissler | Category: Supervision | Participant: |

Discussed with TL re: status.

███████████████████████████████████████████████████

| 8/1/2012-5:53 AM | 𝒞  File Note - Final draft of DJ has been approv | Status: Final |
| Performer: Nadine R. Eissler | Category: Supervision | Participant: |

███████████████████████████████████████████████████

| 4/12/2012-1:45 PM | File Note - Status/cvg and POA | Status: Final |
| Performer: Jennifer Green | Category: Investigation | Participant: |

Received copy of complaint from broker 3/22. Same has been sent to insured but not served to date. Reviewed said correspondence and pleadings -- allegations center around underlying SOL issue as previously identified.

███████████████████████████████████████████████████

CONFIDENTIAL

CIC 000491

285

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT T



**Fireman's Fund**[SM]
Insurance Company

A company of **Allianz** (Ⅲ)

April 21, 2012

<u>**VIA EMAIL AND U.S. MAIL – RETURN RECEIPT REQUESTED**</u>

Paulson & Nace, PLLC
Attn: Barry Nace
1615 New Hampshire Avenue, NW
Washington, DC 20009-2520

Email: <u>bjn@paulsonandnace.com</u>

       Re:    Potential Claimants:  Sarah Gilbert
               Claim No.:         00509630577
               Issuing Company:   Chicago Insurance Company

Dear Mr. Nace:

I am the claims professional assigned by Chicago Insurance Company ("CIC") to review the lawsuit filed against your firm Paulson & Nace entitled: <u>Sarah E. Gilbert v. Paulson & Nace, PLLC, Barry J. Nace, and Gabriel Assaad,</u> which is filed in the Circuit Court of the City of Richmond ("Gilbert Lawsuit"). The Gilbert Lawsuit alleges professional negligence and breach of contract against Paulson & Nace and the other defendants (collectively referred to herein as the "Attorney Defendants") arising out of the legal representation of Sarah Gilbert.

CIC directs this letter to you because it understands that you are handling the insurance coverage matters on behalf of Paulson & Nace. If this understanding is incorrect, please let me know immediately.

The purpose of this letter is to advise Paulson & Nace that, for the reasons discussed below, CIC will provide Paulson & Nace with a defense relative to the Gilbert Lawsuit under a strict reservation of rights. This reservation of rights includes, but is not limited to, the right to withdraw from the defense at any time and the right to bring a declaratory judgment action against Paulson & Nace seeking a declaration of no coverage relative to the Gilbert Lawsuit.

Below is a summary of the allegations in the complaint filed in the Gilbert Lawsuit and the information contained in the documents previously obtained from Paulson & Nace. CIC understands that Paulson & Nace may dispute some of the allegations in the lawsuit and the documents as well as the various decisions by the courts, but includes the information in this letter to explain CIC's coverage position.

Fireman's Fund
Insurance Companies
33 West Monroe St.
Chicago, IL 60603
www.firemansfund.com

Phone (800) 628-8574 ext. 452300
Direct: (312) 629-2300
Fax: (888) 264-1579

Email: Jennifer.green@ffic.com

CONFIDENTIAL

CIC 000444

Barry J. Nace, Esq.
Page 2
4/21/2012

## BACKGROUND

The complaint in the Gilbert Lawsuit alleges that on or about July 28, 2004, Dr. Susan Atkins performed spinal fusion surgery on Sarah Gilbert in order to correct Miss Gilbert's scoliosis. The surgery rendered Miss Gilbert a paraplegic. The complaint alleges that Miss Gilbert and her parents retained the Attorney Defendants to represent Miss Gilbert in her claims for medical malpractice and negligence arising out of the surgery.

The Attorney Defendants filed the first medical malpractice lawsuit on Miss Gilbert's behalf on July 24, 2006. The statute of limitations on Sarah Gilbert's medical malpractice claim expired on July 28, 2006.

The complaint alleges that the first complaint filed on Miss Gilbert's behalf, who was a minor at the time, was styled "Richard Gilbert and Rosie Lee Gilbert, Individually and on behalf of their daughter, Sarah Gilbert, a minor." The defendants in that lawsuit immediately filed motions to dismiss on the grounds that the complaint was in the name of the wrong party.

The complaint alleges that the Attorney Defendants then filed a separate, second complaint on October 25, 2006 which was styled "Sarah Gilbert, by her parents and next friends, Richard and Rosie Lee Gilbert and Richard and Rosie Lee Gilbert, individually."

On February 26, 2007, the Judge dismissed with prejudice all of the claims of Miss Gilbert filed in the first case on the grounds that the Attorney Defendants had filed it in the name of the wrong party.

Ultimately, Miss Gilbert's medical malpractice claim was dismissed for failure to file her lawsuit before the statute of limitations expired.

## THE COVERAGE

On July 18, 2007, you sent an application to CIC to obtain a professional liability policy for Barry Nace dba Paulson & Nace which requested an effective date of July 24, 2007. In the application, you answered the following question:

    (b)    Having inquired of all partners, officers, owners and employed lawyers, are there any circumstances which may result in a claim being made against the firm, its predecessors or any current or past partner, officer, owner or employed lawyer of the firm?    ☐ Yes ☒ No

* * *

THE APPLICANT REPRESENTS THAT THE ABOVE STATEMENTS AND FACTS ARE TRUE AND THAT NO MATERIAL FACTS HAVE BEEN SUPPRESSED OR MISSTATED.

Barry J. Nace _____      7/18/07 _____
Print or Type Name and Title      Date (Mo-Day-Yr.)

CONFIDENTIAL

CIC 000445

Barry J. Nace, Esq.
Page 3
4/21/2012

The CIC application includes the following notice:

> NOTICE:
>
> Failure to report:
>
> 1.   any claim made against you during your current policy term, or
>
> 2.   any facts, circumstances or events which may give rise to a claim to your current insurance company BEFORE policy expiration may create a lack of coverage.

CIC issued a Lawyers Professional Liability Policy to "Barry J. Nace dba Paulson & Nace" effective July 24, 2007 to July 24, 2008 under Master Policy Number LWC-8001101, Certificate Number LWB-2400909 (the "First Policy"). That policy was written on a claims-made and reported basis. CIC was not advised of a potential claim or claim by Miss Gilbert while the First Policy was in effect.

CIC also issued a subsequent professional liability policy to "Barry J. Nace dba Paulson & Nace" effective July 24, 2008 to July 24, 2009 (the "2009 policy").

In May of 2009, you submitted a "Supplemental Claim/Incident Information" form to CIC identifying Sarah Gilbert as a "claimant". On that form, you advised that the date of the "alleged error" in the handling of Mr. Gilbert's claim was 2008.

The policies contain the following insuring agreement:

> **INSURING AGREEMENTS**
>
> I.    **COVERAGE**
>
>       The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the **Policy Period** or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. Provided always that such **Professional Services** or **Personal Injury** happen:
>
>       A.    during the **Policy Period**; or
>
>       B.    prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business,** and continuously renewed and maintained in effect to the inception of this policy period:



CONFIDENTIAL

CIC 000446

Barry J. Nace, Esq.
Page 4
4/21/2012

1.   the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury;**

2.   the **Named Insured**, any partner, shareholder, employee, or where appropriate the **Named Insured's** management committee or any member thereof, had no reasonable basis to believe that the **Insured** had breached a professional duty or to **Reasonably Foresee** that a **Claim** would be made against the **Insured;** and

3.   there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such **Claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any **Claim**, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

(Emphasis supplied).

The professional services rendered by the Attorney Defendants which give rise to the Gilbert Lawsuit happened prior to the effective date of the 2009 Policy. The First Policy issued by CIC to the Attorney Defendants was effective on July 24, 2007. The Gilbert Lawsuit could only be covered by the 2009 Policy if prior to July 24, 2007, the insured had no reasonable basis to believe that the insured had breached a professional duty or to reasonably foresee that a claim would be made against the insured.

The CIC policies define "reasonably foresee" as follows:

**Reasonably Foresee(n)** means:

1.   **Claims** or incidents reported to any prior insurer;

2.   unreported **Claims** or suits of which any **Insured** had received notice prior to the effective date of the first policy with the Company;

3.   incidents or circumstances that involve a particular person or entity which an **Insured** knew might result in a **Claim** or suit prior to the effective date of the first policy issued by the Company to the **Named Insured**, and which was not disclosed to the Company.

Miss Gilbert's first and only timely-filed complaint for medical malpractice was dismissed in February, 2007. CIC reserves its rights to contend that Paulson & Nace had a reasonable basis to believe that a professional duty had been breached before July 24, 2007, the day the First Policy incepted. CIC reserves its rights to contend that there is no coverage for the Gilbert Lawsuit under the policies issued by CIC.

CONFIDENTIAL

CIC 000447

Barry J. Nace, Esq.
Page 5
4/21/2012

Please be advised that CIC also reserves its rights to bring a rescission action based on the July 2007 application submitted by Paulson & Nace wherein it denied knowing any circumstances which may result in a claim being made against the firm or any current or past partner, officer, owner or employed lawyer of the firm. In addition, CIC reserves its right to bring a rescission action based on your representation that the error, if any, was committed in 2008 when the information recently made available to CIC indicates that the error, if any, was committed in 2006.

Please advise if any other insurers were notified of the Gilbert lawsuit and what coverage position(s) they have taken. Please also provide the name of any other insurer who provided insurance which may be potentially applicable to the allegations asserted in the Gilbert lawsuit.

Nothing contained in this letter should be deemed a waiver of the terms or conditions of the policies. CIC expressly reserves the right to rely upon any term or condition of the policies or any other ground which may be found to limit or preclude coverage. CIC reserves the right to modify this coverage position if warranted by further investigation. CIC also reserves the right to seek contribution from other insurance carriers and to bring a declaratory judgment action against Paulson & Nace seeking a court declaration of no coverage.

If you have any questions regarding any aspect of this matter, please do not hesitate to contact me at the e-mail address or phone numbers shown.

Sincerely,

Chicago Insurance Company, a Fireman's Fund Insurance Company
Jennifer L. Green, J.D. -- Claim Specialist

Cc via email:

Angela L. Fleege
Assistant Vice President, Sales Consultant
ProQuest, a division of Alliant

Email: angelaf@proquestinsurance.com

CIC 000448

CONFIDENTIAL



April 21, 2012

**A company of Allianz (ⅱ)**

<u>**VIA EMAIL AND U.S. MAIL – RETURN RECEIPT REQUESTED**</u>

Barry J. Nace, Esq.
1615 New Hampshire Avenue, NW
Washington, DC  20009

Email: bjn@paulsonandnace.com

Re:    Potential Claimants:   Sarah Gilbert
       Claim No.:             00509630577
       Issuing Company:       Chicago Insurance Company

Dear Mr. Nace:

I am the claims professional assigned by Chicago Insurance Company ("CIC") to review the lawsuit brought against you entitled: <u>Sarah E. Gilbert v. Paulson & Nace, PLLC, Barry J. Nace, and Gabriel Assaad</u>, which is filed in the Circuit Court of the City of Richmond ("Gilbert Lawsuit"). The Gilbert Lawsuit alleges professional negligence and breach of contract against you and the other defendants (collectively referred to herein as the "Attorney Defendants") arising out of the legal representation of Sarah Gilbert.

The purpose of this letter is to advise you that, for the reasons discussed below, CIC will provide you with a defense relative to the Gilbert Lawsuit under a strict reservation of rights. This reservation of rights includes, but is not limited to, the right to withdraw from the defense at any time and the right to bring a declaratory judgment action against you seeking a declaration of no coverage relative to the Gilbert Lawsuit.

Below is a summary of the allegations in the complaint filed in the Gilbert Lawsuit and the information contained in the documents previously obtained from your firm. CIC understands that you may dispute some of the allegations in the lawsuit and the documents as well as the various decisions by the courts, but includes the information in this letter to explain CIC's coverage position.

**BACKGROUND**

The complaint in the Gilbert Lawsuit alleges that on or about July 28, 2004, Dr. Susan Atkins performed spinal fusion surgery on Sarah Gilbert in order to correct Miss Gilbert's scoliosis. The surgery rendered Miss Gilbert a paraplegic. The complaint alleges that Miss Gilbert and her parents retained the Attorney Defendants to represent Miss Gilbert in her claims for medical malpractice and negligence arising out of the surgery.

Fireman's Fund
Insurance Companies
33 West Monroe St.
Chicago, IL  60603
www.firemansfund.com

Phone (800) 628-8574 ext. 452300
Direct: (312) 629-2300
Fax: (888) 264-1579

Email: Jennifer.green@ffic.com

292

Barry J. Nace, Esq.
Page 2
4/21/2012

The Attorney Defendants filed the first medical malpractice lawsuit on Miss Gilbert's behalf on July 24, 2006. The statute of limitations on Sarah Gilbert's medical malpractice claim expired on July 28, 2006.

The complaint alleges that the first complaint filed on Miss Gilbert's behalf, who was a minor at the time, was styled "Richard Gilbert and Rosie Lee Gilbert, Individually and on behalf of their daughter, Sarah Gilbert, a minor." The defendants in that lawsuit immediately filed motions to dismiss on the grounds that the complaint was in the name of the wrong party.

The complaint alleges that the Attorney Defendants then filed a separate, second complaint on October 25, 2006 which was styled "Sarah Gilbert, by her parents and next friends, Richard and Rosie Lee Gilbert and Richard and Rosie Lee Gilbert, individually."

On February 26, 2007, the Judge dismissed with prejudice all of the claims of Miss Gilbert filed in the first case on the grounds that the Attorney Defendants had filed it in the name of the wrong party.

Ultimately, Miss Gilbert's medical malpractice claim was dismissed for failure to file her lawsuit before the statute of limitations expired.

### THE COVERAGE

On July 18, 2007, you sent an application to CIC to obtain a professional liability policy for Barry Nace dba Paulson & Nace which requested an effective date of July 24, 2007. In the application, you answered the following question:

(b)   Having inquired of all partners, officers, owners and employed lawyers, are there any circumstances which may result in a claim being made against the firm, its predecessors or any current or past partner, officer, owner or employed lawyer of the firm?     ☐ Yes  ☒ No

* * *

THE APPLICANT REPRESENTS THAT THE ABOVE STATEMENTS AND FACTS ARE TRUE AND THAT NO MATERIAL FACTS HAVE BEEN SUPPRESSED OR MISSTATED.

Barry J. Nace                                      7/18/07
Print or Type Name and Title          Date (Mo-Day-Yr.)

The CIC application includes the following notice:

NOTICE:

Failure to report:

1.      any claim made against you during your current policy term, or

293

Barry J. Nace, Esq.
Page 3
4/21/2012

>   2.   any facts, circumstances or events which may give rise to a claim to your current insurance company BEFORE policy expiration may create a lack of coverage.

CIC issued a Lawyers Professional Liability Policy to "Barry J. Nace dba Paulson & Nace" effective July 24, 2007 to July 24, 2008 under Master Policy Number LWC-8001101, Certificate Number LWB-2400909 (the "First Policy"). That policy was written on a claims-made and reported basis. CIC was not advised of a potential claim or claim by Miss Gilbert while the First Policy was in effect.

CIC also issued a subsequent professional liability policy to "Barry J. Nace dba Paulson & Nace" effective July 24, 2008 to July 24, 2009 (the "2009 policy").

In May of 2009, you submitted a "Supplemental Claim/Incident Information" form to CIC identifying Sarah Gilbert as a "claimant". On that form, you advised that the date of the "alleged error" in the handling of Mr. Gilbert's claim was 2008.

The CIC policies contain the following insuring agreement:

**INSURING AGREEMENTS**

>   **I.**   **COVERAGE**
>
>   The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the **Policy Period** or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. Provided always that such **Professional Services** or **Personal Injury** happen:
>
>   A.   during the **Policy Period**; or
>
>   B.   prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business,** and continuously renewed and maintained in effect to the inception of this policy period:
>
>   >   1.   the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury;**
>   >
>   >   2.   the **Named Insured,** any partner, shareholder, employee, or where appropriate the **Named Insured's** management committee or any member thereof, had no reasonable basis to believe that the **Insured** had breached a professional duty or to **Reasonably Foresee** that a **Claim** would be made against the **Insured;** and

294

Barry J. Nace, Esq.
Page 4
4/21/2012

      3.      there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such **Claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any **Claim**, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

(Emphasis supplied).

The professional services rendered by the Attorney Defendants which give rise to the Gilbert Lawsuit happened prior to the effective date of the 2009 Policy. The First Policy issued by CIC to the Attorney Defendants was effective on July 24, 2007. The Gilbert Lawsuit could only be covered by the 2009 Policy if prior to July 24, 2007, the insured had no reasonable basis to believe that the insured had breached a professional duty or to reasonably foresee that a claim would be made against the insured.

The CIC policies define "reasonably foresee" as follows:

      **Reasonably Foresee(n)** means:

      1.      **Claims** or incidents reported to any prior insurer;

      2.      unreported **Claims** or suits of which any **Insured** had received notice prior to the effective date of the first policy with the Company;

      3.      incidents or circumstances that involve a particular person or entity which an **Insured** knew might result in a **Claim** or suit prior to the effective date of the first policy issued by the Company to the **Named Insured**, and which was not disclosed to the Company.

Miss Gilbert's first and only timely-filed complaint for medical malpractice was dismissed in February, 2007. CIC reserves its rights to contend that you had a reasonable basis to believe that a professional duty had been breached before July 24, 2007, the day the First Policy incepted. CIC reserves its rights to contend that there is no coverage for the Gilbert Lawsuit under the policies issued by CIC.

Please be advised that CIC also reserves its rights to bring a rescission action based on the July 2007 application submitted by Paulson & Nace wherein it denied knowing any circumstances which may result in a claim being made against the firm or any current or past partner, officer, owner or employed lawyer of the firm. In addition, CIC reserves its right to bring a rescission action based on your representation that the error, if any, was committed in 2008 when the information recently made available to CIC indicates that the error, if any, was committed in 2006.

Barry J. Nace, Esq.
Page 5
4/21/2012

Please advise if any other insurers were notified of the Gilbert lawsuit and what coverage position(s) they have taken.  Please also provide the name of any other insurer who provided insurance which may be potentially applicable to the allegations asserted in the Gilbert lawsuit.

Nothing contained in this letter should be deemed a waiver of the terms or conditions of the policies.  CIC expressly reserves the right to rely upon any term or condition of the policies or any other ground which may be found to limit or preclude coverage.  CIC reserves the right to modify this coverage position if warranted by further investigation.  CIC also reserves the right to seek contribution from other insurance carriers and to bring a declaratory judgment action against you seeking a court declaration of no coverage.

If you have any questions regarding any aspect of this matter, please do not hesitate to contact me at the e-mail address or phone numbers shown.

Sincerely,

Chicago Insurance Company, a Fireman's Fund Insurance Company
Jennifer L. Green, J.D. -- Claim Specialist


Cc via email:

Angela L. Fleege
Assistant Vice President, Sales Consultant
ProQuest, a division of Alliant

Email: angelaf@proquestinsurance.com



April 21, 2012

<u>**VIA FACSIMILE AND U.S. MAIL – RETURN RECEIPT REQUESTED**</u>

Gabriel Assaad, Esq.
Assaad Law, PLLC
1425 K Street, NW
Suite 350
Washington, DC 20005
Fax: (202) 741-9347

    Re:    Claimant:        Sarah Gilbert
            Claim No.:      00509630577
            Issuing Company:  Chicago Insurance Company

Dear Mr. Assaad:

I am the claims professional assigned by Chicago Insurance Company ("CIC") to review the lawsuit filed against you entitled: <u>Sarah E. Gilbert v. Paulson & Nace, PLLC, Barry J. Nace, and Gabriel Assaad,</u> which is filed in the Circuit Court of the City of Richmond ("Gilbert Lawsuit"). The Gilbert Lawsuit alleges professional negligence and breach of contract against you and the other defendants (collectively referred to herein as the "Attorney Defendants") arising out of the legal representation of Sarah Gilbert.

The purpose of this letter is to advise you that, for the reasons discussed below, CIC will provide you with a defense relative to the Gilbert Lawsuit under a strict reservation of rights. This reservation of rights includes, but is not limited to, the right to withdraw from the defense at any time and the right to bring a declaratory judgment action against you seeking a declaration of no coverage relative to the Gilbert Lawsuit.

Below is a summary of the allegations in the complaint filed in the Gilbert Lawsuit and the information contained in the documents previously obtained from your firm. CIC understands that you may dispute some of the allegations in the lawsuit and the documents as well as the various decisions by the courts, but includes the information in this letter to explain CIC's coverage position.

## BACKGROUND

The complaint in the Gilbert Lawsuit alleges that on or about July 28, 2004, Dr. Susan Atkins performed spinal fusion surgery on Sarah Gilbert in order to correct Miss Gilbert's scoliosis.

Fireman's Fund
Insurance Companies
33 West Monroe St.
Chicago, IL 60603
www.firemansfund.com

Phone (800) 628-8574 ext. 452300
Direct: (312) 629-2300
Fax: (888) 264-1579

Email: Jennifer.green@ffic.com

CIC 000520

297

Gabriel Assaad, Esq.
April 21, 2012
Page 2

The surgery rendered Miss Gilbert a paraplegic. The complaint alleges that Miss Gilbert and her parents retained the Attorney Defendants to represent Miss Gilbert in her claims for medical malpractice and negligence arising out of the surgery.

The Attorney Defendants filed the first medical malpractice lawsuit on Miss Gilbert's behalf on July 24, 2006. The statute of limitations on Sarah Gilbert's medical malpractice claim expired on July 28, 2006.

The complaint alleges that the first complaint filed on Miss Gilbert's behalf, who was a minor at the time, was styled "Richard Gilbert and Rosie Lee Gilbert, Individually and on behalf of their daughter, Sarah Gilbert, a minor." The defendants in that lawsuit immediately filed motions to dismiss on the grounds that the complaint was in the name of the wrong party.

The complaint alleges that the Attorney Defendants then filed a separate, second complaint on October 25, 2006 which was styled "Sarah Gilbert, by her parents and next friends, Richard and Rosie Lee Gilbert and Richard and Rosie Lee Gilbert, individually."

On February 26, 2007, the Judge dismissed with prejudice all of the claims of Miss Gilbert filed in the first case on the grounds that the Attorney Defendants had filed it in the name of the wrong party.

Ultimately, Miss Gilbert's medical malpractice claim was dismissed for failure to file her lawsuit before the statute of limitations expired.

## THE COVERAGE

On July 18, 2007, Barry Nace sent an application to CIC to obtain a professional liability policy for Barry Nace dba Paulson & Nace which requested an effective date of July 24, 2007. In the application, Barry Nace answered the following question:

(b)   Having inquired of all partners, officers, owners and employed lawyers, are there any circumstances which may result in a claim being made against the firm, its predecessors or any current or past partner, officer, owner or employed lawyer of the firm?   ☐ Yes ☒ No

\* \* \*

THE APPLICANT REPRESENTS THAT THE ABOVE STATEMENTS AND FACTS ARE TRUE AND THAT NO MATERIAL FACTS HAVE BEEN SUPPRESSED OR MISSTATED.

Barry J. Nace                            7/18/07
Print or Type Name and Title      Date (Mo-Day-Yr.)

The CIC application includes the following notice:

NOTICE:

CIC 000521

298

Gabriel Assaad, Esq.
April 21, 2012
Page 3

Failure to report:

1.   any claim made against you during your current policy term, or

2.   any facts, circumstances or events which may give rise to a claim to your current insurance company BEFORE policy expiration may create a lack of coverage.

CIC issued a Lawyers Professional Liability Policy to "Barry J. Nace dba Paulson & Nace" effective July 24, 2007 to July 24, 2008 under Master Policy Number LWC-8001101, Certificate Number LWB-2400909 (the "First Policy"). That policy was written on a claims-made and reported basis. CIC was not advised of a potential claim or claim by Miss Gilbert while the First Policy was in effect.

CIC also issued a subsequent professional liability policy to "Barry J. Nace dba Paulson & Nace" effective July 24, 2008 to July 24, 2009 (the "2009 policy").

In May of 2009, Barry Nace submitted a "Supplemental Claim/Incident Information" form to CIC identifying Sarah Gilbert as a "claimant". On that form, Barry Nace advised that the date of the "alleged error" in the handling of Mr. Gilbert's claim was 2008.

The policies contain the following insuring agreement:

**INSURING AGREEMENTS**

I.   **COVERAGE**

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the **Policy Period** or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. Provided always that such **Professional Services** or **Personal Injury** happen:

A.   during the **Policy Period**; or

B.   prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business,** and continuously renewed and maintained in effect to the inception of this policy period:

1.   the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury;**

2.   the **Named Insured, any partner, shareholder, employee, or where appropriate the Named Insured's management**

CIC 000522

299

Gabriel Assaad, Esq.
April 21, 2012
Page 4

<u>committee or any member thereof, had no reasonable
basis to believe that the **Insured** had breached a
professional duty or to **Reasonably Foresee** that a **Claim**
would be made against the **Insured**;</u> and

3.  there is no prior policy or policies which provide insurance
(including any Automatic or Optional Extended Reporting
Period or similar provision) of such policies for such **Claim**,
unless the available limits of liability of such prior policy or
policies are insufficient to pay any **Claim**, in which event
this policy will be specific excess over any such prior
coverage, subject to this policy's terms, limits of liability,
exclusions and conditions.

(Emphasis supplied).

The professional services rendered by the Attorney Defendants which give rise to the Gilbert
Lawsuit happened prior to the effective date of the 2009 Policy. The First Policy issued by CIC
to the Attorney Defendants was effective on July 24, 2007. The Gilbert Lawsuit could only be
covered by the 2009 Policy if prior to July 24, 2007, the insured had no reasonable basis to
believe that the insured had breached a professional duty or to reasonably foresee that a claim
would be made against the insured.

The CIC policies define "reasonably foresee" as follows:

**Reasonably Foresee(n)** means:

1.  **Claims** or incidents reported to any prior insurer;

2.  unreported **Claims** or suits of which any **Insured** had received notice
prior to the effective date of the first policy with the Company;

3.  incidents or circumstances that involve a particular person or entity which
an **Insured** knew might result in a **Claim** or suit prior to the effective date
of the first policy issued by the Company to the **Named Insured**, and
which was not disclosed to the Company.

Miss Gilbert's first and only timely-filed complaint for medical malpractice was dismissed in
February, 2007. CIC reserves its rights to contend that the insured had a reasonable basis to
believe that a professional duty had been breached before July 24, 2007, the day the First Policy
incepted. CIC reserves its rights to contend that there is no coverage to the Attorney Defendants
for the Gilbert Lawsuit under the policies issued by CIC.

Please be advised that CIC also reserves its rights to bring a rescission action based on the July
2007 application submitted by Paulson & Nace wherein it denied knowing any circumstances
which may result in a claim being made against the firm or any current or past partner, officer,
owner or employed lawyer of the firm. In addition, CIC reserves its right to bring a rescission
action based on Barry Nace's representation that the error, if any, was committed in 2008 when

CIC 000523

300

Gabriel Assaad, Esq.
April 21, 2012
Page 5

the information recently made available to CIC indicates that the error, if any, was committed in 2006.

Please advise if any other insurers were notified of the Gilbert lawsuit and what coverage position(s) they have taken. Please also provide the name of any other insurer who provided insurance which may be potentially applicable to the allegations asserted in the Gilbert lawsuit.

Nothing contained in this letter should be deemed a waiver of the terms or conditions of the policies. CIC expressly reserves the right to rely upon any term or condition of the policies or any other ground which may be found to limit or preclude coverage. CIC reserves the right to modify this coverage position if warranted by further investigation. CIC also reserves the right to seek contribution from other insurance carriers and to bring a declaratory judgment action against you seeking a court declaration of no coverage.

If you have any questions regarding any aspect of this matter, please do not hesitate to contact me at the e-mail address or phone numbers shown.

Sincerely,

Chicago Insurance Company, a Fireman's Fund Insurance Company
Jennifer L. Green, J.D. -- Claim Specialist

Cc via email:

Angela L. Fleege
Assistant Vice President, Sales Consultant
ProQuest, a division of Alliant

Email: angelaf@proquestinsurance.com

CIC 000524

301

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Jennifer L. Green, J.D.
Claims Specialist
Fireman's Fund Insurance Company
33 West Monroe Street, Suite 1200
Chicago, IL  60603-5316

MAY 7 2012

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _____  ☐ Agent  ☐ Addressee<br>B. Received by ( Printed Name )  C. Date of Delivery<br>L. Carter  1 MAY 12 |
| 1. Article Addressed to:<br><br>Gabriel Assaad, Esq.<br>1425 E Street, NW<br>Ste 50<br>Washington, DC 20005 | D. Is delivery address different from item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No |
| | 3. Service Type<br>☒ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D. |
| | 4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number<br>(Transfer from service label)  7007 2680 0000 9310 3868 | |

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

CONFIDENTIAL

CIC 000440

302

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al.*
**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT  V

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

CHICAGO INSURANCE COMPANY,   :
an Illinois Corporation              :
                                    :
      Plaintiff,              :
                                      :
v.                           :     Civil No. 1:12-CV-1082GBL/TCB
                                    :
PAULSON & NACE, PLLC, et al.    :
                                    :
      Defendants.         :
_____/

**DEFENDANTS PAULSON & NACE, PLLC'S AND BARRY J. NACE'S
MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO
FED. R. CIV. P. 12(b)(1), 12(b)(2), AND 12(b)(3)**

## I.   INTRODUCTION

This matter comes on defendants, Paulson & Nace, PLLC's ("Paulson & Nace") and

Barry J. Nace's Motion pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(3) to dismiss for

lack of *in personam* jurisdiction, failure to properly allege subject matter jurisdiction, and

improper venue. These Defendants are appearing specially, without waiving jurisdiction.

Plaintiff, Chicago Insurance Company ("CIC") brought this declaratory judgment action

against Paulson & Nace, Mr. Barry Nace, Gabriel Assad, and Sarah Gilbert, requesting the Court

declare that CIC has no obligation to defend the Defendants in an underlying state action for

legal malpractice. Mr. Nace is an attorney, partner and principal of Paulson & Nace, a

professional limited liability company organized under the laws of Washington, D.C., and with

its principal place of business in Washington, D.C. The Complaint alleges that Defendant Assad

is an attorney and resident of Washington, D.C., who worked for Paulson & Nace in 2006. Sarah

-1-
**BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.**
3920 UNIVERSITY DRIVE • FAIRFAX, VIRGINIA 22030 • (703) 385-1000 • FAX (703) 385-1555

304

Gilbert is a Virginia resident who brought the underlying action against Paulson & Nace, Mr. Nace, and Mr. Assad (collectively, the "Attorney Defendants") in Virginia state court (the "Gilbert Lawsuit"). The Gilbert Lawsuit seeks damages for breach of contract and professional negligence relating to the Attorney Defendants' representation of her in a medical malpractice lawsuit in 2006.

CIC issued a Lawyers Professional Liability Policy to Paulson & Nace effective July 2007 through July 2007, which was renewed through 2009 (the "Policy"). The Complaint alleges that the Policy only could cover the Attorney Defendants with respect to the Gilbert Lawsuit if, prior to July 2007, the insured had "no reasonable basis to believe that the insured had breached a professional duty or to reasonably foresee that a claim would be made against the insured." Compl. ¶ 28. The Complaint alleges that Ms. Gilbert's first medical malpractice claim was dismissed in February 2007, allegedly due to the Attorney Defendants' mistake. Therefore, CIC claims that Paulson & Nace should have reasonably foreseen that a claim may be made against it. The Defendants deny these allegations.

Despite the fact that the Gilbert Lawsuit is pending in Richmond City Circuit Court, CIC brought this declaratory judgment action related to its obligations under the Washington D.C. Policy towards the Attorney Defendants in the Gilbert Lawsuit in this Court, where none of the parties reside, nor any of the events occurred. Pursuant to Fed. R. Civ. P. 12(b)(1), this Court does not have subject matter jurisdiction over this action and venue is improper in this Court. Further, the Court does not have *in personam* jurisdiction arising out of a contract entered into in the District of Columbia, when the Defendants, Paulson & Nace and Barry Nace, are neither citizens nor residents of Virginia, do not have substantial contacts with Virginia, and are not

BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 UNIVERSITY DRIVE • FAIRFAX, VIRGINIA 22030 • (703) 385-1000 • FAX (703) 385-1555

subject to the Court's jurisdiction in Virginia. Therefore, Paulson & Nace and Mr. Nace respectfully request this Court dismiss the Complaint.

## II.   LAW AND ANALYSIS.

### A. The Court does not have personal jurisdiction over Paulson & Nace or Barry J. Nace.

The analysis of *in personam* jurisdiction requires two steps. First, the Court must determine whether the defendant's activity falls within the state's long-arm statute. *Superfos Investments Ltd. V. FirstMiss Fertilizer, Inc.*, 774 F. Supp. 393, 396 (E.D. Va. 1991). Second, the Court must decide whether exercising personal jurisdiction over the defendant would satisfy the requirements of the Due Process clause of the Fourteenth Amendment. *Id.* (*citing Peanut Corp. of America v. Hollywood Brands, Inc.*, 696 F.2d 311, 313 (4th Cir. 1982)). The Supreme Court of Virginia has held that the Virginia Long Arm Statute, Va. Code Ann. § 8.01-328.1, extends personal jurisdiction to the full extent permitted by due process. *Id.* (*citing Danville Plywood Corp. v. Plain and Fancy Kitchens, Inc.*, 218 Va. 533, 534, 238 S.E.2d 800 (1997)). The defendant must have sufficient minimum contacts with the forum, the key factor of which is that "there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (*quoting Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228 (1958)). General jurisdiction arises when the defendant has "continuous and systematic" contacts with the forum state. *Id.* (*citing Chung v. NANA Dev. Corp.*, 783 F.2d 1124, 1130 (4th Cir. 1986)). Specific jurisdiction is less strict and only requires that the suit arise out of or relate to the defendant's contacts with the forum. *Id.* The plaintiff has the burden of proving personal jurisdiction over the defendant. *Id.* at 397.

-3-
**BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.**
3920 UNIVERSITY DRIVE  •  FAIRFAX, VIRGINIA 22030  •  (703) 385-1000  •  FAX (703) 385-1555

306

This case arises out of an insurance policy or contract, executed by an Illinois insurance company and a Washington, D.C. law firm. Neither Paulson & Nace nor Barry J. Nace systematically conducts business in Virginia. Therefore, the Court would have to exercise specific jurisdiction over those Defendants based on conduct arising out of CIC's contract claim. A contract which is accepted and becomes effective in another forum generally will not satisfy minimum contacts. *Luke v. Dalow Ind., Inc.*, 566 F. Supp. 1470, 1472 (E.D. Va. 1983). The factors the Fourth Circuit has considered when assessing whether a defendant has transacted business in the forum when the suit arises out of a single contract are "(i) where any contracting occurred, and where the negotiations took place, (ii) who initiated the contact, (iii) the extent of the communications, both telephonic and written, between the parties, and (iv) where the obligations of the parties under the contract were to be performed." *Affinity Memory & Micro, Inc. v. K&Q Ent., Inc.*, 20 F. Supp. 2d 948, 952 (E.D. Va. 1998).

In *Affinity*, the plaintiff, a Virginia company, reached out to the defendant, a Minnesota company, for computer processors. 20 F. Supp. 2d at 953. The agreement took place over the telephone, the plaintiff sent payment to the defendant in Minnesota, and the defendant performed in Minnesota by directing an Illinois shipping company to ship the processors to the plaintiff in Virginia. *Id.* The Eastern District held that "though the defendant was ultimately responsible for causing goods to be shipped to Virginia," the single transaction did not amount to "transacting business" in Virginia. *Id.* The Court also conducted a due process analysis, even though it found the defendant's conduct did not satisfy the Virginia Long Arm statute. *Id.* The Court cited *Chung v. NANA Dev. Corp.*, 783 F.2d 1124, 1127-28 (4th Cir. 1986), in which the Fourth Circuit noted that "although a single contract may properly form a constitutional basis for jurisdiction, that contract must have a 'substantial connection' with the forum state, determined

BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 UNIVERSITY DRIVE • FAIRFAX, VIRGINIA 22030 • (703) 385-1000 • FAX (703) 385-1555

by the 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." The Court therefore found that the contract at issue in *Affinity* neither satisfied the requirements for due process nor the Long Arm statute.

The argument for personal jurisdiction over Paulson & Nace or Barry Nace is even less compelling than in *Affinity*. This case centers on a contract entered into by an Illinois corporation and a Washington, D.C. limited liability company. Negotiations took place in Washington, D.C., the contract, which was delivered in Washington, D.C., is subject to Washington, D.C. law interpretation, and any performance or misrepresentation alleged in the Complaint occurred in Washington, D.C. The only issue before the Court in the present action is the insurance contract, not the underlying tort claim. There are simply no connections to Virginia as between CIC, Paulson & Nace, Barry Nace and interpretation or enforcement of the insurance contract.[1]

### B. Venue is improper in the Eastern District of Virginia, Alexandria Division.

28 U.S.C. § 1391 sets forth the proper venue for actions brought in district courts of the United States. § 1391(b) states that a civil action may be brought in: 1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; 2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or 3) if neither (1) or (2) applies, any judicial district in which any defendant is subject to the court's personal jurisdiction. In addition to the venue rules in 28 U.S.C. § 1391, The Eastern District of Virginia's Local Civil Rule 3(C) states that the venue rules of § 1391 apply to determine the proper division in which an action should be filed and § 1391 shall be construed as if the terms "judicial district" and "district" are replaced with "division."

---

[1] Barry Nace is currently out of the country and, upon his return, an affidavit will be submitted with a supplemental memorandum in further support of this argument.

BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 UNIVERSITY DRIVE • FAIRFAX, VIRGINIA 22030 • (703) 385-1000 • FAX (703) 385-1555

§ 1391(b)(1) does not apply because not all defendants in this case are residents of Virginia. Therefore, venue would only be proper in the Eastern District of Virginia if subsection 2 or 3 applies. Sara Gilbert is not a resident of the Alexandria Division, but is currently a student at Virginia Polytechnic Institute and State University, located in the Western District. To determine whether events and omissions are substantial enough to support venue under § 1391(b)(2), the Court should review "the entire sequence of events underlying the claim." *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2006) (*quoting First Mich. Corp. v. Bramlet*, 141 F.3d 260, 264 (6th Cir. 1998)).

As discussed in subsection A above, the two counts in the present case arise out of the interpretation and enforcement of a Washington, D.C. insurance policy. The only parties to the contract are CIC and Paulson & Nace. CIC is an Illinois corporation and Paulson & Nace is a Washington, D.C. limited liability company. Barry Nace resides and works in Washington, D.C. Further, the negotiations for and execution of the Policy occurred in Washington, D.C. Consequently, there is no basis for venue in the Alexandria Division of the Eastern District under § 1391(b)(2) because none of the acts or omissions surrounding the Policy occurred there. § 1391(b)(3) does not apply either because, as discussed above, the Court does not have personal jurisdiction over either Paulson & Nace or Barry Nace in this case. Therefore, Paulson & Nace and Mr. Nace respectfully request the Court dismiss this case for improper venue under Fed. R. Civ. P. 12(b)(3), or in the alternative, if the Court has subject matter jurisdiction, transfer the matter to the United States District Court for the District of Columbia.

## C. The Complaint does not properly allege subject matter jurisdiction.

Pursuant to Rule 12(b)(1) and (h)(3), a claim may be dismissed for lack of subject matter jurisdiction. The burden of alleging and proving subject matter jurisdiction falls on the Plaintiff.

Federal subject matter jurisdiction may exist if there is either 1) a federal question pursuant to 28 U.S.C. § 1331, or 2) complete diversity of citizenship between the parties and more than $75,000 in controversy pursuant to 28 U.S.C. § 1332. *Id.*

The Complaint fails to allege the requisite complete diversity of citizenship of the parties. The citizenship of a limited liability company is that of its members. *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 121 (4th Cir. 2004). The Complaint does not allege the citizenship of each of Paulson & Nace's members. Rather, it merely alleges that Paulson & Nace is organized under the laws of Washington, D.C. and has its principal place of business there. Additionally, the Complaint alleges that Mr. Nace and Mr. Assad reside in Washington D.C. These allegations are insufficient to properly plead the citizenship of the LLC and establish subject matter jurisdiction. Without the proper allegations, Defendants Paulson & Nace and Mr. Nace respectfully request the Court dismiss the case pursuant to Fed. R. Civ. P. 12(b)(1).

**D. This Court should abstain from ruling on the merits of this case as there is a parallel state court proceeding in Virginia.**

Abstention under *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746 (1971), requires 1) that there is a pending state judicial proceeding; 2) that the action implicates important state interests and 3) that there is an adequate opportunity for the plaintiff to raise federal constitutional claims in a state forum. *Nat'l Home Ins. Co. v. State Corp. Comm'n of the Commonwealth of Virginia*, 828 F. Supp. 1104, 1117 (E.D. Va. 1993) (*citing Middlesex Ethics Comm. V. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S. Ct. 2515, 2521 (1982)). Additionally, Federal courts also frequently abstain from deciding cases that would require determining complex questions of insurance regulation. *Lloyd v. Travelers Property Cas. Ins. Co.*, 699 F. Supp. 2d 812, 816 (E.D. Va. 2010) (*citing First Penn-Pacific Life Ins. Co. v. Evans*, 304 F.3d 345, 348-49 (4th Cir. 2002)). The types of insurance cases the courts abstain from usually involve "heavily regulated

BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 UNIVERSITY DRIVE • FAIRFAX, VIRGINIA 22030 • (703) 385-1000 • FAX (703) 385-1555

matters that implicat[e] complex and comprehensive regulatory schemes." *Id.* (*citing Spencer v. Frontier Ins. Co.*, 290 Fed. App'x 571, 574 (4th Cir. 2008)).

In this case, the elements of *Younger* are met and the Court should abstain from hearing it. As previously discussed, the Gilbert Lawsuit is currently pending in the Richmond City Circuit Court of Virginia. Further, the issue in this case implicates Washington, D.C.'s significant interest in determining and applying its own insurance contract interpretation law. Indeed, "the regulation of insurance has been traditionally left to the states, and may invoke such significant state interests that abstention is appropriate." *Nat'l Home Ins. Co.*, 838 F. Supp. at 1117. Additionally, there will be ample opportunity for CIC to raise its argument over coverage before a Washington, D.C. court. Finally, unlike the issue in *Lloyd*[2], which involved a straightforward dispute governed by clear and controlling precedent, the issue in this case is much more complex. There is no clear authority on the subject of the particular question of interpretation under Washington, D.C. law and the most appropriate court to analyze and decide the issue is a Washington, D.C. court. For these reasons, Paulson & Nace and Barry Nace respectfully request this Court abstain from deciding the issue in this case and dismiss CIC's declaratory judgment action.

## III. CONCLUSION

Defendants Paulson & Nace and Barry Nace respectfully request this Court dismiss this case pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(2) because the Plaintiff did not properly allege subject matter jurisdiction, and the Court lacks personal jurisdiction over Paulson & Nace and Barry J. Nace, pursuant to 12(b)(3) because venue is improper in any division of the Eastern

---

[2] Judge Ellis rejected a similar argument in *Lloyd v. Travelers Property Cas. Ins. Co.*, 699 F. Supp. 2d 812, 816-18 (E.D. Va. 2010), however in that case he noted that the issue was simple and governed by clear authority and presented no risk of entanglement with an ongoing state action. To the contrary, this case presents a complex and undecided issue of contract interpretation under Washington, D.C. law.

District of Virginia, and abstain from hearing this case due to Washington, D.C.'s significant

interest in determining and applying its own insurance contract law.

> **PAULSON & NACE, PLLC and**
> **BARRY J. NACE, Esq.**
> By Counsel


/s/ _____
Stephen A. Horvath, VA Bar No. 19133
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 University Drive
Fairfax, Virginia 22030
Telephone:   (703) 385-1000
Facsimile:   (703) 385-1555
shorvath@vadctriallaw.com
*Counsel for Defendants, Paulson & Nace, PLLC and*
*Barry J. Nace, Esq.*

-9-
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 UNIVERSITY DRIVE • FAIRFAX, VIRGINIA 22030 • (703) 385-1000 • FAX (703) 385-1555

312

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of October 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

David D. Hudgins, Esq.  
Hudgins Law Firm, P.C.  
515 King Street, Suite 400  
Alexandria, Virginia 22314  
dhudgins@hudginslawfirm.com  
*Counsel for Plaintiff*

Gabriel Assaad, Esq.  
Assaad Law, PLLC  
1425 K Street, N.W., Suite 350  
Washington, D.C. 20005  
*Defendant*

H. Aubrey Ford, Esq.  
Cantor, Stoneburner, Ford, Grana, Buckner  
7130 Glen Forest Drive  
Suite 400  
Richmond, Virginia 23226  
aford@virginiatrialfirm.com  
*Counsel for Defendant Sarah Gilbert*

/s/_____  
Stephen A. Horvath, Va. Bar No. 19133  
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.  
3920 University Drive  
Fairfax, Virginia 22030  
Telephone: (703) 385-1000  
Facsimile: (703) 385-1555  
shorvath@vadctriallaw.comm  
*Counsel for Defendants, Paulson & Nace, PLLC and*  
*Barry J. Nace, Esq*

-10-
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 UNIVERSITY DRIVE • FAIRFAX, VIRGINIA 22030 • (703) 385-1000 • FAX (703) 385-1555

313

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHICAGO INSURANCE COMPANY, | ) | |
| An Illinois Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:12-cv-02068 (ABJ) |
| | ) | |
| PAULSON & NACE, PLLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANT SARAH GILBERT'S RESPONSE TO DEFENDANTS
PAULSON & NACE, PLLC'S AND BARRY J. NACE'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Defendant Sarah Gilbert ("Ms. Gilbert"), by counsel, pursuant to Fed. R. Civ. P.

56, hereby responds to and joins Defendants Paulson & Nace, PLLC and Barry J. Nace,

Esq. (collectively, the "Nace Defendants") in moving this Court for summary judgment

declaring that Chicago Insurance Company ("CIC") failed to give timely notice to Ms.

Gilbert of a reservation of rights letter, and as a result, waived any defense to coverage.

As a result, Ms. Gilbert's legal malpractice claim against the Nace Defendants should

be declared to be covered by CIC's policy of insurance.

**I.    RESOLUTION OF MS. GILBERT'S UNDERLYING LEGAL MALRPACTICE
ACTION**

Ms. Gilbert filed a legal malpractice claim against the Nace Defendants on March

13, 2012 arising out of the Nace Defendants' representation of her in a medical

malpractice action involving the catastrophic scoliosis surgery she endured in 2003 that

314

rendered her a paraplegic.  Trial was held in the Circuit Court of the City of Richmond,

Virginia ("Richmond Circuit Court") on September 24-27, 2013.  At the conclusion of the

four-day trial, the jury returned a verdict of $4,000,000 in favor of Ms. Gilbert.  On

October 30, 2013, the Richmond Circuit Court heard post-trial motions in the case,

affirming the jury's verdict against the Nace Defendants, but reducing Ms. Gilbert's

judgment to $1,750,000 in accord with Virginia's statutory cap on medical malpractice

awards.  The Richmond Circuit Court entered its final order on November 1, 2013,

providing Ms. Gilbert with a fully matured, ripened judgment against the Nace

Defendants for $1,750,000.  (A copy of the Final Order is attached as Exhibit A.)

## II.   MS. GILBERT JOINS IN THE MOTION FOR SUMMARY JUDGMENT FILED BY THE NACE DEFENDANTS

On December 27, 2012, the Nace Defendants' legal malpractice insurance

carrier, CIC, filed the present action seeking a declaration that its policy afforded no

coverage to the Nace Defendants for Ms. Gilbert's legal malpractice claim.  Because

Ms. Gilbert now has a fully matured, ripened judgment against the Nace Defendants for

$1,750,000, she has standing before this Court to join the Nace Defendants' motion for

summary judgment against CIC.

Accordingly, Ms. Gilbert endorses and adopts the Nace Defendants' arguments

offered in their Memorandum of Points and Authorities in Support of Their Motion for

Summary Judgment ("Nace Brief").  Specifically, Ms. Gilbert adopts and restates by

reference the Nace Defendants' argument that Virginia law applies to the analysis of the

issue in this declaratory judgment action (Nace Brief at 7-11); the Nace Defendants'

argument that Virginia Code § 38.2-2226 applies because CIC claims breach of a

contractual condition in the contract (Nace Brief at 11-13); the Nace Defendants'

2

argument that CIC's failure to comply with the § 38.2-2226 notice provisions bars this action to disclaim coverage for Ms. Gilbert's legal malpractice lawsuit (Nace Brief at 13-19); and the Nace Defendants' argument that under common law, CIC waived its right or is estopped from disclaiming coverage (Nace Brief at 19-20).

Further, Ms. Gilbert stands in a unique position relative to the notice requirements of Virginia Code § 38.2-2226.  That Code Section requires an insurance company intending to deny coverage based upon the breach of any contractual condition to (1) notify the claimant or claimant's counsel of the breach within forty-five days after the discovery of the breach and (2) notify the claimant or claimant's counsel within forty-five days after a reservation of rights letter is sent by the insurer to the insured.  Chicago Insurance Company apparently issued its reservation of rights letters to the Nace Defendants in January of 2012.  Neither Ms. Gilbert nor her counsel ever received any such reservation of rights letters.  It appears that Chicago Insurance Company does not contest this fact.  The Gilberts were unaware of the intention of Chicago Insurance Company to rely upon the defense of a breach of the policy to disclaim coverage until Chicago Insurance Company filed its first declaratory judgment action naming Ms. Gilbert as a defendant on September 25, 2012.  (See Affidavit of Ms. Gilbert's legal counsel attached as Exhibit B.)  As a result of this failure by Chicago Insurance Company, the insurance carrier has waived any defense based upon such breach to the extent of the clam by operation of law.  Virginia Code § 38.2-2226.

In this case, Chicago Insurance Company both waived its right to rely upon a breach of contract as a defense to coverage and is estopped from asserting that defense due to its failures.

3

III.   **CONCLUSION**

For the foregoing reasons, Defendant Sarah Gilbert respectfully requests that

this Court grant Defendants Paulson & Nace, PLLC and Barry J. Nace, Esq.'s motion

for summary judgment against Chicago Insurance Company and dismiss the Complaint

with prejudice.

Respectfully submitted,

**SARAH E. GILBERT**

Date: November 21, 2013   By:   _____/s/_____

H. Aubrey Ford, III (VSB No. 18691)
CANTOR STONEBURNER FORD GRANA &
   BUCKNER
7130 Glen Forest Drive, Suite 400
Richmond, Virginia  23226
Telephone:   804-644-1400
Facsimile:   804-644-9205
E-mail:      aford@virginiatrialfirm.com
*Pro Hac Vice Counsel for Defendant Sarah E. Gilbert*

Carla D. Brown (D.C. Bar No. 474097)
CHARLSON BREDEHOFT COHEN BROWN &
   SAKATA, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia  20190
Telephone:   703-318-6800
Facsimile:   703-318-6808
E-mail:      cbrown@cbcblaw.com
*Counsel for Defendant Sarah E. Gilbert*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 21st day of November, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to the following:

David D. Hudgins, Esq.
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, Virginia  22314
dhudgins@hudginslawfirm.com
*Counsel for Plaintiff*

Paulette S. Sarp, Esq.
Hinshaw & Culbertson, LLP
333 South Seventh Street, Suite 2000
Minneapolis, MN  55402-2431
psarp@hinshawlaw.com
*Counsel for Plaintiff*

Stephen A. Horvath, Esq.
Bancroft McGavin Horvath & Judkins, P.C.
3920 University Drive
Fairfax, Virginia  22030
shorvath@bmhjlaw.com
*Counsel for Defendant*
*Paulson & Nace, PLLC and Barry J. Nace*

Gabriel A. Assaad, Esq.
Assaad Law, PLLC
1425 K. Street, N.W., Suite 350
Washington, D.C.  20005
gassaad@assaadlaw.com
*Counsel for Defendant*
*Gabriel Assaad, Esq.*


_____/s/_____
H. Aubrey Ford, III, Esq. (VSB No. 18691)
CANTOR STONEBURNER FORD
    GRANA & BUCKNER
7130 Glen Forest Drive, Suite 400
Richmond, Virginia  23226
Telephone:   (804) 644-1400
Facsimile:   (804) 644-9205
E-mail:      aford@virginiatrialfirm.com
*Pro Hac Vice Counsel for Defendant, Sarah E. Gilbert*

𝔙irginia:
𝔍n the 𝔗ircuit 𝔗ourt of the 𝔗ity of 𝔕ichmond, 𝔍ohn 𝔐arshall 𝔗ourts 𝔅uilding

SARAH E. GILBERT,                       )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )        Case No. CL12001197-00
                                        )
PAULSON & NACE, PLLC,                   )
                                        )
and                                     )
                                        )
BARRY J. NACE,                          )
                                        )
        Defendants.                     )

## FINAL ORDER

On September 24, 2013, came the parties, in person and by counsel, for a trial

by jury, and the Court having empanelled the jury, to wit: Ruchi Chande, Cheryl

Johnson, Joe Lerch, David Smiy, Jr., Christopher Waldron, Iris Lee, and Laura Philips,

who were sworn to well and truly try the issues joined and a true verdict give according

to the evidence and the law;

After considering the evidence, the jury unanimously returned its verdict on

September 27, 2013, as follows:

> "We the jury, find in favor of the plaintiff,
> Sarah E. Gilbert, and award damages in the
> amount of $4,000,000.00.
>
> We do not award interest."
>                         Joe Lerch, Foreperson

On October 30, 2013, the parties, by counsel, appeared before the Court for oral

argument of the post-trial motions filed by the Defendants.  Upon consideration of legal


EXHIBIT
A

Page Two
CL12-1197

memoranda filed by the parties, oral argument by counsel, the pleadings and the evidence presented at trial, it is hereby ORDERED as follows:

(a)    Defendants' Motion for Remittitur to reduce the jury's verdict from $4,000,000 to $1,750,000 pursuant to Virginia Code § 8.01-581.15 is GRANTED;

(b)    Defendants' Motion for Remittitur to reduce the judgment from $1,750,000 to $1,166,666 on the grounds that the Defendants would have been entitled to a one-third contingency fee in the underlying medical malpractice action is DENIED; and

(c)    Defendant Paulson & Nace, PLLC's Motion to Set Aside the Verdict Against It and Enter Judgment in its Favor is DENIED.

It is therefore ORDERED that judgment shall be and hereby is entered in favor of the Plaintiff, Sarah E. Gilbert, in the amount of $1,750,000 against Defendants Paulson & Nace, PLLC and Barry J. Nace.

This Order is FINAL and this matter is ended.

Entered this __1__ day of ~~October~~ November, 2013

_____
Judge

A Copy,
Teste:  BEVILL M. DEAN, CLERK
BY: _____ D.C.

320

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHICAGO INSURANCE COMPANY,  :
an Illinois Corporation       :
                              :
        Plaintiff,            :
                              :
                              :
v.                            :         Civil No. 1:12-CV-2068
                              :
PAULSON & NACE, PLLC, et al., :
                              :
        Defendants.           :
_____:

## AFFIDAVIT OF H. AUBREY FORD, III

I, H. Aubrey Ford, III, after being first duly sworn, do hereby depose and state as follows:

1.      I am over the age of eighteen (18), and this Affidavit is based on personal knowledge.

2.      I am a Director at the law firm Cantor Stoneburner Ford Grana & Buckner, located in Richmond, Virginia and have been practicing law in Virginia for 33 years.

3.      On or before January 28, 2011, Rick and Rosie Gilbert, parents of Sarah Gilbert, retained my firm to represent them and substitute as counsel in the medical malpractice case styled *Richard Gilbert and Rosie Lee Gilbert, Individually v. Susan Edwin Atkins, M.D., et al.,* (At Law Number CL06004760-00) pending in the Circuit Court for the City of Richmond. The Gilberts had been represented by Barry J. Nace, Esq. who was assisted for some period by Gabriel Assaad, Esq. – both of the law firm Paulson & Nace, PLLC – in the medical malpractice claim up to that point.



EXHIBIT
B

4.       On or about March 13, 2012, I filed a legal malpractice and professional negligence complaint against Paulson & Nace, PLLC, Barry J. Nace, Esq., and Gabriel Assaad, Esq. (the "Attorney Defendants"), on behalf of Sarah Gilbert, based upon their handling of her medical malpractice case, which had been dismissed in the Circuit Court for the City of Richmond.

5.       At no time prior to September 25, 2012, were Sarah Gilbert, her parents or I notified in any manner by Plaintiff Chicago Insurance Company of its intent to rely upon a defense of breach of contract to disclaim coverage for Ms. Gilbert's legal malpractice claim against the Attorney Defendants, pursuant to Va. Code Ann. § 38.2-2226.

6.       The first notice of any kind that Sarah Gilbert, her parents or I received of CIC's reservation of rights was service of CIC's first declaratory judgment complaint filed in the United States District Court for the Eastern District of Virginia, Alexandria Division, on September 25, 2012, which I accepted on Ms. Gilbert's behalf on October 12, 2012.

_H. Aubrey Ford (signature)_

H. AUBREY FORD, III

COMMONWEALTH OF VIRGINIA       )
County of Henrico                          ) ss:

Subscribed and sworn to before me, with proof of identity, on this _5th_ day of _August_ _____, 2013.

_Marguerite E. Stinnette (signature)_
Notary Public

My Commission expires: _08/31/2014_
My Registration Number: _225059_

[Notary Seal: MARGUERITE E. STINNETTE, NOTARY PUBLIC, REGISTRATION NUMBER 225059, COMMONWEALTH OF VIRGINIA]

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHICAGO INSURANCE COMPANY,<br>An Illinois corporation, | : <br> : |
| | : |
| Plaintiff, | :    Civil Action No. 1:12-CV-02068-ABJ |
| | : |
| v. | : |
| | : |
| PAULSON & NACE, PLLC, a professional<br>limited liability company; BARRY J. NACE,<br>an individual; GABRIEL ASSAAD, an<br>individual; and SARAH E. GILBERT, an<br>individual. | : <br> : <br> : <br> : <br> : |
| | : |
| Defendants. | : |

---

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF CIC'S RESPONSE IN OPPOSITION TO THE
NACE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Chicago Insurance Company ("CIC") submits the following Memorandum of Points and Authorities in support of its Response in Opposition to the Nace Defendants' Motion for Summary Judgment (Doc. 14).   Defendant Sarah Gilbert has recently joined in the Nace Defendants' Motion (Doc. 21).  CIC requests that the Motion be denied on the grounds that the Nace Defendants' affirmative defenses of waiver and estoppel fail as a matter of law.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

CIC filed this declaratory judgment lawsuit seeking a determination that it has no obligation to defend or indemnify Paulson & Nace, PLLC, Barry Nace, or Gabriel Assaad (the "Attorney Defendants") in a legal malpractice lawsuit filed by Sarah Gilbert because a requirement for coverage in the CIC policy's insuring agreement has not been met.  To fall within the insuring agreement of CIC's claims-made policy the insureds must have had "no reasonable basis to believe that the Insured had breached a professional duty or to Reasonably Foresee that a Claim would be made against the Insured" prior to the first policy being issued on

121589570 2306

July 24, 2007.  Unless this "no prior knowledge" requirement is met, CIC has no obligation to defend or indemnify the insured.

Here, prior to July 24, 2007, the insureds filed two separate medical malpractice lawsuits on behalf of Sarah Gilbert.  The first lawsuit was filed four days before the statute of limitations expired and was dismissed on February 26, 2007 for failure to comply with a Virginia procedural statute.  The Nace Defendants filed a second lawsuit on October 25, 2006 in order to remedy the procedural error in the first lawsuit.  However, the second lawsuit was filed three months after the statute of limitations expired and, at a hearing on June 18, 2007, the trial court advised that it was granting defendants' motion to dismiss this lawsuit with prejudice.   These undisputed facts establish as a matter of law that an insured had a reasonable basis to believe that a professional error had been committed prior to inception of the CIC policy.  CIC has filed its own Motion for Summary Judgment on the grounds that this requirement has not been met as a matter of law.  CIC refers to and incorporates by reference its Motion for Summary Judgment and supporting memorandum and statement of facts.  (Doc. 18).

The Nace Defendants ignore the merits of the "no prior knowledge" requirement in their Motion.  Rather, the Nace Defendants seek to create coverage where none exists under the terms and provisions of the CIC policy by asking this Court to apply a Virginia procedural statute, Va. Code Ann. § 38.2-2226.  This statute requires that an insurer must provide notice to a claimant of a reservation of rights asserting a breach of the policy by the insured within 45 days after discovery of the breach or of a claim being asserted, whichever is later.  CIC does not dispute that it did not send copies to Ms. Gilbert of the reservation of rights letters it issued to the Attorney Defendants.  However, the Virginia statute does not apply here has a matter of law for several reasons, one of which is that the statute has been declared "procedural" in nature by

121589570 2306

Virginia courts.  This Court, exercising diversity jurisdiction, cannot apply or enforce the procedural law of Virginia.  There is no procedural law in the District of Columbia which would require notice to a claimant.

Even if the Virginia statute were a substantive law, it still does not apply because it is the substantive law of the District of Columbia, and not Virginia, that applies to this declaratory judgment action.  The Nace Defendants' argument that Virginia law applies is misplaced and disingenuous given that when CIC originally filed this lawsuit in Virginia in order to ensure personal jurisdiction over the claimant Sarah Gilbert, the Nace Defendants moved to dismiss this lawsuit on the grounds that Virginia had no significant contacts relating to the issue of coverage and that CIC should have filed its lawsuit in the District of Columbia.  The Virginia court dismissed the lawsuit and CIC then filed its complaint in this Court.  The Nace Defendants should not be allowed to reverse their argument and claim that Virginia law applies simply because it now suits their purposes.

In addition, the Virginia statute by its own terms only applies to coverage defenses based upon an insured's *breach* of a policy condition.  CIC does not allege that the insureds breached any condition or provision of the policy.  Although the "no prior knowledge" requirement for coverage in the insuring agreement could be characterized as a "condition precedent" for coverage, it is not a condition that is capable of being breached by the action or inaction of an insured.  Examples of conditions that can be breached are conditions requiring an insured *to provide* prompt notice of a claim, *to cooperate* in an insurer's investigation of a claim, and *to appear* for an examination under oath or deposition.  In contrast, whether the "no prior knowledge" requirement has been met depends upon whether the facts that existed at the time the policy was issued establish that an insured had a reasonable basis to believe that a professional

121589570 2306

duty had been breached or that a claim might be made.  There is nothing the Nace Defendants could have performed in order to satisfy this requirement.  The facts known at the time the policy incepted would cause a reasonable attorney to know that an error had been committed or they would not.

The Virginia statute also does not apply to bar CIC from asserting its coverage defense unless the claimant (Ms. Gilbert) has been prejudiced by the failure to receive a copy of CIC's reservation of rights letters within 45 days of her filing a claim against the Nace Defendants. Ms. Gilbert's attorney submitted an Affidavit (Doc. 21-2) in support of Ms. Gilbert's Response/Joinder in the Nace Defendants' Motion.  Conspicuously absent from this Affidavit is any allegation or evidence that Ms. Gilbert has suffered any prejudice as the result of not receiving notice of CIC's coverage defenses until September of 2012, when CIC filed and served its declaratory judgment complaint.  There has been no prejudice.  The purpose of the Virginia statute is to provide a claimant ample notice of a coverage defense so that the claimant can determine if she wishes to pursue a claim against the insured.  Ms. Gilbert concedes she had notice of CIC's coverage defense no later than September 25, 2012, which was more than one year before her legal malpractice lawsuit against the Nace Defendants was tried in the Virginia court.  Despite this knowledge, Ms. Gilbert did not move to stay her legal malpractice lawsuit pending resolution of coverage, rather, she continued to litigate her lawsuit for a full year and then proceeded to trial.  Ms. Gilbert made an informed decision to proceed with her legal malpractice lawsuit despite full knowledge of CIC's coverage defense.  As a matter of law, Ms. Gilbert has not sustained any prejudice.

The Nace Defendants next seek to create coverage where none exists under the terms of the policy by resorting to the common law doctrines of waiver and estoppel.  The Nace

4

Defendants argue that CIC's issuance of a reservation of rights in January of 2012 specifically identifying the "no prior knowledge" coverage defense was "too late", even though Ms. Gilbert still had not asserted an actual claim at that time, let alone filed a lawsuit, and CIC had no actual knowledge of facts supporting this coverage defense until late 2011.   The Nace Defendants mistakenly contend that CIC should have issued this reservation in May of 2009, when Mr. Nace reported Ms. Gilbert's potential claim to CIC, or at the latest in March of 2010, when Mr. Nace provided CIC some of the pleadings from the underlying lawsuits.

These arguments fail as a matter of law.  The Nace Defendants concede that CIC never affirmatively represented to them that CIC would provide unconditional coverage for Ms. Gilbert's potential claim or claim.  There also is no legal support for the argument that simply by "undertaking to investigate" Ms. Gilbert's potential claim CIC impliedly represented that there would be coverage if and when a claim were asserted.  Moreover, the undisputed facts establish that not until late November of 2011 did CIC discover that the professional errors allegedly committed by the Attorney Defendants took place in 2006, which was prior to inception of the policy, and not in 2008 as the Nace Defendants had represented in writing to CIC when they reported Ms. Gilbert's potential claim.  Upon discovery of the true facts, CIC promptly issued a reservation of rights on January 13, 2012 identifying the "no prior knowledge" coverage defense. Then, when Ms. Gilbert filed her lawsuit in March of 2012, CIC timely issued another reservation of rights letter specifically advising that CIC would provide a defense to the lawsuit subject to its right to deny coverage based upon the fact that the "no prior knowledge" requirement for coverage had not been met.

In order for waiver or estoppel to apply, the Nace Defendants also must establish that they have been prejudiced in this coverage action or in the defense of Ms. Gilbert's lawsuit by

5

121589570 2306

the timing of CIC's reservation of rights.  There is no evidence of actual prejudice.  Although Mr. Nace submitted an Affidavit (Doc. 14-6) in support of the Nace Defendants' Motion for Summary Judgment, *nowhere* in his Affidavit does Mr. Nace claim that the Nace Defendants have sustained any prejudice, let alone what that prejudice might be.

Finally, even if the undisputed facts supported a finding of waiver or estoppel – which they do not – the Nace Defendants cannot rely upon these doctrines to expand coverage beyond the terms and provisions of the policy itself.   Walker v. American Ice Co., 254 F.Supp. 736, 741 (D.D.C. 1966).  As set forth in CIC's Motion for Summary Judgment, there is no coverage for Ms. Gilbert's lawsuit because the policy's insuring agreement plainly requires that, before the policy was issued, no insured had a reasonable basis to believe that a professional error had been committed or to reasonably foresee that a claim might be made against them.  As a matter of law, this coverage requirement has not been met and CIC has no obligation to defend or indemnify the Nace Defendants.  The Nace Defendants' Motion should be denied and CIC's Motion should be granted.

## FACTUAL BACKGROUND

### The underlying legal malpractice lawsuit and the professional error upon which it is based.

On March 19, 2012, Sarah Gilbert filed a legal malpractice lawsuit captioned: Sarah E. Gilbert v. Paulson & Nace, PLLC, Barry J. Nace, and Gabriel Assaad, in the Circuit Court of the City of Richmond (the "Gilbert Lawsuit"). (See Plaintiff's Additional Material Facts in Support of its Response to the Nace Defendants' Motion for Summary Judgment ("PASOF") at ¶ 1).  The Gilbert Lawsuit alleges professional negligence and breach of contract against Barry Nace, Paulson & Nace, and Gabriel Assaad (collective "the Attorney Defendants") arising out of their

6

328

legal representation of Sarah Gilbert in two medical malpractice lawsuits filed on her behalf. (PASOF, ¶ 2).

The Gilbert Lawsuit alleges that on July 28, 2004, Ms. Gilbert underwent spinal fusion surgery to correct her scoliosis. The surgery rendered Miss Gilbert a paraplegic. (PASOF, ¶ 3). In December of 2004, Ms. Gilbert's parents, Richard and Rosie Gilbert, retained Barry Nace and his law firm, Paulson & Nace, on behalf of their minor daughter to pursue a claim of medical malpractice and negligence in Virginia. (PASOF, ¶ 4).

On July 24, 2006, just four days before the statute of limitations expired on Ms. Gilbert's claim, Paulson & Nace filed a medical malpractice lawsuit in Virginia (the "first medical malpractice lawsuit"). (PASOF, ¶¶ 5, 6). The complaint, filed on Ms. Gilbert's behalf, named her parents "*on behalf of their daughter.*" (Id.) (Emphasis added). The defendants in the first medical malpractice lawsuit immediately filed motions to dismiss on the grounds that the Attorney Defendants had filed the case in the name of the wrong party and that, under Virginia law, a parent cannot sue on behalf of a child; rather, the child must bring the suit and the parents named in the suit as "next friends." (PASOF, ¶ 7).

On October 25, 2006 – three months after the statute of limitations on Ms. Gilbert's claim had expired – Paulson & Nace filed a separate, second complaint identifying her parents as "next friends" (the "second medical malpractice lawsuit"). (PASOF, ¶ 8). The purpose in filing this second complaint was to try to correct the mistake in the first complaint. (PASOF, ¶ 9).

At a hearing on the defendants' motion to dismiss the first medical malpractice lawsuit on January 4, 2007, Gabriel Assaad, who was an associate and employee of the Paulson & Nace firm, represented to the Virginia court as follows:

> I do agree the action took place – or the negligence took place on July 28[th], 2004, and, therefore, the statute of limitations would be on that date, would be July 28[th],

7

121589570 2306

2006.  However, Your Honor, there are certain issues that may toll the statute, based on continuing treatment, based on we might move the Court to declare this person incapacitated during a certain period of time during that period, and I have yet to receive the medical records from the defendants to be able to make those arguments to determine whether or not we're going to proceed with that action. That's why I feel at this point, to dismiss the child's claim with prejudice would be inappropriate.  <u>I agree we haven't filed the claim appropriately with regard to the claim at issue at this point in time and therefore</u> – (Emphasis added).

(PASOF, ¶¶ 10, 11).  On February 26, 2007, the court entered an order dismissing the first medical malpractice lawsuit because it had been filed in the name of the wrong party.  (PSOF, ¶ 12).[1]

The defendants also filed motions to dismiss in the second medical malpractice lawsuit, this time based on the fact that the statute of limitations expired before this lawsuit was filed. (PSOF, ¶ 13).  On June 18, 2007, at the oral argument held by the Virginia court on these motions, the court ruled from the bench and advised that it granting the motions to dismiss and would be dismissing the second medical malpractice lawsuit with prejudice on the basis that Ms. Gilbert's claims were barred by the statute of limitations.  (PASOF ¶ 14).  The parties were advised to submit a proposed order to this effect, which order was entered on August 3, 1007 by the Virginia court confirming dismissal with prejudice of the second lawsuit.  (PASOF ¶ 15).

### Issuance of the first CIC policy to Paulson & Nace.

---

[1] CIC acknowledges that the February 26, 2007 order may have dismissed the first medical malpractice lawsuit without prejudice as opposed to "with prejudice."  (PSOF, Exhibit F).  CIC indicated in its Motion for Summary Judgment that the order of dismissal was with prejudice.  The copy of the Order itself has "with prejudice" stricken out by a handwritten mark.  However, in their Petition for Appeal filed in the underlying lawsuit, Paulson & Nace specifically state that on January 4, 2007, the court heard oral argument on the motion to dismiss the first lawsuit and "granted the Motion to Dismiss Sarah Gilbert's claim *with prejudice* and Richard and Rosie Lee Gilbert's claims without prejudice and with leave to amend."  (DSOF, Exhibit 9 at CIC000238) (emphasis added).  In the end, regardless of whether the first lawsuit was dismissed with prejudice or without prejudice in early 2007 is simply not material to CIC's position that the Nace Defendants had reason to believe that an error had been committed prior to inception of the CIC policy on July 24, 2007.  The fact that the first complaint was dismissed for failing to comply with Virginia statutory requirements, with or without prejudice, coupled with the Nace Defendants' filing a second complaint after the statute of limitations had expired in an attempt to correct that error is sufficient to establish as a matter of law that the insureds had a reasonable basis to know they had committed a professional error or errors before July 24, 2007.

121589570 2306

On July 18, 2007 – just one month after the Virginia court granted the defendants' motion to dismiss Ms. Gilbert's second medical malpractice lawsuit at oral argument – Mr. Nace submitted an application to CIC to obtain a professional liability policy requesting an effective date of July 24, 2007.  (PASOF, ¶ 16).  In the application, Mr. Nace answered the following question:

> (b)     Having inquired of all partners, officers, owners and employed lawyers, are there any circumstances which may result in a claim being made against the firm, its predecessors or any current or past partner, officer, owner or employed lawyer of the firm?        ☐ Yes ☒ No
>
> * * *
>
> THE APPLICANT REPRESENTS THAT THE ABOVE STATEMENTS AND FACTS ARE TRUE AND THAT NO MATERIAL FACTS HAVE BEEN SUPPRESSED OR MISSTATED.
>
> Barry J. Nace                                                    7/18/07
> Print or Type Name and Title          Date (Mo-Day-Yr.)

(PASOF, ¶ 17).  The application did not advise CIC of a potential claim by Ms. Gilbert. (PASOF, ¶¶ 16, 17).

CIC issued a claims made and reported Lawyers Professional Liability Policy to "Barry J. Nace dba Paulson & Nace" for the policy period July 24, 2007 to July 24, 2008 ("the 2007-2008 policy").  (PASOF, ¶ 18).  The coverage was renewed for the policy period July 24, 2008 to July 24, 2009 ("the 2008-2009 policy"). (PASOF, ¶ 19).  The relevant terms and provisions in these two policies are the same for purposes of the coverage issues in this lawsuit.  (PSOF, ¶ ¶ 18, 19). The insuring agreement for both policies provides as follows:

**INSURING AGREEMENTS**

**I.     COVERAGE**

> The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the

121589570 2306

**Policy Period** or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. <u>Provided always that such **Professional Services** or **Personal Injury** happen:</u>

A.     during the **Policy Period**; or

B.     <u>prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business,** and continuously renewed and maintained in effect to the inception of this policy period:</u>

    1.     the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury**;

    2.     <u>the **Named Insured**, any partner, shareholder, employee, or where appropriate the **Named Insured's** management committee or any member thereof, had no reasonable basis to believe that the **Insured** had breached a professional duty or to **Reasonably Foresee** that a **Claim** would be made against the **Insured**;</u> and

    3.     there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such **Claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any **Claim**, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

(PASOF, ¶ 45). Pursuant to Paragraph II.B.2 of the policy's insuring agreement, there can only be coverage for claims arising out of professional services rendered before the policy was issued, as is the case here, if, before CIC issued its first policy, the insured had no reasonable basis to believe that a professional duty had been breached or to reasonably foresee that a claim would be made against it. If the professional services and error took place during the policy period, then the "no prior knowledge" requirement for coverage in Paragraph II.B.2 does not apply. The policy defines the terms "claim" and "reasonably foresee" as follows:

121589570 2306

"**Claim**" means a demand for money or services, or the filing of suit or institution of arbitration proceedings or **Alternative Dispute Resolution** naming an **Insured** and alleging a negligent act, error, omission or **Personal Injury** resulting from the rendering of or failure to render **Professional Services**.   **Claim** does not include proceedings seeking injunctive or other non-pecuniary relief.

\*   \*   \*

**Reasonably Foresee(n)** means:

1.      **Claims** or incidents reported to any prior insurer;

2.      unreported **Claims** or suits of which any **Insured** had received notice prior to the effective date of the first policy with the Company;

3.      incidents or circumstances that involve a particular person or entity which an **Insured** knew might result in a **Claim** or suit prior to the effective date of the first policy issued by the Company to the **Named Insured**, and which was not disclosed to the Company.

(PASOF, ¶ ¶ 46, 47).

CIC's 30(b)(6) representative (Frank Lindner, Professional Liability Claim Director) testified that he does not consider the "no prior knowledge" requirements for coverage set forth in the CIC policy's insuring agreement a "condition precedent" to coverage.   (PASOF, ¶ 48). Whether or not the "no prior knowledge" requirement for coverage set forth in the CIC policy's insuring agreement is met is not based upon whether the insured performs or fails to perform an action.   (PASOF, ¶ 49).   CIC's position that the terms of the insuring agreement have not been met is not an allegation that the insureds have "breached" the policy.   (PASOF, ¶¶ 48-50).

The defense provision in the 2008-2009 policy provides:

The Company shall have the right and duty to defend <u>any suit</u> against the **Insured** seeking **Damages** to which this insurance applies even if any of the allegations of the suit are groundless, false or fraudulent.   The Company, at its option, shall select and assign defense counsel; however, the Insured may engage additional counsel, solely at their own expense, to associate in their defense of any **Claim** covered hereunder….Furthermore, the **Insured** shall not assume any obligations, incur any costs, charges, or expenses or enter into any settlement without the Company's consent.

121589570 2306

(PASOF, ¶ 51).  This provision does not obligate CIC to defend a claim or potential claim.  (Id.)

**Notice of Ms. Gilbert's potential claim to CIC**.

In May of 2009, during the 2008-2009 policy period, Mr. Nace submitted a "Supplemental Claim/Incident Information" form to CIC identifying Sarah Gilbert as a potential claimant.  (PASOF, ¶¶ 20, 21).  Mr. Nace stated in this written notification that "no claim or suit has been filed" and that the date of the "alleged error" in the handling of Mr. Gilbert's claim was 2008.  (Id.)  However, as CIC later discovered during its investigation and monitoring of Ms. Gilbert's potential claim, the date of the "alleged error" was not 2008, but rather, 2006, which was before CIC issued its first policy.  (PASOF, ¶¶ 38, 39).   Even Mr. Nace later acknowledged in an application for professional liability insurance he submitted to Lloyds of London in 2011 that the correct "date of alleged error" relating to Ms. Gilbert's claim was "7/24/06 – Date of Original Complaint" filed by Paulson & Nace.  (PASOF, ¶ 22).

In July of 2009, shortly after the potential claim of Ms. Gilbert was reported to CIC, CIC issued a letter to the Attorney Defendants acknowledging receipt of the potential claim, requesting the underlying file, and advising that it would investigate and monitor the potential claim under a general reservation of rights pending the outcome of the appeals that had been filed.  (PASOF, ¶ 24).   CIC was not aware of any specific facts giving rise to any coverage defenses in July of 2009.  (PASOF, ¶ 25).  The purpose of the July 2009 letter was simply to acknowledge receipt of the potential claim and advise that CIC reserved the right to raise coverage defenses if and when CIC became aware of a coverage defense.  (PASOF, ¶ 26).  CIC's acknowledgement letter included the following language:

> Nothing contained herein constitutes a waiver of any of our potential rights and defenses.  CIC reserves all of its rights under the policy and, in particular, reserves the right to assert coverage or policy defenses, if any, at such time when pertinent facts and circumstances or their significance are disclosed or otherwise become

121589570 2306

known to CIC.  Nothing in this letter or in any prior or subsequent investigation should be construed to extend the terms or conditions of coverage in your policy. Nothing in this letter or in any prior or subsequent investigation should be construed as a restriction of any exclusion of coverage.  CIC does not waive any such terms, conditions, or exclusions.

(PASOF, ¶ 27).  Although Mr. Nace testified in his deposition that he does not recall actually receiving this letter via email from CIC, he also could not rule out the possibility that he received it.  (PASOF, ¶ 28).

Mr. Nace does not recall anyone at CIC ever affirmatively advising him that CIC would provide unconditional coverage for any claim or lawsuit that might be asserted by Ms. Gilbert. (PASOF, ¶ 29).  Rather, Mr. Nace "assumed there would be coverage" because he "paid [his] money and [he] expected to be covered."  (PASOF, ¶ 30).

On approximately September 30, 2010, CIC consulted with attorneys John May and Deborah Whelihan (of the Jordan Coyne law firm) to "ascertain if, as the insured has represented, there is a means to amend the issue in this case short of a formal claim or litigation" by Ms. Gilbert.  (PASOF, ¶ 31).  CIC's claim note for this date documents that CIC "has not proceeded to formal assignment of counsel as of yet pending initial impressions of counsel on the matter (she [Whelihan] represents the insured on other cases and accordingly, is frequently in contact with the insured already."  (Id.)   The Nace Defendants had utilized Ms. Whelihan as counsel in other matters and considered Ms. Whelihan to be "their attorney."   (PASOF, ¶ 32). Ms. Whelihan advised CIC on September 30, 2010 that she "still awaits pertinent documents from the insured in order to make an assessment of the total exposure in the case.  She will be following up w/insured shortly."  (PASOF, ¶ 33).

On January 28, 2011, attorney H. Aubrey Ford, III wrote a letter to the Nace Defendants advising that he and his firm had been retained by Ms. Gilbert to represent her in the medical malpractice lawsuit.  (PASOF, ¶34).  Mr. Ford's letter did not assert a claim against the Nace

121589570 2306

Defendants.  (PASOF, ¶ 35).  Although the Nace Defendants had reported to CIC in May 2009 that a potential claim might be asserted against them by Ms. Gilbert, the Nace Defendants continued to represent Ms. Gilbert in the medical malpractice lawsuit until January 28, 2011.

The Nace Defendants' attorney, Ms. Whelihan, advised CIC on October 20, 2011 that she recently received file documents from the insured and would be sending them to CIC.  CIC received these documents on approximately November 21, 2011.  (PASOF, ¶¶ 36 - 38).

CIC reviewed these documents on approximately November 29, 2011 and for the first time discovered that the date of the alleged error giving rise to Ms. Gilbert's potential legal malpractice claim took place prior to CIC's issuance of its first policy on July 24, 2007.  (PASOF, ¶¶ 39, 41).  Prior to November 29, 2011, CIC had relied upon the Nace Defendants' representation to CIC when it reported Ms. Gilbert's potential claim that the "alleged error" took place in 2008.  (PASOF, ¶ 40).  In its investigation of Ms. Gilbert's potential claim, DID had operated under the assumption that the Nace Defendants had provided accurate information as to the fact that the date of the "alleged error" post-dated inception of the first CIC policy.  (PASOF, ¶ 42).

On January 13, 2012, CIC advised the Attorney Defendants in writing that there may be no coverage for Ms. Gilbert's potential claim on the grounds that the requirement for coverage in policy's insuring agreement that the insureds have no reasonable basis to believe that a professional duty had been breached or that a claim might be made prior to inception of the first policy by CIC had not been satisfied.  (PASOF, ¶ 43).  CIC advised that it would "continue to monitor and investigate this potential claim under a strict reservation of rights".  there may be sent a supplemental reservation of rights letter to the Attorney Defendants.  (Id.).   The Nace

121589570 2306

Defendants acknowledge that they received CIC's January 13, 2012 reservation of rights letter on or around that date.  (PASOF, ¶ 44).

**Ms. Gilbert's claim and lawsuit against the Attorney Defendants**.

On March 19, 2012, attorney Aubrey Ford filed the Gilbert Lawsuit on behalf of Sarah Gilbert.  Mr. Ford sent a letter to Barry Nace on that date enclosing a copy of the complaint that had been filed.  (PASOF, ¶ 52).  Ms. Gilbert did not assert an actual claim against the Attorney Defendants until she filed her legal malpractice lawsuit on March 19, 2012.  (PASOF, ¶ 53).

On April 12, 2012, CIC received notice of the Gilbert Lawsuit from the insurance broker for the Attorney Defendants.  (PASOF, ¶ 54).  On April 21, 2012, CIC issued reservation of rights letters to the Attorney Defendants advising that CIC would provide them with a defense to the Gilbert Lawsuit subject to a reservation of rights to deny coverage, to withdraw from the defense, and to bring a declaratory judgment action seeking a declaration of no coverage for the Gilbert Lawsuit based upon the "no prior knowledge" requirement in the insuring agreement not being satisfied. (PASOF, ¶ 55).  The Nace Defendants do not dispute that they received the April, 21, 2012 letter on or around that date.  (PASOF, ¶ 56).

After discussions between CIC, Mr. Nace, and Ms. Whelihan, the law firm of Jordan Coyne, and specifically attorney John Easton, was retained to defend the Nace Defendants in the Gilbert Lawsuit.  The Nace Defendants have never objected to the Jordan Coyne firm and Mr. Easton serving as their defense counsel.   (PASOF, ¶ 57).  The Nace Defendants have never requested that CIC appoint defense counsel other than the Jordan Coyne firm.  (PASOF, ¶ 58).

The Nace Defendants do not contend that the timing of CIC's reservation of rights letters has prejudiced them in any manner in their actual defense of Ms. Gilbert's legal malpractice lawsuit.  (PASOF, ¶ 77).

121589570 2306

## LEGAL ARGUMENT

I.     **VIRGINIA STATUTE § 38.2-2226 DOES NOT PRECLUDE CIC FROM ASSERTING ITS "NO PRIOR KNOWLEDGE" COVERAGE DEFENSE.**

The Nace Defendants erroneously rely on Virginia statute § 38.2-2226 to argue that CIC should be estopped from disclaiming coverage.  Section 38.2-2226 provides in pertinent part as follows:

> Whenever any insurer on a policy of liability insurance discovers a breach of the terms or conditions of the insurance contract by the insured, the insurer shall notify the claimant or the claimant's counsel of the breach. Notification shall be given within forty-five days after discovery by the insurer of the breach or of the claim, whichever is later. Whenever, on account of such breach, a nonwaiver of rights agreement is executed by the insurer and the insured, or a reservation of rights letter is sent by the insurer to the insured, notice of such action shall be given to the claimant or the claimant's counsel within forty-five days after that agreement is executed or the letter is sent, or after notice of the claim is received, whichever is later. Failure to give the notice within forty-five days will result in a waiver of the defense based on such breach to the extent of the claim by operation of law. (Emphasis added). [2] …

As a preliminary matter, it should be noted that § 38.2-2226 does not set forth any obligations as to when an insurer must issue a reservation of rights letter to its own insured.  The statute only addresses notice to a claimant.  Virginia case law is clear that an insured has no standing to rely upon § 38.2-2226 as a basis for obtaining coverage.  <u>Great American Ins. Co. v. Gross</u>, 2008 WL 376263, *10-11 (E.D. Va. 2008) (refusing to apply § 38.2-2226 in a coverage action between the insurer and its insured because the statute has "no effect upon the contractual relations between the insured and the insurer.")    Accordingly, the Nace Defendants have no standing to argue that § 38.2-2226 should apply to bar CIC from asserting its coverage defense.

---

[2] The Nace Defendants and Ms. Gilbert (inaccurately state that this statute requires notice to a claimant within 45 days of an insurer discovering a breach of the policy by the insured.  (Doc. 21, p. 3).  In fact, the statute states that the insurer must provide notice of the breach "within forty-five days after discovery by the insurer of the breach <u>or of the claim, whichever is later</u>."  (Emphasis added).  Ms. Gilbert did not assert a claim until March 19, 2012 and, if the statute applied, any obligation to provide Ms. Gilbert with a copy of CIC's reservation of rights would not have been triggered until March 19, 2012 at the earliest, and certainly not in May of 2009 when the Nace Defendants reported Ms. Gilbert's potential claim to CIC.

16

121589570 2306

However, because Ms. Gilbert is a party to this lawsuit and recently has joined in the Nace Defendants' Motion, CIC will address the merits of this argument.  As set forth below, the Virginia statute does not apply here as a matter of law and affords no relief to the Nace Defendants or to Ms. Gilbert.

   1.   **Virginia statute § 38.2-2226 is a procedural statute that cannot be enforced by this Court**.

Virginia statute § 38.2-2226 is a procedural statute that cannot and should not be enforced by a federal court in the District of Columbia acting pursuant to diversity jurisdiction. See Gaudreau v. American Promotional Events, Inc., 511 F.Supp.2d 152, 157 (D.D.C. 2007) (noting that the law of the forum state applies to all procedural matters); National Railroad Passenger Corp. v. ERC Frankona Ruckversicherungs-AG., 2005 WL 4708212 at *4 (D.D.C. 2005) (noting that forum courts apply their own procedural law); Olivarius v. Stanley J. Sarnoff Endowment for Cardiovascular Science, Inc., 58 A.2d 457, 463 (D.C. 2004) ("Under customary choice of law principles, the laws of the forum...apply to matters of procedure…); Federal Ins. Co. v. Nationwide Mut. Ins. Co., 448 F. Supp. 723, 725 (W.D. Va. 1978) ("[I]t is well established that while a particular forum applies the substantive law of a foreign state, it still applies its own procedural law").

The Virginia federal court in Federal Ins. Co. v. Nationwide Mut. Ins. Co., 448 F. Supp. 723, 725-26 (W.D. Va. 1978) specifically held that Virginia statute §38.1-389.1 (predecessor to §38.2-2226) is "clearly procedural and the court so holds."[3]  Accordingly, the Virginia court held that it would apply § 38.1-389.1 to a declaratory judgment action *filed in the Virginia court* after

---

[3] See Morrel v. Nationwide Mut. Fire Ins. Co., 188 F.3d 218, 226 (4th Cir. 1999) (discussing the differences between the two statutes as being that § 38.1-389.1 imposed a 20-day deadline whereas § 38.2-2226 imposes a 45-day deadline).

121589570 2306

an auto accident that occurred in Virginia even though the insurer argued that the substantive law of Tennessee should govern resolution of the coverage issues before the court because its insurance contract was entered into in Tennessee.   Based upon previous communications with counsel for the Nace Defendants, CIC anticipates that the Nace Defendants will attempt to argue that the reason the Virginia court applied § 38.1-389.1 is because the claimant was involved in an accident in Virginia and that, therefore, this statute must be applied in any coverage action in which the claimant is a Virginia resident.   However, an accurate reading of <u>Federal Ins. Co.</u>, reveals that this was not the basis for the court's holding.   Rather, <u>Federal Ins. Co.</u> simply confirms that a Virginia court is obligated to apply its own procedural rules in a lawsuit filed in Virginia.

Applying <u>Federal Ins. Co.</u>, the Illinois court in <u>MHM Services, Inc. v. Assurance Co. of America</u>, 975 N.E.2d 1139, 1163-1164, 363 Ill.Dec. 830, 854-855 (Ill. Ct. App. 2012) correctly refused to apply Virginia statute § 38.2-2226 to a coverage action pending in Illinois state court. There, the insured contended that its insurer was obligated to provide professional liability coverage for a claim based upon the insurer's failure to provide notice of its reservation of rights to the claimant under § 38.2–2226.   975 N.E.2d at 1163-64.   The insured urged application of Virginia law because its principal place of business was in Virginia and the policy was delivered to its Virginia location.   The Illinois court rejected the insured's argument outright holding that "[t]his law has no bearing here" because it "is a procedural law and another state's procedural laws are not controlling in this case."   <u>Id.</u> (citing to <u>Federal Ins. Co.</u>; <u>Morrel v. Nationwide Mutual Fire Insurance Co.</u>, 188 F.3d 218, 226 (4th Cir.1999); and <u>Marchlik v. Coronet Insurance Co.</u>, 40 Ill.2d 327, 239 N.E.2d 799, 801 (1968) (indicating that if a law is procedural, the law of the jurisdiction in which relief is sought will instead be governing)).   The court further reasoned

121589570 2306

that "[a]nother reason the Virginia statute is irrelevant is because it cannot be applied to the parties before us—it cannot be used by an insured in a dispute with its insurance carrier." Id.

Neither the Nace Defendants nor Ms. Gilbert have cited to any procedural statute or common law in the District of Columbia that would require CIC to provide notice of its reservation of rights to Ms. Gilbert.  The Nace Defendants and Ms. Gilbert cannot rely upon a Virginia procedural statute to argue in this forum that CIC is estopped from denying coverage in this matter.

### 2.     The substantive law of Virginia does not apply to determine coverage.

Even if this Court were to conclude somehow that Virginia statute §38.2-2226 sets forth a substantive law (contrary to the holding by the D.C. court in Federal Ins. Co.), this statute still is inapposite because it is the substantive law of the District of Columbia, and not the substantive law of Virginia, that applies to this coverage lawsuit.  The Nace Defendants incorrectly argue that Virginia law should apply based upon a "governmental interests" analysis.  (Motion, pp. 8-9).  However, this particular test applies only when the issue to be resolved is the merits of a tort claim – not whether insurance coverage exists for an insured against whom the tort is alleged.  Neither of the two cases cited by the Nace Defendants on pp. 8-9 of their Motion involved insurance coverage issues and neither supports application of Virginia law to the coverage issues before this Court.  See Washkoviak v. Student Loan Mktng. Ass'n, 900 A.2d 168, 180-82 (D.C. 2006) (applying "governmental interests" test but still determining that D.C. law applied to fraud claims brought by Wisconsin borrowers against lenders even though Wisconsin was where the borrowers were injured and Wisconsin had "powerful interest in protecting its residents," noting that the "place of injury is less significant in the case of fraudulent misrepresentation than in the case of personal injuries and injuries to tangible things"); District of Columbia v. Coleman, 667

19

121589570 2306

A.2d 811, 816 (D.C. 1995) (applying governmental interest test to determine which state's law applied to excessive force claim against police officer).

Simply put, although the place where a tort occurred and the "governmental interest" of that state may be significant factors in determining which state's law applies to resolution of certain tort claims, this is simply not the analysis applied by D.C. courts in determining whether or not insurance coverage exists for that tort.   Rather, "in cases of insurance, a court will look at the following factors to determine which law will apply: 1) the residence of the insured, 2) the place where the application was completed, 3) the places where the policy was negotiated, consummated, and delivered, and 4) the situs of the insured risk." Eli Lilly and Co. v. Home Ins. Co., 653 F.Supp. 1, 7 (D.D.C. 1984) (applying these factors as part of the "more substantial interest" test).

For example, in Potomac Elec. Power Co. v. California Union Ins. Co., 777 F.Supp. 968, 972-74 (D.D.C. 1991), the court applied the "more substantial interest" test to determine which state's law applied to resolve coverage in action filed by an insured against its insurer seeking coverage for payments the insured made to resolve environmental damage claims against it.  The insured, a large electric utility company primarily serving D.C. and Maryland, argued that D.C. law should apply because D.C. was its headquarters and principal place of business.  The insurer argued that Maryland law should apply because that is where the pollution damage occurred giving rise to the claims against the insured and because Maryland was the largest source of revenue of the three jurisdictions in which the insured operated.

The D.C. court held that the fact that the damage occurred in Maryland did not weigh in favor of Maryland law applying because it was equally possible that environmental damage could have occurred in the other states where the insured operated.  777 F. Supp. at 972.  The

121589570 2306

court also refused to apply the rule that the place where damage occurred should control the issue of insurance coverage.  Rather, the court held that "the most reasonable course" in an insurance coverage dispute was to choose the insured's headquarters "as the location with the most substantial interest in the controversy."  Id. at 973.   The court noted that this was particularly true where the headquarters is also the center of the insured's operations.  Id.  According to the court, "[a]nother reason for choosing the headquarters of the insured as the source of law is that this is the location which appears to be most likely contemplated by the parties":

> [C]ommon sense suggests that, knowing of the potential for claims in any number of states … the parties would consider the insured's principal headquarters as the one jurisdiction which ties all potential parties together.  [citation omitted]
>
> This view is consistent with that of the Restatement (Second) of Conflict of Laws which states that for a liability insurance contract the local law of state which the parties understood to be the principal location of the insured risk during the term of the policy [will be the source of law for the policy] unless with respect to the particulate issue, some other state has a more significant relationship.

Id.

More recently, the D.C. Court of Appeals applied similar factors to hold that the law of the state where the insured was headquartered applied to determine whether the insurer was obligated to indemnify the insured in a series of ongoing lawsuits against the insured, one of which was filed in D.C.[4]   See Adolph Coors Co. v. Truck Ins. Exch., 960 A.2d 617 (D.C. Ct. App. 2008).   There, the insured (Adolph Coors Brewing Companies) was headquartered in Colorado and its principal place of business also was in Colorado.  Adolph Coors was sued in several putative class action lawsuits filed in D.C., Colorado, North Carolina and Ohio for unfair business practices, unjust enrichment, and corrupt activity in marketing to minors in these states.

---

[4] The court considered (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; (5) the residence and place of business of the parties; and (6) the principal location of the insured risk.  Adolph Coors, 960 A.2d at 620.

121589570 2306

960 A.2d at 619-621.   The court held that Colorado had the most significant interest in the issue of coverage because the policy was negotiated there and the insured's principal place of business and headquarters was there.  Id. at 621.  The only apparent connection to D.C. was that one of the plaintiffs was a D.C. resident who filed his lawsuit against the insured in D.C.  This fact alone was insufficient to override the interests of Colorado under these circumstances.  Id.

Here, only potential interest Virginia has in this insurance coverage dispute is that the claimant is a resident of Virginia who filed her legal malpractice lawsuit against the Nace Defendants in Virginia.  The District of Columbia, on the other hand, is the insureds' principal place of business and where Barry Nace and Paulson & Nace are headquartered.  The CIC policy was delivered to the insureds in the District of Columbia.  D.C. also is the principal location of the insured risk.  Barry Nace is not even licensed to practice law in Virginia.  The principal location of the insured risk for a firm of lawyers primarily practicing in the District of Columbia is the District of Columbia.  The fact that the underlying act of malpractice giving rise to this particular coverage litigation may have been committed in Virginia does not alter the fact that the principal place of the risk insured under the CIC policy was the District of Columbia.  Accordingly, to the extent there is any conflict between the law of Virginia and the District of Columbia, District of Columbia law should apply.

Until recently, the Attorney Defendants adamantly maintained that D.C. law – and not Virginia law – should be applied to determine coverage.  For example, when CIC filed its original coverage action in Virginia to ensure personal jurisdiction over Ms. Gilbert (the claimant), the Attorney Defendants immediately moved to dismiss on the grounds that Virginia did not have personal jurisdiction over them.  One of the Attorney Defendants' primary arguments in support of their motion was that D.C. law would apply to determine coverage under

121589570 2306

the CIC policy.  The Attorney Defendants argued that the Virginia court had no jurisdiction over

the "Washington D.C. Policy" at issue in this coverage dispute because the policy was negotiated

and delivered in Washington, D.C. and "is subject to Washington, D.C. law interpretation."

(PSOF, ¶ 35).   According to the Attorney Defendants, "the issue in this case implicates

Washington, D.C.'s significant interest in determining and applying its own insurance contract

interpretation law."  (Id.)  The record is replete with the Attorney Defendants' arguments to the

Virginia court that D.C. law applies, including the following:

- "The only issue before the Court in the present action is the insurance contract, not the underlying tort claim.  There are simply no connections to Virginia as between CIC, Paulson & Nace, Barry Nace and interpretation or enforcement of the insurance contract."

- "[T]he two counts in the present case arise out of the interpretation and enforcement of a Washington, D.C. insurance policy.  The only parties to the contract are CIC and Paulson & Nace.  CIC is an Illinois corporation and Paulson & Nace is a Washington, D.C. limited liability company.  Barry Nace resides and works in Washington, D.C.  Further, the negotiation for and execution of the Policy occurred in Washington, D.C.  Consequently, there is no basis for venue in the Alexandria Division of the Eastern District under § 1391(b)(2) because none of the acts or omissions surrounding the Policy occurred there."

- "[T]he issue in this case implicates Washington, D.C.'s significant interest in determining and applying its own insurance contract interpretation law."

- "[T]he Court does not have *in personam* jurisdiction arising out of a contract entered into in the District of Columbia, when the Defendants, Paulson & Nace and Barry Nace, are neither citizens nor residents of Virginia, do not have substantial contacts with Virginia, and are not subject to the Court's jurisdiction in Virginia."

- "This case arises out of an insurance policy or contract, executed by an Illinois insurance company and a Washington, D.C. law firm."

- "Neither Paulson & Nace nor Barry J. Nace is registered or licensed to do business in Virginia."

- "[I]t is inapposite to this case whether or not the Richmond City Circuit Court has personal jurisdiction over the Nace Defendants in the legal malpractice case due to their representation of Ms. Gilbert in the underlying medical malpractice case

121589570 2306

because the present case does not arise out of any of the Nace Defendants' contacts with Virginia."

☐   "[N]either Paulson & Nace, PLLC, nor Barry J. Nace, had any regular court of conduct or business transaction in the Commonwealth of Virginia."

☐   "Despite the fact that the Gilbert Lawsuit is pending in Richmond City Circuit Court, CIC brought this declaratory judgment action related to its obligations under the Washington D.C. Policy towards the Attorney Defendants in the Gilbert Lawsuit in this Court, where none of the parties reside, nor any of the events occurred."

(PSOF, ¶ 35).  Ms. Gilbert did not oppose the Nace Defendants' Motion to Dismiss.  Having succeeded in avoiding having to litigate coverage in a Virginia court in large part by arguing that D.C. law should apply to this coverage action, neither the Nace Defendants nor Ms. Gilbert should be allowed to take the exact opposite position in this Court and argue that Virginia law applies.  On the contrary, consistent with the choice of law factors utilized by D.C. courts, it is the District of Columbia that has the most significant interest in determining whether coverage exists under a policy where the principal location of the insured risk was the District of Columbia.

### 3.   The Virginia statute applies only to coverage defenses alleging that the insured breached the policy.

By its express terms, Virginia statute § 38.2-2226 requires notice to a claimant only when the insurer "discovers a breach of the terms or conditions of the insurance contract by the insured."  CIC is not claiming that its insured breached a term or condition of the insurance contract, rather, that a requirement to trigger coverage in the insuring agreement has not been met.  The term "breach" refers to a *failure to perform any promise* which forms the whole or part of a contract.  See Medhin v. Hailu, 26 A.2d 307, 310 (D.C. Ct. App. 2011) ("A contract is breached if a party fails to perform when performance is due"); Bembery v. District of Columbia, 758 A.2d 518 (D.C. Ct. App. 2000).  Even if the "no prior knowledge" requirement for coverage

24

346

at issue here can be characterized as a "condition precedent" for coverage to exist, this does not alter the overarching fact that it is not a condition that is capable of being performed or breached. See Restatement (Second) of Contracts, § 225 (1981) ("Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur"); 8 Catherine M.A. McCauliff, Corbin on Contracts, § 30.13 (Rev. ed. 1999) ("If [a] condition consists of a personal action, it may properly be said not to be performed; but non-performance is not a breach of contract unless the person promised to render the performance – to perform the condition."); Williston on Contracts, 63:6 (4th ed.) ("As a general principle, unless the party whose performance is subject to the condition has undertaken to bring the conditioning event about, nonperformance of a condition precedent is not a breach of contract, since the purpose of the condition is merely to qualify the duty to perform immediately.  However, failure to perform a condition precedent will be deemed as a breach of contract, where the performance of the condition is within the control of the party to the agreement, for that party then promises or undertakes that the condition shall occur …).

The Nace Defendants incorrectly blur the distinction between policy conditions that are capable of being breached and those that are not.  Courts, however, routinely recognize and apply this distinction.[5]  Sherwood Brands, Inc. v. Great American Ins. Co., 418 Md. 300, 13 A.3d 1268 (Md. Ct. App. 2011), directly supports CIC's position.  There, the issue was whether the insurer (Great American) was required to prove that it had been prejudiced in order to deny

---

[5] The Nace Defendants repeatedly mischaracterize the allegations in CIC's Complaint as a "breach of contract" and "alleg[ing] the breach of a notice provision – a condition precedent – that Mr. Nace had a duty to report existing or reasonably foreseeable claims both on the renewal application and during the policy period."  (Motion, pp. 11-12).  On the contrary, nowhere does CIC's Complaint allege breach of a "duty to report" or breach of any other condition or provision.  CIC does not seek to avoid coverage on the grounds that the Nace Defendants failed to report Ms. Gilbert' claim to CIC in a timely manner.  To the contrary, CIC seeks a declaration that there is no coverage because prior to inception of the policy, an insured had a reasonable basis to believe that a professional duty had been breached or that a claim would be made against them.  The insured's prior knowledge is not a duty that was to be performed by the insured, rather, it is a requirement in the insuring agreement that must be met for coverage to exist.

121589570 2306

coverage to its insured under a claims-made directors and officers liability policy. The insuring agreement stated that the insurer would pay for claims made against the insured during the policy period. 13 A.3d at 1270-71. The policy also included a provision stating that as a "condition precedent to their rights under this Policy" the insured was required to give notice of a claim made during the policy period "as soon as practicable" after the claim was asserted. Id. at 1271. The claim was made against the insured during the policy period. However, Great American denied coverage on the grounds that the insured failed to give timely notice of this claim to Great American.

The insured argued that Great American was required to prove actual prejudice in order to deny coverage pursuant to Section 19-110 of the Maryland Insurance Code. This statute provides that an insurer may disclaim coverage on the ground that the insured has "*breached the policy* by failing to cooperate with the insurer or by not giving the insurer required notice only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in actual prejudice to the insurer." 13 A.3d at 1275 (Emphasis added). Great American argued that because the notice provision was labeled a "condition precedent", this provision was not something that could be breached and the statute did not apply. The court held that the label applied was not controlling and that the notice requirement was a covenant or promise that could be breached due to inaction or action by the insured and, therefore, § 19-110 applied and Great American was required to establish prejudice.

In so holding, Sherwood Brands distinguished T.H.E. Ins. Co. v. P.T.P., Inc., 331 Md. 406, 628 A.2d 223 (1993). In T.H.E, the insurer denied coverage based upon the fact that the claim against the insured was not made during the policy period, as was required to trigger coverage under the policy's insuring agreement. The insuring agreement stated that "[t]his

26

121589570 2306

insurance applies … if a claim for damages…is first made against any insured during the policy period." T.H.E., 628 A.2d at 225.  The court in Sherwood Brands explained that the coverage defense in T.H.E. did not involve a "breach" by the insured.  Instead, in T.H.E., "a claim being 'made' within the policy period was the functional equivalent of a condition precedent to coverage; if a claim was not made [against the insured] during the policy period, the notice provisions do not come into play, as the insurer was under no obligation to provide coverage for the claim."  Sherwood, 13 A.3d at 1287.  The court in T.H.E. also explained the distinction between a provision that can be breached one that cannot be breached as follows:

> Here, T.H.E. does not deny coverage because of an alleged material failure by [insured] to perform a covenant not to give notice, or to satisfy a policy provision that might be phrased as a condition that must be satisfied to prevent the loss of coverage that otherwise would apply.  In this case the extended reporting period under the original policy had expired before [insured] reported the Buckley claim to T.H.E.  The original policy had come to an end with respect to newly reported claims.  [Section 19-110] could not more revive the original policy to cover the Buckley claim than [§19-110] could reopen an occurrence policy to embrace a claim based on an accident that happened after the end of the policy period.

T.H.E., 628 A.2d at 228.  The fact that the claim against the insured was not made during the policy period "was not a 'breach' of the policy, but rather, the non-occurrence of a condition precedent, i.e., that a claim be 'made' during the policy period."  Id.  Accordingly, the "notice-prejudice" statute did not apply and the insurer was not required to establish that it had been prejudiced in order to deny coverage.  Id.  See also McDowell Building, LLC v. Zurich American Ins. Co., 2013 WL 5234250, *5 (D. Md. 2013) (the purpose of the Maryland statute is to prevent forfeiture of coverage on "procedural grounds" such as a promise to provide timely notice, as opposed to a denial of coverage based upon the requirements for coverage under policy); Minnesota Lawyers Mut. Ins. Co. v. Baylor & Jackson, PLLC, 852 F.Supp.2d 647, 662 (D. Md. 2012) (holding that requirement in claims-made policy that in order for coverage to exist

121589570 2306

a claim must be made and reported to the insurer during the policy period was a condition precedent to coverage and not a covenant or promise that could be breached).[6]

Courts in other jurisdictions also have consistently recognized the distinction between a promise or condition included in a contract that is capable of being breached versus a requirement or condition that must be met in order to trigger coverage in the first instance but is not capable of being breached. See, e.g., McArthur v. State Farm Mut. Inc. Co., 274 P.3d 981, 989 (Utah 2012) (provision in underinsured motorist policy requiring that the limits of the tortfeasor's insurance must be exhausted before coverage was triggered was a condition precedent to coverage rather than a covenant capable of being breached); McVicker v. Travelers Ins. Co., 785 A.2d 550, 554 (requirement in uninsured motorist policy that the insured must prove that the third party tortfeasor is in fact an owner/operator of an insured hit and run vehicle is a condition precedent to recovery of UIM benefits not capable of being breached); Hart Construction Co. v. American Family Mut. Ins. Co., 514 N.W.2d 384, 389 (N.D. 1994) (describing policy's insuring agreement requirement that there must be a "suit" against the insured seeking "damages" resulting from an "occurrence" as conditions precedent to the insurer's duty to defend); Wheeling Pittsburgh Corp. v. American Ins. Co., 2003 WL 23652106, *13 (W. Va. Cir. Ct. 2003) (describing requirement in insuring agreement that property damage take place during policy period as a condition precedent that must be satisfied in order to trigger coverage).

Here, CIC's defense to coverage is that the "no prior knowledge" requirement (or condition precedent for coverage) set forth in the policy's insuring agreement has not been met.[7]

---

[6] Maryland law is the basis for the District of Columbia's common law and therefore is "an especially persuasive authority when the District's common law is silent." Fireman's Fund Ins. Co. v. CTIA, 480 F. Supp. 2d 7, 11 (D.D.C. 2007) (citing Napolean v. Heard, 455 A.2d 901, 903 (D.C. 1983)); TMG II v. United States, 1 F.3d 36, 40-41 (D.C. Cir. 1993).

28

121589570 2306

Although this "no prior knowledge" requirement could be characterized as a condition precedent to the trigger of coverage, it is not a condition that is capable of being breached by the action or inaction of an insured.  Examples of conditions that can be breached are conditions requiring an insured *to provide* prompt notice of a claim, *to cooperate* in an insurer's investigation of a claim, and *to appear* for an examination under oath or deposition.  In contrast, whether the "no prior knowledge" requirement is satisfied is based upon the facts that existed at the time the policy was issued, i.e., would an attorney having knowledge of the facts concerning the filing of two lawsuits and subsequent dismissals have a reasonable basis to believe that an error had been committed or that a claim might be made?  There is nothing an insured could perform or fail to perform in order to satisfy this requirement.  The facts known at the time the policy incepted would either cause a reasonable attorney to know that an error had been committed or they would not.

Virginia courts have consistently held that § 38.2-2226 does not apply when, as here, it is the insurer's position that a claim does not fall within the terms and provisions of coverage as set forth in the policy.  For example, <u>Cheatham v. NGM Ins. Co.</u>, 2013 WL 509049 (E.D. Va. Feb. 11, 2013) held that the Virginia statute had "no application" to a coverage dispute involving whether or not the underlying claims alleged an "occurrence" under the policy's insuring

---

[7] The Nace Defendants mistakenly argue that because CIC's interrogatory answers refer to the "no prior knowledge" requirement as a "condition precedent" for coverage this somehow means that CIC has agreed that this coverage defense is subject to the Virginia statute.  This argument lacks merit.  First, CIC's interrogatory answers expressly state that the "no prior knowledge" condition precedent is not something that can be breached by the insured, but rather, a requirement for coverage that the insured has the burden of proving has been met.  (DSOF, Exhibit 1, pp. 11- 12).  Second, as the legal authority cited by CIC establishes, it is axiomatic that there are "conditions precedent" that are not capable of being breached by the action or inaction of the insured, like the "no prior knowledge" requirement and, therefore, simply do not implicate the Virginia statute.  Finally, interrogatory answers setting forth legal conclusions like this are not binding upon a party.  <u>See</u> <u>Gentry v. Toyota Motor Corp.</u>, 252 Va. 30, 471 S.E.2d 485 (1996).  CIC's 30(b)(6) representative has testified that CIC does not consider the "no prior knowledge" requirement for coverage a "condition precedent" per se, but rather, a requirement for coverage.  (PASOF, ¶¶ 48- 50).  Regardless of the label applied to this provision, CIC has consistently maintained in its interrogatory answers and 30(b)(6) testimony that the "no prior knowledge" requirement for coverage something that can be breached by the insured.  (<u>Id.</u>; DSOF, Exhibit 1).

121589570 2306

agreement.  Id. at *3.  The court reasoned that the insurer was not claiming that the insured breached the terms or conditions of the policy.  Rather, the pivotal issue was "whether the language of the policy covers the claims."  Id. at *5.  See also Berry v. State Farm Mut. Auto. Ins. Co., 340 F.Supp. 228, 231 (D. Va. 1972) ("It should be sufficient to state that this statute has no application to a noncoverage situation. There was no *breach* of the insurance contract by the insured"); Gordon v. Liberty Mut. Ins. Co., 675 F.Supp. 321, 323 (E.D. Va. 1987) (in analyzing Virginia statute § 38.2-2226, the court noted that the plaintiff failed "to distinguish appropriately between denial of coverage based on an alleged insured's breach and denial based on simple non-coverage under the terms of the policy.*** [T]he estoppel principle cannot operate to prevent Liberty Mutual from showing that the policy, by its terms, simply does not cover Mr. Rossi under the circumstances of this case.").

The Nace Defendants do not cite a single case in Virginia -- nor is there any -- in which a court applied § 38.2-2226 to a coverage defense based upon the "no prior knowledge" requirement for coverage.  The only cases in which Virginia courts have applied this statute are those in which the insurer argued that the insured had breached the policy by, for example, failing to cooperate or failing to provide timely notice of a claim.  See Allstate Ins. Co. v. Budget Rent-A-Car Systems, Inc., 65 Va. Cir. 331 (Va. Cir. Ct. 2004) (insurer sought to deny coverage based on insured's alleged breach of duty to cooperate imposed by policy); State Auto Prop. & Cas. Ins. Co. v. Gorsuch, 323 F. Supp. 2d 746, 755-56 (W.D. Va. 2004) (insurer sought to deny coverage based on insured's alleged breach of duty to promptly notify insurer of claims); Morrel v. Nationwide Mut. Fire Ins. Co., 188 F.3d 218, 221, 225-28 (4th Cir. 1999) (insurer sought to deny coverage based on insured's alleged breach of duties to cooperate and provide information and documents to insurer); Angstadt v. Atlantic Mut. Ins. Co., 249 Va. 444, 448 n.l (1995)

30

121589570 2306

(breach of duty to cooperate); Vermont Mut. Ins. Co. v. Everette, 875 F. Supp. 1181, 1187-90 (E.D. Va. 1995) (breach of duty to promptly notify insurer of claim); Aetna Cas. & Sur. Co. v. Compass & Anchor Club, Inc., 33 Va. Cir. 235, 244 (Va. Cir. Ct. 1994) (same); Gordon v. Liberty Mut. Ins. Co., 675 F. Supp. 321, 322-23 (E.D.Va. 1987) (alleged breach of policy covering leased vehicle by permitting use by non-listed driver); Liberty Mut. Ins. Co. v. Safeco Ins. Co. of America, 223 Va. 317, 324-26 (1982) (alleged breach of duty to provide prompt notice of claims); Maxey v. Doe, 217 Va. 22, 24-25 (1976) (alleged breach of duty to file accident report).

The Nace Defendants' citation to this authority misses the mark. Unlike the policy conditions at issue in these cases, the "no prior knowledge" requirement for coverage in the CIC policy's insuring agreement is simply not a promise or condition that can be breached by the performance or non-performance of the insured. Whether or not this requirement has been met depends upon the circumstances and facts that existed at the time the CIC policy was issued, specifically, did an insured have a reasonable basis to believe that an insured had breached a professional duty or to reasonably foresee that a claim might result in a claim against it. Resolution of this issue depends upon the facts and information known to the insureds at the time the policy was issued. As set forth in CIC's Motion for Summary Judgment, the undisputed facts warrant summary judgment in CIC's favor that the "no prior knowledge" requirement for coverage has not been met.

### 4. The Virginia statute does not apply because Ms. Gilbert has not sustained any prejudice.

The purpose of the Virginia statute is to prevent a claimant from wasting finances and time pursuing a judgment that later proves to be uncollectible. See Federal Ins. Co. v. Nationwide Mut. Ins. Co., 448 F.Supp. 723 (W.D. Va. 1978). Consistent with this purpose, The

121589570 2306

Virginia Supreme Court has held that waiver pursuant to § 38.2-2226 only occurs "where the rights of a claimant who is a stranger to the insurance contract may be prejudiced." Maxey v. Doe, 217 Va. 22, 225 S.E.2d 359, 361 (Va.1976) (interpreting § 38.2-2226 's predecessor statute 38.1-3891 as providing for waiver of coverage defenses where the rights of the claimant are prejudiced); accord Vermont Mut. Ins. Co. v. Everette, 875 F.Supp. 1181 (E.D. Va. 1995) ("[F]ailure to timely notify the injured third party results in a waiver of the breach defense, where such failure has prejudiced the claimant's rights."); Great American Ins. Co. v. Gross, 2008 WL 376263 *11 (E.D. Va. 2008) (citing Maxey v. Doe with approval and for the holding that "waiver pursuant to § 38.2-2226 only occurs 'where the rights of a claimant who is a stranger to the insurance contract may be prejudiced'"); Allstate Ins. Co. v. Kinard, 45 Va. Cir. 273, 1998 WL 972156 *2 (Va. Cir. Ct. 1998) (citing the prejudice requirement set forth in Maxey v. Doe with approval).

Neither the Nace Defendants nor Ms. Gilbert have provided any evidence that Ms. Gilbert sustained any prejudice as a result of not having received notice of CIC's coverage defense until CIC served its complaint for declaratory judgment.  For example, although Ms. Gilbert's attorney (Aubrey Ford III) submitted an affidavit (Doc. 21-2) in support of Ms. Gilbert's joinder in the Nace Defendants' Motion, nowhere does Mr. Ford allege that Ms. Gilbert has been prejudiced by the fact that CIC did not provide copies of its reservation of rights letters to Ms. Gilbert within 45 days after these letters were sent to the Nace Defendants.[8]

---

[8] The Nace Defendants' counsel makes the entirely unsupported and speculative statement on page 20 of their Motion to the effect that "all parties except for CIC relied upon CIC's investigation and defense of the Gilbert Lawsuit and all of the parties changed their position to their detriment as a result."  This statement is not supported by any citation to the record, nor is there any.  Ms. Gilbert has submitted no evidence that she has been prejudiced. Unsupported statements made by the Nace Defendants' counsel are not evidence.

121589570 2306

In fact, there has been no prejudice.  Ms. Gilbert concedes she and her counsel were aware of CIC's coverage defenses no later than September of 2012, when CIC filed and served its first complaint for declaratory judgment.  Despite having full knowledge of CIC's coverage position, Ms. Gilbert chose to litigate her underlying legal malpractice lawsuit against the Attorney Defendants for a full year and proceeded to trial in late October of 2013.  The purpose of the Virginia statute is to provide the claimant with information as to potential coverage defenses so that the claimant can determine if it is worth the time and resources to proceed with her claims against the insured.  Ms. Gilbert had this information more than one year before her legal malpractice lawsuit proceeded to trial.  Ms. Gilbert could have, for example, requested a stay in the underlying lawsuit pending resolution of the coverage action.  Ms. Gilbert did not do so.

As a matter of law, Ms. Gilbert has no reasonable basis to argue that she has been prejudiced by not receiving copies of CIC's reservation of rights letters.  Accordingly, Virginia statute § 38.2-2226 does not bar CIC from asserting there is no coverage for Ms. Gilbert's lawsuit.

## II.    THE NACE DEFENDANTS' COMMON LAW CLAIMS OF WAIVER AND ESTOPPEL FAIL AS A MATTER OF LAW.

### A.    There is no evidence that CIC waived its coverage defense.

In order to establish that CIC has waived its right to assert the "no prior knowledge" coverage defense, the Nace Defendants must establish an "*intentional* relinquishment or abandonment of a *known* right."  Zuckerman Spaeder, LLP v. Auffenberg, 646 F.3d 919, 922 (C.A.D.C. 2011).  Although CIC maintains that D.C. law applies here, the law in Virginia is essentially the same.  See Employers Commercial Union Ins. co. v. Great American Ins. Co., 214 Va. 410, 413, 200 S.E.2d 560, 562 (1973) (the "essential elements" of waiver are "knowledge of

121589570 2306

the facts basic to the exercise of the right and the intent to relinquish that right"). Applying D.C. law or Virginia law, the undisputed facts establish as a matter of law that CIC has not waived its right to assert the "no prior knowledge" coverage defense.

The Nace Defendants do not cite to any evidence that CIC ever affirmatively represented to them that CIC would provide unconditional coverage for Ms. Gilbert's claim or lawsuit. There also is no evidence that prior to late November of 2011, CIC had *actual knowledge* that the professional errors allegedly committed by the Nace Defendants took place in 2006 – approximately one year before the first policy was issued on July 24, 2007, as opposed to 2008 as Mr. Nace had represented to CIC when he reported Ms. Gilbert's potential claim.[9] It is undisputed that CIC issued reservation of rights letters to the Attorney Defendants on January 13, 2012 specifically reserving the right to deny coverage on the grounds that the "no prior knowledge" requirement for coverage had not been satisfied.

The Nace Defendants do not dispute that if CIC first became aware of facts supporting the "no prior knowledge" defense in late November of 2011, the reservation of rights letters issued by CIC on January 13, 2012 were timely. Instead, the Nace Defendants argue that CIC has waived its right to assert this defense because it "should have known" before that time that the alleged errors took place before the policy incepted and not in 2008. As support for this argument, the Nace Defendants argue only that Mr. Nace sent CIC copies of the appellate briefs and certain pleadings in March of 2010 (one year after the potential claim was reported) and that, if these pleadings had been reviewed in detail, CIC could have discovered that the two defective complaints were improperly filed by the Nace Defendants in 2006 and not 2008 as the Nace

---

[9] If the errors took place in 2008 as Mr. Nace represented to CIC, the "no prior knowledge" requirement for coverage would not be implicated. Pursuant to the insuring agreement, the "no prior knowledge" requirement only applies if the alleged professional errors took place prior to inception of CIC's first policy, which was July 24, 2007.

121589570 2306

Defendants represented in their Supplemental Claim/Incident Information" form.  (Motion, pp. 19-20).  Of course, the fact that these documents may have been in CIC's file in March of 2010 does not mean that the documents were actually reviewed for purposes of determining when the alleged errors were committed.

The only evidence as to when these documents were reviewed and the true date of the alleged errors was discovered by CIC is the 30(b)(6) testimony of Frank Lindner (CIC Claim Director) and CIC's own claim notes.  This evidence confirms that CIC had been waiting for additional documents from the insureds and their attorney, Deborah Wehlihan, including transcripts from the hearings on the motions to dismiss that took place in June of 2007.  These documents were not received and reviewed by CIC until approximately November 29, 2011.  The claim note entered by CIC claims supervisor Amy Schwemer on that date states that "We have recently received insureds file materials.  It appears there may be an issue as to when they knew of the error with the pleading.  We have forwarded the materials to coverage counsel." (PASOF, ¶ 39).  Mr. Lindner's testimony also confirms that CIC did not become aware of the fact that the alleged errors committed by the Nace Defendants pre-dated the inception of the CIC policy until November of 2011.

That CIC did not discover sooner than it did that the alleged errors committed by the Nace Defendants took place in 2006, as opposed to 2008, is entirely reasonable given that Mr. Nace had affirmatively (mis)represented to CIC when he reported the potential claim in 2009 that the date of the "alleged error" was 2008.  (PASOF, ¶¶ 38-42)).  As Mr. Lindner explained in his 30(b)(6) testimony, CIC relied upon this representation and had no reason to look for evidence to the contrary.  (Id.).

In addition, Ms. Gilbert did not assert an actual claim until March of 2012 when she filed her legal malpractice lawsuit against the Nace Defendants.   Until that time, there was nothing to "defend" under the CIC policy and no obligation to issue any reservation of rights, particularly when CIC had no knowledge of any coverage defenses.   The insuring agreement in the CIC policy specifically states that "The Company shall have the right and duty to defend <u>any suit</u> against the Insured seeking Damages to which this Insurance applies …." (PASOF, ¶ 51).   The CIC policy does not obligate CIC to defend claims or potential claims, but only "suits." Accordingly, until Ms. Gilbert filed her lawsuit against the Attorney Defendants in March of 2012, CIC could not have been obligated to send any reservation of rights.  <u>See</u>, <u>e.g.</u>, <u>Coregis Ins. Co. v. Lewis, Johs, Avallone, Aviles and Kaufman, LLP</u>, 2006 WL 2135782, *17 (E.D.N.Y. 2006) (rejecting insured's argument that insurer waived its right to deny coverage based upon the "prior knowledge" exclusion when it did not issue a reservation of rights after being notified of a potential claim in December of 1998 and waited until November 2000 when an actual claim was finally asserted against the insured); <u>St. Paul Fire and Marine Ins. Co. v. Children's Hosp. Nat. Medical Center</u>, 670 F. Supp. 393, 402 (D.D.C. 1987) (confirming that "[t]he duty to disclaim coverage or to reserve rights is a part of the duty to defend").

Furthermore, it is well-established that "waiver and/or estoppel cannot be used to extend the coverage or the scope of the policy." <u>Walker v. American Ice Co.</u>, 254 F.Supp. 736, 741 (D.D.C. 1966).   The only possible exception to this rule is when a liability insurer, "with knowledge of a ground of forfeiture or noncoverage under the policy, assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from setting up such ground of forfeiture or noncoverage." <u>Id.</u> (citing 29A Am. Jur., Insurance § 1465 (1960)).

36

121589570 2306

Although CIC did monitor and investigate Ms. Gilbert's potential claim after it was reported in May of 2009, there was no actual claim let alone a lawsuit to "defend" under the policy until Ms. Gilbert filed her lawsuit in March of 2012.  There is no dispute that CIC timely issued another reservation of rights after CIC received notice of the lawsuit.  It is also undisputed that when CIC did obtain actual knowledge of facts supporting the "no prior knowledge" coverage defense in late November of 2011, CIC promptly issued a reservation of rights letter identifying this defense on January 13, 2012 even though Ms. Gilbert had not actually asserted a claim at that time and there was nothing to "defend" under the policy.

Based upon the undisputed facts and pertinent legal authority, the Nace Defendants' argument that CIC has waived its coverage defenses fails as a matter of law.  The Nace Defendants are not entitled to evade the requirements for establishing coverage under the CIC policy by claiming waiver.

### B.   CIC is not estopped from denying coverage.

"Because the doctrine of equitable estoppel prevents the showing of the truth, it is applied rarely and only in extraordinary circumstances." Anderson v. Cox, 977 F. Supp. 413, 415-16 (W.D. Va. 1997).   Nonetheless, the Nace Defendants erroneously argue that they have established all of the elements necessary to support a claim for equitable estoppel under Virginia law, namely, (1) a representation; (2) reliance; (3) a change of position; and (4) detriment. (Motion, p. 20, citing Waynesboro Village, LLC v. BMC Properties, 255 Va. 75, 79, 496 S.E.2d 64, 67 (1998)).  Under Virginia law, a party who relies upon estoppel "must prove each element by clear, precise, and unequivocal evidence." Princess Anne Hills Civic League, Inc. v. Susan Constant Real Estate Trust, 243 Va. 53, 59, 413 S.E.2d 599, 603 (1992).  Similarly, in order to establish estoppel under D.C. law, the Nace Defendants must prove that CIC has assumed complete control over the "defense" *of a lawsuit* against the insured with no reservation of rights

121589570 2306

and with *actual knowledge* of a coverage defense. D.C. law also requires that the insured establish prejudice. Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP, 793 F.Supp.2d 399, 411-13 (D.D.C. 2011) ("Actual prejudice may be shown if the insurer's participation in the defense harmed or hindered the insured by undermining their ability to defend themselves"). See also In re Himmelfarb's Estate, 345 A.2d 477, 483 (D.C. 1975) ("An essential element of estoppel is prejudice caused by detrimental reliance.").

The Nace Defendants have produced no evidence of any affirmative representation by CIC that CIC would provide unconditional coverage for Ms. Gilbert's lawsuit. Rather, the Nace Defendants hinge their estoppel argument on CIC's alleged inaction, specifically, that even though CIC was notified of Ms. Gilbert's potential claim in May of 2009, CIC did not issue a reservation of rights identifying the "no prior knowledge" defense to coverage until January 12, 2012. However, under Virginia law, mere silence is not a misrepresentation absent a duty to take action. Whiting v. Whiting, 32 Va. App. 192, 526 S.E.2d 806 (2000), rev'd on other grounds, 262 Va. 3 (2001). The Nace Defendants have cited to no legal authority in Virginia or D.C. holding that an insurer has a duty to issue a reservation of rights upon receiving notice of a potential claim or investigating a potential claim (as opposed to a lawsuit) particularly when the insurer does not have actual knowledge of any coverage defenses. Not until CIC became aware in November of 2011 that Mr. Nace had provided inaccurate information as to when the professional errors occurred did CIC have any duty to issue a reservation of rights, which CIC promptly did on January 13, 2012. Then, when Ms. Gilbert filed her lawsuit in March of 2012, CIC promptly issued another reservation of rights on April 21, 2012 re-stating the "no prior knowledge" coverage defense and advising that CIC would defend the lawsuit under a

121589570 2306

reservation of rights.   There is no evidence of any misrepresentation by CIC and the Nace Defendants' estoppel claim fails as a matter of law.

Even if CIC's actions somehow could be construed as a misrepresentation, which they cannot, there still is no estoppel because as a matter of law the Nace Defendants have sustained no resulting prejudice.   The Nace Defendants speculate that if they had known of CIC's reservation of rights before Ms. Gilbert filed her lawsuit perhaps they would have filed their own declaratory lawsuit.   The Nace Defendants further speculate that maybe they could have convinced Ms. Gilbert not to file her lawsuit against them or they could have hired their own counsel and somehow "resolved" the lawsuit or claim short of having to undergo a trial. (PASOF, ¶¶ 69-76).   These claims of prejudice are not only speculative but they ring hollow given that even after CIC sent its reservation of rights letters in January of 2012, the Nace Defendants did not hire their own coverage counsel or file a declaratory judgment action.   In fact, they did not retain coverage counsel until after CIC filed its declaratory judgment action in September 2012.   Then, the Nace Defendants moved to dismiss that lawsuit and, when it was dismissed, they did not file their own coverage lawsuit.   It was CIC who filed this lawsuit.

More saliently, however, the Nace Defendants do not contend that their defense of Ms. Gilbert's lawsuit was detrimentally impacted in any manner by the timing of CIC's reservation of rights, nor do they have any complaints about the quality of representation provided by the defense counsel (the Jordan Coyne law firm) appointed to defend them in Ms. Gilbert's lawsuit. This is the type of prejudice considered by courts in determining whether estoppel should apply. See Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP, 793 F.Supp.2d 399 (D.D.C. 2011), infra.   In fact, in 2009, Mr. Nace discussed Ms. Gilbert's potential claim with one of the

121589570 2306

attorneys at the Jordan Coyne law firm, Ms. Deborah Whelihan, even before he reported the potential claim to CIC.  Mr. Nace described Ms. Whelihan in his Affidavit as "his attorney."

There also is no evidence here that CIC "assumed complete control" over the insured's defense without a reservation of rights.   There was no lawsuit or even a claim to defend until Ms. Gilbert filed her lawsuit in March of 2012.  CIC promptly issued a reservation of rights in April of 2012 and retained the Jordan Coyne firm to defend the Nace Defendants with the express permission of the Nace Defendants.   However, even if retaining the Jordan Coyne firm to assist CIC in investigating Ms. Gilbert's potential claim somehow could be construed as "assuming complete control over the insured's defense," there still is no estoppel here because the undisputed facts establish that the Nace Defendants sustained no resulting prejudice.

The D.C. court in Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP, 793 F.Supp.2d 399 (D.D.C. 2011) rejected outright a prejudice argument made by the insureds that is nearly identical to the claim being made by the Nace Defendants.  In rejecting the insureds' argument that the insurer was prejudiced in the defense of the malpractice lawsuit against them by the insurer's conduct in undertaking their defense in the malpractice lawsuit against them and delaying in issuing a reservation of rights, the court held:

> The fourth point asserts prejudice [in their defense of the Malpractice Action against them], but defendants fail to demonstrate any evidence of actual prejudice in the handling of their case beyond vague and conclusory allegations of such prejudice.  Defendants allege that they incurred legal fees and costs, and were deprived of their preferred counsel.   However, they do not allege or point to any evidence that the representation provided by [their insurer] hindered the defense of their claim or that the counsel was inadequate or ineffective.  (Emphasis added).

793 F.Supp.2d at 413.  The court also noted that the insureds never objected to the counsel selected by their insurer.  Id.   Under these circumstances, the court held that the insureds "cannot, as a matter of law, invoke the defense of estoppel."  Id.  (citing to Athridge v. Aetna,

121589570 2306

510 F.Supp.2d 1, 8 (D.D.C. 2007) ("Plaintiffs' contentions of ways in which prejudice *could have been created* cannot overcome their inability to show any prejudice *was created* …") (emphasis in original).  Accord Diamond Service Company, Inc. v. Utica Mutual Ins. Co., 476 A.2d 648, 656-57 (D.C. Ct. App. 1984) (rejecting as a matter of law insured's vague argument that they were prejudiced and misled by insurer into believing no coverage defenses would be asserted by insurer when insurer filed an answer to the lawsuit on insured's behalf and answered interrogatories before finally advising the insured that it was reserving its right to deny coverage based upon the insured's failure to provide timely notice of the claim).

The claim of prejudice made by the Nace Defendants is even weaker than those asserted in Capitol Specialty and Diamond because CIC's conduct in not issuing a reservation of rights letter took place while CIC was investigating a only a *potential* claim against the insureds and while CIC had no actual knowledge of any coverage defenses.  The D.C. courts in Capitol Specialty and Diamond found no prejudice and no estoppel as a matter of law even when the insurer delayed in issuing a reservation of rights after a lawsuit had been served on the insured and the insurer was aware of a potential coverage defense.  See, e.g., Diamond, 476 A.2d at 654-56 (no prejudice even though insurer delayed in notifying insured of specific coverage defense for nine months even though insured had knowledge of this potential defense during that time).

In summary, the Nace Defendants fall woefully short of establishing that they were misled by CIC's conduct and that they have sustained actual prejudice as a result.  CIC is not estopped from asserting that there is no coverage for Ms. Gilbert's lawsuit because the "no prior knowledge" requirement has not been met.

## CONCLUSION

This Court should reject the Nace Defendants' attempt to avoid application of the plain terms and provisions in the CIC policy.  As a matter of law, there is no legal authority and no

41

evidence to support a claim for estoppel under the Virginia statute or the common law doctrines of waiver and estoppel. CIC therefore requests that the Nace Defendants' Motion for Summary Judgment be denied. In addition, CIC requests that its Motion for Summary Judgment (Doc. 18) be granted and that this Court rule as a matter of law that CIC has no obligation to defend or indemnify the Attorney Defendants in the legal malpractice lawsuit filed by Ms. Gilbert.

## <u>REQUEST FOR ORAL HEARING</u>

CIC requests oral argument on the Nace Defendants' Motion for Summary Judgment.

**CHICAGO INSURANCE COMPANY**

Dated: December 12, 2013        By:    */s/ Paulette S. Sarp*
                                              Paulette S. Sarp, admitted pro hac vice
                                              HINSHAW & CULBERTSON LLP
                                              333 South Seventh Street, Suite 2000
                                              Minneapolis, MN  55402
                                              O:  (612) 333-3434
                                              F:  (612) 334-8888
                                              psarp@hinshawlaw.com


                                        *-and-*

                                              David D. Hudgins, Esq., D.C. Bar No. 362451
                                              HUDGINS LAW FIRM
                                              515 King Street, Suite 400
                                              Alexandria, VA  22314
                                              O:  (703) 739-3300
                                              F:  (703) 739-3700
                                              e-mailbox@hudginslawfirm.com

                                              Counsel for Plaintiff

121589570 2306

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHICAGO INSURANCE COMPANY, | : | |
| An Illinois corporation, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 1:12-CV-02068-ABJ |
| | : | |
| v. | : | |
| | : | |
| PAULSON & NACE, PLLC, a professional | : | |
| limited liability company; BARRY J. NACE, | : | |
| an individual; GABRIEL ASSAAD, an | : | |
| individual; and SARAH E. GILBERT, an | : | |
| individual. | : | |
| | : | |
| Defendants. | : | |

---

**PLAINTIFF CHICAGO INSURANCE COMPANY'S RESPONSE IN OPPOSITION TO THE NACE DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE AND PLAINTIFF'S ADDITIONAL STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION**

---

Pursuant to Local Rule 7(h), Plaintiff Chicago Insurance Company ("CIC") responds to and refutes several of the facts set forth in the "Statement of Material Facts Not in Dispute" (Doc. 14-2) filed by defendants Paulson & Nace, PLLC and Barry J. Nace ("the Nace Defendants") in support of their Motion for Summary Judgment (Doc. 14). CIC also submits in this document "Plaintiff's Additional Statement of Undisputed Material Facts" or "PASOF" in support of its opposition to the Nace Defendants' Motion for Summary Judgment. For sake of brevity, CIC has not re-filed all of the exhibits attached to the "Statement of Material Facts in Support of Chicago Insurance Company's Motion for Summary Judgment" that CIC previously filed in support of its own Motion for Summary Judgment. (Doc. 18). However, CIC refers to and incorporates by reference the exhibits attached to its previous Statement of Facts and will refer to them herein as "Exhibit __, PSOF". CIC will refer to the "Statement of Material Facts Not in Dispute" filed by the Nace Defendants in support of their Motion for Summary Judgment

121580787 0939915

(Doc. 14-2) as "DSOF".   CIC has attached five exhibits to its "Additional Statement of Undisputed Material Facts" that were not attached to Doc. 18.

## RESPONSE TO THE NACE DEFENDANTS' STATEMENT OF FACTS

Paragraph 1.   CIC does not dispute.

Paragraph 2.   CIC does not dispute.

Paragraph 3.   CIC does not dispute that the Nace Defendants filed their first medical malpractice lawsuit on behalf of Sarah Gilbert on July 24, 2006, just four days before the statute of limitations expired on Ms. Gilbert's claims.

Paragraph 4.   CIC does not dispute that the statute of limitations on Ms. Gilbert's medical malpractice claim expired on July 28, 2006.

Paragraph 5.   CIC does not dispute this alleged fact.   However, the statute of limitations for Ms. Gilbert's parents' claims is irrelevant to the issues in this declaratory judgment lawsuit. Ms. Gilbert's parents have not asserted a legal malpractice claim against the Nace Defendants and, therefore, there is no issue as to coverage for any such claim.

Paragraph 6.   CIC does not dispute that the Virginia court dismissed the first medical malpractice lawsuit filed by the Nace Defendants on the grounds that the complaint did not comply with Va. Code § 8.01-08 (2007), which required that a minor must sue in her own name or by her next friend.   CIC further alleges that the February 26, 2007 Order issued by the Virginia Court speaks for itself.   (Exhibit F, PSOF).[1]

---

[1] CIC acknowledges that the February 26, 2007 order may have dismissed the first medical malpractice lawsuit without prejudice as opposed to "with prejudice."   (Exhibit F, PSOF).   CIC indicated in its Motion for Summary Judgment that the order of dismissal was with prejudice.   The copy of the Order itself has "with prejudice" stricken out by a handwritten mark.   However, in their Petition for Appeal filed in the underlying lawsuit, Paulson & Nace specifically state that on January 4, 2007, the court heard oral argument on the motion to dismiss the first lawsuit and "granted the Motion to Dismiss Sarah Gilbert's claim *with prejudice* and Richard and Rosie Lee Gilbert's claims without prejudice and with leave to amend."   (DSOF, Exhibit 9 at CIC000238) (emphasis added).   In the end, regardless of whether the first lawsuit was dismissed with prejudice or without prejudice in early 2007 is simply not material to CIC's position that the Nace Defendants had reason to believe that an error had been committed prior to

2

121580787 0939915

Paragraph 7.   CIC does not dispute and agrees that in order to correct the error made in the first complaint, on October 25, 2006, after the statute of limitations had expired, the Nace Defendants filed a separate, second medical malpractice complaint on behalf of Ms. Gilbert against the same defendants identifying the correct plaintiff as "Sarah Gilbert, by her parents and next friends, Richard Gilbert and Rosie Lee Gilbert."  (Exhibit D, PSOF).

Paragraph 8.   CIC does not dispute this alleged fact.   However, the status of Ms. Gilbert's parents' claims against the physician who performed Ms. Gilbert's surgery is irrelevant to the issues in this declaratory judgment lawsuit.  Ms. Gilbert's parents have not asserted a legal malpractice claim against the Nace Defendants and, therefore, there is no issue as to coverage for any such claim.

Paragraph 9.   CIC does not dispute that the Virginia court issued a written order on August 3, 2007 dismissing with prejudice the second medical malpractice lawsuit filed by the Nace Defendants on Ms. Gilbert's behalf on the grounds that the second lawsuit was filed after the statute of limitations expired.   However, before issuing this order, the Virginia court conducted a hearing on the motion to dismiss on June 18, 2007.  During this hearing, at which Gabriel Assaad was present, the Virginia court ruled from the bench and stated that it was dismissing the second lawsuit with prejudice and requesting that the parties submit an appropriate order for the court's signature.  (Exhibit G, PSOF).   The written order issued on August 3, 2007 simply confirmed the ruling that had been made on the record at the hearing on June 18, 2007.  (See Defendants' Opposition to Plaintiffs' Motion for Reconsideration filed in the

---

inception of the CIC policy on July 24, 2007.  The fact that the first complaint was dismissed for failing to comply with Virginia statutory requirements, with or without prejudice, coupled with the Nace Defendants' filing a second complaint after the statute of limitations had expired in an attempt to correct that error is sufficient is sufficient to establish as a matter of law that the insureds had a reasonable basis to know they had committed a professional error or errors before July 24, 2007.

3

121580787 0939915

underlying medical malpractice lawsuit, copy attached as Exhibit 9 to DSOF at CIC000343, where Defendants to the medical malpractice lawsuits describe the procedural history of the matter and cite to the transcript from the June 18, 2007 hearing as support for the statement that "Judge Hughes agreed with the Defendants' arguments and dismissed with prejudice Ms. Gilbert's cause of action …").

CIC does not dispute that the Nace Defendants filed a notice of appeal on approximately September 7, 2007 in which they appealed the Virginia court's dismissal of the first medical malpractice lawsuit.

Paragraph 10. CIC does not dispute that Ms. Gilbert's appeal to the Virginia Supreme Court was dismissed.  However, the document attached by the Nace Defendants to support this statement is not admissible evidence supporting this statement.  The Nace Defendants attach only a "Pleadings Index" that lists the title and date of various pleadings and filings in the two medical malpractice lawsuits.  This document is not a document that was included in CIC's claim file or any of the documents produced by the defendants in this coverage lawsuit.  To the contrary, this document was generated by counsel for CIC after this coverage action was filed in an effort to respond to discovery requests served by the Nace Defendants and purports only to list documents that were produced at some point during CIC's investigation of the potential claim against the Nace Defendants.  The "Pleadings Index" does not attach the actual documents listed and does not support the Nace Defendants' statement in paragraph 10 as to the basis for the dismissal of their appeal.

Paragraph 11. CIC does not dispute that certain claims were "nonsuited" in the underlying malpractice lawsuits in approximately May of 2009.  However, the document attached by the Nace Defendants to support this statement is not admissible evidence supporting

4

121580787 0939915

this statement.  The Nace Defendants attach only a "Pleadings Index" that lists the title and date of various pleadings and filings in the two medical malpractice lawsuits.  This document is not a document that was included in CIC's claim file or any of the documents produced by the defendants in this coverage lawsuit.  To the contrary, this document was generated by counsel for CIC after this coverage action was filed in an effort to respond to discovery requests served by the Nace Defendants and purports only to list documents that were produced at some point during CIC's investigation of the potential claim against the Nace Defendants.  The "Pleadings Index" does not attach the actual documents listed and does not support the Nace Defendants' statement in paragraph 11 as to the basis for the order of nonsuit.

Paragraph 12.  CIC does not dispute that the Nace Defendants filed a second notice of appeal to the Virginia Supreme Court on approximately June 17, 2009.  However, the document attached by the Nace Defendants to support this statement is not admissible evidence supporting this statement.  The Nace Defendants attach only a "Pleadings Index" that lists the title and date of various pleadings and filings in the two medical malpractice lawsuits.  This document is not a document that was included in CIC's claim file or any of the documents produced by the defendants in this coverage lawsuit.  To the contrary, this document was generated by counsel for CIC after this coverage action was filed in an effort to respond to discovery requests served by the Nace Defendants and purports only to list documents that were produced at some point during CIC's investigation of the potential claim against the Nace Defendants.

Paragraph 13.  CIC does not dispute that the Virginia Supreme Court dismissed the second appeal on approximately December 15, 2009.  However, the document attached by the Nace Defendants to support this statement is not admissible evidence supporting this statement. The Nace Defendants attach only a "Pleadings Index" that lists the title and date of various

5

121580787 0939915

pleadings and filings in the two medical malpractice lawsuits. This document is not a document that was included in CIC's claim file or any of the documents produced by the defendants in this coverage lawsuit. To the contrary, this document was generated by counsel for CIC after this coverage action was filed in an effort to respond to discovery requests served by the Nace Defendants and purports only to list documents that were produced at some point during CIC's investigation of the potential claim against the Nace Defendants.

Paragraph 14. CIC does not dispute.

Paragraph 15. CIC does not dispute.

Paragraph 16. CIC does not dispute that defendant Barry Nace signed and submitted a "Supplemental Claim/Incident Information" form to CIC in May of 2009 identifying Ms. Gilbert as a potential claimant. CIC further states that this form mis-states the date of the alleged error giving rise to the potential claim by Ms. Gilbert as having occurred in 2008, when in fact the alleged error, which were the filing of the procedurally incorrect first complaint and then filing the second complaint after the statute of limitations had expired, both took place in 2006. (See Plaintiff's Additional Statement of Facts ("PASOF") infra, ¶¶ 19-22).

Paragraph 17. CIC does not dispute that CIC's claims representatives communicated with Mr. Nace and his attorney, Deborah Whelihan, after Ms. Gilbert's potential claim was reported to CIC in 2009. The nature and extent of those communications are set forth in the CIC claim notes, copies of which are attached to this Response as **Exhibit Y**.[2]

Paragraph 18. CIC disputes paragraph 18 in part because it is ambiguous and vague as to what is meant by the statement that CIC investigated Ms. Gilbert's potential claim "with full

---

[2] The exhibits attached to CIC's Statement of Facts in Support of CIC's Motion for Summary Judgment (Doc. 18) were labeled Exhibit A through Exhibit X. For the sake of consistency, CIC has marked the five additional exhibits attached to this Response that were not previously attached to Document 18 beginning with the label "Exhibit Y" and continuing through "Exhibit Z"; Exhibit AA"; "Exhibit BB" and "Exhibit CC".

121580787 0939915

knowledge of the above."   The only citation to this statement is to paragraph 5 of Mr. Nace's

Affidavit, which states only that "CIC did not issue a reservation of rights notice to Paulson &

Nace or me within 45 days of it notice of a potential claim by the Gilberts."   To the extent that

paragraph 18 implies that CIC had actual knowledge of a potential coverage defense based upon

the "no prior knowledge" requirement for coverage at any time prior to approximately November

29, 2011, CIC disputes this statement.   The Nace Defendants have produced no evidence to

support this statement.

CIC also disputes the statement that CIC did not issue any sort of reservation of rights

letter until January 13, 2012.   On July 2, 2009, CIC sent a letter to Mr. Nace and Paulson & Nace

acknowledging receipt of a potential claim by Ms. Gilbert and stating the following:

> Nothing contained herein constitutes a waiver of any potential rights and
> defenses.   CIC reserves all of its rights under the policy and, in particular,
> reserves the right to assert coverage or policy defenses, if any, at such time when
> pertinent facts and circumstances or their significance are disclosed or otherwise
> become known to CIC.   Nothing in this letter or in any prior or subsequent
> investigation should be construed as an admission of coverage or of the obligation
> to defend, and this letter should not be construed to extend the terms or conditions
> of coverage in your policy.   Nothing in this letter or in any prior or subsequent
> investigation should be construed as a restriction of any exclusion of coverage.
> CIC does not waive any such terms, conditions, or exclusions.

(Exhibit O, PSOF).

Paragraph 19.   CIC does not dispute that on approximately March 2, 2010, Mr. Nace sent

a letter to CIC that enclosed the petition and opposition to appeal and several other documents in

the underlying medical malpractice lawsuits.   CIC affirmatively states that Mr. Nace's cover

letter did not indicate the date that the two complaints were filed and dismissed nor did the letter

attempt to correct Mr. Nace's incorrect statement to CIC in the "Supplemental Claim/Incident

Form" that the date of the alleged error was in 2008, which date would have been during the CIC

policy period.

121580787 0939915

Paragraph 20.  CIC disputes paragraph 20 to the extent it can be interpreted as stating that CIC had actual knowledge of a coverage defense based upon the "no prior knowledge" requirement in the insuring agreement as of March 8, 2010.  The Nace Defendants submit no evidence to support this fact.  Simply because certain documents were sent to CIC is not evidence that CIC claims personnel read and/or appreciated the significance of the information included in those documents concerning the date of the professional errors allegedly committed by the Nace Defendants.  This is particularly true since Mr. Nace had specifically advised CIC when he reported the potential claim that the alleged error at issue was committed in 2008, which was during the policy period and, if true, would not have implicated the "no prior knowledge" coverage defense.   CIC reasonably relied upon that representation and had no reason to search for information to the contrary.

Paragraph 21.  CIC disputes the Nace Defendants' characterization of CIC's January 13, 2012 letter as an "alleged notice of a reservation of rights."  Paragraph 5 of Mr. Nace's Affidavit specifically acknowledges that Mr. Nace received a copy of this letter no later than January 20, 2012.  CIC also disputes the Nace Defendants' characterization of the basis for CIC's reservation as "for failure to comply with the notice requirements of the Policy."  This is not what the reservation of rights letter states and the letter speaks for itself.   The reservation of rights letter reserves the right to deny coverage to the extent the terms and requirements for coverage set forth in the insuring agreement were not met.  The letter specifically stated that there was no coverage if an insured had a reasonable basis to believe before the policy incepted on July 24, 2007 that a professional duty had been breached or to "reasonably foresee" that a "claim" would be made against them.  The reservation of rights letter does not allege that the insureds breached any term or provision in the policy.  (Exhibit Q, PSOF).

8

121580787 0939915

Paragraph 22.  CIC does not dispute that it did not specifically reserve its right to deny coverage based upon the "no prior knowledge" requirement in the insuring agreement until it issued the January 13, 2012 reservation of rights letters.   However, as stated in response to paragraphs 18, 19, and 20 above, CIC did not have actual knowledge of this coverage defense until approximately November 29, 2011.   (Exhibit Y, PSOF, at CIC 00492).   In addition, CIC issued a general acknowledgement of claim letter that specifically included language that CIC was not waiving any right to assert coverage defenses when it became aware of them on approximately July 2, 2009.  (Exhibit O, PSOF).

Paragraph 23.  CIC disputes the Nace Defendants' characterization of CIC's January 13, 2012 reservation of rights letters as alleging that the insureds *breached* a condition precedent to coverage under the policy.   The letter speaks for itself and does not allege any breach by the insureds.

Paragraph 24.  CIC does not dispute.

Paragraph 25.  CIC does not dispute.

Paragraph 26.  CIC does not dispute that it filed a complaint for declaratory judgment seeking a determination that it had no obligation to defend or indemnify the Nace Defendants or Defendant Gabriel Assaad in the legal malpractice lawsuit filed against them by Sarah Gilbert.

Paragraph 27.  CIC does not dispute that it did not send copies of any of the reservation of rights letters that it sent to the Nace Defendants and Defendant Gabriel Assaad to Ms. Gilbert or her counsel.   CIC does not dispute that it named Ms. Gilbert as a defendant in the declaratory judgment action CIC filed in the U.S.D.C. for the Eastern District of Virginia on September 25, 2012 and that this lawsuit was served on Ms. Gilbert's counsel shortly after it was filed.

Paragraph 28.  CIC does not dispute.

9

121580787 0939915

Paragraph 29.  CIC does not dispute.

Paragraph 30.  CIC does not dispute that it does not seek to rescind or void the policy in this lawsuit.

Paragraph 31.  CIC disputes the Nace Defendants' statement that the basis for CIC's coverage defense in this matter is the Nace Defendants' "failure to give timely notice of a potential claim, which CIC alleges is a condition precedent to coverage."  The interrogatory answers cited by the Nace Defendants do not state this.  In addition, nowhere in CIC's Complaint does CIC claim that there was a failure to give timely notice of a potential claim.  Rather, CIC seeks a declaration that it has no obligation to defend or indemnify the Nace Defendants or Defendant Assaad in the legal malpractice lawsuit because prior to the policy period, Paulson & Nace, Barry Nace and/or Gabriel Assaad had a reasonable basis to believe that the insured had breached a professional duty or to reasonably foresee that a claim would be made against the insured.  This is a requirement for coverage in the insuring agreement and it is not something that can be breached by an insured.

---

## CIC'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN SUPPORT OF ITS RESPONSE TO THE NACE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

### The underlying legal malpractice lawsuit and the professional error upon which it is based.

1.      On March 19, 2012, Sarah Gilbert filed a legal malpractice lawsuit captioned: Sarah E. Gilbert v. Paulson & Nace, PLLC, Barry J. Nace, and Gabriel Assaad, in the Circuit Court of the City of Richmond (the "Gilbert Lawsuit").  (Exhibit A, PSOF).

2.      The Gilbert Lawsuit alleges professional negligence and breach of contract against Paulson & Nace, PLLC, Barry J. Nace, and Gabriel Assaad (collectively "the Attorney

121580787 0939915

Defendants") arising out of their legal representation of Sarah Gilbert in two medical malpractice lawsuits filed on her behalf. (Exhibit A, PSOF).

3. The Gilbert Lawsuit alleges that on July 28, 2004, Ms. Gilbert underwent spinal fusion surgery to correct her scoliosis. The surgery rendered Ms. Gilbert a paraplegic. (Exhibit A, PSOF, ¶¶ 18-26).

4. In December of 2004, Ms. Gilbert's parents, Richard and Rosie Gilbert, retained Barry Nace and his law firm, Paulson & Nace, on behalf of their minor daughter to pursue a claim of medical malpractice and negligence in Virginia. (Exhibit A, PSOF).

5. The Attorney Defendants filed the first medical malpractice lawsuit on Ms. Gilbert's behalf in a Virginia court on July 24, 2006. The complaint, filed on Miss Gilbert's behalf, named her parents "*on behalf of their daughter*." (Emphasis added). (Exhibit B, PSOF).

6. The statute of limitations on Ms. Gilbert's medical malpractice claim expired on July 28, 2006. The first medical malpractice lawsuit was filed four days before the statute of limitations expired on Miss Gilbert's claim. (Exhibit A, PSOF, ¶ 38).

7. The defendants in the first medical malpractice lawsuit immediately filed motions to dismiss on the grounds that the Attorney Defendants had filed the case in the name of the wrong party and that, under Virginia law, a minor must sue in his or her own name by his or her next friend(s). Va. Code § 8.01-8 (2007). (Exhibit C, PSOF).

8. On October 25, 2006 – three months after the statute of limitations on Ms. Gilbert's claim had expired – the Attorney Defendants filed a separate, second complaint identifying Ms. Gilbert's parents as "next friends." (Exhibit D, PSOF).

9. The purpose of filing the second complaint was to try to correct the mistake in the first complaint. (See p. 17, line 8 through p. 18, line 10, and other pertinent portions of the

11

121580787 0939915

transcript from the deposition of Barry J. Nace and the 30(b)(6) deposition of Paulson & Nace, PLLC, copies of which are attached as **Exhibit Z**).

10.     In a hearing on the defendants' motion to dismiss in the first malpractice lawsuit conducted on January 4, 2007, one of the Attorney Defendants, Gabriel Assaad, stated as follows:

> I do agree the action took place – or the negligence took place on July 28[th], 2004, and, therefore, the statute of limitations would be on that date, would be July 28[th], 2006.  However, Your Honor, there are certain issues that may toll the statute, based on continuing treatment, based on we might move the Court to declare this person incapacitated during a certain period of time during that period, and I have yet to receive the medical records from the defendants to be able to make those arguments to determine whether or not we're going to proceed with that action. That's why I feel at this point, to dismiss the child's claim with prejudice would be inappropriate.  <u>I agree we haven't filed the claim appropriately with regard to the claim at issue at this point in time and therefore</u> – (Emphasis added).

(Exhibit E, PSOF, pp. G13-G14).

11.     Gabriel Assaad was an associate attorney and employee of the Paulson & Nace law firm in 2006 and 2007.  (Exhibit Z, p. 13, line 8 through p. 14, line 10).

12.     On February 26, 2007, the court dismissed Miss Gilbert's first medical malpractice lawsuit because it had been filed in the name of the wrong party.  (Exhibit F, PSOF; Exhibit A, PSOF, at ¶ 42).

13.     The defendants also filed a motion to dismiss in the second medical malpractice lawsuit.  On June 18, 2007, the court heard oral argument on the defendants' motion to dismiss. Mr. Assaad was present at the hearing.  (Exhibit G, PSOF; Exhibit Z, p. 25, line 9 through p. 26, line 1).

14.     At the June 18, 2007 hearing on the defendants' motion, the judge ruled from the bench and dismissed the second malpractice lawsuit with prejudice on the grounds that the

121580787 0939915

second lawsuit was filed after the applicable statute of limitations expired.  (Exhibit G, PSOF, at pp. 31-32, 44).

15.     The Virginia court's ruling at oral argument that the second medical malpractice lawsuit was dismissed with prejudice was also confirmed in a written order dated August 3, 2007.  (Exhibit H, PSOF).

**Issuance of the first CIC policy to Paulson & Nace.**

16.     On July 18, 2007 Mr. Nace sent an application to CIC to obtain a professional liability policy requesting an effective date of July 24, 2007.  (Exhibit J, PSOF).

17.     In the application, Mr. Nace answered the following question:

*     *     *

(b)     Having inquired of all partners, officers, owners and employed lawyers, are there any circumstances which may result in a claim being made against the firm, its predecessors or any current or past partner, officer, owner or employed lawyer of the firm?        ☐ Yes  ☒ No

* * *

THE APPLICANT REPRESENTS THAT THE ABOVE STATEMENTS AND FACTS ARE TRUE AND THAT NO MATERIAL FACTS HAVE BEEN SUPPRESSED OR MISSTATED.

Barry J. Nace                                    7/18/07
Print or Type Name and Title          Date (Mo-Day-Yr.)

(Exhibit J, PSOF at CIC-UW-000046).

18.     CIC first issued a claims made and reported Lawyers Professional Liability Policy to "Barry J. Nace dba Paulson & Nace" for the policy period July 24, 2007 to July 24, 2008 (the "2007-2008 policy").  (Exhibit K, PSOF).

19.     The coverage was renewed for the policy period July 24, 2008 to July 24, 2009 (the "2008-2009 policy").  (Exhibit L, PSOF).

121580787 0939915

**Notice of Ms. Gilbert's potential claim to CIC**.

20.     In May of 2009, during the 2008-2009 policy period, Mr. Nace submitted a "Supplemental Claim/Incident Information" form to CIC identifying Sarah Gilbert as a potential claimant.  On that form, Mr. Nace advised that "no claim or suit has been filed" and that the date of the "alleged error" in the handling of Mr. Gilbert's claim was 2008.  (Exhibit M, PSOF).

21.     In response to Question No. 13 on the form, which asked for a "brief description of the claim, indicating the alleged error, type of engagement and alleged injury" (emphasis added), Mr. Nace wrote the following description:

> An associate mis-named a plaintiff in a complaint filed in Virginia by using the phrase "parent" instead of "next of friend".  The Circuit Court dismissed the child's claim.  A Motion for Reconsideration was filed and denied in May of 2009.  The case will be appealed.

(Exhibit Z, p. 43, line 2 through p. 45, line 8).

22.     As Mr. Nace later stated in an application for professional liability insurance he submitted to Lloyds of London in 2011, the *correct* "date of alleged error" relating to Ms. Gilbert's claim was not 2008, but rather, was "7/24/06 – Date of Original Complaint" filed by Paulson & Nace.  (Exhibit N, PSOF).

23.     Mr. Nace testified in his deposition that he answered the question in the Lloyds of London application concerning the "date of alleged error" with "7/24/06 – Date of Original Complaint" because that is what Mr. Nace "thought [Ms. Gilbert was] going to say" as to the alleged error if and when Ms. Gilbert sued him.  (Exhibit Z, p. 61, line 10 through p. 63, line 16).

24.     In July of 2009, shortly after Mr. Nace had reported to CIC Ms. Gilbert's potential claim involving a 2008 date of alleged error, CIC issued a general acknowledgment of the potential claim and general reservation of rights letter to its insureds and continued to monitor and investigate the potential claim.  (Exhibit O, PSOF).

14

121580787 0939915

25.    CIC was not aware of any specific giving rise to coverage defenses in July of 2009.  (See p. 59, lines 4 through 21, and other pertinent portions of the transcript from the 30(b)(6) deposition of CIC (deponent Frank Lindner), copies of which are attached as **Exhibit CC).**

26.    The purpose of the July 2, 2009 letter was to acknowledge receipt of the potential claim and advise that CIC reserves the right to raise coverage defenses if and when CIC became aware of a coverage defense.  (Exhibit CC, p. 70, lines 1-20).

27.    CIC's letter acknowledged notice of the "potential attorney malpractice claim by Sarah Gilbert and her family".  CIC advised that it would investigate the potential claim.  CIC's acknowledgment letter also included the following language:

> Nothing contained herein constitutes a waiver of any of our potential rights and defenses.  CIC reserves all of its rights under the policy and, in particular, reserves the right to assert coverage or policy defenses, if any, at such time when pertinent facts and circumstances or their significance are disclosed or otherwise become known to CIC.  Nothing in this letter or in any prior or subsequent investigation should be construed to extend the terms or conditions of coverage in your policy. Nothing in this letter or in any prior or subsequent investigation should be construed as a restriction of any exclusion of coverage.  CIC does not waive any such terms, conditions, or exclusions.

(Exhibit O, PSOF).

28.    Mr. Nace testified in his deposition that he does not recall receiving this letter and he does not have a copy in his file at this time.  However, Mr. Nace also could not rule out the possibility that he received this email from Mr. Ellenberger.  (Exhibit Z, p. 96, line 21 through p. 97, line 9).

29.    Mr. Nace does not recall anyone at CIC ever affirmatively advising him that CIC would provide unconditional coverage for any claim or lawsuit that might be asserted by Ms. Gilbert.  (Exhibit Z, p. 91, lines 1 through 8).

121580787 0939915

30.     Mr. Nace "assumed there would be coverage" because he "paid [his] money and [he] expected to be covered."  (Exhibit Z, p. 90, line 11 through p. 91, line 8).

31.     On approximately September 30, 2010, CIC consulted with attorneys John May and Deborah Whelihan (Jordan Coyne) to "ascertain if, as the insured has represented, there is a means to amend the issue in this case short of a formal claim or litigation" by Ms. Gilbert. CIC's claim note for this date documents that CIC "has not proceeded to formal assignment of counsel as of yet pending initial impressions of counsel on the matter (she [Whelihan] represents the insured on other cases and accordingly, is frequently in contact with the insured already." (Exhibit Y, at CIC000492).

32.     Mr. Nace had utilized Ms. Whelihan as counsel in other matters and considered her to be "his attorney".  (See Affidavit of Barry J. Nace, ¶ 3, Doc. 14-6).

33.     Ms. Whelihan advised CIC on September 30, 2010 that she "still awaits pertinent documents from the insured in order to make an assessment of the total exposure in the case. She will be following up w/ the insured shortly." (Exhibit Y, at CIC000493).

34.     On January 28, 2011, attorney H. Aubrey Ford, III wrote a letter to the Nace Defendants advising that he and his firm had been retained by Ms. Gilbert to represent her in the medical malpractice lawsuit.  (A true and correct copy of Mr. Ford's letter dated January 28, 2011 is attached as **Exhibit AA**).

35.     Mr. Ford's letter to the Nace Defendants did not assert a claim against the Nace Defendants.  (Exhibit AA).

36.     Ms. Whelihan advised CIC on July 11, 2011 that she "will be reaching out to Mr. Nace for status of underlying case resolution and documentation previously requested."  (Exhibit Y, at CIC 000492).

121580787 0939915

37.     Ms. Whelihan advised CIC on October 20, 2011 that "she has recently received file docs from insured and will copy us on pertinent items from the file." (Exhibit Y, at CIC 000492).

38.     On approximately November 21, 2011, CIC received copies of all of the pleadings and hearing  transcripts from the underlying malpractice lawsuits. (Exhibit P, PSOF; Exhibit Y, at CIC 000492).

39.     Upon review of the documents provided by Ms. Whelihan on approximately November 29, 2011, CIC discovered for the first time that the date of the alleged error giving rise to Ms. Gilbert's potential claim for legal malpractice was in 2006, which was prior to issuance of CIC's first policy on July 24, 2007.   CIC did not have actual knowledge of the fact that the date of the alleged error committed by the Nace Defendants was prior to inception of its policy until approximately November 29, 2011. (Exhibit CC, p. 106, line 18 through p. 108, line 22; Exhibit Y, at CIC000492).

40.     CIC relied upon the Nace Defendants' representation to CIC when it reported Ms. Gilbert's claim through the "Supplemental Claim/Incident Form" that the "alleged error" that might give rise to a claim took place in 2008. (Exhibit CC, p. 152, line 13 through p. 153, line 10; p. 156, lines 10 through 16; p. 161, line 16 through p. 163, line 2).

41.     Based upon Mr. Nace's representation that the alleged error took place in 2008 and the fact that no actual claim was asserted by Ms. Gilbert until she filed her lawsuit in March of 2012, CIC did not review the appellate briefs and pleadings that Mr. Nace provided to CIC in approximately March of 2010 for the purpose of determining whether or not Mr. Nace's representation as to the date of the alleged error was in fact true. (Exhibit CC, p. 152, line 13 through p. 154, line 6).

42.     CIC operated under the assumption that Mr. Nace had provided accurate information to CIC when he notified CIC of Ms. Gilbert's potential claim in 2009.  (Exhibit CC, p. 162, line 2 through p. 163, line 1).

43.     On January 13, 2012, CIC advised in writing that there may be no coverage for Ms. Gilbert's potential claim on the grounds that the requirement for coverage in policy's insuring agreement that the insureds have no reasonable basis to believe that a professional duty had been breached or that a claim might be made prior to inception of the first policy by CIC had not been satisfied.  CIC advised that it would "continue to monitor and investigate this potential claim under a strict reservation of rights".  (PSOF, Exhibit Q).

44.     The Nace Defendants acknowledge that they received CIC's January 13, 2012 reservation of rights letters on or around that date.  (Exhibit Z, p. 99, line 8 through 21; Nace Affidavit, Doc. 14-6, ¶ 7).

45.     The insuring agreement to the 2008-2009 policy provides:

**INSURING AGREEMENTS**

**I.      COVERAGE**

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the **Policy Period** or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. Provided always that such **Professional Services** or **Personal Injury** happen:

A.      during the **Policy Period**; or

B.      prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business,** and continuously renewed and maintained in effect to the inception of this policy period:

18

121580787 0939915

1.     the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury**;

2.     <u>the **Named Insured**, any partner, shareholder, employee, or where appropriate the **Named Insured's** management committee or any member thereof, had no reasonable basis to believe that the **Insured** had breached a professional duty or to **Reasonably Foresee** that a **Claim** would be made against the **Insured**</u>; and

3.     there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such **Claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any **Claim**, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

(Exhibit L, PSOF, at CIC-UW-000160) (emphasis added)).

46.     The term "claim" is defined as follows:

"**Claim**" means a demand for money or services, or the filing of suit or institution of arbitration proceedings or **Alternative Dispute Resolution** naming an **Insured** and alleging a negligent act, error, omission or **Personal Injury** resulting from the rendering of or failure to render **Professional Services**.  **Claim** does not include proceedings seeking injunctive or other non-pecuniary relief.

(Exhibit L, PSOF, at CIC-UW-000163).

47.     The 2008-2009 policy defines the term "reasonably foresee" as follows:

**Reasonably Foresee(n)** means:

1.     **Claims** or incidents reported to any prior insurer;

2.     unreported **Claims** or suits of which any **Insured** had received notice prior to the effective date of the first policy with the Company;

3.     incidents or circumstances that involve a particular person or entity which an **Insured** knew might result in a **Claim** or suit prior to the effective date of the first policy issued by the Company to the **Named Insured**, and which was not disclosed to the Company.

(Exhibit L, PSOF, at CIC-UW-000164).

121580787 0939915

48.     CIC's 30(b)(6) representative (Frank Lindner, Professional Liability Claim Director) testified that he does not consider the "no prior knowledge" requirement for coverage set forth in the CIC policy's insuring agreement a "conditions precedent" to coverage, but rather a requirement for coverage in the insuring agreement.  (Exhibit CC, p. 129, line 4 through p. 130, line 9).

49.     Whether or not the "no prior knowledge" requirement for coverage set forth in the CIC policy's insuring agreement is met is not based upon whether the insured performs or fails to perform an action.  (Exhibit CC, p. 138, line 14 through p. 139, line 13; p. 143, lines 6 through 9).

50.     CIC's position that the terms of the insuring agreement have not been met is not an allegation that the insureds have "breached" the policy.  (Exhibit CC, p. 143, lines 6 through 20).

51.     The defense provision in the 2008-2009 policy provides:

> The Company shall have the right and duty to defend <u>any suit</u> against the **Insured** seeking **Damages** to which this insurance applies even if any of the allegations of the suit are groundless, false or fraudulent.  The Company, at its option, shall select and assign defense counsel; however, the Insured may engage additional counsel, solely at their own expense, to associate in their defense of any **Claim** covered hereunder….Furthermore, the **Insured** shall not assume any obligations, incur any costs, charges, or expenses or enter into any settlement without the Company's consent.

(Exhibit L, PSOF, at CIC-UW-000160).  This provision does not obligate CIC to defend a claim or potential claim.  (<u>Id.</u>)

**<u>Ms. Gilbert's claim and lawsuit against the Attorney Defendants</u>**.

52.     On March 19, 2012, attorney Aubrey Ford filed the Gilbert Lawsuit on behalf of Sarah Gilbert.  Mr. Ford sent a letter to Barry Nace on that date enclosing a copy of the complaint that had been filed.  (Exhibit R, PSOF).

121580787 0939915

53.     Ms. Gilbert did not assert an actual claim against the Nace Defendants and Gabriel Assaad until she filed her legal malpractice lawsuit on March 19, 2012.  (Exhibit Z, p. 103, lines 7 through 21).

54.     On April 12, 2012, CIC received notice of the Gilbert Lawsuit from the insurance broker for the Attorney Defendants.  (Exhibit S, PSOF, at CIC 000491 (4/12/2012 entry from CIC claim log)).

55.     On April 21, 2012, CIC issued reservation of rights letters to the Attorney Defendants advising that CIC would provide them with a defense to the Gilbert Lawsuit subject to a reservation of rights to deny coverage, to withdraw from the defense, and to bring a declaratory judgment action seeking a declaration of no coverage for the Gilbert Lawsuit. (Exhibit T, PSOF).

56.     The Nace Defendants received the April 21, 2012 letters on approximately April 21, 2012.  (Exhibit Z, p. 104, line 22 through p. 105, line 16).

57.     After discussions between CIC, Mr. Nace, and Ms. Whelihan, the law firm of Jordan Coyne, and specifically attorney John Easton, was retained to defend the Nace Defendants in the Gilbert Lawsuit.  The Nace Defendants had no objection to the Jordan Coyne firm and Mr. Easton serving as their defense counsel.  (Exhibit Z, p. 107, line 20 through p. 108, line 6; see also April 2, 2012 emails between Mr. Nace, Jennifer Green (CIC), and Ms. Whelihan, CIC000486-87, true and correct copies of which are attached as **Exhibit BB**).

58.     The Nace Defendants have never requested of CIC that defense counsel other than Jordan Coyne and John Easton be appointed to defend the Nace Defendants in the Gilbert Lawsuit.  (Id.)

121580787 0939915

**The Coverage Action.**

59.    On September 25, 2012, CIC filed a Complaint for Declaratory Relief against Paulson & Nace, PLLC; Barry J. Nace; Gabriel Assaad; and Sarah Gilbert in the United States District Court, Eastern District of Virginia, file number 12-cv-1082 (the "Virginia Coverage Action").  (Exhibit U, PSOF).  The Virginia Coverage Action involved the same parties and CIC sought the same relief in the Virginia Coverage Action as it does here.  (Id.).

60.    On October 12, 2012, Paulson & Nace and Barry Nace filed a Motion to Dismiss the Virginia Coverage Action on the grounds that the Virginia court did not have personal jurisdiction over the Nace Defendants.  (Exhibit V, PSOF).

61.    On November 15, 2012, the Nace Defendants filed a Reply brief in support of their Motion and an Affidavit of Barry J. Nace and Declaration of Gabriel Assaad.  (Exhibit W, PSOF).

62.    Mr. Assaad joined in the Nace Defendants' Motion to Dismiss.   (Exhibit X, PSOF).

63.    In their briefing in support of their Motion to Dismiss, the Attorney Defendants made the following representations to the court:

☐    "[T]he Court does not have *in personam* jurisdiction arising out of a contract entered into in the District of Columbia, when the Defendants, Paulson & Nace and Barry Nace, are neither citizens nor residents of Virginia, do not have substantial contacts with Virginia, and are not subject to the Court's jurisdiction in Virginia.  (Exhibit V, PSOF, pp. 2-3).

☐    "This case arises out of an insurance policy or contract, executed by an Illinois insurance company and a Washington, D.C. law firm."  (Exhibit V, PSOF, p. 4).

☐    "This case centers on a contract entered into by an Illinois insurance corporation and a Washington, D.C. limited liability company.  Negotiations took place in Washington, D.C., the contract, which was delivered in Washington, D.C., is subject to Washington, D.C. law interpretation, and any performance or misrepresentation alleged in the Complaint occurred in Washington, D.C."  (Exhibit V, PSOF, p. 5).

121580787 0939915

- "The only issue before the Court in the present action is the insurance contract, no the underlying tort claim.  There are simply no connections to Virginia as between CIC, Paulson & Nace, Barry Nace and interpretation or enforcement of the insurance contract."  (Exhibit V, PSOF, p. 5).

- "[T]he two counts in the present case arise out of the interpretation and enforcement of a Washington, D.C. insurance policy.  The only parties to the contract are CIC and Paulson & Nace.  CIC is an Illinois corporation and Paulson & Nace is a Washington, D.C. limited liability company.  Barry Nace resides and works in Washington, D.C.  Further, the negotiation for and execution of the Policy occurred in Washington, D.C.  Consequently, there is no basis for venue in the Alexandria Division of the Eastern District under § 1391(b)(2) because none of the acts or omissions surrounding the Policy occurred there."  (Exhibit V, PSOF, p. 6).

- "[T]he issue in this case implicates Washington, D.C.'s significant interest in determining and applying its own insurance contract interpretation law."  (Exhibit V, PSOF, p. 8).

- "Neither Paulson & Nace nor Barry J. Nace is registered or licensed to do business in Virginia."  (Exhibit W, PSOF, p. 4).

- "[I]t is inapposite to this case whether or not the Richmond City Circuit Court has personal jurisdiction over the Nace Defendants in the legal malpractice case due to their representation of Ms. Gilbert in the underlying medical malpractice case because the present case does not arise out of any of the Nace Defendants' contacts with Virginia."  (Exhibit W, PSOF, p. 8).

- "[N]either Paulson & Nace, PLLC, nor Barry J. Nace, had any regular court of conduct or business transaction in the Commonwealth of Virginia."  (Exhibit W, PSOF (Nace Affidavit), ¶ 11).

- "Despite the fact that the Gilbert Lawsuit is pending in Richmond City Circuit Court, CIC brought this declaratory judgment action related to its obligations under the Washington D.C. Policy towards the Attorney Defendants in the Gilbert Lawsuit in this Court, where none of the parties reside, nor any of the events occurred."  (Exhibit V, PSOF, p. 2).

64. According to Mr. Nace's affidavit submitted in the Virginia Coverage Action, he is not licensed to practice law in Virginia.  (Exhibit W, PSOF, Nace Aff., ¶ 4).

65. Paulson & Nace, PLLC is a professional limited liability company organized under the laws of Washington, D.C., engaged in the practice of law in Washington, D.C., with its principal place of business in Washington, D.C. (Exhibit W, PSOF, Nace Aff., ¶ 3).

121580787 0939915

66. On December 3, 2012, the Virginia court dismissed the Virginia Coverage Action without prejudice for lack of jurisdiction.

67. CIC then filed a Complaint for Declaratory Judgment action in the United States District Court for the District of Columbia. (Doc. 1).

68. Mr. Nace did not assert in the Affidavit he submitted in support of the Nace Defendants' Motion for Summary Judgment that he or his law firm had sustained any prejudice as a result of the timing of CIC's reservation of rights letters. (Doc. 14-6).

69. However, in his deposition on November 22, 2013, Mr. Nace speculated that the Nace Defendants have been prejudiced because if they had known that CIC was going to assert a coverage defense based upon the "no prior knowledge" provision in the policy, the Nace Defendants "would have hired an attorney to figure out what was going on. Probably we would have filed a declaratory judgment action on our own to figure out what was going on. And probably we never would have to go through a trial. The case would have been resolved one way or the other." (Exhibit Z, p. 112, line 14 through p. 113, line 12).

70. Mr. Nace further speculated that if the Nace Defendants had lost this coverage action, "there never would have been a trial in this case, one way or the other." However, Mr. Nace denied that the Nace Defendants would have done whatever was necessary to settle the Gilbert Lawsuit before any trial if it were determined no coverage existed. (Exhibit Z p. 116, line 8 through p. 117, line 3).

71. Mr. Nace also speculated that if there had been a finding of no coverage, Ms. Gilbert "maybe … would not have even filed suit if they were aware of that." (Exhibit Z, p. 116, line 17 through p. 117, line 18).

72.     However, Mr. Nace testified that even after Mr. Ford assumed representation of Ms. Gilbert in the underlying medical malpractice lawsuit in January 2011 (and one year before Ms. Gilbert actually asserted a claim and filed her lawsuit), Mr. Nace would not have attempted to engage in any settlement discussions with Mr. Ford at that time if he had been aware of coverage defenses because "at that point in time, since had the case, he's the adversary, and if I'm going to be sued, I don't think it would be wise for me to be talking to him [about settlement] at that point." (Exhibit Z, p. 123, line 6 through p. 124, line 9).

73.     The Nace Defendants acknowledge that even though they received CIC's reservation of rights specifically identifying the "no prior knowledge" coverage defense in January of 2012, they did not retain coverage counsel or file their own declaratory judgment action at that time.  (Exhibit Z, p. 119, lines 3 through 16).

74.     The Nace Defendants did not retain coverage counsel (Steve Horvath) until *after* CIC filed its own declaratory judgment action in September of 2012.  (Exhibit Z, p. 119, line 7 through 14).

75.     The Nace Defendants further speculate that it was "too late" to file a declaratory judgment action in January of 2012, when CIC issued its first reservation of rights identifying the "no prior knowledge" requirement, because at that time Ms. Gilbert's "lawsuit was being filed." (Exhibit Z, p. 120, lines 1 through 5).

76.     However, Ms. Gilbert did not actually file her legal malpractice lawsuit until approximately March 19, 2012.  (Exhibit R, PSOF).

77.     The Nace Defendants do not claim that the timing of CIC's reservation of rights letters has prejudiced them in the actual defense of the merits of the Gilbert Lawsuit.  (Exhibit Z, p. 121, line 1 through 13).

121580787 0939915

**CHICAGO INSURANCE COMPANY**

Dated:    December 12, 2013    By:    */s/ Paulette S. Sarp*

    Paulette S. Sarp, admitted pro hac vice
    HINSHAW & CULBERTSON LLP
    333 South Seventh Street, Suite 2000
    Minneapolis, MN  55402
    O:  (612) 333-3434
    F:  (612) 334-8888
    psarp@hinshawlaw.com

    *-and-*

    David D. Hudgins, Esq., D.C. Bar No. 362451
    HUDGINS LAW FIRM
    515 King Street, Suite 400
    Alexandria, VA  22314
    O:  (703) 739-3300
    F:  (703) 739-3700
    e-mailbox@hudginslawfirm.com

    Counsel for Plaintiff

121580787 0939915

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December, 2013, a copy of the foregoing pleading was served via ECF on:

Stephen A. Horvath, Esq.  
Bancroft, McGavin, Horvath & Judkins, P.C.  
3920 University Drive  
Fairfax, Virginia 22030  
shorvath@tbmhjlaw.com  

H. Aubrey Ford, III, Esq.  
Cantor, Stoneburner, Ford, Grana & Buckner  
7130 Glen Forest Drive, Suite 400  
Richmond, Virginia 23226  
aford@virginiatrialfirm.com  

Gabriel A. Assaad, Esq.  
Assaad Law, PLLC  
1425 K Street, NW, Suite 350  
Washington, DC 20005  
gassaad@assaadlaw.com  

    /s/ Paulette S. Sarp  
    Paulette S. Sarp, Esq., admitted pro hac vice  
    Hinshaw & Culbertson, LLP  
    333 South Seventh Street  
    Suite 2000  
    Minneapolis, MN 55402  
    (612) 333-3434  
    (612) 334-8888 - facsimile  
    psarp@hinshawlaw.com  

        and  

    David D. Hudgins, Esq., D.C. Bar No. 362451  
    Hudgins Law Firm, P.C.  
    515 King Street, Suite 400  
    Alexandria, Virginia 22314  
    dhudgins@hudginslawfirm.com  

    ATTORNEYS FOR PLAINTIFF  

121590779v1 0939915

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al*

**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT Y

Exhibit Y is a copy of CIC's claim notes relating to Ms. Gilbert's potential claim, a copy of which has previously been produced to the Nace Defendants. Because these notes include, among other things, information concerning CIC's evaluation of Ms. Gilbert's potential claim against the Nace Defendants and Ms. Gilbert's lawsuit is still ongoing, CIC has requested that the Nace Defendants advise CIC as to whether they have any objection to these notes being provided to Ms. Gilbert. CIC has not received a response from the Nace Defendants. If the Nace Defendants object to providing these notes to Ms. Gilbert, then CIC will request entry of a protective order and request to file this exhibit under seal. If the Nace Defendants do not object, CIC will supplement its Statement of Facts with a complete copy of Exhibit Y. In the meantime, CIC has provided the Judge with a copy of Exhibit Y as part of the courtesy copy of CIC's Response to the Nace Defendants' Motion for Summary Judgment.

121590784v1 2306

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al*

**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT Z

**In the Matter Of:**

CHICAGO INSURANCE CO.

vs.

PAULSON & NACE, ET AL

**BARRY J. NACE**

*November 22, 2013*



**Court Reporting**
**Videography**
**Videoconferencing**

Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1                UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3      -------------------------------------+
        CHICAGO INSURANCE COMPANY,           :
 4      an Illinois Corporation,             :
                     Plaintiff,              :
 5                                           :CIVIL NUMBER
        vs.                                  :1:12-CV-2068
 6                                           :
        PAULSON & NACE, PLLC, et al.,        :
 7                   Defendants.             :
        -------------------------------------+
 8                                   Fairfax, Virginia
                              Friday, November 22, 2013
 9

10                       BARRY J. NACE

11

12      called for examination by counsel on behalf of the

13      Plaintiff, Chicago Insurance Company, Pursuant to Notice

14      taken in the Offices of Bancroft, McGavin, Horvath &

15      Judkins, P.C., 3920 University Drive, Fairfax, Virginia

16      22030 at approximately 9:00 a.m., before Janie Arriaga,

17      a certified Verbatim Reporter and a Notary Public in and

18      for the Commonwealth of Virginia, when there were

19      present on behalf of the respective parties.

20

21

22
```

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

```
 1    APPEARANCES:

 2                     On behalf of Plaintiff:

 3                     PAULETTE S. SARP, ESQUIRE

 4                     Hinshaw and Culbertson, LLC

 5                     333 South Seventh Street, Suite 2000

 6                     Minneapolis, Minnesota 55402

 7

 8                     On behalf of Defendants:

 9                     STEPHEN HORVATH, ESQUIRE

10                     Bancroft, McGavin,

11                     Horvath & Judkins, P.C.

12                     3920 University Drive

13                     Fairfax, Virginia 22030

14

15

16

17    ALSO PRESENT:  Mr. Christopher Nace

18

19

20

21

22
```

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 3

Page 3

1                    C O N T E N T S

2    WITNESS                                       PAGE

3    BARRY J. NACE,

4        Examination by Ms. Sarp                     5

5

6                    E X H I B I T S

7

8    Nace Number 1   30(b)6                          5

9    Nace Number 2   Insurance policy                9

10   Nace Number 3   Declarations page              10

11   Nace Number 4   Complaint                       11

12   Nace Number 5   October 18 motion              14

13   Nace Number 6   Complaint                       17

14   Nace Number 7   Opposition to Motion           19

15   Nace Number 8   City of Richmond Order         21

16   Nace Number 9   Judge Hughes transcript        24

17   Nace Number 10  City of Richmond order         29

18   Nace Number 11  Application for insurance      32

19   Nace Number 12  Supplemental claim             42

20   Nace Number 13  Application for liability      60

21   Nace Number 14  Letter from H. Feintuch        65

22

\* \* \*  Case 1:12-cv-02068-ABJ   Document 23-2   Filed 12/12/13   Page 6 of 33

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL                BARRY J. NACE
                                                               Page 17

Page 17

1      Q    Bottom line is that you don't have any

2  independent recollection, as you sit here today, of

3  discussing that motion to dismiss with Mr. Assaad?

4      A    I don't.

5           (Nace Exhibit Number 6 marked for

6           identification.)

7  BY MS. SARP:

8      Q    Exhibit 6 that I just put in front of you is a

9  copy of another complaint that was filed, based on the

10  stamp on the front page, on October 25, 2006.  What is

11  your understanding of what the purpose of this complaint

12  was?

13     A    Well, looking at it all of these years later,

14  it looks to me like the purpose of it would have been to

15  try to correct the misnomer that had been alleged to

16  have occurred in the previous motion that we just talked

17  about.

18     Q    The purpose was to correct the -- you call it

19  misnomer -- to correct the mistake that was made in the

20  first complaint in the way that Sarah Gilbert's name was

21  listed?

22     A    You are using the word "mistake."  I don't --

Page 18

1    I never thought of this as being a mistake.  I suppose

2    you would call it.  But Virginia apparently had -- and I

3    am not a Virginia lawyer -- but apparently had a

4    specific way of naming a minor in a case, and the first

5    one wasn't specifically set out that way.  So the second

6    one is.

7        Q    So the second complaint was an effort to

8    comply with the rule or the statute or whatever

9    principal of law in Virginia --

10       A    Appears to be.

11       Q    I notice on the last page of Exhibit 6, again

12   there is Paulson and Nace's signature line.  Again, is

13   that Gabriel Assaad's signature or yours?

14            MR. HORVATH:  Objection.  Go ahead.

15       A    It's not mine, and my name is not even on it.

16   BY MS. SARP:

17       Q    Do you know why your name is not on that

18   complaint?

19       A    I have no idea, except I am not a

20   Virginia lawyer.  I wasn't then, never have been one.

21       Q    Right.  But your name was on the first

22   complaint that was filed on behalf of Sarah Gilbert?



\* \* \*    Case 1:12-cv-02068-ABJ   Document 23-2   Filed 12/12/13   Page 8 of 33

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL          BARRY J. NACE
                                                              Page 25

Page 25

1    lawsuit that was filed by the Paulson and Nace firm on

2    behalf Sarah Gilbert.  Have you had a chance to review

3    that transcript before today?

4            MR. HORVATH:  Objection.

5        A    No.

6    BY MS. SARP:

7        Q    Your answer is no?

8        A    No.

9        Q    The date of the hearing that this is a

10   transcript from is June 18th, 2007, as stated on the

11   first page.  Were you in attendance at the hearing?

12       A    No.

13       Q    It indicates that the Paulson and Nace

14   attorney that was there was Gabriel Assaad.  Do you see

15   that on the second page?

16           MR. HORVATH:  Objection.

17       A    It says that on the second page.  That would

18   seem to confirm my answer that I just gave.

19   BY MS. SARP:

20       Q    Sure.  You have no reason to dispute that

21   Mr. Assaad was at the hearing on June 18th, 2007, do

22   you?

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 43

Page 43

1   BY MS. SARP:

2        Q    Mr. Nace, what we've marked as Exhibit 12 is a

3   document called Supplemental Claim/Incident Information

4   Filed.  Do you see that at the top?

5        A    That's what it says, yes.

6        Q    Again, at the bottom, is that your signature?

7   There appear to be two signatures.  Are they both yours?

8        A    They are both mine.

9        Q    One is dated 5/20/2009; correct?

10       A    I think so.

11       Q    The other one looks like it's 7/23/2009?

12       A    Yes.

13       Q    Do you know why it was signed twice?

14       A    No.

15       Q    Again, is any of the handwriting that's on

16   this form yours, other than your signatures?

17       A    Yes.

18       Q    Tell me what is your handwriting.

19       A    On paragraph 10, section D says:  No claim or

20   suit has been filed.  That's my writing.

21       Q    Okay.

22       A    On paragraph 13, that is my writing.

Page 44

1        Q    Anything else that looks like your writing?

2        A    I don't think so.

3        Q    Can you -- I think I know what paragraph 13

4    says, but since it is your writing, can you read it for

5    me or I can read it to you.

6             MR. HORVATH:  I think the record will reflect

7    that he doesn't have his glasses on, but then he can go

8    ahead and do it.

9             MS. SARP:  Nobody has got an extra pair of

10   glasses?

11            MR. HORVATH:  Not reading glasses.

12   BY MS. SARP:

13       Q    I can read it for you and you can tell me if

14   you think it sounds right because I think I know what it

15   says, but if you want to go ahead and try it, I'd

16   appreciate it.

17       A    Associate misnamed a Plaintiff on a complaint

18   filed in Virginia by using the phrase as a quote, and

19   something --

20       Q    Parents' name?

21       A    Parents or next of friend or something.  I

22   can't make that out.  I could with my glasses.  I just

Page 45

1    can't read that now.

2        Q    Do you want to use mine?  Now I can't see, but

3    maybe you can.

4        A    The phrase, parents, quote, instead of, quote,

5    next of friend, end quote.  The Court -- Circuit Court

6    dismissed the child's claim.  A motion for

7    reconsideration was filed and denied in May of 2009.

8    The case will be appealed.

9        Q    Thank you.

10       A    You are welcome.

11       Q    Do you remember where you were when you

12   completed this form and the circumstances surrounding

13   your completing the form?

14       A    Where I was and the circumstances?  As I sit

15   here today, I don't know where I was.  I would assume I

16   was in my office, and I assume the circumstances was

17   that I was given this and asked to fill it out, and I

18   did what I could on it.

19       Q    Who gave you the form to complete?

20       A    Oh, come on.  Who gave it to me?

21       Q    What I am trying to figure out is what

22   prompted the decision that a supplemental claim form



* * *
Case 1:12-cv-02068-ABJ   Document 23-2   Filed 12/12/13   Page 12 of 33

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL        BARRY J. NACE
                                                        Page 61

Page 61

1        A    Yes.

2        Q    So, again, this was an application that

3    Paulson and Nace was submitting to Lloyd's for

4    professional liability insurance in 2011?

5        A    After you counseled us, yes.

6        Q    On the first page -- well, first of all,

7    again, is this your handwriting or did someone else

8    complete this?

9        A    It's not my handwriting.

10       Q    Let me direct you to question 4 on the front,

11   first page.  It states there -- it asks, again, the date

12   of the alleged error relating to the Gilbert matter.

13       A    Yes.

14       Q    The answer says, 7/24/2006, date of original

15   complaint.  Do you see that?

16       A    Yes.

17       Q    Do you agree with that statement?

18            MR. HORVATH:  Objection.

19       A    No.

20   BY MS. SARP:

21       Q    Why not?

22       A    Because it is kind of misleading the way you

Page 62

1    put that.  This is in 2011.  Now the phrase is, date of

2    alleged error.  Well, at that point in time, in 2011, we

3    were aware that our chances of winning on appeal -- at

4    that point it might have had a negative result, I don't

5    know; probably.  But that was the basis for the case

6    being dismissed or what happened back in the original

7    complaint.  But that's a little different than the way

8    you phrased it.

9         Q    The error that resulted in the dismissal was

10   the error in the way the caption of the complaint was

11   set forth in the original --

12        A    This says, alleged error.  I did not use the

13   word "error."  I did not write the word "error" down

14   there.  That's kind of misleading as to -- to this day,

15   I disagree that there was an error made.  I think it is

16   ridiculous what happened.  But the answer is in there to

17   let you know or let Lloyd's know, in this case, what we

18   are talking about in the whole thing.

19             So, no, I don't agree there was an error.  I

20   don't agree there was an error on July 24, 2006,

21   whatever it is.  There you are.

22        Q    I understand that you to this day don't agree

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 63

Page 63

1    that it was an error.  What I am saying -- it says

2    alleged error.  The allegation, though, by the

3    Defendants in that lawsuit -- let me finish -- was that

4    the complaint was styled incorrectly under Virginia law.

5    That was their allegation; correct?

6         A    That was an allegation.

7         Q    Whether you believe it or not, that's what

8    they allege.  They allege that this was an error and

9    that that had occurred when that first Complaint was

10   filed.

11        A    Was the suit filed against us by that time?

12        Q    I don't know.

13        A    Well, you made a statement there that I don't

14   know -- if the suit was filed, that would be what the

15   suit said.  If it was not filed, that is probably what I

16   thought they were going to say.

17        Q    Answer to number -- the question in number 6

18   says, date reported to insurance company.  Do you see

19   that?

20        A    Number 6?

21        Q    Yes.  Still on the front page.

22        A    2/25/10.



Page 90

```
 1            I felt like I did everything I should have

 2    done with them, to tell them what was going on.  When

 3    they got other lawyers, whenever it was, I cooperated

 4    and sent those lawyers a complete file -- I take that

 5    back.  I may not have sent them some correspondence that

 6    would have not been what they should have.  But I sent

 7    them the depositions and all that kind of stuff, and it

 8    went on from there.

 9            So, yes, I had a conversation with somebody

10    about the substance of the case.

11    Q    Do you recall any discussion about whether

12    there would be coverage for the claim made by

13    Ms. Gilbert at the time?

14    A    Absolutely not.  I assumed there would be

15    coverage.

16    Q    But no one in that conversation with Chicago

17    Insurance representative; that representative did not

18    tell you that there would be coverage?

19    A    Ma'am, I would expect if there wasn't, it was

20    up to them to tell me that they weren't going to.  Not

21    up to me to say, are you going to cover me?  I paid my

22    money and I expected to be covered.
```

Page 91

1      Q    My question is, did this person in this

2   conversation that you had in June or July of 2009,

3   affirmatively tell you there would be coverage for this

4   claim?

5           MR. HORVATH:  Objection; asked and answered.

6      A    Ma'am, if I wanted to sit here and build my

7   case, I'd say yes to that.  I don't remember anything

8   like that happening on that point.

9   BY MS. SARP:

10     Q    I appreciate it --

11     A    But certainly they didn't tell me that they

12  weren't going to.

13     Q    In fact, what you said was you really don't

14  recall any discussion about coverage; correct?

15     A    I am certain that they didn't tell me that.

16  That, I would have remembered.  If somebody said to me

17  in June of 2009, we may not insure you, we are not going

18  to insure you or something of those words, I would have

19  said, what, and gone ballistic at that point and tried

20  to figure out what was going on.  So I am absolutely

21  certain that that did not happen.

22     Q    What we've marked as Exhibit 17 is a document

* * *

Page 96

1    kept on your system indefinitely?

2         A    No.

3         Q    How far back do they go?

4         A    Not very.

5         Q    So if you were looking in 2013 for an e-mail

6    that was sent in 2009, it's very likely that the system

7    could have automatically deleted it?

8              MR. HORVATH:  Objection.  Time out.  That's an

9    inappropriate question.  He just testified they had no

10   automatic delete system.  So don't say, it's very likely

11   they automatically deleted it, when he just said they

12   don't have an automatic delete system.  That's an

13   inappropriate question.  Ask a correct question.

14   BY MS. SARP:

15        Q    Apparently, you then go through and manually

16   delete your e-mails on a regular basis; is that correct?

17        A    Yes.

18        Q    It sounded like -- how often do you do that?

19        A    There's no set pattern.  Whenever there's too

20   many there, I get around and delete them.

21        Q    So it is possible, anyway, that you received

22   an e-mail from Cari Ellenberger in July of 2009, and you

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

1    deleted it?

2          MR. HORVATH:  Objection.

3      A    Anything is possible, but other than saying

4    anything is possible, the answer to that question would

5    be no because if I received something like this in an

6    e-mail, it would have been kept in the Gilbert file, and

7    it wasn't.  There's no such thing there.  I would even

8    be stunned to think you would send something like this

9    just by e-mail.  That would be stunning.

10   BY MS. SARP:

11     Q    Did the firm have a general e-mail account

12   back then, a general e-mail address?

13     A    No, I don't think so.  You couldn't just send

14   it to Paulson and Nace.  I don't know how that worked,

15   but --

16     Q    That's fair.

17          (Nace Exhibit Number 18 marked for

18          identification.)

19     A    What is your question?

20   BY MS. SARP:

21     Q    I'm getting there.  Hold on.

22          Exhibit 18 is actually an e-mail chain that

* * *

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 99

Page 99

1 anyone at Pro Access in July of 2009 about the fact that

2 this potential claim by Gilbert had not been reported to

3 Fireman's Fund?

4      A    No.

5           (Nace Exhibit Number 19 marked for

6           identification.)

7 BY MS. SARP:

8      Q    What I put in front of you as Exhibit 19 is a

9 letter dated January 13, 2012.

10     A    By U.S. mail, return receipt requested.

11     Q    Can I see your copy for one second, please?

12          That is a letter that indicates that it was

13 sent to you on January 13, 2012, by a woman named

14 Jennifer Green at Chicago Insurance Company.  Her

15 signature is on the sixth page of the letter.  Do you

16 see that?

17     A    There is a signature above Jennifer Green's

18 name.  I don't know that is her signature.

19     Q    Did you receive a copy of this letter around

20 January of 2012?

21     A    I think so.

22     Q    I was going to refer you to your affidavit --



CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

1   Is that what you're telling me?

2       Q    Yes, that is true.

3       A    Okay.

4       Q    The lawsuit was filed in March or April of

5   2012.

6       A    Okay.

7       Q    But until the time that Ms. Gilbert actually

8   filed a lawsuit against Paulson and Nace, she had not

9   actually asserted a claim yet; correct?

10          MR. HORVATH:  Objection.

11      A    I'm not sure I really know what you mean.

12  BY MS. SARP:

13      Q    Okay.  Well, had you ever received anything

14  from Ms. Gilbert before she filed the lawsuit against

15  you stating that she was going to bring a claim or that

16  she intended to bring a malpractice claim against you?

17          MR. HORVATH:  Objection.  He's already

18  testified about some document.  But go ahead.

19  BY MS. SARP:

20      Q    To the best of your recollection.  I can tell

21  you that there is no evidence.

22          MS. SARP:  You have been testifying, so --

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 104

Page 104

1              MR. HORVATH:  You cannot --

2    BY MS. SARP:

3        Q    It's really yes or no.

4        A    Are you telling me there are no documents?

5        Q    I haven't seen any.

6              MR. HORVATH:  Don't accept --

7        A    I don't know.

8    BY MS. SARP:

9        Q    I am asking if you are aware of any written

10   demand by Ms. Gilbert indicating that she was planning

11   on filing a legal malpractice claim against you?

12       A    Any written documents?

13       Q    Before she filed a lawsuit.

14       A    As I sit here right now, I'm not aware of

15   that, but I don't know that there isn't.

16       Q    That's all I wanted to know.

17       A    I might be aware of it next time I testify, if

18   there is.

19              (Nace Exhibit Number 20 and 21 marked for

20              identification.)

21   BY MS. SARP:

22       Q    Mr. Nace, I put two letters in front of you.

Page 105

1   These letters are signed by Jennifer Green.  I know you

2   don't know if that is her signature.  They indicate on

3   the last page that Jennifer Green at Fireman's Fund sent

4   these two letters on or about April 21, 2012, via e-mail

5   and U.S. mail, return receipt requested.

6       A    Okay.

7       Q    Is that your correct e-mail address listed in

8   the address line there?

9       A    I knew that.  Why did you have to ask me about

10  it?

11      Q    I just wanted to make sure.

12           There are two letters.  One is addressed to

13  you personally, and the other is addressed to Paulson

14  and Nace, PLLC.  Did you receive the two letters in

15  about April of 2012?

16      A    Probably.

17      Q    The letters indicate that in the third

18  paragraph -- actually one is in the second.  Let's look

19  at the one that's addressed to Paulson and Nace, PLLC,

20  Exhibit 20.  In the third paragraph down, "the purpose

21  of this letter"?

22      A    Okay.

Page 107

```
 1      A    Yes.

 2      Q    What specific lawyer at Jordan Coyne is

 3  defending you in the Gilbert matter?  Is it John Easton?

 4      A    You mean you didn't know?

 5      Q    I know.

 6      A    Oh, you do know.  Okay.  It didn't seem like

 7  you did know during the trial.

 8      Q    Do you recall why Deborah Whelihan was not the

 9  lawyer at Jordan Coyne defending you and your firm in

10  the Gilbert matter?

11      A    Because she is a D.C. lawyer, and John is a

12  Virginia lawyer, as I understood it.

13      Q    Do you recall having some discussions with

14  Deborah Whelihan about whether you were comfortable with

15  having John Easton at her firm represent you?

16      A    I don't recall, but I may have.  I don't know.

17  I didn't know John Easton, so I may have said something

18  to Debbie Whelihan, tell me about John Easton or

19  something like that.  I don't know.

20      Q    You did not have any objection to John Easton

21  of the Jordan Coyne firm being your defense attorney in

22  that lawsuit?
```

Page 108

1      A      Any objection?  No.  I did not know him before

2   that.

3      Q      Did you make any requests to Chicago Insurance

4   Company that some other lawyer should be hired to defend

5   you other than John Easton?

6      A      No.

7             (Nace Exhibit Number 22 marked for

8             identification.)

9   BY MS. SARP:

10     Q      I put in front of you what we have marked as

11  Exhibit 22.  The bottom half of the first page of the

12  exhibit is Bates labeled CIC 00486.  That includes an

13  e-mail from you to Debbie Whelihan.  Do you see that?

14     A      Yes.

15     Q      The first paragraph -- the date of the e-mail

16  is April 2, 2012.  Just for the record, it states in the

17  first paragraph:  Dear Debbie, I guess the correct thing

18  to do here is to let you provide Mr. Easton with the

19  material I sent you, assuming that Ms. Green agrees with

20  that position.  I don't know Mr. Easton or anyone else

21  in your Virginia office, but I do feel comfortable with

22  your recommendation.



Page 112

1   distinction?

2       Q    Yes, I do.  Let me tell you.  First, do you

3   want me to ask the question separately?

4            MR. HORVATH:  Counsel, let me just make sure

5   it is clear.  He will answer both him personally and

6   Paulson and Nace, because they're both making the claim

7   of prejudice.

8            MS. SARP:  Sure.  I understand that.

9   BY MS. SARP:

10      Q    And if there's some difference in what you're

11  claiming as between you and the firm, please let me

12  know; but I understand that it's both you -- you're both

13  Defendants in the coverage action.

14           How has that argument that you -- how has --

15  how have you been prejudiced?

16      A    It will take a while.  First of all, Paulson

17  and Nace Corporation, PLLC, was not even in existence at

18  the time that this lawsuit --

19           MR. HORVATH:  She's talking about the lack of

20  the Reservation of Rights.  So just focus in on that,

21  the issue of the Reservation of Rights.  That's what

22  we're talking about, not the creation of the lawsuit,

1    not that whole issue you have with the underlying --

2        A    Had you notified us timely on that, I would

3    have hired an attorney to try to figure out what was

4    going on.  Probably we would have a filed a declaratory

5    judgment action on our own to figure out what the

6    situation was.  And probably we never would have had to

7    go through a trial.  The case would have been resolved

8    one way or the other.  If you were -- should have been

9    in the case, I suspect that would have been it, the case

10   would have gotten resolved.  If it had been just me in

11   the case or the corporation in the case, it would have

12   gotten resolved one way or the other.

13        That didn't happen.  So I had to sit through a

14   trial for four days down in Richmond listening to the

15   opposing attorney call me -- saying that I betrayed the

16   client in this case.  It's not very pleasant to hear

17   things like that.  The corporation ends up losing a lot

18   of time.  The corporation is not me.  The corporation

19   has three other shareholders; my three sons, who

20   shouldn't be in this at all.

21        The aggravation of having to go through this

22   whole process, not to mention the amount that was

\* \* \*

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 116

Page 116

1    hired a coverage attorney and that coverage attorney

2    filed a declaratory judgment action, that you win that

3    coverage action.  Your argument is all premised on you

4    winning?

5         A    No.  That's not even true.  That's one part of

6    it.  If we win that action, yes, you would have settled

7    the case.  You know it and I know it.

8         Q    What if you had lost that action?

9         A    Then we would have known where we stood and we

10   would have known what we had to do and we would have

11   known whether or not there was any kind of way of paying

12   any kind of settlement, getting the case resolved or

13   not.  It would have just changed everything, is what it

14   would have done.  There never would have been a trial in

15   this case, one way or the other.  It wouldn't have been

16   tried.

17        Q    Are you saying that if there had been a

18   declaratory judgment action filed early and result in

19   the favor of no coverage, that you and Paulson and Nace

20   would have done whatever was necessary to settle Sarah

21   Gilbert's lawsuit?

22        A    No.  The case would have been resolved.  As

Page 117

1    far as I know, if there's nothing there, maybe the

2    Gilberts would not have even filed suit if they were

3    aware of that.

4         Q    But you don't know that for a fact?

5         A    As a plaintiff's lawyer, I can tell you that

6    that's probably what would have happened.  A lot of

7    different -- the whole game becomes different if you

8    know what the situation is on that.  You can be darn

9    sure I wouldn't have been sitting through a trial.  I

10   mean, darn sure we wouldn't have been hearing a verdict

11   of $4 million or anything like that.  I would be darn

12   sure that my reputation wouldn't have besmirch around

13   the State of Virginia, as it has been, even when it was

14   inappropriately stated that I was the one that made the

15   mistake, which is absolutely false.  But that's what is

16   out there.  That's what is out there.  So my reputation

17   has been dramatically affected by this whole thing, and

18   it shouldn't have been.

19        Q    If a finding of no coverage had been obtained

20   and Ms. Gilbert had made a demand on Paulson and Nace of

21   $1.1 million, are you saying Paulson and Nace would have

22   paid that amount to settle the claim?

Page 119

1    breached by my carrier because nobody took care of that

2    issue.

3        Q    You told me earlier that you received Chicago

4    Insurance Company's Reservation of Rights in January of

5    2012; correct?

6        A    Whatever I told you before.

7        Q    Why didn't you file a declaratory judgment

8    action -- hire coverage counsel and file a declaratory

9    counsel then?

10       A    Because at that point, what was going on was

11   that everything was happening, the lawsuit was

12   happening, Easton was talking to me.  When I found that

13   out about the declaratory judgment, I did, I hired

14   Mr. Horvath here to get involved.

15       Q    That was after we filed the action; correct?

16       A    I am not sure if it was or not.

17       Q    Couldn't Paulson and Nace have filed a

18   declaratory judgment action in, let's say, February of

19   2012, before Ms. Gilbert ever filed her underlying

20   lawsuit?

21       A    February of 2012, as opposed to 2009 when you

22   all became aware of it?

Page 120

1      Q    I'm asking if your concern was that you would

2   have filed a declaratory judgment action --

3      A    It was too late.

4      Q    Why was it too late if you --

5      A    Lawsuit was being filed.

6      Q    It wasn't filed until -- served on you until

7   April of 2012.

8      A    When was it filed?

9      Q    March of 2012, two months after we gave --

10     A    So you're telling me that you expect me to

11  take -- in two or three weeks, to hire somebody, go out

12  and file a declaratory judgment action, when you as a

13  big insurance company can't do it for two-and-a-half

14  years?

15     Q    I'm not saying I expected you to do anything.

16  I'm just asking --

17     A    Well, that's the implication of your question.

18     Q    It seems from your previous answer that you

19  would have filed a declaratory judgment.

20     A    It was too late at that point.

21     Q    Your position is it was too late?

22     A    Yes.  The train was out, going down the track.

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 121

Page 121

1       Q     As far as how you have been defended in the

2    underlying lawsuit, is there anything that would have --

3    you think would have been done differently if CIC had

4    issued a Reservation of Rights sooner?  How has that

5    impacted your defense of the underlying lawsuit?

6       A     I am not sure I understand your question.

7       Q     That's kind of bad.  Are you saying that

8    Paulson and Nace has been prejudiced in the way it has

9    defended the underlying case as a result of what you

10   think is a delay in our Reservation of Rights letter?

11      A     Been prejudiced because of the delay?

12            MR. HORVATH:  In the --

13      A     Well, no, but --

14   BY MS. SARP:

15      Q     The gist of what you are saying is that if you

16   would have known sooner, you would have tried to resolve

17   the covered issue before Ms. Gilbert filed a lawsuit?

18   That's essentially what you're saying?

19      A     I also suspect that if the issue had been

20   handled earlier, it would have been clear that the

21   corporation never should have been a Defendant in the

22   case.

Page 123

1       A    Not right at this moment.

2            MS. SARP:  I don't have a whole lot more, if

3    you want to take a quick break.

4                     (Brief recess held.)

5    BY MS. SARP:

6       Q    You recall testifying that at some point

7    Mr. Aubrey Ford took over representation of Sarah

8    Gilbert; correct?

9       A    Yes.

10      Q    He then continued to represent her until she

11   actually filed her lawsuit against you in approximately

12   April of 2012; correct?

13      A    Yes.

14      Q    Mr. Ford was representing her the whole time?

15      A    Yeah, yes.

16      Q    All right.  During that time period from when

17   he took over until the lawsuit was actually filed, was

18   there ever a demand made on you or Paulson and Nace to

19   settle Ms. Gilbert's legal malpractice claim?

20      A    No.

21      Q    Were there ever any discussions between you

22   and Mr. Ford during that time period about the

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 124

Page 124

1    possibility of settling Ms. Gilbert's potential legal

2    malpractice?

3        A    No.  And I think I would not have discussed it

4    with him at that time.

5        Q    Why is that?

6        A    At that point in time, since he had the case,

7    he's the adversary, and if I'm going to be sued, I don't

8    think it would be wise for me to be talking to him at

9    that point.

10           I believe he filed the -- I think he sent a

11   copy of the complaint to us before he actually filed

12   and/or served it.

13       Q    Well, he did, and I'm almost positive --

14       A    And I submitted it right to you or to the

15   company, and nothing else happened.  Next thing I know

16   I'm being sued.

17       Q    Wait a minute.  Here it is.  I'm almost

18   positive that it was March of 2012.  He basically sent

19   you -- I don't know if it was a courtesy copy of a

20   complaint or the complaint that had actually been filed.

21   But he did give you sort of a heads up a little bit

22   before he filed the lawsuit; correct?

* * *

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al*

**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT AA



**CANTOR STONEBURNER FORD**
**GRANA BUCKNER**

H. Aubrey Ford, III
Direct Dial: (804) 343-4360
E-mail: aford@virginiatrialfirm.com

January 28, 2011

<u>BY FEDERAL EXPRESS</u>
(Priority Overnight Delivery)

Barry J. Nace, Esquire
Paulson & Nace
1615 New Hampshire Avenue, N.W.
Washington, D.C. 20009

      Re:   Richard Gilbert, Rosie Lee Gilbert, and Sarah Gilbert

Dear Mr. Nace:

      Rick and Rosie Gilbert have requested that our law firm assume their representation and substitute as counsel for your law firm in the case styled <u>Richard Gilbert and Rosie Lee Gilbert, Individually v. Susan Edwin Atkins, M.D., et al.</u> (At Law Number CL06004760-00) currently pending in the Circuit Court for the City of Richmond. Rick, Rosie and Sarah have indeed entered into a legal representation agreement with this firm. In order to accomplish transition of representation, I have drafted the enclosed Order of Substitution of Counsel which has been endorsed by Rick Gilbert, Rosie Gilbert and myself. On behalf of the Gilberts, I would ask you to endorse the enclosed original and return it to me for filing in the Court. If you have any questions or concerns about the Order, please call me as soon as possible.

      In order to assume the representation of Rick, Rosie and Sarah, we will need to obtain your firm's entire file on these matters. Therefore, on behalf of the Gilberts, I would request that you provide to me the originals or a photocopy of any and all documents in the possession of Paulson & Nace relating to:

    (1)   The pending lawsuit described above filed on behalf of Rick and Rosie Gilbert;

    (2)   Any litigation or potential litigation filed on behalf of or for the benefit of Sarah Gilbert; and

    (3)   Any other matters whatsoever relating to Sarah Gilbert, Rick Gilbert or Rosie Gilbert.

Barry J. Nace, Esquire
Paulson & Nace
January 28, 2011
Page 2

    The Virginia Rules of Professional Conduct are very clear and specific regarding the obligation of counsel to provide materials to a client or new counsel upon request. For your convenience, I enclose a copy of Rule 1.16(e). If the Gilberts furnished to you any original documents including medical scans or other documents, your firm is obligated to return those original documents to me on behalf of the Gilberts. You may certainly make copies of those documents at your firm's expense. Otherwise, we would request and the Rule requires, that your firm provide originals or copies to me of the following materials:

| | |
|---|---|
| (a) | Your firm's communications with Rick, Rosie or Sarah; |
| (b) | Your firm's communications with third parties; |
| (c) | Transcripts of depositions; |
| (d) | Transcripts of hearings; |
| (e) | Transcripts of appeals; |
| (f) | Pleadings; |
| (g) | Discovery responses and requests; |
| (h) | Working and final drafts of legal instruments; |
| (i) | Official documents; |
| (j) | Investigative reports; |
| (k) | Legal memoranda; |
| (l) | Attorney-work product documents prepared or collected for the clients in the course of the representation; |
| (m) | Research materials; |
| (n) | Bill previously submitted to the clients. |

If your firm prefers to retain the original of the documents listed above, and chooses to provide to me copies of these documents, my firm will reimburse Paulson & Nace for the reasonable costs of copying and delivering these documents to me.

    If you have any questions or concerns regarding the contents of this letter, please contact me as soon as possible so that we can expedite these matters. Thank you for your assistance.

Sincerely,

H. Aubrey Ford, III

HAF/mes
Enclosure

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al*

**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT BB

# FileNet Claims Documentation Index Request

Date: 04/24/2012

To: ● Claims Upload Request ○ RS Upload Request

From: Jennifer Green

\* denotes required field

Claim No / Suffix / Name \*: 00509630577 RE: Gilbert lawsuit
   Name only required when it 's the first document received for that suffix .

| Do you want to file the email body into FileNet ? | ● Yes ○ No |
|---|---|
| Claim Line : | |
| Email Document Type : | GL |
| Email Document Title : | Investigation |
| Email Document Description  \* : | Other |
|   (Required & limited to 100 characters) | 4/2 em from insd re : cnsl. representation |
| Email Document Received Date : | |
|   (Date FFIC received document) | 04/02/2012 |
| Email Document Date : | |
|   (Date document was created, i.e. date on actual document) | 04/02/2012 |



Barry Nace
<bjn@paulsonandnace .co
m>
04/02/2012 03:44 PM

To "Deborah M. Whelihan" <d.whelihan@jocs-law.com>
cc "Jennifer.green@FFIC.com" <Jennifer.green@FFIC.com>
Subject RE: Gilbert lawsuit

Dear Debbie,

I guess the correct thing to do here is to let you provide Mr. Easton with the material I sent you, assuming that Ms. Green agrees with that position. I don't know Mr. Easton or anyone else in your Virginia office, but I do feel comfortable with your recommendation.

Sorry for the delay, but about 10 days ago I had surgery to remove a large kidney stone which was not totally accomplished and I return for surgery in two more days (Wednesday) to complete the job. Hopefully we can discuss the matter tomorrow or after Wednesday, this week. I hope to be back in the office on Thursday. But it has been a rough two weeks.

Thanks.

Barry

Barry J. Nace, Esq.
Paulson & Nace, pllc
202-463-1999
bjn@paulsonandnace.com



BN 22
DEPOSITION
EXHIBIT
11/22/13

CIC 000486

**From:** Deborah M. Whelihan [mailto:d.whelihan@jocs-law.com]
**Sent:** Tuesday, March 27, 2012 5:14 PM
**To:** Barry Nace
**Subject:** Gilbert lawsuit

Dear Barry, I would like to send the Gilbert complaint and the materials that you provided to my partner, John Easton, who is in our Fairfax office. However, I do not want to do that until you let me know if you are comfortable with Mr. Easton being your counsel. Debbie

Deborah Murrell Whelihan
Jordan, Coyne & Savits, L.L.P.
1100 Connecticut Avenue, N.W.
Suite 600
Washington, D.C. 20036
D.Whelihan@jocs-law.com
direct dial: (202) 496-2810
main number: (202) 296-4747
fax number: (202) 496-2800
The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is PRIVILEGED AND CONFIDENTIAL. If the reader of this message is not the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

Click here to report this email as spam.

○ Yes ○ No        Should the same Document Type and Title be used for the email and all attachments ?
                                          Document description is still required below for each attachment .

○ Yes ○ No        Should the Document Type and Title be the same for all attachments ?
                                          Document description is still required below for each attachment .

---

Attachment #1

insert attachment =>

Claim Line :
Document Type :
Document Title :
Document Description *:
(required & limited to 100 characters)

CIC 000487

432

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al*

**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT CC

**In the Matter Of:**

CHICAGO INSURANCE CO.

vs.

PAULSON & NACE, ET AL

**FRANK J. LINDNER**

*November 22, 2013*



Court Reporting
Videography
Videoconferencing

Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3    -------------------------------------+
      CHICAGO INSURANCE COMPANY,           :
 4    an Illinois Corporation,             :
                   Plaintiff,              :
 5                                         :CIVIL NUMBER
      vs.                                  :1:12-CV-2068
 6                                         :
      PAULSON & NACE, PLLC, et al.,        :
 7                   Defendants.           :
      -------------------------------------+
 8                               Fairfax, Virginia
                         Friday, November 22, 2013
 9

10              FRANK J. LINDNER,

11

12    called for examination by counsel on behalf of the

13    Defendants, Paulson and Nace, et al, Pursuant to Notice

14    taken in the Offices of Bancroft, McGavin, Horvath &

15    Judkins, P.C., 3920 University Drive, Fairfax, Virginia

16    22030 at approximately 1:11 p.m., before Janie Arriaga,

17    a certified Verbatim Reporter and a Notary Public in and

18    for the Commonwealth of Virginia, when there were

19    present on behalf of the respective parties.

20

21

22
```

Page 2

```
 1    APPEARANCES:

 2                    On behalf of Plaintiff:

 3                    PAULETTE S. SARP, ESQUIRE

 4                    Hinshaw and Culbertson, LLC

 5                    333 South Seventh Street, Suite 2000

 6                    Minneapolis, Minnesota 55402

 7

 8                    On behalf of Defendants:

 9                    STEPHEN HORVATH, ESQUIRE

10                    Bancroft, McGavin,

11                    Horvath & Judkins, P.C.

12                    3920 University Drive

13                    Fairfax, Virginia 22030

14

15

16

17

18

19

20

21

22
```

Page 59

1      Q    And then it says, call and advised insured I

2   would send -- what?

3      A    ACK, which is short for acknowledgement.

4      Q    When you send an acknowledgement letter, you

5   don't automatically send a Reservation of Rights

6   acknowledgement letter, do you?

7      A    No.

8      Q    Why?

9      A    Well, there are no coverage issues apparent at

10  the time, but in case any coverage issues arise.  It's

11  just standard language that we put in.

12     Q    Well, at this point in time were you aware of

13  any coverage issues?

14     A    No.

15     Q    Were you aware of any potential breach of a

16  term and condition of the policy, that is as of July

17  2nd, 2009?

18     A    No.

19     Q    Did you have any facts that this claim was not

20  covered under the policy as of July 2nd, 2009?

21     A    No.

22     Q    Do you understand what the practice is in the

* * *
Case 1:12-cv-02068-ABJ   Document 23-5   Filed 12/12/13   Page 6 of 21

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL          FRANK J. LINDNER
                                                            Page 70

Page 70

1      Q    What specific rights were you attempting to

2    reserve as of July of 2009?

3           MS. SARP:  Let me just object.  Are you

4    referring to the specific letter?

5           MR. HORVATH:  Yes.

6           MS. SARP:  I think it's fair that he has a

7    chance to see the --

8           MR. HORVATH:  He's already testified he wasn't

9    aware of any coverage issues, so I'm trying to figure

10   out what he's trying to reserve.

11     A    It's just general language that is at the end

12   of the acknowledgement letter, that basically we reserve

13   the right if anything comes to our attention to raise

14   the coverage defense at that point in time.  So it's --

15   BY MR. HORVATH:

16     Q    You don't have a specific issue in mind at

17   that point in time?

18     A    Right.

19     Q    It's just a general reservation; right?

20     A    Correct.

21     Q    Did you tell Mr. Nace that he had a right to

22   reserve his rights?



CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL          FRANK J. LINDNER
                                                          Page 106

1    BY MR. HORVATH:

2        Q    Is that correct?

3             MS. SARP:  Do you mean now?  Are you asking

4    him -- it's unclear.

5             MR. HORVATH:  I don't understand "facts not in

6    evidence."

7             MS. SARP:  Are you asking him --

8             MR. HORVATH:  Time out.

9             MS. SARP:  -- now looking at it or did they

10   know then?

11            MR. HORVATH:  What facts -- what facts are in

12   evidence here?  How do you have an objection to --

13            MS. SARP:  It's a misleading question or

14   whatever you want to call it.  Are you asking him --

15   you're mixing up the time frame.  Are you asking him

16   now?

17   BY MR. HORVATH:

18       Q    As of March of 2010, when they had the briefs

19   that went to the Virginia Supreme Court, you had the

20   information concerning when the documents were filed,

21   when the orders were entered; correct?  You had the

22   procedural history of the case; correct?

Page 107

1       A     Julie Lindenmen had received information from

2    Mr. Nace in March.  I mean, it wasn't reviewed.  But did

3    she receive it?  She did receive it.

4       Q     Do you know why she did not review that in

5    March of 2010?

6       A     Likely because -- I'm going from recollection

7    here.  But the file had been transferred to Jennifer, so

8    I'm assuming it's because Julie was leaving the company.

9       Q     So then did Jennifer review it?

10      A     Jennifer didn't review it.

11      Q     Why not?

12      A     It was a potential claim.

13      Q     But you certainly had information in your

14   possession, that is in the possession of Fireman's, that

15   would say when the pleadings were filed; that is the

16   complaint, the second complaint; when the first

17   complaint was dismissed, and when the second complaint

18   was dismissed.  You had all the information in your file

19   as of March of 2010; correct?

20      A     We had information in our file in March of

21   2010.  It wasn't reviewed.

22      Q     I understand that.  But as to when the

Page 108

1       complaints were filed and when they were dismissed?

2          A    Correct.

3          Q    Go ahead.

4          A    Where did we leave off?

5          Q    September 30th of 2010.

6          A    And then November 4th, 2010, review file on

7       diary.  This is a note from Amy Schwimmer.  Please

8       follow up on proposed meeting.  The rest is redacted.

9       There was a telephone conversation between -- between

10      Jennifer Green and Defense Counsel Whelihan on July 11th

11      of 2011.  Amy Schwimmer reviewed the file and diary.

12         Q    On what date?

13         A    On July 18th of 2011.  Status e-mail was

14      received from Defense Counsel Whelihan on October 20th

15      of 2011.

16         Q    And what was going on at that time?

17         A    I can't tell from the redacted notes.

18              November 29th, 2011, there was a note from Amy

19      Schwimmer, review file on diary.  Recently received

20      insured's file materials.  The rest is redacted.  I

21      believe that's the time period that the materials were

22      reviewed.



* * *   Case 1:12-cv-02068-ABJ   Document 23-5   Filed 12/12/13   Page 10 of 21

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL          FRANK J. LINDNER
                                                              Page 129

Page 129

1          MS. SARP:  I think, because it was taken out

2     of context, that you have to read some of the earlier --

3     BY MR. HORVATH:

4          Q    You have no conditions precedent we're talking

5     about here?

6          A    I know we're talking about the requirements as

7     set forth in the insuring agreement.

8          Q    And what requirements are those?

9          MS. SARP:  If you need the policy, I think

10    you --

11    BY MR. HORVATH:

12         Q    Absolutely.  If you want to look at the

13    policy, I'll be happy to give you the policy?

14         A    The specific reason would be the reasons as

15    set forth in the declaratory judgement action in the

16    pleading.  The insured had -- go ahead.

17         Q    Go ahead.  You started to answer the question,

18    and I started to interrupt you.  I apologize.

19         A    It's my fault.  -- that the insured had a

20    reasonable basis to believe that a duty had been

21    breached or could reasonably foresee that a claim might

22    be made prior to the inception of the first policy that

Page 130

```
 1   CIC issued.

 2       Q    Those two statements you just made, reasonable

 3   belief that a breach had occurred or reasonably foresee

 4   a claim, those are the conditions precedent that you're

 5   talking; is that fair?

 6       A    Those are the requirements I'm talking about.

 7   I don't know why this says "conditions precedent."  But

 8   it's the requirements as set forth in the insuring

 9   agreement.

10       Q    Let's go on to the next interrogatory here,

11   because that one also says:  Do you contend that you're

12   entitled to rescind the policy of insurance.

13            And then you can look at the question, and

14   then the answer, and the answer again says:  CIC does

15   not have to prove that the policy is void or the policy

16   should be rescinded in order to prevail on its claim

17   that the conditions precedent to coverage have not been

18   satisfied here.

19            Are we talking about the same two conditions

20   precedent, that is reasonably believe that there was an

21   error or breach and reasonably foresee a claim?

22       A    We're talking about the same requirements as
```



Page 138

1   parents and next friends?  Have you ever seen a case

2   dismissed on that basis before in all of your experience

3   reviewing claims for Fireman's Fund?

4        A    I may have.  I've been doing this 20 years, so

5   I know I've seen a lot.

6        Q    Let's go on with the answers to

7   interrogatories here.  Go to number 10.  Number 10 says:

8   Do you contend that there was a breach of the term of

9   contract of insurance, including breach of a condition

10  precedent to coverage by the Defendants, Barry Nace

11  and/or Paulson and Nace?

12           Do you see that?

13       A    I do see that.

14       Q    And then your answer is:  CIC has not asserted

15  a breach of contract claim.  To the contrary CIC

16  requested a declaration.  There's no coverage because

17  the conditions precedent to coverage, including the

18  policy's insuring agreement, have not been satisfied.

19           Do you see that?

20       A    I do see that.

21       Q    How is that different than a breach of

22  contract?

Page 139

1           MS. SARP:  Objection; calls for a legal

2    conclusion.

3           You can answer.

4       A    Well, it was -- it's not Paulson and Nace's --

5    it's not their failure to perform something per the

6    terms of the contract, that is -- it's based upon the --

7    the declination is based upon the requirements as set

8    forth in the insure agreement simply not being -- not

9    the facts and circumstances of the insuring agreement;

10   what is required in the insuring agreement not being met

11   as opposed to something that Mr. Nace did or didn't do

12   in the terms of the policy, you know, the contract of

13   insurance.

14   BY MR. HORVATH:

15      Q    Let's talk about that concept here just

16   briefly.  Your policies of insurance have quite a few

17   conditions, requirements; correct?  You have to give

18   notice of a claim?

19      A    Policies in general, they do.

20      Q    Notice of a claim; correct?  That's a common

21   provision?

22      A    Right.



\* \* \*

Case 1:12-cv-02068-ABJ   Document 23-5   Filed 12/12/13   Page 14 of 21

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL          FRANK J. LINDNER
                                                              Page 143

Page 143

1          MR. HORVATH:  I'm not trying to ask for the

2     law on this.

3          MS. SARP:  Right.  But it does call for a

4     legal conclusion.  The question is a little bit

5     unintelligible as well.  And it speaks for itself.

6     A    There's not -- we're not taking a position

7     that there is a breach of the conditions of the policy.

8     It's that the requirements as set forth in the insuring

9     agreement simply haven't been met.

10    BY MR. HORVATH:

11    Q    Why did you call it in your answers a

12    condition precedent to coverage?

13    A    I don't know.

14         MS. SARP:  I'm going to object to foundation.

15    BY MR. HORVATH:

16    Q    So you're saying it's not a condition

17    precedent now, but it's a requirement under the policy?

18    A    I'm saying that the requirements set forth in

19    the insuring agreement were not met.  It's the

20    coverage grant, and the terms were not met.

21    Q    Do you have any explanation why you continue

22    to call the conditions precedent throughout the answers



446

Page 152

1          MS. SARP:  Objection; vague and ambiguous as

2    to what guidelines you're talking about.

3    BY MR. HORVATH:

4          Q    To review a file, to make an evaluation of it.

5          MS. SARP:  Objection; speculation; beyond the

6    scope of the topics designated.

7          A    The reserves would be -- the initial reserve

8    would be decided within the first 120 days.

9    BY MR. HORVATH:

10         Q    So within 120 days you want to review the file

11   to look at it for liability issues; is that correct?

12         A    Correct.

13         Q    And once you have looked at this file within

14   120 days of the liability issues, you would have seen

15   that the date of the first dismissal order was

16   February of 2007, prior to the date of this policy; is

17   that correct?

18         MS. SARP:  Objection; calls for speculation.

19         A    Actually, the insured had represented to us

20   that the error took place in 2008.  That was the

21   representation that was made to us.  We had no reason to

22   disbelieve the insured or believe that it wasn't

Page 153

1    accurate.

2    BY MR. HORVATH:

3        Q    Let's focus on that.

4        A    No.  But it's all part of it.  I mean, it was

5    information that was conveyed by the insured through to

6    us.  So we weren't -- we weren't looking for coverage,

7    you know, in terms -- at the matter in terms of

8    coverage.  In terms of liability, we did request the

9    insured's documents.  The documents were not provided to

10   us within the first 120 days.

11       Q    You had the documents by March of 2010; right?

12       A    Right, which was not within the first 120 days

13   of us being put on notice of this matter.

14       Q    So you had the documents in March of 2010,

15   that gave you the dates for the event.  So you knew when

16   the events occurred; right, as of that time?

17           MS. SARP:  Objection; assumes facts not in

18   evidence; misstates his testimony.

19       A    No, we didn't know because the documents

20   weren't reviewed.

21   BY MR. HORVATH:

22       Q    Why not?

Page 154

1       A    Well, you asked me that earlier, and the best

2    explanation I can give is because Julie Lindenmen was

3    leaving the company and the file had been transferred to

4    Jennifer.  It was a potential claim at that point, and

5    the documents, they hadn't been reviewed.  They weren't

6    reviewed until we received all of the documents.

7       Q    What is your policy for reviewing the

8    documents?  She was required to do regular reports on

9    this file; right?

10      A    No.

11      Q    She's not required to look at a report on a

12   regular basis?

13      A    It was a potential claim.  So she wasn't

14   required to do regular reports on it.  And the reserve

15   had already been set based upon, you know, the best

16   information that we had at that time.

17      Q    What information did you have as to when the

18   loss occurred other than the one stayed in 2008?  When

19   in 2008 did it occur?

20         MS. SARP:  Objection; asked and answered.

21      A    I don't know.

22   BY MR. HORVATH:

* * *

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL          FRANK J. LINDNER
                                                          Page 156

Page 156

1        Q     One note of a conversation with Mr. Nace?

2              MR. HORVATH:  Counsel, your gestures are

3     really very annoying.  I'd appreciate --

4              MS. SARP:  Well, this has been asked and

5     answered about ten times.

6              MR. HORVATH:  I don't care.  It's not

7     appropriate.

8              MS. SARP:  Asked and answered.

9     BY MR. HORVATH:

10       Q     You can answer the question.  Do you have one

11    note of a conversation where Mr. Nace said the loss

12    occurred in 2008?

13       A     As I'm sitting here, I don't recall a file

14    note set forth by the adjustor, but I can tell you that

15    the supplemental app would have been part of the claim

16    file.  I mean, we had the information from the insured.

17       Q     And then in 2010, you have the briefs on the

18    issue as to whether or not there's liability; correct?

19    The briefs would set forth the dates, the events, and

20    you can do an evaluation as to liability; correct?

21       A     We did have that, yes.

22       Q     One of the things that you do on a regular



CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

FRANK J. LINDNER
Page 161

Page 161

1   sheet as an asset; correct?

2       A    Yes.  It's a reserve.

3       Q    That sort of information is also used for your

4   rate making; is that correct?

5            MS. SARP:  Objection; foundation; way beyond

6   the scope of designated topics.

7   BY MR. HORVATH:

8       Q    Isn't that correct?

9       A    I'm not going to go into what is used for rate

10  making.  I mean, there's case reserves, there's IBNR.

11  I'm not an actuary.  It's beyond my area of expertise.

12           MR. HORVATH:  Thank you.

13           MS. SARP:  I actually have a question.

14           EXAMINATION BY COUNSEL FOR PLAINTIFF:

15  BY MS. SARP:

16      Q    Mr. Horvath asked what CIC had for information

17  in March of 2010, and he asked you if all you had was

18  the briefs from the underlying case.  Did you have other

19  information other than the brief?

20      A    Both.  We had the information from the

21  conversation that the adjustor had with Mr. Nace, as

22  well as the supplemental application, the claim or

Page 162

1    incident.

2         Q    And that's been marked as Exhibit 5, I think.

3    Is that the claim form you're referring to?

4         A    Yes.

5         Q    Would that have been part of the claim

6    information that was provided to the adjustor at the

7    outset of the claim?

8         A    Yes.

9         Q    One of the questions on there is the date of

10   the alleged error; correct?

11        A    Correct.

12        Q    Mr. Nace completed that to say 2008; correct?

13        A    Correct.

14        Q    Was 2008 after the first policy had incepted?

15        A    Yes.

16        Q    So based on that, would CIC have any reason to

17   look further as to what the date of the alleged error

18   was?

19        A    No.  We would take it that this would be

20   accurate.

21        Q    Do you operate under the assumption that the

22   insured is giving you accurate information when you get

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL                FRANK J. LINDNER
                                                                    Page 163

                                                                    Page 163

1   a claim information form?

2        A    Yes, we do.

3             MS. SARP:  That's all I have.  Thank you.

4        FURTHER EXAMINATION BY COUNSEL FOR DEFENDANTS:

5   BY MR. HORVATH:

6        Q    What was the alleged error?

7        A    Failing to timely file the lawsuit within the

8   statute of limitations period.

9        Q    What was the statute of limitations period?

10       A    Two years.

11       Q    When was the lawsuit filed?

12            MS. SARP:  Objection; relevance.

13       A    It occurred -- I think the error -- the

14  underlying med mal occurred on July, I think, 24th of

15  '04.  So they had until July, yeah.  So they had until

16  the 28th.  They had until July 28th.  It was filed four

17  days before the statute expired.

18  BY MR. HORVATH:

19       Q    And the statute expired in 2006; correct?

20       A    In 2006, correct.

21       Q    When did you learn what the alleged error was?

22       A    Well, we learned -- of the alleged error or



CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 5th day of November, 2014, I caused this Joint
Appendix to be filed electronically with the Clerk of the Court using the CM/ECF
System, which will send notice of such filing to the following registered CM/ECF
users:

Paulette S. Sarp
HINSHAW & CULBERTSON, LLP
333 South 7th Street, Suite 2000
Minneapolis, MN 55402
(612) 333-3434

*Counsel for Appellee Chicago Insurance Company*

Gabriel Amin Assaad
1425 K Street, NW, Suite 350
Washington, DC 20005
(202) 741-9348

*Appellee Gabriel Amin Assaad*

Carla D. Brown
CHARLSON BREDEHOFT & COHEN
11260 Roger Bacon Drive, Suite 201
Reston, VA 20190
(703) 318-6800

*Counsel for Appellee Sarah Gilbert*

David D. Hudgins
HUDGINS LAW FIRM, P.C.
515 King Street, Suite 400
Alexandria, VA 22314
dhudgins@hudginslawfirm.com

*Counsel for Appellee*

Herman Aubrey Ford, III
CANTOR STONEBURNER FORD GRANA & BUCKNER
7130 Glen Forest Drive, Suite 201
Richmond, VA 23226
afford@virginiatrialfirm.com

*Co-Counsel for Appellee Sarah Gilbert*

I further certify that on this 5th day of November, 2014, I caused the

required copies of the Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Stephen A. Horvath, Esquire
*Counsel for Appellants*