**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

𝕴𝖓 𝕿𝖍𝖊

# 𝕌𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

### 𝕱𝖔𝖗 𝕿𝖍𝖊 𝕯𝖎𝖘𝖙𝖗𝖎𝖈𝖙 𝖔𝖋 𝕮𝖔𝖑𝖚𝖒𝖇𝖎𝖆 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

# CHICAGO INSURANCE COMPANY,

*Plaintiff – Appellee,*

**v.**

# PAULSON & NACE, PLLC; BARRY JOHN NACE,

*Defendants– Appellants,*

# GABRIEL ASSAAD; SARAH GILBERT,

*Defendants– Appellees,*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————

## JOINT APPENDIX
## VOLUME II OF II
## (Pages 454 – 863)

———————

Stephen A. Horvath
BANCROFT, MCGAVIN,
HORVATH & JUDKINS, P.C.
3920 University Drive
Fairfax, Virginia 22030
(703) 385-1000

*Counsel for Appellants*

David D. Hudgins
HUDGINS LAW FIRM, P.C.
515 King Street, Suite 400
Alexandria, Virginia 22314
(703) 739-3300

*Counsel for Appellee*
*Chicago Insurance Company*

Paulette S. Sarp
HINSHAW & CULBERTSON, LLP
333 South 7th Street, Suite 2000
Minneapolis, Minnesota 55402
(612) 333-3434

*Counsel for Appellee*
*Chicago Insurance Company*

*(Counsel continued on inside cover)*

Gabriel Amin Assaad
ATTORNEY AT LAW
1425 K Street, NW, Suite 350
Washington, DC 20005
(202) 741-9348

Carla D. Brown
CHARLSON BREDEHOFT & COHEN
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800

Herman Aubrey Ford, III
CANTOR STONEBURNER
   FORD GRANA & BUCKNER
7130 Glen Forest Drive, Suite 201
Richmond, Virginia 23226

*Counsel for Appellee*
  *Gabriel Amin Assaad*

*Counsel for Appellee*
  *Sarah Gilbert*

*Counsel for Appellee*
  *Sarah Gilbert*

# TABLE OF CONTENTS
## VOLUME I OF II

**Appendix Page**

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Complaint for Declaratory Judgment**
     filed December 27, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Defendants' Answer and Grounds of Defense**
     filed January 16, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Defendants' Motion for Summary Judgment,**
**With Memorandum of Points and Authorities in Support,**
     filed August 8, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Plaintiff's Motion for Summary Judgment,**
**With Memorandum of Points and Authorities in Support,**
**Statement of Material Facts in Support, and Exhibits,**
     filed September 19, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    Exhibits:

    A.    **Complaint**
           dated March 13, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    B.    **Complaint**
           undated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

    D.    **Complaint**
           dated October 25, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

    E.    **Transcript of Hearing before**
        **The Honorable Melvin R. Hughes**
           on January 4, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

    F.    **Order of**
        **The Honorable Melvin R. Hughes**
        **Re: Dismissing Plaintiffs' Claims**
           dated February 26, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . 142

Plaintiff's Motion for Summary Judgment,
With Memorandum of Points and Authorities in Support,
Statement of Material Facts in Support, and Exhibits,
    filed September 19, 2013, continued:

<u>Exhibits</u>, continued:

G.    Transcript of Hearing before
      The Honorable Melvin R. Hughes
          on June 18, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

H.    Order of
      The Honorable Melvin R. Hughes
      Re: Granting Defendants' Motion to Dismiss Complaint
          dated August 3, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

J.    Lawyers Professional Liability Insurance Application
          received June 17, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

K.    Declarations
      Professional Liability Insurance Policy
          received August 10, 2007 . . . . . . . . . . . . . . . . . . . . . . . . 210

L.    Declarations
      Professional Liability Insurance Policy
          various dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

M.    Supplemental Claim Incident Information
          dated July 23, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

N.    Application for Lawyers Professional Liability Insurance
          dated July 20, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

O.    Letter to
      Barry Nace from
      Cari K. Ellenberger
      Re: Confirming Telephone Conference,
      With Attached Email Correspondence,
          dated May 17, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258

Plaintiff's Motion for Summary Judgment,
With Memorandum of Points and Authorities in Support,
Statement of Material Facts in Support, and Exhibits,
    filed September 19, 2013, continued:

<u>Exhibits</u>, continued:

P.    Letter to
Duana J. Grage from
Karen W. Stephens
Re: Enclosed CD
    dated November 21, 2011 ........................... 265

Q.    Letter to
Barry J. Nace from
Jennifer Green
Re: Review of Notice,
With Attachments,
    dated January 13, 2012 ........................... 267

R.    Letter to
Barry J. Nace from
H. Aubrey Ford
Re: Enclosed Copy of Complaint
    dated March 19, 2012 ........................... 282

S.    Claim History Report
    dated January 30, 2013 ........................... 284

T.    Letter to
Barry J. Nace from
Jennifer L. Green
Re: Reviewing Lawsuit,
With Attachments,
    dated April 21, 2012 ........................... 286

V.    Defendants' Memorandum in Support of
Motion to Dismiss Pursuant to
Fed. R. Civ. P. 12(b)(1), 12(b)(2) and 12(b)(3)
    dated October 12, 2012 ........................... 303

**Defendant Sarah Gilbert's Response to Defendants' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment, With Exhibits,**

filed November 21, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314

Exhibits:

A.  **Final Order of Re:  Granting Defendants' Motion for Remitittur**

dated November 1, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 319

B.  **Affidavit of H. Aubrey Ford**

sworn August 5, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

**Plaintiff's Memorandum of Points and Authorities in Support of Response in Opposition to the Defendants' Motion for Summary Judgment, With Statement of Material Facts Not in Dispute and Plaintiff's Additional Statement of Undisputed Material Facts in Support of Plaintiff's Opposition, With Exhibits,**

filed December 12, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

Exhibits:

Y.  **Copy of CIC's Claim Notes Relating to Mr. Gilbert's Potential Claim** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 392

Z.  **Excerpts of Transcript of Deposition of Barry J. Nace**

taken November 22, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . 394

AA.  **Letter to Barry J. Nace from H. Aubrey Ford Re:  New Representation**

dated January 28, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 427

BB.  **FileNet Claims Documentation Index Request**

dated April 24, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 430

Plaintiff's Memorandum of Points and Authorities in Support of
Response in Opposition to the Defendants' Motion for Summary Judgment,
With Statement of Material Facts Not in Dispute and
Plaintiff's Additional Statement of Undisputed Material Facts in
Support of Plaintiff's Opposition,
With Exhibits,
   filed December 12, 2013, continued:

   <u>Exhibits</u>, continued:

   CC.   Excerpts of Transcript of Deposition of Frank J. Lindner
            taken November 22, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 433

# TABLE OF CONTENTS
## VOLUME I OF II

**Appendix Page**

**Defendants' Opposition to Plaintiff's
Motion for Summary Judgment,
With Statement of Genuine Issues of
Material Fact Necessary to be Litigated and Exhibits,**
    filed December 12, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 454

**Exhibits:**

2.    **Excerpts of Transcript of Deposition of Barry J. Nace**
        taken November 22, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . 491

4.    **Pleadings in Underlying Medical Malpractice Lawsuits**
        various dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 500

5.    **Affidavit of Barry J. Nace**
        sworn November 13, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . 514

6.    **Affidavit of H. Aubrey Ford**
        sworn August 5, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 517

7.    **Declarations
Professional Liability Insurance Policy**
        issued July 24, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 520

8.    **Letter to
Julie M. Lindenmann from
Barry J. Nace
Re: Declined to Accept Appeal,
With Attachments,**
        dated March 2, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 544

**Plaintiff's Reply Memorandum in Support of
Motion for Summary Judgment**
    filed January 9, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 675

**Defendants' Reply to Plaintiff's**
**Opposition to Motion for Summary Judgment,**
**With Response to Statement of Additional Material Facts and Exhibits,**
    filed January 9, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 702

    <u>Exhibits:</u>

    11.    **Letter to**
            **Jennifer L. Green from**
            **Barry J. Nace**
            **Re: Response to April 21, 2012 Letter**
                **dated May 30, 2012** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 742

    12.    **Transcript of Deposition of Frank J. Lindner**
                **taken November 22, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . 744

**Plaintiff's Sur-Reply in Support of Opposition to**
**Defendants' Motion for Summary Judgment,**
**With Exhibit,**
    filed January 22, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 755

    <u>Exhibit:</u>

    DD.  **Commercial Lines Policy**
                **undated** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 761

**Exhibit to**
**Defendants' Notice of Exhibit Correction**
    filed January 27, 2014:

    2.    **Excerpts of Transcript of Deposition of Barry J. Nace**
                **taken November 22, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . 795

**Exhibit to**
**Defendants' Notice of Exhibit Correction**
    filed January 27, 2014:

    2.    **Excerpts of Transcript of Deposition of Barry J. Nace**
                **taken November 22, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . 817

**Order of**
**The Honorable Amy Berman Jackson**
**Re: Granting Plaintiff's Motion for Summary Judgment**
　　　filed April 10, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 839

**Memorandum Opinion of**
**The Honorable Amy Berman Jackson**
**Re: Granting Plaintiff's Motion for Summary Judgment**
　　　filed April 10, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 840

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHICAGO INSURANCE COMPANY,    :
an Illinois Corporation    :
        Plaintiff,    :
    :
v.    :      Civil No. 1:12-CV-2068
    :
PAULSON & NACE, PLLC, et al.,    :
        Defendants.    :
_____/

**DEFENDANTS PAULSON & NACE, PLLC, AND BARRY NACE'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

COME NOW, Defendants Paulson & Nace, PLLC ("Paulson & Nace") and Barry J. Nace, Esq., by counsel and respectfully oppose Chicago Insurance Company ("CIC")'s Motion for Summary Judgment and in opposition thereto state as follows:

## I.  INTRODUCTION

This insurance dispute arises from CIC's attempt to disclaim coverage for a legal malpractice claim asserted against the Paulson & Nace, Barry Nace, and Gabriel Assaad, by Sarah Gilbert, during the policy period on a claims-made insurance policy.  CIC contends that it is not obligated to cover the claim because Barry Nace breached a condition precedent to coverage. CIC alleges that Mr. Nace had reason to believe that there had been a breach of a professional duty or reason to foresee a claim would be made against his firm by Sarah Gilbert prior to the beginning of the policy period.  CIC has not identified any witness who can testify that Barry Nace had a reasonable basis to believe that a breach of the standard of care occurred, or that he could reasonably foresee suit because of a simple and common misnomer.  The only evidence is to the contrary: prior to the effective date of the first professional liability insurance policy issued by CIC, Mr. Nace had no reasonable basis to believe that a misnomer of the arrangement of the name

454

of the minor and the next friend in the caption breached a professional duty or that a claim was reasonably foreseeable.

CIC relies on an alleged dismissal of the underlying lawsuit with prejudice in February 2007 as the basis for its denial of coverage; however, the record and the court's statements make it abundantly clear that the February 2007 order did not dismiss the action with prejudice. The words "with prejudice" were struck from the order, such that it reads, "It is therefore ORDERED that Sarah Gilbert's, a minor, claims are DISMISSED ~~WITH PREJUDICE~~." Judge Hughes later confirmed that the February 26, 2007 dismissal was without prejudice. **Exhibit G to Plaintiff's Motion for Summary Judgment**, 31:20-31:23 ("I think I dismissed the first one without prejudice because the second case was pending, and that case, as I recall, was not up for bat, if you will."). Even though the words, "with prejudice" were crossed out of the order, and even though the trial judge made it abundantly clear that the first case was not dismissed with prejudice, CIC bases its motion for summary judgment and denial of coverage on the incorrect statement that the first case was dismissed with prejudice in February 2007.

CIC failed to give timely notice to the defendants that it was relying on a breach of a policy condition to disclaim coverage and defended the underlying legal malpractice action for more than two years without communicating its reservation of rights to Paulson & Nace, Mr. Nace, or Ms. Gilbert, therefore, it cannot rely on the breach of the policy condition to disclaim coverage. The failure to advise Ms. Gilbert of the potential coverage defense severely prejudices her as a claimant on the policy. Ms. Gilbert has now obtained a judgment against Paulson & Nace and as a result she too has an interest in the insurance policy. See Va. Code § 38.2-2200 (providing that a judgment creditor may maintain a direct action against the insurer, if the judgment is not satisfied

by the insured).   The Commonwealth of Virginia has expressed a policy to defend the rights of claimants where an insurer seeks to avoid coverage, but fails to advise the claimant of its intent to rely on failure of a policy condition.

## II.   BACKGROUND

The insurance dispute in this matter concerns a professional liability insurance policy (the "Policy") issued by CIC to Paulson & Nace with an initial policy period July 24, 2007 through July 24, 2008 and which has been renewed annually thereafter.   Docket No. 1, Compl., ¶¶ 21, 24.   The underlying claim for legal malpractice arises from a medical malpractice action asserted by Paulson & Nace on behalf of Ms. Gilbert and her parents.   Compl. ¶ 14.

The Medical Malpractice Cases

On July 24, 2006, Paulson & Nace filed a complaint in the Circuit Court for the City of Richmond, Virginia for medical malpractice against the doctor who performed spinal surgery on Ms. Gilbert and the hospital where that surgery occurred, on behalf of Ms. Gilbert and her parents (the "First Case").   Compl. ¶ 14.   The complaint in the First Case was styled "RICHARD GILBERT and ROSIE LEE GILBERT, Individually and on behalf of their daughter, SARAH GILBERT" and did not contain the words "as next friend," which the Supreme Court of Virginia has interpreted Virginia Code § 8.01-8 to require in suits on behalf of a minor.   Compl. ¶ 16; see Herndon v. St. Mary's Hosp., Inc., 266 Va. 472, 587 S.E.2d 567 (2003).   This was nothing more than a simple misnomer.   This pleading included the minor's claim for medical malpractice injuries as well as her parents' claims for both economic and non-economic damages arising from the injuries to their daughter.   The statute of limitations for Ms. Gilbert's medical malpractice claim ran until two years after the alleged incident, July 28, 2006.   Compl. ¶ 15.   On October 25,

2006, out of an abundance of caution Paulson & Nace filed a second complaint for medical malpractice against the same tort defendants with the names of the plaintiffs rearranged.   The Second Suit was styled as "SARAH GILBERT, by her parents and next friend RICHARD GILBERT and ROSIE LEE GILBERT; and RICHARD GILBERT and ROSIE LEE GILBERT, individually."   Compl., ¶ 17.   On February 26, 2007, the trial court dismissed the First Case due to the alleged misnomer in the named plaintiff.   Compl. ¶ 18.   On March 6, 2007, Mr. Assad filed an amended complaint in the First Case in Ms. Gilbert's parents' names only for their economic and non-economic damages.   Pl. Supp. Resp. Req. Prod. Doc. No. 1, "Pleadings in Underlying Medical Malpractice Lawsuits" (hereinafter, "Pleadings Index" attached hereto as **Exhibit 4**), p. 3. The tort defendants brought a special plea of statute of limitations, motions to dismiss, and demurrers to the parents' claims in the amended Second Case.   Pleadings Index, p. 12.   On August 3, 2007, the trial court sustained the special plea of the statute of limitations, dismissed the Second Case with prejudice, sustained the demurrers to the parents' claims for non-economic damages in the First Case, and consolidated the remaining claims.   Compl. ¶ 19; Pleadings Index, p. 5.   Contrary to CIC's assertion, there was no dismissal "with prejudice" until August 3, 2007. See Statement of Genuine Issues of Material Fact Necessary to be Litigated, ¶¶ 10 & 11.   Even though the words, "with prejudice" were crossed out of the order, and even though the trial judge made it abundantly clear that the first case was not dismissed with prejudice, CIC bases its denial of coverage on the incorrect statement that the first case was dismissed with prejudice in February 2007.

On August 29, 2007, Mr. Nace filed notices of appeal in both the First and Second Case. Pleadings Index, p. 5.   After briefing by both parties, the Supreme Court of Virginia denied the

appeals as premature to a final order from the trial court because the parents claims were still pending.   Pleadings Index, p. 5.   As a result, on April 13, 2009, Mr. Nace filed a Motion to Reconsider the August 3, 2007, Order in the trial court, which was later denied.   Pleadings Index, p. 10.   On May 19, 2009, Mr. Nace nonsuited the remaining parents' claims, which allowed the order to become "final."   Pleadings Index, p. 10.   Mr. Nace proceeded to appeal the now final orders and those appeals were denied by the Supreme Court of Virginia on December 15, 2009. Pleadings Index, p. 11.

<u>The Coverage Dispute and Legal Malpractice Claim</u>

One day after the nonsuit of the parents claims, May 20, 2009, Mr. Nace completed and faxed a Supplemental Claim/Incident Form (the "Claim Report") to Kevin Bradley, at Alliant Insurance Services, reporting the potential claim that may arise due to the procedural faults in the pursuit of the Gilbert lawsuits.   Compl. ¶ 25; See Affidavit of Barry Nace (hereinafter "Nace Aff.," attached as **Exhibit 5**), ¶ 4.   Mr. Nace provided the notice after discussing the matter with another attorney who did a significant amount of appellate work in Virginia and informed Mr. Nace that he felt the chances of a successful appeal of the dismissals were "unfavorable."   Nace Depo., 57:9-58:22.   Prior to that point, Mr. Nace did not believe it would be reasonable to consider that a misnomer of simply rearranged names could ever lead to a final dismissal of the malpractice actions.   <u>See</u> Nace Depo., 59:13-60:7.   Pursuant to the Complaint, CIC received the Claim Report in May 2009.   Compl. ¶ 25.

From December 2009 through January 2012, communication continued between CIC, Mr. Nace, and Mr. Nace's attorney, Deborah Whelihan, regarding the status of any claim by the Gilberts.   Nace Aff. ¶ 5.   In January of 2011, H. Aubrey Ford, Esq., sent a letter to Mr. Nace

advising that the Gilberts asked to transfer their representation in the medical malpractice claim to his firm.   Importantly, for more than two years between May 20, 2009 and January 13, 2012, CIC was actively on notice of a potential claim, and no reservation of rights was communicated to the Paulson & Nace or Ms. Gilbert.   Nace Aff. ¶ 6; see also Affidavit of H. Aubrey Ford, III (hereinafter "Ford Aff.," attached hereto as **Exhibit 6**), ¶ 5, 6.   CIC asserts that a reservation letter was sent to Mr. Nace, but there is no record of receipt of the letter in question and CIC's corporate representative admitted that the letter was an acknowledgement of claim with nothing specific to reserve.   Deposition of Frank J. Lindner, CIC's Corporate Representative, (hereinafter "CIC Depo.", attached hereto as **Exhibit 9**) 59:4-59:21 & 72:5-72:16.

It was not until January 13, 2012, that, by CIC's own admission, it forwarded letters to Mr. Nace, Paulson & Nace, and Mr. Assad, asserting that their defense of a potential legal malpractice claim by the Gilberts would proceed under a reservation of rights.   Nace Aff. ¶ 6.   Mr. Ford filed a legal malpractice claim on behalf of the Gilberts against the Paulson & Nace, Mr. Nace, and Mr. Assad on March 13, 2012.   Compl. ¶ 13.   CIC filed a complaint for declaratory relief in the Eastern District Court of Virginia, Alexandria Division, on September 25, 2012, which was dismissed for lack of subject matter jurisdiction on December 3, 2012.    Shortly thereafter, CIC filed the present action.   At no point up to the present has CIC ever sent notice to the Gilberts or their counsel of the reservation of rights, with the exception of serving Sarah Gilbert through her attorney with the first declaratory judgment complaint on or about October 12, 2012.   Ford Aff. ¶ 6.

## III.   LAW & ANALYSIS

### A.   Summary Judgment Standard

CIC is not entitled to summary judgment in this case because genuine issues of material fact preclude judgment it its favor.   Fed. R. Civ. P. 56(c); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).   The party seeking summary judgment has the initial burden of showing the absence of a material fact.   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).   A genuine issue of material fact exists, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."   <u>Anderson</u>, 477 U.S. at 248.   Whether a fact qualifies as "material" hinges on the substantive law at issue.   <u>See</u> <u>id</u>.   In the present matter, summary judgment in CIC's favor is not appropriate because CIC has not identified any facts or experts to establish the standard when a reasonable basis to believe a professional duty had been breached or when a claim was reasonably foreseeable.   Further, the undisputed facts clearly demonstrate that CIC failed to give its insured and the claimant timely notice of its reservation of rights.

     B.    <u>Virginia Law Applies To The Analysis Of This Declaratory Judgment Action</u>.

Where, as in this case, jurisdiction is based on diversity of citizenship, the court should "apply the choice of law rules for the jurisdiction in which it sits."   <u>Stromberg v. Marriott Int'l, Inc.</u>, 474 F. Supp. 2d 57, 61 (D.D.C. 2007) (<u>quoting</u> <u>Meng v. Schwartz</u>, 305 F. Supp. 2d 49, 58 (D.D.C. 2004)).   Under the modified "governmental interests analysis" employed by D.C. courts, the court

> Evaluate[s] the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review . . . As part of this analysis, we also consider the four factors enumerated in Restatement (Second) of Conflict of Laws § 145:
>     a)  the place where the injury occurred;
>     b)  the place where the conduct causing the injury occurred;
>     c)  the domicile, residence, nationality, place of incorporation and place of business of the parties; and
>     d)  the place where the relationship is centered.

Washkoviak v. Student Loan Mktg. Ass'n, 900 A.2d 168, 180 (D.C. 2006) (quoting District of Columbia v. Coleman, 667 A.2d 811, 816 (D.C. 1995)).

The policy underlying Va. Code § 38.2-2226 is "to require a liability insurer which intends to rely on a breach of the terms and conditions of the policy contract, in defense of any claim under the policy, to furnish prompt notice of such intention to the claimant or his attorney, so that steps may be taken by the claimant, a stranger to the insurance contract, to protect his rights."   Liberty Mut. Ins. Co. v. Safeco Ins. Co., 223 Va. 317, 325, 288 S.E.2d 469, 474 (1982).   Through the enactment of § 38.2-2226, the Commonwealth of Virginia has created a system where "[t]he insurer can prevent, without difficulty, a claimant's wasting of finances and time pursuing a judgment that later proves to be uncollectible. **Virginia, through this statute, has manifested a legitimate interest in safeguarding the rights of persons injured within her boundaries.**" Fed. Ins. Co. v. Nationwide Mut. Ins. Co., 448 F. Supp. 723, 726 (W.D. Va. 1978) (emphasis added).

The District of Columbia's analysis of timeliness and reasonable investigation affect the policy of requiring good faith performance by all parties to a contract.   See e.g. Diamond Serv. Co., Inc. v. Utica Mut. Ins. Co., 476 A.2d 648, 656 (D.C. 1984) ("[t]he relationship of insured and insurer presumes good faith on both sides").   This rule considers fundamental fairness – balancing an insurer's interest in having a reasonable amount of time to investigate a claim and potential coverage against an insured's interest in knowing the scope of its potential personal exposure for a claim and mounting a prompt defense.   Central Armature Works v. Amer. Motorists Ins. Co., 520 F. Supp. 283, 288 (D.D.C. 1980).

Virginia's policy would be more advanced by the application of its law to the facts in this case because § 38.2-2226 conveys a stronger interest in Virginia's policy of protecting those injured within its borders than D.C.'s variable balancing test.   Further, Virginia Code § 38.2-2226 applies because it is "procedural" in that it applies to insurance disputes concerning injuries occurring in Virginia and actions pending there.   In Federal Ins. Co. v. Nationwide Mut. Ins., 448 F.Supp. 723, the court found that the statute applied to a policy issued outside the Commonwealth of Virginia when the underlying accident occurred in Virginia.   The court sought to avoid a *lex loci contractus* choice of law, which would not apply in the District of Columbia:

> However, when a third party has been injured in an accident in Virginia, public policy in Virginia demands that potential claimants be notified when liability insurers intend to deny coverage to their insureds.   If an insurer can require the insured to give prompt notice of an accident, it is certainly reasonable that a state can, as part of its public policy, require the insurer to give notice of a policy defense to the injured claimant, particularly to a third party insured by the insured.

Id. at 726.   The reference to procedure in this matter is the requirement that the statute applies to coverage disputes concerning tort cases pending in the Commonwealth of Virginia.   If the underlying case were pending in another jurisdiction, then that jurisdiction's laws would apply to questions concerning the sufficiency of the insurer's reservation of rights.

The cases cited by CIC fail to consider the policy Virginia seeks to advance in protecting its citizens through the requirement that claimants be notified of any policy defenses. Significantly, unlike Adolph Coors Co. v. Truck Ins. Exch., 960 A.2d 617 (D.C. Ct. App. 2008) where the allegedly injured parties were located in several venues throughout the country, this case involves a single claimant in the underlying action, Ms. Gilbert.   That claimant's interest weighs heavily on the court's consideration of the locus of the insured risk.   Further, because Ms. Gilbert's underlying claim has now been reduced to a judgment, she too has an interest in the

-9-

policy between CIC and Paulson & Nace, as a third party beneficiary.   See Storm v. Nationwide Ins. Co., 199 Va. 130, 97 S.E.2d 759 (1957).   The Storm court noted that legislation enacted for the benefit of injured parties, such as Va. Code § 38.2-2226, should be liberally construed so that its purpose may be accomplished. See id., 199 Va. at 135, 97 S.E.2d at 762.

This Court should also considers the Second Restatement factors.   In this case, the injury occurred in Virginia.   The alleged legal malpractice was the style of the first complaint filed in the Gilbert's medical malpractice claim, which occurred in the Circuit Court of the City of Richmond, Virginia.   The conduct causing the alleged injury occurred in Virginia – the Gilberts' medical malpractice claims - were all filed, dismissed, and appealed in Richmond.   These pleadings, along with correspondence between Paulson & Nace, CIC and Virginia counsel for the Gilberts and Paulson & Nace occurred in Virginia.

While the parties are from several different states, two of the parties have significant ties to Virginia.   CIC is an Illinois corporation with its principal place of business and citizenship in Illinois.   CIC is, however, licensed to sell insurance in Virginia and is present in Virginia. Paulson & Nace is a professional limited liability company organized under the laws of Washington, D.C. with its principal place of business and citizenship in D.C.   Barry Nace is a resident and domicile of Washington, D.C.   Gabriel Assaad is a citizen and resident of Texas. Sarah Gilbert is a citizen and resident of the Commonwealth of Virginia.

Finally and compellingly, the place where the relationship is centered is Virginia.   With regard to liability policies, the rights of the injured party as against the insurer are governed by the law of the place where the underlying tort occurred.   Federal Ins. Co. v. Nationwide Mut. Ins. Co., 448 F. Supp. At 725.   The alleged medical malpractice that injured Ms. Gilbert took place in

Virginia; the suit for that malpractice was filed in Virginia; Barry Nace associated with local Virginia counsel to represent Ms. Gilbert in that case; and the alleged legal malpractice forming the basis for the underlying case, coverage for which is at dispute in this declaratory judgment action, took place in Virginia.

The only connection Washington D.C. has to this matter is that the policy was issued to Paulson & Nace in D.C. and Paulson & Nace and Barry Nace are citizens and residents of D.C. The entire basis of the claim involves actions taken in lawsuits in Richmond, Virginia.   Therefore, the Court should apply Virginia law.

Virginia has adopted a strong policy of protecting its injured plaintiffs from proceeding forward without knowledge of the existence of a reservation of rights.   Pursuant to Va. Code Ann. § 38.2-2226, an insurer must provide notice of its intention to rely upon a reservation of rights to the insured after learning of facts that would show a failure to comply with a condition precedent to coverage. Id.   If an insurer fails to provide timely notice of a reservation of rights to the insured, its defense to coverage is waived by operation of law.   Id.   Further, once a reservation of rights is issued, notice of that reservation must be sent to the tort plaintiff or the tort plaintiff's attorney. Va. Code Ann. § 38.2-2226.

The law of the District of Columbia also protects insureds from insurers pulling the rug out from under them by attempting to disclaim coverage or reserve rights after a significant time period has passed.   Applying the District's law, the court would undergo a fact-specific inquiry as to the timeliness of CIC's notice of reservation of rights to the insured and claimant.   District of Columbia courts have held that a "reservation of rights is sufficient so long as the insurer conducts an investigation and analysis with 'reasonable diligence and promptly notifies the insured' once

the process is complete.  <u>Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP</u>, 793

F.Supp.2d 399 (D.D.C. 2011) (quoting <u>Central Armature Works, Inc.</u>, 520 F. Supp. at 288 n. 4);

<u>see</u> <u>also</u> <u>Lee v. Travelers Ins. Co.</u>, 184 A.2d 636, 639 (D.C. 1962)).   "[A]n insurer who defends an

insured without an appropriate disclaimer and reservation of rights is barred from disclaiming

coverage."  <u>Capitol Specialty</u>, 793 F.Supp.2d at 411, fn. 8; <u>Continental Cas. Co. v. Hartford Fire</u>

<u>Ins. Co.</u>, 116 F.3d 932, 939, 325 U.S. App. D.C. 311 (D.C. Cir. 1997).   Here, even if the District

of Columbia's law is applied, CIC is estopped from denying coverage because of the amount of

time that passed after learning of the claim before sending any sufficient reservation of rights

letter, the retention of counsel to defend Paulson & Nace and Barry Nace in the legal malpractice

action, and the prejudice that resulted from the uncertainty surrounding CIC's coverage position.

<u>See</u> Nace Depo., 111:12-116:16.

      C.    <u>CIC identifies no evidence to indicate that Barry Nace had a reasonable basis to believe that Paulson & Nace had breached a professional duty or reasonably foresaw that a claim might be made against them when CIC's first policy was issued</u>.

    The policy issued by CIC to Paulson & Nace provides insurance coverage on a

claims-made basis.   <u>See</u> Policy, attached hereto as **Exhibit 7**.   Mr. Nace had maintained

coverage under his prior policy until CIC policy went into effect.   Mr. Nace therefore had no

reason not to give notice, if he had reason to believe a breach of professional duty had occurred

prior to the CIC policy period.   If he had known of the potential claim prior to the CIC policy

period, he would have been entitled to coverage under the prior policy.   The CIC insurance

agreement provides,

      **I.  COVERAGE**
      The Company will pay on behalf of the insured all sums which the insured shall
      become legally obligated to pay as Damages for Claims first made against the

Insured and reported to the Company during the Policy Period or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or Personal Injury in the rendering of or failure to render Professional Services or Personal Injury happen:

A.  during the Policy Period; or

B.  prior to the Policy Period provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the Named Insured or Predecessor in Business, and continuously renewed and maintained in effect to the inception of this policy period:

1.  the insured did not give notice to any prior insurer of any such act, error, omission, or Personal Injury;

2.  the Named Insured, any partner, shareholder, employee, or where appropriate the Named Insured's management committee or any member thereof, had no reasonable basis to believe that the Insured had breached a professional duty or to Reasonably Foresee that a Claim would be made against the Insured; and

3.  There is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such Claim; unless the available limits of liability of such prior policy or policies are insufficient to pay any Claim, in which event this policy will be specific excess over any such prior coverage subject to this policy's terms, limits of liability, exclusions and conditions.

Policy, page 1 of 10.   CIC does not dispute that a claim was made for an alleged negligent act, error, omission or Personal Injury prior to the effective date of the first policy it issued, or that Paulson & Nace had continuously renewed and maintained the policy from the date of inception through the date the claim was made (Section B); CIC does not dispute that Paulson & Nace had not given notice to any prior insurer of any such act, error, omission, or Personal Injury (Subsection 1); and CIC does not dispute that no prior policy or policies apply (subsection 3). The only condition precedent to coverage that CIC disputes is whether Mr. Nace had a **reasonable** basis to believe that they had breached a professional duty or could **reasonably** foresee that a claim would be made against them.   This is the equivalent to proving the reasonableness standard in a negligence case; therefore CIC is required to present expert testimony on when a reasonable

-13-

basis exists or when the claim would be reasonably foreseen.   See O'Neil v. Bergan, 452 A.2d

337 (D.C. 1982) (expert necessary to establish legal malpractice); see also Seaward Int'l, Inc. v.

Price Waterhouse, 239 Va. 585, 391 S.E.2d 283 (1990) (unless malpractice case turns on matters

within the common knowledge of laymen or upon rules that have ripened into rules of law, expert

testimony is required to establish appropriate professional standard and deviation therefrom); see

also Foster v. Westchester Fire Ins. Co., 2012 U.S. Dist. LEXIS 88274 (W.D. Pa. 2012) (summary

judgment unavailable to insurer asserting that insured had reasonable basis to believe it had

breached a professional duty without expert opinion on standard of care in the attorney's field).

However, CIC has not identified any expert or facts that an attorney would have a reasonable basis

to believe that a misnomer, such as the alleged error here, was a breach of professional duty or that

a claim was reasonably foreseeable as a result of the misnomer prior to the inception of the first

policy.

    The sole witness identified by any party to this action capable of rendering an opinion on

the standard of care concerning a misnomer is Barry Nace, Esq.   During his deposition, Mr. Nace

was asked if the misnomer was a professional error:

> Q  Would you agree that when you file a lawsuit, if the defendant moves to dismiss
>    and the court dismisses that lawsuit on the grounds that it was not filed
>    correctly, wouldn't you agree that that is a professional error?
> MR. HORVATH:   Objection.
> A  No.
> BY MS. SARP:
> Q  Why not?
> A  Things like that happen.   Well, I suppose you never practiced law like I do in
>    the courts all the time representing individuals.
> Q  Actually, I'm asking the questions.
> A  So the bottom line is, those kind of errors occur all of the time in the office, a
>    misnomer or something of that sort, and nowhere am I aware that that would
>    ever by itself lead to a claim.   That is not dispositive of anything.

We recently had one where the wrong name was  used, totally, wrong defendant, corporation.   An amendment was made and everything was fine.

There's no way I would ever suspect I would send that to an insurance company.   I had another one I can think of very recently, too, in which a court dismissed a case on a Motion of Reconsideration.   Several months later, reinstated the case.

So, no, absolutely not.   There is nothing there that would indicate to me that there might be a claim made in 2006 or '7 on this case.   No.

Q   But as you -- I think you have at least recognized that whether a claim would be made or not, you would agree that the dismissal of an action on the grounds of some sort of error in the caption can -- is a, quote, unquote, professional error; correct?

MR. HORVATH:   Objection.   He just answered your question.   He just said that.

A   No, I don't agree with that.

Nace Depo., 40:22-42:14.   CIC offers no evidence and has identified no expert testimony to suggest that timely filing a complaint containing a misnomer gave Barry Nace a reasonable basis to believe that they had breached a professional duty.   Mr. Nace clearly stated that the dismissal of the action on the grounds of a misnomer, in his professional opinion, was not a "professional error."

Mr. Nace had maintained coverage prior to the CIC policy throughout the time that Paulson & Nace represented Ms. Gilbert.   If he had reason to believe that a professional duty had been violated during the prior policy period, he would have given notice to the prior insurer.   CIC's contention that he had reason to believe a breach of professional duty had occurred prior to his notice is illogical.   Mr. Nace did not stand to gain anything by delaying providing notice, once he has a reasonable basis to believe that a breach had occurred.   As soon as he obtained that information, he put CIC on notice.

None of the cases identified by CIC in the Motion for Summary Judgment support CIC's contention that a misnomer, such as occurred here, constitutes a breach of professional duty as a

-15-

468

matter of law.   To the contrary, many of these cases deal with missed filing deadlines where attorneys simply failed to file within the required time period.   See Capitol Specialty Ins. Corp., 793 F. Supp. 2d 399; see also In re Belmar, 319 B.R. 748, 755 (Bankr. D.D.C. 2004); see also Ross v. Continental Cas. Co., 420 B.R. 43 (D.D.C. 2009); see also Cameron v. Washington Metro. Transit Auth., 649 A.2d 291 (D.C. 1994); see also O'Neil v. Bergan, 452 A.2d 337 (D.C. 1982). None of these cases arise from circumstances demonstrating that a mere misnomer, which is a common occurrence (Nace Depo. 40:22-42:14) and does not prejudice the client under Virginia Code § 8.01-6 ("A misnomer in any pleading may, on the motion of any party, and on affidavit of the right name, be amended by inserting the right name…"), constitutes a breach of a professional duty or that an attorney filing a pleading containing a misnomer has a reasonable basis to believe that it has breached a professional duty.

The case of Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP, 793 F. Supp. 2d 399, upon which CIC relies heavily is distinguishable because the defendants in that action missed the filing deadline for class certification of a class-action lawsuit (id. at 402); whereas in the present matter Paulson & Nace filed the first medical malpractice action (containing the misnomer) within the statute of limitations.   Unlike the attorneys in Capitol Specialty Ins. Corp., the attorney defendants in this matter filed the claim within the time period allowed by statute.   It was not until Mr. Nace had consulted with another attorney concerning the impact of the misnomer that he had reason to believe the misnomer was a breach of a professional duty.   See Nace Depo., 57:9-59:12.

The attorney in In re Belmar, 319 B.R. 748, is also distinguishable from the present facts. There, the attorney did not file a response to a Motion to Lift Stay in a bankruptcy proceeding until

after the deadline for such a motion had expired.   There, the court found that the only breach that occurred was the attorney's failure to timely file or seek an extension of time to file.   Id. at 754. Unlike the late opposition in In re Belmar, Paulson & Nace did in fact file a timely complaint. Although that complaint was later found to be deficient on procedural grounds, i.e. contained a misnomer, the matter was timely filed and at the inception of the first policy, Barry Nace did not believe a professional duty had been breached by the misnomer.

A similar situation occurred in Ross v. Continental Cas. Co., 420 B.R. 43, where the attorney defendant failed to file a timely answer on behalf of his client.   Just as in In re Belmar and Capitol Specialty Ins. Co., the court found that where **no pleading** had been filed within the applicable deadline, the court found that the attorney's complete failure to abide by the filing deadline was a breach of a professional duty as a matter of law.   The Ross court was not faced with facts similar to the present case involving a timely filing containing a misnomer.   In contrast, Barry Nace did not have a reasonable basis to believe that the misnomer was a breach of a professional duty because they did file the complaint, and the concept that a misnomer such as was involved here may lead to a dismissal was ridiculous.   See Nace Depo. 59:17-60:7.

The case of O'Neil v. Bergan, 452 A.2d 337, which CIC cites for its dicta concerning the types of attorney malpractice cases where experts are unnecessary, does not involve a misnomer either.   In fact, the holding of that case favored the defendants because the alleged malpractice did "not fall within the 'common knowledge' exception to the expert testimony requirement."   Id. at 342.   There, just as here, expert testimony would be required to determine whether the work that the defendant attorneys performed fell below the professional standards.   Id.   Because the plaintiff in that case failed to call any expert witness to testify as to the standard of care, the court

-17-

properly directed a verdict in favor of the defendants.   Id.   Similarly, in the present case CIC has

not identified any expert or other witness to testify that the misnomer constituted a breach of a

professional duty or that Barry Nace should have reasonably known that it was a breach of a

professional obligation.

CIC's citation to Bryan Bros. Inc. v. Continental Cas. Co., 660 F.3d 827 (4th Cir. 2011),

also does not set forth any basis for the court to find that the misnomer should have given Barry

Nace a reasonable basis to believe they had breached a professional duty, prior to May of 2009.

That case involved an accounting firm's discovery of the theft of client funds by one of its

employees.   Id. at 829.   That case found that illegal acts by the employee between 2002 and 2009

gave that employee prior knowledge of the breach of professional duty, therefore the policy did not

apply to the clients' claims arising from the thefts.   See generally id.   While the Fourth Circuit

found that the accounting firm was not entitled to coverage arising from prior acts or omissions

that might reasonably be expected to result in a claim, the present case does not involve prior acts

or omissions that a professional **that were reasonably foreseeable at the time of the inception**

**of the first policy**.

The case of Worth v. Tamarack American, 47 F. Supp. 2d 1087 (S.D. Ind. 1999), also cited

by CIC, again involves a missed deadline, as opposed to a misnomer appearing in the pleadings

filed prior to the deadline.   The case does not provide the standard for when an attorney should

reasonably know that a misnomer constitutes a breach of a professional duty.   The only to

establish such a standard is through expert testimony.   See O'Neil v. Bergan, 452 A.2d at 342.

In Virginia there are many instances were a misnomer in the naming of a minor plaintiff goes unnoticed and unchallenged.   Reported cases are found in every level of Virgirnia's courts containing the exact same issue rearranging the names in the caption:

- <u>Debra S. Lee, as mother and next friend of Ry James Lee, a minor v. Nationwide Mut. Ins. Co.</u>, 255 Va. 279, 497 S.E.2d 328 (1998).

- <u>Sally Inez Adams, on behalf of her niece, Jamill C. Boysaw v. Hercules, Inc.</u>, 21 Va. App. 458, 465 S.E.2d 135 (Va. Ct. App. 1995).

- <u>Steven W. White and Janet A. White, parents and next friend of Michael Glenn White, and Michael Glenn White v. School Board of Henrico County</u>, 36 Va. App. 137, 549 S.E.2d 16 (Va. Ct. App. 2001).

- <u>Charles Turner and Keitha Turner, on behalf of themselves individually and on behalf of Baby Doe Turner v. Laserna</u>, 6 Va. Cir. 407 (Fredericksburg Cir. Ct. 1986)

Judge Gregory of the Virginia Supreme Court noted, in dissent, the technical difficulty presented by such misnomers:

> To dismiss the suit simply because the caption styles the complaint "Maude Kirby, in her own right and as next friend of Lois May Kirby Gilliam, an infant" is carrying the enforcement of technical rules of procedure entirely too far…The sole function of the next friend is to protect the interest of the infant.  He is purely a representative, nothing more.  When he is actually in court in that capacity, what difference is it whether he is styled as suing in the name of the infant by him as next friend or suing as next friend for the infant?   In either event the infant is the real party in interest; not the next friend.

<u>Maude Kirby, in her own right and as next friend of Lois May Kirby Gilliam, an infant v. Junious Gilliam</u>, 182 Va. 111, 123, 28 S.E.2d 40, 46 (1943)(dissenting).  Here, the sole evidence to establish when Mr. Nace had a reasonable basis to believe that misnomer breached a professional duty is from Barry Nace, himself.   That evidence does not establish that Paulson & Nace or Mr. Nace knew or should have known that they had breached a professional duty prior to May 2009, when notice was provided to CIC.

D.   Even if a condition precedent to coverage was not satisfied, CIC's failure to comply with Virginia Code § 38.2-2226 notice provisions precludes it from relying on failure of a condition precedent to disclaim coverage.

CIC admits that it first provided notice of a reservation of rights to Paulson & Nace, Barry Nace, and Mr. Assad, on or about January 13, 2012.   CIC never provided notice within 45 days of learning of facts which put it on notice of the breach and CIC never provided notice to the Gilberts or their counsel of any reservation of rights until it filed the first declaratory judgment claim in September 2012.   See Ford Aff. ¶ 5, 6.   The purpose of § 38.2-2226

> is to require a liability insurer that intends to rely on a breach of the terms and conditions of the policy contract, in defense of any claim under the policy, to furnish prompt notice of such intention to the claimant or his attorney so that steps may be taken by the claimant, a stranger to the insurance contract, to protect his rights.

To fulfill this purpose, § 38.2-2226 requires that "notification [by the insurer] shall be given within forty-five days **after discovery by the insurer of the breach or of the claim, whichever is later**." (emphasis added).   "[D]iscovery" of a breach entails "first, awareness by the insurer of facts tending to show there has been a violation of the policy provisions and, second, evaluation of those known facts culminating in a decision that a breach apparently has occurred."   Liberty Mut. Ins. Co. v. Safeco Ins. Co.., 223 Va. at 474, 288 S.E.2d at 474.

> 1.   *CIC's reservation of rights notice to Defendants was untimely as CIC was aware of the Gilberts' claim and Defendants' alleged breach no later than May 2009.*

By its own admission, CIC was aware of the Gilberts' potential claim and Defendants' alleged breach of the Policy in May 2009, and received all relevant pleadings by March 2, 2010. Compl. ¶ 25.   Therefore, its January 2012, notice of reservation of rights was untimely, and its

defense to providing coverage in the legal malpractice claim is barred by Virginia Code § 38.2-2226.

In Liberty Mutual, the insured was at fault in an automobile collision that occurred on January 27, 1977, injuring the plaintiffs.   Id., 223 Va. at 320, 288 S.E.2d at 471.   On March 17, 1977, plaintiffs' counsel sent a letter to the insurer advising it of the accident, plaintiffs' injuries, and the claim.   Id., 223 Va. at 321, 288 S.E.2d at 472.   The insured never contacted the insurer to report the accident.   Id.   By May 18, 1977, the insurer, through the state accident report, had enough information to open an internal file to handle the claim.   Id., 223 Va. at 322, 288 S.E.2d at 472.   That same day, the insurer called plaintiffs' counsel and told him it would likely have to rely on a breach of policy defense.   Id.   The Court held that the notice period in Virginia Code § 38.2-2226 began to run on May 18, 1977, when the insurer "for the first time, [had] the bare details necessary for it to make an informed decision whether an apparent breach of the policy condition had occurred," and therefore, it issued a timely reservation of rights notice.   Id., 223 Va. at 326, 288 S.E.2d at 474.

Notice of a claim does not necessarily require that claimants have filed and served a lawsuit.   For example, in Morrel v. Nationwide Mut. Fire Ins. Co., 188 F.3d 218 (4th Cir. 1999), the Fourth Circuit Court of Appeals held that the insurer had notice of a claim prior to any court filings.   In Morrel, the claimants hired a contractor, the insured, to renovate their home on April 10, 1995.   Id. at 219.   The contractor damaged the claimant's house and they submitted a claim to his insurer, Nationwide, on August 12, 1995.   Id.   Nationwide opened a file for the claim and inspected the property several times.   Id.   In July 1996, because they had not yet been compensated for the damage, the Morrels commenced an arbitration proceeding pursuant to their

contract with the insured.   Id. at 220.   After the trial court entered judgment for the Morrels, they forwarded all pleadings to Nationwide, seeking to enforce the judgment.   Id. at 221.   Nationwide refused to pay and sent a letter to the Morrels in August 1997, explaining the contractor breached the insurance policy and therefore, it would not cover the claim.   Id.

The Fourth Circuit affirmed the district court's holding that Nationwide's defense of breach of the policy was barred by Virginia Code § 38.2-2226.   Id. at 228.   The court held that, at the point when Nationwide sent inspectors to the Morrels house, prior to any arbitration or court filing, it "[u]nquestionably, then, . . . knew of the Morrels' claim no later than this date."   Id. at 227.   The Court further held that Nationwide knew of the insured's breach of the policy at the latest when it received a copy of the arbitration award from the Morrels' counsel, which indicated the insured contractor did not even participate in the arbitration proceeding.   Id.   Therefore, Nationwide's notice to the Morrels in August 1997 was untimely pursuant to Virginia Code § 38.2-2226, and its defense based on breach of contract by the insured was barred by operation of law.

CIC does not dispute that it received notice from Barry Nace of a potential claim involving Sarah Gilbert in May 2009, and its discovery responses reveal that it received all relevant pleadings by March 2, 2010.   Compl. ¶ 25, see Letter from Barry Nace to CIC, enclosing Petition, Complaints & Responses, produced by CIC, attached as **Exhibit 8**.   Despite its active involvement in tracking the Gilberts' potential claim and communicating with Mr. Nace regarding its status for almost 3 years, CIC waited until January 2012, to notify the insureds of its reservation of rights.   CIC knew or should have known of the breach it alleges in the Complaint in May 2009. The Complaint claims the error (or potential legal malpractice) occurred in 2006, when Mr. Assad

filed the First Case.   Compl. ¶ 25.   The alleged failure of condition precedent occurred when Mr.

Nace completed the policy application in 2007 and failed to disclose the potential Gilbert claim.

Compl. ¶ 29.   Therefore, by CIC's own admission, if it received notice of the Gilbert's potential

claim in May 2009, including sufficient "bare details to make an informed decision whether an

apparent breach of the policy condition had occurred," and the 45-day notice period began to run.

Consequently, CIC had until forty-five days after May 20, 2009, to provide notice to the insureds

and Ms. Gilbert of its reservation of rights.

Pursuant to § 38.2-2226, CIC's January 13, 2012, reservation of rights notice to Paulson &

Nace, Barry Nace, and Gabriel Assad was not timely.   Because CIC failed to timely provide

notice of that it intended to rely on the failure of a policy condition in order to disclaim coverage, it

has waived the failure of the policy conditions by operation of law.

> 2.  *Even if the Court determines CIC was not aware of the Gilbert's Claim and Defendants' alleged breach until filing of the Legal Malpractice claim, its defense to coverage is still barred by Virginia Code § 38.2-2226 because it did not provide timely notice to the Gilberts.*

Alternatively, even if the Court determined that the 45-day time period did not begin to run

until the Gilberts served Paulson & Nace and Barry Nace with the legal malpractice claim, CIC's

defense to coverage is still barred.   Service of the legal malpractice claim occurred on June 4,

2012.   Therefore, despite being on notice of a potential claim since May 2009, and knowing the

alleged breach occurred in 2007, the latest CIC could have timely provide notice of its reservation

of rights to the Gilberts would have been July 19, 2012.   CIC never issued notice to Sarah Gilbert,

other than naming her as a defendant in the first declaratory judgment action concerning coverage

in September 2012.

-23-

In <u>State Auto Property and Cas. Ins. Co. v. Gorsuch</u>, 323 F. Supp. 2d 746 (W.D.Va. 2004), the district court of the Western District of Virginia held the insurer's notice to the claimant untimely because the claimant did not receive notice until the insurer filed its declaratory judgment action, well over forty-five days after learning of the claim and breach.  <u>Id.</u> at 757.   On July 8, 2001, a heavy storm flooded culverts installed by Stevenson, owner of the property and president and sole shareholder of BH&P, a mining company which used the property.  <u>Id.</u> at 748.   The flooding on Stevenson's property caused flooding on his neighbor's property, causing damage. <u>Id.</u> at 749.   Stevenson, notified BH&P's insurance agent that the claimants believed his culverts caused their property damage within a week of the flood.  <u>Id.</u>   Stevenson testified he spoke with his insurance agent multiple times regarding the flooding and potential lawsuits for the next two years.  <u>Id.</u>   The claimants did not file suit until April 2003.  <u>Id.</u> at 750.   Upon receipt of the lawsuit, the insurer sent a reservation of rights letter to the Stevenson and his attorney, claiming that Stevenson was not an insured under the policy, that the policy's pollution exclusion precluded coverage, and that Stevenson and BH&P violated the policy condition by failing to timely notify the insurer of the incident.  <u>Id.</u>   The insurer filed a declaratory judgment action seeking to disclaim coverage on October 1, 2003.  <u>Id.</u>

The claimants did not receive notice of the insurer's intent to rely upon a breach of the policy provisions to deny coverage for their claims until filing of the declaratory judgment action and the insurer did not forward a copy of the 2003 reservation of rights letter to claimants until April 2004. <u>Id.</u>   The Court determined that the insurer's notice was untimely pursuant to Virginia Code § 38.2-2226 because the insurer at the latest, was required to notify the claimants of its reservation of rights within forty-five days of the letter to the Stevenson.  <u>Id.</u> at 757.

-24-

Similarly in the present case, CIC issued its reservation of rights letters to the attorney defendants in January 2012; however it did not forward any notice to Ms. Gilbert.   In fact, Ms. Gilbert was unaware of CIC's intention to rely upon the defense of breach of policy to disclaim coverage for their claim until CIC filed its first declaratory judgment action on September 25, 2012.   Pursuant to <u>Gorsuch</u>, and all the cases cited herein, this notice was simply too late. Therefore, CIC waived its defense to coverage by operation of law pursuant to Virginia Code § 38.2-2226.

> E.      <u>Under the common law, in both Virginia and the District of Columbia, CIC has either waived its defense to coverage or is estopped from disclaiming coverage</u>.

Waiver and estoppel are frequently discussed together.   "Waiver is voluntary action or inaction with intent to surrender a right *in esse* with knowledge of the facts and circumstances which gave birth to the right."   <u>Empl. Commercial Union Ins. Co. v. Great American Ins. Co.</u>, 214 Va. 410, 413, 200 S.E.2d 560, 562 (1973); <u>see also</u> <u>Diamond Serv. Co. v. Utica Mut. Ins. Co.</u>, 476 A.2d 648, 654 (D.C. 1984)("Waiver is an act or course of conduct by the insurer which reasonably leads the insured to believe that the breach will not be enforced").   Estoppel, a doctrine in equity, "is the consequence worked by operation of law which enjoins one whose action or inaction has induced reliance by another from benefitting from a change in his position at the expense of another."   <u>Id.</u>; <u>see also</u> <u>Atheridge v. Aetna Cas. & Sur. Co.</u>, 604 F.3d 625, 630 (D.C. Cir. 2010)("Estoppel…generally results when an insurance company assumes the defense of an action [and] to prevail on this basis, the insured is required, in some jurisdictions, to show prejudice while in other jurisdictions prejudice will be presumed." <u>quoting</u> <u>Diamond Serv. Co.</u>, 476 A.2d at 654). In this case, CIC both waived its right to rely upon a breach of contract defense to coverage and is estopped from asserting that defense due to its action in investigating the Gilbert Lawsuit and

-25-

providing a defense to Paulson & Nace and Barry Nace, and its inaction in issuing notice of its intent to rely upon a breach of contract defense.

> 1. *CIC waived its right to rely upon a breach of contract defense to coverage when it undertook to investigate the Gilbert Lawsuit and waited 2 ½ years to issue a reservation of rights.*

For a waiver to exist, "knowledge of the facts basic to the exercise of the right and the intent to relinquish that right are essential elements."  Empl. Commercial Union Ins. Co. v. Great American Ins. Co., 214 Va. at 413, 200 S.E.2d at 562 (citing May v. Martin, 205 Va. 397, 137 S.E.2d 860 (1964)).   There is no genuine issue of material fact that CIC had notice of the Gilberts' potential claim and fully investigated the matter, including obtaining all relevant pleadings almost two years before it issued a reservation of rights.   Compl. ¶ 25.   Therefore, CIC had knowledge of all of the facts basic to its exercise of a breach of contract defense and by its actions and inactions, intended to waive its right to rely on such a defense.

> 2. *CIC is estopped from denying coverage because undertook to investigate the claim for 2 ½ years without issuing a reservation of rights and by assuming the defense of the action.*

In Virginia, the elements necessary to establish equitable estoppel, absent a showing of fraud or deception, are 1) a representation; 2) reliance; 3) a change of position; and 4) detriment.  Waynesboro Village, L.L.C. v. BMC Properties, 255 Va. 75, 79, 496 S.E.2d 64, 67 (1998); T v. T, 216 Va. 867, 872, 224 S.E.2d 148, 152 (1976).   CIC represented that it would not rely upon a breach of contract defense to coverage by undertaking to investigate the matter, retaining counsel for Paulson & Nace and Barry Nace, and communicating with that counsel and Barry Nace for three years.   Nace Aff. ¶ 5.   Barry Nace relied on that representation and determined not to retain their own counsel to protect their individual interests as a result of CIC providing coverage and a

defense.   Furthermore, the Gilberts proceeded to pursue their claim without the benefit of knowing that CIC would potentially deny coverage.   All the parties except for CIC relied upon CIC's investigation and defense of the Gilbert Lawsuits and all of the parties changed their position to their detriment as a result.

In the District of Columbia, estoppel arises when an insurance company assumes defense of an action, and the insured is prejudiced by the existence of that defense without knowledge that the insurer intends to later withdraw coverage.   See Capitol Specialty Ins. Co., 793 F. Supp. 2d at 411-412.   Here, the fact that Barry Nace did not learn of CIC's dispute concerning coverage until long after the potential claim was first discovered resulted in severe prejudice.   Mr. Nace described it as follows:

> Had you notified us timely on that, I would have hired an attorney to try to figure out what was going on.   Probably we would have a filed a declaratory judgment action on our own to figure out what the situation was.   And probably we never would have had to go through a trial.   The case would have been resolved one way or the other.   If you were -- should have been in the case, I suspect that would have been it, the case would have gotten resolved.   If it had been just me in the case or the corporation in the case, it would have gotten resolved one way or the other.
>
> That didn't happen.   So I had to sit through a trial for four days down in Richmond listening to the opposing attorney call me -- saying that I betrayed the client in this case.   It's not very pleasant to hear things like that.   The corporation ends up losing a lot of time.   The corporation is not me.   The corporation has three other shareholders; my three sons, who shouldn't be in this at all.
>
> The aggravation of having to go through this whole process, not to mention the amount that was involved now that probably would not have involved had this matter been resolved without a trial, under any circumstances.   There is no way that this case, whether you were handling it or we were handling it, would not have been settled for far less than $1.75 million.   It would be ridiculous to not settle the case.
>
> So there is all that added stuff -- added amount in there that could affect me personally as this case goes on.   And you're wrinkling your brow like you don't understand what I'm saying.   If you're confused, let me know, and I'll try to explain it to you better.   But I think it's pretty clear.

-27-

Nace Depo., 113:2-114:12.   Thus, Paulson & Nace and Barry Nace suffered palpable prejudice as a result of the uncertainty that arose from the late notice of potential coverage defenses.   Paulson & Nace lost time that could have been spent on other matters, lost money that could have been made working on other matters, suffered aggravation as a result of having to sit through a trial on a matter that would have settled if the coverage position had been clear, and experienced negative publicity that resulted from the trial and its outcome.   The foregoing demonstrates actual prejudice experienced by Paulson & Nace and Barry Nace as a result of CIC's significant delay in notifying them of a potential coverage defense.   Because of CIC's delay, the parties were unable to resolve the present matter in a timely fashion, which resulted in an inability to resolve the underlying matter.

## IV.   CONCLUSION

Based on the foregoing, Paulson & Nace and Barry Nace respectfully request that this honorable Court deny Plaintiff's Motion for Summary Judgment.   CIC has not established that a misnomer provides a reasonable basis to believe that a professional duty had been breached or that a claim against the attorney defendants was reasonably foreseeable prior to May 2009.   Further, the defenses to coverage asserted by CIC were waived by CIC's failure to timely advise the defendants of its coverage concerns.

> PAULSON & NACE, PLLC and
> BARRY J. NACE, Esquire
> By Counsel

_____/s/_____
Stephen A. Horvath
DC Bar Number 417137
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.

3920 University Drive
Fairfax, Virginia 22030
(703) 385-1000
(703) 385-1555 - Facsimile
shorvath@bmhjlaw.com
*Counsel for Defendants, Paulson & Nace, PLLC and*
*Barry J. Nace, Esquire*

-29-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of December, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

David D. Hudgins, Esq.
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, VA 22314
dhudgins@hudginslawfirm.com
*Counsel for Plaintiff*

Paulette S. Sharp, Esquire
Hinshaw & Culbertson, LLP
333 South Seventh Street
Suite 2000
Minneapolis, MN 55402
psarp@hinshawlaw.com
*Counsel for Plaintiff*

Carla D. Brown, Esquire
Charlson Bredehoft Cohen Brown &
Sakata, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA 20190
cbrown@cbc-law.com
*Counsel for Defendant Sarah Gilbert*

Gabriel Assaad, Esquire
Assaad Law, PLLC
1425 K Street, N.W., Suite 350
Washington, DC 20005
gassaad@assaadlaw.com
*Defendant*

Herman Aubrey Ford, III, Esquire
Cantor Stoneburner Ford Grana & Buckner
7130 Glen Forest Drive, Ste 400
Richmond, VA 23226
afford@virginiatrialfirm.com
*Co-Counsel for Defendant Sarah Gilbert*

                         /s/
                    _____
                    Stephen A. Horvath
                    DC Bar Number 417137
                    BANCROFT, McGAVIN,
                        HORVATH & JUDKINS, P.C.
                    3920 University Drive
                    Fairfax, Virginia 22030
                    (703) 385-1000
                    (703) 385-1555 - Facsimile
                    shorvath@bmhjlaw.com
                    *Counsel for Defendants, Paulson & Nace, PLLC*
                    *and Barry J. Nace, Esquire*

-30-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHICAGO INSURANCE COMPANY,       :
an Illinois Corporation          :
     Plaintiff,                 :
                                 :
v.                               :          Civil No. 1:12-CV-2068
                                 :
PAULSON & NACE, PLLC, et al.,    :
     Defendants.                :
_____/

## DEFENDANTS PAULSON & NACE, PLLC, AND BARRY NACE'S STATEMENT OF GENUINE ISSUES OF MATERIAL FACT NECESSARY TO BE LITIGATED

Pursuant to LCvR 7(h), Defendants Paulson & Nace, PLLC ("Paulson & Nace") and Barry J. Nace, Esq. submit the following Statement of Genuine Issues of Material Fact Necessary to be Litigated.   In response to Plaintiff's statement of material facts in support of its motion for Summary Judgment, the Nace Defendants state the following:

1.   Undisputed.

2.   The defendants do not dispute that the Gilbert Lawsuit makes certain allegations; however, the allegations themselves are disputed.   A true and correct copy of the Answer filed in the Gilbert Lawsuit is attached as **Exhibit 1**.

3.   Undisputed.

4.   Undisputed.

5.   Undisputed.

6.   Disputed.   The underlying claim was timely filed, but contained a misnomer.   Defendant does not dispute that the first medical malpractice lawsuit was filed prior to the expiration of the statute of limitations.   **Exhibit 1**; Deposition of Barry J. Nace, "Nace Depo.", 40:22-42:6, excerpts attached as **Exhibit 2**.

7.  Undisputed.

8.  Undisputed.

9.  Disputed to the extent that Mr. Assaad's argument on the underlying Motion to Dismiss is only partially set forth.   The quoted, and emphasized, portion of the transcript is misleading.   The argument concerning the Motion to Dismiss concerned facts and issues that may toll the statute of limitations.   See **Exhibit E to Plaintiff's Motion for Summary Judgment,** at 13:16-14:6.

10. Disputed.   The Order attached as **Exhibit F to Plaintiff's Motion for Summary Judgment** does not dismiss the claims with prejudice.   The words "with prejudice" were struck from the order, such that it reads, "It is therefore ORDERED that Sarah Gilbert's, a minor, claims are DISMISSED ~~WITH PREJUDICE~~."   Judge Hughes later confirmed that the February 26, 2007 dismissal was without prejudice.   **Exhibit G to Plaintiff's Motion for Summary Judgment**, 31:20-31:23 ("I think I dismissed the first one without prejudice because the second case was pending, and that case, as I recall, was not up for bat, if you will.").   Even though the words, "with prejudice" were crossed out of the order, and even though the trial judge made it abundantly clear that the first case was not dismissed with prejudice, Plaintiff bases its denial of coverage on the incorrect statement that the first case was dismissed with prejudice in February 2007.

11. Disputed.   Although argument on the motion to dismiss occurred at the June 18, 2007 hearing, the court did not rule on the motion to dismiss until August 3, 2007, when it entered a written order.   A true and correct copy of the August 3, 2007 Order is attached as **Exhibit 3**.   It is well established that the courts of the Commonwealth of Virginia speak only through their written orders.   Austin v. Consolidation Coal Co., 256 Va. 78, 81, 501 S.E.2d 161, 162 (1998); Davis v. Mullins, 251 Va. 141, 148, 466 S.E.2d 90, 94 (1996); Town of Front Royal v. Industrial Park, 248

2

Va. 581, 586, 449 S.E.2d 794, 797 (1994); <u>Robertson v. Superintendent of the Wise Correctional</u> <u>Unit</u>, 248 Va. 232, 235, 445 S.E.2d 116, 117, fn.* (1994).

12. Disputed.  <u>See</u> ¶ 11.

13. Disputed.   The first lawsuit was not dismissed with prejudice on 2/26/2007.  <u>See</u> ¶ 10. The second lawsuit was not dismissed with prejudice until August 3, 2007.  <u>See</u> ¶ 11.

14. Undisputed.

15. Disputed to the extent that the application is only partially set forth.

16. Undisputed.

17. Undisputed.

18. Undisputed.

19. Undisputed.

20. Disputed.  **Exhibit O to Plaintiff's Motion for Summary Judgment** includes a letter dated May 17, 2013, a string of emails acknowledging that a claim supplement had been received and confirming that coverage was bound as of July 24, 2009, and a redacted claim log concerning receipt of a potential claim.   The evidence attached by Plaintiff does not support the allegedly undisputed fact.   Further, CIC's corporate representative testified during his deposition that the letter was as acknowledgement of the claim with nothing specific to reserve.   Deposition of Frank J. Lindner, CIC's Corporate Representative, (hereinafter "CIC Depo.", attached hereto as **Exhibit 9**) 59:4-59:21, 72:5-72:16, & 73:12-73:21. The corporate representative testified as follows concerning the acknowledgement letter:

Q  So this initial document, which we've marked as Exhibit Number 6, is not a Reservation of Rights letter?
A  It is an acknowledgement letter at the end -- it just has a general -- if we become aware of a coverage issue we are reserving our rights to raise it at that point in time.
Q  But going back on this, did you consider this a Reservation of Rights letter?

3

MS. SARP:   Objection; calls for a legal conclusion.

A   I consider it to be an acknowledgement letter.

…

Q   And you would agree with me that your Reservation of Rights letters to fulfill those goals should try to provide as much detail as you can about the coverage issue or the breach of the condition issue; correct?

A   When a coverage issue has been identified; correct.

Q   And this letter certainly not identify any coverage issues; does it?

A   No coverage issue has been identified.

CIC Depo., 72:5-72:16, & 73:12-73:21.

21. Disputed to the extent that the letter included in **Exhibit O to Plaintiff's Motion for Summary Judgment** does not state what, if any, rights Plaintiff was reserving and that the letter is dated May 17, 2013.

22. Disputed to the extent that Footnote 1 suggests that Ms. Whelihan and her firm were Mr. Nace's personal attorneys.   Ms. Whelihan and her firm, Jordan Coyne, were retained by Plaintiff to represent the Nace Defendants in connection with the claim against them by Ms. Gilbert. **Exhibit 2**, Nace Depo., 106:13-107:1.

23. Disputed to the extent that Plaintiff contends it did not learn of the date of the alleged error until January of 2012.   Plaintiff points to no evidence to support its contention concerning the timing of its discovery of the date of the alleged error.

24. Disputed to the extent that the policy provisions are only partially set forth and do not contain the emphasis asserted by Plaintiff.

25. Disputed to the extent that the policy provisions are only partially set forth and do not contain the emphasis asserted by Plaintiff.

26. Disputed to the extent that the policy provisions are only partially set forth and do not contain the emphasis asserted by Plaintiff.

27. Disputed to the extent that the policy provisions are only partially set forth and do not contain the emphasis asserted by Plaintiff.

28. Undisputed.

29. Undisputed.

30. Undisputed.

31. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

32. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

33. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

34. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

35. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

36. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

37. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

38. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

39. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

5

PAULSON & NACE, PLLC and
BARRY J. NACE, Esquire
By Counsel

_____/s/_____
Stephen A. Horvath
DC Bar Number 417137
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 University Drive
Fairfax, Virginia 22030
(703) 385-1000
(703) 385-1555 - Facsimile
shorvath@bmhjlaw.com
*Counsel for Defendants, Paulson & Nace, PLLC and*
*Barry J. Nace, Esquire*

6

489

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 12th day of December, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

David D. Hudgins, Esq.
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, VA 22314
dhudgins@hudginslawfirm.com
*Counsel for Plaintiff*

Paulette S. Sharp, Esquire
Hinshaw & Culbertson, LLP
333 South Seventh Street
Suite 2000
Minneapolis, MN 55402
psarp@hinshawlaw.com
*Counsel for Plaintiff*

Carla D. Brown, Esquire
Charlson Bredehoft Cohen Brown &
Sakata, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA 20190
cbrown@cbc-law.com
*Counsel for Defendant Sarah Gilbert*

Gabriel Assaad, Esquire
Assaad Law, PLLC
1425 K Street, N.W., Suite 350
Washington, DC 20005
gassaad@assaadlaw.com
*Defendant*

Herman Aubrey Ford, III, Esquire
Cantor Stoneburner Ford Grana & Buckner
7130 Glen Forest Drive, Ste 400
Richmond, VA 23226
afford@virginiatrialfirm.com
*Co-Counsel for Defendant Sarah Gilbert*

_____/s/_____
Stephen A. Horvath
DC Bar Number 417137
BANCROFT, McGAVIN,
        HORVATH & JUDKINS, P.C.
3920 University Drive
Fairfax, Virginia 22030
(703) 385-1000
(703) 385-1555 - Facsimile
shorvath@bmhjlaw.com
*Counsel for Defendants, Paulson & Nace, PLLC
and Barry J. Nace, Esquire*

7

# EXHIBIT 2

**In the Matter Of:**

CHICAGO INSURANCE CO.

vs.

PAULSON & NACE, ET AL

**BARRY J. NACE**

*November 22, 2013*



**Court Reporting**
**Videography**
**Videoconferencing**

Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

492

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 1

```
 1                 UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3    ------------------------------------+
      CHICAGO INSURANCE COMPANY,          :
 4    an Illinois Corporation,            :
                      Plaintiff,          :
 5                                        :CIVIL NUMBER
      vs.                                 :1:12-CV-2068
 6                                        :
      PAULSON & NACE, PLLC, et al.,       :
 7                      Defendants.       :
      ------------------------------------+
 8                                Fairfax, Virginia
                             Friday, November 22, 2013
 9

10                      BARRY J. NACE

11

12    called for examination by counsel on behalf of the

13    Plaintiff, Chicago Insurance Company, Pursuant to Notice

14    taken in the Offices of Bancroft, McGavin, Horvath &

15    Judkins, P.C., 3920 University Drive, Fairfax, Virginia

16    22030 at approximately 9:00 a.m., before Janie Arriaga,

17    a certified Verbatim Reporter and a Notary Public in and

18    for the Commonwealth of Virginia, when there were

19    present on behalf of the respective parties.

20

21

22
```

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL                    BARRY J. NACE
                                                                       Page 2

```
 1    APPEARANCES:

 2                      On behalf of Plaintiff:

 3                      PAULETTE S. SARP, ESQUIRE

 4                      Hinshaw and Culbertson, LLC

 5                      333 South Seventh Street, Suite 2000

 6                      Minneapolis, Minnesota 55402

 7

 8                      On behalf of Defendants:

 9                      STEPHEN HORVATH, ESQUIRE

10                      Bancroft, McGavin,

11                      Horvath & Judkins, P.C.

12                      3920 University Drive

13                      Fairfax, Virginia 22030

14

15

16

17    ALSO PRESENT:  Mr. Christopher Nace

18

19

20

21

22
```

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL                 BARRY J. NACE
                                                                    Page 3

Page 3

```
 1                    C O N T E N T S

 2    WITNESS                                      PAGE

 3    BARRY J. NACE,

 4         Examination by Ms. Sarp                   5

 5

 6                    E X H I B I T S

 7
```

```
 8    Nace Number 1    30(b)6                         5

 9    Nace Number 2    Insurance policy               9

10    Nace Number 3    Declarations page             10

11    Nace Number 4    Complaint                     11

12    Nace Number 5    October 18 motion             14

13    Nace Number 6    Complaint                     17

14    Nace Number 7    Opposition to Motion          19

15    Nace Number 8    City of Richmond Order        21

16    Nace Number 9    Judge Hughes transcript       24

17    Nace Number 10   City of Richmond order        29

18    Nace Number 11   Application for insurance     32

19    Nace Number 12   Supplemental claim            42

20    Nace Number 13   Application for liability     60

21    Nace Number 14   Letter from H. Feintuch       65

22
```

```
                                                           Page 4
 1     (Continuation)

 2

 3     Nace Number 15   Affidavit                        68

 4     Nace Number 16   Renewal application              74

 5     Nace Number 17   E-mail from C. Ellenberger       85

 6     Nace Number 18   E-mail chain                     97

 7     Nace Number 19   January 12, 2013 letter          99

 8     Nace Number 20   Letter to Paulson and Nace      104

 9     Nace Number 21   Letter to B. Nace               104

10     Nace Number 22   E-mail to B. Nace               108

11

12

13

14

15

16

17     (EXHIBITS ATTACHED TO TRANSCRIPT)

18

19

20

21

22
```

Page 5

```
 1               P R O C E E D I N G S

 2   Whereupon,

 3                   BARRY J. NACE

 4   was called for examination by Counsel on behalf of the

 5   Plaintiff, and after having been duly sworn by the Court

 6   Reporter was examined and testified as follows:

 7               (Nace Exhibit Number 1 marked for

 8               identification.)

 9           EXAMINATION BY COUNSEL FOR PLAINTIFF:

10   BY MS. SARP:

11       Q    I am handing you what I have marked as Exhibit

12   1, and that is a copy of the Notice of Rule 30(b)(6)

13   deposition that we issued for Paulson and Nace.  Have

14   you seen that before?

15       A    Yes.

16       Q    Are you the designated representative for

17   Paulson and Nace today?

18       A    Yes.

19       Q    Also, we had noticed a Notice of Deposition

20   for your deposition individually.  In talking to your

21   counsel, Steve Horvath, we are going to essentially

22   proceed on the same track with your personal deposition
```



Page 40

1       A     I probably knew that in the general way you

2    are phrasing it.

3    BY MS. SARP:

4       Q     So with that knowledge, why didn't you answer

5    the question 15B with a yes?

6       A     Because there is certainly nothing in that

7    that would indicate to me that -- trying to use your

8    language here -- may result in something being made

9    against the firm.  Nothing would suggest that to me at

10   that time or today.

11      Q     Would you agree, though, that the fact that a

12   lawsuit filed by Paulson and Nace and on behalf of

13   Ms. Gilbert, the fact that the lawsuit had been

14   dismissed because of an error in the caption was at

15   least noticed that an alleged error had been committed

16   by the firm?

17            MR. HORVATH:  Objection.  That is not what

18   the standard is.  The question was --

19            MS. SARP:  I am not referring to the question.

20   I am just asking generally.

21   BY MS. SARP:

22      Q     Would you agree that when you file a lawsuit,



Page 42

1    very recently, too, in which a court dismissed a case on

2    a Motion of Reconsideration.  Several months later,

3    reinstated the case.

4         So, no, absolutely not.  There is nothing

5    there that would indicate to me that there might be a

6    claim made in 2006 or '7 on this case.  No.

7        Q    But as you -- I think you have at least

8    recognized that whether a claim would be made or not,

9    you would agree that the dismissal of an action on the

10   grounds of some sort of error in the caption can -- is

11   a, quote, unquote, professional error; correct?

12        MR. HORVATH:  Objection.  He just answered

13   your question.  He just said that.

14       A    No, I don't agree with that.

15   BY MS. SARP:

16       Q    Actually, there are two different issues.

17   There is an issue of whether an error had been committed

18   and whether a claim might arise from that.

19       A    I disagree with either one of them.

20       Q    That is what I wanted to know.

21             (Nace Exhibit Number 12 marked for

22             identification.)

# EXHIBIT 4

**PLEADINGS IN UNDERLYING MEDICAL MALPRACTICE LAWSUITS**

| DATE | DESCRIPTION | |
|---|---|---|
| **Pleadings – Case No. CL06-6787-00** | | |
| 9/27/2006 | Certificate Regarding Discovery | |
| 00/00/0000 | Complaint | |
| 9/27/2006 | Notice of Deposition of Susan E. Atkins, M.D. | |
| 9/27/2006 | Plaintiffs' Interrogatories to Defendant Susan Edwin Atkins, M.D. | |
| 9/27/2006 | Plaintiffs' Interrogatories to Defendant Children's Orthopedic Center | |
| 9/27/2006 | Plaintiffs' Interrogatories to Defendant Chippenham & Johnston-Willis Hospital, Inc. d/b/a CJW Medical Center | |
| 9/27/2006 | Plaintiffs' Request for Production of Documents to Defendant Susan Edwin Atkins, M.D. | |
| 9/27/2006 | Plaintiffs' Request for Production of Documents to Defendant Children's Orthopedic Center | |
| 9/27/2006 | Plaintiffs' Request for Production of Documents to Defendant Chippenham & Johnston-Willis Hospital, Inc. d/b/a CJW Medical Center | |
| 7/28/2006 and 9/28/2006 | Affidavits of Service of Summons and Complaint, and Discovery on Defendants | |
| 10/17/2006 | Motion for Bill of Particulars | |
| 10/18/2006 | Defendants' Susan Edwin Atkins, M.D. and Children's Orthopedic Center, Answer and Affirmative Defenses to Plaintiffs' Complaint | |
| 10/18/2006 | Defendants' Susan Edwin Atkins, M.D. and Children's Orthopedic Center Demurrer and Memorandum In Support | |

| 10/18/2006 | Defendants' Susan Edwin Atkins, M.D. and Children's Orthopedic Center Special Plea In Bar and Motion to Dismiss | |
| 11/01/2006 | Notice of Hearing | |
| 11/03/2006 | Notice of Hearing | |
| 11/20/2006 | Defendant Chippenham & Johnston-Willis Hospital, Inc.'s Answers to Plaintiffs' Interrogatories | |
| 11/20/2006 | Defendant Chippenham & Johnston-Willis Hospital, Inc. Responses to Plaintiffs' Request for Production | |
| 12/27/2006 | Plaintiffs' Opposition to Defendant Chippenham & Johnston-Willis Hospital, Inc.'s Motion for Bill of Particulars with Proposed Order | |
| 12/27/2006 | Plaintiffs' Opposition to Defendants Atkins and Children's Orthopedic Center Demurrer with Proposed Order | |
| 12/27/2006 | Plaintiffs' Opposition to Defendants Atkins and Children's Orthopedic Center Plea In Bar and Motion to Dismiss with Proposed Order | |
| 1/08/2007 | Subpoena Duces Tecum Civil / MCV Hospital Medical Records Custodian – Dept. of Health Information Management | |
| 1/08/2007 | Subpoena Duces Tecum Civil / UVA  Medical Records Custodian | |
| 1/10/2007 | Amended Notice of Taking Deposition of Susan E. Atkins, M.D. | |
| 1/10/2007 | Certificate Regarding Discovery | |
| 1/19/2007 | Amended Complaint | |
| 1/19/2007 | Certification That Time For Filing Motion to Quash Subpoena Duces Tecum Has Elapsed and No Motion to Quash Has Been Filed (MCV Hospital) | |
| 1/19/2007 | Certification That Time For Filing Motion to Quash Subpoena Duces Tecum Has Elapsed and No Motion to Quash Has Been Filed (UVA Health System) | |

2

| | |
|---|---|
| 1/22/2007 | Defendants' Susan Edwin Atkins, M.D. and Children's Orthopedic Center, Motion for Entry of Order and Motion to Quash Notice of Discovery Deposition with Exhibits and Proposed Order |
| 1/22/2007 | Notice of Hearing and Presentation of Orders |
| 1/23/2007 | Emergency Motion to Postpone Hearing Unilaterally Scheduled by Defendant Atkins for January 26, 2007 |
| 1/24/2007 | Amended Notice of Hearing and Presentation of Order |
| 1/24/2007 | Notice of Hearing and Presentation of Order |
| 2/05/2007 | Amended Notice of Hearing |
| 2/01/2007 | Amended Notice of Hearing and Presentation of Order |
| 2/20/2007 | Subpoena Duces Tecum Civil / Eric R. Carlsen, M.D. |
| 2/20/2007 | Subpoena Duces Tecum Civil / Eugenio A. Monasterio, M.D. / VCU Dept.of PM&R / Children's Hsp. |
| 2/20/2007 | Subpoena Duces Tecum Civil / Bon Secours St. Mary's Hospital Radiology Department |
| 2/26/2007 | Order |
| 3/08/2007 | Defendants' Susan Edwin Atkins, M.D. and Children's Orthopedic Center, Answer and Affirmative Defenses to Plaintiffs' Amended Complaint |
| 3/06/2007 | Praecipe and Amended Complaint |
| 3/08/2007 | Demurrer and Motion for Bill of Particulars to Plaintiffs' Amended Complaint with Exhibit |
| 3/08/2007 | Defendants' Susan Edwin Atkins, M.D. and Children's Orthopedic Center's, Demurrer to Plaintiffs' Amended Complaint and Memorandum In Support Thereof |
| 3/14/2007 | Certification That Time For Filing Motion to Quash Subpoena Duces Tecum Has Elapsed and No Motion to Quash Has Been Filed ( Medical Records Custodian, Eric R. Carlsen, M.D.) |

121572704v1 2306

| | | |
|---|---|---|
| 3/14/2007 | Certification That Time For Filing Motion to Quash Subpoena Duces Tecum Has Elapsed and No Motion to Quash Has Been Filed (Bon Secours St. Mary's Hospital Radiology Department | |
| 3/14/2007 | Certification That Time For Filing Motion to Quash Subpoena Duces Tecum Has Elapsed and No Motion to Quash Has Been Filed (Eugenio A. Monasterio, M.D. / VCU Dept. of PM&R / Children's Hsp.) | |
| 3/14/2007 | Defendant Chippenham & Johnston-Willis Hospitals Inc.'s Request for Production of Documents to Defendants Susan Edwin Atkins, M.D. and Children's Orthopedics Center | |
| 3/20/2007 | Defendants, Susan Edwin Atkins, M.D. and Children's Orthopaedics Center Responses to Co-Defendants, CJW Medical Center, Request for Production of Documents | |
| 3/21/2007 | Defendant Chippenham & Johnston-Willis Hospitals Inc.'s Second Request for Production of Documents to Defendants Susan Edwin Atkins, M.D. and Children's Orthopedics Center | |
| 3/30/2007 | Notice of Hearing | |
| 4/11/2007 | Notice of Hearing | |
| 5/17/2007 | Emergency Motion to Postpone Hearing Unilaterally Scheduled by Defendant Atkins for May 21, 2007 with Proposed Order and Exhibits | |
| 5/21/2007 | Amended Notice of Hearing | |
| 5/21/2007 | Amended Notice of Hearing | |
| 6/01/2007 | Defendant Susan Edwin Atkins, M.D.'s First Interrogatories and Requests for Production to Plaintiff | |
| 6/05/2007 | Defendants, Susan Edwin Atkins, M.D. and Children's Orthopaedics Center Supplemental Responses to Co-Defendants, CJW Medical Center, Second Request for Production of Documents | |
| 6/11/2007 | Plaintiffs' Opposition to Defendants Demurrer with Proposed Order | |
| 6/11/2007 | Plaintiffs' Opposition to Defendant Chippenham & Johnston-Willis Hospitals Inc.'s Motion for Bill of | |

4

121572704v1 2306

| | | |
|---|---|---|
| | Particulars to Plaintiffs' Amended Complaint | |
| 6/14/2007 | Notice of Hearing | |
| 8/03/2007 | Order | |
| 8/29/2007 | Notice of Appeal to the Supreme Court of Virginia | |
| 9/18/2007 | Second Amended Notice of Taking Deposition of Susan E. Atkins, M.D. (with Production of Documents) | |
| 9/18/2007 | Certificate Regarding Discovery | |
| 10/01/2007 | Affidavit of Service | |
| 9/28/2007 | Subpoena for Witness (Civil) / Susan Edwin Atkins, M.D. | |
| 10/04/2007 | Motion to Quash and Motion for Sanctions with Exhibits | |
| 11/03/2007 | Appellant's Petition for Appeal | |
| 3/07/2008 | Supreme Court of Virginia's Decision dismissing the petition for appeal | |
| 7/17/2008 | Defendant's Motion for A New Trial Date | |
| 7/17/2008 | Notice of Hearing | |
| 8/21/2008 | Defendant Susan Edwin Atkins, M.D.'s First Interrogatories and Requests for Production to Plaintiff | |
| 8/21/2008 | Notice to Take Depositions of Plaintiffs | |
| 8/21/2008 | Notice of Hearing | |
| 8/26/2008 | Amended Notice of Hearing | |
| 8/26/2008 | Defendant Susan Edwin Atkins, M.D. Answer to Plaintiff's First Set of Interrogatories | |
| 8/26/2008 | Defendant's Responses to Plaintiff's First Set of Document Requests | |
| 8/26/2008 | Notice of Deposition of Richard and Rosie Gilbert | |
| 8/29/2018 | Motion to Admit Attorney Pro Hac Vice Pursuant to Rule 1A:4 with Proposed Order and Application to Appear Pro Hac Vice Before a Virginia Tribunal (Barry J. Nace for | |

5

| | | |
|---|---|---|
| | plaintiffs) | |
| 8/29/2008 | Plaintiff's Answers to First Interrogatories and To Requests for Production to Plaintiff | |
| 9/04/2008 | Notice of Deposition of Susan E. Atkins, M.D. with Production of Documents | |
| 9/09/2008 | Amended Motion for New Trial Date | |
| 9/09/2008 | Praecipe of Appearance (of Kathleen G. Burke for plaintiffs) | |
| 9/11/2008 | Motion to Admit Attorney Pro Hac Vice Pursuant to Rule 1A:4 with Proposed Order and Application to Appear Pro Hac Vice Before a Virginia Tribunal (Barry J. Nace for plaintiffs) | |
| 9/16/2008 | Order | |
| 9/19/2008 | Motion for Protective Order and to Quash with Exhibits | |
| 9/23/2008 | Subpoena Duces Tecum (Civil) / Eric R. Carlsen, D.C., Family Chiropractic Center of Richmond | |
| 9/23/2008 | Subpoena Duces Tecum (Civil) / Robert Hans Tuten, M.D., Tuckahoe Orthopedics Associates | |
| 9/23/2008 | Subpoena Duces Tecum (Civil) / Eugenio A. Monasterio, M.D., Crippled Children's Hospital | |
| 10/27/2008 | Plaintiffs' Supplemental Interrogatories to Defendant Children's Orthopedics Center | |
| 10/27/2008 | Plaintiffs' Supplemental Interrogatories to Defendant Chippenham & Johnston-Willis Hospitals Inc. | |
| 10/27/2008 | Plaintiffs' Requests for Admissions to Defendant Children's Orthopedics Center | |
| 10/27/2008 | Certificate Regarding Discovery | |
| 10/27/2008 | Plaintiffs' Requests for Admissions to Defendant Susan Atkins | |
| 10/27/2008 | Plaintiffs' Requests for Admissions to Defendant Chippenham & Johnston-Willis Hospital | |

6

121572704v1 2306

| | | |
|---|---|---|
| 10/27/2008 | Plaintiffs' Supplemental Interrogatories to Defendant Susan Atkins | |
| 11/17/2008 | Defendant Chippenham & Johnston-Willis Hospital Inc.'s Answers to Plaintiff's Supplemental Interrogatories | |
| 11/17/2008 | Defendant Chippenham & Johnston-Willis Hospital Inc.'s Responses to Plaintiff's Requests for Admissions | |
| 11/19/2008 | Defendant Susan Atkins' Answers to Plaintiffs' Requests for Admissions | |
| 11/19/2008 | Defendant Susan Atkins' Answers to Plaintiffs' Supplemental Interrogatories | |
| 11/26/2008 | Notice of Deposition of Mark Abel, M.D., Susan M. Anderson, M.D., and Eugene Monasterio, M.D. with Certificate Regarding Discovery | |
| 11/26/2008 | Subpoena for Witness (Civil) / Mark Abel, M.D. | |
| 11/26/2008 | Subpoena for Witness (Civil) / Susan M. Anderson, M.D. | |
| 11/26/2008 | Subpoena for Witness (Civil) / Eugene Monasterio, M.D. | |
| 12/01/2008 | Affidavit of Service with Subpoena for Witness (Civil) / Eugene Monasterio, M.D. | |
| 12/01/2008 | Affidavit of Service with Subpoena for Witness (Civil) / Mark Abel, M.D. | |
| 12/01/2008 | Affidavit of Service with Subpoena for Witness (Civil) / Susan M. Anderson, M.D. | |
| 12/22/2008 | Amended Notice of De Bene Esse Deposition of Eugene Monasterio, M.D. with Certificate Regarding Discovery and Subpoena for Witness (Civil) / Eugene Monasterio, M.D. | |
| 12/22/2008 | Amended Notice of De Bene Esse Deposition of Mark Abel, M.D. with Certificate Regarding Discovery and Subpoena for Witness (Civil) Mark Abel, M.D. | |
| 12/22/2008 | Amended Notice of De Bene Esse Deposition of Mark Abel, M.D. with Certificate Regarding Discovery and Subpoena for Witness (Civil) Susan M. Anderson, M.D. | |

7

| 12/29/2008 – 12/30/2008 | Affidavits o Service | |
|---|---|---|
| 1/07/2009 | Subpoena Duces Tecum (Civil) / Julie Fortner, M.D. | |
| 1/09/2009 | Subpoena Duces Tecum (Civil) / VCU Health System, Custodian of Medical Records | |
| 1/09/2009 | Subpoena Duces Tecum (Civil) /Kluge Children's Rehabilitation Center, Custodian of Medical Records | |
| 1/09/2009 | Subpoena Duces Tecum (Civil) / Tuckahoe Orthopedics Association | |
| 1/092009 | Subpoena Duces Tecum (Civil) / University of Virginia Health System Department of Radiology | |
| 1/09/2009 | Subpoena Duces Tecum (Civil) / Woodrow Wilson Rehabilitation Center, Custodian of Medical Records | |
| 1/28/2009 | Certification That Time for Filing Motion to Quash Subpoena Duces Tecum Has Elapsed and No Motion to Quash Has Been Filed / Tuckahoe Orthopedics Associates | |
| 1/28/2009 | Certification That Time for Filing Motion to Quash Subpoena Duces Tecum Has Elapsed and No Motion to Quash Has Been Filed / Kluge Children's Rehabilitation Center | |
| 1/28/2009 | Certification That Time for Filing Motion to Quash Subpoena Duces Tecum Has Elapsed and No Motion to Quash Has Been Filed / VCU Health System | |
| 1/29/2009 | Notice of Deposition of Sarah Gilbert | |
| 2/06/2009 | Authorizations to Disclose Confidential Health Information of Sarah Gilbert from Kennedy Krieger Institute and Project Walk Spinal Cord Recovery Center | |
| 2/06/2009 | Subpoena Duces Tecum / CJW Medical Center – Chippenham Campus, Department of Radiology | |
| 2/06/2009 | Subpoena Duces Tecum / Eric R. Carlsen, D.C. | |
| 2/06/2009 | Subpoena Duces Tecum / Radiology Associates of Richmond, Inc. | |

121572704v1 2306

508

| 2/17/2009 | Pre-Trial Order | |
|---|---|---|
| 2/17/2009 | Subpoena Duces Tecum / Ralph Hellams, M.D. | |
| 2/20/2009 | Authorizations to Disclose Confidential Health Information of Sarah Gilbert from Woodrow Wilson Rehabilitation Center | |
| 2/24/2009 | Certification That Time for Filing Motion to Quash Subpoena Duces Tecum Has Elapsed and No Motion to Quash Has Been Filed / CJW Medical Center – Chippenham Campus, Department of Radiology | |
| 2/24/2009 | Certification That Time for Filing Motion to Quash Subpoena Duces Tecum Has Elapsed and No Motion to Quash Has Been Filed / Radiology Associates of Richmond, Inc. | |
| 2/24/2009 | Certification That Time for Filing Motion to Quash Subpoena Duces Tecum Has Elapsed and No Motion to Quash Has Been Filed / Eric R. Carlsen, D.C. | |
| 2/25/2009 | Plaintiffs Designation of Expert Witness | |
| 3/13/2009 | Subpoena Duces Tecum / Earnest Foot & Ankle, PLC | |
| 3/13/2009 | Subpoena Duces Tecum / Children's Hospital Radiology Department | |
| 3/17/2009 | Letter from William Harp, M.D., Virginia Board of Medicine to Barry J. Nace regarding the credentials of Robert A. Rovner, M.D. and 2/19/2009 letter from Mr. Nace to the Virginia Board of Medicine | |
| 3/18/2009 | Notice of Deposition of Robert A. Rovner, M.D. | |
| 3/26/2009 | Defendants Designation of Expert Witnesses and Treating Healthcare Providers to Testify at Trial | |
| 3/30/2009 | Subpoena Duces Tecum / John D. Ward, M.D. | |
| 3/30/2009 | Subpoena Duces Tecum / Laura S. Pheiffer, M.D. | |
| 4/01/2009 | Certification That Time for Filing Motion to Quash Subpoena Duces Tecum Has Elapsed and No Motion to Quash Has Been Filed / Children's Hospital Department of Radiology | |

9

| | | |
|---|---|---|
| 4/09/2009 | Plaintiffs' Motion for Reconsideration with Proposed Order and Exhibits | |
| 4/16/2009 | Certificate Regarding Discovery | |
| 4/16/2009 | Notice of Expert Deposition of John A. Byrd, III, M.D. | |
| 4/16/2009 | Notice of Expert Deposition of Paul Sponseller, M.D. | |
| 4/16/2009 | Notice of Expert Deposition De Bene Esse of Robert Rovner, M.D. | |
| 4/15/2009 | Notice of Hearing | |
| 4/22/2009 | Defendants', Susan Edwin Atkins, M.D. and Children's Orthopedic Center, Brief in Opposition to Plaintiffs' Motion for Reconsideration | |
| 4/27/2009 | Defendants' Designation Pursuant to Virginia Code Section 8.01-401.1 of Statements From Medical Literature Which May Be Introduced At Trial | |
| 4/27/2009 | Notice of Deposition of John D. Ward, M.D. | |
| 5/01/2009 | Plaintiffs' Motion to Strike One of Defendants' Expert Witnesses:  Dr. Zimmerman with Proposed Order and Exhibits | |
| 5/05/2009 | Subpoena for Witness (Civil) / John D. Ward, M.D. | |
| 5/08/2009 | Defendants' Witness and Exhibit List | |
| 5/19/2009 | Order of Nonsuit | |
| 5/28/2009 | Order:  Plaintiffs' Motion for Reconsideration, Denied | |
| 6/17/2009 | Notice of Appeal to the Supreme Court of Virginia (by Plaintiffs) | |
| 8/14/2009 | Appellants' Petition for Appeal | |
| 9/08/2009 | Opposition to Petition for Appeal | |
| 11/16/2009 | Complaint (Circuit Court City of Richmond) | |
| 11/17/2009 | Letter from Gregory E. Lucyk, Supreme Court of Virginia, to W. Brian McCann and Barry J. Nace regarding | |

10

121572704v1 2306

| | | |
|---|---|---|
| | scheduling of oral argument | |
| 11/18/2009 | Summons and Complaint (Circuit Court City of Richmond) | |
| 12/15/2009 | Notice from the Circuit Court City of Richmond refusing the petition for appeal | |
| 5/17/2010 | Affidavits of Service of Summons and Complaint | |
| 6/04/2010 | Answer | |
| 6/04/2010 | Defendants' Demurrer | |
| 8/19/2010 | Subpoena Duces Tecum (Civil) / Laura S. Pheiffer, M.D. | |
| 8/19/2010 | Subpoena Duces Tecum (Civil) / Family Practice of Manakin-Sabot, P.C., Custodian of Medical Records | |
| 8/19/2010 | Subpoena Duces Tecum (Civil) / UVA Health System, Records Custodian, Health Information Services | |
| 8/20/2010 | Memorandum In Support of Defendants' Demurrer | |
| 8/20/2010 | Defendants' Special Plea In Bar of the Statute of Limitations and Motion to Dismiss with Exhibit | |
| 8/20/2010 | Defendants' Special Plea of Res Judicata | |
| 8/20/2010 | Defendants' Motion for Sanctions with Exhibits | |
| 9/20/2010 | Notice of Hearing | |
| 9/21/2010 | Defendant's First Request for Production to Plaintiffs | |
| 9/21/2010 | Defendant's First Set of Interrogatories to Plaintiff Richard Gilbert | |
| 9/21/2010 | Defendant's First Set of Interrogatories to Plaintiff Rosie Lee Gilbert | |
| 9/21/2010 | Defendant's First Set of Interrogatories to Plaintiff Sarah Gilbert | |
| 1/05/2011 | Notice of Presentation of Order with Proposed Order | |
| 1/19/2011 | Notice of Hearing | |

11

121572704v1 2306

| 11/--/2010 | Certificate Regarding Discovery | |
|---|---|---|
| 11/--/2010 | Plaintiffs' Memorandum In Opposition to Defendants' Special Plea of Res Judicata with Proposed Order and Exhibits | |
| 11/--/2010 | Plaintiffs' Memorandum In Opposition to Defendants' Special Plea In Bar of the Statute of Limitations and Motion to Dismiss with Proposed Order and Exhibits | |
| 11/--/2010 | Plaintiffs' Memorandum In Opposition to Defendants' Demurrer with Proposed Order | |
| 11/--/2010 | Plaintiffs' Memorandum In Opposition to Defendants' Motion for Sanctions with Proposed Order | |
| 11/--/2010 | Plaintiff Richard Gilbert's Answers to Defendant's First Set of Interrogatories | |
| 11/--/2010 | Plaintiff Rosie Lee Gilbert's Answers to Defendant's First Set of Interrogatories | |
| 2/17/2011 | Defendant's Second Set of Interrogatories to Plaintiff Rosie Lee Gilbert | |
| 2/17/2011 | Defendants' Motion to Compel with Exhibits | |
| **All Pleadings – Case No. CL06-4760-00** | | |
| 10/25/2006 | Summons and Complaint with Affidavits of Service | |
| 2/07/2007 | Special Plea of the Statute of Limitations Demurrer and Motion for Bill of Particulars | |
| 2/08/2007 | Defendants' Susan Edwin Atkins, M.D. and Children's Orthopedic Center, Answer and Affirmative Defenses to Plaintiffs' Complaint | |
| 2/08/2007 | Defendants' Susan Edwin Atkins, M.D. and Children's Orthopedic Center, Demurrer and Memorandum In Support | |
| 2/19/2007 | Defendants' Susan Edwin Atkins, M.D. and Children's Orthopedic Center, Special Plea in Bar of the Statute of Limitations and Motion to Dismiss with Notice of Hearing | |
| 3/06/2007 | Defendants' Susan Edwin Atkins, M.D. and Children's Orthopedic Center, Motion for Leave to Amend Their , | |

121572704v1 2306

| | | |
|---|---|---|
| | Answer and Affirmative Defenses to Plaintiffs' Complaint | |
| 3/06/2007 | Defendants' Susan Edwin Atkins, M.D. and Children's Orthopedic Center, Amended Answer and Affirmative Defenses to Plaintiffs' Complaint | |
| 3/27/2007 | Order Granting Leave to Defendants to File Their Amended Answer and Affirmative Defenses to Plaintiffs' Complaint | |
| 3/30/2007 | Notice of Hearing On the Defendants' Special Plea and Demurrer | |
| 5/22/2007 | Amended Notice of Hearing On the Defendants' Special Plea and Demurrer | |
| 6/11/2007 | Plaintiffs' Opposition to Defendants' Special Plea in Bar of the Statute of Limitations and Motion to Dismiss with Proposed Order and Exhibit 1, Affidavit of Robert A. Rovner, M.D. | |
| 6/11/2007 | Plaintiffs' Opposition to Defendants' Demurrer with Proposed Order | |
| 8/03/2007 | Order | |

121572704v1 2306

# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

CHICAGO INSURANCE COMPANY,  :
an Illinois Corporation          :
                                 :
        Plaintiff,               :
                                 :
                                 :
v.                               :        Civil No. 1:12-CV-1082GBL/TCB
                                 :
PAULSON & NACE, PLLC, et al.     :
                                 :
        Defendants.              :
_____/

## AFFIDAVIT OF BARRY J. NACE

I, Barry J. Nace, after being first duly sworn, do hereby depose and state as follows:

1.     I am over the age of eighteen (18), and this Affidavit is based on personal knowledge.

2.     I am a founding member of Paulson & Nace, PLLC.

3.     Paulson & Nace, PLLC, is a professional limited liability company, licensed and registered in the District of Columbia with its principal place of business in the District of Columbia. It is not licensed or registered to do business in the Commonwealth of Virginia.

4.     I am an attorney licensed to practice law in the District of Columbia, Maryland, and West Virginia. I am not licensed to practice law in Virginia.

5.     Though I have participated in a few cases in Virginia, I have only appeared *pro hac vice*, through association with locally licensed attorneys. I estimate that over the last 40 years I have handled approximately 15 cases, or approximately one case every 3 years in Virginia.

BANCROFT, MCGAVIN, HORVATH & JUDKINS, P.C.
3920 UNIVERSITY DRIVE  •  FAIRFAX, VIRGINIA 22030  •  (703) 385-1000  •  FAX (703) 385-1555

515

6.     Neither Paulson & Nace, PLLC, nor Barry J. Nace has any cases pending in the Commonwealth of Virginia.

7.     Neither Paulson & Nace, PLLC, nor Barry J. Nace maintains offices in Virginia or owns property in the Commonwealth of Virginia.

8.     Neither Paulson & Nace, PLLC, nor Barry J. Nace, has members, officers, managers, or attorney employees in the Commonwealth of Virginia, and has never sought a Virginia business license.

9.     Neither Paulson & Nace, PLLC, nor Barry J. Nace advertises in Virginia.

10.    Neither Paulson & Nace, PLLC, nor Barry J. Nace purposefully seeks business in the Commonwealth of Virginia.  Neither sends direct mail to potential clients or customers in Virginia.

11.    As set forth above, neither Paulson & Nace, PLLC, nor Barry J. Nace, had any regular course of conduct or business transaction in the Commonwealth of Virginia.

_____
BARRY J. NACE

DISTRICT OF COLUMBIA          )
                             ) ss:
                             )

Subscribed and sworn to before me, with proof of identity, on this _13th_ day of _November_, 2012.

_____
Notary Public

**BRANDI C. BURRELL**
**Notary Public, District of Columbia**
My Commission Expires **My Commission Expires Feb 28, 2014**

BANCROFT, MCGAVIN, HORVATH & JUDKINS, P.C.
3920 UNIVERSITY DRIVE  •  FAIRFAX, VIRGINIA 22030  •  (703) 385-1000  •  FAX (703) 385-1655

516

# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHICAGO INSURANCE COMPANY,  :
an Illinois Corporation                        :
                                                           :
            Plaintiff,                                :
                                                           :
v.                                                       :        Civil No. 1:12-CV-2068
                                                           :
PAULSON & NACE, PLLC, et al.,     :
                                                           :
            Defendants.                          :
_____  :

## AFFIDAVIT OF H. AUBREY FORD, III

I, H. Aubrey Ford, III, after being first duly sworn, do hereby depose and state as follows:

1.      I am over the age of eighteen (18), and this Affidavit is based on personal knowledge.

2.      I am a Director at the law firm Cantor Stoneburner Ford Grana & Buckner, located in Richmond, Virginia and have been practicing law in Virginia for 33 years.

3.      On or before January 28, 2011, Rick and Rosie Gilbert, parents of Sarah Gilbert, retained my firm to represent them and substitute as counsel in the medical malpractice case styled *Richard Gilbert and Rosie Lee Gilbert, Individually v. Susan Edwin Atkins, M.D., et al.*, (At Law Number CL06004760-00) pending in the Circuit Court for the City of Richmond.  The Gilberts had been represented by Barry J. Nace, Esq. who was assisted for some period by Gabriel Assaad, Esq. – both of the law firm Paulson & Nace, PLLC – in the medical malpractice claim up to that point.

4.     On or about March 13, 2012, I filed a legal malpractice and professional negligence complaint against Paulson & Nace, PLLC, Barry J. Nace, Esq., and Gabriel Assaad, Esq. (the "Attorney Defendants"), on behalf of Sarah Gilbert, based upon their handling of her medical malpractice case, which had been dismissed in the Circuit Court for the City of Richmond.

5.     At no time prior to September 25, 2012, were Sarah Gilbert, her parents or I notified in any manner by Plaintiff Chicago Insurance Company of its intent to rely upon a defense of breach of contract to disclaim coverage for Ms. Gilbert's legal malpractice claim against the Attorney Defendants, pursuant to Va. Code Ann. § 38.2-2226.

6.     The first notice of any kind that Sarah Gilbert, her parents or I received of CIC's reservation of rights was service of CIC's first declaratory judgment complaint filed in the United States District Court for the Eastern District of Virginia, Alexandria Division, on September 25, 2012, which I accepted on Ms. Gilbert's behalf on October 12, 2012.

_____
H. AUBREY FORD, III

COMMONWEALTH OF VIRGINIA            )
County of Henrico                   ) ss:

        Subscribed and sworn to before me, with proof of identity, on this 5th day of _August_____, 2013.

_____
Notary Public

My Commission expires: _08/31/2014_
My Registration Number: _225059_

[Notary Seal: MARGUERITE E. STINNETTE, NOTARY PUBLIC, REGISTRATION NUMBER 225059, COMMONWEALTH OF VIRGINIA]

# EXHIBIT 7

# Declarations

## Professional Liability Insurance Policy

## Lawyers

**This is a claims-made Policy.  Please review your Policy carefully.**
The Policy is limited to liability for only those claims that are first made against the Insured during the policy period.

**Insured by the Stock Company below and hereinafter called the company.**



**Fireman's Fund**

Chicago Insurance Company
*Executive Offices: 33 W. Monroe Street*
*Chicago, Illinois 60603*

**MASTER POLICY NUMBER: LWC - 8001101**
**CERTIFICATE NUMBER: LWB -  2400909**

| Item 1. Named Insured and Address (number, Street, Town or City, County, State, Zip Code) | Producer Name |
|---|---|
| | ProAccess, L.L.C. |

**Item 2. Policy Period**

| From (Mo.-Day-Yr.) | To (Mo.-Day-Yr.) | 12:01 A.M. Standard Time at the address of the Named Insured as stated herein. |
|---|---|---|
| 07-24-09 | 07-24-10 | |

Barry J. Nace dba Paulson & Nace
1615 New Hampshire Avenue, NW
Washington, DC 20009

**Item 3. Form of Named Insured's Business**

Insured is ☐ Individual ☐ Partnership ☐ Corporation ☒ Other

**Item 4.  Limit of Liability**

| 2,000,000 | Each Claim |
| 2,000,000 | Aggregate |

☒ a. Are included within the limits of liability.
☐ b. Claim expenses are payable in addition to the limits of liability.

> Please review the entire policy carefully and contact us if any provisions are incorrect, unclear or do not meet your expectations. Please inform us of any changes in coverage needs.

**Item 5. Deductible**
$ 10,000 Per Claim
☐ a. The deductible amount specified above applies only to damages.
☒ b. The deductible amount specified above applies to both damages and claim expenses.

**Item 6. Premium**
$ 12,676.00 Amount    81400 Class    4 No. of Lawyers

Total Premium $ 12,676.00

**Item 7. Forms Attached at Issue**
POP-2122, POJ-2028(10/99)(Ed.09/06),PON-2003,
POE-2875.

By acceptance of this policy the Insured agrees that the statements in the Declarations and the Application and any attachments hereto are the Insured's agreements and representations and that this policy embodies all agreements existing between the Insured and the Company or any of its representatives relating to this insurance.

| Do Not Write In This Box | Remark | Countersigned at | Issue Date |
|---|---|---|---|
| | | | 7/24/09 |
| | | Authorized Representative | Countersign Date |

POP-2122 (01/03) (Ed. 04/06)

# LAWYER'S PROFESSIONAL LIABILITY
# CLAIMS-MADE INSURANCE POLICY

Offered through the
*ADVOCACY PROTECTION PLUS PURCHASING GROUP*
Located and domiciled in the State of Illinois

## CHICAGO INSURANCE COMPANY

One of the Fireman's Fund Insurance Companies®



*Executive Offices:*
33 West Monroe Street
Chicago, Illinois  60603

In the event of any notice of claim or potential claim stemming
from negligent acts, errors, omissions or Personal Injury,
you should immediately contact your agent or broker
or contact this company directly.

Refer all inquiries to your agent or broker or contact the company
at Chicago, Illinois.

POJ-2028 (10/99) (Ed. 09/06)

**NOTICE**

THIS IS A CLAIMS-MADE POLICY.  PLEASE REVIEW THE POLICY CAREFULLY.

**THE POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD UNLESS AND TO THE EXTENT THAT AN EXTENDED REPORTING PERIOD OPTION APPLIES.**

**CHICAGO INSURANCE COMPANY**
(a stock insurance company, herein called the Company)

agrees with all **Insureds**, in consideration of the payment of the premium, and in reliance upon the statements in the Declarations and subject to the limit of liability, exclusions, conditions and other terms of this policy, as follows:

## INSURING AGREEMENTS

I.  **COVERAGE**

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the **Policy Period** or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. Provided always that such **Professional Services** or **Personal Injury** happen:

**A.**  during the **Policy Period**; or

**B.**  prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business**, and continuously renewed and maintained in effect to the inception of this policy period:

    **1.**  the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury**;

    **2.**  the **Named Insured**, any partner, shareholder, employee, or where appropriate the **Named Insured's** management committee or any member thereof, had no reasonable basis to believe that the **Insured** had breached a professional duty or to **Reasonably Foresee** that a **Claim** would be made against the **Insured**; and

    **3.**  there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such **Claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any **Claim**, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

The Company shall have the right and duty to defend any suit against the **Insured** seeking **Damages** to which this insurance applies even if any of the allegations of the suit are groundless, false or fraudulent.  The Company, at its option, shall select and assign defense counsel; however, the **Insured** may engage additional counsel, solely at their expense, to associate in their defense of any **Claim** covered hereunder.  The Company shall also have the right to investigate any **Claim** and/or negotiate the settlement thereof, as it deems expedient, but the Company shall not commit the **Insured** to any settlement without their consent.  If the **Insured** refuses to consent to any settlement recommended by the Company and elects to contest the **Claim** or continue any legal proceedings in connection with such **Claim**, then the Company shall be relieved of any further duty to defend the **Claim**, and the liability of the Company for **Damages** and **Claim Expenses** shall not exceed the amount for which the **Claim** could have been settled, as well as the **Claim Expenses** incurred by the Company, or with the Company's consent, up to the date of such refusal.  Furthermore, the **Insured** shall not assume any obligations, incur any costs, charges, or expenses or enter into any settlement without the Company's consent.

In the event:

**A.**  Item 4.a. of the Declarations is applicable to this policy, **Claim Expenses** shall be part of, and not in addition to, the Limits of Liability specified in Item 4 of the Declarations;

**B.**  Item 4.b. of the Declarations is applicable to this policy, **Claim Expenses** shall be in addition to the Limits of Liability specified in Item 4 of the Declarations.

POJ-2028 (10/99) (Ed. 09/06)

In no event shall the Company be obligated to pay **Damages** or **Claim Expenses** or to defend, or continue to defend, any suit after the applicable limit of the Company's liability has been exhausted by payments of judgments, settlements, **Damages** or **Claim Expenses**, as applicable.

## II.  PERSONS INSURED

Each of the following is an **Insured** under this policy to the extent set forth below:

**A.**  The entity or person named in Item 1 of the Declarations as the **Named Insured**;

**B.**  Any **Predecessor in Business** or **Successor in Business**;

**C.**  Any past partners, officers, directors, stockholders or employees of any person or entity specified in Item **A.** or **B.** above (except as provided in I. below), but only while acting within the scope of their duties on behalf of such person or entity;

**D.**  Any current partner, director, stockholder or employed lawyer of any person or entity specified in Item **A.** or **B.** above;

**E.**  Any current non-lawyer employee of any person or entity specified in Item **A.** or **B.** above, but only while acting within the scope of their duties on behalf of any such person or entity;

**F.**  Any non-affiliated legal firm, including their partners, officers, directors, or employees, but solely for **Professional Services** performed within the scope of their contract with, and on behalf of, the **Named Insured, Predecessor in Business** or **Successor in Business**;

**G.**  Any legal representative, if the **Insured** becomes incompetent, insolvent, bankrupt or dies;

**H.**  Any lawyer acting as "of Counsel" or on a contracted basis but only while performing **Professional Services** on behalf of any person or entity specified in sections **A., B., C.** or **D.** above.

**I.**  Any past partner, director, officer or employed lawyer of any person or entity specified in Item **A.** or **B.** above who retires from the private practice of law while insured under a Lawyers Professional Liability Insurance policy issued by the Company.

## III.  LIMIT OF LIABILITY

Regardless of the number of **Insureds** under this insurance or the number of **Claims** made, the Company's liability is limited as follows:

**A.**  In the event **Claim Expenses** are included within the limit of liability as specified in Item 4.a. of the Declarations, the limit of liability stated in the Declarations as applicable to "each **Claim**" is the limit of the Company's liability for all **Damages** and **Claims Expenses** because of each **Claim** covered hereby.  All **Claims** arising from the same or related negligent act, error or omission or **Personal Injury** shall be considered a single **Claim** for the purpose of this insurance and shall be subject to the same limit of liability.

The limit of liability stated in the Declarations as "aggregate" is, subject to the above provision respecting "each **Claim**", the total limit of the Company's liability under this policy for all **Damages** and **Claims Expenses**.

**B.**  In the event **Claim Expenses** are in addition to the limit of liability as specified in Item 4.b. of the Declarations, the limit of liability stated in the Declarations as applicable to "each **Claim**" is the limit of the Company's liability for **Damages** resulting from each **Claim** covered hereby.  There shall be a separate and equal limit of liability applicable to **Claim Expenses** for any such **Claim**.  All **Claims** arising from the same or related negligent act, error or omission or **Personal Injury** shall be considered a single **Claim** for the purpose of this insurance and shall be subject to the same limit of liability.

The limit of liability stated in the Declarations as "aggregate" is, subject to the above provision respecting "each **Claim**", the total limit of the Company's liability under this policy for all **Damages**.  A separate "aggregate" limit of liability shall apply to all **Claims Expenses** incurred in the defense of **Claims** covered by this Policy, subject to the above provision respecting the Company's liability for **Claim Expenses** for "each **Claim**".

C. The Company's liability for **Damages** and/or **Claim Expenses**, as applicable, resulting from "each **Claim**" is in excess of the deductible amount stated in the Declarations. The deductible amount stated in the Declarations shall upon written demand by the Company, be paid by the **Named Insured** within 30 days of demand.

D. The application of any Extended Reporting Period option shall not increase the limit of liability stated in the Declarations.

E. In the event the **Insured** participated in an **Alternative Dispute Resolution** to settle a **Claim** brought by a client of the firm, the Company will waive 50% of the **Insured's** deductible obligation. The maximum amount of this waiver shall not exceed $25,000 per **Claim**. If the **Alternative Dispute Resolution** fails to resolve the **Claim**, and the **Claim** proceeds to litigation, the deductible will apply to any **Damages** and/or **Claim Expenses** paid by the Company after the litigation has commenced.

## IV. POLICY TERRITORY

The insurance afforded by this policy applies to any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** taking place anywhere in the world. The insurance afforded by this policy applies to **Claims** which are first made and reported to the Company during the **Policy Period** or Extended Reporting Period, if applicable, provided **Claim** is made or suit, if any, is brought within the United States of America, its territories or possessions, or Canada.

## V. WHEN A CLAIM IS DEEMED AS FIRST MADE

A **Claim** shall be deemed as being first made at the earlier of the following times:

A. When the Company first receives written notice from the **Insured** or its representative that a **Claim** has been made; or

B. When the Company first receives written notice from the **Insured** or its representative of specific circumstances or a **Potential Claim** involving a particular person or entity which may result in a **Claim**.

All **Claims** arising out of the same or related negligent act, error, omission or **Personal Injury** shall be considered as having been made at the time the first such **Claim** is made, and shall be subject to the same limit of liability and deductible.

## VI. SUPPLEMENTARY PAYMENTS

The Company will pay, in addition to the applicable limit of liability:

A. Up to $500 for loss of earnings to each **Insured** for each day or part of a day of such **Insured's** attendance, at the Company's request, at a trial, deposition, hearing or arbitration proceeding involving a civil suit against such **Insured** for covered **Damages**, but the amount so payable for any one or series of trials, depositions, hearings or arbitration proceedings arising out of the same or related negligent act, error, omission or **Personal Injury** shall in no event exceed $10,000; and

B. Up to $5,000 per **Policy Period** for each lawyer included within sub-sections A., B., C., D. and I. of **Persons Insured** for attorney fees and other costs, expenses or fees resulting from the investigation or defense of a proceeding before a state licensing board, peer review committee or governmental regulatory body incurred as the result of a notice of a proceeding first received by the **Insured** and reported to the Company during the **Policy Period**, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** by an **Insured** covered under this policy.

## VII. EXCLUSIONS

This insurance does not apply to **Claims**:

A. Based on or arising out of the **Insured's** services and/or capacity as an employee, owner, partner, stockholder, director, officer or trustee of any sole proprietorship, partnership or corporation or other business enterprise which is not defined as **Named Insured**, **Predecessor in Business** or **Successor in Business** unless such **Claim** arises out of a lawyer-client relationship;

B. Arising out of any dishonest, fraudulent, criminal or malicious act or omission, or deliberate misrepresentation (including but not limited to, actual or alleged violations of state or federal antitrust, price-fixing, restraint of trade, copyright or deceptive trade practice laws, rules or regulations) committed by, at the direction of, or with the knowledge of any **Insured**; however, we will provide a defense of such actions until such time as the act

is ruled either by trial verdict, court ruling, regulatory ruling or legal admission as dishonest, fraudulent, criminal or malicious.

C. Based on or arising out of any obligations for which any **Insured** or any carrier acting as the insurer may be liable under any workers' compensation, unemployment compensation, disability or pension benefits law, or any similar laws, including but not limited to, the Employee Retirement Income Security Act of 1974 and any amendments thereof; this exclusion does not apply to the usual and customary legal services performed in connection with such capacities or laws on behalf of any person or entity not defined as an **Insured**;

D. Arising out of the **Insured's** services and/or capacity as:

   1. an officer, director, partner, trustee, or employee of:

      (a) a charitable organization;
      (b) a pension, welfare, profit sharing or mutual fund;
      (c) an investment fund or investment trust;

   2. a public official, or an employee of a governmental body, subdivision, or agency; or
   3. a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto, except if an **Insured** is deemed to be a fiduciary solely by reason of legal advice rendered with respect to an employee benefit plan;
   4. a trustee, administrator, conservator, executor, guardian, receiver or similar fiduciary capacity when any **Insured** is a beneficiary or distributee of any trust or estate serviced and the fee accruing from such work inures to the benefit of any **Insured**.

E. For bodily injury, sickness, disease or death of any person, or injury to or destruction of any tangible property or loss of use resulting therefrom;

F. Arising out of notarized certification or acknowledgment of a signature without the physical appearance before such notary public of the person who is or claims to be the person signing said instrument;

G. Arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** performed for any organization, corporation, company, partnership, or operation (other than the **Named Insured, Predecessor in Business** or **Successor in Business**) while any **Insured** or their spouse has more than 10% equity position in such entity;

H. Made by an **Insured** under this policy against any other **Insured** under this policy, unless such **Claim** arises solely out of **Professional Services** performed for that party in a lawyer-client capacity;

I. Solely as respects **Personal Injury:**

   1. the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the **Insured**;
   2. libel or slander or the publication or utterance of defamatory or disparaging material concerning any person or organization or goods, products or services, or in violation of an individual's right of privacy, made by or at the direction of the **Insured** with the **Insured's** knowledge of the falsity thereof;
   3. failure of performance of contract, but this exclusion does not apply to the unauthorized appropriation of ideas based upon alleged breach of implied contract;
   4. infringement of trademark, service mark or trade name, other than titles or slogans, by use thereof on or in connection with goods, products or services sold, offered for sale or advertised; or
   5. knowingly incorrect description or mistake in advertised price of goods, products or services sold, offered for sale or advertised.

## VIII. DEFINITIONS

When used in this policy (including endorsements forming a part hereto):

"**Alternative Dispute Resolution**" means the use of arbitration or mediation.

"**Claim**" means a demand for money or services, or the filing of suit or institution of arbitration proceedings or **Alternative Dispute Resolution** naming an **Insured** and alleging a negligent act, error, omission or **Personal Injury** resulting from the rendering of or failure to render **Professional Services**. **Claim** does not include proceedings seeking injunctive or other non-pecuniary relief.

**"Claim Expenses"** means:

1. Fees charged by an attorney(s), arbitrator(s) or mediator(s) designated by the Company and all other fees, costs, and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit or proceeding arising in connection therewith, if incurred by the Company, or by the **Insured** with written consent of the Company, but does not include salary charges or expenses of regular employees or officials of the Company, or fees and expenses of independent adjusters;

2. All costs taxed against the **Insured** in suits or proceedings and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the Company has paid or tendered or deposited, whether in court or otherwise, but only as respects that part of the judgment which does not exceed the limit of the Company's liability thereof. Prejudgment interest if/where payable under this policy will be in addition to the Limits of Liability stated in the Declarations.

3. Premiums on appeal bonds and premiums on bonds to release attachments in such suits, but not for bond amounts in excess of the applicable limit of liability of this policy. The Company shall have no obligation to pay for or furnish any bond.

**"Damages"** means compensatory judgments, settlements or awards but does not include punitive or exemplary damages, sanctions, fines or penalties assessed directly against any **Insured**, the return of fees or other consideration paid to the **Insured**, or that portion of any award or judgment caused by the trebling or multiplication of actual damages under federal or state law.

**"Insured"** means any person or organization qualifying as an **Insured** in the **"Persons Insured"** provision of this policy. The insurance afforded applies separately to each **Insured** against whom **Claim** is made or suit is brought, except with respect to the Company's limits of liability.

**"Named Insured"** means the person or organization named in Item I of the Declarations of this policy.

**"Personal Injury"** means: (a) false arrest, detention or imprisonment, wrongful entry or eviction, other invasion of private occupancy, or malicious prosecution; (b) the publication or utterance of libel, slander or other defamatory or disparaging material, or a publication or an utterance in violation of an individual's right of privacy; or (c) injury arising out of an offense occurring in the course of the **Named Insured's** advertising activities, including but not limited to infringement of copyright, title slogan, patent trademark, trade dress, trade names, service mark or service number.

**"Policy Period"** means, whenever used in this policy, the period from the inception date of this policy to the policy expiration date as set forth in the Declarations or its earlier termination date, if any.

**"Potential Claim"** means knowledge of any circumstances involving an individual person or entity that could result in a **Claim**.

**"Predecessor in Business"** means any legal firm which has undergone dissolution and either: (a) some or all of such firm's principals, owners, officers or partners have joined the **Named Insured**, provided such persons were responsible for producing in excess of 50% of the prior firm's annual gross billings and such billings have been assigned or transferred to the **Named Insured**; or (b) at least 50% of the principals, owners, partners or officers of the prior firm have joined the **Named Insured**; or (c) at least 50% of the prior firm's financial assets/liabilities have been assumed by the **Named Insured**.

**"Professional Services"** means:

1. services performed or advice given by the **Insured** in the **Named Insured's** practice as a law firm or legal professional;
2. services as a notary public, title agent, title insurance agent, arbitrator or mediator;
3. services as a trustee, administrator, conservator, executor, guardian, receiver or similar fiduciary capacity;
4. activities of the **Insured** as a member of a formal accreditation, ethics, peer review, licensing board, standards review or similar professional board or committee;
5. the publication or presentation of research papers or similar materials, but only if direct pecuniary compensation per publication or presentation is less than $3,000;
6. services performed by the **Insured** in a lawyer-client relationship on behalf of one or more clients shall be deemed for the purpose of this section to be the performance of **Professional Services** for others in the **Insured's** capacity as a lawyer, although such services could be performed wholly or in part by non-lawyers.

**"Reasonably Foresee(n)"** means:

1. **Claims** or incidents reported to any prior insurer;
2. unreported **Claims** or suits of which any **Insured** had received notice prior to the effective date of the first policy with the Company;

3.  incidents or circumstances that involve a particular person or entity which an **Insured** knew might result in a **Claim** or suit prior to the effective date of the first policy issued by the Company to the **Named Insured**, and which was not disclosed to the Company.

"**Specific Excess**" as used in this policy and in accordance with said policy's terms and limits shall cover liability and defense if and only if all other applicable insurance has been exhausted. **Specific Excess** shall also apply in the event that any term or provision included in this policy offers broader coverage than any other form of insurance simultaneously held by policyholder. This interpretation shall apply to, but not be limited to, issues concerning any Extended Reporting Period, Optional Reporting Period, Automatic Extended Reporting Period, or similar periods in any prior policy or policies.

"**Successor in Business**" means, after dissolution of the **Named Insured**, any law firm in which either: (a) some or all of the principals, owners, officers and/or partners of the **Named Insured** have joined an existing, or formed a new, law firm provided such persons were responsible for producing in excess of 50% of the **Named Insured's** annual gross billings at the time of dissolution and such billings have been assigned or transferred to the successor law firm; or (b) at least 50% of the principals, owners, partners or officers of the **Named Insured** have joined an existing, or formed a new law firm; or (c) at least 50% of the **Named Insured's** financial assets/liabilities have been assumed by the successor law firm; provided this policy does not apply to **Professional Services** or **Personal Injury** if the **Successor in Business** is also an **Insured** under any similar liability or indemnity policy, or would be an **Insured** under any such policy but for exhaustion of its limits of liability. This coverage shall terminate at the earlier of policy termination or 90 days from the date of dissolution of the **Named Insured** unless written notice is given to the Company, together with such information as the Company may request, and the **Successor in Business** shall pay any additional premium required in the event the Company agrees to continue the policy.

## IX. CONDITIONS

A.  **Premium:** All premiums for this policy shall be computed in accordance with the Company's rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein. The **Named Insured** shall maintain records of the information necessary for premium computation and shall send copies of such records to the Company at such times as the Company may direct.

B.  **Assistance and Cooperation of Insured in the Event of Claim or Suit:** Upon the **Insured** becoming aware of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** which could reasonably be expected to be the basis of a **Claim** covered hereby, written notice shall be given by the **Insured**, or its representative to the Company together with the fullest information obtainable as soon as practicable. If **Claim** is made or suit is brought against the **Insured**, the **Insured** or its representative shall immediately forward to the Company every demand, notice, summons or other process received by the **Insured** or the **Insured's** representative. The **Insured** shall cooperate with the Company and, upon the Company's request, assist in making statements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **Insured** because of **Damages** with respect to which this insurance applies. The **Insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **Insured** shall not, except at the **Insured's** own cost, voluntarily make any payments, admit liability, assume any obligation or incur any expense. The **Insured** may provide for **Alternate Dispute Resolution** with a client under an engagement letter or any other written contract, as long as such agreement is executed in writing prior to any **Claim** being made.

C.  **Waiver of Exclusion and Breach of Conditions:**
Whenever coverage under any provision of this policy would be excluded, suspended or lost:

1.  because of **EXCLUSION B.** relating to any judgment or final adjudication based upon or arising out of any dishonest, deliberately fraudulent, criminal, malicious or deliberately wrongful acts or omissions by any **Insured**; or
2.  because of noncompliance with **Section B, CONDITIONS** relating to the giving of notice to the Company with respect to which any other **Insured** shall be in default solely because of the default or concealment of such default by one or more partners or employees responsible for the loss or damage otherwise insured hereunder,

the Company agrees that such insurance as would otherwise be afforded under this policy shall apply with respect to each and every **Insured** who did not personally commit or personally participate in committing one or more of the acts, errors, or omissions described in any such exclusion or condition; provided that if the condition be one with which such **Insured** can comply, after receiving knowledge thereof, the **Insured** entitled to the benefit of the Waiver of Exclusions and Breach of Conditions shall comply with such conditions promptly after obtaining knowledge of the failure of any other **Insured** or employee to comply therewith.

With respect to provision **C. 1.** above, the Company's obligation to pay in the event of such waiver shall be in excess of the deductible and in the excess of the full extent of any assets in the firm of any **Insured** who is not a beneficiary to the waiver.

**D. Assignment:** The interest of the **Named Insured** is not assignable. If any **Insured** shall die or be adjudged incompetent, this insurance shall thereupon terminate for such person but shall cover the **Insured's** legal representative as the **Insured** with respect to liability previously incurred and covered by this insurance. Pro rata return premium will be computed from the date of termination.

**E. Legal Action Against the Company:** A person or organization may bring a suit against the Company including, but not limited to, a suit to recover on an agreed settlement or on a final judgment against an **Insured**; but the Company will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by the Company, the **Insured** and the claimant or the claimant's legal representative.

However, no action by an Insured shall lie against the Company unless there has been full compliance with all of the terms of this policy.

**F. Conformity to Statute:** Notwithstanding anything contained herein to the contrary, in the event that any terms or conditions of this contract conflict with any law applicable to the coverage afforded hereunder, the terms of this contract shall by this statement be amended to conform to such law or laws.

**G. Other Insurance:** If there is other valid insurance (whether primary, excess, contingent or self-insurance), against a **Claim** covered by this policy the insurance provided hereunder shall be deemed excess insurance over and above the applicable limit of all other insurance or self-insurance. This policy is written as specific excess of coverage available under any Extended Reporting Period, Optional Extended Reporting Period and Automatic Extended Reporting Period or similar period in any prior policy or policies.

When this insurance is excess, the Company shall have no duty under this policy to defend any **Claim** or suit that any other insurer or self-insurer has a duty to defend. If such other insurer or self-insurer refuses to defend such **Claim** or suit, the Company shall be entitled to the **Insured's** rights against all such other insurers or self-insurers for any **Claim Expenses** incurred by the Company.

When both this insurance and other insurance or self-insurance apply to the **Claim** on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater proportion of the **Damages** or **Claim Expenses** than the applicable limit of liability under this policy for such **Claim** bears to the total applicable limit of liability of all valid and collectible insurance against such **Claim**. Subject to the foregoing, if a loss occurs involving two or more policies, each of which provides that its insurance shall be excess, each will contribute pro rata.

**H. Subrogation:** In the event of any payment under this policy, the Company shall be subrogated to all the **Insured's** rights of recovery therefore against any person, organization or entity and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing after any loss to prejudice such rights.

**I. Changes:** The terms of this policy shall not be waived or changed except by endorsement issued to form a part of this policy.

**J. Bankruptcy or Insolvency of Insured:** Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the Company of any of its obligations hereunder.

**K. Cancellation:** This insurance may be canceled by the **Named Insured** at any time by written notice or by surrender of this insurance to the Company or its authorized representative and the Company shall refund the paid premium less the earned portion thereof within thirty (30) days of the latter of the effective date of the cancellation or the date of delivery of the **Insured's** notice of intent to cancel subject to the retention by the Company of any minimum premium stipulated herein (or proportion thereof previously agreed upon). The earned portion of the premium shall be computed on the customary short-rate basis unless any state law or regulation of the state shown in the mailing address of the **Named Insured** on the Declarations Page requires that return premium be computed on a pro-rata basis, even in the event of cancellation by the **Named Insured**. This insurance may also be canceled, with or without the return or tender of the unearned premium, by the Company, or by its authorized representative on its behalf, by sending to all **Named Insureds**, by first class, registered or certified mail, at the **Named Insured(s)** address last known to the Company or its authorized agent, not less than ninety (90) days written notice stating the specific reason for such cancellation and when the cancellation shall be effective. In such case the Company shall refund the paid premium less the earned portion thereof within ten (10) business days after the effective date of cancellation, subject to the

retention by the Company of any minimum premium stipulated herein (or proportion thereof previously agreed upon). In the event of cancellation by the Company, minimum premium shall not apply to the return of unearned premium. In case of non-payment of premium only thirty (30) days written notice of cancellation must be given by the Company. Proof of mailing will be sufficient proof of notice.

Cancellation by the Company shall only be effective if based on one or more of the following reasons:

1. Nonpayment of premium;
2. The policy was obtained through a material misrepresentation that was relied on by the Company, and such policy would not have been issued by the Company under the same terms and conditions if correct information had been disclosed;
3. Material failure to comply with policy terms, conditions or contractual duties;
4. The risk originally accepted has measurably increased;
5. Loss by the Company of reinsurance which provided coverage for all or a substantial part of the risk insured.

**L. Nonrenewal:** The Company will renew this policy unless written notice of the Company's intent not to renew, stating the specific reasons for nonrenewal, is mailed to the **Named Insured** not less than ninety (90) days before the policy expires.

Any notice of nonrenewal will be mailed by first class registered or certified mail to the **Named Insured** at the last mailing address known to the Company. Proof of mailing will be sufficient proof of notice.

**M. Renewal Rate Increase or Change in Policy Terms:** If the Company increases the rate, changes the deductible, reduces the limit or substantially reduces coverage at renewal, the Company will mail to the **Named Insured**, at least sixty (60) days prior to the effective date of that increase or change:

1. Written notice of any change in coverage terms;
2. The amount of our rate increase.

A rate increase is defined as any increase in premium except increase due to change in exposure (including claims-made step factors) and/or rating plans based solely on the Insured's developed experience.

Any notice of renewal rate increase or change in policy terms will be mailed by first class registered or certified mail to all **Named Insureds** at the last mailing address known to the Company. Proof of mailing will be sufficient proof of notice.

**N. Declarations and Applications:** By acceptance of this policy, the **Insured** agrees that the statements in the Declarations and application are his agreements and representations, and that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the Company or any of its agents relating to this insurance.

**O. Extended Reporting Period Option:**

1. **Cancellation/Nonrenewal:** In the case of:

   (a) cancellation or nonrenewal of this policy by the **Named Insured** or the Company for any reason other than flat cancellation at policy inception for non-payment of premium; or
   (b) advancing a retroactive or prior acts date from or previously applied by the Company

   the **Named Insured** shall have the right, subject to the other terms and conditions of this policy, or an endorsement attached thereto, to have an endorsement issued extending the time during which **Claims** can be reported for an additional premium of:

   (i) 100% of the full annual premium for this policy, to a period of twelve (12) months;
   (ii) 150% of the full annual premium for this policy, to a period of twenty-four (24) months;
   (iii) 185% of the full annual premium for this policy, to a period of thirty-six (36) months; or
   (iv) 285% of the full annual premium for this policy, for an unlimited period.

following the effective date of such cancellation or nonrenewal in which to give written notice to the Company of **Claims** first made against the **Insured** during this Extended Reporting Period for any act, error, omission or **Personal Injury** arising from the rendering of or failure to render **Professional Services** occurring prior to the termination of the final **Policy Period**, subject to its terms, limitations, exclusions and conditions. This right shall terminate sixty (60) days after the effective date of such action as is indicated in subparagraphs (a) or (b) above unless written notice of such election, together with the

additional premium, is received by the Company or its authorized agent from the **Named Insured** within that sixty (60) day period.

Subject to the foregoing, in the event that the **Named Insured** is a partnership or a corporation, and the policy is terminated, the premium calculation stated in i. through iv. above shall not include a charge for any individual legal professional who qualifies for a free Extended Reporting Period under section 2., 3. or 4. following, provided always that the notice is given to the Company as required and the other provisions of these sections are fully satisfied.

2. **Retiree Provision:** Notwithstanding **CONDITION O. 1.** above, in the event that the **Named Insured** is an individual, the **Named Insured** shall also have the right to have an endorsement issued extending the reporting period for this policy to an unlimited period following the effective date of such cancellation or non-renewal  upon his or her retirement from the private practice of law and the payment of additional premium for this option will be waived if:

   (a) the **Named Insured** is an individual and has been continuously insured by the Company under a claims-made Lawyers Professional Liability Insurance policy for at least:

      (i) seven consecutive years prior to such cancellation or nonrenewal, and is at least 55 years of age at the time of retirement; or
      (ii) six consecutive years prior to such cancellation or nonrenewal and is at least 56 years of age at the time of retirement; or
      (iii) five consecutive years prior to such cancellation or nonrenewal and is at least 57 years of age at the time of retirement.

   (b) written notice of this election is given to the Company within sixty (60) days after termination of this policy; and
   (c) all premiums and deductibles due the Company have been paid in full.

3. **Death or Disability of Insured:** Notwithstanding **CONDITION O. 1.** of this policy, if the **Named Insured** designated in the Declaration is an individual and shall cancel or nonrenew this policy, the **Named Insured** shall have the right, at no cost, to have an endorsement issued extending the reporting period for this policy to an unlimited period following the effective date of such cancellation or nonrenewal provided that:

   (a) such cancellation or nonrenewal results from the death or disability of the **Named Insured** during the **Policy Period;**
   (b) in the event of disability, the **Named Insured** is totally and continuously disabled from the practice of law a minimum of six (6) months prior to the election of this option;
   (c) satisfactory written evidence of death or disability is provided to the Company within one (1) year of such death or disability; and
   (d) all premiums and deductibles due the Company have been paid in full.

   This right shall terminate, however, unless written notice of election is received by the Company or its authorized agent from the **Named Insured** or legal representative of **Named Insured** within sixty (60) days after the effective date of such cancellation or nonrenewal.

4. Notwithstanding **CONDITION O. 1.** above, in the event that a licensed lawyer:

   (a) is an **Insured** under sections **A.** and **D.** of **Persons Insured** as defined by this policy; and
   (b) Either:

      (i) Retires from the active practice of law and:

         (a) Has been continuously insured by the Company under a claims-made policy for at least:

            (i) seven consecutive years prior to such cancellation or nonrenewal, and is at least 55 years of age at the time of retirement; or
            (ii) six consecutive years prior to such cancellation or nonrenewal, and is at least 56 years of age at the time of retirement; or
            (iii) five consecutive years prior to such cancellation or nonrenewal and is at least 57 years of age at the time of retirement.

         (b) Written notice of retirement is given to the Company within sixty (60) days after retirement; and

**(c)** All premiums and deductibles due the Company have been paid in full;
or
**(ii)** Dies or becomes permanently disabled during the **Policy Period** and:

**(a)** In the event of disability, the **Named Insured** must be totally and continuously disabled from the practice of law for a minimum of six (6) months prior to the election of this option;
**(b)** Satisfactory written evidence of death or disability is provided to the Company within one (1) year of such death or disability; and
**(c)** All premiums and deductibles due the Company have been paid in full

then the period during which **Claims** must be first made against each qualifying lawyer will be extended as follows:

During the **Policy Period**, or any renewal thereof, each individual will be afforded coverage as a former partner, owner, employee, officer or trustee of the **Named Insured**, subject to the terms, conditions and limitations of such policy or renewal policy; and/or

If this policy terminates and an Extended Reporting Period option is elected by the **Named Insured**, each individual will be afforded coverage subject to the terms, conditions and limitations of the policy and the extended reporting endorsement elected; and/or

If this policy terminates and an Extended Reporting Period option is not elected by the **Named Insured**, each individual who qualifies under (a) and (b) above will be entitled to an unlimited Extended Reporting Period endorsement at no additional premium. This Extended Reporting Period shall be part of this policy or the last policy issued by the Company to which this is a renewal. The limit of liability available for the Extended Reporting Period shall be part of, and not in addition to, the limits available under such policy.

In the event notice is given by the individual as provided in (a) and (b) above, a memorandum of coverage will be issued upon written request to the Company.

5.  At the commencement of any Extended Reporting Period option, the entire premium therefore shall be deemed earned and the Company shall not be liable to return to the **Named Insured** any portion of the premium for the Extended Reporting Period. The cost of any Extended Reporting Period option is based on the rates and rules in effect at the time the policy was issued or last renewed.

    The fact that the period during which a **Claim** must be first made against the **Named Insured** under this policy is extended by virtue of any Extended Reporting Period option shall not in any way increase the limit of this policy. The limit of liability under any Extended Reporting Period option shall be part of, and not in addition to, the limit of liability available under the last policy or renewal certificate issued to the **Named Insured**.

6.  An automatic sixty (60) day **Extended Reporting Period Option**, effective at the termination of the policy period, will be provided by the Company at no additional cost unless this insurance is replaced with the same or similar insurance issued by the Company, whether or not the limits or deductibles are identical to those provided under this policy. This extended reporting period option shall only apply to claims made during the policy period and reported to the Company within sixty (60) days of the policy termination. The limits available under this extension shall be part of, and not in addition to, the limits available under the expiring policy period. Coverage provided by this automatic extended reporting period shall be specific excess over any replacement policy providing the same or similar coverage. This Extended Reporting Period option shall not be available if the policy is cancelled for non-payment of premium effective at policy inception.

    Any provision in the policy which conflicts with this extension is amended accordingly.

**P. Reimbursement:** While the Company has no duty to do so, if the Company pays **Damages** or **Claims Expenses:**

1.  Within the amount of the applicable deductible; or
2.  In excess of the applicable limit of liability

all **Insureds** shall be jointly and severally liable to the Company for such amounts. Upon written demand, the **Insured** shall repay such amounts to the Company with thirty (30) days thereof. Failure to pay any amount indicated may lead to policy cancellation.

**Q. Liberalization Clause:**
If the Company adopts any revision that would broaden the coverage under the policy without additional premium at any time during the **Policy Period**, the broadened coverage will immediately apply to this policy.

**In Witness whereof,** the Company has caused this policy to be signed by its president and secretary.

Secretary                                                                 President

# CONSUMER INFORMATION NOTIFICATION

**IMPORTANT INFORMATION TO PURCHASING GROUP MEMBERS**
KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS.

PLEASE NOTE
**PLEASE READ** YOUR COVERAGE TERMS CAREFULLY.
THE POLICY MAY CONTAIN ONE OR MORE OF THE FOLLOWING EXCLUSIONS:
*ASBESTOS, DISCRIMINATION, SEXUAL ASSAULT, TRANSMISSION OF DISEASE*

---

AS ACCEPTED AND APPROVED BY YOUR RISK PURCHASING GROUP ASSOCIATION, THIS POLICY DOES NOT INSURE PUNITIVE OR EXEMPLARY DAMAGES THAT MAY BE SOUGHT AGAINST YOU. YOUR PREMIUM FOR THIS POLICY IS LOWER AS A RESULT OF THIS EXCLUSION.

---

THIS POLICY DOES NOT PROVIDE A REINSTATEMENT OF THE AGGREGATE LIMIT OF LIABILITY UNDER ANY OPTIONAL EXTENDED REPORTING PERIOD UNLESS SPECIFIC STATE LAW REQUIRES SUCH REINSTATEMENT.

---

WARNING: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

---

*In the event you need to contact someone about this policy for any reason please contact your agent. If you have additional questions, you may contact the insurance company issuing this policy at the following address and telephone number:*

**CHICAGO INSURANCE COMPANY**
**Professional Liability Department**
**33 West Monroe Street, Chicago, IL  60603**
**Phone: (312) 346-6400**

*If you have been unable to contact or obtain satisfaction from the company or the agent,
you may contact your State Insurance Department:*

*Written correspondence is preferable so that a record of your inquiry is maintained. When contacting your agent, company, or the State Insurance Department, have your certificate number available.*



PON-2003 (01/04) (Ed. 02/07)

Page 1 of 2

*IN ALASKA:* All return premiums will be computed pro-rata.
Pursuant to the Alaska Division of Insurance, we must provide to you and comply with the following notice:
Your policy contains a provision relating to "Other Insurance". If any other valid insurance is primary, and permits contributions by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limits of insurance or none of the loss remains, which ever comes first.

*IN ARKANSAS,* contact:   Arkansas Insurance Department
Consumer Services Division
Third and Cross Streets
Little Rock, Arkansas 72201                Phone: (501) 371-2640

*IN INDIANA:*
Should you have a valid claim and feel you are not being treated fairly, you may contact the Indiana Department of Insurance at the address and phone number below with your complaint and seek assistance from the governmental agency that regulates insurance.

Indiana Department of Insurance
Consumer Services Division          Phone: Consumer Hotline:   1-800-622-4461
311 West Washington Street, Suite 300        In Indianapolis area:   1-317-232-2395
Indianapolis, IN 46204-2787

*IN NORTH CAROLINA:*
Within 45 days after receipt of a written request from the Named Insured the Company shall mail or deliver loss information on open and closed claims covering a three-year period. In the event of policy cancellation or non-renewal, the Insured may elect to purchase coverage for the extending reporting period. The Insured may choose a limit of liability in the policy aggregate for the extended reporting period which is one hundred percent (100%) of the expiring policy aggregate that was in effect at the inception of the policy.

*IN TEXAS:* COMPLAINT NOTICE:
Should any dispute arise about your premium or about a claim that you have filed, contact the agent or write to the company that issued the policy or certificate. If the problem is not resolved, you may also write the Texas Department of Insurance, Consumer Protection Program, P.O. Box 149091, (333 Guadalupe, Austin, TX 78701), Austin, Texas 78714-9091, Fax # (512) 475-1771. This notice of complaint procedure is for information only and does not become a part or condition of this policy or certificate. Please be advised that the insurance company issuing your policy may not be subject to all insurance laws and regulations of the State of Texas.

**FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL: 1-800-628-8574**

*IN VIRGINIA,* contact:
State of Virginia Bureau of Insurance
Consumer Service Division          Phone: (In-state toll free):   1-800-552-7945
P.O. Box 1157                    (Out-of-state calls):   1-877-310-6560
Richmond, Virginia 23218

*IN WEST VIRGINIA,* contact:
West Virginia Insurance Commission
Consumer Service Division          Phone: (In-state toll free):   1-888-879-9842
P.O. Box 50540                        (Otherwise)   1-304-558-3386
Charleston, West Virginia 25305-0540

*IN WISCONSIN:*
**PROBLEMS WITH YOUR INSURANCE?** - If you are having problems with your insurance company or agent, do not hesitate to contact the insurance company or agent to resolve your problem. You can also contact the **OFFICE OF THE COMMISSIONER OF INSURANCE**, a state agency which enforces Wisconsin's insurance laws, and file a complaint. You can contact the **OFFICE OF THE COMMISSIONER OF INSURANCE** by writing to:

**OFFICE OF THE COMMISSIONER OF INSURANCE**
Information and Complaints Section
P.O. Box 7873
Madison, WI 53707-7873

or you can call 1-800-236-8517 outside of Madison or 1-608-266-0103 in Madison and request a complaint form.

# PRIOR ACTS EXCLUSION ENDORSEMENT –
# MULTIPLE ATTORNEYS

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

In consideration of the premium charged, this policy specifically excludes loss resulting from **Claims** made against any **Insured** arising from any negligent  act, error, omission, or **Personal Injury** occurring or alleged to have occurred prior to the Prior Acts Date(s) as scheduled below.   This exclusion applies solely to the **Insured(s)** scheduled below:

### SCHEDULE

| Attorney | Prior Acts Date |
|---|---|
| Christopher T. Nace | 2/20/07 |
| Jonathan B. Nace | 12/12/07 |
| Matthew A. Nace | 12/17/08 |

### ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

Insured: Barry J. Nace dba Paulson & Nace

Policy#: LWB2400909
Effective Date:  7/24/09

POE- 2875 (03/07)        © 2007, Fireman's Fund Insurance Company, Novato, CA.  All rights reserved.

536

Effective 12:01 AM   09/01/2009                     Policy No. WC   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

Issued to ELK HILL FARM, INC.

By COMMERCE AND INDUSTRY INSURANCE COMPANY

## Partners In Productivity SM
### AIG RiskTool System SM
### https://www.aigswc.com

AIG Specialty Workers' Compensation®
American International Group

P.O. Box 409                                        P.O. Box 40029
Parsippany, NJ  07054                               Phoenix, Arizona  85067
(800) 645-2259                                      (800) 645-2259

---

### NOTICE TO POLICYHOLDER

---

This notice is to alert you to AIG Specialty Workers' Compensation's new online, loss prevention and risk management platform, called AIG RiskTool System SM.   AIG RiskTool System can assist you in managing the risks your company and employees face everyday.

As a valued customer, you can employ this tool to assess your specific needs, take steps to prevent injuries from occurring, and build and monitor your own loss prevention and risk management program.

The AIG RiskTool System can be accessed at our Partners in Productivity website, which also provides you with:

- Information about us, frequently asked questions, and Contact Us access
- information on workers' compensation insurance
- the ability to locate medical providers for an injured worker
- the ability to report voluntary premium audits, and
- news and links to related workers compensation websites

When accessing the Partners in Productivity website have your policy close by so that you can enter the following information:

- Policy Number
- Agent or Broker Number
- Issuing Company

This valuable service is only available to current policyholders and their brokers.

If you have questions, please call us toll free at **1-800-645-2259.**

### https://www.aigswc.com

Member Companies of American International Group, Inc.
American Home Assurance, Inc., American International Pacific Insurance Company, American International South Insurance Company, AIU Insurance Company, Commerce and Industry Insurance Company, Granite State Insurance Company, Illinois National Insurance Co., New Hampshire Insurance Company, National Union Fire Insurance Company of Pa, Insurance Company of the State of Pa

SWCPN
(Ed. 12/03)

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aigproducercompensation.com or by calling AIG at 1-800-706-3102.

91222 (7/06)



**Pro**Access
INSURANCE WHOLESALERS

*Real Solutions. Expert Advice.*

### Interstate Insurance Group
### Lawyers Professional Liability Insurance
### <u>Claims Made And Reported Policy Form and Claim Reporting</u> *

**NOTICE TO BROKER:**  If you have not already done so, we recommend that you immediately inform your client that the Interstate Insurance Group coverage procured on their behalf is issued on a "**Claims** made and reported" policy form. Subject to all other terms, conditions and exclusions of this policy, coverage applies only to **Claims** first made against the **Insured** and reported to Interstate (hereinafter the "Company") in writing during the **Policy Period**, or an Extended Reporting Period obtained in accordance with **Condition O. Extended Reporting Period Option** of their policy.

Under **Insuring Agreement VIII. Definitions**, on Pages 4 and 5 of your client's policy, the term "**Claim**" is defined as:

a demand for money or services, or the filing of suit or institution of arbitration proceedings or alternative dispute resolution naming an **Insured** and alleging a negligent act, error, omission or **Personal Injury** resulting from the rendering of or failure to render **Professional Services**.  **Claim** does not include proceedings seeking injunctive or other non-pecuniary relief

and the term "**Potential Claim**" is defined as:

knowledge of any circumstances involving an individual person or entity that could result in a **Claim**.

Furthermore, **Insuring Agreement V.  When A Claim Is Deemed As First Made**, on Page 3 of your client's policy states that:

A **Claim** shall be deemed as being first made at the earlier of the following times:

A.   When the Company first receives written notice from the **Insured** or its representative that a **Claim** has been made; or

B.   When the Company first receives written notice from the **Insured** or its representative of specific circumstances or a **Potential Claim** involving a particular person or entity which may result in a **Claim**.

All **Claims** arising out of the same or related negligent act, error, omission or **Personal Injury** shall be considered as having been made at the time the first such **Claim** is made, and shall be subject to the same limit of liability and deductible.

In the event that a **Claim** is made against your client during the **Policy Period** or an Extended Reporting Period, or should your client become aware of a **Potential Claim** during the **Policy Period** or an Extended Reporting Period, written notification of said **Claim** or **Potential Claim** should immediately be submitted to the Company at the following address.  Every demand, notice, summons or other process should immediately be forwarded to this address as well:

Claims Department - Lawyers Professional Liability
Interstate Insurance Group / Chicago Insurance Company
33 West Monroe Street;  Suite 1200
Chicago, Illinois  60603

RECEIVED SEP 0 4 2009

A copy of the initial notification to the Company should also be sent to us as follows, so that we may update our records:

ProAccess, L.L.C.
100 Executive Drive
West Orange, NJ  07052-3362
Attn.: James A. Young, Managing Director

* **NOTE:  THE PROVISIONS CONTAINED IN YOUR CLIENT'S POLICY THAT PERTAIN TO CLAIM REPORTING REQUIREMENTS ARE ONLY BRIEFLY HIGHLIGHTED HEREIN.  PLEASE REFER TO THE POLICY ITSELF FOR COMPLETE DETAILS, INCLUDING THE DEFINITIONS OF ALL TERMS THAT APPEAR IN BOLD TYPE.**

IIG Bulletin #2 (07/04)

ProAccess, LLC
100 Executive Drive, West Orange, NJ 07052-3362
☎877.396.3501 ☏973.669.2300 ✆973.669.2399
www.proaccess1.com

# PRIOR ACTS EXCLUSION ENDORSEMENT – MULTIPLE ATTORNEYS

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

In consideration of the premium charged, this policy specifically excludes loss resulting from **Claims** made against any **Insured** arising from any negligent   act, error, omission, or **Personal Injury** occurring or alleged to have occurred prior to the Prior Acts Date(s) as scheduled below.   This exclusion applies solely to the **Insured(s)** scheduled below:

### SCHEDULE

| Attorney | Prior Acts Date |
|---|---|
| Christopher T. Nace | 2/20/07 |
| Jonathan B. Nace | 12/12/07 |
| Matthew A. Nace | 12/17/08 |

## ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

Insured: Barry J. Nace dba Paulson & Nace

Policy#: LWB2400909
Effective Date:  7/24/09

POE- 2875 (03/07)          © 2007, Fireman's Fund Insurance Company, Novato, CA.  All rights reserved.

## Declarations
## Professional Liability Insurance Policy
## Lawyers

**This is a claims-made Policy.  Please review your Policy carefully.**
The Policy is limited to liability for only those claims that are first made against the Insured during the policy period.

**Insured by the Stock Company below and hereinafter called the company.**


**Fireman's Fund®**

Chicago Insurance Company
*Executive Offices: 33 W. Monroe Street*
*Chicago, Illinois 60603*

**MASTER POLICY NUMBER:  LWC - 8001101**
**CERTIFICATE NUMBER:  LWB - 2400909**

| Item 1. Named Insured and Address (number, Street, Town or City, County, State, Zip Code) | Producer Name |
|---|---|

**ProAccess, L.L.C.**

Barry J. Nace dba Paulson & Nace
1615 New Hampshire Avenue, NW
Washington, DC 20009

**Item 2. Policy Period**

| From (Mo.-Day-Yr.) | To (Mo.-Day-Yr.) | 12:01 A.M. Standard Time at the address of the Named Insured as stated herein. |
|---|---|---|
| 07-24-09 | 07-24-10 | |

**Item 3. Form of Named Insured's Business**

Insured is  ☐ Individual   ☐ Partnership   ☐ Corporation  ☒ Other

**Item 4.  Limit of Liability**

$ 2,000,000   Each Claim
$ 2,000,000   Aggregate

☒ a. Are included within the limits of liability.
☐ b. Claim expenses are payable in addition to the limits of liability.

> Please review the entire policy carefully and contact us if any provisions are incorrect, unclear or do not meet your expectations. Please inform us of any changes in coverage needs.

**Item 5.  Deductible**

$ 10,000   Per Claim
☐ a. The deductible amount specified above applies only to damages.
☒ b. The deductible amount specified above applies to both damages and claim expenses.

**Item 6.  Premium**

$ 12,676.00   Amount   81400   Class   4   No. of Lawyers

Total Premium $ 12,676.00

**Item 7. Forms Attached at Issue**
POP-2122, POJ-2028(10/99)(Ed.09/06),PON-2003,
POE-2875.

By acceptance of this policy the Insured agrees that the statements in the Declarations and the Application and any attachments hereto are the Insured's agreements and representations and that this policy embodies all agreements existing between the Insured and the Company or any of its representatives relating to this insurance.

| Do Not Write In This Box | Remark | Countersigned at | Issue Date 7/24/09 |
|---|---|---|---|
| | | Authorized Representative | Countersign Date |

POP-2122 (01/03) (Ed. 04/06)

541

# CONSUMER INFORMATION NOTIFICATION

### IMPORTANT INFORMATION TO PURCHASING GROUP MEMBERS
KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS.

PLEASE NOTE
**PLEASE READ** YOUR COVERAGE TERMS CAREFULLY.
THE POLICY MAY CONTAIN ONE OR MORE OF THE FOLLOWING EXCLUSIONS:
*ASBESTOS, DISCRIMINATION, SEXUAL ASSAULT, TRANSMISSION OF DISEASE*

---

AS ACCEPTED AND APPROVED BY YOUR RISK PURCHASING GROUP ASSOCIATION, THIS POLICY DOES NOT INSURE PUNITIVE OR EXEMPLARY DAMAGES THAT MAY BE SOUGHT AGAINST YOU. YOUR PREMIUM FOR THIS POLICY IS LOWER AS A RESULT OF THIS EXCLUSION.

---

THIS POLICY DOES NOT PROVIDE A REINSTATEMENT OF THE AGGREGATE LIMIT OF LIABILITY UNDER ANY OPTIONAL EXTENDED REPORTING PERIOD UNLESS SPECIFIC STATE LAW REQUIRES SUCH REINSTATEMENT.

---

WARNING: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

---

*In the event you need to contact someone about this policy for any reason please contact your agent. If you have additional questions, you may contact the insurance company issuing this policy at the following address and telephone number:*

**CHICAGO INSURANCE COMPANY**
**Professional Liability Department**
**33 West Monroe Street, Chicago, IL 60603**
**Phone: (312) 346-6400**

*If you have been unable to contact or obtain satisfaction from the company or the agent,*
*you may contact your State Insurance Department:*

*Written correspondence is preferable so that a record of your inquiry is maintained. When contacting your agent, company, or the State Insurance Department, have your certificate number available.*



PON-2003 (01/04) (Ed. 02/07)

Page 1 of 2

*IN ALASKA*: All return premiums will be computed pro-rata.
Pursuant to the Alaska Division of Insurance, we must provide to you and comply with the following notice:
Your policy contains a provision relating to "Other Insurance". If any other valid insurance is primary, and permits contributions by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limits of insurance or none of the loss remains, which ever comes first.

*IN ARKANSAS*, contact:          Arkansas Insurance Department
                                 Consumer Services Division
                                 Third and Cross Streets
                                 Little Rock, Arkansas 72201          Phone: (501) 371-2640

*IN INDIANA*:
Should you have a valid claim and feel you are not being treated fairly, you may contact the Indiana Department of Insurance at the address and phone number below with your complaint and seek assistance from the governmental agency that regulates insurance.

                Indiana Department of Insurance
                Consumer Services Division          Phone: Consumer Hotline:     1-800-622-4461
                311 West Washington Street, Suite 300     In Indianapolis area:     1-317-232-2395
                Indianapolis, IN 46204-2787

*IN NORTH CAROLINA*:
Within 45 days after receipt of a written request from the Named Insured the Company shall mail or deliver loss information on open and closed claims covering a three-year period. In the event of policy cancellation or non-renewal, the Insured may elect to purchase coverage for the extending reporting period. The Insured may choose a limit of liability in the policy aggregate for the extended reporting period which is one hundred percent (100%) of the expiring policy aggregate that was in effect at the inception of the policy.

*IN TEXAS:* COMPLAINT NOTICE:
Should any dispute arise about your premium or about a claim that you have filed, contact the agent or write to the company that issued the policy or certificate. If the problem is not resolved, you may also write the Texas Department of Insurance, Consumer Protection Program, P.O. Box 149091, (333 Guadalupe, Austin, TX 78701), Austin, Texas 78714-9091, Fax # (512) 475-1771. This notice of complaint procedure is for information only and does not become a part or condition of this policy or certificate. Please be advised that the insurance company issuing your policy may not be subject to all insurance laws and regulations of the State of Texas.

**FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL: 1-800-628-8574**

*IN VIRGINIA*, contact:
State of Virginia Bureau of Insurance
Consumer Service Division               Phone: (In-state toll free):     1-800-552-7945
P.O. Box 1157                                  (Out-of-state calls):     1-877-310-6560
Richmond, Virginia 23218

*IN WEST VIRGINIA*, contact:
West Virginia Insurance Commission
Consumer Service Division               Phone: (In-state toll free):     1-888-879-9842
P.O. Box 50540                                 (Otherwise):     1-304-558-3386
Charleston, West Virginia 25305-0540

*IN WISCONSIN:*
**PROBLEMS WITH YOUR INSURANCE?** - If you are having problems with your insurance company or agent, do not hesitate to contact the insurance company or agent to resolve your problem. You can also contact the **OFFICE OF THE COMMISSIONER OF INSURANCE**, a state agency which enforces Wisconsin's insurance laws, and file a complaint. You can contact the **OFFICE OF THE COMMISSIONER OF INSURANCE** by writing to:

**OFFICE OF THE COMMISSIONER OF INSURANCE**
Information and Complaints Section
P.O. Box 7873
Madison, WI 53707-7873

or you can call 1-800-236-8517 outside of Madison or 1-608-266-0103 in Madison and request a complaint form.

# EXHIBIT 8

# Paulson&Nace, PLLC
## ATTORNEYS AT LAW

Richard S. Paulson (1929-1986)
Barry J. Nace (DC, MD, PA, WV)
Certified in Civil Trial Advocacy by the National
Board of Trial Advocacy
Certified in Medical Malpractice by the American
Board of Professional Liability Attorneys

Christopher T. Nace (DC, MD, GA)
Jonathan B. Nace (DC, MD)
Matthew A. Nace (MD)
Caitlin S. Palacios (DC, MD)

MAR 0 8 2010

March 02, 2010

*Via U.S. Mail*
Ms. Julie M. Lindemann
Fireman's Fund Insurance Company
33 West Monroe
Suite 1200
Chicago, IL 60603

*005 09 630577*

    Re:   *Gilbert v. Atkins, M.D., et al.*

Dear Ms. Lindemann:

    As I indicated on the phone, the current status is that the Supreme Court of Virginia declined to accept the appeal and we are now exploring possibilities for the U.S. Supreme Court. It is unlikely that we will be successful in that endeavor but we are exploring the issue. I am enclosing copies of the briefs that were filed in the West Virginia Supreme Court for your review. I think that would give you everything you need at this point.

    The parents claim will be re-filed and served as it is still viable. We will be in touch. Thank you for your cooperation.

                 Very truly yours,

                 Barry J. Nace

BJN/BCB
Enclosures *(Petition, Complaints & Responses)*

1615 New Hampshire Avenue, NW
Washington, DC 20009-2520
(202) 463-1999 phone
(202) 223-6824 fax
www.paulsonandnace.com

CONFIDENTIAL

CIC 000229
Exhibit 9

**IN THE VIRGINIA SUPREME COURT**

FROM THE CIRCUIT COURT FOR THE CITY OF RICHMOND

AT LAW NUMBERS:
CL06004760-00 & CL06006787-00



CLERK
SUPREME COURT OF VIRGINIA
**RECEIVED**
AUG 14 2009
RICHMOND, VIRGINIA

APPEAL NUMBER_____

Trial Judge: Hon. Walter Stout

### APPELLANTS' PETITION FOR APPEAL

RICHARD AND ROSIE LEE GILBERT, Individually and on Behalf
Of Their Daughter, Sarah Gilbert, a Minor
Plaintiffs – Appellants

v.

SUSAN E. ATKINS, M.D., et al.
Defendants – Appellees

&

SARAH GILBERT, by her parents and next friends,
RICHARD GILBERT and ROSIE LEE GILBERT; and RICHARD GILBERT and
ROSIE LEE GILBERT, Individually
Plaintiffs – Appellants

v.

SUSAN E. ATKINS, M.D., et al.
Defendants – Appellees

W. Brian McCann, Esq. VSB # 65712
HIRSCHLER FLEISCHER, A PROFESSIONAL CORP.
2100 Cary Street (23223-7078)
Richmond, VA 23223-0500
Tel. (804) 771-9514
Fax. (804) 644-0957
*Local Counsel for Plaintiffs*

Barry J. Nace, Esq.
PAULSON & NACE
1615 New Hampshire Ave.,NW
Washington, D.C. 20009
Tel. (202) 463-1999
Fax. (202) 223-6824
*Co-Counsel for Plaintiffs*

CONFIDENTIAL

CIC 000230

## SUBJECT INDEX

1. Table of Citations..................................................................iii

2. Assignments of Error ...............................................................1

3. Questions Presented .................................................................2

4. Nature of the Case....................................................................3

    i. Factual History.................................................................3

    ii. Material Proceedings ..........................................................4

5. Statement of Facts as Related to

   Assignments of Error ...............................................................8

6. Argument....................................................................................11

    i. The Trial Court Erred In Dismissing Sarah Gilbert's

    Claim With Prejudice In Case 1 Based Solely Upon The

    Wording In The Caption Of The Complaint. .........................11

       1. The Caption Of Case 1 Did

       Not Create A Legal Nullity. ......................................11

       2. There Has Been No Prejudice To Appellees

       To Warrant Dismissal of Sarah Gilbert's Claims. ......15

       3. Even If Sarah Gilbert Was Incorrectly Identified,

       She Should Have Been Granted Leave To Amend

       Her Complaint.............................................................16



CONFIDENTIAL

CIC 000231

ii. The Trial Court Erred In Dismissing Case 2 Because
The Filing Date Of Case 2 Relates Back To The Filing
Date Of Case 1. ........................................................... 18

iii. Virginia Precedent Clearly Allows For Parents To
Collect Non-Economic Damages For Injuries To
Their Children. ........................................................... 19

7. Conclusion ........................................................................ 21

8. Rule 5:17(e) Certificate ...................................................... 22

ii

CONFIDENTIAL

CIC 000232

## TABLE OF CITATIONS

1. Virginia Code § 8.01-243.1 ................................................. *Passim*

2. Virginia Code § 8.01-8 ...................................................... *Passim*

3. *Burnett v. New York Central Railroad, Co.,*
   380 U.S. 424, 85 S.Ct. 1050 (1965)........................................ 16

4. *Castle, M.D. v. Lester,* 272 Va. 591,
   636 S.E.2d 342 (2007)......................................................... 20

5. *Halatyn v. Miller,* 69 Va. Cir. 236, 2005 WL
   3476665 (Va. Cir. Ct.)(2005)............................................... 14

6. *Harmon v. Sadjadi, M.D., et al.,* 273 Va. 184,
   639 S.E.2d 294 (2007)......................................................... 13

7. *Herndon v. St. Mary's Hospital,* 266 Va. 472,
   587 S.E.2d 567 (2003)......................................................... *Passim*

8. *McDaniel, et al. v. North Carolina Pulp Company, et al.,*
   198 Va. 612, 95 S.E.2d 201 (1956)......................................... *Passim*

9. *Modaber, M.D. v. Kelley,* 232 Va. 60,
   348 S.E.2d 233 (1986)......................................................... 19

10. *New York Central & H.R.R. Co. v. Kinney,*
    260 U.S. 340, 43 S.Ct. 122 (1922).......................................... 15

CONFIDENTIAL   CIC 000233

## ASSIGNMENTS OF ERROR

1.     The trial court erred in granting Appellees' Motion to Dismiss, thereby dismissing Sarah Gilbert's claims With Prejudice based solely upon the wording in the caption of the Complaint, and subsequently denying Sarah Gilbert's request for leave to amend the Complaint.

2.     The trial court erred in sustaining Defendants' Special Pleas and granting Appellees' Motions to Dismiss on statute of limitations grounds a second filed Complaint because the filing of that action related back to the first filed action and should have been deemed timely.

3.     The trial court erred in its decision to Dismiss With Prejudice Richard and Rosie Lee Gilbert's claims for non-economic damages, including mental anguish, pain and suffering, humiliation, embarrassment, and the loss of enjoyment of life because Virginia precedent expressly allows for the parents of an injured minor to pursue such claims.

CONFIDENTIAL

CIC 000234

## QUESTIONS PRESENTED

1.   Did the trial court err in granting Appellees' Motion to Dismiss and dismissing Sarah Gilbert's claims with prejudice and without leave to amend in Case Number CL 06-4760 based solely upon the captioning of the complaint?

2.   Did the trial court err in granting Appellees' Special Plea and Motion to Dismiss with prejudice by failing to recognize that it related back to the filing of a previously filed action and was thus filed timely?

3.   Did the trial court err in dismissing Richard and Rosie Lee Gilbert's claims for non-economic damages despite Virginia precedent allowing the parents of an injured minor to pursue such claims?

CONFIDENTIAL

CIC 000235

## NATURE OF THE CASE

I.    FACTUAL HISTORY:

In June of 2004, Sarah Gilbert was an energetic thirteen year old girl. She played soccer and basketball and enjoyed other physical activities with her friends. Unfortunately, Sarah had developed scoliosis and was in need of routine, corrective surgery. Susan Atkins, M.D. was in charge of performing this surgery for Sarah on July 28, 2004. By the end of that attempted corrective surgery, Sarah Gilbert was paralyzed. She can no longer play soccer, and she vainly attempts to recapture her lost enjoyment of driving to the basket for a "lay up" on the court by acting as an assistant coach for her high school team from a wheelchair near the bench.

According to the original operative report, which was dictated on July 28, 2004, "[a]pproximately five minutes after placement of initial, left, upper thoracic hook, the patient had complete loss of all distal signals, which did not return on wake up test. No lower extremity, active motion could be elicited." A second, but different, operative report was later dictated on July 28, 2004 in which Dr. Atkins stated, "[a] thoracic hook was then placed without difficulty. However, approximately five minutes after placement of hook, the SSEP and EMG readings were lost to the bilateral lower extremities."

CONFIDENTIAL

CIC 000236

552

Once Sarah was stabilized, she was transferred to the Medical College of Virginia. Upon admission, she was noted to be suffering from "idiopathic paralysis." The discharge summary stated that "[i]mmediately after placing the first hook, evoked potentials were lost." Eventually, Sarah was transferred to the University of Virginia where she underwent further corrective surgery. Following that surgery, she began extensive rehabilitation at the Kluge Children's Rehabilitation Center. She continues to go through vigorous rehabilitation sessions, and she will continue to go through such rehabilitation for the rest of her life.

Today, Sarah is paralyzed from and below the waist. She can no longer participate in physical activities with her friends, but she has dedicated herself to her Church and studies, assists other students with their studies as a tutor, and aspires to pursue a career in bio-mechanical engineering at Virginia Tech, where she will enroll in the Fall of 2009.

II.   <u>MATERIAL PROCEDINGS:</u>

The procedural history of this case is extremely extensive due to the vast amount of pleadings. The salient issues of the procedural history are as follows:

On July 24, 2006, Case Number 06004760-00 (hereinafter "Case 1") was filed in the Circuit Court for the City of Richmond with the caption of,

4



CONFIDENTIAL

CIC 000237

"Richard Gilbert and Rosie Lee Gilbert, Individually and on behalf of their daughter, Sarah Gilbert, a minor."  On October 18, 2006, Defendants Atkins and Children's Orthopedic Center jointly filed their "Answer and Affirmative Defenses" along with a "Special Plea in Bar and Motion to Dismiss."

On October 25, 2006, Case Number 06006787-00 (hereinafter "Case 2") was filed in the Circuit Court for the City of Richmond.  Case 2 was captioned, "Sarah Gilbert, by her parents and next friends Richard and Rosie Lee Gilbert, and Richard and Rosie Lee Gilbert, individually."

On January 4, 2007, the Honorable Melvin R. Hughes heard oral arguments on the motions to dismiss Case 1 and granted the Motion to Dismiss Sarah Gilbert's claim with prejudice and Richard and Rosie Lee Gilbert's claims without prejudice and with leave to amend.  On February 26, 2007, the Court entered its Order.

On March 7, 2007, Case 1 was amended and filed with the caption of, "Richard Gilbert and Rosie Lee Gilbert, Individually," as per the trial court's instruction.

CONFIDENTIAL

CIC 000238

On June 18, 2007, the Court heard oral arguments involving all outstanding motions in both Case 1 and Case 2.[1]

On August 3, 2007, the Honorable Melvin R. Hughes issued his Order dismissing Case 2 with prejudice; dismissing any and all claims for personal injury pled on or behalf of Sarah Gilbert with prejudice; allowing Richard and Rosie Lee Gilbert's claim for economic damages and loss of services to proceed in Case 1; dismissing Sarah Gilbert's claim for property damage with prejudice; and dismissing with prejudice Plaintiffs' claims of negligence in post operative treatment, *res ipsa loquitor*, *respondeat superior*, and "being otherwise negligent."

---

[1] The outstanding motions include: plaintiffs "Opposition to Defendant's Special Plea in Bar and Motion to Dismiss" on December 28, 2006. On February 7, 2007, Defendant Chippenham & Johnston Willis Hospital filed its "Special Plea of the Statute of Limitations," "Demurrer," and "Bill of Particulars" in Case 2. On February 8, 2007, Defendants Atkins and Children's Orthopedic Center jointly filed their "Answer and Affirmative Defenses" and "Demurrer" in Case 2. On February 19, 2007, Defendants Atkins and Children's Orthopedic Center jointly filed their "Special Plea of the Statute of Limitations and Motion to Dismiss" in Case 2. On March 6, 2007, Defendants Atkins and Children's Orthopedic Center jointly filed their "Amended Answer and Affirmative Defenses" in Case 2. On June 15, 2007, Plaintiffs filed their "Opposition to Defendants' Special Plea in Bar of Statute of Limitations and Motion to Dismiss" and their "Opposition to Defendants' Demurrers" in Case 2. Plaintiffs also filed their "Opposition to Defendants' Demurrers" and "Opposition to Defendant's Motion for Bill of Particulars" in Case 1.

CONFIDENTIAL

CIC 000239

On August 29 and 30, 2007, Plaintiffs filed a Notice of Appeal of the August 3rd Order in both cases.

On March 7, 2008, this Court dismissed without prejudice the Appeal on the grounds that it was filed prematurely before a final order had been entered in the lower court.

On April 13, 2009, Plaintiffs filed a Motion to Reconsider the previous Orders that was heard and denied by the Honorable Walter Stout on April 28, 2009.

On May 19, 2009, an Order of Nonsuit was entered against all remaining defendants, making the previous Orders final and appealable.

On June 17, 2009, Plaintiffs then filed their Notice of Appeal.

CONFIDENTIAL

CIC 000240

## STATEMENT OF FACTS AS RELATED TO ASSIGNMENTS OF ERROR

Because this appeal has been brought prior to the commencement of trial, the facts as related to the assignments of error are found wholly in the pleadings both Case Numbers 4760 (Case 1) and 6787 (Case 2) and the hearings held on January 4, 2007, June 18, 2007, and April 28, 2009.

It is undisputed that on July 28, 2004, Sarah Gilbert underwent corrective spinal surgery.  Appellants allege that, as a result of the alleged negligence of Susan Atkins, M.D., Sarah Gilbert was paralyzed.  Sarah Gilbert and her parents then proceeded with a medical malpractice lawsuit.

Because Sarah was fourteen years of age at the time that the alleged negligence occurred, a two year statute of limitations applied pursuant to Section 8.01-243.1 of the Virginia Code.  As a minor, however, Sarah could not proceed with her lawsuit on her own; she needed to proceed with the assistance of her parents.

Sarah and her parents instituted such a lawsuit on July 24, 2006.  The caption of this lawsuit listed the Plaintiffs as, "Richard and Rosie Lee Gilbert, Individually, and on behalf of their Daughter, Sarah Gilbert, a minor."  In so doing, this caption clearly identified three plaintiffs: (1) Richard Gilbert, (2) Rosie Lee Gilbert, and (3) Sarah Gilbert as a minor being represented by both Richard and Rosie Lee Gilbert.  Appellees' sole

CONFIDENTIAL

CIC 000241

argument for dismissing Sarah Gilbert from the case, and the sole reason that the trial court granted such a motion, was based on Virginia Code Section 8.01-8, which states that "[a]ny minor entitled to sue may do so by his next friend."

In essence, on January 4, 2007, the Circuit Court for the City of Richmond denied Sarah Gilbert her day in court because the caption of her Complaint read "Richard and Rosie Lee Gilbert. . . on behalf of their Daughter, Sarah Gilbert," instead of "Sarah Gilbert, by her parents and next friends Richard and Rosie Lee Gilbert." The assignment of error arises against this contention insofar as Appellees and the lower court relied upon *Herndon v. St. Mary's Hospital*, 266 Va. 472, 587 S.E.2d 567 (2003), to imply that Appellants' failure to use the passive tense, "by her parents and next friends," instead of the active tense "on behalf of," created a legal nullity. This is a false assumption and is <u>not</u> the proposition put forth by the *Herndon* decision.

The trial court subsequently found in the July 18, 2007 hearing that Case 2 was barred by the statute of limitations. The ruling to bar Case 2 is assigned error because the trial court continued to function under the erroneous belief that the original complaint filed in Case 1 was a legal nullity. The trial court also failed to acknowledge that under *McDaniel v.*

*North Carolina Pulp Company*, 198 Va. 612, 95 S.E.2d 201 (1956), a plaintiff may be added if she is substantially similar to the party named in the original pleading and the filing date will relate back to the date of the original pleading.

10

CONFIDENTIAL

CIC 000243

## ARGUMENT

I. **The Trial Court Erred In Dismissing Sarah Gilbert's Claim With Prejudice In Case 1 Based Solely Upon The Wording In The Caption Of The Complaint.**

    a. The Caption Of Case 1 Did Not Create A Legal Nullity.

The lower court found that because the caption of the original complaint filed in Case 1 failed to comply with Virginia Code § 8.01-8, it was a legal nullity and therefore Sarah Gilbert's claims are barred by the statute of limitations. The lower court relied on *Herndon v. St. Mary's Hospital, Inc.*, 266 Va. 472, 587 S.E.2d 567 (2003), for the proposition that when the caption of a complaint lists *only* the parents as representatives of the minor child, then the complaint as a whole becomes a legal nullity and fails to satisfy the statute of limitations.

The lower court's belief that the original caption of Case 1 created a legal nullity based upon *Herndon* is misplaced. *Herndon* is not the case presently before the Court. The *Herndon* Court acknowledged in footnote one that the only issue it was deciding was whether solely naming a mother and father as representatives of a minor creates a legal nullity. *Id.* at 474; footnote 1.

Here, Case 1 named three entities: (1) Richard Gilbert, (2) Rosie Lee Gilbert, and (3) Richard and Rosie Lee Gilbert as Personal Representatives

CONFIDENTIAL

CIC 000244

of Sarah Gilbert, a minor.  Richard Gilbert, Rosie Lee Gilbert, and Sarah Gilbert *all* had proper standing to institute a lawsuit against the Defendants for the negligent actions that arose during the surgery performed on Sarah Gilbert on July 28, 2004.  The operative facts for all three individuals' causes of actions are identical.  The notice given of the operative facts needed by the Appellees to defend all three of the individuals' causes of actions is identical.  The only issue present is the fact that the Appellants used the active voice in naming Sarah Gilbert instead of the passive voice.

The complaint in Case 1 identified parties with standing to bring the medical malpractice action, identified the operative facts surrounding the alleged medical malpractice action, gave proper notice to the Appellees of the operative facts and alleged negligence,[2] sought specific damages for the alleged negligence, and was properly served upon the Appellees.  The complaint was proper and not a nullity.

Once it is established that the complaint is not a legal nullity, *Herndon* and its progeny no long apply.  The proper case law to apply is that of *McDaniel v. North Carolina Pulp Company,* 198 Va. 612, 95 S.E.2d 201 (1956), and its progeny.

---

[2]  The complaint gave the defendants so much notice that defense counsel herself acknowledge, "if you read the complaint, this was a cause of action that was brought for Sarah Gilbert." (Transcript of January 4, 2007 at page 19 line 4.)

12

CONFIDENTIAL

CIC 000245

Virginia Supreme Court authority holds that, "in Virginia our statutes are liberal in their provisions for adding new parties in cases of non-joinder" and that "[a] statute extending the time for the institution of a new action on failure of the original action for reasons other than on the merits is highly remedial, and should be liberally construed in furtherance of its purpose, to afford litigants a hearing on the merits, and is not to be frittered away by any narrow construction." *McDaniel,* 198 Va. at 612.

The *McDaniel* decision properly grants a plaintiff the ability to correct a hyper-technicality that bears no prejudice upon defendants, so long as the parties and the subject matter are substantially the same in both cases. *Id.* at 617.   Ultimately, *McDaniel* justly states that when a defendant knows why he is being sued, the defendant cannot deny the plaintiff her day in court by claiming that despite proper notice and knowledge of the subject matter and parties of the case that they somehow did not know.

While this Court overruled *McDaniel* in *Harmon v. Sadjadi,* 273 Va. 184, 639 S.E.2d 294 (2007), a close reading of *Harmon* makes it clear that this Court did not overrule the logic of *McDaniel* so much as it disagreed with the ultimate result because the original party in the first action did not have standing.  Appellants do not disagree.  Appellants agree that, under *Harmon,* in order to reach the substantially similar analysis put forth by the

13

CONFIDENTIAL

CIC 000246

*McDaniel* decision, a plaintiff must first show that the original parties filing the original complaint had standing.

In this case, Richard and Rosie Lee Gilbert, as well as Sarah Gilbert, had standing to file the original action; therefore, it was not a legal nullity and the Court can proceed with the "substantially similar" analysis of *McDaniel*, which remains good law. · Under this analysis, as in *Halatyn v. Miller*, 69 Va. Cir. 236, 2005 WL 3476665 (Va. Cir. Ct. Oct. 31, 2005), the Court should rule that the "need to add [Richard Gilbert, father and next friend], as a titular party [is] simply to add the 'figurehead' or 'formal party' that the Supreme Court held in *McDaniel* was necessary, but the addition of which did not change the true party in interest. . . [w]hatever the name of the plaintiff, the real party in interest remained the same; the suit was instituted in the same right; and the cause of action was the same. . . A suit by [Sarah Gilbert, by her parents and next friends Richard and Rosie Lee Gilbert, and Richard and Rosie Lee Gilbert, Individually] is an action by 'substantially the same party' in interest as a suit by [Richard and Rosie Lee Gilbert, Individually and on behalf of their Daughter, Sarah Gilbert, a minor]." *Halatyn* at *5

There is no argument, and Appellees must concede that the parties of interest are substantially similar and that they have been aware of that

CONFIDENTIAL

CIC 000247

since the day they first received the complaint in Case 1.   There is no surprise, no delay, and no undue burden.   Since 1922, The United States Supreme Court has acknowledge that "when a defendant has had notice from the beginning that the plaintiff sets up and is trying to enforce a claim against it because of specified conduct, the reasons for the statute of limitations do not exist, and we are of the opinion that a liberal rule should be applied." *New York Central & H.R.R. Co. v. Kinney*, 260 U.S. 340, 346, 43 S.Ct. 122 (1922).   The case before the Court today could not be any more on point.   Not only were the Appellees made aware of the parties involved, the operative facts involved, and the damages sought, but they have even *admitted* that they had notice and knew that Sarah Gilbert was trying to enforce a claim against them.   (Transcript of January 4, 2007 at page 19 line 4.)

b. <u>There Has Been No Prejudice To Appellees To Warrant Dismissal of Sarah Gilbert's Claims.</u>

The subject matter of this case is and has always been the operation performed by Dr. Atkins upon Sarah Gilbert on July 28, 2004.   On July 24, 2006, Case 1 was timely filed.   The parties were clearly identified, the incident in question was clearly identified, the damages were clearly identified, and the count of medical malpractice was clearly identified. Appellees have even made the argument before the trial court on this very

issue that "this was a cause of action that was brought for Sarah Gilbert." (Transcript of January 4, 2007 at page 19 line 4.)

Furthermore, according to The United States Supreme Court, "[s]tatutes of limitation are primarily designed to assure fairness to defendants. . . by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Burnett v. New York Central Railroad, Co.*, 380 U.S. 424, 428, 85 S.Ct. 1050, 1054 (1965). There were no surprises, loss of memory, or disappearance of witnesses to warrant the trial court's dismissal with prejudice of Case 1. There was a technical flaw in the wording of the caption that bore absolutely no significance whatsoever upon the merits or facts of the case. Appellees' argument that a mere technical flaw, which did nothing to confuse the nature of the complaint, flies directly in the face of the Commonwealth's long standing tradition of liberally construing statutes in order to avoid "frittering away" a plaintiff's ability to litigate the issue on the merits. *McDaniel* 198 Va. at 612.

     c. <u>Even If Sarah Gilbert Was Incorrectly Identified, She Should Have Been Granted Leave To Amend Her Complaint.</u>

Even if the Court finds that Sarah Gilbert was incorrectly identified in the filing of the original complaint in Case 1, dismissing her claim with

prejudice was a far too harsh ruling.   Sarah's claim should have been dismissed without prejudice and with leave to amend.

As has been stated *supra*, there was no surprise, shock, or undue burden upon the Appellees in allowing Sarah Gilbert's claims to proceed. The statute that was created by the General Assembly and called for a staggered set of statutes of limitation for minors injured as a result of medical malpractice was created to protect defendants from ancient claims springing up over a decade after the alleged negligent action occurred. Virginia Code § 8.01-243.1.   The purpose, thus, becomes to inform the defendants within the prescribed statutory period that a negligent action occurred and to give the defendant notice.   Appellants properly gave such notice.

In denying Sarah's claim, the Court would be granting an additional protection upon defendants: it would be granting them the ability to avoid being held accountable for the damages caused by such negligent actions despite being put on notice.   This is not the purpose of the statue of limitations.   The statute exists to give *notice*.   Such notice was properly given, and Appellees cannot deny that it was.   They are not entitled to a damage analysis for their anticipated exposure.

CONFIDENTIAL

CIC 000250

II.   The Trial Court Erred In Dismissing Case 2 Because The Filing Date
Of Case 2 Relates Back To The Filing Date Of Case 1.

Despite the fact that Case 2 was filed after the two-year statute of limitations, Case 2's filing relates back to the timely filing of Case 1. Once Case 1 was filed, the Appellees were on notice as to the parties of the case, the subject matter of the case, and the relief sought. Appellees have made no contention that they were not aware of who the proper parties were and have in fact acknowledged that at all times they believed the action to be on behalf of Sarah. The *McDaniel* analysis, *supra*, thus governs.

Mr. and Mrs. Gilbert and Sarah Gilbert have standing and have always had standing to file the original complaint. Because they had standing, were substantially the same parties, and were suing in the same right, the original complaint was <u>not</u> a legal nullity and Case 2 was timely filed on July 24, 2006.

Within one week of being made aware that there was a questionable issue regarding the captioning of Case 1, Appellants took the initiative to correct this hyper-technicality by instituting Case 2. Case 2 named the same parties – albeit in the passive voice as opposed to the active – stated the same operative facts, sought the same damages, and was aimed at giving the exact same notice to the Appellees as Case 1. Not only was it

CONFIDENTIAL

CIC 000251

aimed at giving the Appellees the same notice as Case 1, but it did give the Appellees the same notice as to the cause of actions that were being raised. Case 2 operated in the exact fashion as Case 1 and was a prompt correction of a hyper-technical defect; thus, it was timely filed on October 25, 2006 because it relates back to July 24, 2006. Accordingly, Case 2 should have been deemed timely.

III.   <u>Virginia Precedent Clearly Allows For Parents To Collect Non-Economic Damages For Injuries To Their Children.</u>

The trial court erred in denying Mr. and Mrs. Gilbert the ability to seek non-economic damages. During oral arguments, the trial court acknowledged that there do exist distinctions to the unsubstantiated premise put forward by Appellees that a parent can only seek economic damages. Had the trial court allowed this issue to be briefed, it would have come to realize that its original feeling that exceptions did exist was not only accurate, but that the exceptions are broad enough to cover situations such as this. Specifically, the trial court acknowledged that such a distinction existed in *Modaber v. Kelley*, 232 Va. 60, 66, 348 S.E.2d 233, 237 (1986), in which this Court stated that "injury to an unborn child constituted injury to the mother and that she may recover for such physical injury and mental suffering associated with a stillbirth."

CONFIDENTIAL

CIC 000252

Similar to the *Modaber* opinion, other distinctions exist.  In 2006, this Court found that a mother was capable of recovering for the mental anguish she suffered on a daily basis in caring for her child and that "the parents were 'entitled to recover those damages which are the reasonable and proximate consequences of the breach of the duty owed them, *viz.*, consequences that a reasonable and informed person could have foreseen and anticipated.'"  *Castle v. Lester*, 272 Va. 591, 09, 636 S.E.2d 342, 351 (2007).  More specifically, this Court allowed the plaintiff to recover from evidence "concerning the daily tasks required to care for [the child] and her use of the cumbersome medical equipment in doing so, her frustration from sleepless nights, and her knowledge that her son will not live more than a few more years."  *Id.* at 608.

Such a case not only creates a distinction directly on point with the damages sought by Mr. and Mrs. Gilbert, but it also indicates that parents, in general, have a right to seek and recover non-economic damages for negligence committed upon their children.  The only argument Appellees have left to make is that the non-economic damages suffered by Mr. and Mrs. Gilbert were not proximately caused by the breach of the duty owed.  That argument, however, is one for a jury to decide; and, one that the trial court should have allowed a jury to decide.



CONFIDENTIAL

CIC 000253

## **CONCLUSION**

Appellants ask this court to allow Sarah Gilbert to pursue her claims as pled.

21
CONFIDENTIAL

CIC 000254

## RULE 5:17(e) CERTIFICATE

I, W. Brian McCann, Esq., counsel of record for Richard Gilbert, Rosie Lee Gilbert, and Sarah Gilbert by her next friends Richard Gilbert and Rosie Lee Gilbert, hereby certify that:

(1)　The name and address of the Appellants are:

> RICHARD GILBERT and ROSIE LEE GILBERT, Individually, and as Personal Representative of SARAH GILBERT, a Minor.
>
> &
>
> SARAH GILBERT, by her parents and next
> Friends, RICHARD and ROSIE LEE GILBERT, and RICHARD and ROSIE LEE
> GILBERT individually.
>
> 2611 Turner Road
> Goochland, VA 23063

(2)　Counsel for the Appellants are:

> W. Brian McCann, Esq.
> VSB # 65712
> HIRSCHLER FLEISCHER, A PROFESSIONAL CORPORATION
> 2100 Cary Street (23223-7078)
> Richmond, VA 23223-0500
> Tel. (804) 771-9514
> Fax. (804) 644-0957
>
> And



CONFIDENTIAL

CIC 000255

Barry J. Nace, Esq.
Paulson & Nace
1615 New Hampshire Ave., NW
Washington, DC 20009
(202) 463-1999
*Co-Counsel for Plaintiffs*

(3)   The name and address of the Appellees are:

SUSAN EDWIN ATKINS, M.D.
1011 Hioaks Road, Suite D
Richmond, VA 23225-4040

CHILDREN'S ORTHOPEDIC CENTER
1011 Hioaks Road, Suite D
Richmond, VA 23225-4040

(4)   Counsel for the Appellees are:

Rodney K. Adams, Esq.
Donna L. Foster, Esq.
LeClair Ryan, P.C.
Riverfront Plaza, East Tower
951 East Byrd Street, 8th Floor
Richmond, VA 23219
(804) 783-2003
*Counsel for Susan E. Atkins, M.D. &
Children's Orthopedic Center*

(5)   Counsel for the appellant has caused a true and exact copy of this
Petition for Appeal to be mailed upon all counsel.

(6)   Pursuant to Rule 5:17(e)(4) & (g) Appellants seek oral argument
before this Honorable Court in person.

23

CONFIDENTIAL

CIC 000256

Respectfully submitted,

W. Brian McCann, Esq. VSB # 65712
HIRSCHLER FLEISCHER, A PROFESSIONAL CORPORATION
2100 Cary Street (23223-7078)
Richmond, VA 23223-0500
Tel. (804) 771-9514
Fax. (804) 644-0957
*Counsel for Plaintiffs*

And

Barry J. Nace, Esq.
Paulson & Nace
1615 New Hampshire Ave., NW
Washington, DC 20009
(202) 463-1999
*Co-Counsel for Plaintiffs*

August 14, 2009.

24
CONFIDENTIAL

CIC 000257

# IN THE SUPREME COURT OF VIRGINIA

### RECORD NO. 091660

**RECEIVED**
CLERK
SUPREME COURT OF VIRGINIA
SEP - 8 2009
RICHMOND, VIRGINIA

**RICHARD and ROSIE LEE GILBERT, individually and on behalf of their daughter, Sarah Gilbert, a minor,**

Petitioners-Appellants,

v.

**SUSAN E. ATKINS M.D., et al.,**

Respondents-Appellees.

&

**SARAH GILBERT, by her parents and next friends Richard and Rosie Lee Gilbert, and RICHARD and ROSIE LEE GILBERT, individually,**

Petitioners-Appellants,

v.

**SUSAN E. ATKINS M.D., et al.,**

Respondents-Appellees.

## OPPOSITION TO PETITION FOR APPEAL

Rodney K. Adams, Esquire (VSB #32656)
Donna L. Foster (VSB #42220)
Joseph Rainsbury (VSB #45782)
LeClair Ryan, A Professional Corporation
951 East Byrd St., East Tower Suite 800
Richmond, Virginia 23219
Telephone No.: (804) 783-2003
Facsimile No.: (804) 783-2294

*Counsel for Respondents-Appellees*

CONFIDENTIAL

CIC 000258

## CONTENTS

TABLE OF AUTHORITIES.................................................................. ii

INTRODUCTION................................................................................ 1

QUESTIONS PRESENTED............................................................... 3

NATURE OF THE CASE.................................................................... 4

ARGUMENT ...................................................................................... 7

I.   The Trial Court correctly dismissed the First Action
     and correctly refused to allow Sarah to be
     substituted as Plaintiff............................................................ 7

     A.   Sarah's claims in the First Action were improperly
          filed because the Complaint named Sarah's
          parents, not Sarah, as the Plaintiffs................................. 7

     B.   A complaint naming an improper party may not be
          amended to substitute a proper plaintiff. ........................ 13

     C.   Petitioners' reliance upon *McDaniel* is misplaced
          because this Court overruled *McDaniel* and—in
          any event—Sarah is not the same "real party in
          interest" as her parents.................................................. 14

II.  The Trial Court properly sustained Defendants' Plea
     of Statute of Limitations to the Second Complaint. ........... 18

III. The Trial Court correctly limited Sarah's parents'
     individual claims to economic losses for medical
     expenses and loss of services. ............................................ 20

     A.   Under settled Virginia law regarding personal
          injuries to minors, a parent only has a claim for
          medical expenses and loss of services. ......................... 21

     B.   The *Modaber* line of cases is irrelevant because
          those cases involved *in utero* injury to a fetus,
          which the law deems to be an injury to the *mother*. ....... 23

CONCLUSION ................................................................................ 25

CERTIFICATE OF COMPLIANCE WITH RULE 5:26(D) ................. 27

CONFIDENTIAL

CIC 000259

i

## TABLE OF AUTHORITIES

### Cases

*Bulala v. Boyd*, 239 Va. 218, 389 S.E.2d 670 (1990)................................. 24

*Castle v. Lester*, 272 Va. 591, 636 S.E.2d 342 (2006)................... 23, 24, 25

*Chesapeake House on the Bay, Inc. v. Virginia National Bank*,
  231 Va. 440, 344 S.E.2d 913 (1986)........................................................ 13

*Delk v. Edens*, 56 Va. Cir. 518 (City of Newport News 2001) ................... 23

*Estate of James v. Peyton*, 277 Va. 443, 674 S.E.2d 864 (2009).......passim

*Fowler v. Winchester Medical Center*, 266 Va. 131, 580 S.E.2d
  816 (2003) ............................................................................................... 19

*Halatyn v. Miller*, 69 Va. Cir. 236 (Fairfax Co. 2005).............................. 17

*Harbour Gate Owners' Assoc. v. Berg*, 232 Va. 98, 348 S.E.2d
  252 (1986) ............................................................................................... 19

*Harmon v. Sadjadi*, 273 Va. 184, 639 S.E.2d 294 (2007) ........ 14, 15, 16, 19

*Herndon v. St. Mary's Hosp.*, 266 Va. 472, 587 S.E.2d 567
  (2003) ...............................................................................................passim

*Kalafut v. Gruver*, 239 Va. 278, 389 S.E.2d 681 (1990)............................ 24

*Kirby v. Gilliam*, 182 Va. 111, 28 S.E.2d 40 (1943)................................. 7, 8

*McDaniel v. North Carolina Pulp. Co.*, 198 Va. 612, 95 S.E.2d
  201 (1956) .........................................................................................passim

*Modaber v. Kelley*, 232 Va. 60, 348 S.E.2d 233 (1986)................. 23, 24, 25

*Moses v. Akers*, 203 Va. 130, 122 S.E.2d 864 (1961) .............................. 21

*Sims v. Virginia Elec. & Power Co.*, 550 F.2d 929 (4th Cir.
  1977)........................................................................................................ 22

*Swann v. Marks*, 252 Va. 181, 476 S.E.2d 170 (1996) ............................ 10

*Watson v. Daniel*, 165 Va. 564, 183 S.E. 183 (1936).......................... 21, 22

### Statutes

Va. Code § 8.01-243 ................................................................................... 22

Va. Code § 8.01-243.1 ................................................................... 4, 18, 20

Va. Code § 8.01-36 ..................................................................................... 22

CONFIDENTIAL

CIC 000260

Va. Code § 8.01-6 ................................................................ 20
Va. Code § 8.01-6.1 ............................................................. 20
Va. Code § 8.01-8 ........................................................... passim

CONFIDENTIAL

CIC 000261

## INTRODUCTION

This case follows a familiar pattern. A plaintiff brings a claim naming an improper party. Later, recognizing the error, the plaintiff (1) attempts to amend the initial complaint to substitute the proper party, and (2) brings a second action naming the proper party. By that time, however, it is too late. The statute of limitations has run. The trial court dismisses the first action because it named the wrong party. And it dismisses the second action because it was untimely.

This scenario, or a variation on the same theme, has been presented countless times to this Court. And each time, the result is the same—a suit by or against an improper party is a nullity, it cannot be amended to name the proper party, and it does not toll the running of the statute of limitations. . The claim is time-barred.

The particular variation in this case concerns the proper party to assert a personal-injury claim on behalf of a minor child. It is well settled that such an action must be brought in the name of the minor herself, suing by her next friend. It may *not* be brought in the name of the next friend, suing "on behalf of" the minor. Yet that is exactly what happened here. By the time Petitioners discovered their error, the statute of limitations had run.

CIC 000262

Predictably, Petitioners attempted to amend the initial Complaint to name the proper party, the child, but the Trial Court correctly refused to allow this. They also brought a second action, this time properly suing in the name of the minor, by her next friends. But the Trial Court correctly held that the minor's claim was time-barred—the first action was a nullity as to the minor's claim, and thus did not toll the statute of limitations. The only surviving claim was the parents' cause of action for medical expenses and loss of services, which has a five-year limitations period.

In their appeal, Petitioners make various arguments to avoid the statute-of-limitations bar, none of them with any substance. They acknowledge their error in bringing the first action in the name of the parents, rather than the child. But they attempt to excuse it as a mere stylistic faux pas or grammatical error. They fail to recognize what it really was—*a lawsuit commenced by the wrong plaintiffs*. Petitioners also rely on this Court's decision in *McDaniel v. North Carolina Pulp. Co.*, 198 Va. 612, 95 S.E.2d 201 (1956). But this Court expressly and emphatically overruled *McDaniel* two years ago. Petitioners' reliance on it only underscores their desperation.

Finally, Petitioners argue that the trial court erred in rejecting the parents' claims for emotional distress, mental anguish, and loss of



CONFIDENTIAL

enjoyment of life. As the Trial Court correctly held, however, the parents' sole claim is for pecuniary injury from medical expenses and loss of services. The cases that Petitioners cite in support of allowing parents to recover non-economic damages all involve injuries to a fetus *in utero*, which this Court has held to be a personal injury to the mother herself. Unlike a fetus *in utero*, a teenager is her own legal person. And an injury to a teenager is *not* deemed to be a personal injury to her mother or father. The Trial Court properly limited Sarah's parents to a claim for their pecuniary loss.

Because this case treads along well-worn paths and because the Trial Court decided the legal issues correctly, this Court should refuse this appeal.

### QUESTIONS PRESENTED

1. Under Virginia Code § 8.01-8, must a lawsuit for a minor child's injuries be brought in the child's own name, by next friend, rather than in the name of her parents?

2. Where a lawsuit is filed by an improper plaintiff, does Virginia law permit the plaintiff to amend the complaint to name the proper plaintiff?

3. When an initial lawsuit names an improper plaintiff but a subsequent lawsuit names the proper plaintiff, does the filing date for the second lawsuit "relate back" to the filing date of the first lawsuit?

3



CONFIDENTIAL

CIC 000264

3.   In parents' individual actions arising out of injuries to
     their minor children, are damages limited to
     pecuniary losses—i.e., medical expenses and loss
     of services?

## NATURE OF THE CASE

This appeal arises out of two separate lawsuits seeking to recover for injuries that Sarah Gilbert ("Sarah") suffered during a July 28, 2004 surgery to correct scoliosis. At the time of the surgery, Sara was 13 years old.[1] So under Virginia Code § 8.01-243.1, she had two years from the surgery to commence a medical-malpractice lawsuit.

On July 24, 2006—four days before statute ran—Sarah's parents, Richard Gilbert ("Richard") and Rosie Gilbert ("Rosie"), filed a Complaint in the Circuit Court for the City of Richmond (Case No 4760, the "First Action") seeking damages for Sarah's personal injuries.[2] Sarah's parents sued in their own name "on behalf of" Sarah. The Complaint's caption identified the Plaintiffs as "Richard Gilbert and Rosie Lee Gilbert, individually and on behalf of their daughter, Sarah Gilbert."

Defendants filed a Special Plea in Bar, asserting that the Complaint failed to comply with Virginia Code § 8.01-8, which requires that an infant

---

[1] Sarah's birth date is October 28, 1990.

[2] The Complaint also named Chippenham & Johnston-Willis Hospital, Inc., as a Defendant. The Hospital was later nonsuited. Its involvement in the case is not germane to this appeal.



CIC 000265

sue as the named plaintiff by next friends. *See* Va. Code § 8.01-8.

Defendants also demurred to the Complaint to the extent that Sarah's

parents sought non-economic damages for themselves.

On February 26, 2007, the Trial Court dismissed Sarah's claims in

the first Complaint. It also sustained Defendants' demurrers to Sarah's

parents' individual claims for non-economic damages. It gave Sarah's

parents permission to amend the Complaint in the First Action to properly

plead their individual claims for economic damages.

On October 25, 2006—while the Demurrer and Plea In Bar on the

First Action were still pending—a second complaint was filed (Case No

6787, the "Second Action"). Unlike the First Action, the Second Action

named Sarah as a plaintiff, suing by her parents and next friends, Richard

Gilbert and Rosie Lee Gilbert. The Complaint also named Sarah's parents

as plaintiffs in their own right, seeking both economic and non-economic

damages for their daughter's injury. Defendants filed a Special Plea of the

Statute of Limitations, asserting that Sarah's claim was time-barred. And

Defendants again demurred to Sarah's parents' claim for non-economic

damages.

Meanwhile, on March 6, 2007, Sarah's parents filed an Amended

Complaint in the First Action for their individual claims arising out of their

CONFIDENTIAL

CIC 000266

daughter's injury.  Notwithstanding the Trial Court's February 26, 2007

order, they sought both economic and non-economic damages.[3]  Once

again, Defendants demurred to Sarah's parents' claim for non-economic

damages.

The Circuit Court held a hearing on the pending matters in both

cases.  In its August 3, 2007 order disposing of the issues, it dismissed

Sarah's claims with prejudice.  It also dismissed Sarah's parents' individual

claims to the extent they sought non-economic damages.  But the Trial

Court allowed Sarah's parents' individual claims for economic damages to

proceed.  It consolidated the First Action and the Second Action into a

single case, retaining case number 4760.

Even though the parents' individual claims remained pending—and,

thus, there had been no final order in either case—Petitioners appealed to

this Court, Case No. 072266.  Because there had been no final order, this

Court denied that appeal, without prejudice.  Back before the Trial Court,

Sarah and her parents filed a Motion to Reconsider the Court's earlier

ruling on the timeliness of Sarah's claims and on her parents' ability to

recover non-economic damages.  The Trial Court denied that motion.  After

---

[3] The non-economic damages that Sarah's parents sought included mental
anguish, pain and suffering, humiliation, embarrassment, and loss of
enjoyment of life.



CONFIDENTIAL

CIC 000267

that, Sarah's parents nonsuited their individual claims, thereby converting the Trial Court's earlier rulings into final orders. Petitioners then commenced the present appeal.

## ARGUMENT

I.   THE TRIAL COURT CORRECTLY DISMISSED THE FIRST ACTION AND CORRECTLY REFUSED TO ALLOW SARAH TO BE SUBSTITUTED AS PLAINTIFF.

A.   Sarah's claims in the First Action were improperly filed because the Complaint named Sarah's parents, not Sarah, as the Plaintiffs.

Virginia Code § 8.01-8 permits minors to bring actions by their "next friend."[4] It is well-settled that such actions must be brought in the name of the minor, not the minor's next friends. *Herndon v. St. Mary's Hosp.*, 266 Va. 472, 587 S.E.2d 567 (2003); *Kirby v. Gilliam*, 182 Va. 111, 28 S.E.2d 40 (1943). Where, as here, a minor's claims are brought in the name of the next friend, the action is improper. This is so, even if the complaint describes the next friend as suing on behalf of the minor.[5]

---

[4] "Any minor entitled to sue may do so by his next friend. Either or both parents may sue on behalf of a minor as his next friend." Va. Code § 8.01-8.

[5] In evaluating whether a Complaint has named an improper party, the Court must view the Complaint as a whole. *Estate of James v. Peyton*, 277 Va. 443, 455, 674 S.E.2d 864, 869 (2009) ("In determining the adequacy of a pleading to identify a party, we consider the pleading as a whole.").



CONFIDENTIAL

CIC 000268

*Herndon* is directly on point. It, too, was a medical malpractice case brought on behalf of an injured child. And there, too, the child's parents brought suit in their own name, not the child's name:

> The plaintiffs named in the motion for judgment included "Debbie Thompson Herndon, as mother and next friend of Matthew McNeil Herndon" and "Larry McNeil Herndon, as father and next friend of Matthew McNeil Herndon."

266 Va. at 474, 587 S.E.2d at 568. The trial court dismissed the action pursuant to Va. Code § 8.01-8 because it was not filed by the child.

On appeal, this Court affirmed. It held that "the minor child, not the next friend, is the real party in interest in such an action." *Id.* at 476, 587 S.E.2d at 570. Observing that "[n]o party, infant or adult, may sue by deputy," this Court reiterated its earlier holdings that "if the action is brought 'in the name of the next friend 'on behalf of the infant' it cannot be maintained.'" *Id.* (quoting *Kirby*, 182 Va. at 117, 28 S.E.2d at 43). The Court rejected the plaintiffs' arguments that the 1998 amendment to § 8.01-8 had changed this long-standing rule of Virginia procedure.[6]

In the present case, the Complaint in the First Action named only Sarah's parents—not Sarah herself—as Plaintiffs. The caption identifies Richard and Rosie as the plaintiffs suing "on behalf of" their daughter:

---

[6] The 1998 amendment clarified that either or both parents may serve as next friend in their child's suit.


CONFIDENTIAL

CIC 000269

RICHARD GILBERT and ROSIE LEE GILBERT, individually
and on behalf of their daughter, SARAH GILBERT, a minor.

Nowhere does the caption state that Sarah was suing on her own behalf.

The body of the Complaint, too, makes it clear that Sarah's parents

were the only plaintiffs. The initial section of the Complaint, which identifies

the parties, lists only Richard and Rosie as plaintiffs. Although Sarah's

name is mentioned, she is not referred to as a Plaintiff. Rather, she is

identified only as the Plaintiffs' daughter:

¶ 1.   Plaintiff Richard Gilbert is an adult resident of the
       Commonwealth of Virginia.

¶ 2.   Plaintiff Rosie Gilbert is an adult resident of the
       Commonwealth of Virginia.

¶ 3.   Plaintiffs Richard Gilbert and Rosie Gilbert are the
       parents of their daughter, Sarah Gilbert, a minor.

Thus, both the caption and the text of the Complaint show that Sarah is not

a named plaintiff. Because the Complaint named only Sarah's parents as

Plaintiffs, and because Sarah's parents could not assert her malpractice

claims, the Trial Court properly dismissed the Complaint in the First Action

to the extent that it purported to assert those claims.

Petitioners acknowledge that "there was a technical flaw in the

wording of the caption" in the First Action, but claim that this should have

had no consequence because the Complaint "named" Sarah inasmuch as it

described her as the person on whose behalf the suit was brought. (Pet. at

9

CONFIDENTIAL

CIC 000270

12, 16).  Arguing that the Complaint "identified" Sarah and that the "technical flaw" did not prejudice Defendants, Petitioners claim that the initial Complaint was "proper and not a nullity."  (Pet at 12).

This argument is without merit.  To begin, this case is no different from *Herndon*.  In *Herndon*, too, the parents "identified" their minor child inasmuch as they included his name in the caption.  But there, as here, the complaint did not name the minor child *as a plaintiff*.  As here, the wording of the caption made it clear that the parents, not the child, were the plaintiffs.  Accordingly, the *Herndon* court held that the action had been improperly filed.

Furthermore, this Court considered—and rejected—an argument similar to Petitioners' earlier this year in *Estate of James v. Peyton*, 277 Va. 443, 674 S.E.2d 864 (2009).  There, the plaintiff initially brought suit against "Robert Judson James," not realizing that Mr. James had died.  Upon learning of the death, the plaintiff amended the Motion for Judgment to name "The Estate of ROBERT JUDSON JAMES, Administrator, Edwin F. Gentry, Esq." as defendant.  Citing *Swann v. Marks*, 252 Va. 181, 184, 476 S.E.2d 170, 171-72 (1996), the personal administrator moved to dismiss, claiming that the action had been improperly brought against the

CONFIDENTIAL

CIC 000271

decedent's "estate" rather than the personal representative of the estate. The trial court rejected this argument.

On appeal, this Court reversed. It held that the action *was an improper action against an estate*. Pertinent here, the plaintiff argued that the pleading was proper because it "identified" the administrator of the estate, naming him in the caption. This Court rejected that argument, noting that it was inconsistent with the holding in *Herndon* and with the text of the complaint:

> Just as in *Herndon*, where *the order of words identified the parents, not the child, as the plaintiffs* who were further described as the "next friends" of the child, here, the most straightforward reading of the amended motion for judgment identifies "the Estate of ROBERT JUDSON JAMES" as the party defendant. While the caption of the pleading goes on to identify Gentry as the administrator of the estate and the body of the pleading recites the fact of his qualification as administrator, *at best these references only serve to identify James' estate more specifically. The simply do not name Gentry, rather than the estate as the party defendant* when the pleading is read as a whole.

277 Va. at 455, 674 S.E.2d 870 (emphasis added). Accordingly it reversed the trial court.

In the present case, as in *Estate of James*, the references to "Sarah Gilbert" in the Complaint serve at best to identify her parents more specifically. They do *not* name Sarah as a party plaintiff.

CIC 000272

Petitioners, however, attempt to characterize the failure to name Sarah as a Plaintiff in the initial Complaint as a mere stylistic infelicity: "The only issue present is the fact that the Appellants used the active voice in naming Sarah Gilbert instead of the passive voice." (Pet at 12).  This is not so.  The issue is whether the Complaint *names Sarah as a Plaintiff at all*.[7]  A reading of the caption and the body of the Complaint shows that it does not—it identifies only her parents, Richard and Rosie, as the Plaintiffs.  Although Sarah is described as the *daughter* of Plaintiffs, she is never named as a Plaintiff in her own right.

This is a problem of substance, not style.  Few things are as important to a lawsuit as the identity of the parties.  The trial court correctly

---

[7] As a matter of basic grammar, too, Petitioners' argument is flawed.  This is not case of active/passive voice. "'Voice' refers to the relationship between the subject of a clause and its verb: if the verb performs the action of the subject (as in 'Jane hit the ball'), the verb is active, whereas if it is acted upon (as in 'The ball was hit by Jane'), the verb is passive."  Bryan Garner, *A Dictionary of Modern Legal Usage* 643 (2d Ed. 1995).  The identification of plaintiffs does not involve the relationship between a subject and verb—indeed the caption does not even have any verbs.  Rather, the question is whether Sarah was named as a separate plaintiff, or whether instead her name simply appears part of a clause that modifies or describes the other plaintiffs.  Here, Sarah's name does not appear as a separate plaintiff.  It appears only in the clause "on behalf of their daughter SARAH GILBERT," which describes the capacity in which Sarah's parents are suing.

CONFIDENTIAL

held that the initial Complaint did *not* name Sarah as a Plaintiff and, thus, could not assert Sarah's medical-malpractice cause of action.

### B. A complaint naming an improper party may not be amended to substitute a proper plaintiff.

Petitioners assert that, even if there was an error in naming the parties in the initial Complaint, the Trial Court should have allowed them to cure the problem by amending the Complaint to name Sarah properly: "Sarah's claim should have been dismissed without prejudice and with leave to amend." (Pet. at 17). This argument is a nonstarter. It is settled law that a plaintiff cannot amend a complaint to substitute a proper party for an improper party. *See Estate of James*, 277 Va. at 453, 674 S.E.2d at 868-69 ("[A] new plaintiff may not be substituted for an original plaintiff who lacked standing to bring the action.") (citing *Chesapeake House on the Bay, Inc. v. Virginia National Bank*, 231 Va. 440, 442-43, 344 S.E.2d 913, 915 (1986)).

This Court recently addressed that exact issue in *Estate of James v. Peyton*. In its discussion of *Herndon*, this Court observed that the parents could not have amended their complaint to add their minor child as a party because the failure to name the minor child as a plaintiff in the original complaint was a problem that could not be cured by amendment:



13

CIC 000274

We addressed a similar "syntactical" conundrum in *Herndon v. St. Mary's Hospital, Inc.*, 266 Va. 472, 587 S.E.2d 567 (2003). . . . Although we were not required to address the question whether the court should have allowed the substitution of the child, by his parents as next friends, as the proper party, it is clear that, as in *Cook* [*v. Radford Community Hosp., Inc.*, 260 Va. 443, 536 S.E.2d 906 (2000)], *such an amendment would not have been allowed since the failure to name the proper party plaintiff cannot be cured by an amendment.*

277 Va. at 454-55, 674 S.E.2d at 869 (emphasis added). This reasoning is sound and it forecloses any argument that the Trial Court erred in denying leave to amend the initial Complaint to add Sarah as a party Plaintiff.

C.   **Petitioners' reliance upon *McDaniel* is misplaced because this Court overruled *McDaniel* and—in any event—Sarah is not the same "real party in interest" as her parents.**

Casting about for arguments, Petitioners claim that this Court's decision in *McDaniel v. North Carolina Pulp Co.*, 198 Va. 612, 95 S.E.2d 201 (1956), entitled her to cure a "hyper-technicality . . . so long as the parties and the subject matter are substantially the same in both cases." (Pet. at 13). This argument betrays both a misunderstanding of the holding in *McDaniel* and of the viability of that holding in light of this Court's recent decision in *Harmon v. Sadjadi*, 273 Va. 184, 639 S.E.2d 294 (2007).

In *McDaniel*, a non-resident administrator—the decedent's father—brought a wrongful death action in Virginia. That action was dismissed because the father had not qualified as administrator in Virginia. Shortly

CONFIDENTIAL

CIC 000275

thereafter, a Virginia administratrix was qualified and she brought suit together with the decedent's father. They commenced the second suit outside the limitations period. This Court held that the first action, though improperly filed, tolled the running of the statute of limitations. It reasoned that even though the father lacked the legal capacity to bring the first suit, he still had "an interest in the subject matter of the litigation" and was the "real party in interest" in both lawsuits. *Id.* at 619, 95 S.E.2d at 206. The Court observed that the "*the plaintiffs in the second action were substantially the same* plaintiff as the plaintiff in the first action, *suing in the same right.*" *Id.* (emphasis added). This, the Court held, gave the non-resident administrator a sufficient interest in the matter to toll the running of the limitations period.

Petitioners argue that they should benefit from the *McDaniel* rule because, they claim, the parties and subject matter were substantially the same between the First Action and the Second Action. (Pet. at 14). There are two insurmountable obstacles to this argument.

First, *McDaniel* was expressly overruled in *Harmon v. Sadjadi*. Although Petitioners acknowledge this, they claim that "a close reading of *Harmon* makes it clear that this Court did not overrule the logic of *McDaniel* so much as it disagreed with the ultimate result." (Pet. at 13). This is not

CONFIDENTIAL

CIC 000276

**80.** *Harmon* rejected, forcefully and categorically, the entire "logic" underlying *McDaniel*:

> The rule set forth in *McDaniel* is clearly a mistake and a flagrant error that we will not perpetuate. We can discern no basis to carve out an exception to our otherwise clear precedent that lack of standing causes a party's legal proceeding to be of no legal effect.

273 Va. at 197, 639 S.E.2d at 301. For this reason, the *Harmon* court held that a lawsuit initiated by an improper party was a nullity. If, as Petitioners argue, *McDaniel's* "substantially similar" analysis truly remained intact, *Harmon* would have come out differently. The West Virginia administrator in *Harmon* case was, after all, "substantially the same" as the Virginia Administrator—they were the same person.

Second, even if *McDaniel* had not been overruled, Petitioners could not have benefited from the legal principle it represented. As shown above, the only parties to the initial Complaint were Sarah's parents. But Sarah's parents had no legally cognizable interest in Sarah's personal-injury claim[8]—only Sarah had in interest in such an action. *Herndon*, 266 Va. at

---

[8] They only had a derivative claim for medical expenses and loss of services. *See infra*, Section III. The fact that Sarah's parents had standing to assert their *derivative* claims does not entail that they had standing to assert Sarah's *malpractice* claim. None of the Plaintiffs initially named in the Complaint in the First Action had standing to assert that claim—only

(note continued on following page . . .)



18

CONFIDENTIAL

CIC 000277

476, 587 S.E.2d at 570 ("[T]he minor child, not the next friend, is the real party in interest in such an action."). So they were unlike the foreign personal representative in *McDaniel*, who—though barred from suing—*did have an interest in the action.*[9] Thus, even under the now-defunct *McDaniel* rule, the first Complaint would not have tolled the limitations period for Sarah's claims.[10]

There is no getting around the fact that, in the First Action, Sarah's parents improperly brought her medical malpractice claims in their own

---

*(note continued from previous page)*
Sarah did. So the pendency of the First Action did not toll Sarah's malpractice claim.

[9] Petitioners argue that the present case differs from *McDaniel* inasmuch as it "identified parties with standing to bring the medical malpractice action." (Br. at 12). For reasons stated above, Sarah's parents did *not* have standing to assert her claim. And Sarah—though "identified" in the Complaint in the First Action—was not a named plaintiff.

[10] Petitioner's reliance on the circuit court decision in *Halatyn v. Miller*, 69 Va. Cir. 236 (Fairfax Co. 2005) is misplaced. *Halatyn* was decided prior to *Harmon*. And it involved a situation where the initial action was brought by the minor child (alone, not by next friend). The child nonsuited that case. Later, the minor child sued by next friend. On the eve of trial in the second case, he again attempted to nonsuit. The circuit court found that the second plaintiff (i.e., the minor child, suing by next friend), was suing in the same right as the initial plaintiff (i.e., the minor child, suing alone). Applying the rule in *McDaniel*, the trial court barred the plaintiff from taking a second nonsuit. Here, by contrast, the initial plaintiffs were Sarah's *parents*, not Sarah. Sarah is not substantially the same as her parents. So even if *McDaniel* were still good law—and it is *not*—*Halatyn* still does not support Petitioners' arguments.

17



CONFIDENTIAL

CIC 000278

name, rather than in her name.  Because "no party, infant or adult, may sue by deputy" the Trial Court properly dismissed the personal-injury claims in the First Action with prejudice.  As it relates to Sarah's malpractice claims, the First Action was a nullity.

## II. THE TRIAL COURT PROPERLY SUSTAINED DEFENDANTS' PLEA OF STATUTE OF LIMITATIONS TO THE SECOND COMPLAINT.

Recognizing these problems, Petitioners filed the Second Action.  Unlike the First Action, Sarah's malpractice claim was brought by the proper party—i.e., by "Sarah Gilbert, by her parents and next friends Richard Gilbert and Rosie Lee Gilbert."[11]  But by this time, Sarah's malpractice claim was time-barred.

As noted above, the surgery giving rise to these causes of action occurred on July 28, 2004.  At the time, Sarah was 13 years old.  A medical malpractice action brought by a minor who, at the time of the malpractice, is older than eight years old "shall be commenced within two years of the date of the last act or omission giving rise to the cause of action."  Va. Code § 8.01-243.1.  Sarah did not file the Second Complaint until October 25, 2006—nearly two years and three months after Sarah's

---

[11] As noted above, the Second Action also named Sarah's parents as plaintiffs for their individual claims.

18



CONFIDENTIAL

CIC 000279

███gory.  So absent a tolling rule, her medical-malpractice claim is time-

███ed.

███  There is no applicable tolling rule.  Sarah cannot rely on any tolling

███ from the First Action, as it was brought by the incorrect party.  Under

███ 8, only Sarah—not her parents—had standing to assert her

███ injury claims.  And as noted above, the First Action was

███ erly brought by Sarah's parents, not Sarah.  An action brought by a

███ without standing is a nullity and does not toll the running of the statute

███ ations.  *See Fowler v. Winchester Medical Center*, 266 Va. 131, 134,

███.2d 816, 817 (2003) ("We have previously held that a motion for

███ ent filed by one who did not have standing to sue did not toll the

███ of limitations.") (citing *Harbour Gate Owners' Assoc. v. Berg*, 232

███ 107, 348 S.E.2d 252, 258 (1986)); *Harmon*, 273 Va. at 193, 639

███ at 299 ("Our jurisprudence is clear that when a party without

███ brings a legal action, the action so instituted is, in effect, a legal

███  Thus, the pendency of the First Action did not toll the running of

███ ute of limitations.

███ ing terminology more appropriate for amendments, however,

███ ers claim that the Second Action—which was an entirely new

███ not an amendment to an existing Complaint—"relates back to July

CONFIDENTIAL

CIC 000280

24, 2006."[12] (Pet. at 19). Other than another off-hand reference to "the *McDaniel* analysis" Petitioners cite no authority to support this novel "relation back" theory. For the reasons stated above, *McDaniel* is no longer good law, and even if it were, it is of no avail for Sarah, because she is suing in a different right from her parents.

Because there is no authority to support Petitioners' "relation-back" theory, and because the Second Action was filed outside the two-year limit prescribed by Va. Code § 8.01-243.1, the Trial Court correctly held that Sarah's medical-malpractice claim was time-barred.

### III. THE TRIAL COURT CORRECTLY LIMITED SARAH'S PARENTS' INDIVIDUAL CLAIMS TO ECONOMIC LOSSES FOR MEDICAL EXPENSES AND LOSS OF SERVICES.

That leaves only Sarah's parents' individual claims. In those claims, however, Sarah's parents sought more than just their economic losses arising out of Sarah's injury (i.e., medical expenses and loss of services). They also sought "mental anguish, pain and suffering, humiliation, embarrassment, and the loss of enjoyment of life." The Trial Court

---

[12] Va. Code § 8.01-6 and -6.1 state that *amendments* will "relate back" to the date of original filing, under certain specified conditions. They do not say that the filing date of one lawsuit will relate back to the filing date of a completely different lawsuit.


CONFIDENTIAL
CIC 000281

correctly limited Sarah's parent's damages to medical expenses and loss of services.

**A.   Under settled Virginia law regarding personal injuries to minors, a parent only has a claim for medical expenses and loss of services.**

Under Virginia law, a tortious injury to a minor child gives rise to two separate causes of action—one for the child and one for her parents:

> It is well settled that in case of an injury to an unemancipated infant by wrongful act two causes of action ordinarily arise. One cause of action is on behalf of the infant to recover damages for pain and suffering, permanent injury and impairment of earning capacity after attaining majority. The other is on behalf of the parent for loss of services during minority and necessary expenses incurred for the infant's treatment.

*Moses v. Akers*, 203 Va. 130, 132, 122 S.E.2d 864, 865-66 (1961).

The parents' claim is not a claim for personal injury—it is a claim for economic losses suffered because of the child's injury:

> The plaintiff's action is for the damage he has sustained by reason of *loss of services and incurring or paying the medical and hospital expense* made necessary to effect a cure of the infant whose injury was caused by the negligence of the defendants.

*Watson v. Daniel*, 165 Va. 564, 568-69, 183 S.E. 183, 185 (1936) (emphasis added). The claim arises out of the fact that parents are chargeable for the care and support of their injured child. *Id.* at 573, 183 S.E. at 187 ("The father is legally chargeable with such expense.  It is his

CONFIDENTIAL

CIC 000282

duty to provide his child with the necessary medical attention."). The

essence of the parents' claim is that they have suffered "pecuniary loss" by

being required to provide medical care for their child:

> The father's action is one to *recover the pecuniary loss he has sustained* by being required to furnish medical treatment to his child and by losing the child's services. This is the gist of his action.

*Id.* (emphasis added). *See also Sims v. Virginia Elec. & Power Co.*, 550

F.2d 929, 934 (4th Cir. 1977) ("The parents' cause of action in Virginia for

injuries to a minor child are based on loss of services and the responsibility

of paying for the cure of the child.").

The fact that the parents' claim is a claim for pecuniary loss is

reflected in Virginia Code § 8.01-243, which establishes a five-year

limitations period for property-injury claims. This statute classifies a

parent's claim for a minor child's medical expenses as a form of injury to

property:

> Every action for injury to property, *including actions by a parent or guardian of an infant against a tortfeasor for expenses of curing or attempting to cure such infant from the result of a personal injury or loss of services of such infant*, shall be brought within five years after the cause of action accrues.

Va. Code § 8.01-243(B) (emphasis added). Likewise, Virginia Code

§ 8.01-36, which allows joinder of a minor child's personal-injury claim with

his parents' claim, refers to the parents' claim as one for "the expenses of



CIC 000283

curing or attempting to cure such infant from the result of such personal injury.'

There is no basis for Petitioners' argument that a parent of an injured child can recover for non-economic losses. *See Delk v. Edens*, 56 Va. Cir. 518 (City of Newport News 2001) ("There would appear to be no support for the proposition that a derivative action of a parent for medical expenses or loss of services for an infant also allows, under the applicable statute, any claim for injury to the person of the parent, emotionally or otherwise, or for loss of society and companionship of a child.") As the case law and pertinent statues demonstrate, parents of an injured child only have a claim for pecuniary losses.

**B.    The *Modaber* line of cases is irrelevant because those cases involved *in utero* injury to a fetus, which the law deems to be an injury to the *mother*.**

Petitioners, however, cite *Modaber v. Kelley*, 232 Va. 60, 348 S.E.2d 233 (1986) and *Castle v. Lester*, 272 Va. 591, 636 S.E.2d 342 (2006)—two cases involving injuries to fetuses *in utero*—and claim that these cases stand for the broad proposition that "parents, in general, have a right to seek and recover non-economic damages for negligence committed upon their children." (Pet. at 20). The cases do nothing of the sort. Rather, they stand for the principle, not implicated in this case, that an injury to a fetus *in*

CONFIDENTIAL                                      CIC 000284

*utero* is an injury to the mother for which the mother may recover her resulting damages, including emotional injuries.

In *Modaber*, the defendant obstetrician provided improper care to a pregnant woman suffering from preeclampsia. This injured the mother—nearly causing her death—and led to the death of the fetus while still in the womb. Noting that under Virginia law "an unborn child is a part of the mother until birth," this Court held that "injury to an unborn child constitutes injury to the mother and that she may recover for such physical injury and mental suffering associated with a stillbirth." 232 Va. at 66, 348 S.E.2d at 236-37.

*Castle* likewise was a case where a fetus was injured while still in the womb. In that case, however, the child was born alive. Nevertheless, following its holdings in *Bulala v. Boyd*, 239 Va. 218, 389 S.E.2d 670 (1990), and *Kalafut v. Gruver*, 239 Va. 278, 389 S.E.2d 681 (1990), this Court held that the injury to the fetus *in utero* was still an injury to the mother. The happenstance that the child was born alive did not efface the mother's injury. It simply meant that both the mother and the infant had personal injury claims arising out of the negligence: "when a fetus sustains injury and is subsequently born alive, the mother and the impaired child

CONFIDENTIAL

CIC 000285

each have a claim for damages resulting from the negligently cause, *in utero* injury." *Castle*, 272 Va. at 603, 636 S.E.2d at 348.

The present case is not a case involving injury to a fetus *in utero*. Sarah was 13 years old at the time of the surgery. Unlike an unborn child, an injury to a teenager is an injury to a person who is legally distinct from her parents. Nothing in *Modaber*, *Castle*, or any other case of this Court holds—or even suggests—that an injury to an adolescent child constitutes a personal injury to her parents for which they may recover emotional-distress or pain-and-suffering damages. This Court should reject Petitioners' arguments for non-economic damages.

## CONCLUSION

Because the Trial Court correctly held that Sarah's claims were time-barred and because it held that Sarah's parents' claims for non-economic damages had no basis in Virginia law, this Court should deny the Petition for Appeal.

CONFIDENTIAL
CIC 000286

SUSAN E. ATKINS, M.D. AND
CHILDREN'S ORTHOPEDIC CENTER

_____
                    Of Counsel

Rodney K. Adams, Esquire (VSB #32656)
Donna L. Foster (VSB #42220)
Joseph Rainsbury (VSB #45782)
LeClair Ryan, A Professional Corporation
951 East Byrd St., East Tower Suite 800
Richmond, Virginia 23219
Telephone No.:  (804) 783-2003
Facsimile No.:  (804) 783-2294

*Counsel for Respondents-Appellees*

CONFIDENTIAL

CIC 000287

## CERTIFICATE OF COMPLIANCE WITH RULE 5:26(D)

The undersigned hereby certifies that the requirements of Rule

5:26(D) have been complied with on this 8th day of September, 2009.

CONFIDENTIAL

CIC 000288



RECEIVED
SEP 1 0 2009
BY:

CONFIDENTIAL

CIC 000289

605

)                                                                    )

**VIRGINIA:**

### IN THE CIRCUIT COURT
### FOR THE CITY OF RICHMOND

RICHARD GILBERT and                              :
ROSIE LEE GILBERT, Individually and              :
on behalf of their daughter,                     :
SARAH GILBERT, a minor:                          :
2611 Turner Road                                 :
Goochland, VA 23063                              :
                                                 :
        Plaintiffs,          :
                                                 :
    v.                             :   At Law No.: _____
                                                 :
SUSAN EDWIN ATKINS, M.D.                         :
1011 Hioaks Road, Suite D                        :
Richmond, VA 23225-4040                          :
                                                 :
-and-                                            :
                                                 :
CHILDREN'S ORTHOPEDIC CENTER                     :
1101 Hioaks Road                                 :
Richmond, VA 23225                               :
                                                 :
-and-                                            :
                                                 :
CHIPPENHAM & JOHNSTON-WILLIS                     :
HOSPITAL, INC.,                                  :
d/b/a CJW MEDICAL CENTER                         :
7101 Jahnke Road                                 :
Richmond, VA 23225                               :
                                                 :
   Serve:   CT Corporation System       :
        4701 Cox Road, Suite 301     :
        Glen Allen, VA  23060        :
                                                 :
        Defendants.       :

### COMPLAINT

COMES NOW, Plaintiffs Richard Gilbert and Rosie Lee Gilbert, individually and on

behalf of their daughter, Sarah Gilbert, by and through the undersigned counsel, and make this

Complaint against Defendants.  In support thereof, Plaintiffs state as follows:

CONFIDENTIAL

CIC 000290

## PARTIES

1.  Plaintiff Richard Gilbert is an adult resident of the Commonwealth of Virginia.

2.  Plaintiff Rosie Gilbert is an adult resident of the Commonwealth of Virginia.

3.  Plaintiffs Richard Gilbert and Rosie Gilbert are the parents of their daughter, Sarah Gilbert, a minor.

4.  At all times relevant hereto, Defendant Susan E. Atkins, M.D. was a health care provider licensed to practice medicine in the Commonwealth of Virginia.

5.  At all times relevant hereto, Defendant Chippenham & Johnston-Willis Hospital, Inc. (hereinafter "CJW Medical Center") was a business providing healthcare in the Commonwealth of Virginia

6.  At all times relevant hereto, Defendant Children's Orthopedic Center (hereinafter "COC") was a business providing healthcare in the Commonwealth of Virginia.

7.  At all times relevant hereto, Defendant Atkins was a partner, member, agent, servant and/or an employee of Defendant COC.

## JURISDICTION

8.  This Court has subject matter jurisdiction over this action pursuant to § 17.1-513 of the Code of Virginia in that this is a case at law greater than $15,000.00 and that the matters alleged herein occurred in the Commonwealth of Virginia.

9.  This Court has personal jurisdiction over Defendant pursuant to § 8.01-328.1 of the Code of Virginia in that Defendant committed a tortuous injury in this Commonwealth.

10. This Court is the proper venue for this matter pursuant to § 8.01-262 of the Code of Virginia in that this cause of action arose in Richmond, Virginia.

CONFIDENTIAL

CIC 000291

)                                              )

## FACTUAL BACKGROUND

11.   On or about July 28, 2004, Defendant Atkins, an orthopedic surgeon, performed a spinal fusion surgery to correct Sarah Gilbert's scoliosis (hereinafter "Operation").

12.   On or about July 28, 2004, during the Operation, Defendant Atkins placed a left upper thoracic hook at T4.

13.   On or about July 28, 2004, during the Operation, Sarah Gilbert had abrupt loss of SSEP readings to her lower extremities.

14.   On or about July 28, 2004, during the Operation, Sarah Gilbert had an abrupt loss of her electromagnetic graph (EMG) readings.

15.   On or about July 28, 2004, during the Operation, no motion could be detected to Sarah Gilbert's lower extremities on a wake-up test.

16.   On or about July 28, 2004, Defendant Atkins removed all the hardware and discontinued the Operation.

17.   On or about July 28, 2004, following the Operation, Sarah Gilbert was transferred to the Virginia Commonwealth University Health System.  Specifically, the Medical College of Virginia Hospital and Physicians in Richmond, Virginia.

18.   On or about July 28, 2004, Sarah Gilbert was diagnosed as a paraplegic.

19.   Sarah Gilbert suffers significant and permanent injuries including paralysis.

### Count I
(Medical Malpractice)

20.   Plaintiffs incorporate paragraphs 1 through 19 herein by reference.

21.   At all times relevant hereto, Defendants had a duty to provide care consistent with the accepted standard of care of health care providers existing under the same or similar circumstances.

CONFIDENTIAL                                CIC 000292

22.     Plaintiffs relied upon Defendants to exercise such degree of skill and care to properly, accurately, and timely diagnose and treat Sarah Gilbert's condition, as would other reasonable health care providers if presented with the same or similar circumstances.

23.     At all times relevant hereto, Defendants failed to perform the aforesaid duty and were negligent in the following respects:

a) Failure to properly perform Sarah Gilbert's Operation to correct her scoliosis;
b) In the placement of the thoracic hook during the Operation;
c) In the use of the thoracic hook during the Operation;
d) In the treatment of paralysis following the Operation;
e) Plaintiffs also assert the doctrine of *res ipsa loquitur* and *respondeat superior*; and
f) Being otherwise negligent.

24.     Sarah Gilbert has otherwise been injured without any negligence on her part contributing thereto and relied upon the expertise of Defendants.

25.     As a direct and proximate result of the negligence of the Defendants Dr. Susan Atkins, COC and CJW Medical Center, and each of them, Plaintiffs have been injured and have suffered and will continue to suffer economic and non-economic losses, including but not limited to mental anguish, paralysis, pain and suffering, humiliation, embarrassment, and the loss of enjoyment of life, all of which are permanent and will continue into the future.

**WHEREFORE**, Plaintiffs request judgment against Defendants in the amount of $5,000,000.00, plus interest costs of suit, and such other and further relief as this Court deems just and proper.

CIC 000293

CONFIDENTIAL

Respectfully submitted,

PAULSON & NACE

Barry J. Nace
Gabriel A. Assaad, #46621
PAULSON & NACE
1615 New Hampshire Avenue, NW
Washington, DC 20009
(202) 463-1999
*Attorneys for Plaintiffs*

## Jury Demand

Plaintiffs, by and through the undersigned counsel, hereby demands trial by jury of all issues in this matter.

Respectfully submitted,

Barry J. Nace
Gabriel A. Assaad, #46621
PAULSON & NACE
1615 New Hampshire Avenue, NW
Washington, DC 20009
(202) 463-1999
*Attorneys for Plaintiffs*

CONFIDENTIAL

CIC 000294

VIRGINIA:

### IN THE CIRCUIT COURT
### FOR THE CITY OF RICHMOND

RICHARD GILBERT and
ROSIE LEE GILBERT, individually
2611 Turner Road
Goochland, VA 23063

          Plaintiffs,

        v.

SUSAN EDWIN ATKINS, M.D.
1011 Hioaks Road, Suite D
Richmond, VA 23225-4040

-and-

CHILDREN'S ORTHOPEDIC CENTER
1101 Hioaks Road
Richmond, VA 23225

-and-

CHIPPENHAM & JOHNSTON-WILLIS
HOSPITAL, INC.,
d/b/a CJW MEDICAL CENTER
7101 Jahnke Road
Richmond, VA 23225

    Serve:   CT Corporation System
            4701 Cox Road, Suite 301
            Glen Allen, VA 23060

         Defendants.

At Law No.: 760CL06004760-00



RECEIVED & FILED
CIRCUIT COURT
COPY
JAN 1 9 2007
NEVILL M. ___
BY ___ LHB

### AMENDED COMPLAINT

COMES NOW, Plaintiffs Richard Gilbert and Rosie Lee Gilbert, individually, by and

through the undersigned counsel, and make this Amended Complaint against Defendants. In

support thereof, Plaintiffs state as follows:

CONFIDENTIAL

CIC 000295

## PARTIES

1.   Sarah Gilbert is a minor resident of the Commonwealth of Virginia.

2.   Plaintiff Richard Gilbert is an adult resident of the Commonwealth of Virginia.

3.   Plaintiff Rosie Gilbert is an adult resident of the Commonwealth of Virginia.

4.   Plaintiffs Richard Gilbert and Rosie Gilbert are the parents of their daughter, Sarah Gilbert, a minor.

5.   At all times relevant hereto, Defendant Susan E. Atkins, M.D. was a health care provider licensed to practice medicine in the Commonwealth of Virginia.

6.   At all times relevant hereto, Defendant Chippenham & Johnston-Willis Hospital, Inc. (hereinafter "CJW Medical Center") was a business providing healthcare in the Commonwealth of Virginia

7.   At all times relevant hereto, Defendant Children's Orthopedic Center (hereinafter "COC") was a business providing healthcare in the Commonwealth of Virginia.

8.   At all times relevant hereto, Defendant Atkins was a partner, member, agent, servant and/or an employee of Defendant COC.

## JURISDICTION

9.   This Court has subject matter jurisdiction over this action pursuant to § 17.1-513 of the Code of Virginia in that this is a case at law greater than $15,000.00 and that the matters alleged herein occurred in the Commonwealth of Virginia.

10.   This Court has personal jurisdiction over Defendant pursuant to § 8.01-328.1 of the Code of Virginia in that Defendant committed a tortuous injury in this Commonwealth.

11.   This Court is the proper venue for this matter pursuant to § 8.01-262 of the Code of Virginia in that this cause of action arose in Richmond, Virginia.

2

CONFIDENTIAL

CIC 000296

## FACTUAL BACKGROUND

12.   On or about July 28, 2004, Defendant Atkins, an orthopedic surgeon, performed a spinal fusion surgery to correct Sarah Gilbert's scoliosis (hereinafter "Operation").

13.   On or about July 28, 2004, during the Operation, Defendant Atkins placed a left upper thoracic hook at T4.

14.   On or about July 28, 2004, during the Operation, Sarah Gilbert had abrupt loss of SSEP readings to her lower extremities.

15.   On or about July 28, 2004, during the Operation, Sarah Gilbert had an abrupt loss of her electromagnetic graph (EMG) readings.

16.   On or about July 28, 2004, during the Operation, no motion could be detected to Sarah Gilbert's lower extremities on a wake-up test.

17.   On or about July 28, 2004, Defendant Atkins removed all the hardware and discontinued the Operation.

18.   On or about July 28, 2004, following the Operation, Sarah Gilbert was transferred to the Virginia Commonwealth University Health System.  Specifically, the Medical College of Virginia Hospital and Physicians in Richmond, Virginia.

19.   On or about July 28, 2004, Sarah Gilbert was diagnosed as a paraplegic.

20.   Sarah Gilbert suffers significant and permanent injuries including paralysis.

21.   Plaintiffs Richard and Rosie Gilbert suffered injury to property and loss of services of their daughter as well as emotional distress, mental anguish, and other injuries as a result of the defendants.

3

CONFIDENTIAL

CIC 000297

## Count I
### (Medical Malpractice)

22.   Plaintiffs incorporate paragraphs 1 through 21 herein by reference.

23.   At all times relevant hereto, Defendants had a duty to provide care consistent with the accepted standard of care of health care providers existing under the same or similar circumstances.

24.   Plaintiffs relied upon Defendants to exercise such degree of skill and care to properly, accurately, and timely diagnose and treat Sarah Gilbert's condition, as would other reasonable health care providers if presented with the same or similar circumstances.

25.   At all times relevant hereto, Defendants failed to perform the aforesaid duty and were negligent in the following respects:

   a) Failure to properly perform Sarah Gilbert's Operation to correct her scoliosis;
   b) In the placement of the thoracic hook during the Operation;
   c) In the use of the thoracic hook during the Operation;
   d) In the treatment of paralysis following the Operation;
   e) Plaintiffs also assert the doctrine of *res ipsa loquitur* and *respondeat superior*; and
   f) Being otherwise negligent.

26.   Sarah Gilbert has otherwise been injured without any negligence on her part contributing thereto and relied upon the expertise of Defendants.

27.   As a direct and proximate result of the negligence of the Defendants Dr. Susan Atkins, COC and CJW Medical Center, and each of them, Plaintiffs Richard Gilbert and Rosie Lee Gilbert have been injured and have suffered and will continue to suffer economic and non-economic losses, including but not limited to mental anguish, pain and suffering, humiliation, embarrassment, and the loss of enjoyment of life, all of which are permanent and will continue into the future.

CONFIDENTIAL

CIC 000298

28.   As a direct and proximate result of the negligence of the Defendants Dr. Susan Atkins, COC and CJW Medical Center, and each of them, Plaintiffs Richard Gilbert and Rosie Lee Gilbert have been injured to their property which is permanent and will continue in the future.

29.   As a direct and proximate result of the negligence of the Defendants Dr. Susan Atkins, COC and CJW Medical Center, and each of them, Plaintiffs Richard Gilbert and Rosie Lee Gilbert have been injured to their property and loss of services of Sarah Gilbert which is permanent and which will continue in the future.

WHEREFORE, Plaintiffs request judgment against Defendants in the amount of $5,000,000.00, plus interest costs of suit, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

PAULSON & NACE

Gabriel A. Assaad, #46621
PAULSON & NACE
1615 New Hampshire Avenue, NW
Washington, DC  20009
(202) 463-1999
*Attorneys for Plaintiffs*

5

CONFIDENTIAL

CIC 000299

## Jury Demand

Plaintiffs, by and through the undersigned counsel, hereby demands trial by jury of all issues in this matter.

Respectfully submitted,

Gabriel A. Assaad, #46621
PAULSON & NACE
1615 New Hampshire Avenue, NW
Washington, DC 20009
(202) 463-1999
*Attorneys for Plaintiffs*

CONFIDENTIAL

6

CIC 000300

616

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND
John Marshall Courts Building

RICHARD GILBERT and
ROSIE LEE GILBERT, Individually

Plaintiffs,

v.                                              AT LAW NO.: CL06004760-00

SUSAN EDWIN ATKINS, M.D., et al

Defendants.

## PLAINTIFFS' MOTION FOR RECONSIDERATION

*COME NOW*, Plaintiffs by and through their undersigned counsel and respectfully submit this Motion for Reconsideration pursuant Rule 4:15 of the Rules of the Supreme Court of Virginia.

## FACTUAL HISTORY

In June of 2004, Sarah Gilbert was an energetic thirteen year old girl. She played soccer and basketball and enjoyed other physical activities with her friends. Unfortunately, Sarah had developed scoliosis and was in need of routine, corrective surgery. Susan Atkins, M.D. was in charge of performing the routine, corrective surgery for Sarah on July 28, 2004 at Chippenham & Johnston Willis Hospital (hereinafter "CJW"). By the end of that attempted corrective surgery, Sarah Gilbert was paralyzed. She can no longer play soccer, and she vainly attempts to recapture her lost enjoyment of driving to the basket for a "lay up" on the court by acting as an assistant coach for her high school team from a wheelchair on the bench.

According to the original operative report, which was dictated on July 28, 2004, "[a]pproximately five minutes after placement of initial, left, upper thoracic hook, the

CONFIDENTIAL

CIC 000301

617

patient had complete loss of all distal signals, which did not return on wake up test. No lower extremity, active motion could be elicited." (Exhibit 1). A second, but different, operative report was later dictated on July 28, 2004 in which Dr. Atkins stated, "[a] thoracic hook was then placed without difficulty. However, approximately five minutes after placement of hook, the SSEP and EMG readings were lost to the bilateral lower extremities. (Exhibit 2). Dr. Atkins then contacted John Ward, M.D. while Sarah was still in the operating room, administered steroids per Dr. Ward's instructions, and stabilized her.

Once Sarah was stabilized, she was transferred to the Medical College of Virginia. Upon admission, she was noted to be suffering from "idiopathic paralysis." (Exhibit 3). According to the discharge summary, however, Dr. Ward stated that "[i]mmediately after placing the first hook, evoked potentials were lost." (Exhibit 4). Eventually Sarah was transferred to the University of Virginia where she underwent corrective surgery for her scoliosis by Mark Abel M.D. Following that surgery, she began extensive rehabilitation at the Kluge Children's Rehabilitation Center. She continues to go through vigorous rehabilitation sessions, and she will continue to go through such rehabilitation for the rest of her life.

Today, Sarah is paralyzed from the waist down and confined, primarily, to a wheel chair. She can no longer participate in physical activities with her friends, but she has dedicated herself to her Church and studies, assists other students with their studies as a tutor, and aspires to pursue a career in bio-mechanical engineering at the University of Virginia.

2

CIC 000302

CONFIDENTIAL

Sarah has fought against adversity since the day she underwent her surgery without so much as a lending hand from those who caused her to become paralyzed. Now she sees her right to her day in court, her only possible recourse for fair compensation, being paralyzed under the auspices of a demurrer that is based upon a technicality, which is no longer recognized by the Commonwealth of Virginia as a justification. She deserves better.

## PROCEDURAL HISTORY

The procedural history of this case is extremely extensive due to the vast amounts of pleadings filed[1]. The salient issues of the procedural history are as follows:

On July 24, 2006, Case Number 06004760-00 (hereinafter "Case No. 4760") was filed in the Circuit Court for the City of Richmond. Case No. 4760 was captioned, "Richard Gilbert and Rosie Lee Gilbert, Individually and on behalf of their daughter, Sarah Gilbert, a minor."

On October 18, 2006, Defendants Atkins and Children's Orthopedic Center jointly filed their "Answer and Affirmative Defenses" along with their "Special Plea in Bar and Motion to Dismiss."

---

[1] Plaintiffs filed their "Opposition to Defendant's Special Plea in Bar and Motion to Dismiss" on December 28, 2006. On February 7, 2007, Defendant CJW filed its "Special Plea of the Statute of Limitations," "Demurrer," and "Bill of Particulars" in Case No. 6787. On February 8, 2007, Defendants Atkins and Children's Orthopedic Center jointly filed their "Answer and Affirmative Defenses" and "Demurrer" in Case No. 6787. On February 19, 2007, Defendants Atkins and Children's Orthopedic Center jointly filed their "Special Plea of the Statute of Limitations and Motion to Dismiss" in Case No. 6787. On March 6, 2007, Defendants Atkins and Children's Orthopedic Center jointly filed their "Amended Answer and Affirmative Defenses" in Case No. 6787. On June 15, 2007, Plaintiffs filed their "Opposition to Defendants' Special Plea in Bar of Statute of Limitations and Motion to Dismiss" and their "Opposition to Defendants' Demurrers" in Case No. 6787. Plaintiffs also filed their "Opposition to Defendants' Demurrers" and "Opposition to Defendant's Motion for Bill of Particulars" in Case No. 4760.

CONFIDENTIAL

CIC 000303

On October 25, 2006, Case Number 06006787-00 (hereinafter "Case No. 6787") was filed in the Circuit Court for the City of Richmond. Case No. 6787 was captioned, "Sarah Gilbert, by her parents and next friends Richard and Rosie Lee Gilbert, and Richard and Rosie Lee Gilbert, individually."

On January 4, 2007, the Honorable Melvin R. Hughes heard oral arguments on the motions to dismiss Case No. 4760 and granted the Defendant's Motion to Dismiss Sarah Gilbert's claim with prejudice and Richard and Rosie Lee Gilbert's claims without prejudice with leave to amend. (Exhibit 5).

On February 26, 2007, the Court entered its Order regarding the January 4, 2007 hearing in Case No. 4760 dismissing Sarah Gilbert's claims with prejudice and dismissing Richard Gilbert and Rosie Lee Gilbert's claims without prejudice with leave to amend. (Exhibit 6).

On March 7, 2007, in compliance with the Court's Order, Case No. 4760 was amended and filed with the caption of, "Richard Gilbert and Rosie Lee Gilbert, Individually."

On June 18, 2007, this Court heard oral arguments involving all outstanding motions in both Case No. 4760 and Case No. 6787.

On August 3, 2007, the Honorable Melvin R. Hughes issued his Order dismissing Case No. 6787 with prejudice; dismissing any and all claims for personal injury pled on or behalf of Sarah Gilbert with prejudice; allowing Richard and Rosie Lee Gilbert's claim for economic damages and loss of services to proceed in Case No. 4760; dismissing Sarah Gilbert's claim for property damage with prejudice; and dismissing with prejudice

4

CONFIDENTIAL

CIC 000304

Plaintiffs' claims of negligence in post operative treatment, *res ipsa loquitor*, *respondeat superior*, and "being otherwise negligent." (Exhibit 7)

On August 29 and 30, 2007, Plaintiffs filed a Notice of Appeal of the August 3, 2007 Order in Case No. 6787 and Case No. 4760, respectively.

On March 7, 2008, after Plaintiffs filed their Petition for Appeal and all Defendants filed their Oppositions, the Supreme Court of Virginia dismissed without prejudice the Appeal on the grounds that it was filed prematurely before a final order had been entered in the lower court.

Case No. 4760 is set for trial on May 26, 2009.

## EFFECT OF THE COURT'S RULING

The effect of these various rulings is that the case of a thirteen year old girl who is paralyzed due to the negligence of Defendant Atkins will not be heard, whereas her parents' claims pertaining to the exact same subject matter will be heard, notwithstanding that the parents will have to prove the claim of negligence just like the minor would. This is all because the caption of the original complaint read "Richard Gilbert and Rosie Lee Gilbert, Individually and on behalf of their daughter, Sarah Gilbert, a minor," instead of "Sarah Gilbert, by her parents and next friends Richard and Rosie Lee Gilbert, and Richard and Rosie Lee Gilbert, individually." Now there is a probability of not one, but two trials. This waste of judicial time makes no sense[2].

## ARGUMENT

I. <u>Dismissing Sarah Gilbert's Claim Was Contradictory To Virginia's Well Established Practice Of Liberally Construing Its Statutes And As Such, The Court Should Allow Her To Amend Her Complaint.</u>

---

[2] Once a final order has been entered, Sarah Gilbert's only recourse will be to file an appeal that will very likely result in an entirely new trial regarding the same subject matter to be re-litigated. The judicial efficiency of this result would make *no sense* at all.

CONFIDENTIAL

CIC 000305

Defendants sought dismissal of Sarah Gilbert's claim because the caption of the Complaint failed to identify Sarah Gilbert individually. There is, and has never been, any argument that the defendants did not have clear notice of the issues and claims for which suit was filed. Rather, defense counsel's entire argument pertaining to the dismissal of Sarah Gilbert's claim is predicated upon a technicality. That technicality, however, is in direct contradiction to clear Virginia Supreme Court authority holding that, "in Virginia our statutes are liberal in their provisions for adding new parties in cases of non-joinder" and that "[a] statute extending the time for the institution of a new action on failure of the original action for reasons other than on the merits is highly remedial, and should be liberally construed in furtherance of its purpose, to afford litigants a hearing on the merits, and is not to be frittered away by any narrow construction." *McDaniel v. North Carolina Pulp Co.*, 198 Va. 612, 95 S.E.2d 201 (1956).

There can be no argument that the subject matter of this case is and has always been the operation performed by Dr. Atkins upon Sarah Gilbert on July 28, 2004. On July 24, 2006, Case No. 4760 was timely filed. The parties were clearly identified, the incident in question was clearly identified, the damages were clearly identified, and the count of medical malpractice was clearly identified. Defense counsel has even made the argument before this very Court on this very issue that "this was a cause of action that was brought for Sarah Gilbert." (Exhibit 5 at p. 19, ln. 4 – 5).

Furthermore, according to the Supreme Court of the United States, "[s]tatutes of limitation are primarily designed to assure fairness to defendants ... by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Burnett v. New*

6

CONFIDENTIAL

CIC 000306

*York Central Railroad, Co.*, 380 U.S. 424, 428, 85 S.Ct. 1050, 1054. There were no surprises, loss of memories, or disappearance of witnesses thrown before defense counsel to warrant this Court's dismissal with prejudice of Case No. 4760.     Regardless of whether or not there were, this case has proceeded through Mr. and Mrs. Gilbert's timely filed derivative claim. There was a technical flaw in the wording of the caption that bore absolutely no significance whatsoever upon the merits of the case. Defense counsel's argument that a mere technical flaw, which did nothing to confuse the nature of the Complaint, flies directly in the face of the Commonwealth's long standing tradition of liberally construing statutes in order to avoid "frittering away" a plaintiff's ability to litigate the issue on the merits.

The statute upon which the Court dismissed Sarah Gilbert's claim states that, "[a]ny minor entitled to sue may do so by his next friend. Either or both parents may sue on behalf of a minor as his next friend." Virginia Code § 8.01-8. Through *McDaniel* and its progeny, however, the Virginia Supreme Court abolished hyper-technical applications of statutes regarding the proper naming of the parties to the suit, holding instead that simply "[the parties] must be substantially the same, suing in the same right." *McDaniel* at 617.

There is no dispute that the parties involved in the original Complaint, Case No. 4760, the Amended Complaint, Case No. 4760, and the Complaint filed in Case No. 6787 are not only substantially the same parties, but are in fact the identical same parties: Sarah Gilbert for the negligence committed upon her by Dr. Atkins and Mr. and Mrs. Gilbert *for their derivative claims in relation to the negligence committed upon Sarah.*

Dismissal of Sarah's claim was predicated upon a technicality that unfairly seeks to deny Sarah Gilbert, the paralyzed 18 year old victim of medical malpractice, her day in

CONFIDENTIAL

CIC 000307

court. This technicality is unjust and wrong. Furthermore, it has been rejected by the Supreme Court of Virginia. As in *Halatyn v. Miller*, 2005 WL 347665 (Va. Cir. Ct.), this Court should rule that the "need to add [Richard Gilbert, father and next friend], as a titular party [is] simply to add the 'figurehead' or 'formal party' that the Supreme Court held in *McDaniel* was necessary, but the addition of which did not change the true party in interest...[w]hatever the name of the plaintiff, the real party in interest remained the same; the suit was instituted in the same right; and the cause of action was the same...A suit by [Sarah Gilbert by her parents and next friends Richard and Rosie Lee Gilbert, and Richard and Rosie Lee Gilbert, Individually] is an action by 'substantially the same party' in interest as a suit by [Richard and Rosie Lee Gilbert, Individually and on behalf of their Daughter, Sarah Gilbert, a minor]."

Dismissing Sarah's claim with prejudice and failing to afford her an opportunity to cure the caption of the Complaint was manifestly unjust and deprived her of her day in court. As such, this Honorable Court should reconsider its prior ruling and either deny defense counsel's prior motion to dismiss or grant Sarah Gilbert the opportunity to cure the technicality by amending the original Complaint.

II. Sarah Gilbert's Statute of Limitations Was Equitably Tolled By The Filing Of Case Number 4760 Because The Plaintiffs In Both Actions Were Substantially The Same Parties.

Despite the fact that Case No. 6787 was filed after the two-year statute of limitations of July 28, 2006, the timely filing of Case No. 4760 equitably tolled Sarah Gilbert's statute of limitations. Once Case No. 4760 was filed, the defendants were on notice as to the parties of the case, the subject matter of the case, and the relief sought. Defendants have made no contention that they were not aware of who the proper parties

8

CIC 000308

CONFIDENTIAL

were and have in fact acknowledged that at all times they believed the action to be on behalf of Sarah.

While it is true that the Supreme Court of Virginia distinguished *McDaniel* in *Harmon v. Sadjadi, M.D.*, 273 Va. 184, 639 S.E.2d 294 (2007), a careful reading of the *Harmon* decision actually solidifies Plaintiffs' claim that the statute was in fact equitably tolled upon the filing of the original Complaint in Case No. 4760. The *Harmon* Court did not overturn the law put forward in *McDaniel*, rather, it introduced an analytical step needed in order to get to that law. In so doing, the *Harmon* Court clearly limited what aspects of *McDaniel* it was overruling when it stated that it "will overrule [its] decision in *McDaniel* for the reasons set forth below." Those reasons, however, are all predicated upon the original suit being filed by a party without standing: "Our jurisprudence is clear that when a party *without standing* brings a legal action, the action so instituted is, in effect, a legal nullity." *Harmon* at 193 *emphasis* added. The Court later narrowed its opinion even further by stating that, "[w]e can discern no basis to carve out an exception to our otherwise clear precedent that *lack of standing* causes a party's legal proceeding to be of no legal effect." *Harmon* at 197 *emphasis* added.

These statements do not overturn *McDaniel* so much as reframe the question at issue before the Court today: "Did Richard and Rosie Lee Gilbert have standing to file the original claim?" If the parties had standing to bring the action, then the action was not a legal nullity. This Court has already answered this question for us in the affirmative. By granting Mr. and Mrs. Gilbert the ability to proceed with this case in its Order of August 3, 2007 and specifically stating that, "[t]he Order shall in no way be construed to alter or dismiss the derivative action of Richard and Rosie Lee Gilbert with

9



CIC 000309

respect to their claims for economic damages and loss of services as pled in Amended Complaint, Case No. 4760 and Complaint, Case No. 6787," the Court has ruled that they did have standing to file the original Complaint, that the Complaint was not a legal nullity, and thereby the Complaint equitably tolled the statute. Defense counsel even stated that the "parents' claim in an action for malpractice for the care and treatment given to a minor is a derivative action, and it's a derivative action out of the alleged negligence asserted on the minor child." (Exhibit 5 at p. 22, ln. 12 – 16). Clearly, defense counsel agrees that Mr. and Mrs. Gilbert had standing to file a law suit and this Honorable Court saw no such reason to deny the fact that they do have standing.

Mr. and Mrs. Gilbert have standing and have always had standing to file the original Complaint. Because they had standing, were substantially the same parties, and were suing in the same right, the original Complaint was not a legal nullity and Sarah Gilbert's statute of limitations for medical malpractice was tolled from July 24, 2006 until February 26, 2007. Case No. 6787, however, was timely filed on October 25, 2006; and, therefore, it was filed within the tolling period and prior to the running of the statute of limitations.

Recently, the Court of Appeals of the Eleventh Circuit ruled that, "tolling may be appropriate when a plaintiff 'timely files a technically defective pleading and in all other respects acts with 'the proper diligence...which...statutes of limitations were intended to insure.'" *Booth v. Carnival Corporation*, 522 F.3d 1148, 1150 (2008). Within one (1) week of receiving defense counsel's Special Plea in Bar and Motion to Dismiss, Plaintiffs sought to cure this meaningless technicality by filing Case No. 6787. There can be no doubt that Plaintiffs acted with the proper diligence needed to equitably toll the statute.

10

CONFIDENTIAL

Because the statute was equitably tolled and the case was timely filed with proper diligence, this Honorable Court should reconsider and vacate its Order of August 3, 2007 and re-institute Case No. 6787.  In so doing, "Sarah Gilbert, by her parents and next friends Richard and Rosie Lee Gilbert" shall become a party to this action and "Richard and Rosie Lee Gilbert, Individually," shall be attached as a party with a derivative claim to this action.

III.  The Medical Malpractice Statute Of Virginia Is Rendered Moot Upon The Facts Before Us, And Defense Counsel's Prior Reliance On *Willis v. Mullett* is Misguided.

While the Supreme Court of Virginia addressed the constitutionality of the Medical Malpractice Statute of Limitations in *Willis v. Mullett*, 263 Va. 653, 561 S.E.2d 705, Plaintiffs contend, without conceding that the statute is constitutional, that the statute is rendered moot in the face of the facts before the Court today.  Section 8.01-243.1 of the Medical Malpractice Statute states,

> Notwithstanding the provisions of § 8.01-229 A and except as provided in subsection C of § 8.01-243, any cause of action accruing on or after July 1, 1987, on behalf of a person who was a minor at the time the cause of action accrued for personal injury or death against a health care provider pursuant to Chapter 21.1 (§ 8.01-581.1 et seq.) shall be commenced within two years of the date of the last act or omission giving rise to the cause of action except that if the minor was less than eight years of age at the time of the occurrence of the malpractice, he shall have until his tenth birthday to commence an action. Any minor who is ten years of age or older on or before July 1, 1987, shall have no less than two years from that date within which to commence such an action.

In the *Willis* decision, the Court found that the Medical Malpractice Statute was not special legislation because it addressed a public benefit to society; "the defendants note the legislative sub-committee's statement of the background of this and other medical malpractice legislation 'to alleviate the 'medical malpractice insurance crisis.'"  *Willis* at

CONFIDENTIAL

CIC 000311

627

660.  The Court went on to further explain that such legislation was needed for the protection of insurance companies because, "[i]nsurers find it difficult to adequately assess the risk exposure of health care providers who treat minors because of the long tail on the claim." *Willis* at 660.  Furthermore, the Court stated that the statute of limitations in medical malpractice actions of minors only needs to be modified when, "[r]ecognizing (i) the particular and severe insurance availability problems facing physicians, (ii) the need of insurers for predictability of risk exposure, and (iii) the effect of the provisions tolling the two-year statute of limitations during minority on the availability of insurers to adequately assess their risk of loss." *Willis* at 661.  None of these three conditions are present in the action before us.  Thus, the constitutionality, the intent, and the need for applying § 8.01-243.1 of the Medical Malpractice Statute is solely *to give notice* to insurance companies within the stated time period to protect them from the tails on their policies.

Sarah Gilbert's case does not fall under the control of this statute because it does not hinder the insurers' ability to assess the risk exposure.  The insurers are already assessing such a risk by trying *Case No. 4760*, which was timely filed and put the insurers on notice of the assessments that they had to make.  The statute, with regard to Sarah Gilbert's claim, therefore, becomes moot and does not apply.  Since it does not apply, we must then look at § 8.01-229(A)(2)(a), which tolls the statute of limitations until the infant is no longer a minor: "If an infant becomes entitled to bring such action, the time during which he is within the age of minority shall not be counted as any part of the period within which the action must be brought except as to any such period during

12

CONFIDENTIAL

CIC 000312

which the infant has been judicially declared emancipated." Sarah Gilbert's claim was filed within the statutory period and should be allowed to proceed.

It should also be noted that in *Willis*, the Court stated that the "legislature was thus free to presume that some adult responsible for the minor's welfare, usually a parent, would act diligently and prudently to protect the minor's interests. *See Washabaugh v. Northern Virginia Const. Co.*, 187 Va. 767, 773, 48 S.E.2d 276, 279 (1948) ('primary duty to inform, advise, and protect a child ... is upon the parents')." *Willis* at 658. What is notable about this citation is that *Washabaugh* was an attractive nuisance case, not a medical malpractice case, and certainly not a case directed at the legal pleading of a case as the Court attempts to justify it as. It is also notable that the entire quotation that was cited by the Court actually states the following: "primary duty to inform, advise, and protect a child *against such natural, open, and obvious dangers* is upon the parents." (*emphasis added*)(A rather convenient use of an ellipsis.) The Court's reliance upon *Washabaugh* in assuming that a parent would act diligently and prudently to protect the minor's interest in a medical malpractice case in order to justify a piece of legislation aimed at limiting the minor's rights and benefiting the insurance companies is misguided at best.

The *Washabaugh* decision did not speak to the parent's duty to protect the pleading of the minor's medical malpractice case, but rather to the parent's duty to protect the child from "natural, open, and obvious dangers" that are physical in nature, not statutorily construed. It therefore, cannot be used to justify the constitutionality of the medical malpractice statute with regard to Sarah Gilbert's claim. *Washabaugh* and *Willis* are, therefore, distinguishable from the action at hand and should not be used as a justification

13

CIC 000313

to deny Sarah Gilbert her rights.  As a result, this Honorable Court should apply § 8.01-229(A)(2)(a) to this case and find that Sarah Gilbert properly filed her claim during her age of minority; thus, Case Number 6787 was timely filed.

IV. **Even If The Court Decides That The Only Case Remaining Is Mr. And Mrs. Gilbert's Derivative Action, Parents Of Such Derivative Actions Can Collect Non-Economic Damages.**

Without so much as a single court citation, defense counsel took the stance before this Court that "as the Court knows…[b]y virtue of the fact that it is a derivative action, it is for economic damages only." (Exhibit 5 p. 22, ln. 12 – 18).  Such a stance is inaccurate and should be rectified by this Court.

During oral arguments, this Court acknowledged that there do exist distinctions to the unsubstantiated premise put forward by defense counsel.  Specifically, the Court acknowledged that such a distinction existed in *Modaber, M.D. v. Kelley*, 232 Va. 60, 348 S.E.2d 233 (1986), in which the Court stated that "injury to an unborn child constituted injury to the mother and that she may recover for such physical injury and mental suffering associated with a stillbirth." *Modaber* at 66.

Like the *Modaber* opinion, other distinctions also exist.  In 2006, the Supreme Court of Virginia found that a mother was capable of recovering for the mental anguish she suffered on a daily basis in caring for her child and that "the parents were 'entitled to recover those damages which are the reasonable and proximate consequences of the breach of the duty owed them, *viz.*, consequences that a reasonable and informed person could have foreseen and anticipated." *Castle, M.D. v. Lester*, 272 Va. 591, 608 – 609, 636 S.E.2d 342, 351 (2007).  More specifically, the Court allowed the Plaintiff to recover

14

CONFIDENTIAL

CIC 000314

from evidence "concerning the daily tasks required to care for [the child] and her use of the cumbersome medical equipment in doing so, her frustration from sleepless nights, and her knowledge that her son will not live more than a few more years." *Id.*

Such a case not only creates a distinction directly on point with the damages sought by Mr. and Mrs. Gilbert, but it also indicates that parents, in general, have a right to seek and recover non-economic damages in a derivative action. The burden is upon defense counsel to find an exception to that general premise. Defense counsel, however, cannot find an exception to this premise because no such exception exists. The only argument defense counsel is left to make is that the non-economic damages suffered by Mr. and Mrs. Gilbert were not proximately caused by the breach of the duty owed. That argument, however, is one for a jury to decide; and, one that Plaintiff's counsel is more than happy to bring before the jury.

This Court, therefore, should reconsider and vacate its prior ruling dismissing recovery for all non-economic damages suffered by Mr. and Mrs. Gilbert. In doing so, the Court should allow Plaintiffs' counsel to present evidence of any such damages that Mr. and Mrs. Gilbert have suffered and will continue to suffer to the jury, and allow the jury to determine whether they were a reasonable and proximate result of the breach of duty owed.

## CONCLUSION

A minor who was paralyzed during a routine corrective surgery has had her case dismissed by the Virginia Courts because the caption in the original complaint read "Richard Gilbert and Rosie Lee Gilbert, Individually and on behalf of their daughter, Sarah Gilbert, a minor," when "Sarah Gilbert, by her parents and next friends Richard

CONFIDENTIAL

CIC 000315

and Rosie Lee Gilbert, and Richard and Rosie Lee Gilbert, individually" would have been better. Clearly, the result of the Court's ruling does not seek to decide this case on the merits, but rather goes to extreme limits to prevent a paralyzed 18 year old girl from having her case decided on the merits.

She deserves better.

**WHEREFORE**, Plaintiffs respectfully ask this Court to reconsider its previous rulings, overturn its Orders of February 26, 2007 and August 3, 2007, and allow Sarah Gilbert to pursue her claim for medical malpractice along with her parents' derivative claim.

Respectfully submitted,

PAULSON & NACE

Kathleen G. Burke, Esq. VSB # 27090
Law Office of Kathleen G. Burke
12011 Lee Jackson Memorial Highway
Suite 310
Fairfax, Virginia 22033
(703) 913-9000
*Counsel for Plaintiffs*

And

Barry J. Nace
1615 New Hampshire Ave., NW
Washington, DC 20009
(202) 463-1999
*Co-Counsel for Plaintiffs*

CONFIDENTIAL

CIC 000316

**\* \* \***

## CERTIFICATE OF SERVICE

I hereby certify that on this ___ day of April 2009, I caused a true and exact copy of the foregoing *Plaintiffs' Motion to Reconsider* to be served via first class, U.S. Mail upon:

Rodney K. Adams, Esq.
Donna L. Foster, Esq.
LeClair Ryan, P.C.
Riverfront Plaza, East Tower
951 East Byrd Street, 8th Floor
Richmond, VA 23219
        *Counsel for Susan E. Atkins, M.D.*
        *And Children's Orthopedic Center*

Kathleen G. Burke, Esq.

**17**

CONFIDENTIAL

CIC 000317

633

**VIRGINIA:**

**IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND**
John Marshall Courts Building

**RICHARD GILBERT** and
**ROSIE LEE GILBERT, Individually**

Plaintiffs,

AT LAW NO.: CL06004760-00

**SUSAN EDWIN ATKINS, M.D.,** et al

Defendants.

## ORDER

This matter coming before this Honorable Court upon Plaintiffs' Motion for Reconsideration, it is this ____ day of _____ 2009, hereby:

ORDERED that Plaintiffs' motion is **GRANTED**;

ORDERED that the prior rulings of this Honorable Court are **VACATED**;

ORDERED, that Sarah Gilbert's claim for medical malpractice against the named defendants is reinstated;

ORDERED that Richard Gilbert and Rosie Lee Gilbert's derivative claims shall be consolidated with Sarah Gilbert's claim; AND

ORDERED that Richard Gilbert and Rosie Lee Gilbert are afforded the opportunity to seek and receive non-economic damages against the defendants through their derivative claim.

_____
Judge

Copies to:
Kathleen G. Burke, Esq.
Barry J. Nace, Esq.
Rodney K. Adams, Esq.
Donna L. Foster, Esq.



CONFIDENTIAL

CIC 000318

# EXHIBIT 1

CONFIDENTIAL

CIC 000319

CJW Medical Center
Chippenham & Johnston Willis

7101 Jahnke Road            1401 Johnston-Willis Dr
Richmond, Virginia 23225   Richmond, VA 23235

PATIENT:   GILBERT, SARAH ELISABETH
MR #:      D001573871  SSN #:   227599958
DOB:       10/28/1990  ROOM #:
OP DATE:   07/28/04  BILL #:  D35002197505

SURGEON:   SUSAN ATKINS, M.D.

## OPERATIVE REPORT

Preoperative Diagnosis:  1. Idiopathic scoliosis
                         2. Spinal cord syrinx

Postoperative Diagnosis:  Same.

Procedure:  Aborted posterior spinal fusion due to spinal cord monitoring changes.  No hardware placed.

Anesthesia:  General

Blood Loss:  550 cc

Replacement:  300-350 cc cell saver.

Findings:  Approximately five minutes after placement of initial, left, upper thoracic hook, the patient had complete loss of all distal signals, which did not return on wake up test.  No lower extremity, active motion could be elicited.  Therefore, no hardware was placed.  There was no dural leak, or significant bleeding.  Exploration was not done.  Steroids were given.

Procedure in Detail:  After anesthesia was induced, patient was positioned on the spinal

Dictation ended

TR:  lsb
DD:  07/28/2004
DT:  07/28/2004
DRPT:  07/29/2004 edited by agm
F/R:

SUSAN ATKINS, M.D.

0R4025

CONFIDENTIAL

Operative Report - STATUS: Draft

# EXHIBIT 2

CONFIDENTIAL

CIC 000321

CJW Medical Center
Chippenham & Johnston Willis

7101 Jahnke Road                    1401 Johnston-Willis Dr
Richmond, Virginia 23225           Richmond, VA 23235

PATIENT:       GILBERT, SARAH ELISABETH
MR #:          D001573871   SSN #:    227599958
DOB:           10/28/90   ROOM #:
OP DATE:       07/28/04   BILL #:   D35002197505

SURGEON:       SUSAN ATKINS, M.D.

## OPERATIVE REPORT

PREOPERATIVE DIAGNOSIS:  1. Progressive idiopathic scoliosis.
    2. Syrinx, small and stable, in distal cord.

POSTOPERATIVE DIAGNOSIS: Same, with addition of loss of spinal cord SSEP
and EMG testing, thus aborting procedure.

PROCEDURE:    Aborted posterior spinal fusion with full
exposure due to loss of SSEP and EMG monitoring after placement of initial
hook.

ANESTHESIA:   General endotracheal.

ESTIMATED BLOOD LOSS: 550 ccs.

REPLACEMENT:  One unit cell saver, 300-350 ccs.

FINDINGS:  Approximately five minutes after placement of initial left upper
thoracic hook at T4, the patient had abrupt loss of SSEP readings in lower
extremities, as well as EMG readings.  On wake-up test, no motion could be
detected in the lower extremities; thus, hardware was removed and procedure
was not continued.  The wound was closed.  The patient had no significant
bleeding at surgical site prior to closure nor dural leak noted by Valsalva
stress.  Steroids were initiated in the O.R., as well as phone contact with
Dr. Ward of pediatric neurosurgery.

PROCEDURE IN DETAIL: After adequate anesthesia was induced, the patient was
prepped and draped in the usual sterile manner.  With confirmation of proper
positioning, the abdomen being free, a longitudinal incision was then made
from the mid to upper thoracic spine to approximately L2, slightly curved in
anticipation of correction of curvature.  Soft tissue was then dissected with
Bovie to expose the midline fascia.  Hemostasis was attained with Bovie and
further attained with use of Weitlaner retractors.  Diluted epinephrine was
injected prior to initial incision.  Fascia was clearly identified in midline
and a Kelly clamp was then straddled over the upper thoracic vertebra,
counting from apex approximately T4.  The apophysis was split with Bovie and
elevated minimally with the use of Bovie on the right and left side.  The

091026
CONFIDENTIAL

CIC 000322
Page 1 of 3

Operative Report - STATUS: Draft

638

Patient: GILBERT, SARAH ELISABETH                    Medical Record: D001573871

next lower level was similarly straddled with a Kelly clamp and again the
midline split with Bovie. This was repeated in a sequential manner through
the thoracic spine to approximately L2. A Cobb elevator was then utilized to
elevate the periosteum from the tip of the posterior spinous process to just
lateral to the base of the spinous process. Each level was then packed with
Ray-Tec to assist with bleeding. The Bovie was utilized as necessary for
bleeds of soft tissues to complete initial dissection. Weitlaner's were then
replaced at level of fascia and again utilized to assist with bleeding, as
well as exposure. Vertebrae were then exposed to the tip of transverse
process through the thoracic spine. Care was taken to avoid damage to the
upper facet joints. At the lumbar spine, the facet joints and the transverse
process were exposed with packing of the lateral gutter with Ray-Tec. A
radiograph was then taken, marking approximately T12 to confirm proper level.
The towel clip was then removed and the posterior spinous process of T12 was
marked with a rongeur to assist with counting levels. Exposure was
inadequate inferiorly and L2 was then adequately exposed in similar manner;
with initial extension of skin incision approximately 1 1/2 cm. Exposure of
only the superior tip of the posterior spinous process at L3 with stripping
of the periosteum with use of a Cobb elevator initially. Exposure of the
facet joint with care to avoid damage to facet joint at L2-3, but with full
exposure and partial removal of facet joint L1-2, as well as exposure of the
L2 transverse process. Attention was then directed to the facet joints.
These were cleared with initial use of a large curet; followed by use of a
rongeur. Soft tissue was removed between the sinus process at each level
with use of a large rongeur. Ligamentum flavum was not removed. Levels were
then counted and radiographs reassessed. The patient was noted to have
significant rotation at T5. Therefore, fusion was extended to T4. Facet
joint was prepped at T4 with partial removal utilizing small Key elevator.
The most posterior aspect of superior portion of facet joint. A pedicle
finder was then utilized to locate pedicle without difficulty and with good
stability. A thoracic hook was then placed without difficulty. However,
approximately five minutes after placement of hook, the SSEP and EMG readings
were lost to the bilateral lower extremities. During this period, the T5 to
upgoing hook site was prepared with use of small osteotome and clearing of
soft tissues, however, a pedicle finder was not inserted nor hook inserted at
T5. At this point, due to changes in monitoring, the previously placed hook
was removed without difficulty. Monitoring equipment was reassessed and
functioning of the upper extremity testing was confirmed, as well as
placement of leads to the lower extremities. Despite multiple repeat tests,
no significant signal could be attained. Therefore, the patient was
gradually awakened for a wake-up test. On clearing of facet joint, the
patient did have brief bleeding, however, this was easily controlled with
rapid resolution ablating. No dural leak was identified. The facet joint
was carefully evaluated and further bone was not removed in light of complete
lack of bleeding. Valsalva test was done x 3 and no dural leakage could be
identified. Further laminotomy and exposure was therefore not done. A
wake-up test was then performed. The patient was noted to have active
movement of the paraspinal musculature throughout the wound, however, no
movement of the lower extremities could be elicited. The patient was then
reanesthetized fully to allow for closure and for safety concerns regarding
maintenance of the airway. Dr. John Ward was contacted and steroids
initiated per his recommendations. Further exposure was not felt warranted
in light of lack of dural leak or any significant trauma at the time of hook
insertion. The wound was then re-evaluated. No significant bleeding
persisted. The wound was irrigated thoroughly. Motor testing was repeated

091027-

CONFIDENTIAL

639

Patient: GILBERT, SARAH ELISABETH          Medical Record: D001573871

several times with no return noted. The fascia was then closed with 0 Vicryl
running suture.  It was tagged down to the spinous process every few levels
to decrease dead space.. Subcutaneous tissue was then closed with 2-0 Vicryl.
Running subcutaneous suture again was tagged down to the midline fascia
every few levels to close dead space.  The skin was then closed with running
4-0 Monocryl subcuticular suture.  A soft dressing was then applied:  The
patient was then awakened.  On awakening, again no significant motion of the
lower extremities could be elicited.  She was extubated without difficulty
and transferred to the Recovery Room in stable condition.


TR: dkh
DD: 07/28/2004
DT: 07/29/2004
DRPT: 07/29/2004
F/R:


SUSAN ATKINS, M.D.
CC: JOHN D. WARD, M.D. [P]

CONFIDENTIAL

Operative Report - STATUS: Draft
640

# EXHIBIT 3

CONFIDENTIAL

CIC 000325



# Medical College of Virginia Hospital
## 401 North 12th Street
## Richmond, Virginia 23298



| Patient Name | | Sex | Birthday | Age | Medical Record Number | Account Number |
|---|---|---|---|---|---|---|
| GILBERT, SARAH | | Female | 10/28/1990 | 13 | 000006987026 | 709151845666 |
| Admit Date | Discharge Date | | | LOS | Disposition | |
| 07/28/04 05:25 PM | 08/03/04 12:11 PM | | | 6 | Home or Self Care | |
| Primary Pay Source | | | | | | |
| HMO/PPO Blue Cross | | | | | | |
| Attending Physician | | | | Doctor Number | Order | |
| WARD, JOHN D | | | | | Jason McDowell | |

| MDC Code | MDC Text |
|---|---|
| 001 | DISEASES & DISORDERS OF THE NERVOUS SYSTEM |
| AP DRG Code | AP DRG Text |
| 533 | OTHER NERVOUS SYSTEM DISORDERS EXCEPT TIA, SEIZURES AND HEADACHE WITH |
| DRG Code | DRG Text |
| 034 | OTHER DISORDERS OF NERVOUS SYSTEM with CC |

| HCFA Weight | Average LOS | Geometric Mean LOS | Estimated Reimbursement |
|---|---|---|---|
| 0.9931 | 5.0000 | 3.7000 | 1586875.80 |

| APR DRG Code | APR DRG Text |
|---|---|
| 058 | OTHER DISORDERS OF NERVOUS SYSTEM |
| APR DRG Severity | APR DRG Mortality |
| Major Pt Sev of Illness | Moderate Risk of Mortality |

| Admit DX | Admit Diagnosis Text |
|---|---|
| 7373D | SCOLIOSIS (& KYPHOSCOLIOSIS), IDIOPATHIC |

| Prin. DX | Principal Diagnosis Text |
|---|---|
| 99709 | NERVOUS SYSTEM COMPLICATIONS |

| DX Code | Secondary Diagnosis Text |
|---|---|
| 95214 | T1-T6 LEVEL WITH SPINAL CORD INJURY |
| 7373D | SCOLIOSIS (& KYPHOSCOLIOSIS), IDIOPATHIC |
| 3449 | PARALYSIS, UNSPECIFIED |
| E8788 | OTHER SURGICAL OPERATION, WITH ABNORMAL REACTION/LATER COMPLICATION, NO SURGICAL MISADVENTURE |
| E8497 | Injury or Poisoning occurring at/in residential institution |
| V4589 | POSTPROCEDURAL STATUS |

| RX Code | Procedure Text | Date | Surgeon | Dr. # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

Date Printed: 08/06/04

003000

CIC Q00326


CONFIDENTIAL

642

# EXHIBIT 4

CONFIDENTIAL

CIC 000327

MEDICAL COLLEGE OF VIRGINIA HOSPITALS AND PHYSICI
Virginia Commonwealth Univers
Richmond, Virginia 23

DISCHARGE SUMMARY

Patient Name: GILBERT, SARAH
Admitted: 07/28/2004
Attending: John D. Ward, M.D.
Clinical Service: NEUROSURGERY

MR#: 698702
Discharged: 08/03/:

PRINCIPAL DIAGNOSIS: Incomplete acute spinal cord injury.

OTHER DIAGNOSES: 1. Scoliosis. 2. Paraplegia. 3. Postoperativ
pain.

OTHER SUBSPECIALTIES: PICU, physical medicine and rehabilitation,
Dr. Jacob Neufeld.

HISTORY OF PRESENT ILLNESS: Briefly, Sarah is a 13-year-old white
female with a history of scoliosis. On 07/28/04, she underwent a
corrective surgery at Chippenham Hospital. During this procedure,
evoked potentials were monitored. Immediately after placing the
first hook, evoked potentials were lost. The surgery was stopped
and the hook was removed. In the recovery room, postoperatively,
Sarah had no sensation or movement from the T4 level down. Dr. Joh
D. Ward was contacted at that time, and the Bracken protocol for
spinal cord injury was started. Within 30 minutes, she regained
diminished sensation, but not to her baseline yet. She was
subsequently transferred to Pediatric Intensive Care Unit at MCV
Hospital for further evaluation by neurosurgery.

HOSPITAL COURSE BY SYSTEM: 1. Central nervous system: Sarah has
experienced mild improvement in sensation in her lower extremities.
It is still diminished from normal and is associated with occasiona
paresthesias, especially of her right lower extremity. She was
initially treated with morphine sulfate PCA for pain control, but
has weaned to Tylenol No. 3 p.r.n. Repeat MRI on 07/29/04 revealed
1. Prominent scoliosis with secondary changes in cord position. 2
Increased cord signal intensity consistent with edema, ischemic
changes, or non-hemorrhagic contusion in the upper thoracic cord,
centered at T3. There is no direct evidence of cord hemorrhage.
The mid thoracic cord at the T8 level may show similar changes.
Lower thoracic syrinx as described. Heterogenous epidural signal
intensity consistent with fat and serosanguineous fluid. There was
no clear evidence of cord compression.

She is being continued on Neurontin 300 mg t.i.d. for neuropathic
pain.

2. Cardiovascular: Stable.

3. Respiratory: The patient has some mild decrease in ability to
cough consistent with loss of intercostal muscle innervation. The
patient will have diaphragmatic training at Children's Hospital
Rehabilitation Program. The patient received incentive spirometry
and chest PT while in the PICU.

4. Fluids, electrolytes, and nutrition: The patient was put on
general diet, but had poor intake, slowly increased while she was i

Copy
0:2009
CIC 000328

CONFIDENTIAL

MEDICAL COLLEGE OF VIRGINIA HOSPITALS AND PHYSICIA
Virginia Commonwealth Universi
PAGE

DISCHARGE SUMMARY                                    MR#: 6987026
Patient Name: GILBERT, SARAH

the hospital, probably because of mood swings from all of these
acute events on her.  The patient did receive 600 cc of normal
saline bolus on hospital day four.

5.  Gastrointestinal:  The patient was put on bowel regimen because
of the paraplegia.  She cannot go to the bathroom and concern about
neurogenic bladder and bowel.  The patient was put on famotidine 20
mg p.o. b.i.d., Colace 100 mg p.o. q.12h., and bisacodyl 20 mg
suppository per rectum q.o.d.

6.  Hematology:  The patient was put on DVT prophylaxis with
enoxaparin 20 mg subcutaneously q.12h.

7.  Infectious disease:  The patient developed a temperature of
101.3 on 08/01/04.  A urine culture was sent.  Chest x-ray was done
to rule out atelectasis.  Urine culture has been no growth to date,
and chest x-ray is within normal limits.  The patient has remained
afebrile upon discharge.

8.  Rehabilitation:  The patient is stable to be transferred to
Children's Hospital.  The patient was being evaluated by physical
therapy and occupational therapy was well while in the hospital.

9.  Genitourinary:  She likely has neurogenic bladder.  We will
leave the urinary catheter in time and the patient is being sent to
Children's Hospital.

10.  Scoliosis:  The patient will be followed up by the
neurosurgeon, orthopedics, and Children's Hospital rehabilitation
coordination.


John D. Ward, M.D., Dictated by: Peggy Chang, M.D.

PC/1858 D08/04/2004 T08/04/2004 R08/05/2004 J0178-861


cc: Jacob Neufeld, M.D.

002010

Copy
CIC 000329

CONFIDENTIAL

645

# EXHIBIT 5

CONFIDENTIAL

CIC 000330

Page 1

VIRGINIA:

IN THE CIRCUIT COURT OF THE CITY OF RICHMOND

---

RICHARD GILBERT and ROSIE LEE
GILBERT, Individually and on
Behalf of Their Daughter,
SARAH GILBERT, a minor,

Plaintiff,

v.                                          Case No.  CL06-4760

SUSAN EDWIN ATKINS, M.D., et al.,

Defendants.

---

HEARING PROCEEDINGS

BEFORE:  THE HONORABLE MELVIN R. HUGHES, JUDGE

January 4, 2007

Richmond, Virginia

HALASZ REPORTING & VIDEO
P. O. Box 1644
Richmond, VA 23218-1644
(804) 741-5215
Reported by:  Mary L. Rosser, RPR

CONFIDENTIAL

f06e2493-b678-45cb-9b7c-d12be2ba7d86
CIC 000331

**Page 2**

```
1
2    APPEARANCES:
3    PAULSON & NACE
     BY: GABRIEL A. ASSAAD, ESQ.
4    attorney, of counsel for the plaintiff
5    GOODMAN, ALLEN & FILETTI
     BY: KATHLEEN M. McCAULEY, ESQ.
6    attorney, of counsel for Chippenham &
     Johnston-Willis Hospital, Inc., etc.
7
     LECLAIR, RYAN
8    BY: DONNA L. FOSTER, ESQ.
     attorney, of counsel for Dr. Atkins, et al.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1        THE COURT:  Good morning.
2        MR. ASSAAD:  Good morning, Your Honor.
3        MS. McCAULEY:  Good morning.
4        MS. FOSTER:  Good morning, Your Honor.
5        THE COURT:  Yes, ma'am.
6        MS. FOSTER:  We are here today on defendant's
7    special plea and motion to dismiss.  My name is Donna
8    Foster, and I'm here on behalf of Dr. Susan Edwin Atkins,
9    M.D. and Children's Orthopedic Center.
10       Is it all right, Your Honor, if I stand here?
11       THE COURT:  Yes.
12       MS. FOSTER:  And joining in my special plea and
13   motion to dismiss is Chippenham & Johnston-Willis
14   Hospitals.
15       Your Honor, the basis of our special plea is
16   that the plaintiff filed their complaint -- styled the
17   case and filed the case in the name of Richard Gilbert
18   and Rosie Gilbert, individually, and on behalf of their
19   daughter, Sarah Gilbert, a minor.
20       And just by way of background, this is a
21   medical malpractice action wherein the plaintiffs allege
22   the defendants were negligent in their care and treatment
23   of the minor plaintiff during a spinal fusion surgery,
24   performed at Chippenham & Johnston-Willis Hospitals to
25   correct the plaintiff's scoliosis on July 28th, 2004.
```

**Page 4**

```
1        And the plaintiffs further allege that due to the
2    defendants' negligence, the minor plaintiff suffers from
3    significant permanent injuries, including paralysis.
4        Virginia Code Section 8.01-8 states that any
5    minor entitled to sue may do so by his next friend.
6    Either or both parents may sue on behalf of the minor as
7    his next friend.  The common law in Virginia, parents
8    cannot bring an action in their own name on behalf of
9    their child.  This is stated in Kirby versus Gilliam, 182
10   Va. 111, and that was stated in 1943.
11       That was, again, stated recently in the case of
12   Herndon versus St. Mary's Hospital, 266 Va. 472, 2003,
13   where the court determined that Virginia Code Section
14   8.01-8 does not modify the common law rule and that a
15   minor child must bring an action by his or her next
16   friend.
17       I'm sure the Court is aware of the Herndon
18   case, where, in that case, the parents of a minor child
19   brought a medical malpractice action against a hospital
20   and other health-care providers.  And the plaintiffs in
21   that case were Debbie Thompson Herndon, as mother and
22   next friend, of Matthew McNeil Herndon, and Larry McNeil
23   Herndon, as father and next friend of Matthew McNeil
24   Herndon, and the hospital there moved to dismiss the
25   action on the basis the action was not brought by the
```

**Page 5**

```
1    minor child in conformity with Virginia Code 8.01-8.  The
2    trial court did sustain the hospital's motion to dismiss,
3    and the parents appealed.
4        On appeal, the Court did affirm the trial
5    court's judgment, holding the statute does not modify the
6    common law rule and merely clarifies that either or both
7    parents may serve as a minor child's next friend.
8        In the present action, the parents here did not
9    sue by her next friend, as required under the Code.
10   Here, they sued on behalf of their daughter, which is not
11   permitted.  And here the complaint suffers the same
12   defect as it did in Herndon and, also, as set forth in
13   Kirby.  Because this complaint does not comply with the
14   requirements of the Code, it must be dismissed.
15       Now, what the plaintiff is now contending --
16   the defense filed their special plea, a motion to dismiss
17   on October 18, 2006.  I noticed this motion for hearing
18   on November 3rd, 2006.  On December 27, 2006, plaintiff's
19   counsel mailed out their opposition to defendants'
20   special plea in bar and motion to dismiss, which
21   counsel -- I guess I received maybe two days ago.
22       In there, plaintiff contends that the
23   defendants are only seeking to dismiss the minor's claim
24   and not the parents' claim, and that dismissal at this
25   time would be inappropriate.  While plaintiff is correct
```

CONFIDENTIAL

fc8a2a93-b678-45cb-9b7c-d12ae2be7d86
CIC 000332

648

Page 6

1 that a parent can bring a claim individually, the
2 defendants are seeking to dismiss this claim in its
3 entirety because plaintiff's counsel has only attempted
4 to bring a claim in the name of the child, which they
5 can't do in this case because they haven't done it
6 properly, as I've already stated.
7     In their opposition, curiously, they do contend
8 that they actually weren't bringing a cause of action on
9 behalf of the child, but they were merely only bringing a
10 cause of action for the parents, individually. And,
11 respectfully, I submit, Your Honor, that they haven't
12 done that here. If you carefully look at the complaint,
13 there are no —
14     THE COURT: Did the Herndon case say, rather
15 than suing on behalf of the child, that the plaintiffs
16 only asserted a claim for themselves?
17     MS. FOSTER: No, Your Honor. In that case, in
18 the Herndon case — I'm sorry if I didn't explain it more
19 specifically.
20     THE COURT: No, that's all right.
21     MS. FOSTER: But in that case, the two parents
22 brought suit against a health-care provider on behalf of
23 their minor child, styled, Debbie Thompson Herndon, as
24 mother and next friend of Matthew McNeil versus
25 St. Mary's, and the trial court dismissed the case

Page 7

1 without prejudice because it was not filed in Matthew's
2 own name by his next friend. So that sort of —
3     THE COURT: But the court didn't say that the
4 only thing asserted there was a claim by the parents, did
5 they?
6     MS. FOSTER: No, because the parents did not
7 assert —
8     THE COURT: They didn't seek to assert their
9 own claim there?
10     MS. FOSTER: No.
11     THE COURT: All right.
12     MS. FOSTER: And what plaintiff is now saying
13 in their opposition is that we're not making a claim for
14 the child.
15     THE COURT: In this case, they say —
16     MS. FOSTER: In this case.
17     THE COURT: — they're bringing their own
18 claim.
19     MS. FOSTER: They're saying the parents are
20 bringing their own claim. And we submit that that's not
21 what they've done here.
22     If you look at the four corners of the
23 complaint here, this is clearly a complaint that was
24 attempting to bring a cause of action for the child.
25 They didn't do that properly. So the complaint here is,

Page 8

1 indeed, a legal nullity, as I explained is set forth in
2 Herndon, Kirby, and under Code 8.01-8.
3     In their opposition, they're attempting to cure
4 that by saying, What we were really asking for was to
5 make a cause of action on behalf of the parents,
6 individually, and I submit, Your Honor, that they haven't
7 done that here.
8     If you look at the complaint, there is no count
9 here alleging injury to property or loss of services to
10 the daughter in the complaint, and there is no allegation
11 that they have incurred medical expenses or loss of
12 services, as required under the Code. They merely just
13 have one generalized statement that the plaintiff has
14 been injured and has suffered and will continue to suffer
15 economic and non-economic losses, including, but not
16 limited to, mental anguish, paralysis, pain and
17 suffering, humiliation, embarrassment, loss of enjoyment
18 of life, all of which are permanent and will continue
19 into the future.
20     And as Your Honor is well-aware, parents are
21 not entitled to non-economic losses, including, but not
22 limited to, things like mental anguish and things of that
23 nature. They are entitled to medical expenses they have
24 incurred in an attempt to cure their minor child's
25 injuries caused by the health-care provider's alleged

Page 9

1 negligence. That is not pled here. They have not pled
2 that they have suffered injury to property and loss of
3 services of their daughter. They haven't done that here.
4     So what they have now tried to do in their
5 opposition is come back and say, We weren't trying to
6 attempt to allege an action on behalf of the daughter,
7 but for the parents. That's not pled here.
8     And, you know, I think that basically the
9 essential fact — you know, when you look at the
10 complaint, it's essential that they inform the defendants
11 of the true nature of the claim, and it's clear from
12 looking at this that this was to bring an action for the
13 daughter, which clearly doesn't comply with the Code or
14 with the law of this Commonwealth, and it becomes a legal
15 nullity. And at this point, it's time-barred as to the
16 daughter. She was 14 at the time the alleged negligence
17 occurred, which was July 28th, 2004, which means she had
18 two years to file the lawsuit. So, obviously, it's
19 time-barred.
20     So we submit that the lawsuit be dismissed with
21 prejudice. In the alternative, Your Honor, if the Court
22 does feel that the case can proceed as to the parents,
23 that it can only proceed, we submit, and the parents can
24 only be entitled to the medical expenses. As Your Honor
25 is well-aware, they are not entitled to non-economic

3 (Pages 6 to 9)
fc6e2a93-b678-45cb-6b7c-d12ee2ba7d86



CONFIDENTIAL

CIC 000333

**Page 10**

1 damages of any type. They are only entitled to medical
2 expenses they have incurred in an attempt to cure the
3 minor child's injuries caused by the health-care
4 provider's alleged negligence, and there cannot be a
5 cause of action at this point moving forward as to Sarah
6 Gilbert, the infant.
7 And I'd like to give Ms. McCauley an
8 opportunity, if she wishes.
9     MS. McCAULEY: Happy New Year, Your Honor.
10     THE COURT: Happy New Year.
11     MS. McCAULEY: I'm here on behalf of CJW and
12 Johnston-Willis Hospitals. I have nothing to add to what
13 Ms. Foster has already said, Your Honor, but to say that
14 I do have another motion that may be rendered moot, but I
15 do join in Dr. Atkins' and her group's arguments with
16 respect to the demurrer and motion to dismiss, as well as
17 the plea in bar.
18     MS. FOSTER: Your Honor, I would like to
19 reserve an opportunity to just respond to anything that
20 plaintiff's counsel does have to say, and, also, we do
21 have a demurrer, if it's relevant after.
22     THE COURT: All right.
23     MR. ASSAAD: Good morning, Your Honor. I'm
24 Gabriel Assaad, on behalf of the plaintiffs.
25     THE COURT: Did you sign these pleadings?

**Page 11**

1     MR. ASSAAD: Yes.
2     THE COURT: I see you're the only member of
3 your firm that is a member of the Virginia Bar.
4     MR. ASSAAD: That is correct, Your Honor.
5     First of all, Your Honor, looking at the
6 caption of the case, the parents are named individually
7 in the caption. They do have a claim.
8     I'd just like to point out to the Court Rule
9 3:18 of the Virginia Practice and Procedures, and it
10 states, An allegation of negligence or contributory
11 negligence is sufficient without specifying the
12 particulars of the negligence. We pled non-economic and
13 economic damages, and we pled it with plural,
14 plaintiff.
15     THE COURT: Is it your intent to file a claim
16 only for the parents?
17     MR. ASSAAD: I'm addressing the parents' claim
18 right now, and I'll address the child's claim in a
19 minute.
20     THE COURT: All right.
21     MR. ASSAAD: Therefore, Your Honor, the parents
22 have a claim. We don't have to specify loss of services
23 and medical expenses. We specified negligence and
24 economic damages. Loss of services and medical expenses
25 are economic damages. We pled that in paragraph 23 of

**Page 12**

1 our complaint, Your Honor.
2     Second of all, Your Honor, I'm not aware of any
3 case that holds that parents are not entitled to
4 non-economic damages. The defendant states this Court is
5 well-aware. I'm not aware of any case that states that.
6 I researched the issue. There's nothing on point. If
7 they find a case later on, I think I'd like to address
8 that issue at that time. I think it would be
9 inappropriate to grant any type of demurrer or dismissal
10 on non-economic damages on behalf of the parents without
11 any cite or case law to support her position, Your Honor.
12     So I think the parents' claim is established in
13 this case, as parties to this complaint and with regards
14 to the loss of services, at least the loss of services
15 and medical expenses. And the issue of non-economic
16 damages, I think that it's not ripe at this point to
17 argue that point, that issue, based on I have nothing to
18 argue based on their lack of support of case law or
19 statutory law with respect to their position.
20     With regard to the child's claim, according to
21 the case of 2003, they are technically correct. At this
22 time, I have filed another complaint in this Court, on
23 October 25th, 2006, and I have yet to file it based on
24 the issues I mentioned in my opposition. First, I have
25 yet to receive all the records from --

**Page 13**

1     THE COURT: Let me be clear. You filed it and
2 you have yet to file it. Which one?
3     MR. ASSAAD: I have yet to serve it. I
4 apologize.
5     THE COURT: Yet to serve it.
6     MR. ASSAAD: I apologize. I misspoke, Your
7 Honor. I have yet to serve it. I have a year to serve
8 it, according to case law, and I have yet to serve it
9 based on I have yet to receive any of the medical
10 records. This patient is a 13-year-old child.
11     THE COURT: You filed another action that's
12 pending, but not served. How is that styled?
13     MR. ASSAAD: It is styled correctly with
14 relation to the child.
15     THE COURT: All right.
16     MR. ASSAAD: I do agree the action took
17 place -- or the negligence took place on July 28th, 2004,
18 and, therefore, the statute of limitations would be on
19 that date, would be July 28th, 2006. However, Your
20 Honor, there are certain issues that may toll the
21 statute, based on continuing treatment, based on we might
22 move the Court to declare this person incapacitated
23 during a certain period of time during that period, and I
24 have yet to receive the medical records from the
25 defendants to be able to make those arguments to

4 (Pages 10 to 13)
fc6a2a93-b678-45cb-9b7c-d12ea2ba7d66
CIC 000334

CONFIDENTIAL

650

**Page 14**

1 determine whether or not we're going to proceed with that
2 action. That's why I feel at this point, to dismiss the
3 child's claim with prejudice would be inappropriate. I
4 agree we haven't filed the claim appropriately with
5 regard to the claim at issue at this point in time and,
6 therefore --
7      THE COURT: Well, you've said that twice. I
8 tend to agree with the defendants.
9      MR. ASSAAD: I can't argue that point.
10 However, Your Honor, I will argue that the statute, as
11 written, a parent cannot bring -- the two-year statute of
12 limitations for med. mal. for minors, as written, if a
13 parent cannot bring a claim on behalf of a child, which
14 is 8.01-243.1, as written, the child may bring a claim on
15 her own because the statute of limitations would not
16 apply to her because she's bringing it on her own --
17 she's bringing it by her own action and not on behalf --
18 and not a parent bringing it on behalf of her.
19      And if you look at the statute of 8.01-243.1,
20 it states, Any cause of action accruing on or after July
21 1st, 1987, on behalf of a person who was a minor at the
22 time of the cause of action. Their argument is that we
23 brought this case on -- the parents' brought the case on
24 behalf of a minor. If we're not allowed to bring a case
25 on behalf of a minor, then this statute does not apply

**Page 15**

1 because then the minor has to bring the case on her own
2 behalf, and not a parent on behalf of someone else. And
3 that has not been raised in the Supreme Court, and it's
4 basically an issue of first impression.
5      THE COURT: Now, you may have to repeat that
6 for me.
7      MR. ASSAAD: Okay. Their argument, Your Honor,
8 is that a parent is not allowed to bring a claim on
9 behalf of a child after two years of the date of the
10 negligence based on 8.01-243.1, the statute of
11 limitations. Well, if the parent can't bring the claim
12 on behalf of the child, then 8.01-243.1 does not apply to
13 the child herself bringing the claim on her own and,
14 therefore, two things could happen. One, we rule the
15 statute void, as improperly written or, two, I wait until
16 the child is 18 to bring a claim on her behalf.
17      THE COURT: Well, you have some special
18 provisions in the medical malpractice statute, don't you,
19 under 58? Is it 58?
20      MR. ASSAAD: Not with regard to statute of
21 limitations.
22      THE COURT: No? Sorry.
23      MR. ASSAAD: I could be incorrect, Your Honor,
24 but --
25      THE COURT: All right. So you think that

**Page 16**

1 this -- while you concede that this claim that's being
2 asserted on behalf of the child is not properly asserted,
3 the case should remain on the docket because the parents
4 are suing?
5      MR. ASSAAD: The parents should stay. As of
6 now, I have another case that has been filed with the
7 child's claim. And if this Court rules that I haven't
8 pled or haven't properly captioned the child's claim,
9 which would be very hard for me to argue against, I
10 request this Court just to dismiss the child's claim,
11 which technically doesn't really exist at this point in
12 time, without prejudice, and address the issue of the
13 child's claim that I haven't served, the next complaint,
14 upon receiving all the information, and, depending on the
15 information that I discover, continuing treatment,
16 whether this patient was incapacitated for a certain
17 period of time before the statute of limitations, deal
18 with those issues at a later point in time.
19      And to give you background of this child, the
20 child had a back surgery, and during the back surgery the
21 patient became a paraplegic at the age of 13, was unable
22 to take care of herself, was in operations and health
23 facilities for months. And depending on what I discover,
24 that few months she could be ruled as incapacitated and,
25 therefore, toll the limitations for that period of time

**Page 17**

1 and, therefore, the October 25th filing of the complaint
2 will be acceptable and it would toll the statute of
3 limitations.
4      THE COURT: All right.
5      MS. FOSTER: Thank you, Your Honor. Just to
6 address a couple of points. First and foremost, the
7 plaintiff raised the issue of the parents' claim and
8 stated that he claimed that the complaint states that the
9 parents have filed a -- the complaint does state a cause
10 of action for the parents. There is no indication in
11 here that there is a cause of action on behalf of the
12 parents.
13      Making a general statement of economic damages
14 is not enough. Clearly, under the Code, it says medical
15 expenses and loss of services. The statute -- let me get
16 to it, Your Honor -- does say --
17      THE COURT: Which statute is that?
18      MS. FOSTER: 8.01 -- for loss of property,
19 parents are given five years. A claim by a parent for
20 medical expenses incurred in an attempt to cure the
21 injuries of a child as a result of personal injury to the
22 child must be brought within five years of the date the
23 cause of action accrued. Virginia Code 8.01-243(B).
24      That is what they're entitled to. They are not
25 entitled to anything other than that. They are not

5 (Pages 14 to 17)

CONFIDENTIAL

fc6a2e93-b678-46cb-9b7c-d12ae2ba7d88

CIC 000335

651

**Page 18**

1  entitled to non-economic damages. Anything other than
2  that, they're subject to the -- the child is the only
3  person that is entitled to non-economic damages, and
4  they're subject to the two-year statute of limitations.
5  This child was over the age of 10 at the time of the
6  alleged negligence.
7      THE COURT: Yeah. Don't the statutes make a
8  distinction regarding the statute of limitations in
9  medical mal. cases --
10     MS. FOSTER: Absolutely, Your Honor.
11     THE COURT: -- as to the age of the child? I
12  misspoke. It's not 581.
13     MS. FOSTER: Well, it's 229.
14     THE COURT: 229?
15     MS. FOSTER: Yes. And, Your Honor, it clearly
16  states that if the child is over 10 years old at the time
17  of the alleged malpractice, they're subject to the
18  two-year statute of limitations. It's when the child is
19  below the age of 8, then they get -- I believe they get
20  an additional two years once they turn -- I have to look.
21     THE COURT: What about that window from 8 to
22  10? Suppose you're 9?
23     MS. FOSTER: When you turn 10 years old, you
24  have two years.
25     THE COURT: Turn 10, I see.

**Page 19**

1      MS. FOSTER: Yes. This child was 14, and she
2  is subject to the two-year statute of limitations. I
3  know this very well.
4      I mean, the fact is, if you read the complaint,
5  this was a cause of action that was brought for Sarah
6  Gilbert. This complaint is a legal nullity. They did
7  not comply with 8.01-8, which the case law -- the Supreme
8  Court spoke about in great detail in Herndon and spoke
9  loud and clear to me, Your Honor, with all due respect,
10  when I got the complaint, and you cannot have a catchall
11  paragraph that says economic and non-economic damages,
12  and now come back and say, We're actually making a claim
13  for the parents. The statute is very clear, medical
14  expenses and loss of services. And they do get five
15  years for that, but that's not what they were doing here.
16     Secondly, the complaint that was filed by the
17  by the plaintiff on October 25th, 2006, that they're now
18  saying was done correctly, is not before the Court today.
19  That's not before the Court.
20     But I will say that for the plaintiff to come
21  here today and say, We didn't do something because we
22  didn't have medical records, is very misleading because
23  Your Honor is well-aware under the expert certification
24  statute, before you can even serve a lawsuit, you have to
25  have this case reviewed by an expert -- filed, and so I

**Page 20**

1  have some misgivings on why this case was even served and
2  filed on the defendants in the first place. And if they
3  didn't even have the records of my defendant, I'm a
4  little concerned because that tells me that perhaps an
5  expert hasn't even looked at this case.
6      Secondly, the plaintiff's counsel has all but
7  conceded that he knows that there's not a cause of action
8  against -- first, on behalf of Sarah Gilbert, which tells
9  me their pleading wasn't filed in good faith, which is
10  concerning under 8.01-271.1, so I have lots of concerns
11  here.
12     But getting back to the motion at issue, this
13  lawsuit is a legal nullity. It should be dismissed. And
14  any subsequent lawsuit that's filed does not toll the
15  statute of -- it does not relay back because when a
16  lawsuit is a legal nullity, it does not toll the statute
17  of limitations.
18     So we respectfully submit, Your Honor, that the
19  defendant's special plea and motion to dismiss should be
20  granted. Thank you, Your Honor.
21     THE COURT: All right.
22     MR. ASSAAD: If I could address a few issues
23  based on those accusations by counsel against me on my
24  good faith. We have the medical records of the
25  operation. We have the medical records post-op. What we

**Page 21**

1  don't have, which haven't been produced, but requested,
2  are the office visit medical records of the defendant,
3  Dr. Atkins, But I do have the certificate of expert, and
4  any allegations to this Court that I haven't or I haven't
5  in good faith is a false accusation, a baseless
6  accusation, and they're just basically talking, like
7  these other accusations, without any case law to support
8  it.
9      3:18 states, Any allegation of negligence or
10  contributory negligence is sufficient without specifying
11  the particulars of the negligence. We pled negligence
12  against the defendants, The parents are parties to the
13  claim as individuals, and whether or not it's fully pled,
14  they could file a bill of particulars for a more definite
15  statement, and we do that. But to dismiss the parents'
16  claim at this time based on the -- I can't recall the --
17  I'm trying to use the exact word she used, but based on
18  that there's no claim pled, that's totally incorrect.
19     Second of all, 8.01-229 is not the med. mal.
20  statute of limitations. It actually says, The two-year
21  statute of limitations for tort cases and for infants or
22  for people under the age of majority, it's tolled to the
23  age of 18. That's the common law, and that's the way
24  it's been until it was amended by the legislature by
25  8.01-243.1, which changed the statute of limitations for

6  (Pages 18 to 21)
fc6a2e93-b678-45cb-9b7c-d12ae2ba7d86
CIC 000336



652

**Page 22**

1  minors in a med. mal. case to two years. And my argument
2  is that that doesn't apply for a minor that's -- or for a
3  person that's bringing an action by herself or himself.
4  But at this time, it's not ripe because I haven't served
5  the other complaint. But the parents' claim should stay
6  at this point in time, Your Honor.
7      THE COURT: Ms. McCauley, you had a demurrer?
8      MS. McCAULEY: Ms. Foster had a demurrer. I
9  had a motion for a bill of plaintiffs, Your Honor.
10     But before we step away from the issue of the
11 parents' claim, Mr. Assaad asserts that the parents are
12 entitled to non-economic damages. And as the Court
13 knows, a parents' claim in an action for malpractice for
14 the care and treatment given to a minor is a derivative
15 action, and it's a derivative action out of the alleged
16 negligence asserted on the minor child. By virtue of the
17 fact that it is a derivative action, it is for economic
18 damages only. It is not for any personal injury to
19 themselves as a parent because the action --
20     THE COURT: Isn't there a little distinction
21 about this? Do you remember the Motorbar (ph.) case; I
22 think a mother who claims injury to her child in utero?
23     MS. McCAULEY: A mother who is claiming
24 injuries to herself during the delivery of a child, yes,
25 Your Honor, there is a distinction there.

**Page 23**

1      THE COURT: But that's about the only one I can
2  think of.
3      MS. McCAULEY: Yes, Your Honor. And this is a
4  case for an injury to a 14-year-old minor child. There
5  is no non-economic damage or cause of action that the
6  parents can assert, other than that derivative action
7  that necessarily requires the personal injury action of
8  the minor child. The statute of limitations is longer
9  for those actions because they're derivative in nature
10 and because the medical expenses might not be full at the
11 time the statute of limitation runs for the personal
12 injury action underneath, but it is a derivative action,
13 and, for that reason, and by statute, it's for medical
14 expenses and loss of services of the injured person.
15     The non-economic damages that are permissible
16 in Virginia in a personal injury action are for those of
17 the actual injured person, like pain and suffering, like
18 embarrassment, like scarring and disfigurement, like loss
19 of enjoyment of life. Those are unique to, in this case,
20 Sarah Gilbert. The parents can't claim those general or
21 non-economic damages. They're only entitled to recover
22 their medical expenses, as well as loss of services, and
23 that was not pled in the original complaint. Thank you,
24 Judge.
25     THE COURT: Well, if the plaintiff is allowed

**Page 24**

1  to recast this and assert a loss of services claim and a
2  claim for medical expenses, would you argue their claim
3  would be time-barred at this point?
4      MS. McCAULEY: The parents' claim? The parents
5  claim would not be time-barred. The underlying action
6  would be time-barred.
7      MR. ASSAAD: I just want to address that issue.
8  There is no case law that states parents can't have
9  mental anguish or non-economic damages.
10     THE COURT: Well, the only situation I can
11 think of now is the case I just alluded to, the situation
12 I just alluded to.
13     MR. ASSAAD: And the action does exist, Your
14 Honor, because under the wrongful death claim, a
15 beneficiary can claim solace, loss of companionship and
16 all the above, even though it's by statute, according to
17 law, wrongful death.
18     THE COURT: Well, there's always been some
19 dispute about whether a beneficiary is actually a party.
20 The actual party is a personal representative,
21 beneficiary of the decedent, and that claim is brought on
22 behalf --
23     MR. ASSAAD: Well, those actions are allowed
24 under the wrongful death statute.
25     THE COURT: Well, they are, and that's

**Page 25**

1  statutory.
2      MR. ASSAAD: That's statutory. But there's no
3  case law in Richmond that says that the same type of
4  damages does not allow a personal injury by a parent.
5  And maybe it needs to be briefed a little further, but at
6  this point in time --
7      THE COURT: I'm just not aware of any case that
8  stands for the proposition you just suggested.
9      MR. ASSAAD: Well, there's no case that stands
10 for the opposite either, Your Honor.
11     THE COURT: What else do you have? Do you have
12 a demurrer?
13     MS. McCAULEY: Your Honor, I have a motion for
14 a bill of particulars.
15     THE COURT: Well, did you say you had a
16 demurrer? What's the demurrer about?
17     MS. FOSTER: The demurrer, Your Honor, the
18 basis of the demurrer, first, in Count --
19     THE COURT: This goes to the merits of the
20 child's claim?
21     MS. FOSTER: The demurrer, Your Honor, is that
22 the -- first basis is that in Count I, paragraph 23,
23 subsection (e) of the complaint, the plaintiff attempts
24 to set forth a claim of res ipsa loquitur.
25     THE COURT: Subsection (e)?

7  (Pages 22 to 25)

fc6a2e93-b678-45cb-9b7c-d12ae2ba7d88

CIC 000337

CONFIDENTIAL

**Page 26**

1    MS. FOSTER: Yes. In the complaint, paragraph
2  23, there are --
3      THE COURT: Oh, I see. Right, you're right.
4      MS. FOSTER: The plaintiffs assert the doctrine
5  of res ipsa loquitur, which is not a compensable cause of
6  action in Virginia.
7      THE COURT: Well, I think -- what other motions
8  do you have? You have a bill of particulars and
9  demurrer?
10     MS. FOSTER: That's it.
11     THE COURT: That's it? I think this motion has
12 merit, the motion to dismiss, and I will dismiss it. The
13 question is -- now, your motion goes to dismiss the
14 child's claim; is that right?
15     MS. FOSTER: Your Honor, we contend that the
16 entire claim should be, but, in the alternative, I
17 believe that if you're going to allow anything, it would
18 only be with regard to the parents, only as to medical
19 expenses and loss of services.
20     THE COURT: That's the position I'm going to
21 take, and I'll grant the motion to dismiss.
22     Now, what are we going to do about this other
23 case that's hanging?
24     MR. ASSAAD: Your Honor, I just want to clarify
25 the Court's ruling. The motion to dismiss is --

**Page 27**

1      THE COURT: The child's claim.
2      MR. ASSAAD: The child's claim, not the
3  parents' claim?
4      THE COURT: Well, I'm going to give you leave
5  to amend the parents' claim, and I think you can assert a
6  claim for medical expenses and loss of services, but I
7  don't think -- unless you are confident in your position
8  about asserting a claim for non-economic damages in this
9  context, but I'm just not aware that a parent can assert
10 such a claim under these circumstances. So I'll give you
11 leave to amend, at any rate, to recast the parents'
12 claim.
13     MR. ASSAAD: But if I file a motion in support
14 of my claim for non-economic damages for the parents'
15 claim --
16     THE COURT: File a motion?
17     MR. ASSAAD: I mean, if I add non-economic
18 damages, they're going to file a demurrer and --
19     THE COURT: Just make sure you have some basis
20 for it. You know, we're talking about sanctions and so
21 forth.
22     MR. ASSAAD: Thank you, Your Honor.
23     THE COURT: Now, the order, though, with regard
24 to dismissing the child's claim, in light of the fact
25 that you filed this other case and you say you have some

**Page 28**

1  basis to pursue that claim now, it's properly styled, but
2  brought in October, which is, what, about three months
3  since the statute may have run, the two years, but if you
4  have some theory about how that claim survives the
5  running of the statute, I think we'll do -- well, in this
6  case, I'll dismiss the child's claim. Maybe the order
7  just says that the case is dismissed. I wouldn't want to
8  say dismissed with prejudice because the other case that
9  has been mentioned is not before me, and I don't know
10 what you're going to, for lack of a better term and I
11 don't mean this derogatory, what you're going to come up
12 with in the other case.
13     MR. ASSAAD: The technicality, Your Honor, with
14 just granting a dismissal automatically assumes that the
15 child is properly a party in the case, and they're
16 arguing the child is not a party to the case because of
17 the way it was captioned. So I would think the more
18 appropriate action, maybe grant the demurrer against any
19 claim for pain and suffering --
20     THE COURT: But they haven't filed a demurrer.
21     MR. ASSAAD: Well, dismissal would be an
22 inappropriate term because the child is not a party to
23 the case, so how can you dismiss something that's not a
24 party?
25     MS. McCAULEY: Your Honor, if you dismiss the

**Page 29**

1  case that is --
2      THE COURT: This case?
3      MS. McCAULEY: Yes, sir. If you dismiss it by
4  action number, at law action, it dismisses the complaint
5  that is currently before the Court, the complaint that
6  has been filed and served and is the subject matter.
7      MR. ASSAAD: Well, Your Honor, I disagree with
8  that because the two-year statute of limitations, which
9  this one was filed within, for any tort for the parents
10 would not apply to the following October 25th, 2006
11 complaint. So to dismiss --
12     THE COURT: Well, I think Ms. McCauley is
13 right. We can dismiss this case, this case, and then
14 we'll see what happens.
15     MR. ASSAAD: Well, I don't want to lose the
16 two-year statute of limitations on the parents.
17     THE COURT: Well, you may not. You may not.
18 I'm not saying you have.
19     MR. ASSAAD: Well, if they dismiss this case,
20 you're dismissing the parents' claim as well, Your Honor.
21     THE COURT: Well, I give you leave to amend the
22 parents' claim.
23     MR. ASSAAD: Okay. So we're not dismissing
24 this; we're granting leave to --
25     THE COURT: I'm dismissing the child's claim.

8  (Pages 26 to 29)
fc6a2a93-b878-45cb-9b7c-d12ae2ba7d88

CIC 000338



Page 30

```
1    To the extent this asserts the child's claim --
2        MR. ASSAAD: Fair enough.
3        THE COURT: -- that will be dismissed. With
4    respect to the parents' claim, you can amend, and you'll
5    have 21 days to do that -- well, 15 days, 15 days to
6    amend, and 10 days to respond to any amended claim for
7    the parents. And we'll look at the other case in due
8    course.
9        All right. Thank you.
10       MS. McCAULEY: Thank you, Your Honor.
11
12           (Hearing adjourned.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 31

```
1
2
3
4
5        CERTIFICATE OF REPORTER
6
7
8        I, Mary L. Rosser, shorthand reporter, do
9    certify that the foregoing 30 pages is a full, true and
10   correct transcript of my stenographic notes taken on
11   January 4, 2007, in the Circuit Court of the City of
12   Richmond, in the matter captioned Richard Gilbert and
13   Rosie Lee Bilbert, etc. versus Susan Edwin Atkins, M.D.,
14   et al.
15       Given under my hand this 22nd day of January,
16   2007.
17
18       _____
19              Mary L. Rosser
                Shorthand Reporter
20
21
22
23
24
25
```

9 (Pages 30 to 31)

fc8a2e93-b978-45cb-8b7c-d12be2be7d86

CONFIDENTIAL
CIC 000339

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

RICHARD GILBERT and ROSIE LEE GILBERT
Individually,

<div align="center">Plaintiffs,</div>

v.                                                    Case No.: CL06-4760-01

SUSAN EDWIN ATKINS, M.D., and
CHILDREN'S ORTHOPEDIC CENTER,

<div align="center">Defendants.</div>

<div align="center">

**DEFENDANTS',**
**SUSAN EDWIN ATKINS, M.D. AND CHILDREN'S ORTHOPEDIC CENTER,**
**BRIEF IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR RECONSIDERATION**

</div>

COME NOW, Defendants, Susan Edwin Atkins, M.D. and Children's Orthopedic Center (hereinafter "the Defendants"), by and through their undersigned counsel and respectfully submit this Brief in Opposition to Plaintiffs' Motion for Reconsideration pursuant to Rule 4:15 of the Rules of the Supreme Court of Virginia and pray that this Honorable Court deny Plaintiffs' Motion for Reconsideration.

<div align="center">

**INTRODUCTION AND PROCEDURAL BACKGROUND**

</div>

On July 28, 2004, Defendant Dr. Atkins operated on *thirteen year old*[1] Sarah Gilbert (hereinafter "Ms. Gilbert"), to correct her progressive idiopathic scoliosis.[2]  On July 24, 2006, Ms. Gilbert's parents Richard and Rosie Gilbert (hereinafter "the Gilberts"), filed a Complaint, <u>Case No. 4760</u>, seeking damages for personal injuries suffered by Ms. Gilbert,

---

[1] Ms. Gilbert's birth date is October 28, 1990.
[2] Ms. Gilbert was subsequently transferred to Virginia Commonwealth University (VCU) Medical Center for treatment associated with the complications. After July 28, 2004, Ms. Gilbert was never treated by Dr. Atkins.

CONFIDENTIAL

CIC 000340

four days before the two-year statutory bar (July 28, 2006), under Virginia Code § 8.01-243.1.[3] The Gilberts filed this lawsuit as named Plaintiffs on behalf of minor Ms. Gilbert and individually seeking economic and non-economic damages. This Complaint was captioned in the name of "Richard Gilbert and Rosie Lee Gilbert, Individually and on behalf of their daughter, Sarah Gilbert" See Complaint for 4760, attached as Exhibit A. Defendants timely filed a Special Plea in Bar requesting dismissal of the Complaint citing Plaintiffs' failure to comply with Virginia Code 8.01-8, which requires that an infant sue as the named plaintiff by next friend(s). See Va. Code § 8.01-8 (2007).[4] In support, Defendants cited the decision by the Supreme Court of Virginia in Herndon v. St. Mary's Hospital, Inc., which held that "it is well settled that . . . an infant's suit must be brought in [her] name and not in that of the next friend – that is, the infant and not the next friend must be the real party plaintiff." 266 Va. 472, 476, 587 S.E.2d 567, 571 (2003); See also Kirby v. Gilliam, 182 Va. 111, 116, 28 S.E.2d 40, 43 (1943). The Defendants also timely demurred to, *inter alia*, the Gilberts' claim for non-economic damages contending that this claim was derivative of Miss Gilbert's claims, and could not be brought. Citing Bulala v. Boyd, the Defendants contended that any claim for medical expenses, loss of property and/or loss of services is a derivative claim belonging to the parents of the minor, 239 Va. 230 (1990). However, the personal injuries and all damages associated with the alleged injuries remain the claim of the minor child.

---

[3] Section 8.01-243.1 reads, in part, "any cause of action . . . on behalf of a person who was a minor at the time the cause of action accrued for personal injury . . . shall be commenced within two years of the date of the last act or omission giving rise to the cause of action except that if the minor was less than eight years of age at the time of the occurrence of the malpractice, he shall have until his tenth birthday to commence an action."

[4] Section 8.01-8 states, "[a]ny minor entitled to sue may do so by his next friend. Either or both parents may sue on behalf of a minor as his next friend."

2

CONFIDENTIAL

CIC 000341

On February 26, 2007, this Court dismissed Miss Gilbert's claims contained in the first Complaint. See Order of February 26, 2007, attached hereto as Exhibit B. This Court also sustained Defendants' demurrers to the Gilberts' individual claims for non-economic damages and granted Plaintiffs leave to amend the Complaint to properly plead their individual claim for economic damages. Id.[5] See also Hearing Transcript of January 4, 2007, attached hereto as Exhibit C.

On October 25, 2006, Ms. Gilbert, a minor, filed Case No. 6787 – three months after the two-year statutory deadline (July 28, 2006). See Complaint for 6787, attached as Exhibit D. Ms. Gilbert filed as named plaintiff by her parents and next of friends, Richard Gilbert and Rosie Lee Gilbert and the Gilberts filed individually seeking non-economic and economic damages. Id. Defendants timely filed a Special Plea of the Statute of Limitations, asserting that Ms. Gilbert's cause of action was time-barred under Va. Code §8.01-243.1, and once again timely filed a Demurrer to, inter alia, the Gilberts' claim for non-economic damages.

On March 6, 2007, the Gilberts filed an Amended Complaint in the first action, Case No. 4760. See Amended Complaint for 4760, attached as Exhibit E. This Amended Complaint was for the parents' individual claims. Despite this Court's earlier Order of February 26, 2007, the Gilberts again sought both economic and non-economic damages, including mental anguish, pain and suffering, humiliation, embarrassment, and loss of enjoyment of life, injury to property, and loss of services. Id. Once again, the Defendants timely filed several demurrers to the individual claims of the Gilberts in the Amended Complaint of Case No. 4760.

On June 18, 2007, counsel appeared before the Honorable Melvin R. Hughes, Jr. with

---

[5] The Complaint was dismissed without prejudice, in consideration of the fact that the Gilberts by this time had already filed a second Complaint on October 25, 2006, Case No. 6787.

CONFIDENTIAL

CIC 000342

regard to both cases. The Court heard argument on Defendants' Special Pleas of the Statute of Limitations filed in <u>Case No. 6787</u>. At that time, the Court also heard extensive argument from all counsel on Defendants' Demurrers to the Gilberts' individual claims set forth in the Amended Complaint in <u>Case No. 4760</u>. <u>See</u> Hearing Transcript of June 18, 2007, attached hereto as Exhibit F. Judge Hughes agreed with the Defendants' arguments and dismissed with prejudice Ms. Gilbert's cause of action and the Gilberts' individual claim for non-economic damages.[6] On August 3, 2007, this Court entered its Order reflecting these rulings. <u>See</u> Order of August 3, 2007, attached hereto as Exhibit G. Judge Hughes consolidated all of the Gilberts' remaining individual claims for economic damages into <u>Case No. 4760</u> and ordered the Defendants to answer the Amended Complaint within 14 days. <u>Id.</u> The Gilberts' cause of action seeking economic damages was the only case remaining before the Court.

The Plaintiffs did not file a Motion for Reconsideration within twenty-one days of either of the Court's February or August orders pursuant to Rule 1:1 of the Rules of the Supreme Court of Virginia. Instead, on August 29, 2007, the Gilberts filed Notices of Appeal for both cases. The Plaintiffs then filed a Petition for Appeal with the Supreme of Virginia on or about November 3, 2007. Plaintiffs' counsel's only contention was that this Court erred in granting Defendants' Special Plea of the Statute of Limitations when it failed to consider whether the statute of limitations was tolled when Ms. Gilbert was allegedly incapacitated from July 24, 2004 until October 23, 2004. <u>See</u> Appellants' Petition for Appeal, attached hereto as Exhibit H, and Appellees' Brief in Opposition to Petition for Appeal, attached hereto as Exhibit

---

[6] The Gilberts, on the other hand, discounted Va. Code 8.01-243.1 and contended that the Statute of Limitations had been tolled by reason of the alleged incapacity of the minor, Ms. Gilbert. Specifically, they contended that Ms. Gilbert was incapacitated for several months after the surgery, while she was hospitalized and suffered from paralysis and depression. <u>Id.</u>

4

CONFIDENTIAL

CIC 000343

1. The Supreme Court denied the appeal on March 7, 2008.[7] See Letter from the Clerk of the Supreme Court, attached hereto as Exhibit J.

The trial in this matter was then placed on the Court's docket and is scheduled to begin on May 26, 2009. The Scheduling Order was endorsed by all counsel and subsequently entered by the Court on February 17, 2009.[8] Although this Court has previously heard extensive arguments on the issues before the Court, just over a month before trial Plaintiffs now request that this Court vacate it two prior orders, which were entered over two-years ago. See Exhibits B and G.

## ARGUMENT

1. **The Court should deny Plaintiffs' Motion for Reconsideration because more than twenty-one days have passed since this Court's entry of the Orders**

Rule 1:1 of the Virginia Supreme Court Rules provides that "all final judgments, orders and decrees irrespective of terms of courts, shall remain under the control of the trial court and subject to be modified, vacated, or suspended for twenty one days after the date of entry and no longer." Va. Sup. Ct. R. 1:1 (2008). The Supreme Court of Virginia has held that the twenty-one day period begins running from the date the order or decree is entered, unless the Court expressly provides in the order that the court "retains jurisdiction to reconsider the judgment or to address other matters still pending in the action before it." See Super Fresh Food Mkts. of Va. v. Ruffin, 263 Va. 555, 561, 561 S.E.2d 734, 737 (2002). Further, an Order cannot be vacated more than

---

[7] The Gilberts' appeal was improper because there was not a final appealable order from a final judgment in the case. The Virginia Code mandates, "any person may present a petition for an appeal to the Supreme Court if he believes himself aggrieved: . . . by a final judgment in any other civil case." Va. Code § 8.01-670(A). Pursuant to Supreme Court precedent a "final judgment" is "one which disposes of the entire action and leaves nothing to be done except the ministerial superintendence of execution of the judgment." Super Fresh Food Mkts. of Va. v. Ruffin, 263 Va. 555, 560, 561 S.E.2d 734, 737 (2002). As was stated above, on August 3, 2007, Judge Hughes sustained, for the second time, Defendants' demurrers to the Gilberts' individual claims for non-economic damages in Case No. 4760. However, he declined to dismiss, any of the Gilberts' individual claims for economic damages and loss of services. See Exhibit G.

[8] Close of discovery pursuant to the Court's Scheduling Order is April 27, 2009.

5

CONFIDENTIAL

CIC 000344

twenty-one days after entry. See Janvier v. Arminio, 272 Va. 353, 643 S.E.2d 754 (2006); see also James v. James, 263 Va. 474, 562 S.E.2d 133 (2002) (holding that the court no longer had jurisdiction of the Order after the expiration of the statutory twenty-one day period).

The Honorable Melvin R. Hughes issued an order dismissing Ms. Gilbert's cause of action and the Gilberts' claim for non-economic damages on February 26, 2007, and entered an Order dismissing with prejudice Ms. Gilbert's cause of action and the Gilberts' claim for non-economic damages with prejudice on August 3, 2007. See Exhibits B and G. Plaintiffs filed their Motion for Reconsideration on April 9, 2009, which is well beyond the mandatory twenty-one day jurisdictional period outlined by Rule 1:1 of the Virginia Supreme Court. Further, this Court did not expressly provide in the Orders that it would "retain jurisdiction" beyond the twenty-one day period. It is for this reason that this Court is no longer able to consider Plaintiffs' Motion for Reconsideration and vacate its two previous orders.

2. **This Court should deny the Motion for Reconsideration because there is no legal question left open per Herndon**

Plaintiffs assert this Court's decision to dismiss Ms. Gilbert's cause of action is contradictory to Virginia's well-established practice of liberally construing its statutes, and as such, the Court should vacate its previous Order and allow her to amend the Complaint. Plaintiff also states that to do otherwise would waste judicial time because if the case were appealed it would likely result in an entirely new trial regarding the same matter to be re-litigated because the Plaintiffs are substantially the same parties.

First, the Plaintiffs ignore the Herndon case, where the Supreme Court addressed "whether Code § 8.01-8 authorizes parents to bring an action in their own name as next friend of their minor child." 226 Va. 472, 474, 587 S.E.2d 567, 568 (2003). The Supreme Court held that "an infant's suit must be brought in [her] name and not in that of the next friend –

6

CONFIDENTIAL

CIC 000345

that is, the infant and not the next friend must be the real party plaintiff." _Id._  In deciding the issue presented in Herndon, the Court looked to the named plaintiffs identified in the caption to determine if the named plaintiffs properly filed the suit.  In the caption, the named plaintiffs sued as "Debbie Thompson Herndon, as mother and next friend of Matthew McNeil Herndon" and "Larry McNeil Herndon, as father and next friend of Matthew McNeil Herndon." _Id._ at 474, 587 S.E. 2d at 568.  The Court held that the trial court properly dismissed the action because the suit was filed in the name of the next of friend and not in the name of the minor child.  _Id._ at 476, 587 S.E. 2d at 570.  This Court used the same analysis before it entered the Orders at issue.  See Exhibits C and F.

Here, the original Complaint, Case No. 4760, filed by parents Richard and Rosie Gilbert on behalf of Sarah Gilbert suffered the same fatal defect as in Herndon.  In their first Complaint, the Gilberts styled the case as "Richard Gilbert and Rosie Lee Gilbert individually and on behalf of their daughter, Sarah Gilbert."  Making the same mistake as the parents did in Herndon, parents Richard and Rosie Gilbert brought the earlier action in their name as the named plaintiffs, and not in the name of the real party of interest, Sarah Gilbert.  As such, Richard and Rosie Gilbert lacked standing, and Sarah Gilbert's case was a legal nullity.  See Herndon, 266 Va. at 474.

Likewise, in Kirby v. Junious L. Gilliam, the Virginia Supreme Court held that according to the common law rule, "an infant's suit must be brought in [her] name and not in that of the next friend-that is, the infant and not the next friend must be the real party plaintiff," 182 Va. at 111; Herndon, 226 Va. at 570.  The Supreme Court followed this in Herndon stating that "as we further observed in Kirby, if the action in brought in the name of the next friend on behalf of the infant, it cannot be maintained," _Id._ (internal citations omitted).  The Supreme Court also

7

CONFIDENTIAL

CIC 000346

662

contemplated the Legislature's intent to change the common law rule stating, "any statutory change in the common law rule must be reflected in the express words of the statute or necessarily implied from these words; we consider the express language of Code §8.01-8 to determine whether that language shows a plainly manifested legislative intent to change the common law rule expressed in Kirby. Id. at 570. The Virginia Supreme Court ruled that the "statutory language did not manifest such an intent." Id.

Second, the Plaintiffs rely on McDaniel v. North Carolina Pulp Co., 198 Va. 612, 95 S.E. 2d 201 (1956), to support their contention that the Supreme Court has abolished hyper-technical applications of statutes regarding the proper naming of the parties to the suit and should consider that the Plaintiffs are substantially the same parties. The Plaintiffs however, failed to mention that in McDaniel the Court held that "to be substantially the same parties, the named plaintiff in the lawsuit has to be a "real party in interest, not a mere figurehead or simply a formal party." Id.

Here there is no substantial similarity between parents Richard and Rosie Gilbert as named plaintiffs in the first filed Complaint and Plaintiff Sarah Gilbert. Quite simply, in the earlier action the Gilberts lacked standing since they were not the real party in interest. Va. Code 8.01-8; see also Kirby, 182 Va. at 117. In other words, parents Richard and Rosie could not step into the shoes of Sarah Gilbert since they are not the real party at interest.

In McDaniel the Supreme Court also ruled that the parties not go beyond the caption to determine the real party in interest, but to look at the named plaintiffs. Id. at 206. This Court, like the Supreme Court of Virginia in Herndon, looked to the caption to decide if the named plaintiffs had standing. Herndon, 266 Va. at 474. In the more recent case of The Estate of Judson James, Administrator v. Peyton, et. al., the Supreme Court held that the trial court

CONFIDENTIAL

CIC 000347

erred by allowing the plaintiff to amend the motion for judgment to substitute the real party

defendant. In reaching it decision the court referred to the Herndon case noting that it had

"addressed a similar 'syntactical' conundrum." Id. The Court further discusses that although

the court in Herndon was not required to address whether the trial court should have allowed

the substitution of the child, by his parents and next friends, as the proper party, it was clear

that such an amendment would not have been permissible because the failure to name a proper

party cannot be cured by amendment. Thus, "a new plaintiff may not be substituted for an

original plaintiff who lacked standing to bring the action," 2009 Va. LEXIS 60 (citations

omitted).

    Thus, the rule is settled in Virginia and now to go beyond the caption to determine the

real party in interest would require ignoring the Supreme Court's decisions in Herndon,

McDaniel, and James.

### 3.    The first Complaint brought by Richard and Rosie Gilbert did not toll the statute of limitations

    Lawsuits filed by plaintiffs who lack standing are a legal nullity. Herndon, 266 Va at

476. Given that their earlier action was a nullity, it cannot toll the applicable statute of

limitations as it applies to the present action. A lawsuit filed by a wrong party will not toll the

applicable statute of limitations for the correct party. Harbour Gate Homeowners Association,

Inc v. Berg, 232 Va. 98, 107, 348 S.E.2d 258 (1986). In Harbour Gate, a condominium

owner's association filed an initial lawsuit on behalf of its members. Later, the association

filed a second suit, adding individual unit owners as named plaintiffs. Id. at 101. The trial

court dismissed the owners' lawsuit as time-barred under the applicable statute of limitations.

The Supreme Court affirmed, holding that because the unit owner's association did not have

CONFIDENTIAL

CIC 000348

standing under the law to file the initial lawsuit: "the original motion for judgment did nothing to toll the running of the statute of limitations." Id. at 107. Similarly in this case, parents Richard and Rosie Gilbert did not have standing to file the earlier lawsuit on behalf of Ms. Gilbert. Therefore, the earlier action did not toll the statute of limitations for plaintiff Sarah Gilbert in this action. See Id. Moreover, as discussed previously the exception to this principal law that the statute of limitation will be tolled if "the plaintiffs in the two actions are substantially the same parties" is not applicable in this case. McDaniel, 198 Va. at 619. To be the substantially the same parties, the named plaintiff in the first lawsuit has to be "a real party in interest." Id. at 619. That simply was not the case here.

Plaintiff argues that Sarah Gilbert's case was not a legal nullity because her parents had standing. The basis for this contention is that the Court permitted the Gilberts' claim for economic damages to proceed. However, Plaintiffs are not drawing correct and precise distinctions between each of the cases that were brought forth. As stated above this Court dismissed with prejudice the Gilberts' claim for non-economic damages contending that this claim was derivative of Miss Gilbert's claims, and could not be brought. However, any claim for medical expenses, loss of property and/or loss of services is a derivative claim belonging to the parents of the minor, and so the Court gave them leave to amend since their claim for economic damages was not pled properly. Just because this Court allowed the Gilberts to proceed with their claim for economic damages does not change the long-standing precedent that parents of a minor do not have standing to bring the minor's cause of action. The Gilberts, who brought forth their claim for economic damages before the applicable statute of limitations had expired, are the "real parties in interest" because this claim belongs to them. On the contrary, the Gilberts did not have the right of action (standing) to bring Sarah Gilbert's case. Simply put, the

Gilberts did not possess a legal right under the substantive law to a file a cause of action of their daughter. Consequently, as the Plaintiffs point out, lack of standing causes a party's legal proceeding to be of no legal effect. Harmon v. Sadjadi, 273 Va. 184,193, 639 S.E.2d 294 (2007). Lack of standing does not amount to a mere technicality but is a substantive legal question that has already been decided by this Court and the Supreme Court of Virginia.

### 4. Virginia Code Section § 8.01-243.1 is applicable in this case

The Virginia legislature has carved an exception for medical malpractice claims with respect to minors. Virginia Code § 8.01-243.1 provides the applicable statute of limitations, stating:

> Notwithstanding the provisions of § 8.01-229 A and except as provided in subsection C of § 8.01-243, any cause of action accruing on or after July 1, 1987, on behalf of a person who was a minor at the time the cause of action accrued for personal injury or death against a health care provider pursuant to Chapter 21.1 (§ 8.01-581.1 et seq.) shall be commenced within two years of the date of the last act or omission giving rise to the cause of action except that if the minor was less than eight years of age at the time of the occurrence of the malpractice, he shall have until his tenth birthday to commence an action. Any minor who is ten years of age or older on or before July 1, 1987, shall have no less than two years from that date within which to commence such an action.

Virginia Code § 8.01-243.1. This language carves out a specific statute of limitations for medial malpractice claims regarding minors regardless of tolling provisions found otherwise in the Virginia Code. Further, "courts are bound by the plain meaning of statutory language." Hicks v. Mellis, 275 Va. 213, 218 657 S.E.2d 142, 145 (2008). If the "language of a statute is unambiguous, courts may not interpret the language in a way that effectively holds that the General Assembly did not mean what it actually expressed." Id.

It is undisputed that Miss Gilbert was thirteen at the time of the alleged negligence. Further, the Plaintiff does not dispute that the surgery giving rise to these causes of action occurred on July 28, 2004. Sarah Gilbert's cause of action was not filed on October 25, 2006 in

CIC 000350

the action in <u>Case. No 6787</u>.  Thus, the action was barred by the statute of limitations, which ran on July 28, 2006.

Plaintiff cites the Eleventh Circuit, stating "tolling may be appropriate when a plaintiff files a technically defective pleading and in all other respects acts with "the proper diligence . . . which . . . statutes of limitations were intended to insure." <u>Booth v. Carnical Corporation</u>, 522 F.3rd 1148, 1150 (2008). However, the Eleventh Circuit is not binding in the Commonwealth of Virginia and is not consistent with Virginia law that does not allow tolling of a minor's medical malpractice claim, except in limited circumstances, none of which apply in this case.

Establishing a statute of limitations, like any other statute, is a legislative function, which cannot be undertaken by the courts.  <u>Fairbanks, Morse & Co. v. Cape Charles</u>, 144 Va. 56, 63, 131 S.E. 437, 439 (1926).  Moreover, strong public policy justifications favor a strict application of statutes of limitations.

> [S]tatutes of limitations serve an important and salutary purpose.  Without them, defendants could find themselves at the mercy of unscrupulous plaintiffs who hoard evidence that supports their position while waiting for their prospective opponents to discard evidence that would help make a defense. . . *Where there exists any doubt, it should be resolved in favor of the operation of the statute of limitations.*

<u>Burns v. Board of Supervisors of Stafford County</u>, 227 Va. 354, 359, 315 S.E.2d 856, 859 (1984) (emphasis added).  As the Plaintiffs point out the "legislature was free to presume that some adult responsible for the minor's welfare, usually a parent would act diligently and prudently to protect the minor's interest."  <u>See</u> <u>Willis v. Mullet</u>, 263 Va. 653, 561 S.E.2d 705 (2002).

Under the scenario advocated by the Gilberts, they would be permitted to bring a cause of action, even though the named plaintiff lacked standing.  But, the cause would survive so long as the 'real party in interest' was mentioned in the body of the pleadings or elsewhere in

<div align="center">12</div>

CONFIDENTIAL

CIC 000351

the record, despite the fact that the real party in interest may have no interest in litigation or may be unaware of the litigation. Thus, the statute of limitations would be impermissibly extended because the first suit (which is a legal nullity) would toll the statute of limitations for the real party in interest, who could later sue if he or she so desired. Defendants would be subject to a multiplicity of suits and would bear the burden of trying to determine what 'real' cause of action is raised in the pleadings and to whom it belongs. Moreover, as in this case, a whole different set of damages could become necessary to defend.

Already physicians providing care to minor children, who are over ten years of age at the time of the alleged negligence, are subject to suits long after the alleged malpractice has occurred. As each day passes, witnesses' memories and supporting documents are likely to dissipate. Here, Plaintiffs are attempting to make the Defendants subject to suit just before the close of discovery and just weeks before trial. Permitting a plaintiff to extend statutes of limitations to bring a cause of action, especially when that cause of action is discovered within the limitations period, serves no just cause.

In summary, Virginia's pleading and standing requirements serve a real and valuable purpose: they permit only the person who is entitled to redress for the legal wrong done to her to bring the claim. The style of the case puts the defendant on notice of whose claims it must defend. Those claims are only those that the named plaintiff has a right to bring. Indeed, a defendant is entitled to understand the claims and should not be required to engage in a guessing game as to the real party in interest. Permitting an action that is a nullity under Virginia law to toll the statute of limitations for the proper cause of action relieves the plaintiff of his most fundamental burden: properly and timely pleading his cause of action. This the Court cannot do.

13

CONFIDENTIAL

CIC 000352

**5.   The Gilberts' claim should remain limited to economic damages**

A minor child in a medical malpractice claim must sue in her own name by her next friend and may claim damages for personal injuries. See Virginia Code §8.01-8 (2009). Any claim for medical expenses, loss of property, and/or loss of services is a derivative claim belonging to the parents of the minor child. See Bulala, 239 Va. 218, 230 (1990).

The Plaintiff cites Modaber, M.D. v. Kelley, 232 Va. 60 (1986), to distinguish the well established principal that the parents' claims are derivative from those of their minor children and are limited to economic and loss of service claims. 232 Va. 60, 66, 348 S.E.2d 233, 237 (1986). However, Modaber is a narrow exception that applies only to unborn children. Id. at 66. As cited by the Plaintiffs, the Modaber Court held that "injury to an unborn child constitutes injury to the mother and that she may recover for such physical injury and mental suffering associated with a stillbirth." Id. The court carves out this narrow exception because an injury an unborn child remains part of the mother until birth and an injury to the unborn child is an injury to the mother until after birth. Unlike the Modaber case, Ms. Gilbert was thirteen years old on July 28, 2004, thus falling outside the purview of the "unborn child" exception within Modaber, and does not apply to the Gilberts.

Plaintiff also cites Castle v. Lester, 272 Va. 591, 636 S.E. 2d 342, 351 (2007) which allowed a mother to recover for damages for mental anguish " which [were] the reasonable and proximate consequence of the breach of duty owed them" that she suffered as a result of caring for her child. 272 Va. 591, 608-609, 636 S.E. 2d 342, 351 (2007). However, Castle is factually distinguishable from the Gilbert's case. Castle involved a mother who alleged that her physician poorly managed and monitored her labor as well as effected her son's birth. Id. at 595. The Virginia Supreme Court held that "when a fetus sustains injury and is subsequently born alive,

14

CONFIDENTIAL

CIC 000353

the mother and the impaired child each have a claim for damages resulting from the negligently caused, in utero injury." Id.  The court noted that the Mother's claim is "solely for her mental suffering arising from the birth of a defective child." Id. Thus, the exception in Castle is limited to suits by mothers based on injuries to a fetus, and not applicable in this case.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons and those stated during oral argument, the Defendants respectfully ask that Court deny the Plaintiffs' Motion for Reconsideration.

SUSAN E. ATKINS M.D. AND
CHILDREN'S ORTHOPEDIC CENTER

By: _Donna L Foster_

Counsel

Rodney K. Adams, Esquire (VA Bar No. 32656)
Donna L. Foster (VA Bar No 42220)
LeClair Ryan, A Professional Corporation
951 East Byrd St., East Tower Suite 800
Richmond, Virginia 23219
Telephone No.: (804) 783-2003
Facsimile No.: (804) 783-2294

CONFIDENTIAL

CIC 000354

## CERTIFICATE OF SERVICE

I hereby certify that on this _22_ day of April, 2009, I mailed, via facsimile and overnight mail postage prepaid, a true and correct copy of the foregoing to:

Barry J. Nace, Esquire
Paulson & Nace
1615 New Hampshire Avenue, NW
Washington, DC  20009

Kathleen G. Burke, Esq.
Law Office of Kathleen G. Burke
12011 Lee Jackson Memorial Highway
Suite 310
Fairfax, VA  22033

*Counsel for the Plaintiffs*

16

CONFIDENTIAL

CIC 000355

RECEIVED
APR 2 3 2009
BY: _____

CONFIDENTIAL

CIC 000356





CIC 000357

First Class Mail

Ms. Julie M. Lindemann
Fireman's Fund Insurance Company
33 West Monroe
Suite 1200
Chicago, IL  60603

530F090

Paulson&Nace, PLLC
ATTORNEYS AT LAW

1815 New Hampshire Avenue, NW
Washington, DC 20009-2520

CONFIDENTIAL

# EXHIBIT 9

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHICAGO INSURANCE COMPANY,<br>An Illinois corporation, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 1:12-CV-02068-ABJ |
| | : | |
| v. | : | |
| | : | |
| PAULSON & NACE, PLLC, a professional<br>limited liability company; BARRY J. NACE,<br>an individual; GABRIEL ASSAAD, an<br>individual; and SARAH E. GILBERT, an<br>individual. | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

---

## REPLY MEMORANDUM IN SUPPORT OF
## CIC'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Chicago Insurance Company ("CIC") submits the following Reply Memorandum in support of its Motion for Summary Judgment. CIC requests that the Court grant its Motion.

### INTRODUCTION AND SUMMARY OF ARGUMENT

The Nace Defendants seek to avoid summary judgment by mis-characterizing the factual basis for CIC's coverage position; mis-stating the controlling test for coverage as a subjective one dependent upon whether or not Mr. Nace subjectively believed before CIC issued its first policy that an error had been committed or a claim might be made when, in fact, the District of Columbia applies an objective test; and by asking this Court to apply case law which requires expert testimony to establish the "standard of care" in a lawsuit for legal malpractice and which could only apply if the issue before this Court were the merits of Ms. Gilbert's underlying legal malpractice claim. This, of course, is not the issue before this Court.

121591463 2306

The issue here is whether one of the requirements for coverage included in the CIC policy's insuring agreement has been satisfied.  Specifically, in order to trigger coverage under the CIC policy, the Nace Defendants must establish that no insured had a "reasonable basis to believe that the Insured had breached a professional duty <u>or</u> to Reasonably Foresee that a Claim would be made against the Insured" prior to the first policy being issued on July 24, 2007.  It is the Nace Defendants' burden to establish this requirement has been met.  <u>See</u> <u>Council for Responsible Nutrition v. Hartford Cas. Ins. Co.</u>, 2007 WL 2020093 (D.D.C. 2007).  In addition, whether or not Mr. Nace subjectively believed that an error had been committed or that a claim might be made is *irrelevant*.  The test is an objective one for the Court to determine based upon what a reasonable attorney would have known.  <u>Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP</u>, 793 F.Supp.2d 399, 411 (D.D.C. 2011).  Moreover, expert testimony is not required or even appropriate on this coverage issue, but even if it were, it is the Nace Defendants' burden, not CIC's burden, to produce such evidence to support their position.

The Nace Defendants cannot meet their burden of establishing that the policy's "no prior knowledge" requirement has been met.  The undisputed facts establish that, prior to July 24, 2007, an insured under the CIC policy had a reasonable basis to believe that a professional duty had been breached or that a claim might be brought against the insureds.  The Nace Defendants filed two separate medical malpractice lawsuits on behalf of Sarah Gilbert, both of which were dismissed.  The first lawsuit was filed four days before the statute of limitations expired and was dismissed on February 26, 2007 for failure to comply with a Virginia statute governing who must bring a lawsuit on behalf of a minor plaintiff.[1]  The Nace Defendants also concede that they filed

---

[1] The Nace Defendants disingenuously attempt to characterize this error as a "simple and common misnomer" that only involved "re-arranging names in the caption."  On the contrary, Virginia Code §8.01-8 governs who can properly assert a claim on behalf of a minor.  The statute requires that a lawsuit must be brought in the child's own

121591463 2306

a second lawsuit on October 25, 2006, *in order to remedy the mistake in the first lawsuit,* and that the second lawsuit was filed three months after the statute of limitations expired. The transcript from the hearing conducted on June 18, 2007 confirms that the trial court advised the parties during this hearing it was granting defendants' motion to dismiss the second lawsuit with prejudice based upon the Nace Defendants' failure to file this lawsuit within the statute of limitations. These events all took place before CIC issued its first policy on July 24, 2007.

An objective lawyer with knowledge of these facts would have a reasonable basis to believe a professional error had been committed or that a claim might be made. Indeed, CIC cited case law in the District of Columbia, Virginia, and other jurisdictions holding as a matter of law that a reasonable attorney would know an error had been committed or a claim might be made under similar circumstances. The Nace Defendants unsuccessfully attempt to distinguish a few of these cases on the grounds that they did not involve the same Virginia statute with which they failed to comply. The Nace Defendants do not cite any case law supporting their position. In fact, Mr. Nace testified in his deposition that when he eventually consulted with a Virginia lawyer as to whether the trial court's dismissal based on the Virginia statute would be upheld by an appellate court, this lawyer advised Mr. Nace that it would. The Nace Defendants cannot credibly argue now that no reasonable lawyer would understand that failure to comply with the Virginia statute and the resulting dismissal of lawsuits was a professional error.

In addition, whether or not Mr. Nace himself was present at the hearings when the court dismissed the lawsuits, or whether Mr. Nace personally reviewed the courts' orders of dismissal

---

name, by next friend, and not in the name of the parents. Although Mr. Nace, as a lawyer never admitted to practice in Virginia, may have believed or hoped that this was a trivial matter that could not qualify as a professional error, the Virginia legislature, who enacted the requirement, and the Virginia trial court, who dismissed the first lawsuit for failure to comply with the statute, obviously disagree.

3

121591463 2306

prior to July 24, 2007, is not controlling.[2]  The "no prior knowledge" requirement is not limited

to what the Named Insured (Barry Nace, d/b/a Paulson & Nace) knew, but also applies if *any*

insured or employee of the Named Insured had knowledge.  It is undisputed that Gabriel Assaad

was present at the June 18, 2007 hearing during which the second lawsuit was dismissed and that

he was an employee of the Paulson & Nace firm at that time.  It is true that the trial court did not

issue its written order confirming what it verbally ordered at the hearing until August 3, 2007.

However, this does not erase the undisputed fact that Mr. Assaad was aware on June 18, 2007,

before the policy was issued, that in addition to the first lawsuit being dismissed for failure to

comply with the Virginia statute, the second lawsuit, which was filed to correct the error, also

had been dismissed because it was filed after the statute of limitations expired.

The Nace Defendants erroneously argue that CIC's position of no coverage hinges upon

the first lawsuit having been dismissed with prejudice and, since it was dismissed without

prejudice, CIC is not entitled to summary judgment.  This argument is a red herring.  An accurate

reading of CIC's Motion and Statement of Facts confirms that CIC's coverage position is based

upon the entire series of events that took place prior to CIC's first policy being issued, including

the filing of the second lawsuit to correct the error in the first lawsuit and the dismissal of the

second lawsuit because it was filed after the statute of limitations expired.  Whether or not the

first lawsuit was dismissed with prejudice as opposed to without prejudice is inapposite.

Moreover, CIC's characterization of the February 26, 2007 order as dismissing the first

lawsuit with prejudice is consistent with the Nace Defendants' own representations to the

Virginia appellate court.  In their Petition for Appeal in the underlying lawsuits, the Nace

Defendants represented that on January 4, 2007 the Virginia trial court "granted the [defendants]

---

[2] Mr. Nace claimed in his deposition that he underwent surgery during this general time period and therefore did not
recall whether he was aware of the trial court's ruling June 18, 2007 ruling at oral argument prior to July 24, 2007.

121591463 2306

Motion to Dismiss Sarah Gilbert's claim *with prejudice* and Richard and Rosie Lee Gilbert's claims without prejudice and with leave to amend." (DSOF, Exhibit 9 at CIC000238) (Emphasis added). This statement, coupled with the fact that the copy of the Order of Dismissal includes "with prejudice" language that is apparently stricken but does not include any initials next to the handwritten change certainly creates some question as to whether the first dismissal was with or without prejudice. The Nace Defendants' heavy focus on this issue only serves to highlight the weakness of their overall position.

Finally, the Nace Defendants seek to avoid summary judgment by arguing that CIC has waived or is estopped from asserting its coverage defense. The Nace Defendants essentially repeat verbatim the arguments they made in their own Motion for Summary Judgment (Doc. 14-1). CIC has fully refuted these arguments in its Response in Opposition to Defendants' Motion for Summary Judgment and Statement of Facts (Doc. 23) and, therefore, refers to and incorporates by reference these documents. The Nace Defendants' waiver and estoppel arguments fail as a matter of law.

CIC respectfully requests that this Court enter summary judgment in its favor and rule that CIC has no obligation to defend or indemnify the Nace Defendants in the underlying legal malpractice lawsuit filed by Ms. Gilbert. CIC also requests that the Court deny the Nace Defendants' motion for summary judgment in its entirety.

## LEGAL ARGUMENT

**I.      The law of the District of Columbia applies to this coverage action**.

The Nace Defendants urge this Court to apply the substantive law of Virginia to resolve coverage based upon Virginia's alleged "governmental interest" in seeing that Virginia statute § 38.2-2226 applies. This argument fails for several reasons, one of which is that this statute is relevant only to the Nace Defendants' affirmative defenses of waiver and estoppel. The Virginia

121591463 2306

statute says nothing as to how the terms and provisions of an insurance policy should be interpreted.  In addition, Virginia statute § 38.2-2226 is a procedural statute to be applied only by Virginia courts.  See Federal Ins. Co. v. Nationwide Mut. Ins. Co., 448 F. Supp. 723, 725-26 (W.D. Va. 1978) (holding that the statute is "clearly procedural and the court so holds.")   On Page 9 of their Response, the Nace Defendants concede, as they must, that the Virginia Statute 38.2-2226 is "procedural" but then go on to wrongly state that the term "procedural" means that it applies to insurance coverage disputes involving tort cases pending in Virginia.   In other words, the Nace Defendants interpret the term "procedural" to mean any coverage case in which a claimant resides in Virginia, regardless of where the coverage case is filed.  Conspicuously absent is any legal authority supporting this statement.  Federal Ins. Co. certainly does not stand for this proposition.  This Court, exercising diversity jurisdiction in this coverage lawsuit, cannot apply or enforce the procedural law of Virginia, regardless of whether Ms. Gilbert's underlying malpractice claim is pending in Virginia.  More saliently, any interest that Virginia might have in applying its own procedural law in cases pending in Virginia is not relevant in determining which substantive law applies to resolve coverage here.

In arguing that Virginia substantive law should apply, the Nace Defendants incorrectly apply a modified "governmental interests" analysis.  (Response, pp. 7-9).  However, this test applies only when the issue to be resolved is the merits of a tort claim – not whether insurance coverage exists for an insured against whom the tort is alleged.  Neither of the two cases cited by the Nace Defendants on p. 8 of their Response involved insurance coverage issues and neither supports application of Virginia law to the coverage issues before this Court.  See Washkoviak v. Student Loan Mktng. Ass'n, 900 A.2d 168, 180-82 (D.C. 2006) (applying "governmental interests" test but still determining that D.C. law applied to fraud claims brought by Wisconsin

6

borrowers against lenders even though Wisconsin was where the borrowers were injured and Wisconsin had "powerful interest in protecting its residents," noting that the "place of injury is less significant in the case of fraudulent misrepresentation than in the case of personal injuries and injuries to tangible things"); District of Columbia v. Coleman, 667 A.2d 811, 816 (D.C. 1995) (applying governmental interest test to determine which state's law applied to excessive force tort claim against a police officer).[3]

Simply put, although the place where a tort occurred (here, the Nace Defendants' alleged malpractice) may be significant in determining which state's law applies to resolve the merits of that tort claim, this is not the analysis applied by D.C. courts in determining whether or not insurance coverage exists for that tort.  Rather, "in cases of insurance, a court will look at the following factors to determine which law will apply: 1) the residence of the insured, 2) the place where the application was completed, 3) the places where the policy was negotiated, consummated, and delivered, and 4) the situs of the insured risk."  Eli Lilly and Co. v. Home Ins. Co., 653 F.Supp. 1, 7 (D.D.C. 1984) (applying these factors as part of the "more substantial interest" test).

For example, in Potomac Elec. Power Co. v. California Union Ins. Co., 777 F.Supp. 968, 972-74 (D.D.C. 1991), the court applied the "more substantial interest" test to determine which state's law applied to resolve coverage in an action filed by an insured against its insurer seeking coverage for payments the insured made to resolve environmental damage claims against it.  The insured, a large electric utility company primarily serving D.C. and Maryland, argued that D.C.

---

[3] The Nace Defendants also cite to Federal Ins. Co. v. Nationwide Mut. Ins. Co., 448 F.Supp. 723 (W.D. Va. 1978) for the proposition that "[w]ith regard to liability policies, the rights of the injured party as against the insurer are governed by the place where the underlying tort occurred."  (Response, p. 10).  The Nace Defendants fail to point out that Federal Ins. Co. applied the choice of law principles adopted by Virginia, not the District of Columbia.  This is not the rule in the District of Columbia.

121591463 2306

law should apply because D.C. was its headquarters and principal place of business.  The insurer argued that Maryland law should apply because that is where the pollution damage occurred giving rise to the claims against the insured and because Maryland was the largest source of revenue of the three jurisdictions in which the insured operated.

The D.C. court held that the fact that the damage occurred in Maryland did not weigh in favor of Maryland law applying because it was equally possible that environmental damage could have occurred in the other states where the insured operated.  777 F. Supp. at 972.  The court also refused to apply the rule that the place where damage occurred should control the issue of insurance coverage.  Rather, the court held that "the most reasonable course" in an insurance coverage dispute was to choose the insured's headquarters "as the location with the most substantial interest in the controversy."  Id. at 973.  The court noted that this was particularly true where the headquarters is also the center of the insured's operations.  Id.  According to the court, "[a]nother reason for choosing the headquarters of the insured as the source of law is that this is the location which appears to be most likely contemplated by the parties":

> [C]ommon sense suggests that, knowing of the potential for claims in any number of states … the parties would consider the insured's principal headquarters as the one jurisdiction which ties all potential parties together.  [citation omitted]

> This view is consistent with that of the Restatement (Second) of Conflict of Laws which states that for a liability insurance contract the local law of state which the parties understood to be the principal location of the insured risk during the term of the policy [will be the source of law for the policy] unless with respect to the particulate issue, some other state has a more significant relationship.

Id.

More recently, the D.C. Court of Appeals applied similar factors to hold that the law of the state where the insured was headquartered applied to determine whether the insurer was obligated to indemnify the insured in a series of ongoing lawsuits against the insured, one of

8

which was filed in D.C.[4]  See Adolph Coors Co. v. Truck Ins. Exch., 960 A.2d 617, 621 (D.C.

Ct. App. 2008) (holding that Colorado had the most significant interest in the issue of coverage

because the policy was negotiated there and the insured's principal place of business and

headquarters was there).

Here, the only potential interest Virginia has in this insurance coverage dispute is that the

claimant is a resident of Virginia who filed her legal malpractice lawsuit against the Nace

Defendants in Virginia.  The District of Columbia, on the other hand, is the insureds' principal

place of business and where Barry Nace and Paulson & Nace are headquartered.  The CIC policy

was delivered to the insureds in the District of Columbia.  D.C. also is the principal location of

the insured risk.  Barry Nace is not even licensed to practice law in Virginia.  The principal

location of the insured risk for a firm of lawyers primarily practicing in the District of Columbia

is the District of Columbia.  The fact that the underlying act of malpractice giving rise to this

particular coverage litigation may have been committed in Virginia does not alter the fact that

the principal place of the risk insured under the CIC policy was the District of Columbia.

Accordingly, to the extent there is any conflict between the law of Virginia and the District of

Columbia, District of Columbia law should apply.

As demonstrated in CIC's opening Motion, until recently, the Nace Defendants adamantly

maintained that D.C. law – and not Virginia law – should be applied to determine coverage.  For

example, when CIC filed its original coverage action in Virginia to ensure personal jurisdiction

over Ms. Gilbert (the claimant), the Attorney Defendants immediately moved to dismiss on the

grounds that Virginia did not have personal jurisdiction over them.  One of the Nace Defendants'

---

[4] The court considered (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; (5) the residence and place of business of the parties; and (6) the principal location of the insured risk.  Adolph Coors, 960 A.2d at 620.

9

primary arguments in support of their motion was that D.C. law would apply to determine coverage under the CIC policy.  The Nace Defendants argued that the Virginia court had no jurisdiction over the "Washington D.C. Policy" at issue in this coverage dispute because the policy was negotiated and delivered in Washington, D.C. and "is subject to Washington, D.C. law interpretation."  (PSOF, ¶ 35).  According to the Nace Defendants, "the issue in this case implicates Washington, D.C.'s significant interest in determining and applying its own insurance contract interpretation law."  (Id.)  The record is replete with the Nace Defendants' arguments to the Virginia court that D.C. law applies.  (See CIC's Motion (Doc. 18), pp. 14-15).

Not surprisingly, the Nace Defendants completely ignore their prior representations in their Response.  However, having succeeded in avoiding having to litigate coverage in a Virginia court in large part by arguing that D.C. law should apply to this coverage action, neither the Nace Defendants nor Ms. Gilbert should be allowed to take the exact opposite position in this Court and argue that Virginia law applies.  On the contrary, consistent with the choice of law factors utilized by D.C. courts, it is the District of Columbia that has the most significant interest in determining whether coverage exists under a policy where the principal location of the insured risk was the District of Columbia.  D.C. law applies here.

## II.     There is no coverage for Ms. Gilbert's lawsuit because the "no prior knowledge" requirement for coverage has not been met.

CIC set forth case law in its opening Motion establishing that it is the Nace Defendants' burden as insureds under the CIC policy to establish that all of the requirements for coverage in the CIC policy's insuring agreement have been satisfied.  (Motion, pp. 16-17).  The Nace Defendants do not respond to this argument, let alone dispute it, and therefore concede this point.  Nonetheless, the Nace Defendants claim that they somehow have satisfied this burden because Mr. Nace never believed prior to inception of the CIC policy that he or his firm had committed a

121591463 2306

professional error or that a claim might be asserted against them by Ms. Gilbert.  See, e.g., Response at p. 15 where the Nace Defendants cite to Mr. Nace's self-serving deposition testimony that he never believed, and still does not believe, that the failure to comply with Virginia statute 38.2-2226 was a professional error.

This argument reflects a fundamental misunderstanding of the law.  Whether or not an insured subjectively believed or understood that an error had been committed or that a claim might be brought is irrelevant.  The correct test is "the objective, reasonable attorney one, not whether the lawyer in fact had a subjective belief that a malpractice action was probable." Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP, 739 F.Supp.2d 399, 411 (D.D.C. 2011) (applying D.C. law) ("the dismissal of a lawsuit because of attorney error would clearly put a lawyer on notice of the possibility of a malpractice claim) (citing Ross v. Continental Cas. Co., 420 B.R. 43, 55 (D.D.C. 2009) ("whether the [insured] could have reasonably foreseen a malpractice claim is an objective test that can be determined as a matter of law.").

Moreover, simply because an attorney subjectively believes that he will be able to "fix" an error (like the dismissal of a lawsuit) by filing motions for reconsideration or appeals does not satisfy the "no prior knowledge" requirement in a claims-made policy.  See Mt. Airy Ins. Co. v. Thomas, 954 F. Supp. 1073, 1080 (W.D. Pa. 1997) (an insured's subjective impressions and beliefs regarding whether a claim would be brought by a particular client are irrelevant); Wittner, Poger, Rosenblum & Spewak, P.C. v. Bar Plan Mut. Ins. Co., 969 S.W.2d 749, 754 (Mo. 1998) (insured's subjective belief that default judgment eventually would be vacated and client would not file a claim did not preclude finding that insured had a reasonable basis to believe he had committed an error); Lewis v. St. Paul Fire and Marine Ins. Co., 452 N.W.2d 386, 389 (Iowa 1990) (rejecting argument that attorney could not reasonably believe a claim might be pursued

11

121591463 2306

against him based upon dismissal of client's workers compensation claim until commissioner rendered final ruling that claim could not be reinstated); General Ins. Co. of America v. Boyd, 2002 U.S. Dist. LEXIS 13276 at *19-20 (S.D. Ind. 2002) (insured's good faith subjective belief that default judgment against his client was in error and would be reversed on appeal did not preclude finding that a malpractice claim was reasonably foreseeable); Ross v. Continental Cas. Co., 420 B.R. 43, 55 (D.D.C. 2009) (no malpractice coverage available to an attorney for a suit stemming from the attorney's failure to file an answer which resulted in a default being entered; the court stated, "[i]n establishing prior knowledge, there is no requirement that the client complain ahead of time or indicate that it will file a claim against the insured").

CIC cited numerous cases in its Motion supporting its position that, prior to inception of the CIC policy on July 24, 2007, at least one employee/insured under the CIC policy was aware of facts that would have caused an objective attorney to know that a professional error had been committed or that a claim might be made against them.  See, e.g., Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP, 793 F.Supp.2d 399 (D.C. 2011) (dismissal of a lawsuit for failure to file within class certification deadline even though an appeal was still possible); Ross v. Continental Cas. Co., 420 B.R. 43 43 (D.D.C. 2009) (untimely answer and entry of default judgment against client); Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co., 712 F.3d 336 (7th Cir. 2013) (inadvertent misfiling of an executed sales contract resulting in an unenforceable purchase contract); and cases cited on pp. 20-24 of CIC's Motion (Doc. 18).

The critical facts in each of these cases is that as a result of the attorney's conduct, whether it was the failure to file a pleading in a timely manner or the failure to properly record an executed sales contract, the client's claim or legal rights were either dismissed or otherwise negatively impacted.  The Nace Defendants argue that these cases do not apply here because

none involved the failure to comply with a statute requiring that a minor's claim be filed in the appropriate name like Virginia Code 8.01-8 and because the first lawsuit they filed was filed within the statute of limitations.  This argument is based upon an incomplete recitation of the facts and an overly narrow reading of the case law.

It is true that the Nace Defendants filed the first medical malpractice lawsuit four days before the statute of limitations expired.  However, the analysis does not end there.  The first lawsuit also failed to comply with Virginia law requiring that a minor's claim be brought in the minor's name by her "next friends" and was therefore dismissed as defective.  It also is true that if the Nace Defendants had not waited until four days before the statute of limitations had expired, they may have been able to re-file the complaint in order to correct this defect within the statute of limitations and Ms. Gilbert's claim would not have been dismissed.  But because of the delay in filing the first lawsuit, the corrected lawsuit was not filed until many months after the statute of limitations expired and also was dismissed.  It is this entire series of events, which culminated in both of Ms. Gilbert's lawsuits being dismissed before CIC issued its policy, that would have caused an objective attorney to understand that a professional error had been committed and that a claim might be asserted.[5]

Unable to effectively distinguish these cases, the Nace Defendants next argue that CIC's Motion must fail because CIC has not presented testimony from an expert witness that a reasonable attorney would have known prior to July 24, 2007 that an error had been committed or a claim might be made.  On the contrary, courts routinely determine as a matter of law – without relying on expert testimony – whether or not an insured had a reasonable basis to believe

---

[5]The fact that the trial court did not issue its written order of dismissal until August of 2007 (shortly after the CIC policy was issued) does not alter this result.  It is undisputed that Mr. Assaad was present at the hearing on pending motions to dismiss on June 18, 2007 and that the trial court advised the parties at that time that he was granting the motions and dismissing the lawsuits.  (Doc. 18-7 (Exhibit G to PSOF)).

121591463 2306

that it had breached a professional duty or to reasonably foresee that a claim might be made against it based upon the undisputed facts.  See, e.g., Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP, 793 F. Supp. 2d 399 (D.D.C. 2011) (holding as a matter of law that the insured failed to establish that the "no prior knowledge" requirement had been satisfied without reference to the need for expert testimony); Ross v. Continental Cas. Co., 420 B.R. 43 (D.D.C. 2009) (holding as a matter of law that an insured had reason to know a claim might be asserted against him with no expert testimony required on issue); Bryan Bros. Inc. v. Continental Cas. Co., 660 F.3d 827, 830-31 (4th Cir. 2011) (applying Virginia law) (holding as a matter of law that an insured had a reasonable basis to believe his conduct could result in a claim with no expert testimony required on issue); Worth v. Tamarack American, a Div. of Great American Ins. Co., 47 F.Supp.2d 1087, 1095 (S.D. Ind. 1999), aff'd 2000 WL 101227 (7th Cir. Jan. 26, 2000) (holding as a matter of law that insured had a reasonable basis to believe a professional duty had been breached with no expert testimony required on issued; Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co., 712 F.3 336 (7th Cir. 2013) (holding as a matter of law that insured had knowledge that a claim might be asserted against it with no expert testimony required on issued); Home Ins. Co. v. Powell, 1997 WL 370109, *5 (E.D. Pa. 1997) (holding as a matter of law that an attorney who failed to "follow local rules of court procedure" had a reasonable basis to believe he had breached a professional duty with no expert testimony required); Darwin Nat. Assur. Co. v. Hellyer, 2011 U.S. Dist. LEXIS 60592 at *11-12 (N.D. Ill. 2011) (holding as a matter of law that based upon an "objective, reasonable person standard" a reasonable attorney would have understood that a claim might be made with no expert testimony required).

Moreover, Federal Rule of Evidence 702 provides that expert testimony is only admissible to help the trier of fact "understand the evidence or to determine a fact issue."  See

U.S. ex rel. Mossey v. Pal-Tech, Inc., 231 F.Supp.2d 94, 98 (D.D.C. 2002).  "It is established, however, that expert testimony consisting of *legal conclusions* will not be permitted because such testimony merely states what result should be reached, thereby improperly influencing the decisions of the trier of fact and impinging upon the responsibilities of the court."  Id. (Emphasis added).  Whether or not a reasonable attorney had a basis to know that a professional error had been committed is a legal question for the Court to decide.  See Westport Ins. Corp. v. Lilley, 292 F.Supp.2d 165, 169-170 (D. Me. 2003) (granting motion to strike insured's "expert testimony from the summary judgment record on the ground that it is offered on a question of law and is immaterial" as to whether or not the insured could have reasonably foreseen that a claim might be made).

The Nace Defendants do not cite to a single case in the District of Columbia (or Virginia for that matter) holding that expert testimony is required in this coverage action.  Instead, the Nace Defendants misleadingly cite to two cases holding that a plaintiff who asserts a legal malpractice claim against an attorney is required to support this claim with expert testimony that the attorney deviated from the standard of care.  (See pp. 13-14 of Response).  None of these cases involved the separate and distinct issue as to whether coverage exists for a malpractice claim, let alone whether the "no prior knowledge" requirement for coverage has been satisfied.[6]

---

[6] The Nace Defendants' citation to Foster v. Westchester Fire Ins. Co., 2012 WL 2402895 (W.D. Pa. 2012) misses the mark.  The 2012 opinion simply denied the insurer's motion for reconsideration of the 2011 opinion, wherein the court denied cross-motions for summary judgment filed by the insurer and insured in a coverage action involving a "no prior knowledge" provision.  See Foster v. Westchester Fire Ins. Co., 2011 WL 438297 (W.D. Pa. 2011). Contrary to the Nace Defendants' mis-characterization of these cases, the court denied summary judgment because there were "questions of fact with respect to what plaintiff [insured] subjectively knew" concerning the status of the case the insured was pursuing on behalf of his client prior to inception of the policy and communications between the insured and his client concerning a potential claim.  Id. at *11.  The court went on to state that it could not address the next issue, i.e. whether an objective attorney would have known a claim might be pursued, until it was determined what facts were known by the insured.  Id. at * 12.  Although the court indicated that "little authority" was provided by the parties as to what a reasonable attorney would have believed, nowhere does the court suggest that this "authority" must be expert testimony as opposed to, for example, case law analyzing similar circumstances.

121591463 2306

Even if it were necessary or appropriate to present expert testimony, which it is not, it is the Nace Defendants' burden to do so, and not CIC's burden.  It is well-established that the insured – and not the insurer – bears the burden of establishing that a claim falls within the policy's insuring agreement.   See Evans v. Medical Inter-Ins. Exchange, 856 A.2d 609, 613 (D.C. 2004); Young Women's Christian Ass'n of Nat. Capital Area, Inc. v. All State Ins. Co. of Canada, 158 F.R.D. 6, 8 (D.D.C. 1994); Council For Responsible Nutrition v. Hartford Cas. Ins. Co., 2007 WL 2020093 at *4 (D.D.C. 2007) ("insured bears the burden of showing that the underlying complaint comes within the policy's grant of coverage").

Here, the Nace Defendants bear the burden of establishing satisfaction of the "no prior knowledge" requirement for coverage in the CIC policy.  The Nace Defendants have not done so, stating only that it is *Mr. Nace's subjective opinion* that the failure to comply with the Virginia statute in filing the first medical malpractice lawsuit and then filing the second lawsuit after the statute of limitations expired did not qualify as professional errors.  Mr. Nace, as a party to this lawsuit, certainly does not qualify as an independent expert witness, nor has he ever been identified by the Nace Defendants in their disclosures as an expert witness.  Indeed, Mr. Nace acknowledged in his deposition that because he was not admitted to practice in Virginia and no expert on Virginia law, he eventually consulted with a Virginia lawyer (whom Mr. Nace considered an expert on Virginia law) about whether the trial court's dismissal of the first lawsuit would be upheld on appeal.  This Virginia lawyer advised Mr. Nace that he thought the appeal would be unsuccessful.  (Doc. 24, Exhibit 2, pp. 57-58).  Mr. Nace's own testimony, therefore,

---

Even if the opinion could be interpreted this way it is plainly dicta and, more saliently, directly contrary to the D.C. court's holding in Capitol and the plethora of cases cited by CIC.

121591463 2306

supports the conclusion that an objective, reasonable attorney would have understood a professional error had been committed prior to inception of the CIC policy.[7]

In summary, applying an objective standard as this Court must do, the undisputed facts establish as a matter of law that a reasonable attorney would have understood that a professional error had been committed when the two separate lawsuits it filed were dismissed for, one, failure to comply with the controlling Virginia statutes, and, two, failure to comply with the statute of limitations.  There is, therefore, no coverage under the CIC policy for the lawsuit filed against the defendants by Ms. Gilbert.

CIC notes that the Nace Defendants focus solely on what Mr. Nace knew or did not know prior to inception of the policy.  It is important to clarify that it is not necessary that Mr. Nace, as the Named Insured under the policy, had personal knowledge of facts that would have placed an objective attorney on notice of an error or potential claim.  It is sufficient that *any insured* or *any employee* of the Paulson & Nace firm had knowledge of such facts.  The unambiguous language of the insuring agreement requires that, prior to the effective date of the first policy issued to the Named Insured, "the **Named Insured**, any partner, shareholder, employee or where appropriate the **Named Insured**'s management committee or any member thereof, had no reasonable basis to believe that the **Insured** had breached a professional duty or to **Reasonably Foresee** that a **Claim** would be made against the **Insured**."  The use of the disjunctive "or" in the provision evidences alternatives that should be considered separately.  See Parrish v. District of Columbia,

---

[7] The Nace Defendants cite to four Virginia cases allegedly supporting the notion that "there are many instances where a misnomer in the naming of a minor plaintiff goes unnoticed and unchallenged."  (Response, p. 19).  However, there was no issue in those cases as to whether the plaintiff's lawsuit should be dismissed for failure to comply with Virginia Code § 8.01-8.  It appears that, for whatever reason, the defendants in those cases did not raise this issue as a defense.  This certainly does not mean that failure to comply with the statute is not a professional error -- whether or not an error has been committed is not determined by whether or not it is commonly made or the opposing side catches the error.  Maude Kirby v. Junious Gilliam, 28 S.E.2d 40 (1943), also cited by the Nace Defendants, actually supports CIC's position because the Supreme Court of Appeals there actually *affirmed* the dismissal of a case to annul a minor's marriage because it was not brought in the proper name.

121591463 2306

718 A.2d 133, 135-36 (D.C. 1998) (the word "or" "is normally disjunctive and establishes a relationship of contrast" and when used to join alternatives, "indicates that they are mutually exclusive"); TravCo Ins. Co. v. Ward, 284 Va. 547, 504-505, 736 S.E.2d 321, 326 (Va. 2012) (the disjunctive "or" "may not be omitted or replaced with the conjunctive without doing violence to the plain language of the policy.").

Similarly, the use of the word "any" to describe "partner, shareholder, employee or where appropriate the Named Insured's management committee" unambiguously applies to mean "one or some."  See Skokie Castings, Inc. v. Illinois Ins. Guar. Fund, 964 N.E.2d 1225, 1229, 358 Ill.Dec. 203, 207 (Ill. Ct. App. 2012) ("The common dictionary definition of 'any' encompasses 'one or some indiscriminately of whatever kind." (quoting Merriam–Webster's Collegiate Dictionary 53 (10th ed. 1998)); FCCI Ins. Group v. Rodgers Metal Craft, Inc., 2008 WL 2951992 at *6 (M.D. Ga. 2008) (the "ordinary and customary" meaning of the word "any" is "[o]ne or some indiscriminately of whatever kind").

Accordingly, to the extent Mr. Nace suggests in his Response that he was not personally aware of the orders of dismissal or the trial court's ruling of dismissal of the second lawsuit from the bench on June 18, 2007 because he was not at this hearing, these facts do not preclude summary judgment in favor of CIC.  It is undisputed that Mr. Nace's associate, Gabriel Assaad, who was undeniably an employee and insured, had subjective knowledge of these facts prior to inception of the CIC policy.  Moreover, as the case law cited by CIC establishes, a reasonable attorney with knowledge of the facts surrounding the filing and dismissal of the two medical malpractice lawsuits would have known that an error had been committed or that a claim might be made.  Accordingly, the Nace Defendants cannot establish that the policy's "no prior knowledge" requirement has been satisfied and CIC is entitled to summary judgment.

121591463 2306

### III.   Neither Virginia Statute § 38.2-2226 nor common law principles of waiver or estoppel preclude CIC from asserting the "no prior knowledge" coverage defense.

The Nace Defendants next seek to create coverage where none exists under the terms of the CIC policy by asking this Court to apply a Virginia procedural statute, Va. Code Ann. § 38.2-2226.  This statute requires that an insurer must provide notice to a claimant of a reservation of rights asserting a breach of the policy by the insured within 45 days after discovery of the breach or of a claim being asserted, whichever is later.  CIC does not dispute that it did not send copies to Ms. Gilbert of the reservation of rights letters it issued to the Attorney Defendants.  However, the Virginia statute does not apply here has a matter of law for several reasons, one of which is that the statute has been declared "procedural" in nature by Virginia courts.  See Federal Ins. Co. v. Nationwide Mut. Ins. Co., 448 F. Supp. 723, 725-26 (W.D. Va. 1978) (holding that the statute is "clearly procedural and the court so holds.")[8]

On Page 9 of their Response, the Nace Defendants concede, as they must, that the Virginia Statute 38.2-2226 is procedural but then go on to wrongly state that the term "procedural" means that it applies to insurance coverage disputes involving tort cases pending in Virginia.   In other words, the Nace Defendants interpret the term "procedural" to mean any coverage case in which a claimant resides in Virginia, regardless of where the coverage case is filed.  Conspicuously absent is any legal authority supporting this statement.  Federal Ins. Co. certainly does not stand for this proposition.  This Court, exercising diversity jurisdiction in this coverage lawsuit, cannot apply or enforce the procedural law of Virginia, regardless of whether Ms. Gilbert's underlying malpractice claim is pending in Virginia.

---

[8] The Nace Defendants' arguments in this regard essentially repeat the facts and arguments set forth in their own Motion for Summary Judgment (Doc. 14-1).  Accordingly, CIC refers to and incorporates by reference herein the Memorandum in Support of CIC's Opposition to the Nace Defendants' Motion for Summary Judgment and CIC's Response in Opposition to the Nace Defendants' Statement of Material Facts (Doc. 23).

121591463 2306

However, even if the Virginia statute were a substantive law, it still does not apply because, as previously established, it is the substantive law of the District of Columbia, and not Virginia, that applies to this declaratory judgment action.  In addition, the Virginia statute by its own terms only applies to coverage defenses based upon an insured's *breach* of a policy condition.  CIC does not allege that the insureds breached any condition or provision of the policy.  Although the "no prior knowledge" requirement for coverage in the insuring agreement could be characterized as a "condition precedent" for coverage, it is not a condition that is capable of being breached by the action or inaction of an insured.  Examples of conditions that can be breached are conditions requiring an insured *to provide* prompt notice of a claim, *to cooperate* in an insurer's investigation of a claim, and *to appear* for an examination under oath or deposition. (See case law and analysis on pp. 24-31 of CIC's Response (Doc. 23)).  In contrast, whether the "no prior knowledge" requirement has been met depends upon whether the facts that existed at the time the policy was issued establish that an insured had a reasonable basis to believe that a professional duty had been breached or that a claim might be made.  There is nothing the Nace Defendants could have performed in order to satisfy this requirement.  The facts known at the time the policy incepted either would cause a reasonable attorney to know that an error had been committed, or they would not.

The Virginia statute also does not apply to bar CIC from asserting its coverage defense unless the claimant (Ms. Gilbert) has been prejudiced by the failure to receive a copy of CIC's reservation of rights letters within 45 days of her filing a claim against the Nace Defendants.  See Maxey v. Doe, 217 Va. 22, 225 S.E.2d 359, 361 (Va. 1976); Vermont Mut. Ins. Co. v. Everette, 875 F.Supp. 1181 (E.D. Va. 1995); and analysis set forth on pp. 31-33 of CIC's Response (Doc. 23)). Ms. Gilbert's attorney submitted an Affidavit (Doc. 21-2) in support of Ms. Gilbert's

121591463 2306

Response/Joinder in the Nace Defendants' Motion.  Conspicuously absent from this Affidavit is any allegation or evidence that Ms. Gilbert has suffered any prejudice as the result of not receiving notice of CIC's coverage defenses until September of 2012, when CIC filed and served its declaratory judgment complaint.  There has been no prejudice.[9]  The purpose of the Virginia statute is to provide a claimant ample notice of a coverage defense so that the claimant can determine if she wishes to pursue a claim against the insured.  Ms. Gilbert concedes she had notice of CIC's coverage defense no later than September 25, 2012, which was more than one year before her legal malpractice lawsuit against the Nace Defendants was tried in the Virginia court.  Despite this knowledge, Ms. Gilbert did not move to stay her legal malpractice lawsuit pending resolution of coverage, rather, she continued to litigate her lawsuit for a full year and then proceeded to trial.  Ms. Gilbert made an informed decision to proceed with her legal malpractice lawsuit despite full knowledge of CIC's coverage defense.  As a matter of law, Ms. Gilbert has not sustained any prejudice.

The Nace Defendants next seek to create coverage where none exists under the terms of the policy by resorting to the common law doctrines of waiver and estoppel.  The Nace Defendants argue that CIC's issuance of a reservation of rights in January of 2012 specifically identifying the "no prior knowledge" coverage defense was "too late", even though Ms. Gilbert still had not asserted an actual claim at that time, let alone filed a lawsuit, and CIC had no actual knowledge of facts supporting this coverage defense until late 2011.  The Nace Defendants mistakenly contend that CIC should have issued this reservation in May of 2009, when Mr. Nace

---

[9] For the first time in her Reply (Doc. 27), Ms. Gilbert's attorney now states that prejudice is "self-evident" and that Ms. Gilbert sustained "substantial expenses" in investigating and prosecuting her lawsuit.  Such vague allegations are insufficient to establish prejudice, particularly when Ms. Gilbert concedes she knew of CIC's coverage position for more than one year before her lawsuit went to trial and made no effort to stay her legal malpractice action.  In addition, Ms. Gilbert could only sustain prejudice if her judgment against the Nace Defendants were uncollectible.  There is no evidence that the Nace Defendants cannot satisfy the judgment if no coverage exists.

121591463 2306

reported Ms. Gilbert's potential claim to CIC, or at the latest in March of 2010, when Mr. Nace provided CIC some of the pleadings from the underlying lawsuits.

These arguments fail as a matter of law.  (See pp. 33-41 of CIC's Response (Doc. 23)). The Nace Defendants concede that CIC never affirmatively represented to them that CIC would provide unconditional coverage for Ms. Gilbert's potential claim or claim.  There also is no legal support for the argument that simply by "undertaking to investigate" Ms. Gilbert's potential claim CIC impliedly represented that there would be coverage if and when a claim were asserted. Moreover, the undisputed facts establish that not until late November of 2011 did CIC discover that the professional errors allegedly committed by the Attorney Defendants took place in 2006, which was prior to inception of the policy, and not in 2008 as the Nace Defendants had represented in writing to CIC when they reported Ms. Gilbert's potential claim.  Upon discovery of the true facts, CIC promptly issued a reservation of rights on January 13, 2012 identifying the "no prior knowledge" coverage defense.  Then, when Ms. Gilbert filed her lawsuit in March of 2012, CIC timely issued another reservation of rights letter specifically advising that CIC would provide a defense to the lawsuit subject to its right to deny coverage based upon the fact that the "no prior knowledge" requirement for coverage had not been met.

In order for waiver or estoppel to apply, the Nace Defendants also must establish that they have been prejudiced in this coverage action or in the defense of Ms. Gilbert's lawsuit by the timing of CIC's reservation of rights.  There is no evidence of actual prejudice.  Although Mr. Nace submitted an Affidavit (Doc. 14-6) in support of the Nace Defendants' Motion for Summary Judgment, *nowhere* in his Affidavit does Mr. Nace claim that the Nace Defendants have sustained any prejudice, let alone what that prejudice might be.

121591463 2306

However, in their Response to CIC's Motion, the Nace Defendants speculate that if they had known of CIC's reservation of right sooner perhaps they could have filed their own declaratory judgment lawsuit and maybe would not have had to sit through a trial in the underlying lawsuit.  (Response, pp. 27-28).  The Nace Defendants further speculate that maybe they could have convinced Ms. Gilbert not to file her lawsuit against them or they could have hired their own counsel and somehow "resolved" the lawsuit or claim short of having to undergo a trial.  (PASOF, ¶¶ 69-76).  These claims of prejudice are not only speculative but they ring hollow given that even after CIC sent its reservation of rights letters in January of 2012, the Nace Defendants did not hire their own coverage counsel or file a declaratory judgment action.  In fact, they did not retain coverage counsel until after CIC filed its declaratory judgment action in September 2012.  Then, the Nace Defendants moved to dismiss that lawsuit and, when it was dismissed, they did not file their own coverage lawsuit.  It was CIC who filed this lawsuit to determine coverage.

More saliently, however, the Nace Defendants do not contend that their defense of Ms. Gilbert's lawsuit was detrimentally impacted in any manner by the timing of CIC's reservation of rights, nor do they have any complaints about the quality of representation provided by the defense counsel (the Jordan Coyne law firm) appointed to defend them in Ms. Gilbert's lawsuit. This is the type of prejudice considered by courts in determining whether estoppel should apply. See Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP, 793 F.Supp.2d 399 (D.D.C. 2011), infra.  In fact, in 2009, Mr. Nace discussed Ms. Gilbert's potential claim with one of the attorneys at the Jordan Coyne law firm, Ms. Deborah Whelihan, even before he reported the potential claim to CIC.  Mr. Nace described Ms. Whelihan in his Affidavit as "his attorney."

121591463 2306

There also is no evidence here that CIC "assumed complete control" over the insured's defense without a reservation of rights.  There was no lawsuit or even a claim to defend until Ms. Gilbert filed her lawsuit in March of 2012.  It is undisputed that CIC promptly issued a reservation of rights in April of 2012 and retained the Jordan Coyne firm to defend the Nace Defendants with the express permission of the Nace Defendants.  However, even if retaining the Jordan Coyne firm to assist CIC in investigating Ms. Gilbert's potential claim somehow could be construed as "assuming complete control over the insured's defense," there still is no estoppel here because the undisputed facts establish that the Nace Defendants sustained no resulting prejudice.

The D.C. court in Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP, 793 F.Supp.2d 399 (D.D.C. 2011) rejected outright a prejudice argument made by the insureds that is nearly identical to the claim being made by the Nace Defendants.  In rejecting the insureds' argument that the insurer was prejudiced in the defense of the malpractice lawsuit against them by the insurer's conduct in undertaking their defense in the malpractice lawsuit against them and delaying in issuing a reservation of rights, the court held:

> The fourth point asserts prejudice [in their defense of the Malpractice Action against them], but defendants fail to demonstrate any evidence of actual prejudice in the handling of their case beyond vague and conclusory allegations of such prejudice.  Defendants allege that they incurred legal fees and costs, and were deprived of their preferred counsel.  However, they do not allege or point to any evidence that the representation provided by [their insurer] hindered the defense of their claim or that the counsel was inadequate or ineffective.  (Emphasis added).

793 F.Supp.2d at 413.  The court also noted that the insureds never objected to the counsel selected by their insurer.  Id.  Under these circumstances, the court held that the insureds "cannot, as a matter of law, invoke the defense of estoppel." Id. (citing to Athridge v. Aetna, 510 F.Supp.2d 1, 8 (D.D.C. 2007) ("Plaintiffs' contentions of ways in which prejudice *could*

*have been created* cannot overcome their inability to show any prejudice *was created* …") (emphasis in original).  Accord <u>Diamond Service Company, Inc. v. Utica Mutual Ins. Co.</u>, 476 A.2d 648, 656-57 (D.C. Ct. App. 1984) (rejecting as a matter of law insured's vague argument that it was prejudiced and misled by insurer into believing no coverage defenses would be asserted when insurer filed an answer to the lawsuit on insured's behalf and answered interrogatories before finally advising the insured that it reserved its right to deny coverage).

The prejudice claim made by the Nace Defendants is even weaker than those asserted in <u>Capitol Specialty</u> and <u>Diamond</u> because CIC's conduct in not issuing a reservation of rights letter took place while CIC was investigating a only a *potential* claim against the insureds and while CIC had no actual knowledge of any coverage defenses.  The D.C. courts in <u>Capitol Specialty</u> and <u>Diamond</u> found no prejudice and no estoppel as a matter of law even when the insurer delayed in issuing a reservation of rights after a lawsuit had been served on the insured and the insurer was aware of a potential coverage defense.  <u>See</u>, <u>e.g.</u>, <u>Diamond</u>, 476 A.2d at 654-56 (no prejudice even though insurer delayed in notifying insured of specific coverage defense for nine months even though insured had knowledge of this potential defense during that time).

## CONCLUSION

There is no coverage for Ms. Gilbert's lawsuit because prior to inception of the first CIC policy, an insured under the CIC policy had a reasonable basis to believe that a professional duty had been breached or that a claim might be brought by Ms. Gilbert.  The Nace Defendants also fall woefully short of creating a material issue of fact to support their claims of waiver and estoppel.  CIC therefore requests that this Court enter summary judgment in its favor and rule as a matter of law that CIC has no obligation to defend or indemnify the Nace Defendants or defendant Gabriel Assaad in connection with Ms. Gilbert's lawsuit.

121591463 2306

Dated:      January 9, 2014          **CHICAGO INSURANCE COMPANY**


By:    /s/ Paulette S. Sarp
          Paulette S. Sarp, admitted pro hac vice
          HINSHAW & CULBERTSON LLP
          333 South Seventh Street, Suite 2000
          Minneapolis, MN  55402
          O:  (612) 333-3434
          F:  (612) 334-8888
          psarp@hinshawlaw.com


*-and-*
          David D. Hudgins, Esq., D.C. Bar No. 362451
          HUDGINS LAW FIRM
          515 King Street, Suite 400
          Alexandria, VA  22314
          O:  (703) 739-3300
          F:  (703) 739-3700
          e-mailbox@hudginslawfirm.com

          ATTORNEYS FOR PLAINTIFF

26

**700**

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of January, 2014, a copy of the foregoing pleading was served via ECF on:

Stephen A. Horvath, Esq.
Bancroft, McGavin, Horvath & Judkins, P.C.
3920 University Drive
Fairfax, Virginia 22030
shorvath@tbmhjlaw.com

H. Aubrey Ford, III, Esq.
Cantor, Stoneburner, Ford, Grana & Buckner
7130 Glen Forest Drive, Suite 400
Richmond, Virginia 23226
aford@virginiatrialfirm.com

Gabriel A. Assaad, Esq.
Assaad Law, PLLC
1425 K Street, NW, Suite 350
Washington, DC 20005
gassaad@assaadlaw.com

/s/ Paulette S. Sarp
Paulette S. Sarp, Esq., admitted pro hac vice
Hinshaw & Culbertson, LLP
333 South Seventh Street
Suite 2000
Minneapolis, MN 55402
(612) 333-3434
(612) 334-8888 - facsimile
psarp@hinshawlaw.com

and

David D. Hudgins, Esq., D.C. Bar No. 362451
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, Virginia 22314
dhudgins@hudginslawfirm.com

ATTORNEYS FOR PLAINTIFF

121591463 2306

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHICAGO INSURANCE COMPANY,  :
an Illinois Corporation       :
   Plaintiff,        :
               :
v.              :   Civil No. 1:12-CV-2068
               :
PAULSON & NACE, PLLC, et al.,   :
   Defendants.      :
_____/

**DEFENDANTS PAULSON & NACE, PLLC, AND BARRY NACE'S REPLY TO
PLAINTIFF'S OPPOSITION TO THEIR MOTION FOR SUMMARY JUDGMENT**

COME NOW, Defendants Paulson & Nace, PLLC ("Paulson & Nace") and Barry J. Nace,

Esq., by counsel and submit the following Reply to Chicago Insurance Company ("CIC")'s

Opposition to Their Motion for Summary Judgment:

**I. INTRODUCTION & SUMMARY OF RESPONSE**

Defendants Paulson & Nace and Barry J. Nace, Esq., respectfully request that this Court

grant their Motion for Summary Judgment on the grounds that CIC failed to provide them and

co-defendant Sarah Gilbert with timely notice that the insurer intended to rely upon a breach of its

policy conditions, to avoid responsibility for Ms. Gilbert's legal malpractice claim.   CIC filed the

present action seeking a declaration that Barry Nace and his firm are not covered under the legal

malpractice insurance policy because of their alleged failure to comply with conditions precedent

to coverage (i.e. that Mr. Nace failed to give timely notice of the potential claim by Ms. Gilbert and

that prior to the first policy issued by CIC to Paulson & Nace and Barry Nace, Mr. Nace allegedly

had a "reasonable basis to believe that [Paulson & Nace] had breached a professional duty or to

Reasonably Foresee that a Claim would be made against [Paulson & Nace]" – the "no prior

knowledge" condition).   CIC investigated the claim for over two and a half years and had all of

the information necessary to raise the defense for more than eighteen months before it provided Paulson & Nace and Barry Nace with any notice of the coverage dispute.   When CIC did eventually issue a reservation of rights letter to Paulson & Nace and Barry Nace, no notice was given to Ms. Gilbert, who as a Virginia resident has a statutory right to such notice within 45 days of CIC's discovery of a breach of policy conditions that may impact her right to recover against the tortfeasor's liability insurance carrier under Virginia Code § 38.2-2226.

Originally, CIC pointed to its reliance on an alleged misrepresentation by Mr. Nace in the date of the alleged error.   The reservation letter sent in January 2012 stated, "In your claim form you advised CIC that the error, if any, was committed in 2008.   CIC relied on this representation when it agreed to treat this as a potential claim at that time.   Based on recent documents made available to CIC it is clear that the error, if any, was committed in 2006."   See **Exhibit 5 to Paulson & Nace's Motion for Summary Judgment**, pg. 4.   This corresponds directly with the insured's obligation in Condition N of the Policy:

> **N. Declarations and Applications:**   By acceptance of this policy, the Insured agrees that the statements in the Declarations and application are his agreements and representations, and that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the Company or any of its agents relating to this insurance.

Policy, attached as **Exhibit L to Plaintiff's Motion for Summary Judgment**, Page 8 of 10.   CIC has indicated in its Answers to Interrogatories that it does in fact rely on misrepresentations in the application and failures of Mr. Nace to comply with conditions precedent in the CIC policy as a basis for its declaratory judgment action:

> It is CIC's position that the facts available at this time support the conclusion that Paulson & Nace and/or Barry Nace **made a material misrepresentation or omission of material fact in their application for insurance to CIC.**   However,

-2-

703

> CIC is *not* making a claim for rescission in this matter.   Whether or not the condition precedents to coverage to coverage [sic] included in the policy's insuring agreement have been satisfied is a distinct legal issue from the issue of rescission. CIC does not have to prove that the policy is void or that the policy should be rescinded in order to prevail on **its claim that the conditions precedent to coverage have not been satisfied here**.

<u>See</u> CIC's Answers to Interrogatories, Nos. 8 & 9, attached as **Exhibit 1 to Paulson & Nace's Motion for Summary Judgment** (emphasis added).     Now, rather than relying on the breach identified in the reservation of rights letter, CIC seeks to re-characterize its coverage defense in an attempt to avoid Virginia Code § 38.2-2226.

CIC seeks to avoid its obligations under the common law and Virginia Code § 38.2-2226 by re-characterizing its coverage defense based on Mr. Nace's alleged prior knowledge as a *failure*, rather than a *breach*, of a condition precedent – a semantic distinction without any substantive difference.   The allegedly failed condition was a breach of the requirement to give timely notice of a claim.   Regardless of whether such a breach was a breach of a condition precedent or an act that triggered a policy exclusion, CIC should have given timely notice to Paulson & Nace and Mr. Nace that it intended to rely on such a breach to avoid its obligations under the Lawyers Professional Liability Insurance Policy.   Because CIC gave no such indication for years after it had knowledge of the circumstances of the claim, CIC waived the coverage defense and is estopped from denying coverage.

Ms. Gilbert now has an interest in the CIC policy, as well.   First she has been joined as a necessary party to this declaratory judgment action as a claimant to the proceeds of the CIC policy. <u>See</u> Complaint, ¶8.   Additionally, because the underlying lawsuit has resulted in a judgment in favor of Ms. Gilbert she is now a third-party beneficiary of the insurance policy.   <u>See</u> <u>Storm v. Nationwide Ins. Co.</u>, 199 Va. 130, 97 S.E.2d 759 (1957).   The <u>Storm</u> court noted that legislation

-3-

enacted for the benefit of injured parties, such as Va. Code § 38.2-2226, should be liberally construed so that its purpose may be accomplished. See id., 199 Va. at 135, 97 S.E.2d at 762.   CIC incorrectly asserts that Mr. Nace and Ms. Gilbert "must" show prejudice in order for this statute to apply.   To the contrary, the statute applies where the insurer's failure to advise the claimant of coverage issues "may prejudice" their claims.   See Maxey v. Doe, 217 Va. 22, 25, 225 S.E.2d 359, 361 (1976).   As discussed in further detail below, CIC's two year delay in raising its potential coverage defenses not only created potential prejudice to Paulson & Nace, Mr. Nace and Ms. Gilbert – each of these entities were actually prejudiced by the loss of time, resources, publicity and the ability to pursue other insurance available.

CIC further attempts to avoid is obligations to Ms. Gilbert completely, by arguing that Virginia Code § 38.2-2226, which grants her substantive rights under Virginia law, does not apply to this diversity action.   Because the statute reflects Virginia's public policy of protecting the rights of the innocent claimant, this court should enforce Ms. Gilbert's right to recover her judgment proceeds from Paulson & Nace's professional liability insurer.

## II.   SUMMARY OF FACTS

There are no genuine disputes as to the facts in this case, which are set forth in detail in Paulson & Nace's Memorandum in Support of Summary Judgment (Docket No. 14) and Opposition to CIC's Motion for Summary Judgment (Docket No. 24).   The essential facts for the present motion are that despite having possession of information concerning an alleged breach of policy conditions CIC did not give Mr. Nace or Ms. Gilbert notice that it would rely on such conditions between receiving notice of the loss in May of 2009, or receiving all of the relevant pleadings in March of 2010, until January of 2012.   In fact, CIC never provided notice

of the potential coverage issue to Ms. Gilbert until it filed its first declaratory judgment action. Because CIC induced the parties to rely on its coverage, they did not pursue additional available coverage for the underlying legal malpractice claim.   Now CIC seeks to pull the rug from under them and deny coverage for Ms. Gilbert's judgment.

### III.   LAW & ANALYSIS

Although CIC goes to great lengths to re-characterize its action to avoid alleging a breach of contract, the facts plainly show that CIC seeks to rely on Mr. Nace's failure to comply with the terms of the Policy to avoid coverage – thus seeking to assert a breach of terms or conditions of the policy as a defense to coverage.   Specifically, CIC has indicated in its Answers to Interrogatories that it does in fact rely on misrepresentations in the application and failures of Mr. Nace to comply with conditions precedent in the CIC policy as a basis for its declaratory judgment action:

> It is CIC's position that the facts available at this time support the conclusion that Paulson & Nace and/or Barry Nace **made a material misrepresentation or omission of material fact in their application for insurance to CIC.**   However, CIC is *not* making a claim for rescission in this matter.   Whether or not the condition precedents to coverage to coverage [sic] included in the policy's insuring agreement have been satisfied is a distinct legal issue from the issue of rescission. CIC does not have to prove that the policy is void or that the policy should be rescinded in order to prevail on **its claim that the conditions precedent to coverage have not been satisfied here**.

See CIC's Answers to Interrogatories, Nos. 8 & 9, attached as **Exhibit 1 to Paulson & Nace's Motion for Summary Judgment** (emphasis added).   Where an insurer seeks to rely on such a breach to avoid its coverage obligations, it must give notice to the insured and to the claimant within a reasonable time after discovery of the coverage issue.   Here CIC failed to give such notice in a timely fashion, despite its lengthy investigation of the underlying claim and

participation in the claim's defense, therefore CIC is estopped from denying coverage both by statute and in equity.   CIC's lengthy investigation period, without advising Paulson & Nace of the potential coverage issue lulled Paulson & Nace into believing that it need not give further notice to any additional carriers, including Philadelphia Insurance Company, with whom they had a policy immediately prior to CIC.

**A. Virginia Code § 38.2-2226 precludes CIC from relying on Barry Nace's alleged prior knowledge of the claim as a breach of a condition precedent to coverage.**

Despite CIC's attempts to re-characterize this action to avoid the statute and avoid the Virginia citizen's right to notice, Virginia Code § 38.2-2226 applies, and CIC has waived its alleged coverage defense by failing to timely provide such notice.

*1.   This court should apply Virginia's substantive law to determine whether coverage exists for Ms. Gilbert's claim.*

Where, as here, this court hears a case based on its diversity jurisdiction, the court applies "the choice of law rules for the jurisdiction in which it sits."   Stromberg v. Marriott Int'l Inc., 474 F. Supp. 2d 57, 61 (D.D.C. 2007) (quoting Meng v. Schwartz, 305 F. Supp. 2d 49, 58 (D.D.C. 2004)).   Further, although CIC claims that Virginia Code § 38.2-2226 is a procedural statute, rather than substantive, the procedure applies to tort matters pending in the Commonwealth of Virginia, regardless of where the coverage dispute occurs.   Regardless of whether it follows the District of Columbia's application of the "governmental interests analysis," as argued in the Motion for Summary Judgment, or the "substantial interest test," as argued by CIC's opposition, this court apply Virginia Code § 38.2-2226 to protect Ms. Gilbert's interest in the proceeds of the CIC insurance policy.

Virginia Code § 38.2-2226 is procedural as to tort cases pending in Virginia, but is a **substantive** remedial law granting rights to tort claimants that are citizens of the Commonwealth of Virginia, regardless of where the insurer brings the subsequent coverage action.   By enacting Virginia Code § 38.2-2226, Virginia seeks to defend the rights of innocent claimants who were non-parties to the insurance contract, yet nonetheless experienced an injury arising in the Commonwealth of Virginia.   Otherwise, the insurer could forum-shop concerning its obligations to the Virginia resident by filing the declaratory judgment action in its jurisdiction of choice.   The question of the tort claimant's rights under the insurance policy may vary by jurisdiction, which is why the insurer must become familiar with the rights in the applicable jurisdiction.   See Wen-Shin Cheng & Rae M. Williamson, "Settling Claims Under Reservations of Rights," appearing in FOR THE DEFENSE (May 2010)("…coverage counsel must understand all the applicable rules in a given jurisdiction regarding the duty to defend, the duty to settle, and how to resolve coverage disputes, **bearing in mind that significant differences exist state-to-state**." [emphasis added]).

Both the "governmental interests analysis" and the "substantial interest test" look to the policies underlying the states' laws to determine which law to apply.   Under the modified "governmental interests analysis" employed by District of Columbia courts, the court

> Evaluate[s] the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review . . . As part of this analysis, we also consider the four factors enumerated in Restatement (Second) of Conflict of Laws § 145:
> a) the place where the injury occurred;
> b) the place where the conduct causing the injury occurred;
> c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and
> d) the place where the relationship is centered.

-7-

Washkoviak v. Student Loan Mktg. Ass'n, 900 A.2d 168, 180 (D.C. 2006) (quoting District of Columbia v. Coleman, 667 A.2d 811, 816 (D.C. 1995)).   The policy underlying Va. Code § 38.2-2226 is "to require a liability insurer which intends to rely on a breach of the terms and conditions of the policy contract, in defense of any claim under the policy, to furnish prompt notice of such intention to the claimant or his attorney, so that steps may be taken by the claimant, a stranger to the insurance contract, to protect his rights."   Liberty Mut. Ins. Co. v. Safeco Ins. Co., 223 Va. 317, 325, 288 S.E.2d 469, 474 (1982).   Through the enactment of § 38.2-2226, the Commonwealth of Virginia has created a system where "[t]he insurer can prevent, without difficulty, a claimant's wasting of finances and time pursuing a judgment that later proves to be uncollectible. **Virginia, through this statute, has manifested a legitimate interest in safeguarding the rights of persons injured within her boundaries.**"   Fed. Ins. Co. v. Nationwide Mut. Ins. Co., 448 F. Supp. 723, 726 (W.D. Va. 1978) (emphasis added).

The District of Columbia's analysis of timeliness and reasonable investigation affect the policy of requiring good faith performance by all parties to a contract.   See e.g. Diamond Serv. Co., Inc. v. Utica Mut. Ins. Co., 476 A.2d 648, 656 (D.C. 1984) ("[t]he relationship of insured and insurer presumes good faith on both sides").   This rule considers fundamental fairness – balancing an insurer's interest in having a reasonable amount of time to investigate a claim and potential coverage against an insured's interest in knowing the scope of its potential personal exposure for a claim and mounting a prompt defense.   Central Armature Works v. Amer. Motorists Ins. Co., 520 F. Supp. 283, 288 (D.D.C. 1980).

Virginia's policy would be more advanced by the application of its law to the facts in this case because § 38.2-2226 conveys a stronger interest in Virginia's policy of protecting those

-8-

injured within its borders than D.C.'s variable balancing test.   Further, Virginia Code § 38.2-2226 applies because it is "procedural" in that it applies to insurance disputes concerning injuries occurring in Virginia and actions pending there.   In Federal Ins. Co. v. Nationwide Mut. Ins., 448 F.Supp. 723, 726 (W.D. Va. 1978) the court found that Va. Code § 38.1-389.1, a prior version of Va. Code § 38.2-2226, applied to a policy issued outside the Commonwealth of Virginia when the underlying accident occurred in Virginia.   The court sought to avoid a *lex loci contractus* choice of law, which would not apply in the District of Columbia:

> However, when a third party has been injured in an accident in Virginia, public policy in Virginia demands that potential claimants be notified when liability insurers intend to deny coverage to their insureds.   If an insurer can require the insured to give prompt notice of an accident, it is certainly reasonable that a state can, as part of its public policy, require the insurer to give notice of a policy defense to the injured claimant, particularly to a third party insured by the insured.

Id. at 726.   The reference to procedure in this matter is the requirement that the statute applies to coverage disputes concerning tort cases pending in the Commonwealth of Virginia.   If the underlying case were pending in another jurisdiction, then that jurisdiction's laws would apply to questions concerning the sufficiency of the insurer's reservation of rights.

The cases cited by CIC fail to consider the policy Virginia seeks to advance in protecting its citizens through the requirement that claimants be notified of any policy defenses. Significantly, unlike Adolph Coors Co. v. Truck Ins. Exch., 960 A.2d 617 (D.C. Ct. App. 2008) where the allegedly injured parties were located in several venues throughout the country, this case involves a single claimant in the underlying action, Ms. Gilbert.   That claimant's interest weighs heavily on the court's consideration of the locus of the insured risk.   Further, because Ms. Gilbert's underlying claim has now been reduced to a judgment, she too has an interest in the policy between CIC and Paulson & Nace, as a third party beneficiary.   See Storm v. Nationwide

Ins. Co., 199 Va. 130, 97 S.E.2d 759 (1957).   The <u>Storm</u> court noted that legislation enacted for the benefit of injured parties, such as Va. Code § 38.2-2226, should be liberally construed so that its purpose may be accomplished. <u>See id.</u>, 199 Va. at 135, 97 S.E.2d at 762.

Applying the "more substantial interest" test, this court should also find Virginia Code § 38.2-2226 controls CIC's obligations to Ms. Gilbert.   "[T]he 'more substantial interest' test is not a mechanical standard and courts must ascertain the quality of the contacts which invoke a state's interest in the particular case."   <u>Eli Lilly & Co. v. Home Ins. Co.</u>, 653 F. Supp. 1 (D.D.C. 1984). Although the court will also look at the residence of the insured, the place where the application was completed, the place where the policy was negotiated, consummated, and delivered, and the situs of the risk; these considerations are not paramount to the protection of a state's citizens or of the state from the incidents of loss.   The District of Columbia Court of Appeals noted the importance of these real policy interests in applying Virginia insurance law to a dispute before it in <u>Stevens v. American Service Mutual Insurance Company</u>, 234 A.2d 305, 309-310 (D.C. 1967). The court measured the states' interests "by 'highly realistic considerations such as the protection of the citizen insured or the protection of the state from the incidents of loss,' and not by 'conceptualistic discussion of theories of the place of contracting or [the place] of performance.'" <u>Id</u>. at 309, <u>citing</u> <u>Hoopeston Canning Co. v. Cullen</u>, 318 U.S. 313, 316, 87 L. Ed. 777, 63 S. Ct. 602 (1943).   Where a state's interest is strong enough to exercise authority over the incidents of insurance within its borders, "that state may act to protect its interest although 'state action may have repercussions beyond state lines.'"   <u>Stevens</u>, 234 A.2d at 309, <u>citing</u> <u>Osborn v. Ozlin</u>, 310 U.S. 53, 62, 60 S. Ct. 758, 84 L. Ed. 1074 (1940).   In applying the "more substantial interest" test, this court should look beyond CIC's "conceptualistic" application of place of contracting and

-10-

performance of the insurance contract, and apply the highly realistic consideration of the protection of Ms. Gilbert's interest in the right to notice of coverage disputes concerning her tort claim.

Similarly, this court recognized that the formulaic application of the place of contracting and delivery of the insurance contract do not control where factors indicate another forum has a significant relationship to the particular issue in question in Potomac Elec. Power Co. v. California Union Ins. Co., 777 F. Supp. 968, 973 (D.D.C. 1991).   While CIC points to this case as support for its position that Virginia law should not apply to the issue protecting its citizen, the outcome of that case is distinguished because here there is a particular issue in which Virginia has a significant interest.   The court noted, "the local law of the state the parties understood to be the principal location of the insured risk during the term of the policy [will be the source of law for the policy] **unless with respect to the particular issue, some other state has a more significant relationship.**" Id. (emphasis added).   Here Virginia has a more significant relationship and interest in protecting its citizens' rights to notice of coverage issues concerning their claims.

Finally, CIC's reference to Paulson & Nace and Mr. Nace's arguments concerning personal jurisdiction at pages 23 and 24 of the Opposition are misleading and out of context.   Just as CIC initially argued that that a matter was dismissed "with prejudice" where the court had clearly stricken the words "with prejudice" from the order[1], CIC again seeks to mislead this Court to rely on arguments that were not relied upon by the Eastern District of Virginia in dismissing CIC's prior action.   Each argument highlighted by CIC pertained to whether a court sitting in

---

[1] CIC's Opposition to Motion for Summary Judgment finally acknowledges that the February 26, 2007 "may" have dismissed the medical malpractice without prejudice and backtracks from its original position that the Order was with prejudice even though that language was struck through on the written order and Judge Hughes later acknowledged that it was his intention not to dismiss the action with prejudice.   See CIC's Opposition to the Motion for Summary Judgment at footnote 1.

Virginia could assert personal jurisdiction over Barry Nace and Paulson & Nace for the purposes of a declaratory judgment.   The arguments did not pertain to whether Ms. Gilbert, a Virginia resident, was entitled to the protections of Virginia law.   Ultimately, the case filed in the Eastern District of Virginia was dismissed due to lack of subject matter jurisdiction because CIC had failed to properly allege its own citizenship, not because Virginia law was inapplicable to the decision. See Chicago Ins. Co. v. Paulson & Nace, PLLC, Case No. 1:12-cv-1082-GBL-TCB, ORDER Doc. 33 (E.D. Va. Dec. 3, 2012)(attached hereto as **Exhibit 10**).

Thus, regardless of whether the "governmental interest" analysis or "more substantial interest" test is applied, this court should apply Virginia Code § 38.2-2226 in determining whether coverage exists for Ms. Gilbert's claim.

*2. Virginia Code § 38.2-2226 applies to breaches such as the alleged failure of a condition precedent based on prior knowledge.*

Although CIC attempts to characterize this action differently, the alleged failure of the "no prior knowledge" condition is in fact an alleged breach of the policy terms or conditions.   Where the insurer relies on such a breach to disclaim coverage, the insurer is obligated by Virginia Code § 38.2-2226 to alert the claimant to the potential coverage issue:

> Whenever any insurer on a policy of liability insurance discovers a breach of the terms or conditions of the insurance contract by the insured, the insurer shall notify the claimant or the claimant's counsel of the breach. Notification shall be given within forty-five days after discovery by the insurer of the breach or of the claim, whichever is later. Whenever, on account of such breach, a nonwaiver of rights agreement is executed by the insurer and the insured, or a reservation of rights letter is sent by the insurer to the insured, notice of such action shall be given to the claimant or the claimant's counsel within forty-five days after that agreement is executed or the letter is sent, or after notice of the claim is received, whichever is later. **Failure to give the notice within forty-five days will result in a waiver of the defense based on such breach to the extent of the claim by operation of law.**

-12-

> **Notwithstanding the provisions of this section, in any claim in which a civil action has been filed by the claimant, the insurer shall give notice of reservation of rights in writing to the claimant, or if the claimant is represented by counsel, to claimant's counsel not less than thirty days prior to the date set for trial of the matter.** The court, upon motion of the insurer and for good cause shown, may allow such notice to be given fewer than thirty days prior to the trial date. **Failure to give the notice within thirty days of the trial date, or such shorter period as the court may have allowed, shall result in a waiver of the defense based on such breach to the extent of the claim by operation of law.**

Va. Code § 38.2-2226 (emphasis added).   CIC does not dispute that it did not give notice of the reservation of rights in writing to the claimant, Ms. Gilbert.   Instead, CIC has taken the position that alleged failure of the "no prior knowledge" condition is simply an exclusion from coverage, and that Mr. Nace's alleged knowledge of a potential claim or breach of a professional duty at the time of the initial application with CIC was not breach of a term or condition of the insurance contract.

The policy provision in question is a condition precedent, which can and allegedly was breached by the timing of Mr. Nace's notice of the potential claim to CIC.   Throughout this matter CIC has referred to the provision as a condition precedent.   A condition precedent is "an act or event, other than lapse of time, that must exist or occur before a duty to perform something promised arises."   BLACK'S LAW DICTIONARY, Second Pocket Edition (West 2001).   Here, regardless of whether CIC characterizes the failure of the condition as an affirmative act or an act of omission, the crux of their argument is that Mr. Nace breached the "no prior knowledge" condition precedent in the policy.

CIC's Answers to Interrogatories belie the insurer's contention that the failure of the "no prior knowledge" condition was not a breach.   CIC stated as follows:

-13-

It is CIC's position that the facts available at this time support the conclusion that Paulson & Nace and/or Barry Nace **made a material misrepresentation or omission of material fact in their application for insurance to CIC.** However, CIC is *not* making a claim for rescission in this matter. Whether or not the condition precedents to coverage to coverage [sic] included in the policy's insuring agreement have been satisfied is a distinct legal issue from the issue of rescission. CIC does not have to prove that the policy is void or that the policy should be rescinded in order to prevail on **its claim that the conditions precedent to coverage have not been satisfied here**.

See CIC's Answers to Interrogatories, Nos. 8 & 9, attached as **Exhibit 1 Paulson & Nace's Motion for Summary Judgment.** (emphasis added). Although CIC contends that it has not asserted a breach of contract claim, the allegation that Paulson & Nace or Mr. Nace failed to satisfy the "no prior knowledge" condition is no different than the requirement that an insured give timely notice of a claim and accurately report information on the application. CIC is bound by its Answers to Interrogatories and the court may properly consider those answers on motion for summary judgment. Fed. R. Civ. P. 56(c); see, e.g., Keziah v. W.M. Brown & Son, Inc., 888 F.2d 322 (4th Cir. 1989).

Just as notice provisions could be breached by action or inaction, similarly here the "no prior knowledge" condition was allegedly breached by Paulson & Nace or Mr. Nace allegedly having a reasonable basis to believe that a professional duty had been violated or that there was a reasonably foreseeable claim, but failing to disclose that knowledge on the application. This obligation, which CIC contends Mr. Nace failed to perform, is set forth as a condition in the Policy:

> **N. Declarations and Applications:** By acceptance of this policy, the Insured agrees that the statements in the Declarations and application are his agreements and representations, and that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the Company or any of its agents relating to this insurance.

-14-

715

Policy, **Exhibit L to Plaintiff's Motion for Summary Judgment**, Page 8 of 10.   If, as CIC

contends, Paulson & Nace and Mr. Nace had knowledge of a potential claim or breach of a

professional duty at the time of the first application, they would have been obligated to disclose

that knowledge on the application in response to question 15(b).   See Application, **Exhibit J to**

**Plaintiff's Motion for Summary Judgment**, ("Having inquired of all partners, officers, owners

and employed lawyers, are there any circumstances which may result in a claim being made

against the firm, its predecessors or any current or past partner, officer, owner or employed lawyer

of the firm?").   In fact, CIC has pointed to the alleged misrepresentation in responding to this

question in its Answers to Interrogatories (see Answers to Interrogatories Nos. 8 & 9), Motion for

Summary Judgment (see Docket No. 18, Statement of Facts, ¶ 15), and Opposition to the present

Motion for Summary Judgment (see Docket No. 23, Statement of Additional Facts, ¶ 17).

    Notice provisions are considered conditions precedent to coverage under a policy of

insurance and an alleged failure to fulfill such a condition constitutes a breach of that provision.

See Liberty Mut. Ins. Co. v. Safeco Ins. Co., 223 Va. 317, 324, 288 S.E.2d 469, 473 (1982); Lord

v. State Farm Mut. Auto. Ins. Co., 224 Va. 283, 284, 295 S.E.2d 796, 797 (1982); State Farm Mut.

Auto. Ins. Co. v. Porter, 221 Va. 592, 597, 272 S.E.2d 196, 199 (1980).   "In construing notice

provisions in the context of liability coverages . . . performance of such provisions is a condition

precedent to coverage under the insurance contract, 'requiring substantial compliance by the

insured.'"   Lord, 224 Va. at 284, 295 S.E.2d at 797.   In Lord, the Supreme Court of Virginia held

that an insured's failure to give timely notice of an automobile accident "constitute[d] a breach of

the notice conditions of the policy in question. . ."   Id. at 288, 295 S.E.2d at 800.   However, "even

if proper notice [of an accident] was not given 'as soon as practicable' [an insurer is still] under a

-15-

duty to notify the claimant . . . within twenty days of its intention to rely on the defense of lack of notice." Federal Ins. Co. v. Nationwide Mut. Ins. Co., 448 F. Supp. at 725.

Just as the notice provision could be breached by action or inaction in the cases noted in CIC's Opposition to the Motion for Summary Judgment, CIC asserts a breach by Paulson & Nace and Mr. Nace's alleged knowledge of a potential claim and alleged failure to timely disclose it here. See, e.g., Sherwood Brands, Inc. v. Great American Ins. Co., 418 Md. 300, 13 A.3d 1268 (Md. Ct. App. 2011)(inaction in failing to give timely notice was a breach of the policy). Where an insurer relies on the insured's inaction regarding notice of a claim or potential claim in order to avoid coverage, such defense relies on a breach of the policy conditions.

Similarly, when a particular loss is not covered because of an exclusion, the insurer has an obligation to inform the claimant of the defense to coverage. In Gordon v. Liberty Mutual Insurance Company, 675 F.Supp. 321 (E.D. Va. 1987), the District Court for the Eastern District of Virginia applied Virginia Code § 38.2-2226 where Liberty Mutual was relying on a driver's breach of a rental agreement and an exclusion in its policy pertaining to operation of the rental car without the named insured's permission. There, the court applied Section 2226 and found that Liberty Mutual's notice to the claimant was sufficient regarding both issues. The statute was applied to both the alleged breach of contract and the contract exclusion. Here, CIC never gave such notice to Ms. Gilbert and delayed significantly in notifying Mr. Nace.

CIC points to two Maryland cases (Sherwood Brands,Inc. v. Great American Ins. Co., 418 Md. 300, 13 A.3d 1268 (Md. Ct. App. 2011) and T.H.E. Ins. Co. v. P.T.P., Inc., 331 Md. 406, 628 A.2d 223 (1993)),concerning its semantic argument of failure of a condition as opposed to an insured's alleged breach of the condition. Neither of these cases applies the Virginia law in

-16-

question here.   Further, the policy period arguments raised in these cases are distinct issues from the "no prior knowledge" condition that CIC alleges Paulson & Nace and Mr. Nace violated.

Regardless of whether the insured provided timely notice, the claimant – Ms. Gilbert – has a statutory right to receive notice from the insurer that it intends to rely on the coverage defense. Had CIC given Paulson & Nace, Mr. Nace, or Ms. Gilbert timely notice of their intention to rely on the "no prior knowledge" condition, they would have been able to take steps to protect themselves from a no-coverage situation.   For example, timely notice to Mr. Nace that there was no coverage because of the alleged timing of the breach would have allowed him to give notice to the professional liability insurer that covered Paulson & Nace immediately prior to CIC.   Similarly, Ms. Gilbert would have been able to ensure that insurance coverage were in place prior to pursuing her legal malpractice claim against Paulson & Nace.   Regardless of how CIC describes its position, by relying on a lack of timely notice by Paulson & Nace, it is asserting that Paulson & Nace breached the Policy and therefore, Virginia Code § 38.2-2226 applies.

   3.   *Paulson & Nace, Mr. Nace and Ms. Gilbert have all been prejudiced by CIC's failure to timely raise the alleged breach.*

CIC's delay in notifying the other parties of the alleged breach has caused each of them to suffer prejudice to their rights concerning the judgment in the underlying legal malpractice action. Although Paulson & Nace, Mr. Nace and Ms. Gilbert need not show actual prejudice, only potential prejudice, such prejudice is nonetheless present here.   See Maxey v. Doe, 217 Va. 22, 25, 225 S.E.2d 359, 361 (1976).   With regard to Ms. Gilbert, she had relied on CIC's involvement in the claim when pursuing the underlying legal malpractice action as a source to satisfy her claim, which has now ripened into an enforceable judgment.   Similarly, Paulson & Nace and Mr. Nace relied on CIC's investigation and involvement in the claim believing that it provided coverage for

the claim.   Because of the delay in bringing the "no prior knowledge" defense to the insured's attention, Paulson & Nace and Mr. Nace were deprived of the opportunity to give timely notice to the insurer that covered them in the period until the CIC policy came into effect.   Had Paulson & Nace been able to inform its prior insurer, there may have been coverage available for Ms. Gilbert's claim under that policy.

The waiver provision of the notice statute applies "where the rights of a claimant who is a stranger to the insurance contract **may** be prejudiced."   See Maxey v. Doe, 217 Va. at 25, 225 S.E.2d at 361 (emphasis added).   CIC seeks to turn the *possibility* of prejudice into a *requirement* of prejudice.   CIC points to no case that converts Maxey's potential prejudice statement to a requirement to show prejudice.   The cases cited by CIC do not impose such a requirement.   See Vermont Mut. Ins. Co. v. Everette, 875 F.Supp. 1181 (E.D. Va. 1995)(insurer complied with Va. Code § 38.2-2226 by sending sufficient reservation of rights letters, therefore prejudice not addressed); see also Great Am. Ins. Co. v. Gross,[2] 2008 U.S. Dist. LEXIS 10079 (E.D. Va. 2008) (quoting Maxey's "may be prejudiced" language, but not reaching the issue of prejudice in a first party insurance claim); see also Allstate Ins. Co. v. Kinard, 45 Va. Cir. 273 (Va. Cir. Ct. 1998) (also quoting Maxey's "may be prejudiced" language, but not reaching the issue of prejudice in a first party insurance claim).

Under Virginia law, there need only be potential prejudice. Where there has been a failure or delay concerning notice, no prejudice need be shown.   See State Farm Fire & Cas. Co. v. Walton, 244 Va. 498, 423 S.E.2d 188 (1992)(where delay or failure of notice is material and

---

[2] Great Am. Ins. Co. v. Gross is also distinguishable as a first party insurance claim, where all claimants to the policy proceeds were also insured by the policy.   Here, Ms. Gilbert is a third party to the insurance contract, whose rights accrued following entry of a judgment in her favor against the insured.   As such Va. Code § 38.2-2226 protects her rights to the policy proceeds, regardless of any showing of prejudice.

-18-

substantial, prejudice need not be shown); see also State Farm Fire & Cas. Co. v. Scott, 236 Va. 116, 372 S.E.2d 383 (1988).   Just as no prejudice need be shown where an insured materially fails to provide notice to the insurer, no prejudice is required by Maxey – only the possibility of prejudice – for the insurer to waive its coverage defense where the insurer materially and substantially fails to provide notice of its intention to rely on such a breach.

Nonetheless, the waiver applies because of the potential prejudice that Ms. Gilbert, who was a stranger to the contract between CIC and Paulson & Nace until she obtained a judgment against the insured (see Storm v. Nationwide Ins. Co., 199 Va. 130, 97 S.E.2d 759 (1957)), would experience by being unable to collect the proceeds of Paulson & Nace's insurance to satisfy her judgment. Ms. Gilbert further details the actual prejudice to her claim in her Reply to CIC's Opposition to the Motion for Summary Judgment.   See Docket No. 27.

Furthermore, had CIC given the parties timely notice, they would have been in a position to give timely notice of the claim to Paulson & Nace's prior insurer, Philadelphia Insurance Companies.   The Philadelphia policy had a policy period from July 24, 2006 to July 24, 2007, and would have covered the period during which CIC claims Paulson & Nace would have had a reasonable basis to believe that a violation of professional duty had occurred.   See Correspondence from Barry Nace to Jennifer Green, dated May 30, 2012 and produced by CIC, attached as **Exhibit 11**.   Because CIC did not give notice to Mr. Nace, Paulson & Nace, or Ms. Gilbert concerning the alleged "no prior knowledge" breach, the real parties in interest were deprived of the opportunity to give timely notice to the insurer that would have provided coverage for the period prior to CIC.   Thus, the lack of timely notice worked severe prejudice on both the insured and the claimants in this action.

-19-

**B. Under the common law, in both Virginia and the District of Columbia, CIC has either waived its defense to coverage or is estopped from disclaiming coverage.**

1. *CIC waived its right to rely upon a breach of contract defense to coverage when it undertook to investigate the Gilbert Lawsuit and waited 2 ½ years to issue a reservation of rights.*

Although CIC contends that it took no affirmative action to waive its coverage defenses, CIC's actions throughout the investigation and willful blindness for a significant period of time act as a waiver.   For a waiver to exist, "knowledge of the facts basic to the exercise of the right and the intent to relinquish that right are essential elements."   Empl. Commercial Union Ins. Co. v. Great American Ins. Co., 214 Va. 410, 413, 200 S.E.2d 560, 562 (1973)(citing May v. Martin, 205 Va. 397, 137 S.E.2d 860 (1964)); see also Diamond Serv. Co. v. Utica Mut. Ins. Co., 476 A.2d 648, 654 (D.C. 1984)("Waiver is an act or course of conduct by the insurer which reasonably leads the insured to believe that the breach will not be enforced").   There is no genuine issue of material fact that CIC had notice of the Gilberts' potential claim and fully investigated the matter, including obtaining all relevant pleadings almost two years before it issued a reservation of rights.   Compl. ¶ 25.   Therefore, CIC had knowledge of all of the facts basic to its exercise of a breach of contract defense and by its actions and inactions, intended to waive its right to rely on such a defense.

CIC had all the information it needed for its "no prior knowledge" defense no later than March 8, 2010, when it received the pleadings and briefs concerning the underlying medical malpractice appeal to the Virginia Supreme Court.   CIC contends that the mere fact it requested and received these documents in March of 2010 does not mean they were actually reviewed any time prior to November 2011.   However, even a cursory review of the documents would have alerted CIC to the defense it now claims.   The underlying case involved a statute of limitations that had run in July 2006 and even a cursory review of the documents requested from Paulson &

-20-

Nace in March 2010 would have revealed this information.   Instead, CIC chose to ignore the documents it had obtained from Mr. Nace.   CIC cannot simply hide its head in the sand concerning the documents it had requested and received.   See In re Cutty's-Gurnee, Inc., 133 B.R. 934, 956 (Bankr. N.D. Ill. 1991)(insurer "is not entitled to bury its head in the sand or look the other way when it has in its possession the very document creating such interest and knowledge of the circumstances…").

CIC's corporate representative confirmed that it took such a head in the sand approach, ignored the documents it had requested from Paulson & Nace, and continued its investigation of the claim for a period of over 18 months before reviewing those documents:

Q  **So when they got the documents in, in March of 2010, your testimony is that you guys absolutely ignored it and not one person looked at any of that information in those documents.   Is that your testimony under oath?**
MS. SARP:   Objection; misstates testimony. And you're arguing with the witness.
MR. HORVATH:   I just want to make sure it's clear.
MS. SARP:   And you've asked this question about ten times.
MR. HORVATH:   **I want to make sure that it's crystal clear, that this company has asked for information from my clients for months, and they get the information in, and absolutely no one at all looks at the information that they had been requesting for months**.
BY MR. HORVATH:
Q  Is that your testimony under oath?
A  **That is my testimony, that it wasn't reviewed until November of 2011**.

CIC Depo. 168:13-169:10, additional excerpts attached as **Exhibit 12** (emphasis added).   Further, while CIC contends that it was not obligated to investigate or defend potential claim, it nonetheless undertook to investigate and defend the claim.

Thus, by undertaking to investigate the claim for literally years before issuing any notice of any issues to Mr. Nace, CIC waived its coverage defenses.   In this case, CIC both waived its right to rely upon a breach of contract defense to coverage and is estopped from asserting that defense

due to its undertaking the investigation of the claim, and its inaction in issuing notice of its intent to rely upon a breach of contract defense despite having the information necessary to raise the defense for a significant period of time.

> 2. *CIC is estopped from denying coverage because undertook to investigate the claim for 2 ½ years without issuing a reservation of rights and by assuming the defense of the action.*

In Virginia, the elements necessary to establish equitable estoppel, absent a showing of fraud or deception, are 1) a representation; 2) reliance; 3) a change of position; and 4) detriment. Waynesboro Village, L.L.C. v. BMC Properties, 255 Va. 75, 79, 496 S.E.2d 64, 67 (1998); T v. T, 216 Va. 867, 872, 224 S.E.2d 148, 152 (1976).   CIC represented that it would not rely upon a breach of contract defense to coverage by undertaking to investigate the matter, retaining counsel for Paulson & Nace and Barry Nace, and communicating with that counsel and Barry Nace for three years.   Nace Aff. ¶ 5.   Barry Nace relied on that representation and determined not to retain their own counsel to protect their individual interests as a result of CIC providing coverage and a defense.   Furthermore, the Gilberts proceeded to pursue their claim without the benefit of knowing that CIC would potentially deny coverage.   All the parties except for CIC relied upon CIC's investigation and defense of the Gilbert Lawsuits and all of the parties changed their position to their detriment as a result.

In the District of Columbia, estoppel arises when an insurance company assumes defense of an action, and the insured is prejudiced by the existence of that defense without knowledge that the insurer intends to later withdraw coverage.   See Capitol Specialty Ins. Co., 793 F. Supp. 2d at 411-412.   Here, the fact that Barry Nace did not learn of CIC's dispute concerning coverage until

long after the potential claim was first discovered resulted in severe prejudice.   Mr. Nace

described it as follows:

> Had you notified us timely on that, I would have hired an attorney to try to figure out what was going on.   Probably we would have a filed a declaratory judgment action on our own to figure out what the situation was.   And probably we never would have had to go through a trial.   The case would have been resolved one way or the other.   If you were -- should have been in the case, I suspect that would have been it, the case would have gotten resolved.   If it had been just me in the case or the corporation in the case, it would have gotten resolved one way or the other.
>
> That didn't happen.   So I had to sit through a trial for four days down in Richmond listening to the opposing attorney call me -- saying that I betrayed the client in this case.   It's not very pleasant to hear things like that.   The corporation ends up losing a lot of time.   The corporation is not me.   The corporation has three other shareholders; my three sons, who shouldn't be in this at all.
>
> The aggravation of having to go through this whole process, not to mention the amount that was involved now that probably would not have involved had this matter been resolved without a trial, under any circumstances.   There is no way that this case, whether you were handling it or we were handling it, would not have been settled for far less than $1.75 million.   It would be ridiculous to not settle the case.
>
> So there is all that added stuff -- added amount in there that could affect me personally as this case goes on.   And you're wrinkling your brow like you don't understand what I'm saying.   If you're confused, let me know, and I'll try to explain it to you better.   But I think it's pretty clear.

Nace Depo., 113:2-114:12.   Thus, Paulson & Nace and Barry Nace suffered palpable prejudice

as a result of the uncertainty that arose from the late notice of potential coverage defenses.

Paulson & Nace lost time that could have been spent on other matters, lost money that could

have been made working on other matters, suffered aggravation as a result of having to sit

through a trial on a matter that would have settled if the coverage position had been clear, and

experienced negative publicity that resulted from the trial and its outcome.

Additional prejudice arose from Paulson & Nace, Mr. Nace and Ms. Gilbert relying on

CIC's coverage rather than notifying and pursuing other potential insurers, such as Philadelphia

Insurance.   By investigating the underlying claim for such a significant period of time without providing notice of any coverage issue to Mr. Nace, CIC essentially foreclosed any possibility that the prior insurer would provide coverage for the claim.

The foregoing demonstrates actual prejudice experienced by Paulson & Nace and Barry Nace as a result of CIC's significant delay in notifying them of a potential coverage defense. Because of CIC's delay, the parties were unable to resolve the present matter in a timely fashion, which resulted in an inability to resolve the underlying matter.

**IV.    CONCLUSION**

Based on the foregoing, Paulson & Nace and Barry Nace respectfully request that this honorable Court grant their Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.   The defenses to coverage asserted by CIC were waived by CIC's failure to timely advise the defendants of its coverage concerns.

<div style="margin-left:50%">

PAULSON & NACE, PLLC and
BARRY J. NACE, Esquire
By Counsel

</div>

_____/s/_____
Stephen A. Horvath
DC Bar Number 417137
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 University Drive
Fairfax, Virginia 22030
(703) 385-1000
(703) 385-1555 - Facsimile
shorvath@bmhjlaw.com
*Counsel for Defendants, Paulson & Nace, PLLC and*
*Barry J. Nace, Esquire*

-24-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 9th day of January, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

David D. Hudgins, Esq.
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, VA 22314
dhudgins@hudginslawfirm.com
*Counsel for Plaintiff*

Paulette S. Sharp, Esquire
Hinshaw & Culbertson, LLP
333 South Seventh Street
Suite 2000
Minneapolis, MN 55402
psarp@hinshawlaw.com
*Counsel for Plaintiff*

Carla D. Brown, Esquire
Charlson Bredehoft Cohen Brown &
Sakata, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA 20190
cbrown@cbc-law.com
*Counsel for Defendant Sarah Gilbert*

Gabriel Assaad, Esquire
Assaad Law, PLLC
1425 K Street, N.W., Suite 350
Washington, DC 20005
gassaad@assaadlaw.com
*Defendant*

Herman Aubrey Ford, III, Esquire
Cantor Stoneburner Ford Grana & Buckner
7130 Glen Forest Drive, Ste 400
Richmond, VA 23226
afford@virginiatrialfirm.com
*Co-Counsel for Defendant Sarah Gilbert*

          /s/
          Stephen A. Horvath
          DC Bar Number 417137
          BANCROFT, McGAVIN,
             HORVATH & JUDKINS, P.C.
          3920 University Drive
          Fairfax, Virginia 22030
          (703) 385-1000
          (703) 385-1555 - Facsimile
          shorvath@bmhjlaw.com
          *Counsel for Defendants, Paulson & Nace, PLLC*
          *and Barry J. Nace, Esquire*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHICAGO INSURANCE COMPANY,          :
an Illinois Corporation                          :
       Plaintiff,                                    :
                                                      :
v.                                                          :          Civil No. 1:12-CV-2068
                                                      :
PAULSON & NACE, PLLC, et al.,           :
       Defendants.                                :
_____/

### RESPONSE TO CIC'S STATEMENT OF ADDITIONAL MATERIAL FACTS

1. Undisputed.

2. The defendants do not dispute that the Gilbert Lawsuit makes certain allegations; however, the allegations themselves are disputed.  <u>See</u> Answer filed in Gilbert Lawsuit, **Exhibit 1 to Paulson & Nace's Opposition to CIC's Motion for Summary Judgment** (Docket No. 25-1).

3. Undisputed.

4. Undisputed.

5. Undisputed.

6. Disputed.  The underlying claim was timely filed, but contained a misnomer.  Defendant does not dispute that the first medical malpractice lawsuit was filed prior to the expiration of the statute of limitations.  Docket No. 25-1; Deposition of Barry J. Nace, "Nace Depo.", 40:22-42:6, excerpts attached as **Exhibit 2 to Paulson & Nace's Opposition to CIC's Motion for Summary Judgment**.  The statute of limitations was tolled by the filing of the first lawsuit and Mr. Nace had no reasonable basis to believe that such a misnomer would lead to a claim.  Mr. Nace stated, "So the bottom line is, those kind of errors occur all of the time…a misnomer or

something of that sort, and nowhere am I aware that that would ever by itself lead to a claim. That is not dispositive of anything." Id.

7.  Undisputed.

8.  Undisputed.

9.  Disputed.  The purpose was to correct a misnomer of the order in which the plaintiffs were named in the lawsuit, which CIC characterizes as a "mistake."  See **Exhibit Z to Plaintiff's Opposition to Summary Judgment**, 17:18-18:6.

10. Disputed to the extent that Mr. Assaad's argument on the underlying Motion to Dismiss is only partially set forth.  The quoted, and emphasized, portion of the transcript is misleading. The argument concerning the Motion to Dismiss concerned facts and issues that may toll the statute of limitations.  See **Exhibit E to Plaintiff's Motion for Summary Judgment,** at 13:16-14:6.  The remainder of Mr. Assaad's argument stated, "…However, Your Honor, there are certain issues that may toll the statute, based on continuing treatment, based on we might move the Court to declare this person incapacitated during a certain period of time during that period, and I have yet to receive the medical records from defendants to be able to make those arguments to determine whether or not we're going to proceed with that action.  That's why I feel at this point, to dismiss the child's claim with prejudice would be inappropriate…" Id. at 13:16-14:3.

11. Undisputed.

12. Disputed.   The Order attached as **Exhibit F to Plaintiff's Motion for Summary Judgment** does not dismiss the claims with prejudice.  The words "with prejudice" were struck from the order, such that it reads, "It is therefore ORDERED that Sarah Gilbert's, a minor, claims are DISMISSED ~~WITH PREJUDICE~~."  Judge Hughes later confirmed that the February

26, 2007 dismissal was without prejudice.  **Exhibit G to Plaintiff's Motion for Summary Judgment**, 31:20-31:23 ("I think I dismissed the first one without prejudice because the second case was pending, and that case, as I recall, was not up for bat, if you will.").  Even though the words, "with prejudice" were crossed out of the order, and even though the trial judge made it abundantly clear that the first case was not dismissed with prejudice, Plaintiff bases its denial of coverage on the incorrect statement that the first case was dismissed with prejudice in February 2007.  See **Exhibit 5 to Paulson & Nace's Motion for Summary Judgment.**

13. Undisputed.

14. Disputed.  Although argument on the motion to dismiss occurred at the June 18, 2007 hearing, the court did not rule on the motion to dismiss until August 3, 2007, when it entered a written order.  This was after the application was submitted.  A true and correct copy of the August 3, 2007 Order is attached as **Exhibit 3 to Paulson & Nace's Opposition to CIC's Motion for Summary Judgment**.  It is well established that the courts of the Commonwealth of Virginia speak only through their written orders.  Austin v. Consolidation Coal Co., 256 Va. 78, 81, 501 S.E.2d 161, 162 (1998); Davis v. Mullins, 251 Va. 141, 148, 466 S.E.2d 90, 94 (1996); Town of Front Royal v. Industrial Park, 248 Va. 581, 586, 449 S.E.2d 794, 797 (1994); Robertson v. Superintendent of the Wise Correctional Unit, 248 Va. 232, 235, 445 S.E.2d 116, 117, fn.* (1994).

15. Disputed.  See ¶ 14.

16. Undisputed.

17. Disputed to the extent that the application is only partially set forth.

18. Undisputed.

19. Undisputed.

20. Undisputed.

21. Undisputed.

22. Undisputed.

23. Undisputed.

24. Disputed.   **Exhibit O to Plaintiff's Motion for Summary Judgment** includes a letter dated May 17, 2013, not July of 2009, a string of emails acknowledging that a claim supplement had been received and confirming that coverage was bound as of July 24, 2009, and a redacted claim log concerning receipt of a potential claim.   Mr. Nace testified that this letter was not received.   See Nace Depo. 93:17-94:5. Further, CIC's corporate representative testified during his deposition that the letter was as acknowledgement of the claim with nothing specific to reserve, and that letter was not a reservation of rights letter, but merely an acknowledgement. Deposition of Frank J. Lindner, CIC's Corporate Representative, (hereinafter "CIC Depo.", attached hereto as **Exhibit 9 to Paulson & Nace's Opposition to CIC's Motion for Summary Judgment**.) 59:4-59:21, 72:5-72:16, & 73:12-73:21; see also CIC Depo. 70:1-70:18 additional excerpts attached as **Exhibit 12.**

25. Disputed.   In July 2009 CIC had received notice of the claim and initiated its investigation.   See **Exhibits 4 & 5 to Paulson & Nace's Motion for Summary Judgment**.

26. Disputed to the extent that the letter included in **Exhibit O to Plaintiff's Motion for Summary Judgment** does not state what, if any, rights Plaintiff was reserving.

27. Disputed to the extent that the letter included in **Exhibit O to Plaintiff's Motion for Summary Judgment** does not state what, if any, rights Plaintiff was reserving.   More importantly, the Nace Defendants never received this letter.   See Nace Depo. 93:17-94:5.

-4-

28. Undisputed.   Plaintiff has no affirmative evidence that the letter was received and the suggestion that it was received is disputed. Further, if it had been received Mr. Nace would have kept a copy.

29. Disputed.   CIC did not advise Mr. Nace of any coverage issues prior to January 2012; therefore his reliance on CIC's acceptance of coverage was reasonable. See, e.g., Ins. Co. of N. Am. v. Atlantic Nat'l Ins. Co., 329 F.2d 769 (4th Cir. 1964)(when a liability insurer with knowledge of a grounds of forfeiture or noncoverage under the policy assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from relying on such ground for forfeiture or noncoverage.)

30. Disputed.   Nonetheless, CIC did not advise Mr. Nace of any coverage issues prior to January 2012; therefore his reliance on CIC's acceptance of coverage was reasonable.   Unless coverage is disputed, an insured can assume that coverage exists.   See, e.g., Ins. Co. of N. Am. v. Atlantic Nat'l Ins. Co., 329 F.2d 769 (4th Cir. 1964)(when a liability insurer with knowledge of a grounds of forfeiture or noncoverage under the policy assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from relying on such ground for forfeiture or noncoverage.)

31. Disputed.   CIC had hired Jordan Coyne and Ms. Whelihan in the past to represent Mr. Nace.   Mr. Nace never hired the Jordan Coyne law firm directly.   Nace Depo., 69:9-69:22, additional excerpts attached as **Exhibit 13**.

-5-

32. Disputed.  CIC had hired Jordan Coyne and Ms. Whelihan in the past to represent Mr. Nace.  Mr. Nace never hired the Jordan Coyne law firm directly.  Nace Depo., 69:9-69:22, additional excerpts attached as **Exhibit 13**.

33. Disputed.  By September 30, 2010 CIC had already received the Petitions for Appeal, Oppositions, Complaints and Briefs by March 8, 2010.  <u>See</u> **Exhibit 9 to Paulson & Nace's Motion for Summary Judgment**.  The documents enclosed with Mr. Nace's March 2, 2010, letter were:  Petition for Appeal filed August 14, 2009; Opposition to Petition for Appeal filed September 8, 2009; the Complaint filed in the First Gilbert Suit; the Amended Complaint filed in the First Gilbert Suit; the Motion for Reconsideration filed by the Attorney Defendants in the First Gilbert Suit on April 13, 2009, with exhibits, including a transcript of the January 4, 2007, hearing before the Honorable Melvin Hughes; and the Defendants' Brief in Opposition to Plaintiff's Motion for Reconsideration filed April 22, 2009.  This information contained the dates of the events and facts that provide the basis for the allegation that Paulson & Nace had "prior knowledge" of the potential claim.

34. Undisputed.

35. Undisputed.  However, CIC does not dispute that it had been advised of the potential claim and had begun investigating the claim prior to the January 28, 2011 letter.

36. Disputed.  By September 30, 2010 CIC had already received the Petitions for Appeal, Oppositions, Complaints and Briefs by March 8, 2010.  <u>See</u> **Exhibit 9 to Paulson & Nace's Motion for Summary Judgment**.  The documents enclosed with Mr. Nace's March 2, 2010, letter were:  Petition for Appeal filed August 14, 2009; Opposition to Petition for Appeal filed September 8, 2009; the Complaint filed in the First Gilbert Suit; the Amended Complaint filed in the First Gilbert Suit; the Motion for Reconsideration filed by the Attorney Defendants in the

First Gilbert Suit on April 13, 2009, with exhibits, including a transcript of the January 4, 2007, hearing before the Honorable Melvin Hughes; and the Defendants' Brief in Opposition to Plaintiff's Motion for Reconsideration filed April 22, 2009.  This information contained the dates of the events and facts that provide the basis for the allegation that Paulson & Nace had "prior knowledge" of the potential claim.

37. Disputed.  By October 20, 2011 CIC had already received the Petitions for Appeal, Oppositions, Complaints and Briefs by March 8, 2010.  <u>See</u> **Exhibit 9 to Paulson & Nace's Motion for Summary Judgment**.  The documents enclosed with Mr. Nace's March 2, 2010, letter were:  Petition for Appeal filed August 14, 2009; Opposition to Petition for Appeal filed September 8, 2009; the Complaint filed in the First Gilbert Suit; the Amended Complaint filed in the First Gilbert Suit; the Motion for Reconsideration filed by the Attorney Defendants in the First Gilbert Suit on April 13, 2009, with exhibits, including a transcript of the January 4, 2007, hearing before the Honorable Melvin Hughes; and the Defendants' Brief in Opposition to Plaintiff's Motion for Reconsideration filed April 22, 2009.  This information contained the dates of the events and facts that provide the basis for the allegation that Paulson & Nace had "prior knowledge" of the potential claim.

38. Disputed.  By November 21, 2011 CIC had already received the Petitions for Appeal, Oppositions, Complaints and Briefs by March 8, 2010.  <u>See</u> **Exhibit 9 to Paulson & Nace's Motion for Summary Judgment**.  The documents enclosed with Mr. Nace's March 2, 2010, letter were:  Petition for Appeal filed August 14, 2009; Opposition to Petition for Appeal filed September 8, 2009; the Complaint filed in the First Gilbert Suit; the Amended Complaint filed in the First Gilbert Suit; the Motion for Reconsideration filed by the Attorney Defendants in the First Gilbert Suit on April 13, 2009, with exhibits, including a transcript of the January 4, 2007,

hearing before the Honorable Melvin Hughes; and the Defendants' Brief in Opposition to Plaintiff's Motion for Reconsideration filed April 22, 2009. This information contained the dates of the events and facts that provide the basis for the allegation that Paulson & Nace had "prior knowledge" of the potential claim. Mr. Nace did not know that an error had been made until after the inception of the first CIC policy. Mr. Nace believed in good faith that there was no reason to believe that a claim would be made against Paulson & Nace based on the lower court ruling until after the briefs had been submitted for the Petition for Appeal to the Supreme Court of Virginia.

39. Disputed. Prior to November 29, 2011 and no later than March 8, 2010 CIC had all information necessary to reach its conclusion that the alleged error committed by the Nace Defendants was prior to the inception of its policy. See **Exhibit 9 to Paulson & Nace's Motion for Summary Judgment**.

40. Disputed. CIC continued to request information concerning the claim following the date of its alleged reliance. The documents enclosed with Mr. Nace's March 2, 2010, letter were: Petition for Appeal filed August 14, 2009; Opposition to Petition for Appeal filed September 8, 2009; the Complaint filed in the First Gilbert Suit; the Amended Complaint filed in the First Gilbert Suit; the Motion for Reconsideration filed by the Attorney Defendants in the First Gilbert Suit on April 13, 2009, with exhibits, including a transcript of the January 4, 2007, hearing before the Honorable Melvin Hughes; and the Defendants' Brief in Opposition to Plaintiff's Motion for Reconsideration filed April 22, 2009. This information contained the dates of the events and facts that provide the basis for the allegation that Paulson & Nace had "prior knowledge" of the potential claim.

41. Disputed to the extent that CIC claims that it requested significant documentation yet refused to review that documentation.   See CIC Depo. 168:13-169:10, additional excerpts attached as **Exhibit 12**.

42. Disputed.  CIC requested and received documents, which had they been reviewed would have revealed information contrary to CIC's alleged assumption. See CIC Depo. 168:13-169:10, additional excerpts attached as **Exhibit 12**; see also **Exhibit 9 to Paulson & Nace's Motion for Summary Judgment**.   The documents enclosed with Mr. Nace's March 2, 2010, letter were: Petition for Appeal filed August 14, 2009; Opposition to Petition for Appeal filed September 8, 2009; the Complaint filed in the First Gilbert Suit; the Amended Complaint filed in the First Gilbert Suit; the Motion for Reconsideration filed by the Attorney Defendants in the First Gilbert Suit on April 13, 2009, with exhibits, including a transcript of the January 4, 2007, hearing before the Honorable Melvin Hughes; and the Defendants' Brief in Opposition to Plaintiff's Motion for Reconsideration filed April 22, 2009. This information contained the dates of the events and facts that provide the basis for the allegation that Paulson & Nace had "prior knowledge" of the potential claim.

43. Disputed to the extent that such notice was never sent to Ms. Gilbert.  **Exhibit 7 to Paulson & Nace's Motion for Summary Judgment**, ¶ 5.  Further, CIC's denial was also based on the alleged breach of the condition requiring truth in declarations and applications.  The denial letter stated, "In your claim form you advised CIC that the error, if any, was committed in 2008.  CIC relied on this representation when it agreed to treat this as a potential claim at that time.  Based on recent documents made available to CIC it is clear that the error, if any, was committed in 2006." **Exhibit 5 to Paulson & Nace's Motion for Summary Judgment**, pg. 4.

44. Undisputed.

45. Disputed to the extent that the policy provisions are only partially set forth and do not contain the emphasis asserted by Plaintiff.

46. Disputed to the extent that the policy provisions are only partially set forth and do not contain the emphasis asserted by Plaintiff.

47. Disputed to the extent that the policy provisions are only partially set forth and do not contain the emphasis asserted by Plaintiff.

48. Disputed.   This statement is not fact, but instead is Mr. Lindner's legal conclusions, which are not admissible evidence.   See Burkhart v. Washington Metropolitan Area Transit Auth., 324 U.S. App. D.C. 241, 246, 112 F.3d 1207, 1212 (1997)("expert testimony that consists of legal conclusions cannot properly assist the trier of fact [to understand the evidence or to determine a fact in issue] and thus is not otherwise admissible.").

49. Disputed.   This statement is not fact, but instead is Mr. Lindner's legal conclusions, which are not admissible evidence. See Burkhart v. Washington Metropolitan Area Transit Auth., 324 U.S. App. D.C. 241, 246, 112 F.3d 1207, 1212 (1997)("expert testimony that consists of legal conclusions cannot properly assist the trier of fact [to understand the evidence or to determine a fact in issue] and thus is not otherwise admissible.").

50. Disputed.   This statement is not fact, but instead is Mr. Lindner's legal conclusions, which are not admissible evidence.   See Burkhart v. Washington Metropolitan Area Transit Auth., 324 U.S. App. D.C. 241, 246, 112 F.3d 1207, 1212 (1997)("expert testimony that consists of legal conclusions cannot properly assist the trier of fact [to understand the evidence or to determine a fact in issue] and thus is not otherwise admissible.").

51. Disputed to the extent that the policy provisions are only partially set forth and do not contain the emphasis asserted by Plaintiff.

52. Undisputed.

53. Disputed.  CIC's policy defines a "claim" as <u>any demand for money or services</u> or the filing of the suit or institution of proceedings.  <u>See</u> **Exhibit L to Plaintiff's Motion for Summary Judgment** (emphasis added).  Furthermore, CIC contends that its reservation of rights letter predates this alleged claim.

54. Undisputed.

55. Undisputed.

56. Undisputed.

57. Disputed.  CIC had been consulting with the Jordan Coyne law firm about this matter since at least September 30, 2010.  <u>See</u> CIC Depo. 103:17-104:6, additional excerpts attached hereto as **Exhibit 12**.

58. Undisputed.

59. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

60. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

61. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

62. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

63. Disputed.  The facts alleged are not material to the present motion for summary judgment.  Further, arguments made by counsel in collateral cases concerning distinct issues are

not binding under a theory of judicial estoppel.  See Schneider v. Lockheed Aircraft Corp., 658 F.2d 835

64. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

65. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

66. Disputed.  The District Court for the Eastern District of Virginia dismissed the action based on CIC's failure to allege **subject matter** jurisdiction.  See Order attached hereto as **Exhibit 10**.

67. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

68. Disputed.  The affidavit speaks for itself.

69. Disputed to the extent that CIC characterizes Mr. Nace's testimony as speculative. Further there is no need to show actual prejudice.  Virginia Code § 38.2-2226 applies where there *may* be prejudice.  See Maxey v. Doe, 217 Va. 22, 25, 225 S.E.2d 359, 361 (1976). Furthermore, there was in fact prejudice to Paulson & Nace, Mr. Nace, and Ms. Gilbert.  See Deposition of Barry J. Nace, 113:2-114:12, excerpts attached as **Exhibit 2 to Paulson & Nace's Opposition to CIC's Motion for Summary Judgment**.

70. Disputed to the extent that CIC characterizes Mr. Nace's testimony as speculative.

71. Disputed to the extent that CIC characterizes Mr. Nace's testimony as speculative.

72. Undisputed.

73. Undisputed.

74. Disputed to the extent that the fact alleged is not material to the present motion for summary judgment.

75. Disputed to the extent that CIC characterizes Mr. Nace's testimony as speculative.

76. Undisputed.

77. Disputed.  The delay in CIC's reservation of rights prejudiced Ms. Gilbert and the Nace Defendants in the resources expended in the underlying trial and further prejudiced their ability to give notice to the Paulson & Nace's prior legal malpractice liability insurer.   See Correspondence from Barry Nace to Jennifer Green, dated May 30, 2012 and produced by CIC identifying Philadelphia Insurance as the prior insurer, attached as **Exhibit 11**.   See also Deposition of Barry J. Nace, 113:2-114:12, excerpts attached as **Exhibit 2 to Paulson & Nace's Opposition to CIC's Motion for Summary Judgment**. Mr. Nace identified the following prejudice:

> Had [CIC] notified us timely on that, I would have hired an attorney to try to figure out what was going on.  Probably we would have a filed a declaratory judgment action on our own to figure out what the situation was.  And probably we never would have had to go through a trial.  The case would have been resolved one way or the other.  If you were -- should have been in the case, I suspect that would have been it, the case would have gotten resolved.  If it had been just me in the case or the corporation in the case, it would have gotten resolved one way or the other.
>
> That didn't happen.  So I had to sit through a trial for four days down in Richmond listening to the opposing attorney call me -- saying that I betrayed the client in this case.  It's not very pleasant to hear things like that.  The corporation ends up losing a lot of time.  The corporation is not me.  The corporation has three other shareholders; my three sons, who shouldn't be in this at all.
>
> The aggravation of having to go through this whole process, not to mention the amount that was involved now that probably would not have involved had this matter been resolved without a trial, under any circumstances.  There is no way that this case, whether you were handling it or we were handling it, would not have been settled for far less than $1.75 million.  It would be ridiculous to not settle the case.
>
> So there is all that added stuff -- added amount in there that could affect me personally as this case goes on.  And you're wrinkling your brow like you don't

understand what I'm saying.  If you're confused, let me know, and I'll try to explain it to you better.  But I think it's pretty clear.

Nace Depo., 113:2-114:12.

PAULSON & NACE, PLLC and
BARRY J. NACE, Esquire
By Counsel

_____/s/_____
Stephen A. Horvath
DC Bar Number 417137
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
3920 University Drive
Fairfax, Virginia 22030
(703) 385-1000
(703) 385-1555 - Facsimile
shorvath@bmhjlaw.com
*Counsel for Defendants, Paulson & Nace, PLLC and*
*Barry J. Nace, Esquire*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on the 9th day of January, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

David D. Hudgins, Esq.
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, VA 22314
dhudgins@hudginslawfirm.com
*Counsel for Plaintiff*

Paulette S. Sharp, Esquire
Hinshaw & Culbertson, LLP
333 South Seventh Street
Suite 2000
Minneapolis, MN 55402
psarp@hinshawlaw.com
*Counsel for Plaintiff*

Carla D. Brown, Esquire
Charlson Bredehoft Cohen Brown &
Sakata, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA 20190
cbrown@cbc-law.com
*Counsel for Defendant Sarah Gilbert*

Gabriel Assaad, Esquire
Assaad Law, PLLC
1425 K Street, N.W., Suite 350
Washington, DC 20005
gassaad@assaadlaw.com
*Defendant*

Herman Aubrey Ford, III, Esquire
Cantor Stoneburner Ford Grana & Buckner
7130 Glen Forest Drive, Ste 400
Richmond, VA 23226
afford@virginiatrialfirm.com
*Co-Counsel for Defendant Sarah Gilbert*

_____/s/_____
Stephen A. Horvath
DC Bar Number 417137
BANCROFT, McGAVIN,
    HORVATH & JUDKINS, P.C.
3920 University Drive
Fairfax, Virginia 22030
(703) 385-1000
(703) 385-1555 - Facsimile
shorvath@bmhjlaw.com
*Counsel for Defendants, Paulson & Nace, PLLC*
*and Barry J. Nace, Esquire*

# EXHIBIT 11

# Paulson&Nace, PLLC
## ATTORNEYS AT LAW

Richard S. Paulson (1929-1986)
Barry J. Nace (DC, ' ID, PA, W.')
Certified in Civil Trial Advocacy by the National
Board of Trial Advocate

Certified in Medical Malpractice by the American
Board of Professional Liability Attorneys

Christopher T. Nace (DC, G'., MD, WV)
Jonathan B. Nace (DC, MD)
Matthew A. Nace (MD)
Caitlin S. Palacios (DC, MD)

May 30, 2012

*Via U.S. Mail*
Jennifer L. Green, J.D. – Claims Specialist
Fireman's Fund Insurance Company
33 West Monroe Street
Chicago, IL 60603

     Re:    *Gilbert v. Paulson & Nace, PLLC, et al.*

Dear Ms. Green:

Your letter of April 21, 2012 asked me to respond and identify the other insurers that were notified of the *Gilbert* lawsuit and what coverage position(s) they have taken.

Our insurance is always handled by Alliant Insurance Services, Inc.; 9901 Business Parkway, Suite B, Lanham, MD, 207061. Since 2006, our insurance carriers have been:

       07/24/05 – 07/24/07   Philadelphia Indemnity
       07/24/07 – 07/24/10   Chicago Insurance Company
       07/24/10 – 07/24/11   Evanston Insurance Company

Lloyd's of London was informed of this claim by our agency and Ms. Kathaleen Bowen. I don't know of any other carrier that has been notified. Lloyd's apparently will not cover the claim. Perhaps my broker can answer the question "why." I can't.

                 Very truly yours,

                 Barry J. Nace

BJN/bcb

cc:    Angela L. Fleege (Email: angelaf@proquestinsurance.com)
      Deborah Whelihan, Esq.
      Ms. Kathaleen Bowen

1615 New Hampshire Avenue, NW
Washington, DC 20009-2520
(202) 463-1999 phone
(202) 223-6824 fax
www.paulsonandnace.com

Chicago 0104

# EXHIBIT 12

In the Matter Of:

CHICAGO INSURANCE CO.

vs.

PAULSON & NACE, ET AL

**FRANK J. LINDNER**

*November 22, 2013*



Court Reporting
Videography
Videoconferencing

Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1                UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3      -------------------------------------+
        CHICAGO INSURANCE COMPANY,           :
 4      an Illinois Corporation,             :
                         Plaintiff,          :
 5                                           :CIVIL NUMBER
        vs.                                  :1:12-CV-2068
 6                                           :
        PAULSON & NACE, PLLC, et al.,        :
 7                       Defendants.         :
        -------------------------------------+
 8                               Fairfax, Virginia
                         Friday, November 22, 2013
 9

10                 FRANK J. LINDNER,

11

12   called for examination by counsel on behalf of the

13   Defendants, Paulson and Nace, et al, Pursuant to Notice

14   taken in the Offices of Bancroft, McGavin, Horvath &

15   Judkins, P.C., 3920 University Drive, Fairfax, Virginia

16   22030 at approximately 1:11 p.m., before Janie Arriaga,

17   a certified Verbatim Reporter and a Notary Public in and

18   for the Commonwealth of Virginia, when there were

19   present on behalf of the respective parties.

20

21

22
```

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

```
 1    APPEARANCES:

 2                    On behalf of Plaintiff:

 3                    PAULETTE S. SARP, ESQUIRE

 4                    Hinshaw and Culbertson, LLC

 5                    333 South Seventh Street, Suite 2000

 6                    Minneapolis, Minnesota 55402

 7

 8                    On behalf of Defendants:

 9                    STEPHEN HORVATH, ESQUIRE

10                    Bancroft, McGavin,

11                    Horvath & Judkins, P.C.

12                    3920 University Drive

13                    Fairfax, Virginia 22030

14

15

16

17

18

19

20

21

22
```

|    |                                           | Page 3 |
|----|-------------------------------------------|--------|
| 1  | C O N T E N T S                           |        |
| 2  | WITNESS                                   | PAGE   |
| 3  | FRANK J. LINDNER                          |        |
| 4  | Examination by Mr. Horvath                | 4      |
| 5  | Examination by Ms. Sarp                   | 161    |
| 6  | Further Examination by Mr. Horvath        | 163    |
| 7  |                                           |        |
| 8  | E X H I B I T S                           |        |
| 9  |                                           |        |
| 10 | Lindner Number 1    30(b)6                | 8      |
| 11 | Lindner Number 2    Complaint             | 24     |
| 12 | Lindner Number 3    Order                 | 27     |
| 13 | Lindner Number 4    Order                 | 31     |
| 14 | Lindner Number 5    Claim                 | 48     |
| 15 | Lindner Number 6    Notes                 | 53     |
| 16 | Lindner Number 7    Reservation of Rights | 112    |
| 17 | Lindner Number 8    (Not identified.)     | 119    |
| 18 | Lindner Number 9    Reservation of Rights | 120    |
| 19 | Lindner Number 10   Answers Interrogatories| 127   |
| 20 |                                           |        |
| 21 |                                           |        |
| 22 | (EXHIBITS ATTACHED TO TRANSCRIPT)         |        |

Page 4

```
 1                    P R O C E E D I N G S

 2   Whereupon,

 3                    FRANK J. LINDNER,

 4   was called for examination by Counsel on behalf of the

 5   Defendants, and after having been duly sworn by the

 6   Court Reporter was examined and testified as follows:

 7             EXAMINATION BY COUNSEL FOR DEFENDANTS:

 8   BY MR. HORVATH:

 9        Q    Could you please state your full name?

10        A    Sure.  Frank John, J-o-h-n, Lindner,

11   L-i-n-d-n-e-r.

12        Q    What is your occupation or profession?

13        A    Claim director.

14        Q    For?

15        A    Fireman Fund Insurance Company.

16        Q    And where do you reside?

17        A    Fontana, Wisconsin.

18        Q    Have you ever been deposed before?

19        A    Yes.

20        Q    How many times?

21        A    A couple of times.

22        Q    What type of cases?
```

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

FRANK J. LINDNER
Page 70

Page 70

1      Q     What specific rights were you attempting to

2   reserve as of July of 2009?

3          MS. SARP:  Let me just object.  Are you

4   referring to the specific letter?

5          MR. HORVATH:  Yes.

6          MS. SARP:  I think it's fair that he has a

7   chance to see the --

8          MR. HORVATH:  He's already testified he wasn't

9   aware of any coverage issues, so I'm trying to figure

10   out what he's trying to reserve.

11      A     It's just general language that is at the end

12   of the acknowledgement letter, that basically we reserve

13   the right if anything comes to our attention to raise

14   the coverage defense at that point in time.  So it's --

15   BY MR. HORVATH:

16      Q     You don't have a specific issue in mind at

17   that point in time?

18      A     Right.

19      Q     It's just a general reservation; right?

20      A     Correct.

21      Q     Did you tell Mr. Nace that he had a right to

22   reserve his rights?

Page 103

1       A    I believe that is correct.  I know that the

2   Jordan Coyne firm was involved at that time.

3       Q    That's in July of 2011.  How long had they

4   been involved?

5       A    There's a note from Jennifer that on September

6   30th of 2010, that there was a conversation with the

7   Jordan Coyne firm.

8       Q    So that is as of September 30th, 2010, Jordan

9   Coyne had been retained to represent Mr. Nace's firm; is

10  that correct?

11          MS. SARP:  Objection.  That misstates

12  testimony.

13          Go ahead.

14  By MR. HORVATH:

15      Q    Is that correct?

16      A    I'm sorry, repeat the question.

17      Q    As of September 30th, 2010, Jordan Coyne had

18  been retained to represent Mr. Nace and his firm?

19          MS. SARP:  Same objection.

20      A    I don't know when they were like -- when they

21  were officially retained.  I mean, there was a

22  conversation.  I can tell from the note here on

                                                                  Page 104

 1    September 30th.  It would have been around that time

 2    frame.  I just don't know if it was on that date.

 3    BY MR. HORVATH:

 4        Q    Within a couple of weeks either way?

 5        A    I believe so, because, I mean, in November Amy

 6    is following up on a proposed meeting.

 7        Q    Sure.  Do you know when the Jordan Coyne firm

 8    had the file?

 9        A    Do I know when they received the file?

10        Q    Yes.

11        A    Hold on.  I don't know when they actually

12    received it.  Yeah, I can't tell.  The notes are

13    redacted.  I don't know if we would have noted when they

14    actually received it or not.

15        Q    Do you have any information that on or about

16    November 30th, 2010, they did not have the file, the

17    file being the pleadings of the underlying litigation

18    and possibly the transcripts?

19        A    Around November 30th, 2010, that they did not?

20        Q    Yes.

21        A    I can't tell without reviewing all of the

22    notes.  I don't know if our notes would actually specify

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

FRANK J. LINDNER
Page 168

Page 168

```
 1   are.  In fact, when you do your evaluation, you usually

 2   say, this matter arises out of a loss that occurred for

 3   breach for missing the statute of limitations, the

 4   underlying tort occurred on this date, the statute ran

 5   on this date, suit was filed on this.  Don't you put

 6   that in your standard initial reports?

 7        A    This was a potential claim.  So this wasn't --

 8   it wasn't worked up like an actual claim.  It wasn't.  I

 9   mean, there were many attempts to get information from

10   the insured, to get documents from the insured.  There

11   were some conversation with the insured, but it remained

12   a potential claim.

13        Q    So when they got the documents in, in March of

14   2010, your testimony is that you guys absolutely ignored

15   it and not one person looked at any of that information

16   in those documents.  Is that your testimony under oath?

17             MS. SARP:  Objection; misstates testimony.

18   And you're arguing with the witness.

19             MR. HORVATH:  I just want to make sure it's

20   clear.

21             MS. SARP:  And you've asked this question

22   about ten times.
```

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL                FRANK J. LINDNER
Page 169

Page 169

1              MR. HORVATH:  I want to make sure that it's

2    crystal clear, that this company has asked for

3    information from my clients for months, and they get the

4    information in, and absolutely no one at all looks at

5    the information that they had been requesting for

6    months.

7    BY MR. HORVATH:

8         Q    Is that your testimony under oath?

9         A    That is my testimony, that it wasn't reviewed

10   until November of 2011.

11             MR. HORVATH:  No further questions.

12             MS. SARP:  We'll read and sign.

13             (Thereupon, at 4:43 p.m., the deposition

14             concluded.)

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

CHICAGO INSURANCE COMPANY,  :
An Illinois corporation,            :
                                    :      Civil Action No. 1:12-CV-02068-ABJ
Plaintiff,                          :
                                    :
v.                                  :
                                    :
PAULSON & NACE, PLLC, a professional :
limited liability company; BARRY J. NACE, :
an individual; GABRIEL ASSAAD, an    :
individual; and SARAH E. GILBERT, an :
individual.                         :
                                    :
Defendants.                         :

---

**SUR-REPLY IN SUPPORT OF CIC'S OPPOSITION TO NACE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

Chicago Insurance Company ("CIC") submits the following Sur-Reply in support of its Opposition to the Nace Defendants' Motion for Summary Judgment. The Court granted CIC's motion to file a brief Sur-Reply in its minute order dated January 15, 2014.

The Nace Defendants assert an entirely new argument in their Reply Memorandum concerning the alleged prejudice they claim to have sustained as the result of the timing of CIC's reservation of rights letters. Specifically, the Nace Defendants argue that if CIC had given them notice of CIC's "no prior knowledge" coverage defense sooner, the Nace Defendants would have provided notice to their prior insurer, Philadelphia Indemnity Insurance Company ("PIIC"), and been able to obtain coverage for Ms. Gilbert's claim from that insurer.

The Nace Defendants provide no evidence to support this speculative argument. Indeed, the Nace Defendants do not even provide the Court with a copy of the insurance policy issued by PIIC even though they have a copy in their possession and produced it to CIC in response to CIC's discovery requests. The Nace Defendants also fail to produce an affidavit from PIIC

121592744 0939915

supporting their position that PIIC would have extended coverage for Ms. Gilbert's claim had the Nace Defendants reported the potential claim to PIIC at the same time they reported the potential claim to CIC in May of 2009.[1]   On the contrary, an examination of the basic provisions of the PIIC policy and the undisputed facts warrant the conclusion that *even if* CIC had advised the Nace Defendants of its specific coverage defense on the very same day that the Nace Defendants first notified CIC of Ms. Gilbert's potential claim in May of 2009, the Nace Defendants had already delayed too long in providing notice of Ms. Gilbert's potential claim to PIIC and most likely would not have been able to obtain coverage from PIIC.  In other words, the fact that CIC did not advise the Nace Defendants in writing of its "no prior knowledge" coverage defense until January of 2012, as opposed to May of 2009, in no way deprived the Nace Defendants of their opportunity to obtain coverage under the PIIC policy.

The PIIC policy provided "Lawyers Professional Liability Insurance" to "Barry J. Nace dba Paulson & Nace" on a claims-made and reported basis.  The PIIC policy was in effect from July 24, 2006 to July 24, 2007 and includes the following insuring agreement:

### I.     COVERAGE – PROFESSIONAL LIABILITY

A.     The Company will pay on behalf of any INSURED those sums in excess of the deductible which any INSURED becomes legally obligated to pay as DAMAGES as a result of CLAIMS <u>first made against any INSURED during the POLICY PERIOD and reported to the Company in writing during the POLICY PERIOD or within sixty (60) days thereafter</u>, by reason of any WRONGFUL ACT or PERSONAL INJURY occurring on or after the RETROACTIVE DATE, if any.  (Emphasis added).

(Exhibit DD at PIIC 021).   The PIIC policy also includes the following provisions concerning the reporting of "potential claims":

### III.    REPORTING OF POTENTIAL CLAIMS

---

[1] A copy of the professional liability policy issued by PIIC for the policy period July 24, 2006 to July 24, 2007 has been Bates-labeled PIIC 001-33 and is attached as Exhibit DD to this Sur-Reply.

121592744 0939915

> If, during the POLICY PERIOD, any INSURED first becomes aware of a potential CLAIM (i.e., any WRONGFUL ACT or PERSONAL INJURY which might reasonably give rise to a CLAIM against any INSURED under this policy) and gives written notice of such WRONGFUL ACT or PERSONAL INJURY to the Company during the POLICY PERIOD, any CLAIMS subsequently made against any INSURED arising out of that WRONGFUL ACT or PERSONAL INJURY shall be considered to have been made during the POLICY PERIOD.

(Exhibit DD at PIIC 026).   The PIIC policy also provides the insured with the option of purchasing an "Extended Reporting Period Endorsement" of 12 months, 24 months, 36 months or even an unlimited period of time in exchange for payment of an additional premium.   The extended coverage applies to "CLAIMS otherwise covered by this policy which are first made against any INSURED and reported to the Company during the Extended Reporting Period." (Exhibit DD at PIIC 026).   There is no evidence that the Nace Defendants purchased an Extended Reporting Period Endorsement to the PIIC policy.

Based upon these provisions, in order to obtain coverage under the PIIC policy, the Nace Defendants would have been required to report to PIIC a claim or potential claim by Ms. Gilbert no later than September 24, 2007, which was 60 days after the PIIC policy period expired on July 24, 2007.   However, it is undisputed that the Nace Defendants did not report Ms. Gilbert's potential claim to CIC until May of 2009 – nearly two years after the time for reporting potential claims to PIIC had expired.   Simply put, even if CIC had advised the Nace Defendants that there was an issue as to coverage under the CIC policy when the Nace Defendants first reported Ms. Gilbert's potential claim to CIC in May of 2009, it was already too late for the Nace Defendants to report Ms. Gilbert's potential claim and obtain coverage under the PIIC policy.

It is important to note that the Nace Defendants should have, and easily could have, preserved coverage for Ms. Gilbert's claim under the PIIC policy before the PIIC policy and its 60-day extended reporting period expired on September 24, 2007.   The Nace Defendants could

3

121592744 0939915

have notified PIIC within this period of a professional error or potential claim in June of 2007 when the Virginia court advised during oral argument on motions to dismiss that Ms. Gilbert's second lawsuit would be dismissed with prejudice.  Even if the Nace Defendants had waited until the Virginia court signed the written order of dismissal in August of 2007 (simply confirming what had already been ordered at the hearing), there still would have been sufficient time to report Ms. Gilbert's potential claim under the PIIC policy.  If the Nace Defendants had done this, when Ms. Gilbert finally did assert a claim in March of 2012, Ms. Gilbert's claim would have been considered made and reported to PIIC during the PIIC policy period and coverage would have been preserved.  The Nace Defendants also could have purchased an Extended Reporting Period Endorsement to the PIIC policy that would have provided even additional time to report Ms. Gilbert's potential claim.

The Nace Defendants did not do this and, even though they had a reasonable basis to know that an error had been committed or a claim might be made before the PIIC policy expired, they failed to report the potential claim to PIIC and failed to purchase an extended reporting period endorsement.  As a result, there may be no coverage under the PIIC policy for Ms. Gilbert's claim.  If so, the Nace Defendants' failure to preserve coverage under the PIIC policy certainly was not due to any delay on the part of CIC in issuing its reservation of rights letter, but rather, on the Nace Defendants' apparent failure to understand and comply with the plain terms of their insurance policies.  The Nace Defendants' claim of prejudice fails as a matter of law.

121592744 0939915

Dated:    January 22, 2014      **CHICAGO INSURANCE COMPANY**

By:   /s/ Paulette S. Sarp
         Paulette S. Sarp, admitted pro hac vice
         HINSHAW & CULBERTSON LLP
         333 South Seventh Street, Suite 2000
         Minneapolis, MN  55402
         O:  (612) 333-3434
         F:  (612) 334-8888
         psarp@hinshawlaw.com

           and

         David D. Hudgins, Esq., D.C. Bar No. 362451
         HUDGINS LAW FIRM
         515 King Street, Suite 400
         Alexandria, VA  22314
         O:  (703) 739-3300
         F:  (703) 739-3700
         e-mailbox@hudginslawfirm.com

         ATTORNEYS FOR PLAINTIFF

121592744 0939915

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of January, 2014, a copy of the foregoing pleading was served via ECF on:

Stephen A. Horvath, Esq.
Bancroft, McGavin, Horvath & Judkins, P.C.
3920 University Drive
Fairfax, Virginia 22030
shorvath@tbmhjlaw.com

H. Aubrey Ford, III, Esq.
Cantor, Stoneburner, Ford, Grana & Buckner
7130 Glen Forest Drive, Suite 400
Richmond, Virginia 23226
aford@virginiatrialfirm.com

Gabriel A. Assaad, Esq.
Assaad Law, PLLC
1425 K Street, NW, Suite 350
Washington, DC 20005
gassaad@assaadlaw.com

/s/ Paulette S. Sarp
Paulette S. Sarp, Esq., admitted pro hac vice
Hinshaw & Culbertson, LLP
333 South Seventh Street
Suite 2000
Minneapolis, MN 55402
(612) 333-3434
(612) 334-8888 - facsimile
psarp@hinshawlaw.com

and

David D. Hudgins, Esq., D.C. Bar No. 362451
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, Virginia 22314
dhudgins@hudginslawfirm.com

ATTORNEYS FOR PLAINTIFF

121592744 0939915

*Chicago Insurance Company v. Paulson & Nace, PLLC, et al*

**Cause No.:  1:12-CV-02068-ABJ**

# EXHIBIT DD

PIIC 001

 **Philadelphia Indemnity Insurance Company**

(A Stock Company founded in 1927)
One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
1-800-759-4961

# Commercial
# Lines
# Policy

THIS POLICY CONSISTS OF:

- DECLARATIONS
- COMMON POLICY CONDITIONS
- ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:
- ONE OR MORE COVERAGE FORMS
- APPLICABLE FORMS AND ENDORSEMENTS

BJP-190-1 (12-98)

PIIC 002

**IN WITNESS WHEREOF,** we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

President

Secretary

BJP-190-1 (12-98)

PIIC 003

 # Loss Control Notice

Welcome to PIC Loss Control Services.   PIC is familiar with the unique loss control programming needs of your organization and has achieved superior results in this area.  We are committed to delivering quality and timely loss prevention services and risk control products to your organization.  Customer satisfaction through the delivery of these quality professional products to achieve measurable risk improvement results is our goal.  We know the fulfillment of the loss control commitment is not complete until we deliver upon our promises.

Our product specific service capabilities follow on the next few pages. They include a multi-faceted approach to risk management covering safety program development, site audits, and training (including a new interactive web-based training).  We offer a wide range of products and value-added services at no cost to help you achieve your risk management goals.

Please take a moment to register for our website @ *www.losscontrol.com* to gain full access to these resources. Please assign yourself your own username and password.   Your registration request will be processed within two business days.

We look forward to helping to make your insurance program a success.  We are standing by if you have any questions or if we may be of further assistance. Please contact us at:

<div align="center">

Jeffrey M. Collins, AVP & Director
Loss Control Department
Phone: 610-617-7717
E-Mail: jcollins@phlyins.com


Mark A. Konchan, Manager
Loss Control Department
Phone: 610-538-2967
E-Mail: mkonchan@phlyins.com

</div>

*Vickie Davis*

PIIC 004



# PIC LOSS CONTROL SERVICES

## TOTAL SOLUTION TO YOUR RISK MANAGEMENT NEEDS



**OUR MISSION:** *"We welcome the opportunity to demonstrate how we can tailor a program suitable for our customers needs. We are committed to providing our customer, with improved communications, quicker implementation of loss control servicing initiatives, and an improved identity towards the needs of our consumers."*

We provide customized loss control consultation services to the following products:

Protect your business with PIC Loss Control Services. Keep costs down by choosing Loss Control Programs specific to your industry and exposures. We'll show you how to implement Risk Management Programs and Client Training Services that get results.

| | |
|---|---|
| • Day Cares & Day Camps | • Mobile Home Parks |
| • Boat Dealers | • Municipalities |
| • Bowling Centers | • Non-Profit & For-Profit Agencies |
| • Guides & Outfitters | • Office Buildings, Real Estate, Shopping Centers |
| • Health & Fitness Clubs, Wellness Centers | • Residential Occupancies (Apartments, Condominiums, Home Owners Associations) |
| • Health Care Industry (Nursing Homes, Assisted Living, Hospitals) | • School Districts, Specialty Schools, Colleges and Universities |
| • Hotels | • Social Services Agencies |
| • Mental Health Services | • Sports Arenas, Ice Arenas & Recreation Centers |

Benefits of our Service:

♦ **National coverage with no limitations to territory.**

♦ **Clients can register for our website** *www.losscontrol.com* **to access our comprehensive online resources at no cost.**

♦ **Large network of loss control and risk management professionals with expertise in all aspects of Risk Management.**

♦ **Superior level of Quality and timely risk assessment and loss prevention services.**

♦ **Tailor a risk management program suitable for your needs.**

5/4/2005

765

PIIC 005



## SAFETY MANAGEMENT RESOURCES:



**PureSafety** : This **interactive online defensive driver training course** is designed to teach the driver how to minimize the risks involved with driving any type of vehicle, and how to avoid dangerous driving situations and improper driving techniques. These are things everyone should know how to do, both on and off the job. This can be accessed through _www.losscontrol.com_ at no cost to PIC policyholders.   A final exam and completion certificate are also available online.




**Web-enabled EPLI Risk Management Services.** YourHRdepartment, Inc™ provides FREE HR training programs and other materials to all EPL Policyholders to assist the policyholders in reducing their exposure to employment practices liability. This can be   accessed through _www.losscontrol.com_.




**Driver Monitoring Program.** - SafetyFirst Systems, LLC ("SafetyFirst") provides a vehicle driver monitoring system uniquely geared to the transportation industry. SafetyFirst's primary product is a driver performance feedback service that highlights risk-taking behaviors.  Independent studies by major insurance companies have shown a 20-65% reduction in collisions when information developed by the program is used to coach drivers on their performance and influence a behavior change. "1-800-550-SAFE" decals are placed on rear of commercial vehicles (vans, pickups, delivery trucks, tractor trailers, etc.) that encourage motorists to report risk-taking behaviors. Calls are received at staffed, 'round the clock (24/7/365), dedicated call center for documentation and reporting to the client for management review.

http://www.phly.com/home/products/losscontrol.asp




**WEMED Loss Assistance Hotline**  -  Philadelphia Insurance Companies (PIC) has partnered with nationally recognized law firm Wilson, Elser, Moskowitz, Edelman and Dicker LLP to offer a Loss Assistance Hotline. This hotline provides policyholders with 2 free hours of legal consultation with knowledgeable attorneys on any matter that could potentially result in a claim under your PIC policy. This loss assistance hotline is NOT a loss reporting hotline. Please visit _www.losscontrol.com_ for full details including contact information.

**You can also contact WEMED online to inquire about loss assistance by visiting the following website:** WEMED Loss Assistance Hotline.

5/4/2005

766



## STRATEGIC ALLIANCES:



These services are pre-negotiated arrangements with "Best in Class" vendors and provide solutions to your human resources and risk management needs. PIC does not receive any revenue from these alliances.



**IntelliCorp Records, Inc.** - IntelliCorp Records, Inc., an affiliate of the Insurance Services Offices (ISO), is the leading provider of innovative decision-support products for employment and background checks and offers the best screening tools in the industry. IntelliCorp offers a wide range of innovative pre-employment verification and screening services, including criminal background checks, previous employment and education references, motor vehicle records and more.

As a PIC client, you receive the value-added benefit of reduced pricing and access to the largest criminal history database available. IntelliCorp provides customers with industry leading information solutions enabling them to make better decisions. No other provider gets you closer to the comprehensive, timely and accurate data you need. Your organization will avoid costly hiring and recruiting mistakes and limit exposure to risk litigation. You can access IntelliCorp's employment solutions by visiting www.losscontrol.com. Please make certain you have your Policy Number available. Some of the information available includes:

| | | |
|---|---|---|
| Workers compensation records | Nationwide criminal records searches | Single-county court searches |
| Education verification | Criminal Super Search - 50 states of criminal record data | Federal criminal records search in all U.S. district courts |
| Employment verification | Arrest and booking records | Motor vehicle records - all 50 states |
| Personnel assessments | Statewide criminal searches | Social Security number verification |
| Drug testing | Civil court records | Credit reports |

**Getting started:**

1.  Click on "Total Solution Pre-Employment Verification, Screening Services, and Motor Vehicle Record Checks" located on the front page of www.losscontrol.com.
2.  Enter promotion code **PHLY**
3.  As part of the activation process, you'll need to submit a photocopy of one of these documents:
    - Business license
    - Vendor license
    - Federal identification number (on a legal/government document)

4.  The system will invoice you when you register. You can pay by monthly invoice or credit card. If you choose monthly invoicing, you must complete our Credit Authorization Form. You can submit the form on-line during the

5/4/2005

PIIC 007



registration process or fax it to 440-505-0261. IntelliCorp submits all invoices through e-mail and will invoice you on the first business day after the end of the month. If you pay by credit card, you'll receive an e-mail statement.

5/4/2005





**YourHRdepartment, Inc.** - offers a full-service Human Resources Management program, including HR consulting services, to Philadelphia Insurance Company (PIC) policyholders.

**PIC clients are entitled to the below benefits at no additional cost:**

♦ Monthly HR newsletters (by e-mail) covering both federal and state employment law news to help you comply with ever-changing employment laws

♦ On-line HR training programs, including Anti-Harassment/Discrimination; Hiring; HIPAA; Privacy in the Workplace; Progressive Discipline; and Termination

♦ HR Self-Audit Checklists to quickly spot HR landmines

**Additional HR services available at 15% discount:**

♦ YourHRassistant™ (Internet-based HR management)

♦ Employee handbooks

♦ HR management forms

♦ Full-service HR consulting

♦ HR telephone support by HR experts

♦ Other consulting services

Access to all services are available through *www.losscontrol.com*.

5/4/2005

## POLICYHOLDER NOTICE (LOSS ASSISTANCE HOTLINE)

We are pleased to enclose an original copy of your policy.  Please take a moment to review the policy to ensure it meets your needs.

Please feel free to contact our local sales representatives or our customer service unit at 877-GET-PHLY, if you need further assistance.

As a free loss control benefit to our policyholders, Philadelphia Insurance Companies (PIC) has partnered with a nationally recognized law firm Wilson, Elser, Moskowitz, Edelman and Dicker LLP (WEMED), to offer a toll-free **Loss Assistance Hotline**.  The toll-free loss assistance hotline telephone number is **1-877-742-2201**.  You can also contact a WEMED attorney online at either of the following internet addresses: http://www.wemed.com/pic/ **or** <http://www.losscontrol.com> .  This hotline provides policyholders 2 free hours of legal consultation with a knowledgeable attorney on any matter that could potentially result in a claim under your PIC policy.  This loss assistance hotline is **NOT** a loss reporting hotline.  To report a claim, read the claim reporting instructions in your Policy, or ask your agent.  If you have questions concerning the loss assistance hotline, please contact us at 1-800-759-4961 x7717.

The Philadelphia Insurance Companies thanks you for choosing us to meet your insurance needs.

Sincerely,

Philadelphia Insurance Companies

PIIC 010

 **Philadelphia Insurance Companies**
One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004

Philadelphia Indemnity Insurance Company

## COMMON POLICY DECLARATIONS

Policy Number: PHSD199151

**Named Insured and Mailing Address:**
BARRY J. NACE DBA PAULSON & NACE
1615 New Hampshire Ave NW
Washington, DC 20009-2520

**Producer:** 5952
HUB INTERNATIONAL OF ILLINOIS LIMITED
55 EAST JACKSON BOULEVARD
CHICAGO, IL, 60604

**Policy Period From:** 07/24/2006  **To:** 07/24/2007   at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:** Law Firm

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

|  | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| | |
| Lawyers | 10,469.00 |
| | |
| **Total** | **$  10,469.00** |

FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE
Refer To Forms Schedule

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

Countersignature Date          Authorized Representative

PIIC 011

Philadelphia Indemnity Insurance Company

Form Schedule – Policy

**Policy Number:** PHSD199151

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| BJP-190-1 | 1298 | Commercial Lines Policy Jacket |
| LAH-Notice | 1002 | Policyholder Notice (Loss Assistance Hotline) |
| Common Policy Dec | 0100 | Common Policy Declarations |
| PP 0701 | 0701 | Privacy Policy Notice |
| IL0985 | 0103 | Disclosure Pursuant to Terrorism Risk Ins Act of 2002 |

Page   1   of   1

PIIC 012

PI-LAW-1 (3-97)

### Philadelphia Insurance Companies
One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004

## LAWYERS PROFESSIONAL LIABILITY INSURANCE

☒ Philadelphia Indemnity Insurance Company
☐ Philadelphia Insurance Company

### DECLARATIONS

Policy Number: PHSD199151

NOTICE:  EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.  THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS.  PLEASE READ CAREFULLY.

Item 1.  NAMED INSURED and Address:
        BARRY J. NACE DBA PAULSON & NACE
        1615 New Hampshire Ave  NW
        Washington, DC 20009-2520

Item 2.  Limits of Liability:   (A)$   2,000,000 each CLAIM, including CLAIMS EXPENSE
                                 (B)$   2,000,000 Annual Aggregate, including CLAIMS EXPENSE

Item 3.  Deductible:  $   10,000   Deductible per CLAIM

Item 4.  POLICY PERIOD:   From:  07/24/2006   To:  07/24/2007
                          (12:01 A.M. local time at the address shown in Item 1.)

Item 5.  Premium:  $   10,469.00

Item 6.  Retroactive Date: FULL PRIOR ACTS

Endorsements: PER SCHEDULE ATTACHED

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

Authorized Representative        Countersignature        Countersignature Date

Page 1 of 1

PIIC 013

Philadelphia Indemnity Insurance Company

Form Schedule – Lawyers

**Policy Number:** PHSD199151

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|------|---------|-------------|
| PI-LAW-1 | 0397 | Lawyers Professional Liability Insurance Declarations |
| PI-LAW-10 | 0397 | Claim Expense in Addition to Limit of Liability |
| PI-LAW-11 | 0397 | Prior Acts Exclusion |
| PI-LAW-20 | 0397 | Pollution Exclusion |
| PI-LAW-22 | 0397 | Prior and Pending Litigation Endorsement |
| PI-LAW-75 | 1005 | Amendatory Endorsement |
| PI-LAW-1829 | 0397 | Lawyers Professional Liability Insurance |
| PI-ARB-1 | 0403 | Binding Arbitration |
| PI-LAW-DC-1 | 1098 | Amendatory Endorsement - District of Columbia |
| PI-SLD-001 | 0103 | Cap on Losses from Certified Acts of Terrorism |

PIIC 014

PP-0701 07-01

# PHILADELPHIA INSURANCE COMPANIES

## PRIVACY POLICY NOTICE

Philadelphia Insurance Company & Philadelphia Indemnity Insurance Company

The Philadelphia Insurance Companies values your privacy and we are committed to protecting personal information that we collect during the course of our business relationship.

The collection, use and disclosure of certain nonpublic personal information are regulated by law.

This notice is for your information only and requires no action on your part. It will inform you about the types of information we collect and how it may be disclosed. This does not reflect a change in the way we do business or handle your information.

## Information We Collect:

We collect personal information about you from the following sources:
- Applications or other forms such as claims forms or underwriting questionnaires completed by you;
- Information about your transactions with us, our affiliates or others; and
- Depending on the type of transaction you are conducting with us, information may be collected from consumer reporting agencies, health care providers, employers and other third parties.

## Information We Disclose:

We will only disclose the information described above, as permitted by law, to our affiliates and non-affiliated third parties when necessary to conduct our normal business activities.

For example, we may make disclosures to the following types of third parties:
- Your agent or broker;
- Parties who perform a business, professional or insurance function for our company, including our reinsurance companies;
- Independent claims adjusters, investigators, other insurers, medical care institutions and attorneys who need the information to investigate, defend or settle a claim involving you;
- Insurance regulatory agencies in connection with the regulation of our business; and
- Lienholders, mortgagees, lessors or other persons shown on our records as having legal or beneficial interest in your policy.

We do not sell your information to others for marketing purposes.
We do not disclose the personal information of persons who have ceased to be our customers.

## Protection of Information:

The Philadelphia Insurance Companies maintains physical, electronic and procedural safeguards that comply with state and federal regulations to protect the confidentiality of your personal information. We also limit employee access to personally identifiable information to those with a business reason for knowing such information.

## How to Contact Us:

Feel free to call or write to us for additional information.

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
(877)-438-7459

POLICY NUMBER: PHSD199151

IL 09 85 01 03

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT OF 2002. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT OF 2002

**SCHEDULE\***

| |
|---|
| Terrorism Premium (Certified Acts)<br>$ 0<br><br>Additional information, if any, concerning the terrorism premium: |

\*   Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act of 2002, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.

IL 09 85 01 03

© ISO Properties, Inc., 2003

Page 1 of 1   □

PIIC 016

PI-LAW-10 (3-97)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CLAIM EXPENSE IN ADDITION TO LIMIT OF LIABILITY

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY POLICY

In consideration of the premium paid, it is agreed that this policy is amended as follows:

CLAIMS EXPENSES shall apply in addition to the Limit of Liability.  The Company's maximum aggregate liability for all CLAIMS EXPENSES arising out of all CLAIMS made during the POLICY PERIOD shall be the Limit of Liability stated in the Declarations.

All other terms and conditions of this Policy remain unchanged.

Page 1 of 1

PIIC 017

PI-LAW-11 (3-97)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PRIOR ACTS EXCLUSION

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY POLICY

In consideration of the premium paid, it is agreed that the Policy is amended as follows:

This policy does not cover any CLAIM or CLAIMS arising from or attributable to or based upon any WRONGFUL ACT(S), or PERSONAL INJURY(IES) committed or alleged to have been committed by the following lawyer prior to the corresponding retroactive dates.

LAWYER:                                          RETROACTIVE DATE:

Gabriel A. Assaad                                          06/07/2004

All other terms and conditions of this Policy remain unchanged.

PI-LAW-20 (3-97)

**<u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT</u>**
**<u>CAREFULLY.</u>**

## POLLUTION EXCLUSION

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY POLICY

In consideration of the premium paid, it is hereby understood and agreed that this policy does not apply to any CLAIM arising out of:

(1)  the actual, alleged, or threatened discharge, dispersal, release, or escape of pollutants, or

(2)  any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed.

All other terms and conditions of this policy remain unchanged.

PIIC 019

PI-LAW-22 (3-97)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PRIOR AND PENDING LITIGATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY POLICY

In consideration of the premium paid, it is hereby understood and agreed that the Company shall not be obligated to defend or indemnify an Insured for, and this insurance does not apply:

To any CLAIM based upon or arising out of any demand, suit or proceeding pending, or order, decree, settlement or judgment entered against the NAMED INSURED as of 07/24/2003 or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation.

All other terms and conditions of this policy remain unchanged.

Page 1 of 1

PIIC 020

PI-LAW-75 (10/05)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMENDATORY ENDORSEMENT**
AMENDMENT OF DEFINITION OF "DAMAGES"
AMENDMENT OF EXCLUSION B. (PRIOR KNOWLEDGE)

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY POLICY

**DEFINITIONS** Item V. DAMAGES is replaced by:

V. DAMAGES whenever used in this policy shall mean the monetary portion of any judgment, award or settlement, provided always that DAMAGES shall not include:

A. punitive or exemplary awards, nor

B. sanctions, fees, fines or penalties imposed by law; nor

C. any consideration representing the return, refund, disgorgement, waiver or offset of fees and/or expenses paid to or owed to any INSURED.

**EXCLUSIONS** Item B. is replaced by:

B. any CLAIM arising out of any WRONGFUL ACT or PERSONAL INJURY occurring prior to the effective date of this policy if a) the matter had previously been reported to any insurance company or b) if any INSURED at the effective date knew or could have reasonably foreseen that such WRONGFUL ACT or PERSONAL INJURY might be expected to be the basis of a CLAIM.

Page 1 of 1

PIIC 021

PI-LAW-1829 (3-97)

# LAWYERS PROFESSIONAL LIABILITY INSURANCE

In consideration of the payment of the premium and in reliance upon the statements in the application and supplements attached hereto and made a part hereof, and subject to all terms of the policy, the insurance company shown in the Declarations (a stock insurance company, herein called the "Company") agrees with the NAMED INSURED as follows:

## INSURING AGREEMENTS

I.      COVERAGE - PROFESSIONAL LIABILITY

A.      The Company will pay on behalf of any INSURED those sums in excess of the deductible which any INSURED becomes legally obligated to pay as DAMAGES as a result of CLAIMS first made against any INSURED during the POLICY PERIOD and reported to the Company in writing during the POLICY PERIOD or within sixty (60) days thereafter, by reason of any WRONGFUL ACT or PERSONAL INJURY occurring on or after the RETROACTIVE DATE, if any. Coverage shall apply to any such CLAIMS arising out of services rendered or which should have been rendered by any INSURED, and arising out of the conduct of the INSURED'S profession as a Lawyer, or as a Lawyer acting in the capacity of an Arbitrator, Mediator, Title Insurance Agent or Notary Public or as a member, director or officer of any Bar Association, its governing board or any of its committees.

B.      When an INSURED acts as an administrator, conservator, executor, guardian, trustee or in a similar fiduciary capacity, any INSURED'S WRONGFUL ACTS or PERSONAL INJURIES in such capacity shall be deemed for the purpose of Insuring Agreement I. to be the performance of professional services for others, in any INSURED's capacity as a lawyer. This coverage shall not apply to any CLAIM against any INSURED as the beneficiary or distribute of any trust or estate.

II.     DEFENSE, INVESTIGATION AND SETTLEMENT OF CLAIMS

As respects such insurance as is afforded by this policy, the Company shall:

A.      have the right and duty to defend, including selection of counsel and arbitrators, in any INSURED'S name and on any INSURED'S behalf for CLAIM for DAMAGES against any INSURED, even if such CLAIM is groundless, false or fraudulent and shall have the right to make such investigation, negotiation and settlement, subject to II.B. below, of any CLAIM as it deems expedient;

B.      not settle any CLAIM without the written consent of the NAMED INSURED which consent shall not be unreasonably withheld. If, however, the NAMED INSURED refuses to consent to a settlement recommended by the Company and elects to contest the CLAIM or continue legal proceedings in connection with such CLAIM, the Company's liability for the CLAIM shall not exceed the amount for which the CLAIM could have been settled, including CLAIMS EXPENSES up to the date of such refusal, or the applicable limits of liability, whichever is less;

C.      reimburse up to $250 to each INSURED for each day or part thereof for his or her attendance at trial, court-imposed hearing or arbitration proceeding involving a CLAIM, but the total amount so payable shall not exceed $5,000 per CLAIM. Any payments made by the Company under this

PIIC 022

PI-LAW-1829 (3-97)

provision will be in addition to the applicable limits of liability.  The deductible shall not apply to this provision.

In any event, the Company shall not be obligated to pay any DAMAGES or defend or continue to defend any CLAIM after the limit of the Company's liability has been exhausted by payment of DAMAGES and/or CLAIM EXPENSES, or by deposit of sums equal to the applicable limits of liability in a court having jurisdiction.

III. **DISCIPLINARY PROCEEDINGS**

If, during the POLICY PERIOD, a DISCIPLINARY PROCEEDING should commence against any INSURED, by reason of any WRONGFUL ACT or PERSONAL INJURY occurring on or after the RETROACTIVE DATE, if any, the Company will indemnify the INSURED for reasonable fees, costs and expenses incurred in responding to such DISCIPLINARY PROCEEDING.  The maximum amount payable, regardless of the number of DISCIPLINARY PROCEEDINGS or the number of INSUREDS, shall be $5,000 per POLICY PERIOD.  The deductible shall not apply to this provision, however, any payments made by the Company under this provision will be in addition to the applicable limits of liability.  The Company shall not be obligated to pay any award resulting from any DISCIPLINARY PROCEEDING.

IV. **TERRITORY**

This policy applies to WRONGFUL ACTS and PERSONAL INJURIES that occur anywhere in the world provided CLAIM is made and suit or arbitration proceedings are brought against any INSURED in the United States of America, its territories or possessions or Canada.

## DEFINITIONS

I. **"NAMED INSURED" WHENEVER USED IN THIS POLICY SHALL MEAN** the person or entity stated in Item 1. of the Declarations and any PREDECESSOR FIRM thereof.

II. **"INSURED" WHENEVER USED IN THIS POLICY SHALL MEAN:**

A.  the NAMED INSURED;
B.  any past or present partner, officer, director, stockholder, employee or of counsel of the NAMED INSURED, but only as respects professional services rendered on behalf of the NAMED INSURED;
C.  any lawyer listed in the application that is a partner, officer, director, stockholder or employee of the NAMED INSURED as respects professional services rendered by such individual while associated with a PRIOR LAW FIRM;
D.  any lawyer who has retired from the NAMED INSURED, but only as respects professional services rendered prior to the date of retirement;
E.  the heirs, executors, administrators and legal representatives of any INSURED in the event of any INSURED'S death, incapacity or bankruptcy, but only as respects professional services rendered prior to such INSURED'S death, incapacity or bankruptcy and only to the extent that such INSURED would otherwise be covered by this policy.

III. **"CLAIMS EXPENSES" WHENEVER USED IN THIS POLICY SHALL MEAN:**

A.  fees charged by any lawyer designated by the Company; and
B.  if authorized by the Company, all other fees, costs and expenses resulting from the investigation, adjustment, defense or appeal of any CLAIM, including but not limited to:

PI-LAW-1829 (3-97)

1.     all costs taxed against any INSURED and all interest which accrues after the entry of any judgment and before the Company has tendered or deposited, in court or otherwise, such judgment amount for which any INSURED is liable; and

2.     premiums on appeal bonds and premiums on bonds to release attachments in such suits. The Company shall have no obligation to provide such bonds.

3.     Shall not include salaries & expenses of regular employees or officers of the Company.

IV.     **"CLAIM" WHENEVER USED IN THIS POLICY SHALL MEAN** a demand made upon any INSURED for DAMAGES, including, but not limited to, service of suit or institution of arbitration proceedings against any INSURED.

V.     **"DAMAGES" WHENEVER USED IN THIS POLICY SHALL MEAN** the monetary portion of any judgment, award or settlement, provided always that DAMAGES shall not include:

A.     punitive or exemplary DAMAGES; or
B.     sanctions, fees, fines or penalties imposed by law.

VI.     **"DISCIPLINARY PROCEEDING" WHENEVER USED IN THIS POLICY SHALL MEAN** any proceeding by a regulatory or disciplinary official or agency to investigate charges made by a client or former client alleging professional misconduct in rendering or failing to render professional services as a lawyer.

VII.     **"PERSONAL INJURY" WHENEVER USED IN THIS POLICY SHALL MEAN** false arrest, detention or imprisonment, wrongful entry or eviction or other invasion of private occupancy, malicious prosecution, libel, slander and breach of privacy.

VIII.     **"POLICY PERIOD" WHENEVER USED IN THIS POLICY SHALL MEAN** the period from the effective date of this policy to the expiration date as set forth in the Declarations or earlier termination date, if any, of this policy.

IX.     **"PREDECESSOR FIRM" WHENEVER USED IN THIS POLICY SHALL MEAN** any legal entity which was engaged in the practice of law to whose financial assets and liabilities the firm listed as the NAMED INSURED in the Declarations is the majority successor in interest.

X.     **"PRIOR LAW FIRM" WHENEVER USED IN THIS POLICY SHALL MEAN** any law firm or professional corporation engaged in the private practice of law for which any lawyer listed in the application was a partner, officer, director, stockholder or employee prior to such lawyer joining the NAMED INSURED.

XI.     **"PROFESSIONAL SERVICES" WHENEVER USED IN THIS POLICY SHALL MEAN** any services arising out of the conduct of the INSURED'S profession as a Lawyer or as a Lawyer acting in the capacity of an Arbitrator, Mediator, Title Insurance Agent, or Notary Public, or as a member, director or, officer of any Bar Association, its governing board or any of its committees.

XII.     **"RETROACTIVE DATE" WHENEVER USED IN THIS POLICY SHALL MEAN** the date, if specified in the Declarations or in any endorsement attached hereto, on or after which any act, error, omission or PERSONAL INJURY must have occurred in order for CLAIMS arising therefrom to be covered under this policy. CLAIMS arising from any act, error,

PIIC 024

PI-LAW-1829 (3-97)

omission or PERSONAL INJURY occurring prior to this date are not covered by this policy.

XIII.    **"WRONGFUL ACT(S)" WHENEVER USED IN THIS POLICY SHALL MEAN** any actual or alleged:
  a)   act;
  b)   error;
  c)   omission;
  d)   misstatement;
  e)   misleading statements; or
  f)   neglect or breach of duty.

# EXCLUSIONS

This policy does not apply to:

A.     any CLAIM that results in a final adjudication against any INSURED where an INSURED has committed any criminal, dishonest, fraudulent or malicious WRONGFUL ACTS or PERSONAL INJURIES.
       This exclusion does not apply to any INSURED who is not so adjudged;

B.     any CLAIM arising out of any WRONGFUL ACT or PERSONAL INJURY occurring prior to the effective date of this policy if a) the matter had previously been reported to any insurance company or b) if the INSURED at the effective date knew or could have reasonably foreseen that such WRONGFUL ACT or PERSONAL INJURY might be expected to be the basis of a CLAIM; provided, however, that subsection b) does not apply to any INSURED who had no knowledge of or could not have reasonably foreseen that any such WRONGFUL ACT or PERSONAL INJURY might be expected to be the basis of a CLAIM.

C.     any CLAIM arising out of any WRONGFUL ACT or PERSONAL INJURY committed or alleged to have been committed by any INSURED who was a partner, officer, director, stockholder or employee of a PRIOR LAW FIRM if there is other valid and collectable insurance under any other policy or policies covering that INSURED for DAMAGES and/or CLAIMS EXPENSES for such CLAIM, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise;

D.     any CLAIM arising from bodily injury to, or sickness, disease, or death of any person. This exclusion does not apply to mental illness, emotional distress or humiliation caused by PERSONAL INJURY;

E.     any CLAIM for loss of, injury to, or destruction of tangible property or for loss of use thereof;

F.     any CLAIM arising out of any INSURED's activities as an officer, director, partner, manager or employee of any company, corporation, operation, organization or association other than the NAMED INSURED or PRIOR LAW FIRM except as a member, director or officer of any Bar Association, its governing board or any of its committees;

G.     any CLAIM made by any INSURED under this policy against any other INSURED under this policy unless such CLAIM arises out of professional services rendered to such other INSURED as a client;

H.     any CLAIM arising out of any INSURED'S capacity as a public official or an employee of a governmental body, subdivision or agency unless any INSURED is deemed to be such solely because any INSURED has rendered legal services to such governmental body and the remuneration for such legal services inures to the benefit of the NAMED INSURED;

I.      any CLAIM arising out of the alleged certification or acknowledgment by any INSURED, in his or her capacity as a notary public, of a signature on a document which the INSURED did not witness being placed on the document;

J.      any CLAIM arising out of defects in title which any INSURED had knowledge of at the date of issuance of such title insurance;

PI-LAW-1829 (3-97)

K.    any CLAIM based upon or arising out of any intentional breach of underwriting authority by any INSURED in the INSURED'S capacity as a title insurance agent;

L.    any CLAIM arising out of conversion, misappropriation or improper commingling of client funds;

M.    any CLAIM arising out of Nuclear Energy liability.

Nuclear Energy Liability Exclusion (Broad Form) attaches to this policy.

# LIMITS OF LIABILITY AND DEDUCTIBLE

## I.    LIMITS OF LIABILITY

The limit of liability shall apply in excess of the deductible.  CLAIMS EXPENSES and amounts paid in satisfaction of CLAIMS are subject to the applicable limits of liability.

All CLAIMS EXPENSES shall first be subtracted from the limits of liability, with the remainder, if any, being the amount available to pay DAMAGES.

The liability of the Company for the combined total of DAMAGES and CLAIMS EXPENSES for each CLAIM first made against any or all INSUREDS during the POLICY PERIOD, including the Extended Reporting Period, if purchased, shall not exceed the amount stated in the Declarations concerning each CLAIM.

Subject to Item 2. in the Declarations concerning each CLAIM, the liability of the Company for the combined total of DAMAGES and CLAIMS EXPENSES shall not exceed the amount stated in the Declarations as "aggregate" as a result of all CLAIMS first made against any and all INSUREDS during the POLICY PERIOD, and all Extended Reporting Periods, if purchased.

## II.    DEDUCTIBLE

The deductible stated in the Declarations applies to each CLAIM and shall be paid by the NAMED INSURED.  The deductible shall be first applied to all CLAIMS EXPENSES with the remainder, if any, then to be applied to DAMAGES.  Payment of the deductible or portions thereof shall be made by the NAMED INSURED within thirty (30) days of receipt of demand by the Company.

## III.    CLAIMS EXPENSES

CLAIMS EXPENSES shall be included within the deductible and the limits of liability and not in addition thereto.  Such CLAIMS EXPENSES shall reduce the available limit of liability.

## IV.    MULTIPLE OF INSUREDS, CLAIMS AND CLAIMANTS

The inclusion of more than one INSURED in any CLAIM or the making of CLAIMS by more than one person or organization shall not operate to increase the limits of liability and deductible.

Two or more CLAIMS arising out of a single wrongful act or PERSONAL INJURY or a series of related WRONGFUL ACTS or PERSONAL INJURIES shall be treated as a single CLAIM.

All such CLAIMS whenever made shall be considered first made on the date on which the earliest CLAIM arising out of such WRONGFUL ACT or PERSONAL INJURY was

PI-LAW-1829 (3-97)

first made and all such CLAIMS are subject to the same limits of liability and deductible.

## V.  REIMBURSEMENT TO COMPANY

If the Company has paid any amounts as DAMAGES and/or CLAIMS EXPENSES in satisfaction of any CLAIMS in excess of the applicable limit of liability, or has paid DAMAGES and/or CLAIMS EXPENSES within the amount of the applicable deductible, the NAMED INSURED shall be liable to the Company for any and all such amounts and, upon demand, shall pay such amounts to the Company.

# CONDITIONS

## I.  INSURED'S DUTIES PRECEDENT TO COVERAGE

As a condition precedent to the availability of coverage under this policy, an INSURED'S duties in the event of a CLAIM are as follows:

A.  If a CLAIM is made against any INSURED, the INSURED must give prompt written notice to the Company.  However, breach of this condition shall not result in a denial of coverage with respect to any INSURED who had no knowledge of the CLAIM.  Nothing contained herein shall be construed as limiting the reporting requirements of INSURING AGREEMENT 1.A.
Notice to the Company must be directed to:

**Philadelphia Insurance Companies**
**One Bala Plaza, Suite 100**
**Bala Cynwyd, Pennsylvania 19004**
**Attention: Professional Liability Claims Department**

Notice shall include every demand, notice, summons or other process received by any INSURED.

B.  No INSURED shall, without prior written consent of the Company, make any payment, admit liability, settle CLAIMS, assume any obligation, agree to arbitration or any similar means of resolution of any dispute, waive any rights or incur any CLAIMS EXPENSES on behalf of the Company.

## II.  INSURED'S DUTIES SUBSEQUENT TO CLAIM

A.  All INSUREDS shall cooperate with the Company in the defense, investigation and settlement of any CLAIM. Upon the Company's request, the INSURED shall submit to examination or questioning, attend hearings, depositions and trials and assist in effecting settlements, securing and giving evidence and obtaining the attendance of witnesses in the conduct of suits.

B.  All INSUREDS shall assist the Company in effecting any rights of indemnity, contribution or apportionment available to any INSURED or the Company.

## III.  REPORTING OF POTENTIAL CLAIMS

If, during the POLICY PERIOD, any INSURED first becomes aware of a potential CLAIM (i.e., any WRONGFUL ACT or PERSONAL INJURY which might reasonably give rise to a CLAIM against any INSURED under this policy) and gives written notice of such WRONGFUL ACT or PERSONAL INJURY to the Company during the POLICY PERIOD, any CLAIMS subsequently made against any INSURED arising out of that WRONGFUL ACT or PERSONAL INJURY shall be considered to have been made during the POLICY PERIOD.

PI-LAW-1829 (3-97)

Written notice of a potential CLAIM shall include:

  A.   the specific WRONGFUL ACT or PERSONAL INJURY, including the date(s) thereof; and

  B.   the injury or damage that may reasonably result; and

  C.   the date and circumstances by which any INSURED became aware of the WRONGFUL ACT or PERSONAL INJURY.

## IV. EXTENDED REPORTING PERIOD

If the Company or the NAMED INSURED shall cancel or non-renew this policy, the NAMED INSURED shall have the right to extend the time for reporting CLAIMS made against any INSURED per the following schedule.  If any Extended Reporting Period is exercised, the coverage shall apply only to CLAIMS otherwise covered by this policy which are first made against any INSURED and reported to the Company during the Extended Reporting Period.  Coverage for CLAIMS first made and reported during the Extended Reporting Period applies only to Claims for WRONGFUL ACTS or PERSONAL INJURIES which took place prior to the end of the POLICY PERIOD and on or after the RETROACTIVE DATE, if any. The additional premium for the Extended Reporting Period shall be:

   125% of the policy's annual premium for 12 months;
   185% of the policy's annual premium for 24 months;
   225% of the policy's annual premium for 36 months;
   285% of the policy's annual premium for an unlimited period.

This right to purchase the Extended Reporting Endorsement is subject to the following conditions:

  A.   Any amounts due the Company must be paid by the INSURED.

  B.   The NAMED INSURED must send written notice to the Company of the intention to purchase the Extended Reporting Endorsement accompanied by the additional premium.  Written notice and premium payments must be received by the Company within sixty (60) days after the termination date of the POLICY PERIOD.

  C.   Separate or new limits do not apply to the Extended Reporting Period.

  D.   This option to extend the reporting period does not extend the POLICY PERIOD.

  E.   Premium for this option is fully earned when payment is made.

## V. SUBROGATION

In the event of payment by the Company under this policy, the Company shall be subrogated to all INSUREDS' rights of recovery against any person or organization.  ALL INSUREDS shall cooperate with the Company and do whatever is necessary to secure such rights and shall do nothing to prejudice such rights.

## VI. CHANGES

The terms of this policy shall not be waived or changed except by endorsement issued to form a part of this policy.

## VII. ASSIGNMENT

Assignment of interest under this policy shall not bind the Company unless its consent is endorsed hereon.  If, however, an INSURED shall die or be adjudged incompetent, this

PI-LAW-1829 (3-97)

policy shall cover the INSURED'S legal representative as the INSURED with respect to liability previously incurred and covered by this policy.

**VIII.   CANCELLATION**

This policy may be canceled by the NAMED INSURED by surrender thereof to the Company or by mailing to the Company written notice stating when thereafter such cancellation shall be effective.  If this policy is canceled by the NAMED INSURED, the Company may retain a proportion of the premium greater than pro rata.

This policy may be canceled by the Company by mailing to the NAMED INSURED at the address stated in the Declarations written notice stating when, not less than ten (10) days prior to when the cancellation is being effected by reason of the NAMED INSURED'S nonpayment of premium.  The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the POLICY PERIOD.  If the Company cancels, earned premium shall be computed pro rata.

Delivery of written notice by the Company shall be equivalent to mailing.  Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

**IX.   NONRENEWAL**

A.   If the Company elects not to renew this policy, the Company will mail a notice of nonrenewal stating the reason(s) for nonrenewal to the NAMED INSURED at least thirty (30) days before the expiration of this policy.

B.   This notice will be sent to the NAMED INSURED at the last mailing address known to the Company by:

1.   Certified mail;
2.   First class mail if the Company has obtained from the post office a date-stamped proof of mailing showing the NAMED INSURED'S name and address.

C.   Notice of nonrenewal need not be mailed or delivered if the NAMED INSURED has:

1.   Replaced coverage elsewhere; or
2.   Specifically requested termination.

**X.   OTHER INSURANCE**

Except for those CLAIMS specifically excluded pursuant to Exclusion C., the following shall apply:

If there is other insurance applicable to a CLAIM covered by this policy, this policy shall be deemed excess insurance over and above the applicable limits of liability of all such other insurance unless such other insurance is written only as specific excess insurance over the limits of liability provided in this policy.

**XI.   ACTION AGAINST THE COMPANY**

No action shall lie against the Company unless, as a condition precedent thereto, the INSURED shall have fully complied with the all the terms of this policy, nor until the amount of the INSURED'S obligations to pay shall have been finally determined either by

PI-LAW-1829 (3-97)

judgement against the INSURED after actual trial or by written agreement of the NAMED INSURED, the claimant and the Company.

Any person, organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy.

Nothing contained in this policy shall give any person or organization any right to join the Company as a codefendant in any action against any INSURED to determine any INSURED's liability.  Bankruptcy or insolvency of any INSURED or of any INSURED'S estate shall not relieve the Company of any of its obligations hereunder.

XII.    ENTIRE AGREEMENT

By acceptance of this policy, all INSUREDS reaffirm as of the effective date of this policy that (a) the statements in the application including all information communicated by the INSURED to the Company, attached hereto and made a part hereof, are all INSUREDS' agreements and representations, (b) this policy is issued in reliance upon the truth and accuracy of such representations and © this policy embodies all agreements between all INSUREDS and the Company or any of its agents relating to this insurance.

This policy is not valid unless completed by the attachment of the Declarations signed by an authorized representative.

## NUCLEAR ENERGY LIABILITY EXCLUSION (Broad Form)

It is agreed that:

I.      The policy does not apply:

A.      Under any Liability Coverage, to bodily injury or property damage
(1)     with respect to which an INSURED under the policy is also an INSURED under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an INSURED under any such policy but for its termination upon exhaustion of its limit of liability; or
(2)     resulting from the hazardous properties of nuclear material with and respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the INSURED is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.
B.      Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of nuclear facility by any person or organization.
C.      Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if
(1)     the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an INSURED or (b) has been discharged or dispersed therefrom;
(2)     the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of

PI-LAW-1829 (3-97)

by or on behalf of an INSURED; or

(3)    the bodily injury or property damage arises out of the furnishing by an
INSURED of services, materials, parts or equipment in connection with
the planning, construction, maintenance, operation or use of any nuclear
facility, but if such facility is located within the United States of America,
its territories or possessions or Canada, this exclusion (3) applies only to
property damage to such nuclear facility and any property thereat.

II.    As used in this endorsement

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

"source material", "special nuclear material", and "byproduct material" have the meanings
given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been
used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (a) containing by-product material other than the
tailings or waste produced by the extraction or concentration of uranium or thorium from
any ore processed primarily for its source material content, and (b) resulting from the
operation by any person or organization of any nuclear facility included under the first two
paragraphs of the definition of nuclear facility;

"nuclear facility" means

(a)    any nuclear reactor;
(b)    any equipment or device designed or used for (1) separating the isotopes of
uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling,
processing or packaging waste;
(c)    any equipment or device in the processing, fabrication or alloying of special
nuclear material if at any time the total amount of such material in the custody
of the INSURED at the premises where such equipment or device is located
consists of or contains more than 25 grams of plutonium or uranium 233 or any
combination thereof, or more than 250 grams of uranium 235;
(d)    any structure, basin, excavation, premises or place prepared or used for the
storage or disposal of waste, and includes the site on which any of the foregoing
is located, all operations conducted on such site and all premises used for such
operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear
fission in a self-supporting chain reaction or to contain a critical mass of
fissionable material;

"property damage" includes all forms of radioactive contamination of property.

PIIC 031

PI-ARB-1 (4/03)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## BINDING ARBITRATION

Wherever, used in this endorsement: 1) "we", "us", "our", and "insurer" mean the insurance company which issued this policy; and 2) "you", "your", "named insured", "first named insured", and "insured" mean the Named Corporation, the Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "other insured(s)" means all other persons or entities afforded coverage under this policy.

This endorsement modifies coverage provided under the Coverage Part to which it is attached.

If we and the insured do not agree whether coverage is provided under this Coverage Part for a claim made against the insured, then either party may make a written demand for arbitration.

When this demand is made, each party will select an arbitrator.  The two arbitrators will select a third.  If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction.  Each party will:

    1.  Pay the expenses it incurs; and

    2.  Bear the expenses of the third arbitrator equally.

Unless both parties agree otherwise, arbitration will take place in the county in which the address shown in the Declarations is located.  Local rules of law as to procedure and evidence will apply.  A decision agreed to by two of the arbitrators will be binding.

All other terms of the policy remain unchanged.

Includes copyright material of the Insurance Services Office, Inc. used with its permission.

PI-LAW-DC-1 (10-98)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## Amendatory Endorsement – District of Columbia

This endorsement modifies insurance provided by the following:

### Lawyers Professional Liability Insurance Policy

It is hereby agreed and understood that CONDITION VIII. Cancellation is deleted and replaced with the following:

VIII.   CANCELLATION

A.   Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to the Company advance written notice of cancellation.
2. The Company may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.  At least 5 days before sending notice to the first Named Insured, the Company will notify the agent or broker, if any, who wrote the policy.
   If this policy has been in effect for 30 days or less and is not a renewal of a policy the Company issued, the Company may cancel this policy for any reason.
   If this policy has been in effect more than 30 days, or if this policy is a renewal of a policy the Company issued, the Company may cancel this policy only for one or more of the following reasons:
   1. You have refused or failed to pay a premium due under the terms of the policy;
   2. You have made a material and willful misstatement or omission of fact to the Company or its employees, agents or brokers in connection with any application to or claim against us;
   3. You have transferred your property or other interest to a person other than you or your beneficiary, unless the transfer is permitted under the terms of the policy; or
   4. The property, interest or use of the property or interest has materially changed with respect to its insurability.
3. The Company will mail or deliver its notice to the first Named Insured's last mailing address known to the Company.
4. Notice of cancellation will state the effective date of cancellation.  The policy period will end on that date.
5. If this policy is cancelled, the Company will send the first Named Insured any premium refund due.  If the Company cancels, the refund will be pro rata.  If the first Named Insured cancels, the refund may be less than pro rata.  The cancellation will be effective even if the Company has not made or offered a refund.
6. If notice is mailed, proof of mailing will be sufficient proof of notice.

PI-SLD-001 (01/03)

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

# PROFESSIONAL LIABILITY

## *DIRECTORS AND OFFICERS LIABILITY*

With respect to any one or more "certified acts of terrorism", we will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

1. The act resulted in aggregate losses in excess of $5 million; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Includes copyrighted material of the Insurance Services Office Inc., used with its permission.

# EXHIBIT 2

**In the Matter Of:**

CHICAGO INSURANCE CO.

vs.

PAULSON & NACE, ET AL

**BARRY J. NACE**

*November 22, 2013*



Court Reporting
Videography
Videoconferencing

Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3    ------------------------------------+
      CHICAGO INSURANCE COMPANY,         :
 4    an Illinois Corporation,           :
                      Plaintiff,         :
 5                                       :CIVIL NUMBER
      vs.                                :1:12-CV-2068
 6                                       :
      PAULSON & NACE, PLLC, et al.,      :
 7                    Defendants.        :
      ------------------------------------+
 8                                  Fairfax, Virginia
                              Friday, November 22, 2013
 9

10                    BARRY J. NACE

11

12    called for examination by counsel on behalf of the

13    Plaintiff, Chicago Insurance Company, Pursuant to Notice

14    taken in the Offices of Bancroft, McGavin, Horvath &

15    Judkins, P.C., 3920 University Drive, Fairfax, Virginia

16    22030 at approximately 9:00 a.m., before Janie Arriaga,

17    a certified Verbatim Reporter and a Notary Public in and

18    for the Commonwealth of Virginia, when there were

19    present on behalf of the respective parties.

20

21

22
```

Page 2

```
 1    APPEARANCES:

 2                    On behalf of Plaintiff:

 3                    PAULETTE S. SARP, ESQUIRE

 4                    Hinshaw and Culbertson, LLC

 5                    333 South Seventh Street, Suite 2000

 6                    Minneapolis, Minnesota 55402

 7

 8                    On behalf of Defendants:

 9                    STEPHEN HORVATH, ESQUIRE

10                    Bancroft, McGavin,

11                    Horvath & Judkins, P.C.

12                    3920 University Drive

13                    Fairfax, Virginia 22030

14

15

16

17    ALSO PRESENT:  Mr. Christopher Nace

18

19

20

21

22
```

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL                    BARRY J. NACE
                                                                        Page 3

|  |  |  | Page 3 |
|---|---|---|---|
| 1 | C O N T E N T S | | |
| 2 | WITNESS | | PAGE |
| 3 | BARRY J. NACE, | | |
| 4 | Examination by Ms. Sarp | | 5 |
| 5 | | | |
| 6 | E X H I B I T S | | |
| 7 | | | |
| 8 | Nace Number 1 | 30(b)6 | 5 |
| 9 | Nace Number 2 | Insurance policy | 9 |
| 10 | Nace Number 3 | Declarations page | 10 |
| 11 | Nace Number 4 | Complaint | 11 |
| 12 | Nace Number 5 | October 18 motion | 14 |
| 13 | Nace Number 6 | Complaint | 17 |
| 14 | Nace Number 7 | Opposition to Motion | 19 |
| 15 | Nace Number 8 | City of Richmond Order | 21 |
| 16 | Nace Number 9 | Judge Hughes transcript | 24 |
| 17 | Nace Number 10 | City of Richmond order | 29 |
| 18 | Nace Number 11 | Application for insurance | 32 |
| 19 | Nace Number 12 | Supplemental claim | 42 |
| 20 | Nace Number 13 | Application for liability | 60 |
| 21 | Nace Number 14 | Letter from H. Feintuch | 65 |
| 22 | | | |

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL               BARRY J. NACE
                                                                   Page 4

                                                                    Page 4
 1    (Continuation)

 2

 3    Nace Number 15   Affidavit                              68

 4    Nace Number 16   Renewal application                   74

 5    Nace Number 17   E-mail from C. Ellenberger             85

 6    Nace Number 18   E-mail chain                           97

 7    Nace Number 19   January 12, 2013 letter                99

 8    Nace Number 20   Letter to Paulson and Nace            104

 9    Nace Number 21   Letter to B. Nace                     104

10    Nace Number 22   E-mail to B. Nace                     108

11

12

13

14

15

16

17    (EXHIBITS ATTACHED TO TRANSCRIPT)

18

19

20

21

22

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 5

Page 5

1                    P R O C E E D I N G S

2    Whereupon,

3                       BARRY J. NACE

4    was called for examination by Counsel on behalf of the

5    Plaintiff, and after having been duly sworn by the Court

6    Reporter was examined and testified as follows:

7               (Nace Exhibit Number 1 marked for

8               identification.)

9          EXAMINATION BY COUNSEL FOR PLAINTIFF:

10   BY MS. SARP:

11      Q    I am handing you what I have marked as Exhibit

12   1, and that is a copy of the Notice of Rule 30(b)(6)

13   deposition that we issued for Paulson and Nace.  Have

14   you seen that before?

15      A    Yes.

16      Q    Are you the designated representative for

17   Paulson and Nace today?

18      A    Yes.

19      Q    Also, we had noticed a Notice of Deposition

20   for your deposition individually.  In talking to your

21   counsel, Steve Horvath, we are going to essentially

22   proceed on the same track with your personal deposition

* * *

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 40

Page 40

1      A    I probably knew that in the general way you

2   are phrasing it.

3   BY MS. SARP:

4      Q    So with that knowledge, why didn't you answer

5   the question 15B with a yes?

6      A    Because there is certainly nothing in that

7   that would indicate to me that -- trying to use your

8   language here -- may result in something being made

9   against the firm.  Nothing would suggest that to me at

10  that time or today.

11     Q    Would you agree, though, that the fact that a

12  lawsuit filed by Paulson and Nace and on behalf of

13  Ms. Gilbert, the fact that the lawsuit had been

14  dismissed because of an error in the caption was at

15  least noticed that an alleged error had been committed

16  by the firm?

17          MR. HORVATH:  Objection.  That is not what

18  the standard is.  The question was --

19          MS. SARP:  I am not referring to the question.

20  I am just asking generally.

21  BY MS. SARP:

22     Q    Would you agree that when you file a lawsuit,

Page 41

1    if the defendant moves to dismiss and the court

2    dismisses that lawsuit on the grounds that it was not

3    filed correctly, wouldn't you agree that that is a

4    professional error?

5              MR. HORVATH:   Objection.

6        A    No.

7    BY MS. SARP:

8        Q    Why not?

9        A    Things like that happen.  Well, I suppose you

10   never practiced law like I do in the courts all the time

11   representing individuals.

12       Q    Actually, I'm asking the questions.

13       A    So the bottom line is, those kind of errors

14   occur all of the time in the office, a misnomer or

15   something of that sort, and nowhere am I aware that that

16   would ever by itself lead to a claim.  That is not

17   dispositive of anything.

18            We recently had one where the wrong name was

19   used, totally, wrong defendant, corporation.  An

20   amendment was made and everything was fine.  There's no

21   way I would ever suspect I would send that to an

22   insurance company.  I had another one I can think of

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 42

Page 42

1    very recently, too, in which a court dismissed a case on

2    a Motion of Reconsideration.  Several months later,

3    reinstated the case.

4           So, no, absolutely not.  There is nothing

5    there that would indicate to me that there might be a

6    claim made in 2006 or '7 on this case.  No.

7       Q    But as you -- I think you have at least

8    recognized that whether a claim would be made or not,

9    you would agree that the dismissal of an action on the

10   grounds of some sort of error in the caption can -- is

11   a, quote, unquote, professional error; correct?

12          MR. HORVATH:  Objection.  He just answered

13   your question.  He just said that.

14      A    No, I don't agree with that.

15   BY MS. SARP:

16      Q    Actually, there are two different issues.

17   There is an issue of whether an error had been committed

18   and whether a claim might arise from that.

19      A    I disagree with either one of them.

20      Q    That is what I wanted to know.

21          (Nace Exhibit Number 12 marked for

22          identification.)



Page 57

1           MR. HORVATH:  No, you're not.  You've got a

2    goal.  You've got a definite goal.  I know you do.  I

3    know exactly what you are doing.

4        A    Do you want me to answer what happened in that

5    period of time?  I know what happened in that period of

6    time.

7    BY MS. SARP:

8        Q    Okay.

9        A    At some point I contacted an attorney who did

10   a lot of appellate work in the Commonwealth of Virginia.

11   I was told to contact this individual, and I did.  I

12   contacted that individual.  After talking with him, he

13   thought that we would be unsuccessful in the appeal,

14   which is why at that point in time it was necessary to

15   give some information.  I did not agree with him, but he

16   was right.

17       Q    Who was that attorney, if you recall?

18       A    I think we've even provided the name to you in

19   some answer to an interrogatory or in the --

20       Q    Was it Bartley or --

21       A    No.  I think it started with an E.

22       Q    Was it Deborah Whelihan?

Page 58

1      A     No.  I said E, not D.  Is it Edward?  I think.

2   But I can find that name.

3      Q     That's all right.

4      A     If you want to know what it is, I can find it.

5   But that's -- something happened at that point that I --

6   I said, this is stupid, but I better let them know about

7   it.  Simple as that.

8      Q     That's exactly the kind of information I was

9   looking for.

10      A     You did not ask me that exactly.  I

11   volunteered that to you.

12      Q     Let me make sure I get this straight.  At some

13   time then, approximately around May of 2009 or shortly

14   before that, you consulted with an appellate attorney

15   who was licensed in Virginia; correct?

16      A     I told you I talked to an appellate attorney.

17      Q     And that attorney advised you at that time

18   that the chances of succeeding on appeal in the Gilbert

19   matter were unfavorable?

20      A     What is the word?

21      Q     Unfavorable.

22      A     Unfavorable.

Page 59

1      Q     What was his word?

2      A     I don't know what the word was.  But he didn't

3  think he could win the case.

4      Q     So as a result of that, you decided that

5  perhaps this was something that needed to be --

6      A     My reaction would have been, you're kidding

7  me.

8      Q     I know you did not necessarily agree with his

9  advice, but it was enough to, in your name, to suggest

10  that maybe this is something that needed to be reported

11  as a potential claim?

12     A     At that time, yes.

13     Q     What prompted you to consult with an appellate

14  attorney?  Was there some specific event that happened

15  in the case?

16     A     That is the way I am.

17     Q     Why didn't you consult, for example, with an

18  appellate attorney back in 2007, when the second lawsuit

19  was dismissed?

20     A     Because at that point in time, the whole

21  concept to me was so ridiculous.  And had the -- we

22  did -- I believe we petitioned to have the Court take

Page 60

1    the case, appellate court.  Had they agreed to take the

2    case, I probably would have consulted with a Virginia

3    attorney on that particular issue.

4         Q    Because at that point you were --

5         A    It was not final.  There was not a final

6    judgment according to the Supreme Court of Virginia.

7    There was nothing to do at that point.

8              (Nace Exhibit Number 13 marked for

9              identification.)

10   BY MS. SARP:

11        Q    Now, what we've marked as Exhibit 13 to your

12   deposition is a document that was produced by Alliant

13   who is identified in your interrogatory answers was your

14   insurance broker for a period of time.  And they Bates

15   label their documents at the bottom, Chicago -- here

16   it's 68 and 69.  So that is where we got this document.

17             On the second page, the one that's Bates

18   labeled Chicago 69, again, is that your signature at the

19   bottom?

20        A    Yes.

21        Q    According to this document, you signed this on

22   approximately 7/20/2011?

Page 106

1    Q    "The purpose of the letter is to advise

2  Paulson and Nace that for the reasons discussed below,

3  CIC will provide Paulson and Nace with the defense

4  relative to the Gilbert lawsuit under a strict

5  Reservation of Rights.  This Reservation of Rights

6  includes but is not limited to the right to withdraw

7  from defense at any time and the right to bring a

8  declaratory judgment action against Paulson and Nace

9  seeking a declaration of no coverage relative to the

10  Gilbert lawsuit."

11       Do you see that paragraph?

12    A    Yes.

13    Q    And, in fact --

14    A    Yes.

15    Q    -- Chicago Insurance Company did retain

16  counsel to defend you and the firm in the Gilbert

17  lawsuit; correct?

18    A    Yes.

19    Q    Is that from the Jordan Coyne firm?

20    A    Yes.

21    Q    That is the same firm that Deborah Whelihan is

22  a lawyer at?

Page 107

1     A    Yes.

2     Q    What specific lawyer at Jordan Coyne is

3   defending you in the Gilbert matter?  Is it John Easton?

4     A    You mean you didn't know?

5     Q    I know.

6     A    Oh, you do know.  Okay.  It didn't seem like

7   you did know during the trial.

8     Q    Do you recall why Deborah Whelihan was not the

9   lawyer at Jordan Coyne defending you and your firm in

10   the Gilbert matter?

11     A    Because she is a D.C. lawyer, and John is a

12   Virginia lawyer, as I understood it.

13     Q    Do you recall having some discussions with

14   Deborah Whelihan about whether you were comfortable with

15   having John Easton at her firm represent you?

16     A    I don't recall, but I may have.  I don't know.

17   I didn't know John Easton, so I may have said something

18   to Debbie Whelihan, tell me about John Easton or

19   something like that.  I don't know.

20     Q    You did not have any objection to John Easton

21   of the Jordan Coyne firm being your defense attorney in

22   that lawsuit?

Chicago Insurance Co. v. Paulson & Nace, et al
Barry J. Nace

Page 111

1     about what your argument is, at least in part?

2               MR. HORVATH:  In part.

3          A    I was going to say partly.

4     BY MS. SARP:

5          Q    Sure.  In part.  Part of it is that Paulson

6     and Nace's position and your position is that -- let me

7     finish -- is that CIC did not notify you that there was

8     a potential coverage defense that related to whether you

9     had knowledge of a claim before the policy was issued

10    until January of 2012; correct?

11         A    Part of it.

12         Q    How has Paulson and Nace been prejudiced in

13    the defense of this coverage action by that fact?  How

14    have you been prejudiced?

15         A    How has Paulson and Nace been prejudiced or

16    how have I been prejudiced?

17              MR. HORVATH:  And also -- both have been

18    prejudiced.

19    BY MS. SARP:

20         Q    Here, I'm talking about -- if there's some

21    distinction between you and --

22         A    There is a distinction.  Do you understand the

1   distinction?

2       Q    Yes, I do.  Let me tell you.  First, do you

3   want me to ask the question separately?

4            MR. HORVATH:  Counsel, let me just make sure

5   it is clear.  He will answer both him personally and

6   Paulson and Nace, because they're both making the claim

7   of prejudice.

8            MS. SARP:  Sure.  I understand that.

9   BY MS. SARP:

10      Q    And if there's some difference in what you're

11  claiming as between you and the firm, please let me

12  know; but I understand that it's both you -- you're both

13  Defendants in the coverage action.

14           How has that argument that you -- how has --

15  how have you been prejudiced?

16      A    It will take a while.  First of all, Paulson

17  and Nace Corporation, PLLC, was not even in existence at

18  the time that this lawsuit --

19           MR. HORVATH:  She's talking about the lack of

20  the Reservation of Rights.  So just focus in on that,

21  the issue of the Reservation of Rights.  That's what

22  we're talking about, not the creation of the lawsuit,

Page 113

1    not that whole issue you have with the underlying --

2         A    Had you notified us timely on that, I would

3    have hired an attorney to try to figure out what was

4    going on.  Probably we would have a filed a declaratory

5    judgment action on our own to figure out what the

6    situation was.  And probably we never would have had to

7    go through a trial.  The case would have been resolved

8    one way or the other.  If you were -- should have been

9    in the case, I suspect that would have been it, the case

10   would have gotten resolved.  If it had been just me in

11   the case or the corporation in the case, it would have

12   gotten resolved one way or the other.

13            That didn't happen.  So I had to sit through a

14   trial for four days down in Richmond listening to the

15   opposing attorney call me -- saying that I betrayed the

16   client in this case.  It's not very pleasant to hear

17   things like that.  The corporation ends up losing a lot

18   of time.  The corporation is not me.  The corporation

19   has three other shareholders; my three sons, who

20   shouldn't be in this at all.

21            The aggravation of having to go through this

22   whole process, not to mention the amount that was

Page 114

1    involved now that probably would not have involved had

2    this matter been resolved without a trial, under any

3    circumstances.  There is no way that this case, whether

4    you were handling it or we were handling it, would not

5    have been settled for far less than $1.75 million.  It

6    would be ridiculous to not settle the case.

7           So there is all that added stuff -- added

8    amount in there that could affect me personally as this

9    case goes on.  And you're wrinkling your brow like you

10   don't understand what I'm saying.  If you're confused,

11   let me know, and I'll try to explain it to you better.

12   But I think it's pretty clear.

13   BY MS. SARP:

14      Q    I know what you're saying.  You're saying that

15   if -- this is what I hear you saying; that if Chicago

16   Insurance Company had afforded coverage, as you wanted

17   it to, the lawsuit could have been settled, and you

18   wouldn't have had to sit through a trial.  Is that what

19   you're saying?

20      A    Partly.

21           MR. HORVATH:  Objection.  Objection.  Counsel,

22   I don't think you heard the first part of the answer

Page 115

1    when he talked about the opportunity that was --

2    BY MS. SARP:

3         Q    I'm talking about, I want to know how things

4    would have been different, how you've been prejudiced,

5    if we had sent a Reservation of Rights letter to you as

6    you claim --

7         A    I would have hired an attorney.

8         Q    What would that attorney have done?  You mean

9    a coverage attorney?

10        A    Yes.

11        Q    What would that attorney have done?

12        A    Presumably a coverage attorney would have

13   filed a declaratory judgement action to determine if

14   there was anything there, determine which way it was

15   going to go.  It would have all been resolved.  It would

16   have been resolved before a lawsuit was filed.

17        Q    Before the Gilbert lawsuit was filed?

18        A    Yes, yes.  Could have been.

19        Q    That all assumes that you would win on the

20   coverage; correct?

21        A    Assumes what?

22        Q    Your position there assumes that if you had

Page 116

1    hired a coverage attorney and that coverage attorney

2    filed a declaratory judgment action, that you win that

3    coverage action.   Your argument is all premised on you

4    winning?

5         A    No.   That's not even true.   That's one part of

6    it.   If we win that action, yes, you would have settled

7    the case.   You know it and I know it.

8         Q    What if you had lost that action?

9         A    Then we would have known where we stood and we

10   would have known what we had to do and we would have

11   known whether or not there was any kind of way of paying

12   any kind of settlement, getting the case resolved or

13   not.   It would have just changed everything, is what it

14   would have done.   There never would have been a trial in

15   this case, one way or the other.   It wouldn't have been

16   tried.

17        Q    Are you saying that if there had been a

18   declaratory judgment action filed early and result in

19   the favor of no coverage, that you and Paulson and Nace

20   would have done whatever was necessary to settle Sarah

21   Gilbert's lawsuit?

22        A    No.   The case would have been resolved.   As

# EXHIBIT 2

**In the Matter Of:**

CHICAGO INSURANCE CO.

vs.

PAULSON & NACE, ET AL

**BARRY J. NACE**

*November 22, 2013*



Casamo | **Court Reporting**
**Videography**
**Videoconferencing**

Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3    -----------------------------------+
      CHICAGO INSURANCE COMPANY,          :
 4    an Illinois Corporation,            :
                        Plaintiff,        :
 5                                        :CIVIL NUMBER
      vs.                                 :1:12-CV-2068
 6                                        :
      PAULSON & NACE, PLLC, et al.,       :
 7                  Defendants.           :
      -----------------------------------+
 8                              Fairfax, Virginia
                          Friday, November 22, 2013
 9

10                    BARRY J. NACE

11

12    called for examination by counsel on behalf of the

13    Plaintiff, Chicago Insurance Company, Pursuant to Notice

14    taken in the Offices of Bancroft, McGavin, Horvath &

15    Judkins, P.C., 3920 University Drive, Fairfax, Virginia

16    22030 at approximately 9:00 a.m., before Janie Arriaga,

17    a certified Verbatim Reporter and a Notary Public in and

18    for the Commonwealth of Virginia, when there were

19    present on behalf of the respective parties.

20

21

22
```

Page 2

```
 1    APPEARANCES:

 2                    On behalf of Plaintiff:

 3                    PAULETTE S. SARP, ESQUIRE

 4                    Hinshaw and Culbertson, LLC

 5                    333 South Seventh Street, Suite 2000

 6                    Minneapolis, Minnesota 55402

 7

 8                    On behalf of Defendants:

 9                    STEPHEN HORVATH, ESQUIRE

10                    Bancroft, McGavin,

11                    Horvath & Judkins, P.C.

12                    3920 University Drive

13                    Fairfax, Virginia 22030

14

15

16

17    ALSO PRESENT:  Mr. Christopher Nace

18

19

20

21

22
```

Page 3

```
 1                      C O N T E N T S

 2   WITNESS                                           PAGE

 3   BARRY J. NACE,

 4        Examination by Ms. Sarp                        5

 5

 6                      E X H I B I T S

 7

 8   Nace Number 1    30(b)6                             5

 9   Nace Number 2    Insurance policy                   9

10   Nace Number 3    Declarations page                 10

11   Nace Number 4    Complaint                          11

12   Nace Number 5    October 18 motion                 14

13   Nace Number 6    Complaint                          17

14   Nace Number 7    Opposition to Motion               19

15   Nace Number 8    City of Richmond Order             21

16   Nace Number 9    Judge Hughes transcript            24

17   Nace Number 10   City of Richmond order             29

18   Nace Number 11   Application for insurance          32

19   Nace Number 12   Supplemental claim                 42

20   Nace Number 13   Application for liability          60

21   Nace Number 14   Letter from H. Feintuch            65

22
```

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 4

|  |  |  | Page 4 |
|---|---|---|---|
| 1 | (Continuation) | | |
| 2 | | | |
| 3 | Nace Number 15 | Affidavit | 68 |
| 4 | Nace Number 16 | Renewal application | 74 |
| 5 | Nace Number 17 | E-mail from C. Ellenberger | 85 |
| 6 | Nace Number 18 | E-mail chain | 97 |
| 7 | Nace Number 19 | January 12, 2013 letter | 99 |
| 8 | Nace Number 20 | Letter to Paulson and Nace | 104 |
| 9 | Nace Number 21 | Letter to B. Nace | 104 |
| 10 | Nace Number 22 | E-mail to B. Nace | 108 |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | (EXHIBITS ATTACHED TO TRANSCRIPT) | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |

T: (703) 837-0076          Toll Free (877) 837-0077          F: (703) 837-8118
http://www.casamo.com          Casamo and Associates          transcript@casamo.com

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 5

Page 5

1                    P R O C E E D I N G S

2    Whereupon,

3                        BARRY J. NACE

4    was called for examination by Counsel on behalf of the

5    Plaintiff, and after having been duly sworn by the Court

6    Reporter was examined and testified as follows:

7               (Nace Exhibit Number 1 marked for

8               identification.)

9            EXAMINATION BY COUNSEL FOR PLAINTIFF:

10   BY MS. SARP:

11       Q    I am handing you what I have marked as Exhibit

12   1, and that is a copy of the Notice of Rule 30(b)(6)

13   deposition that we issued for Paulson and Nace.  Have

14   you seen that before?

15       A    Yes.

16       Q    Are you the designated representative for

17   Paulson and Nace today?

18       A    Yes.

19       Q    Also, we had noticed a Notice of Deposition

20   for your deposition individually.  In talking to your

21   counsel, Steve Horvath, we are going to essentially

22   proceed on the same track with your personal deposition

* * *

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 40

Page 40

1      A    I probably knew that in the general way you

2    are phrasing it.

3    BY MS. SARP:

4      Q    So with that knowledge, why didn't you answer

5    the question 15B with a yes?

6      A    Because there is certainly nothing in that

7    that would indicate to me that -- trying to use your

8    language here -- may result in something being made

9    against the firm.  Nothing would suggest that to me at

10   that time or today.

11     Q    Would you agree, though, that the fact that a

12   lawsuit filed by Paulson and Nace and on behalf of

13   Ms. Gilbert, the fact that the lawsuit had been

14   dismissed because of an error in the caption was at

15   least noticed that an alleged error had been committed

16   by the firm?

17          MR. HORVATH:  Objection.  That is not what

18   the standard is.  The question was --

19          MS. SARP:  I am not referring to the question.

20   I am just asking generally.

21   BY MS. SARP:

22     Q    Would you agree that when you file a lawsuit,

Page 41

1    if the defendant moves to dismiss and the court

2    dismisses that lawsuit on the grounds that it was not

3    filed correctly, wouldn't you agree that that is a

4    professional error?

5            MR. HORVATH:  Objection.

6        A    No.

7    BY MS. SARP:

8        Q    Why not?

9        A    Things like that happen.  Well, I suppose you

10   never practiced law like I do in the courts all the time

11   representing individuals.

12       Q    Actually, I'm asking the questions.

13       A    So the bottom line is, those kind of errors

14   occur all of the time in the office, a misnomer or

15   something of that sort, and nowhere am I aware that that

16   would ever by itself lead to a claim.  That is not

17   dispositive of anything.

18            We recently had one where the wrong name was

19   used, totally, wrong defendant, corporation.  An

20   amendment was made and everything was fine.  There's no

21   way I would ever suspect I would send that to an

22   insurance company.  I had another one I can think of

CHICAGO INSURANCE CO. vs. PAULSON & NACE, ET AL

BARRY J. NACE
Page 42

Page 42

1    very recently, too, in which a court dismissed a case on

2    a Motion of Reconsideration.  Several months later,

3    reinstated the case.

4         So, no, absolutely not.  There is nothing

5    there that would indicate to me that there might be a

6    claim made in 2006 or '7 on this case.  No.

7        Q    But as you -- I think you have at least

8    recognized that whether a claim would be made or not,

9    you would agree that the dismissal of an action on the

10   grounds of some sort of error in the caption can -- is

11   a, quote, unquote, professional error; correct?

12        MR. HORVATH:  Objection.  He just answered

13   your question.  He just said that.

14        A    No, I don't agree with that.

15   BY MS. SARP:

16        Q    Actually, there are two different issues.

17   There is an issue of whether an error had been committed

18   and whether a claim might arise from that.

19        A    I disagree with either one of them.

20        Q    That is what I wanted to know.

21            (Nace Exhibit Number 12 marked for

22            identification.)



Page 57

1           MR. HORVATH:  No, you're not.  You've got a

2    goal.  You've got a definite goal.  I know you do.  I

3    know exactly what you are doing.

4         A    Do you want me to answer what happened in that

5    period of time?  I know what happened in that period of

6    time.

7    BY MS. SARP:

8         Q    Okay.

9         A    At some point I contacted an attorney who did

10   a lot of appellate work in the Commonwealth of Virginia.

11   I was told to contact this individual, and I did.  I

12   contacted that individual.  After talking with him, he

13   thought that we would be unsuccessful in the appeal,

14   which is why at that point in time it was necessary to

15   give some information.  I did not agree with him, but he

16   was right.

17        Q    Who was that attorney, if you recall?

18        A    I think we've even provided the name to you in

19   some answer to an interrogatory or in the --

20        Q    Was it Bartley or --

21        A    No.  I think it started with an E.

22        Q    Was it Deborah Whelihan?

Page 58

1      A    No.  I said E, not D.  Is it Edward?  I think.

2  But I can find that name.

3      Q    That's all right.

4      A    If you want to know what it is, I can find it.

5  But that's -- something happened at that point that I --

6  I said, this is stupid, but I better let them know about

7  it.  Simple as that.

8      Q    That's exactly the kind of information I was

9  looking for.

10     A    You did not ask me that exactly.  I

11  volunteered that to you.

12     Q    Let me make sure I get this straight.  At some

13  time then, approximately around May of 2009 or shortly

14  before that, you consulted with an appellate attorney

15  who was licensed in Virginia; correct?

16     A    I told you I talked to an appellate attorney.

17     Q    And that attorney advised you at that time

18  that the chances of succeeding on appeal in the Gilbert

19  matter were unfavorable?

20     A    What is the word?

21     Q    Unfavorable.

22     A    Unfavorable.

Page 59

1      Q    What was his word?

2      A    I don't know what the word was.  But he didn't

3  think he could win the case.

4      Q    So as a result of that, you decided that

5  perhaps this was something that needed to be --

6      A    My reaction would have been, you're kidding

7  me.

8      Q    I know you did not necessarily agree with his

9  advice, but it was enough to, in your name, to suggest

10  that maybe this is something that needed to be reported

11  as a potential claim?

12     A    At that time, yes.

13     Q    What prompted you to consult with an appellate

14  attorney?  Was there some specific event that happened

15  in the case?

16     A    That is the way I am.

17     Q    Why didn't you consult, for example, with an

18  appellate attorney back in 2007, when the second lawsuit

19  was dismissed?

20     A    Because at that point in time, the whole

21  concept to me was so ridiculous.  And had the -- we

22  did -- I believe we petitioned to have the Court take

Page 60

1    the case, appellate court.  Had they agreed to take the

2    case, I probably would have consulted with a Virginia

3    attorney on that particular issue.

4          Q    Because at that point you were --

5          A    It was not final.  There was not a final

6    judgment according to the Supreme Court of Virginia.

7    There was nothing to do at that point.

8               (Nace Exhibit Number 13 marked for

9               identification.)

10   BY MS. SARP:

11         Q    Now, what we've marked as Exhibit 13 to your

12   deposition is a document that was produced by Alliant

13   who is identified in your interrogatory answers was your

14   insurance broker for a period of time.  And they Bates

15   label their documents at the bottom, Chicago -- here

16   it's 68 and 69.  So that is where we got this document.

17              On the second page, the one that's Bates

18   labeled Chicago 69, again, is that your signature at the

19   bottom?

20         A    Yes.

21         Q    According to this document, you signed this on

22   approximately 7/20/2011?

Page 106

1     Q     "The purpose of the letter is to advise

2    Paulson and Nace that for the reasons discussed below,

3    CIC will provide Paulson and Nace with the defense

4    relative to the Gilbert lawsuit under a strict

5    Reservation of Rights.  This Reservation of Rights

6    includes but is not limited to the right to withdraw

7    from defense at any time and the right to bring a

8    declaratory judgment action against Paulson and Nace

9    seeking a declaration of no coverage relative to the

10   Gilbert lawsuit."

11           Do you see that paragraph?

12     A     Yes.

13     Q     And, in fact --

14     A     Yes.

15     Q     -- Chicago Insurance Company did retain

16   counsel to defend you and the firm in the Gilbert

17   lawsuit; correct?

18     A     Yes.

19     Q     Is that from the Jordan Coyne firm?

20     A     Yes.

21     Q     That is the same firm that Deborah Whelihan is

22   a lawyer at?

Chicago Insurance Co. v. Paulson & Nace, et al                    Barry J. Nace

1        A    Yes.

2        Q    What specific lawyer at Jordan Coyne is

3   defending you in the Gilbert matter?  Is it John Easton?

4        A    You mean you didn't know?

5        Q    I know.

6        A    Oh, you do know.  Okay.  It didn't seem like

7   you did know during the trial.

8        Q    Do you recall why Deborah Whelihan was not the

9   lawyer at Jordan Coyne defending you and your firm in

10  the Gilbert matter?

11       A    Because she is a D.C. lawyer, and John is a

12  Virginia lawyer, as I understood it.

13       Q    Do you recall having some discussions with

14  Deborah Whelihan about whether you were comfortable with

15  having John Easton at her firm represent you?

16       A    I don't recall, but I may have.  I don't know.

17  I didn't know John Easton, so I may have said something

18  to Debbie Whelihan, tell me about John Easton or

19  something like that.  I don't know.

20       Q    You did not have any objection to John Easton

21  of the Jordan Coyne firm being your defense attorney in

22  that lawsuit?

Barry J. Nace

Page 111

1    about what your argument is, at least in part?

2            MR. HORVATH:  In part.

3        A    I was going to say partly.

4    BY MS. SARP:

5        Q    Sure.  In part.  Part of it is that Paulson

6    and Nace's position and your position is that -- let me

7    finish -- is that CIC did not notify you that there was

8    a potential coverage defense that related to whether you

9    had knowledge of a claim before the policy was issued

10   until January of 2012; correct?

11       A    Part of it.

12       Q    How has Paulson and Nace been prejudiced in

13   the defense of this coverage action by that fact?  How

14   have you been prejudiced?

15       A    How has Paulson and Nace been prejudiced or

16   how have I been prejudiced?

17           MR. HORVATH:  And also -- both have been

18   prejudiced.

19   BY MS. SARP:

20       Q    Here, I'm talking about -- if there's some

21   distinction between you and --

22       A    There is a distinction.  Do you understand the

Page 112

1    distinction?

2        Q    Yes, I do.  Let me tell you.  First, do you

3    want me to ask the question separately?

4            MR. HORVATH:  Counsel, let me just make sure

5    it is clear.  He will answer both him personally and

6    Paulson and Nace, because they're both making the claim

7    of prejudice.

8            MS. SARP:  Sure.  I understand that.

9    BY MS. SARP:

10       Q    And if there's some difference in what you're

11   claiming as between you and the firm, please let me

12   know; but I understand that it's both you -- you're both

13   Defendants in the coverage action.

14           How has that argument that you -- how has --

15   how have you been prejudiced?

16       A    It will take a while.  First of all, Paulson

17   and Nace Corporation, PLLC, was not even in existence at

18   the time that this lawsuit --

19           MR. HORVATH:  She's talking about the lack of

20   the Reservation of Rights.  So just focus in on that,

21   the issue of the Reservation of Rights.  That's what

22   we're talking about, not the creation of the lawsuit,

Page 113

1    not that whole issue you have with the underlying --

2        A    Had you notified us timely on that, I would

3    have hired an attorney to try to figure out what was

4    going on.  Probably we would have a filed a declaratory

5    judgment action on our own to figure out what the

6    situation was.  And probably we never would have had to

7    go through a trial.  The case would have been resolved

8    one way or the other.  If you were -- should have been

9    in the case, I suspect that would have been it, the case

10   would have gotten resolved.  If it had been just me in

11   the case or the corporation in the case, it would have

12   gotten resolved one way or the other.

13           That didn't happen.  So I had to sit through a

14   trial for four days down in Richmond listening to the

15   opposing attorney call me -- saying that I betrayed the

16   client in this case.  It's not very pleasant to hear

17   things like that.  The corporation ends up losing a lot

18   of time.  The corporation is not me.  The corporation

19   has three other shareholders; my three sons, who

20   shouldn't be in this at all.

21           The aggravation of having to go through this

22   whole process, not to mention the amount that was

Page 114

1    involved now that probably would not have involved had

2    this matter been resolved without a trial, under any

3    circumstances.  There is no way that this case, whether

4    you were handling it or we were handling it, would not

5    have been settled for far less than $1.75 million.  It

6    would be ridiculous to not settle the case.

7           So there is all that added stuff -- added

8    amount in there that could affect me personally as this

9    case goes on.  And you're wrinkling your brow like you

10   don't understand what I'm saying.  If you're confused,

11   let me know, and I'll try to explain it to you better.

12   But I think it's pretty clear.

13   BY MS. SARP:

14       Q    I know what you're saying.  You're saying that

15   if -- this is what I hear you saying; that if Chicago

16   Insurance Company had afforded coverage, as you wanted

17   it to, the lawsuit could have been settled, and you

18   wouldn't have had to sit through a trial.  Is that what

19   you're saying?

20       A    Partly.

21           MR. HORVATH:  Objection.  Objection.  Counsel,

22   I don't think you heard the first part of the answer

Page 115

1    when he talked about the opportunity that was --

2    BY MS. SARP:

3        Q    I'm talking about, I want to know how things

4    would have been different, how you've been prejudiced,

5    if we had sent a Reservation of Rights letter to you as

6    you claim --

7        A    I would have hired an attorney.

8        Q    What would that attorney have done?  You mean

9    a coverage attorney?

10       A    Yes.

11       Q    What would that attorney have done?

12       A    Presumably a coverage attorney would have

13   filed a declaratory judgement action to determine if

14   there was anything there, determine which way it was

15   going to go.  It would have all been resolved.  It would

16   have been resolved before a lawsuit was filed.

17       Q    Before the Gilbert lawsuit was filed?

18       A    Yes, yes.  Could have been.

19       Q    That all assumes that you would win on the

20   coverage; correct?

21       A    Assumes what?

22       Q    Your position there assumes that if you had

Page 116

1    hired a coverage attorney and that coverage attorney

2    filed a declaratory judgment action, that you win that

3    coverage action.   Your argument is all premised on you

4    winning?

5        A    No.   That's not even true.   That's one part of

6    it.   If we win that action, yes, you would have settled

7    the case.   You know it and I know it.

8        Q    What if you had lost that action?

9        A    Then we would have known where we stood and we

10   would have known what we had to do and we would have

11   known whether or not there was any kind of way of paying

12   any kind of settlement, getting the case resolved or

13   not.   It would have just changed everything, is what it

14   would have done.   There never would have been a trial in

15   this case, one way or the other.   It wouldn't have been

16   tried.

17       Q    Are you saying that if there had been a

18   declaratory judgment action filed early and result in

19   the favor of no coverage, that you and Paulson and Nace

20   would have done whatever was necessary to settle Sarah

21   Gilbert's lawsuit?

22       A    No.   The case would have been resolved.   As

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| CHICAGO INSURANCE COMPANY,          ) | |
|                                     ) | |
| Plaintiff,          ) | |
|                                     ) | |
| v.                                  ) | Civil Action No. 12-2068 (ABJ) |
|                                     ) | |
| PAULSON & NACE, PLLC, *et al.*,     ) | |
|                                     ) | |
| Defendants.          ) | |
| _____ ) | |

<u>**ORDER**</u>

Pursuant to Federal Rules of Civil Procedure 56 and 58, and for the reasons set forth in the accompanying Memorandum Opinion, it is ORDERED that plaintiff's motion for summary judgment [Dkt. # 18] is GRANTED.  It is FURTHER ORDERED that defendants' motion for summary judgment [Dkt. # 14] is DENIED.

SO ORDERED.

_____
AMY BERMAN JACKSON
United States District Judge

DATE:  April 10, 2014

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| CHICAGO INSURANCE COMPANY, | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | Civil Action No. 12-2068 (ABJ) |
|  | ) | |
| PAULSON & NACE, PLLC, *et al.*, | ) | |
|  | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION</u>

In this case, an insurance carrier seeks a declaratory judgment holding that it is not bound to cover the costs of a legal malpractice action brought against a District of Columbia law firm and two of its attorneys. Invoking this Court's diversity jurisdiction, plaintiff Chicago Insurance Company ("CIC") brings this action against defendants Paulson & Nace, PLLC ("Paulson & Nace"), Barry J. Nace, Gabriel Assaad, and Sarah Gilbert. Paulson & Nace is a law firm at which attorney Barry J. Nace practices. Gabriel Assaad, also an attorney, was formerly an associate at Paulson & Nace.[1] Sarah Gilbert is a former Paulson & Nace client. In July 2007, CIC issued a professional liability insurance policy to Paulson & Nace and Barry J. Nace, which defendant Nace renewed for the July 2008–July 2009 period.

On November 1, 2013, the Circuit Court for the City of Richmond, Virginia awarded defendant Gilbert a $1.75 million legal malpractice judgment against the attorney defendants. According to CIC, the attorney defendants should have been aware of defendant Gilbert's

_____

[1]    The Court will refer to Paulson & Nace, Barry J. Nace, and Gabriel Assaad collectively as the "attorney defendants."

potential claim before the inception of the CIC–Nace insurance policy, and they failed to notify CIC as required by the policy. Therefore, CIC seeks a declaratory judgment from this Court that it has no obligation to indemnify the attorney defendants for the damages, costs, or fees incurred in connection with the Gilbert legal malpractice lawsuit.

After completing discovery in this action, defendants Barry J. Nace, Paulson & Nace, and Sarah Gilbert, and plaintiff CIC all moved for summary judgment.[2] Defendants contend that Virginia substantive law should apply in this diversity case, and that Virginia law precludes judgment for CIC. They further argue that the attorney defendants were not aware of defendant Gilbert's potential claim until 2009, and that CIC has waived its defense to coverage, or in the alternative, that CIC is estopped from asserting it because CIC did not reserve its rights until 2012. Plaintiff maintains that District of Columbia law applies to this case, that the attorney defendants reasonably should have known that defendant Gilbert had a potential claim against them before the inception of the insurance policy, and that the doctrines of waiver and estoppel do not bar its defense to coverage.

The Court finds that District of Columbia law applies to this case, that the attorney defendants should have known of defendant Gilbert's potential claim before they even applied for the CIC insurance policy, that the attorney defendants failed to notify CIC of the potential

---

2    Defendant Gilbert has joined the briefing of defendants Barry J. Nace and Paulson & Nace in full. *See* Def. Sarah Gilbert's Resp. to Defs. Paulson & Nace, PLLC's & Barry J. Nace's Mem. of P. & A. in Supp. of Their Mot. for Summ. J. at 1 (joining motion for summary judgment) [Dkt. # 21]; Def. Sarah Gilbert's Resp. to Pl.'s Mot. for Summ. J. & Joinder of Opp. Filed by Defs. at 2 (joining opposition to CIC's motion for summary judgment) [Dkt. # 39]. Defendant Assaad has joined only the opposition to CIC's motion for summary judgment. Def. Gabriel Assaad's Joinder of Defs. Paulson & Nace, PLLC & Barry Nace's Opp. to Pl.'s Mot. for Summ J. at 1 [Dkt. # 38]. For the sake of simplicity, the Court will refer to these filings as having been submitted by "defendants."

2

claim, and that CIC's defense to coverage is not barred by the doctrines of waiver or estoppel. Therefore, the Court will grant plaintiff's motion for summary judgment and deny defendants' motion.

## BACKGROUND

**I.    Factual Background**[3]

*A.   The Gilbert Medical Malpractice Lawsuit*

On July 28, 2004, Sarah Gilbert underwent spinal surgery to correct her scoliosis, and the surgery rendered her a paraplegic.  Statement of Material Facts in Supp. of Chi. Ins. Co.'s Mot. for Summ. J. ¶ 3 [Dkt. # 18] ("CIC SOF").  Ms. Gilbert was a minor at the time.  *Id.* ¶ 4.  In December 2004, her parents, Richard and Rosie Gilbert, retained defendant Barry J. Nace and his law firm, defendant Paulson & Nace, to pursue a claim of medical malpractice and negligence on behalf of their daughter in Virginia.  *Id.*  Defendant Gabriel Assaad, then an associate attorney at Paulson & Nace who, unlike Nace, was admitted to the Virginia bar, *see* Ex. W to CIC SOF, Decl. of Gabriel Assaad ¶ 3 [Dkt. # 18-23]; Ex. W to CIC SOF, Aff. of Barry J. Nace ¶ 4 [Dkt. # 18-23], assisted in the representation of Ms. Gilbert.[4]  *See* Ex. G to CIC SOF at 2 [Dkt. 18-7]

---

3       The parties have submitted four statements of material fact.  Statement of Material Facts Not in Dispute, Defs. Paulson & Nace, PLLC's & Barry J. Nace, Esq.'s Mot. for Summ. J. [Dkt. # 14-2]; Statement of Material Facts in Supp. of Chi. Ins. Co.'s Mot. for Summ. J. [Dkt. # 18]; Pl.'s Resp. in Opp. to the Nace Defs.' Statement of Material Facts not in Dispute & Pl.'s Additional Statement of Undisputed Material Facts in Supp. of Pl.'s Opp. [Dkt. # 23]; Defs. Paulson & Nace, PLLC, & Barry Nace's Statement of Genuine Issues of Material Fact Necessary to Be Litigated [Dkt. # 24-1].  Except where noted, all of the facts in this section are undisputed.

4       Mr. Assaad is no longer an associate with Paulson & Nace.  *See* Paulson & Nace, PLLC & Barry J. Nace Answer & Grounds for Relief ¶ 5 [Dkt. # 5].

3

(transcript of Virginia court proceeding indicating defendant Assaad's appearance on behalf of defendant Gilbert).

The attorney defendants filed a complaint in the Gilbert medical malpractice lawsuit on July 24, 2006, in the Circuit Court for the City of Richmond.  Statement of Material Facts Not in Dispute, Defs. Paulson & Nace, PLLC's & Barry J. Nace, Esq.'s Mot. for Summ. J. ¶ 3 [Dkt. # 14-2] ("Nace SOF").  The statute of limitations on Ms. Gilbert's claim expired four days later, on July 28, 2006.[5]  CIC SOF ¶¶ 5–6.  The court dismissed this complaint without prejudice on February 26, 2007, because the complaint did not identify Richard and Rosie Gilbert as Sarah Gilbert's "next friend," as required by Virginia law.  Nace SOF ¶ 6; *see also* Va. Code § 8.01-8 (2013) ("Any minor entitled to sue may do so by his next friend.  Either or both parents may sue on behalf of a minor as his next friend.").  In the meantime, though, the attorney defendants recognized their error and on October 25, 2006, they filed a second complaint in the same court with a style that comported with Virginia law.  Nace SOF ¶ 7.  On June 18, 2007, the Virginia judge ruled from the bench and dismissed the second complaint with prejudice as untimely.  Ex. G to CIC SOF at 31–32, 44 (transcript of court proceedings).  Defendant Gabriel Assaad represented Ms. Gilbert at that hearing and acknowledged the court's ruling against his client.  *Id.* at 32 ("MR. ASSAAD: Your Honor, I understand your ruling.  *Note my exception to it*.")

---

[5]    The attorney defendants state that "it is alleged" that the statute of limitations on Sarah Gilbert's claim ran out on July 28, 2006, Nace SOF ¶ 4, but a Virginia court ultimately dismissed the claim as untimely for precisely this reason.  *See* Ex. H to CIC SOF at B93–B94 [Dkt. # 18-8] (order of the Circuit Court of the City of Richmond dismissing Ms. Gilbert's medical malpractice claim as untimely).

4

(emphasis added).  The court subsequently issued an order memorializing its ruling on August 3, 2007.  Ex. H to CIC SOF at B93-B95 [Dkt. # 18-8].

The attorney defendants' attempts to appeal that ruling were unsuccessful, and the Supreme Court of Virginia finally disposed of Sarah Gilbert's untimely medical malpractice claim on December 15, 2009.  Nace SOF ¶ 13.  In addition, the attorney defendants nonsuited the remaining claims of Richard and Rosie Gilbert, which had not been dismissed, on May 19, 2009.  *Id.* ¶ 11.  On January 29, 2011, counsel for defendant Gilbert in this case, Herman Aubrey Ford, III, informed defendant Nace by letter that he would be taking over representation of Richard and Rosie Gilbert at their request.  Ex. AA to Mem. of P. & A. in Supp. of CIC's Resp. in Opp. to the Nace Defs.' Mot. for Summ. J. at 1–2 [Dkt. # 23-3].

B.   *The CIC Insurance Policy*

On July 18, 2007, after the Virginia court had ruled from the bench and dismissed the Gilbert case as untimely, defendant Barry J. Nace applied for a "claims-made" professional liability insurance policy from plaintiff, Chicago Insurance Company.[6]  CIC SOF ¶ 14.  At the time, the attorney defendants held a policy from the Philadelphia Insurance Company that was set to expire July 24, 2007.  Defs. Paulson & Nace, PLLC, & Barry Nace's Reply to Pl.'s Opp. to their Mot. for Summ. J. at 19 [Dkt. # 29] ("Defs.' Reply"); Ex. DD to Pl.'s Sur-Reply in Supp. of CIC's Opp. to Nace Defs.' Mot. for Summ. J. at PIIC 010 [Dkt. # 32-1].  Plaintiff issued a "Lawyers Professional Liability Policy" to the attorney defendants for the July 24, 2007–July 24,

---

6     A "claims-made" policy is one in which "the insurer agrees to indemnify the insured party against all claims made during the period of the policy, regardless whether the incident that gave rise to the claim occurred during the policy term."  *Nat'l R.R. Passenger Corp. v. Lexington Ins. Co.*, 365 F.3d 1104, 1105 (D.C. Cir. 2004), citing Black's Law Dictionary 809 (7th ed. 1999).

2008 period, and defendant Barry J. Nace renewed that policy for the July 24, 2008–July 24, 2009 period.  Nace SOF ¶¶ 14, 15.

In the application for the initial policy, Mr. Nace answered "no" to the following question:  "Having inquired of all partners, officers, owners and employed lawyers, are there any circumstances which may result in a claim being made against the firm, its predecessors or any current or past partner, officer, owner or employed lawyer of the firm?"  CIC SOF ¶ 15.

Additionally, the 2008–2009 insurance agreement provided as follows:

**INSURING AGREEMENTS**

**I.      COVERAGE**

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as **Damages** for **Claims** first made against the **Insured** and reported to the Company during the **Policy Period** or Extended Reporting Period, as applicable, arising out of any negligent act, error, omission or **Personal Injury** in the rendering of or failure to render **Professional Services** for others by an **Insured** covered under this policy. <u>Provided always that such **Professional Services** or **Personal Injury** happen:</u>

      A.  during the **Policy Period**; or

      B.  <u>prior to the **Policy Period** provided that prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by this Company to the **Named Insured** or **Predecessor in Business,** and continuously renewed and maintained in effect to the inception of this policy period:</u>

            1.  the **Insured** did not give notice to any prior insurer of any such act, error, omission or **Personal Injury**;

            2.  <u>the **Named Insured**, any partner, shareholder, employee, or where appropriate the **Named Insured's** management committee or any member thereof, had no reasonable basis to believe that the **Insured** had breached a professional duty or to **Reasonably Foresee** that a **Claim** would be made against the **Insured**</u>; and

6

845

3. there is no prior policy or policies which provide insurance (including any Automatic or Optional Extended Reporting Period or similar provision) of such policies for such **Claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any **Claim**, in which event this policy will be specific excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

CIC SOF ¶ 24 (emphasis added by CIC).  The agreement further defined the term "reasonably foresee" as follows:

**Reasonably Foresee(n)** means:

1. **Claims** or incidents reported to any prior insurer;

2. unreported **Claims** or suits of which any **Insured** had received notice prior to the effective date of the first policy with the Company;

3. incidents or circumstances that involve a particular person or entity which an **Insured** knew might result in a **Claim** or suit prior to the effective date of the first policy issued by the Company to the **Named Insured**, and which was not disclosed to the Company.

*Id.* ¶ 26 (emphasis added by CIC).

The attorney defendants did not alert CIC to Sarah Gilbert's potential legal malpractice claim until May of 2009.  CIC SOF ¶ 18.  At that time, the attorney defendants informed CIC that the "alleged error" with respect to defendant Gilbert had occurred in 2008.  *Id.*  The attorney defendants never informed their prior insurer, the Philadelphia Insurance Company, of Ms. Gilbert's potential claim.  *See* Defs.' Reply at 23–24.

CIC claims that it issued a general reservation of rights letter to the attorney defendants in July 2009, shortly after defendant Nace alerted plaintiff to defendant Gilbert's potential claim. CIC SOF ¶ 20.  This letter acknowledged that CIC was on notice of the potential claim and that

7

846

CIC would investigate it, but further stated:  "[n]othing contained herein constitutes a waiver of any of our potential rights and defenses.  CIC reserves all of its rights under the policy and, in particular, reserves the right to assert coverage or policy defenses, if any, at such time when pertinent facts and circumstances or their significance are disclosed or otherwise become known to CIC."  *Id.* ¶ 21.  Defendant Nace claims that he never received this letter.  Pl.'s Resp. in Opp. to the Nace Defs.' Statement of Material Facts not in Dispute & Pl.'s Additional Statement of Undisputed Material Facts in Supp. of Pl.'s Opp. ¶ 28 [Dkt. # 23] ("CIC SOF Resp.").

CIC retained a law firm to represent the attorney defendants against defendant Gilbert's potential malpractice action.  Defs. Paulson & Nace, PLLC, & Barry Nace's Statement of Genuine Issues of Material Fact Necessary to Be Litigated ¶ 22 [Dkt. # 24-1].  On March 8, 2010, CIC received several litigation documents from the underlying Gilbert medical malpractice action.  Nace SOF ¶¶ 19–20.  CIC did not review these records, however, and did not discover the timing of the dismissal of the Gilbert medical malpractice action until November 2011.  CIC SOF ¶ 22.  CIC asserts that it did not review the documents it received in March 2010 for a timeliness issue because it relied on defendant Nace's representation that the "alleged error" had occurred in 2008, and because defendant Gilbert had not yet filed a claim.  CIC SOF Resp. at 17.  Nevertheless, CIC's own records indicate that, starting in 2009, its claims adjusters repeatedly noted that CIC had "insufficient facts" about the potential Gilbert claim and needed more information.  Ex. Y to Mem. of P. & A. in Supp. of CIC's Resp. in Opp. to the Nace Defs.' Mot. for Summ. J. at CIC 000493–95 [Dkt. # 23-1].

On January 13, 2012, CIC sent letters to defendants Nace and Assaad stating that "CIC reserves its rights to deny coverage [of the potential Gilbert claim] to the extent that an insured

8

had a reasonable basis to believe that a professional duty had been breached or to 'reasonably foresee' that a 'claim' would be made against the insured before the CIC policy incepted on July 24, 2007." Ex. Q to CIC SOF at CIC 000022, CIC 000029.  CIC further stated that it would "continue to monitor and investigate [the] potential [Gilbert] claim under a strict reservation of rights including, but not limited to, the right to bring a declaratory action seeking a declaration of no coverage or a rescission action."  *Id.* at CIC 000017, CIC 000024–25.  It is undisputed that CIC never sent a reservation of rights notice to defendant Gilbert.  CIC SOF Resp. at 9.

### C. The Gilbert Legal Malpractice Action

Defendant Sarah Gilbert filed a legal malpractice claim against the attorney defendants in Richmond Circuit Court on March 13, 2012.  Nace SOF ¶ 24.  CIC received notice of this lawsuit on April 12, 2012, and issued a second reservation of rights letter to defendants Nace and Assaad on April 21, 2012.  CIC SOF ¶¶ 29–30; Ex. T to CIC SOF at CIC 000444, CIC 000520. A jury awarded Ms. Gilbert $4,000,000, which the court reduced to $1,750,000 pursuant to Virginia law on November 1, 2013.  Ex. A to Gilbert Resp. at 2 [Dkt. # 21-1].

## II.     Procedural Background

On December 27, 2012, plaintiff CIC filed this diversity action seeking a declaratory judgment that it is not obligated to continue defending the attorney defendants.[7]  Compl. at 1 [Dkt. # 1].  The parties conducted discovery, and defendants Paulson & Nace and Barry J. Nace filed a motion for summary judgment on August 8, 2013, [Dkt. # 14].  They argue that this case

---

7       CIC had previously filed a virtually identical action against the same defendants in the United States District Court for the Eastern District of Virginia, which was dismissed for lack of subject matter jurisdiction on December 3, 2012.  Ex. 8 to Defs. Paulson & Nace, PLLC's & Barry J. Nace, Esq.'s Mot. for Summ. J. at 2 [Dkt. # 14-10].

9

is controlled by Virginia law, and that under Virginia law, plaintiff has waived or is estopped from asserting its defense to coverage.  Defs. Paulson & Nace, PLLC's, and Barry J. Nace's Mem. of P. & A. in Supp. of Their Mot. for Summ. J. at 1 ("Defs.' Mem.") [Dkt. # 14-1].  Defendant Gilbert joined the defendants' motion on December 12, 2013.  Def. Sarah Gilbert's Resp. to Defs. Paulson & Nace, PLLC's & Barry J. Nace's Mem. of P. & A. in Supp. of Their Mot. for Summ. J. at 1 [Dkt. # 21] ("Gilbert Resp.").

Plaintiff CIC filed a cross-motion for summary judgment on September 19, 2013, [Dkt. # 18], contending that District of Columbia ("District" or "D.C.") law applies to this action and that plaintiff is entitled to a declaratory judgment as a matter of law.  Mem. of P. & A. in Supp. of CIC's Mot. for Summ. J. at 11–16 [Dkt. # 18] ("Pl.'s Mem.").  Defendants Paulson & Nace and Barry J. Nace opposed that motion on December 12, 2013, [Dkt. # 24].  Defendant Assaad joined the opposition on March 18, 2014, [Dkt. # 38], and defendant Gilbert joined the opposition on March 26, 2014, [Dkt. # 39].

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a

genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  The existence of a factual

dispute is insufficient to preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the

non-moving party; a fact is only "material" if it is capable of affecting the outcome of the

litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In

assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the

light most favorable to the party opposing the summary judgment motion.'"  *Scott v. Harris*, 550

U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654,

655 (1962) (per curiam).

"The rule governing cross-motions for summary judgment . . . is that neither party waives

the right to a full trial on the merits by filing its own motion; each side concedes that no material

facts are at issue only for the purposes of its own motion."  *Sherwood v. Wash. Post*, 871 F.2d

1144, 1148 n.4 (D.C. Cir. 1989), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir.

1982).  In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in

the light most favorable to the non-moving party."  *N.S. ex rel. Stein v. District of Columbia*, 709

F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

**I.      District of Columbia law applies to this case.**

As a preliminary matter, the Court must determine whether District of Columbia law or

Virginia law applies in this case because a federal court sitting in diversity "must apply state law

to the substantive issues before it."  *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d

1454, 1458 (D.C. Cir. 1995), citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *see also*

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941).  To determine which state's substantive law to apply, a court must "apply the choice-of-law rules of the forum state." *Republican Nat'l Comm. v. Taylor*, 299 F.3d 887, 890 (D.C. Cir. 2002).  Thus, District of Columbia choice-of-law principles will guide the Court's inquiry.

Under D.C. law, a court must "first determine whether there is a conflict" between D.C. and Virginia law in the case.  *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985), citing *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C. 1970); *see also Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler, LLP*, 793 F. Supp. 2d 399, 407 (D.D.C. 2011).  If no conflict exists, the court need not proceed with the choice of law analysis.  *Eli Lilly*, 764 F.2d at 882.

Defendants appear to believe that a conflict exists between District and Virginia law.[8] Specifically, defendants point to the requirement under Virginia law that, when a liability insurer "discovers a breach of the terms or conditions of the insurance contract by the insured, the insurer shall notify the claimant or the claimant's counsel of the breach . . . within forty-five days" of either the insurer's discovery of the breach or of the claimant's claim.  Va. Code § 38.2-2226 (2013).  It is undisputed that District of Columbia law does not contain a similar notice requirement.  It is also undisputed that plaintiff did not provide any notice to the claimant in this case, defendant Gilbert, until it filed its initial declaratory judgment action in the United States District Court for the Eastern District of Virginia.  CIC SOF Resp. at 9.

---

8       Defendants do not address the first step of the D.C. choice of law analysis and therefore do not expressly contend that a conflict exists between District and Virginia law.  Nevertheless, they strongly urge the Court to conduct the District's choice-of-law analysis and to conclude that Virginia law applies.  Defs.' Mem. at 7–11.

Assuming without deciding that these circumstances present a conflict between D.C. and Virginia law,[9] the second step is to apply a multi-factor test that draws from the Restatement (Second) of Conflict of Laws and is referred to alternatively as the "governmental interest" or "more substantial interest" test.[10]  *See Adolph Coors Co. v. Truck Ins. Exch.*, 960 A.2d 617, 620–21 (D.C. 2008) ("governmental interest"); *see also Eli Lilly*, 764 F.2d at 882 ("more substantial interest").  This test examines the following factors:

> (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; (5) the residence and place of business of the parties; and (6) the principal location of the insured risk.

*Adolph Coors*, 960 A.2d at 620, citing Restatement (Second) of Conflict of Laws §§ 188, 193 (1971).

Taken together, these factors overwhelmingly indicate that District of Columbia law "controls the interpretation and enforcement" of the insurance contract at issue in this case.  CIC is an Illinois company that issued an insurance policy to the attorney defendants in the District of

---

9       Plaintiff argues that the Virginia notice requirement is "procedural," not substantive, and therefore that it "cannot and should not be enforced" by this Court.  Mem. of P. & A. in Supp. of CIC's Resp. in Opp. to the Nace Defs.' Mot. for Summ. J. at 17 [Dkt. # 23] ("Pl.'s Opp.").  But neither plaintiff nor defendants have conducted the *Erie* analysis that would determine whether a federal court could or should apply this provision of Virginia law.  *See Burke v. Air Serv. Int'l, Inc.*, 685 F.3d 1102, 1107 (D.C. Cir. 2012) ("The Supreme Court has evolved a set of tests to determine whether a law is substantive or procedural for *Erie* purposes."); *see also Erie*, 304 U.S. 64.  Plaintiff also contends that, even if Virginia law applied in this case, this provision of the Virginia Code would not be relevant because plaintiffs do not claim that the attorney defendants "breached" the policy, but rather "fail[ed] to perform a condition precedent" to coverage.  Pl.'s Opp. at 24–25.  The Court need not address either of these arguments because it finds that District of Columbia law applies in this case.

10      The insurance contract itself appears to be silent on the choice of law question, *see* Ex. L to CIC SOF [Dkt. 18-12], and none of the parties alleges otherwise.

Columbia.   Defs.' Mem. at 10–11.   Barry J. Nace is a resident of the District, and Paulson &

Nace is organized under the laws of the District of Columbia, engaged in the practice of law in

the District, with its principal place of business in the District.   *Id.* at 10; CIC SOF ¶ 37.

Therefore, the place of contracting and negotiation, the location of the subject matter of the

contract, and the principal location of the insured risk (the law firm and its lawyers) is the

District of Columbia.   *See* Defs.' Mem. at 10.   Moreover, while the legal action underlying the

coverage dispute was filed in Virginia, the subject matter of the insurance contract, i.e. the

attorney defendants' professional activities, was located in the District.   *Id.*   And despite

defendants' insistence to the contrary, the question here is what law governs the insurance

contract between CIC and the attorney defendants, and not what law governs the legal

malpractice claim underlying this case.[11]   *See* Defs.' Mem. at 10–11.   Thus, after applying the

D.C. choice of law analysis, the Court concludes that the law governing the attorney defendants'

insurance contract with CIC is the law of the District of Columbia.

---

11     The Court further notes that, when before the United States District Court for the Eastern
District of Virginia, the attorney defendants insisted that the Virginia federal court "[did] not
have *in personam* jurisdiction arising out of" the insurance contract because the contract
"[n]egotiations took place in Washington, D.C., the contract, which was delivered in
Washington, D.C., is subject to Washington, D.C. law interpretation, and any performance or
misrepresentation alleged in the Complaint occurred in Washington, D.C."   Ex. V to CIC SOF at
2, 5 [Dkt. # 18-22] (attorney defendants' memorandum in support of their motion to dismiss
CIC's complaint in the Virginia federal court).   The attorney defendants attempt to explain their
apparent reversal of position by arguing that defendant Gilbert is nevertheless "entitled to the
protections of Virginia law."   Defs.' Reply at 12.   But as the attorney defendants themselves
explained to the Virginia federal court, "[t]he only issue before the Court in the present action is
the insurance contract, not the underlying tort claim,"   Ex. V to CIC SOF at 5,   and that contract
is governed by the laws of the District.

14

II.    **The insurance policy does not obligate CIC to defend or indemnify the attorney defendants in the Gilbert legal malpractice case.**

Applying District of Columbia law, the Court concludes that the attorney defendants failed to report Ms. Gilbert's potential legal malpractice claim to CIC on a timely basis, and that CIC is therefore not obligated to defend or indemnify them against those claims.   The Court finds that the attorney defendants reasonably should have known about defendant Gilbert's potential claim prior to the July 24, 2007 inception of the CIC policy, and therefore, they did not satisfy an essential prerequisite to coverage of her claim.   Second, the Court finds that although CIC could – and perhaps should – have reserved its rights with respect to the defense it asserts in this case (the "prior knowledge" defense) much sooner, CIC did not waive this defense, and it is not estopped from asserting it here.

   A.   *The attorney defendants had a reasonable basis to believe that they had breached a professional duty to defendant Gilbert prior to the inception of the CIC liability insurance policy.*

In the District of Columbia, "[a]n insurance policy is a contract between the insured and the insurer, and in construing it [a court] must first look to the language of the contract." *Travelers Indem. Co. of Ill. v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001), quoting *Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C. 1999).   "'Where insurance contract language is not ambiguous . . . a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence.'" *Id.*, quoting *In re Corriea*, 719 A.2d 1234, 1239 (D.C. 1998).   Moreover, "notice provisions in insurance contracts are deemed 'of the essence of the contract' and are given effect 'to promote the efficient and economic liability insurance administration.'" *Columbia Cas. Co. v. Columbia*

15

*Hosp. for Women*, 633 F. Supp. 697, 699 (D.D.C. 1986), quoting *Diamond Serv. Co. v. Utica Mut. Ins. Co.*, 476 A.2d 648, 652 (D.C. 1984).

Looking to the language of the contract here, the 2008–2009 liability insurance policy obligated CIC to cover incidents that took place prior to the inception of the policy as long as it received appropriate notice of potential claims.  Specifically, the policy provided coverage if, "prior to the effective date of the first . . . Policy issued by [CIC] to the Named Insured . . . the Named Insured, . . . [or any] employee . . . had no reasonable basis to believe that the Insured had breached a professional duty or to Reasonably Foresee that a Claim would be made against the Insured."  CIC SOF ¶ 24.  The policy further defined "Reasonably Foresse(n)" to include "incidents or circumstances that involve a particular person or entity which an Insured knew might result in a Claim or suit prior to the effective date of the first policy . . . and which was not disclosed to [CIC]."  *Id.* ¶ 26.

The parties do not dispute the meaning of the language of the contract itself, but rather the date on which the attorney defendants should have notified CIC of defendant Gilbert's potential claim.  CIC argues that the attorney defendants had a "reasonable basis to believe" that they had "breached a professional duty," or to "Reasonably Foresee" that defendant Gilbert would bring a claim, as early as February 26, 2007, when the court dismissed the first medical malpractice complaint for an improper style, and certainly no later than June 18, 2007, when the court dismissed the second medical malpractice complaint from the bench with prejudice.  Pl.'s Mem. at 24.   The attorney defendants counter that there was no reason to believe they had breached a professional duty with respect to defendant Gilbert because the error leading to the dismissal was a mere "misnomer."  Defs.' Paulson & Nace, PLLC, & Barry Nace's Opp. to Pl.'s

16

855

Mot. for Summ. J. at 15–16 [Dkt. # 24] ("Defs.' Opp."). Therefore, they claim, they could not reasonably have foreseen defendant Gilbert's claim prior to the inception of the CIC policy. *Id.* at 15. They further contend – without citing any relevant authority[12] – that CIC is required to provide expert testimony to establish when they reasonably could have foreseen that defendant Gilbert would bring a legal malpractice claim. *Id.* at 13–14.

The Court finds that the attorney defendants had a reasonable basis to believe that they had breached a professional duty to defendant Gilbert no later than the date of the Virginia court's ruling on June 18, 2007, and that expert testimony is not necessary in this case. Whether the attorney defendants had a "reasonable basis to believe" that a breach of professional duty had occurred is an objective inquiry that asks what a reasonable attorney would have done in the same circumstances.[13] *See Capitol Specialty*, 793 F. Supp. 2d at 411 ("[T]he correct standard is the objective, reasonable attorney one, not whether the lawyer in fact had a subjective belief that a malpractice action was probable."); *see also Colliers Lanard & Axilbund v. Lloyds of London*,

---

12    Rather, defendants cite two cases that hold that expert testimony is required to establish whether legal malpractice has occurred, *O'Neil v. Bergan*, 452 A.2d 337 (D.C. 1982); *Seaward Int'l, Inc. v. Price Waterhouse*, 391 S.E.2d 283 (1990), and one case applying Pennsylvania law, *Foster v. Westchester Fire Ins. Co.*, No. 09-1459, 2012 WL 2402895, *1 (W.D. Pa. June 26, 2012).

13    The Court notes that, under the definition provided in the CIC insurance contract, whether the attorney defendants "reasonably foresaw" defendant Gilbert's claim appears to be a subjective inquiry, as it looks to "incidents or circumstances . . . which an Insured *knew* might result in a Claim or suit." CIC SOF ¶ 24 (emphasis added); *see Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 237 (3d Cir. 2006) (identifying the subjective and objective elements of a liability insurance contract). But because the policy is worded in the alternative, requiring that an insured have "no reasonable basis to believe that [it] had breached a professional duty *or* to Reasonably Foresee" a future claim, CIC SOF ¶ 24 (emphasis added), what the attorney defendants subjectively knew at the inception of the CIC insurance contract does not control when, objectively, they should have recognized the professional error.

458 F.3d 231, 237 (3d Cir. 2006) ("[W]e conclude that this part of the exclusion gives rise to an objective test:  whether a reasonable professional in the insured's position might expect a claim or suit to result.").  "[T]he question whether the insured has acted reasonably becomes a question of law only when reasonable persons can draw but one inference." *Travelers Indem. Co.*, 770 A.2d at 991.  Moreover, under D.C. law, an expert witness is required to establish the standard of care or the contractual duty "when 'the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson,'" *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 225 (D.C. Cir. 2011), quoting *Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007) (citation and internal quotation marks omitted), but that is not the case here.  *See also Daskalea v. District of Columbia*, 227 F.3d 433, 445 (D.C. Cir. 2000) (same).

Here, the attorney defendants filed a medical malpractice complaint on behalf of defendant Gilbert in 2006 that did not comport with the Virginia Code requirement that a minor must sue by a "next friend."  *See* Ex. B to CIC SOF at 1; *see also* Va. Code § 8.01-8.  The statute of limitations on defendant Gilbert's claim expired before the attorney defendants were able to correct their mistake, and thus their error became fatal to defendant Gilbert's claims.  *See* Ex. G to CIC SOF at 31–32, 44 (transcript of hearing in which Virginia judge dismissed Gilbert's claims with prejudice).  The attorney defendants' efforts to minimize the seriousness of their naming mistake are unavailing:  not only did this last-minute "misnomer" cost defendant Gilbert the right to bring her medical malpractice claim in court, but also it led a Virginia jury to find the attorney defendants liable for legal malpractice.  *See* Ex. A to Gilbert Resp. at 2.  The Court finds that under these circumstances, "reasonable persons can draw but one inference":  that the

attorney defendants had a "reasonable basis to believe" that they had "breached a professional duty" to defendant Gilbert no later than June 18, 2007, when the Virginia judge dismissed her medical malpractice claims with prejudice.  *See Capitol Specialty*, 793 F. Supp. 2d at 411 ("[T]he dismissal of a lawsuit because of attorney error would clearly put a lawyer on notice of the possibility of a malpractice claim.").

The Court further finds that this question is not "so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson." *Capitol Sprinkler*, 630 F.3d at 225; *see also Capitol Specialty*, 793 F. Supp. 2d at 411 (holding without expert testimony that attorneys who missed a filing deadline that caused a court to dismiss their clients' class action claims reasonably should have known that the clients had a potential malpractice claim against them); *Ross v. Cont'l Cas. Co.*, 420 B.R. 43, 50 (D.D.C. 2009) (holding without expert testimony that attorney's failure to timely file an answer, leading to a default judgment against the client, "might reasonably be expected to be the basis of a claim" under liability policy); *Minn. Lawyers Mut. Ins. Co. v. Hahn*, 355 F. Supp. 2d 104, 110–11 (D.D.C. 2004) (applying Virginia law and holding without expert testimony that attorneys reasonably should have known that a "[l]etter stating that an attorney ha[d] been 'authorized to institute legal proceedings for claims'" constituted notice of a claim for purposes of a professional liability insurance policy).   Therefore, the attorney defendants reasonably should have known of defendant Gilbert's potential claim prior to the inception of the CIC policy.

B. *CIC did not waive its "prior knowledge" defense and is not estopped from asserting it here.*

Defendants contend that even if their notice to CIC of defendant Gilbert's potential claim was untimely, CIC has waived its "prior knowledge" defense or is estopped from asserting it because CIC investigated the potential claim for more than two years before reserving its rights. Defs.' Mem. at 19–20; Defs.' Opp. at 26–28.

Under District of Columbia law, "[w]aiver is an act or course of conduct by the insurer which reasonably leads the insured to believe that the breach will not be enforced." *Diamond*, 476 A.2d at 654. In other words, and in this context, "'an insurer undertaking the defense of an insured against a litigious assertion of an unprotected liability, without a disclaimer of contractual responsibility and a suitable reservation of rights, is foreclosed from thereafter taking refuge in the policy provisions exempting the liability from coverage.'" *Cincinnati Ins. Co. v. All Plumbing, Inc. Serv., Parts Installation*, CV 12-851 (CKK), 2013 WL 5665195, at *4 (D.D.C. Oct. 18, 2013), quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v. Aetna Cas. & Sur. Co.*, 384 F.2d 316, 318 (D.C. Cir. 1967); *see also Cont'l Cas. Co. v. Hartford Fire Ins. Co.*, 116 F.3d 932, 939 n.8 (D.C. Cir. 1997) (same). "Estoppel, on the other hand, generally results when an insurance company assumes the defense of an action or claim, with knowledge of a defense of non-liability under the policy . . . ." *Diamond*, 476 A.2d at 654. "[A]n insurer may be estopped from denying coverage," however, "only if its participation somehow prejudiced the insured by undermining his ability to defend himself." *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 629 (D.C. Cir. 2010).

20

Although it may be true that CIC should have uncovered the timing issue in this case earlier than it did, the Court finds that CIC's "prior knowledge" defense is not barred by the doctrines of waiver or estoppel.  It is undisputed that CIC *could* have discovered the facts underlying its "prior knowledge" defense in March of 2010, NACE SOF ¶¶ 19–20, but it did not do so until November 2011, CIC SOF ¶ 22, and did not reserve its rights with respect to that defense until January 13, 2012.[14]  Ex. Q to CIC SOF at CIC 000022, CIC 000029.  But D.C. law required CIC to reserve its rights before "undertaking the defense" of the attorney defendants "against a litigious assertion of an unprotected liability."  *See Cincinnati Ins. Co.*, 2013 WL 5665195, at *4.  Given that defendant Gilbert did not file her legal malpractice claim until March 13, 2012, exactly three months *after* CIC reserved its "prior knowledge" defense, the timing of CIC's reservation of rights notice met this requirement of D.C. law.  *See Cincinnati Ins. Co.*, 2013 WL 5665195, at *4.

Moreover, the twenty-two months that elapsed between the earliest date on which CIC could have become aware of its prior knowledge defense (March 8, 2010) and the date on which it issued its reservation of rights (January 13, 2012) did not prejudice defendants because CIC had taken no actions that "hampered or harmed" the defendants' "ability to defend [themselves]."  *See Diamond*, 476 A.2d at 658.  In *Diamond*, the court held that an insurance company had not foregone its coverage defenses when there was a "seven-month delay between

---

14     CIC asserts that, in July 2009, shortly after Nace notified it of defendant Gilbert's potential claim, it issued a general reservation of rights letter to the attorney defendants. CIC SOF ¶ 20.  Defendant Nace contends that he never received that letter.  CIC SOF Resp. at 15. This factual dispute is immaterial, however, because the Court finds that the timing of the January 2012 reservation of rights notice does not bar CIC from asserting its "prior knowledge" defense.

the time [the insurer] knew there was a good possibility it would withdraw" and the time it did withdraw, because the insurer had merely "advise[d] [the insured] on answering interrogatories and . . . file[d] an answer to the amended complaint." 476 A.2d at 656–57.  Likewise, in *Capitol Specialty*, there was no prejudice when the insurer withdrew coverage nine months after receiving notice of the claim, having only "advised defendants that coverage [was] available for [their] claim" and "undert[aken] their defense in the Malpractice Action."  793 F. Supp. 2d at 412–13 & n.8.  By contrast, in *Cincinnati Ins. Co.*, the court did find prejudice when the insurer "controlled the defense of the . . . action for approximately five months before disclaiming coverage and . . . undertook several important defensive actions," including removing the case to federal court, opposing a motion for class certification, and agreeing to stay the case pending resolution of a motion to remand.  2013 WL 5665195, at *5.

Again, and unlike the insurers in all of these cases, CIC reserved its rights with respect to its "prior notice" defense before defendant Gilbert even filed her complaint.[15]  Moreover, the only actions CIC undertook prior to reserving its rights were to investigate defendant Gilbert's potential claim and to retain counsel to represent the attorney defendants.  It is true that CIC continued to defend the attorney defendants through the conclusion of the Gilbert legal malpractice lawsuit, but the attorney defendants were undisputedly on notice of CIC's defense at

---

15    Defendant Gilbert asserts that it is "self-evident" that she has suffered prejudice in this case.  But in the District of Columbia, "[a]n insurer's obligation to provide notification of its reservation of rights under an insurance policy is to the insured, not to the party seeking a judgment from the insured."  *Cincinnati Ins. Co.*, 2013 WL 5665194, at *4.  Further, defendant Gilbert has not offered any arguments or authority that would clarify her rights in this case under District of Columbia law.  Therefore, the Court will not consider the issue of prejudice with respect to her.

22

that time.  None of CIC's actions impeded the attorney defendants from obtaining their own counsel, or prevented defendants from negotiating settlement and avoiding a trial.

In their reply, defendants also contend that had CIC reserved its rights sooner, the attorney defendants would have "notif[ied] and pursu[ed] other potential insurers," including their immediately prior insurer, Philadelphia Insurance Company.  Defs.' Reply at 23–24.  But that policy expired in July 2007, and it is not clear that such a claim could have been successful, since the very earliest date CIC could have discovered its defense and notified the defendants was March 2010.  *See* Ex. DD to Pl.'s Sur-Reply at PIIC 012, PIIC 027 [Dkt. # 32-1] (copy of the attorney defendants' Philadelphia Insurance Company policy stating that the insured could only purchase "Extended Reporting Period" coverage within sixty days after the termination of the policy period).

The Court cannot conclude, therefore, that CIC's actions prejudiced the attorney defendants or "undermin[ed] [their] ability to defend [themselves]."  *See Athridge*, 604 F.3d at 629.  Nor were CIC's actions "a course of conduct . . . which reasonably [led] the insured to believe that the breach [would] not be enforced."  *Diamond*, 476 A.2d at 654.  Therefore, CIC's "prior knowledge" defense is not barred by the doctrines of waiver or estoppel, and the Court will grant its motion for summary judgment.

## CONCLUSION

The Court finds that District of Columbia law applies in this case, that the attorney defendants failed to timely report defendant Gilbert's legal malpractice claim to their insurer, plaintiff CIC, and that CIC is not barred from asserting this defense to coverage by the doctrines of waiver or estoppel. Therefore, plaintiff's motion for summary judgment will be granted, and defendants' motion for summary judgment will be denied.


AMY BERMAN JACKSON
United States District Judge

DATE:  April 10, 2014

24

863

CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 5th day of November, 2014, I caused this Joint

Appendix to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

>Paulette S. Sarp
>HINSHAW & CULBERTSON, LLP
>333 South 7th Street, Suite 2000
>Minneapolis, MN 55402
>(612) 333-3434
>
>*Counsel for Appellee Chicago Insurance Company*
>
>Gabriel Amin Assaad
>1425 K Street, NW, Suite 350
>Washington, DC 20005
>(202) 741-9348
>
>*Appellee Gabriel Amin Assaad*
>
>Carla D. Brown
>CHARLSON BREDEHOFT & COHEN
>11260 Roger Bacon Drive, Suite 201
>Reston, VA 20190
>(703) 318-6800
>
>*Counsel for Appellee Sarah Gilbert*
>
>David D. Hudgins
>HUDGINS LAW FIRM, P.C.
>515 King Street, Suite 400
>Alexandria, VA 22314
>dhudgins@hudginslawfirm.com
>
>*Counsel for Appellee*

Herman Aubrey Ford, III
CANTOR STONEBURNER FORD GRANA & BUCKNER
7130 Glen Forest Drive, Suite 201
Richmond, VA 23226
afford@virginiatrialfirm.com

*Co-Counsel for Appellee Sarah Gilbert*

I further certify that on this 5th day of November, 2014, I caused the

required copies of the Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Stephen A. Horvath, Esquire
*Counsel for Appellants*